1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLORADO

 3
     Civil Action No. 19-CV-01224-RBJ
 4

 5    AMANDA WILSON,

 6            Plaintiff,

 7            vs.

 8    JONATHAN PAULING, et al.,

 9            Defendants.

10   ------------------------------------------------------------
                      REPORTER'S TRANSCRIPT
11                   Scheduling Conference
     ------------------------------------------------------------
12
             Proceedings before the HONORABLE R. BROOKE JACKSON,
13   Judge, United States District Court for the District of
     Colorado, commencing on the 19th day of February, 2020, in
14   Courtroom A902, United States Courthouse, Denver, Colorado.

15                          APPEARANCES

16   For the Plaintiff:
     ROSS W. PULKRABEK and AARON D. GOLDHAMER, Keating Wagner
17   Polidori & Free, PC, 1290 Broadway, Ste. 600, Denver, CO 80203

18   For the Defendants:
     CHRISTOPHER W. CARR, Dill Dill Carr Stonbraker & Hutchings,
19   PC, 455 Sherman St., Ste. 300, Denver, CO 80203

20   R. LIVINGSTON KEITHLEY, Antero Law LLC, 1700 Broadway, Ste.
     640, Denver, CO 80290
21
     PETER C. FORBES, Carver Schwarz McNab Kamper & Forbes, LLC,
22   1888 Sherman St., Ste. 400, Denver, CO 80203

23   TRACY A. OLDEMEYER, Cline Williams Wright Johnson & Oldfather,
     215 Mathews St., Ste. 300, Fort Collins, CO  80524
24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                 Denver, CO 80294, 303-335-2108
          Proceedings reported by mechanical stenography;
                transcription produced via computer.

1               *          *          *          *          *

2        (The proceedings commenced at 9:03 a.m.)

3              THE COURT:  Good morning.  19CV1224, Amanda Wilson

4   versus Jonathan Pauling, et al.  We are set for a scheduling

5   conference.  We're in the courtroom.  Typically I do these in

6   chambers, but there are enough of you here that it made more

7   sense to do it in the courtroom today.  Who's appearing for

8   the plaintiff?

9              MR. PULKRABEK:  Good morning, Your Honor.  Ross

10  Pulkrabek.  I'm here with my colleague Aaron Goldhamer on

11  behalf of the plaintiff Amanda Wilson.

12             MR. GOLDHAMER:  Good morning, Your Honor.

13             THE COURT:  Gentlemen.  Now, we have several

14  defendants, so we'll start with defendant Jonathan Pauling.

15  Who represents him?

16             MR. CARR:  Good morning, Your Honor.  Christopher

17  Carr on behalf of Jonathan Pauling.

18             THE COURT:  Mr. Carr, right?

19             MR. CARR:  Yes, sir.

20             THE COURT:  And then we've got Mark Pauling?

21             MR. KEITHLEY:  Your Honor, good morning.  My name is

22  Livingston Keithley appearing on behalf of Mark Pauling and

23  Two Mile Ranch General Partnership.

24             THE COURT:  And we have Elyce York?

25             MR. FORBES:  Good morning, Your Honor.  Peter Forbes

1   on behalf of Ms. York and also on behalf of Lardyn Consulting

2   LLC.

3          THE COURT:  And that leaves the bank.

4          MS. OLDEMEYER:  Good morning, Your Honor.  Tracy

5   Oldemeyer on behalf of Farmers State Bank.

6          THE COURT:  According to the complaint Ms. Wilson

7   filed a lawsuit in state court against Jonathan Pauling

8   alleging that he had sexually harassed and assaulted her.  It

9   went to trial in front of Judge Buchanan.  The plaintiff

10  prevailed, obtained a large judgment which has been made even

11  larger post-trial.  However, plaintiff claims that she has not

12  been able to collect any of the judgment.  Accordingly, she

13  hired counsel to, in effect, attempt to collect the judgment.

14         Counsel has filed this complaint here contending that

15  Mr. Pauling has made fraudulent transfers of assets to avoid

16  collection by Ms. Wilson, and those transfers went to his

17  brother Mark Pauling.  They involved the ranch.  They claim

18  that Ms. York is another female acquaintance of Mr. Pauling,

19  Jonathan, and they've, in effect, used her and this company of

20  hers, Lardyn Consulting, to act as a placeholder essentially

21  for the transfer of the property, again, to the consulting

22  company.  They claim that she has no background or experience

23  in ranching or farming, and she's just a convenience, let's

24  say.  And finally we have the bank.  They say the bank is in

25  cahoots with all of this due to the long and profitable

19-CV-01224-RBJ      Scheduling Conference      02/19/2020    4

1    relationship between the bank and the Pauling brothers.

2            The defendants tell a different story.  Mr. Pauling,

3    Jonathan, says he fell on hard times necessitating a transfer

4    of his piece of the ranch, or at least a large part of his

5    piece of the ranch, to his brother.  The ranch itself has

6    fallen on hard times.  No transfers were made to defeat

7    collection, but instead were driven by economic concerns.

8    Correct?

9            MR. PULKRABEK:  That's an accurate summary, Your

10   Honor.

11           MR. FORBES:  I agree, Your Honor.

12           THE COURT:  There are several motions under 12(b)(6)

13   pending.  The bank filed one.  The York defendants filed one.

14   Mark and the ranch filed one or two joining the others.

15   They're in our queue.  I haven't looked at them yet, but just

16   in the nature of things, 12(b)(6) motions more often than not

17   are denied.  Doesn't mean these will be, but they often are,

18   and so we're going ahead with the scheduling conference as if

19   hypothetically those motions end up, when we get to them,

20   being denied.

21           I'd like to start at the end and then work backwards

22   in these conferences, and the end is trial.  The way we set

23   trials here is that we look at your dispositive motion

24   deadline, we look at how many days you want for trial, and

25   then we try to give you the best and earliest trial date that

19-CV-01224-RBJ      Scheduling Conference      02/19/2020   5

1   we have that fits your parameters.  Your dispositive motions

2   deadline is November 11th, 2020, and with a seven-day trial,

3   which you've requested, we can give you a trial date in April

4   of 2021, either the 5th, the 12th, or the 19th, for seven

5   days.

6            So let's start by telling me which of those dates you

7   prefer?  Plaintiff?

8            MR. PULKRABEK:  Your Honor, I don't have anything set

9   for any of those dates, so any one of them would be fine by

10  us.

11           THE COURT:  Okay.  Defendants?

12           MR. CARR:  I prefer the 12th or 19th, if possible.

13           MR. KEITHLEY:  The 12th or 19th as well, Your Honor.

14           MS. OLDEMEYER:  Those dates work for the bank.

15           MR. FORBES:  As for the York defendants.

16           THE COURT:  Well then, Julie, is either the 12th or

17  19th better for us?

18           THE COURTROOM DEPUTY:  The 12th, Your Honor.

19           THE COURT:  Let's do the 12th, April 12th, 2021.

20  Trial preparation conference, we can give you March 18th,

21  March 23rd, or April 2nd, 2021.  It sounds like it's a long

22  time from now, but it's really just a little over a year.

23           MR. PULKRABEK:  Your Honor, probably the April date

24  would work best for us.

25           THE COURT:  Pardon me?

                    Sarah K. Mitchell, RPR, CRR

1          MR. PULKRABEK:  The April date I think would work

2     best.

3          THE COURT:  April 2nd.

4          MR. CARR:  I'd prefer either of the March dates over

5     the April date, if possible.  I'm planning to be out of town

6     in that period of April which is why I didn't take that trial

7     date either.

8          THE COURT:  Can you accept one of the March dates?

9          MR. PULKRABEK:  I can.  Sure.

10          THE COURT:  March 18th or March 23rd?  Any preference

11     there?  Both in the afternoon.

12          MR. KEITHLEY:  Either of those works for me, Your

13     Honor.  Thank you.

14          THE COURT:  Okay.  Plaintiff, I'll give you your

15     choice since they vetoed your choice.

16          MR. PULKRABEK:  Let's go with the 23rd then.

17          THE COURT:  March 23rd.  And therefore I'll need your

18     proposed jury instructions a week ahead by the 16th of March.

19          MR. FORBES:  Your Honor, I believe it's a trial to

20     the Court.

21          THE COURT:  Oh, it's a trial to the Court?

22          MR. PULKRABEK:  Yes, it is, Your Honor.

23          THE COURT:  What a shame.  Okay.  March 23rd, 1:30.

24     No jury instructions.  You're right.  I see that now.  But we

25     will resolve at that conference any issues -- pretrial issues

19-CV-01224-RBJ      Scheduling Conference      02/19/2020      7

 1   concerning exhibits, witnesses, in limine issues.  Anything

 2   that needs to be resolved before trial we'll deal with that

 3   day.  I don't care about a final pretrial order as such.  I

 4   never require those, but the conference will take the place of

 5   that.

 6          All right.  Now, let me go back over the complaint.

 7   I think I noted a couple of questions.  Well, on page 10

 8   there's a little discussion of settlement.  I guess

 9   instinctively I have to question whether you're going to

10   settle this case if you haven't by now, but plaintiff says she

11   is amenable to scheduling a mediation or otherwise engaging in

12   settlement discussions.  Defendants say they have asked

13   plaintiff to provide a number based upon the value of the

14   property transferred, but the defendants, at least all but

15   Jonathan, indicate that they're amenable to scheduling a

16   mediation or discussing settlement, but believe that some

17   discovery is needed first.

18          Are you folks actually going to mediate and maybe

19   settle this?  That certainly would be what the plaintiff would

20   like.

21          MR. PULKRABEK:  Well, the offer still stands.  I

22   mean, we're certainly open and interested in discussing

23   settlement if we can.

24          MR. FORBES:  Your Honor, I think on this side of the

25   table, as laid out here, there's a fundamental question, which

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Scheduling Conference      02/19/2020      8

1    is what -- were there assets transferred?  Was there any

2    equity in the properties that were transferred?  And if so,

3    how much was that equity, because fraudulent transfers

4    liability is only if there was equity transferred and then

5    based on the actual equity that was transferred.  So that is

6    -- and the bank did have appraisals that have been produced.

7    They did have loans against the property.  The balances of

8    those loans have also been produced.

9         So at this point, I think the question ultimately is

10   going to be -- and I think probably we need to get new

11   appraisals for the litigation here.  But the question

12   ultimately is going to be what's the value, and we think we

13   need to do discovery on that issue before -- before a mediator

14   can assist the parties hopefully in evaluating the true

15   exposure, if any, that the defendants may have.

16         THE COURT:  Well, are you saying that the only assets

17   that are even potentially available are the ranch properties?

18         MR. FORBES:  Well, I can tell you in the case of my

19   defendant that's certainly the case.  Obviously the bank has

20   money.

21         THE COURT:  Well, what you're telling me is that's

22   what you think is the case.

23         MR. FORBES:  Well, I know that's the case.

24         THE COURT:  How do you know that?

25         MR. FORBES:  Well, talking to my client.

Sarah K. Mitchell, RPR, CRR

1          THE COURT:  That's what I thought.

2          MR. FORBES:  Yeah.  I haven't done --

3          THE COURT:  The whole purpose of the case is to claim

4    that this group of defendants is playing fast and loose with

5    the facts, and if there were any truth to that, it could be

6    that counsel were not aware of all the facts.

7          MR. FORBES:  Your Honor, I guess -- I guess my view

8    is let's even assume that there was somebody that was engaged

9    in an improper transaction, which we deny, but let's say they

10   did this with malicious intent.  It wouldn't make any

11   difference if what they transferred were not assets with

12   equity.  We're governed by Colorado law.  There's a Colorado

13   case that we cited in our motion to dismiss, which

14   unfortunately I don't have with me -- it's Sportsmen's

15   something, and I apologize for not having the exact cite --

16   involved this exact type of situation where there were assets

17   that had no value because they were fully encumbered.  They

18   were admittedly transferred to defeat the lien of a judgment

19   creditor, and the Colorado Court of Appeals ruled that, well,

20   there's no liability because there's no fraudulent transfer

21   because there is nothing of value that was transferred.

22          And that I'm saying is the -- that is the fundamental

23   issue in this case, is our view and our position, and we think

24   the evidence shows that all these assets transferred were

25   fully encumbered.  They weren't worth as much as the bank loan

19-CV-01224-RBJ     Scheduling Conference     02/19/2020     10

1   against them, so basically it doesn't make any difference

2   because nothing was taken away from the judgment creditor that

3   could be used to realize her judgment, satisfy her judgment.

4   So I guess --

5        THE COURT:  Well, it could potentially make a

6   difference because by what you're telling me you're leaving

7   poor Ms. Oldemeyer picking up the drinks.

8        MR. FORBES:  Well, we're not -- that's not the case,

9   Your Honor.  First, she can only get a charging order against

10  a partnership anyway, right, which means only if there's

11  distributions from the partnership could she collect those.

12  She's claiming that these assets had value and these assets

13  were transferred away.  She's got to show the assets had

14  value.  We don't think the assets had value.  We think there

15  wasn't any monkey business involved anyway, but even assuming

16  there was, my point is it doesn't make any difference unless

17  the assets had value.

18        THE COURT:  Well, there apparently was some monkey

19  business involved in the facts that were tried in the Denver

20  District Court.

21        MR. FORBES:  Right.  My client wasn't involved in

22  that at all.

23        THE COURT:  No.  No.  Okay.  Well, you could be

24  100 percent right.  There's no money there.  I don't know.

25        MR. FORBES:  Right.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Scheduling Conference     02/19/2020     11

1          THE COURT:  Have you ever done any plaintiff's work?

2          MR. FORBES:  Have I?  Yes, Your Honor, I have.

3          THE COURT:  You know, I did some too long ago, but I

4   wonder if I had kept track how many times as a plaintiff I was

5   told by the defendant, There's no reason to pursue this,

6   there's no money there.  Every plaintiff lawyer hears that,

7   and so they're skeptical.  Well, if you can get it settled,

8   everybody comes out ahead, I think, but we'll see.

9          Parties agree to the presumptive number of

10  depositions.  You might need that many in this case actually.

11  Ten to a side.  Ten for the plaintiff's side, ten for the

12  defendants' side.  Seven hours per deposition, probably not,

13  but maybe one or two of those.  Okay.  I have no problem with

14  it.

15         On page 11 plaintiff requests direction from the

16  Court whether it is postponing disposition of those motions

17  such that defendants are required to answer and plead

18  affirmative defenses.  I'm not postponing anything.  It's just

19  that we have so many motions we have to work them into an

20  order.  But we have, because I checked your case in our queue,

21  and we'll get to it as soon as we can.  I'm not suggesting

22  that there -- there don't have to be answers.  I'm not

23  suggesting that there can't be discovery.  I'm not suggesting

24  there's any stay in effect.  I'm just telling you we haven't

25  gotten to the motions quite yet.  We will for sure get to them

1   within the next month and a half.  We're not going to carry

2   them over into the next six-month period, I'm quite sure of

3   that.

4           MR. PULKRABEK:  Your Honor, I think that maybe we

5   inartfully worded it here, but I think there's a provision in

6   the civil rules where if a motion to dismiss is filed, it

7   stays the obligation to file an answer unless you order

8   otherwise.

9           THE COURT:  That's true, if the motion to dismiss is

10  to dismiss all the claims.  Is that what these are?

11          MR. PULKRABEK:  Yes, I believe so.

12          THE COURT:  Then I don't think they have to file an

13  answer then.  We get a lot of motions to dismiss a claim or

14  two out of five or six.  That's why I haven't looked at yours

15  yet.

16          Discovery, once you get into discovery, if you have

17  disputes, I would ask that you not file motions.  I have

18  plenty of motions.  Just confer, and if you can't work it out,

19  just call chambers, and we'll set you up for a hearing on the

20  phone, which I'll conduct myself.

21          Page 14, there's a dispute maybe already concerning

22  discovery of QuickBooks information.  I'm surprised to see

23  this, but the plaintiff is wanting the electronic file, and

24  defendant is saying we'll only give you the hard copy.  That's

25  weird.  Why?

19-CV-01224-RBJ     Scheduling Conference     02/19/2020    13

 1              MR. FORBES:  Well, Your Honor, in the first instance,

 2     I don't even see the relevance of any of these QuickBooks

 3     files.  The question is what -- the question in the case

 4     relates to the transfer of assets.  Under CUFTA the assets are

 5     valued as of the date of transfer, so I don't even see the

 6     relevance of any of these document -- requests for our files,

 7     our accounting files afterwards.

 8              THE COURT:  But you -- it says here that you're

 9     willing to produce them, just the hard copies.

10              MR. FORBES:  We have produced the hard copies, and --

11              THE COURT:  Then why wouldn't you produce the

12     electronic copy?

13              MR. FORBES:  Your Honor, I have seen no showing of

14     why they need the electronic copies.

15              THE COURT:  Then why did you produce the hard copy?

16              MR. FORBES:  I was trying to avoid discovery

17     disputes.

18              THE COURT:  All right.  The Court orders that you

19     produce the electronic file.

20              MR. FORBES:  Your Honor --

21              THE COURT:  That's a dispute that I shouldn't have to

22     resolve.

23              MR. FORBES:  Through what date, Your Honor?  Through

24     end of 2019?  We have produced -- we have produced hard copies

25     through the end of 2019.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Scheduling Conference     02/19/2020    14

1       MR. PULKRABEK:  I'd like current and ongoing, and the

2   reason for it is what this case is going to show is this

3   business is a cash cow.  It spits off distributions, and it is

4   continuing to spit off distributions.

5       THE COURT:  Current and ongoing.

6       MR. FORBES:  I'm sorry?

7       THE COURT:  Current and ongoing.

8       MR. FORBES:  Okay.

9       THE COURT:  Bottom of page 14, defendant jointly

10   propose -- defendants propose bifurcating discovery and trial.

11   What does that mean?

12       MR. KEITHLEY:  Your Honor, with regard to the

13   bifurcation issue, further on what we suggest is bifurcating

14   the damages portion of this case from the liability portion of

15   this case, as we've already --

16       THE COURT:  The damages are fixed, aren't they?

17   Pretty much whatever the judgment is in the state court?

18       MR. KEITHLEY:  No, Your Honor.  That's absolutely

19   incorrect.  The damages under -- the theory that they brought

20   under CUFTA has to do with the value of assets that were

21   transferred, if any.  As Mr. Forbes has previously

22   articulated, the issues in this case have to do with the

23   transfer of the property previously owned by Two Mile Ranch,

24   which from our theory was underwater, we owed more to the bank

25   than the property and the business was worth, and negotiated

19-CV-01224-RBJ      Scheduling Conference      02/19/2020      15

1   and executed a transfer of that property to Lardyn Consulting,

2   which is owned by Elyce York.

3         THE COURT:  Why in the world did you transfer the

4   property to Lardyn Consulting owned by someone who is not an

5   experienced rancher or farmer --

6         MR. KEITHLEY:  Your Honor, she stepped up --

7         THE COURT:  -- which just happens to be the

8   girlfriend of the Pauling defendant?

9         MR. KEITHLEY:  She's alleged to be the girlfriend of

10   Mr. Pauling.  Your Honor, in terms of the actual relationship

11   between the two of them, that may or may not even be relevant.

12   With regard to her operations of the property, she has a

13   business interest.  She has any sort of right to start the

14   business and to operate the business as she sees fit to see if

15   she can turn a profit.  What the evidence will show in this

16   case is that Mark Pauling and Jonathan Pauling were not able

17   to operate this business at a profit.  There were not

18   distributions from the operations.  I know plaintiffs take

19   speculation with that and believe, as Mr. Pulkrabek --

20         THE COURT:  Take speculation?

21         MR. KEITHLEY:  He believes it's a cash cow.

22         THE COURT:  I find that utterly incredible.

23         MR. KEITHLEY:  I'm sorry?

24         THE COURT:  I said it's not speculation.  I find that

25   story utterly incredible.

                        Sarah K. Mitchell, RPR, CRR

1    MR. KEITHLEY:  Understood, Your Honor, which is

2  exactly why we suggest that there be a trial first as to

3  damages to determine whether or not there actually was any

4  value in the property and in the operation of this business.

5    THE COURT:  Okay.

6    MR. KEITHLEY:  If they can't prove that, then there's

7  no reason to go to a liability phase.

8    THE COURT:  I think you're right about the measure of

9  damages.  I was wrong about that.  But I'm not going to

10  bifurcate anything.  One trial.

11    MR. FORBES:  And, Your Honor, for clarification,

12  there's an allegation that Ms. York was Mr. Jon Pauling's

13  girlfriend.  That allegation is denied, just for the record.

14    THE COURT:  Okay.  I have no idea.  All I know is

15  what I read in -- all I know is what I read in the papers.

16    MR. FORBES:  Understood, Your Honor.

17    THE COURT:  So to speak.  What else, gentlemen and

18  lady?

19    MR. PULKRABEK:  Your Honor, I think we've covered

20  everything.

21    MR. KEITHLEY:  Your Honor, one item also referenced

22  in the proposed case management order with regard to

23  depositions.  The plaintiffs have intimated that they want to

24  take separate depositions of Jonathan Pauling, Mark Pauling,

25  and then also a separate 30(b)(6) deposition of Two Mile Ranch

1   General Partnership.  Jonathan Pauling and Mark Pauling are

2   the only two partners of Two Mile Ranch General Partnership.

3   We believe that that's some method to try to get around the

4   seven-hour maximum requirement for depositions of Jonathan

5   Pauling and Mark Pauling to ask additional questions that they

6   may not be able to squeeze into those individual depositions.

7   They will already have those individuals there and those two

8   individuals will be able to testify to any and all issues.

9        I think there's also this same issue with regard to a

10   proposed 30(b)(6) deposition of Lardyn Consulting and whether

11   or not by taking the deposition of Mark Pauling and Elyce York

12   they'll learn everything they need to know that they would

13   have otherwise asked in a 30(b)(6) deposition.  We want to

14   bring that to the Court -- hopefully we can resolve that

15   without that, but I wanted to raise that for the Court's

16   consideration since it's already in the draft in front of you.

17        THE COURT:  Look, in a situation where the only

18   person that can be a 30(b)(6) witness is already being deposed

19   my preference always would be to have one deposition cover the

20   waterfront.  On the other hand, seven hours per deposition is

21   subject to reconsideration if there's a legitimate need for

22   more time, so I wouldn't get too hung up on seven hours.

23   That's a target.  If somebody needs more than seven hours, and

24   they haven't wasted time, and they legitimately need more, and

25   the other side won't agree, then I'm here.  Bring it to me,

19-CV-01224-RBJ     Scheduling Conference     02/19/2020   18

1    and I'll decide it.  But I would expect the plaintiff to try

2    to take the Lardyn deposition and York deposition in the same

3    deposition if possible, and same with the Paulings and the

4    ranch.  I agree with you.  What else?

5              MR. PULKRABEK:  Your Honor, nothing from the

6    plaintiff.

7              THE COURT:  How about the bank?  The bank is trying

8    to keep a low profile.

9              MS. OLDEMEYER:  You are correct in that, Your Honor.

10   I don't have anything to add other than from the bank's

11   perspective Two Mile Ranch was a general partnership that

12   started in the 1980s.  The bank's relationship with Two Mile

13   Ranch didn't start until about 2013.  And the bank's lending

14   relationship to that general partnership tied up all

15   partnership assets, and then there were also personal

16   guarantees executed by the two partners.

17             The only other additional fact I wanted to add is the

18   -- in 2016 plaintiff's counsel did the discovery --

19   post-judgment discovery of I think Jonathan Pauling for sure.

20   It could have included Mark Pauling.  So what assets are there

21   available to satisfy this judgment, what can we attach to,

22   these questions have been going for an awfully long time.  And

23   so, again, from the bank's perspective we believe our motion

24   to dismiss should be carefully considered, and it touches on

25   the issues of was there any asset as defined under CUFTA in

1   the timeframe that plaintiffs complain about.

2         THE COURT:  What evidence do you have, plaintiff, at

3   this point, if any, that the bank was colluding with these

4   guys?

5         MR. PULKRABEK:  Well, the -- I think that the

6   relationship is a deep one, and it does go back -- I will need

7   to look at this again in light of Ms. Oldemeyer's

8   representation, but I thought the relationship went back

9   further than that.

10        THE COURT:  That's the impression I got too.

11        MR. PULKRABEK:  Yeah.  This bank has loaned millions,

12  -- and I think in excess of tens of millions of dollars over

13  the years to the Pauling brothers on this ranch operation.

14  The -- at the point in time when the assets are transferred

15  from Two Mile Ranch to Lardyn, that cannot be done without the

16  bank's cooperation and approval of the transfer.  And what we

17  see at this stage is the -- the bank first looks at Elyce

18  York, and they don't have a deep preexisting relationship with

19  Ms. York.  It looks like they have a short preexisting

20  relationship with Ms. York, and they require Mark Pauling to

21  be a cosigner on the bank documents, which I think from our

22  standpoint you can infer that they know that Ms. York is not

23  the real brains and money and labor behind this operation.

24  It's really Mark Pauling.

25        And so the bank then goes forward with this

1    transaction.  One of the things that we see in the documents

2    that we've obtained thus far is participation by some

3    individuals at this bank in the financing of this.  So it's

4    not just the bank.  There is a participation group of

5    individuals at the bank who are knowledgeable of the Paulings

6    and are participating, and particularly it's the members of

7    the Stull family who are involved in this.  And so they know,

8    we think, what's going on, in fact, at the ranch.

9            One other thing that we've seen is -- I think they've

10   been very careful thus far to keep Jon Pauling's fingerprints

11   off of any operations having to do with Lardyn.  They've tried

12   to do that.  But they've slipped up one time at least that we

13   know of so far, and the one time that we found so far is we

14   can see Jon Pauling making a very large deposit on Lardyn's

15   behalf at this bank.  So they know that Jon Pauling is

16   involved.  So that's -- that's kind of what we have so far.

17           Beyond that what we see is we think that, yes, we're

18   going to look at the appraisals.  We're probably going to have

19   an appraiser ourself to see what would an appraised value of

20   these assets be.  But we think that the real issue is this.

21   Judge Buchanan enters this charging order, and it's a charging

22   order on distributions from the ranch operation.  Nobody knows

23   the ranch operation and what it can distribute better than Jon

24   Pauling and Mark Pauling who have been running it for 20 years

25   or more.

1        And they first try to get around the charging order

2   by playing monkey business fudging with the percentages, and

3   they create a backdated document, and we catch them on that.

4   So then the next thing they do is they do this transfer to

5   Lardyn, and already what we can see, and part of the reason

6   why we want the QuickBooks, is we can see Elyce York taking

7   over, I think the period of time from 2017 and '18, clearly in

8   excess of a couple hundred thousand, maybe in excess of

9   $300,000 in distribution.  So the story that this business

10  doesn't generate money is I think already disproven by the

11  books that we've received.

12       And whatever mischief the Pauling brothers have been

13  doing to conceal the money that it spits off, whether they've

14  been paying themselves just with cash or they're

15  characterizing it as an expense rather than a distribution or

16  what, we need to figure that out.  We need to get into that in

17  greater detail.  But we think that the bank is well aware of

18  the fact that Jon Pauling and Mark Pauling are running the

19  show, and they would know -- I mean, there's that old adage

20  know your customer in banking .  They would certainly know,

21  before extending a multimillion-dollar loan, who the real

22  operators are behind this operation.

23       THE COURT:  Well, it's all very interesting.  Does

24  Jon Pauling have any sense of obligation to make good on his

25  judgment?

19-CV-01224-RBJ    Scheduling Conference    02/19/2020    22

1          MR. CARR:  Your Honor, Mr. Pauling doesn't have any
2  ability to make good on the judgment.
3          THE COURT:  You think.  Okay.  Anything else we can
4  do for you?
5          MR. PULKRABEK:  No, Your Honor.  Thank you for your
6  time.
7          MR. FORBES:  No, Your Honor.
8          MS. OLDEMEYER:  No, Your Honor.
9          MR. KEITHLEY:  No.  Thank you, Your Honor.
10          MR. CARR:  Nothing.
11          THE COURT:  Okay.  Thank you, all.  Have a good day.
12      (The proceedings were concluded at 9:38 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

                    Sarah K. Mitchell, RPR, CRR

1                        <u>REPORTER'S CERTIFICATE</u>

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 11th day of December, 2020.

11

12

13

14         <u>      /s/ Sarah K. Mitchell      </u>

15              SARAH K. MITCHELL
                Official Court Reporter
16         Registered Professional Reporter
                Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR