## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01224-RBJ-STV

**AMANDA WILSON**, a Michigan citizen,

Plaintiff,

v.

**JONATHAN PAULING**, an individual Colorado citizen, **MARK PAULING**, an individual Colorado citizen, **TWO MILE RANCH a/k/a TWO MILE RANCH GENERAL PARTNERSHIP**, a Colorado General Partnership, **ELYCE YORK**, an individual Nebraska or Colorado citizen, **LARDYN CONSULTING LLC**, a Nebraska Limited Liability Company, and **FARMERS STATE BANK**, a Nebraska Corporation.

Defendants.

---

### PLAINTIFF'S MOTION FOR LEAVE TO AMEND TO PERMIT COURT TO CONSIDER EXEMPLARY DAMAGES

---

Plaintiff Amanda Wilson, by and through her attorneys, Aaron D. Goldhamer and Ross W. Pulkrabek of Keating Wagner Polidori Free, P.C., for her Motion for Leave to Amend to Permit Court to Consider Exemplary Damages ("Motion"), states the following:

#### Certificate of Conferral

On December 23, 2020, Plaintiff emailed Defendants to schedule a phone call to confer about amending the complaint to allow the Court to entertain a request for exemplary damages. Counsel for Elyce York and Lardyn Consulting replied by email that they "would likely object." On December 30, 2020, counsel for Mark Pauling and Two Mile Ranch indicated via email that they oppose any motion to amend the pleadings. Counsel for Farmers State Bank ("FSB") replied that she would be catching up with emails starting January 5, 2021. Counsel for Jonathan Pauling did not respond and withdrew on January 12, 2021. On January 18, 2021, Jonathan Pauling provided an email address to undersigned counsel where he could be reached. Plaintiff

1

recommenced the conferral process with Defendants' counsel and Jonathan Pauling, *pro se*, on January 21, 2021, by requesting telephone conferences with Mr. Pauling and all counsel. Plaintiff's counsel conferred by telephone with counsel for FSB, Mark Pauling, and Two Mile Ranch on January 22, 2021. Plaintiff's counsel separately conferred by telephone with counsel for Lardyn Consulting and Elyce York on January 25, 2021. All Defendants other than Jonathan Pauling have expressed their intent to oppose the Motion. Jonathan Pauling has not replied to multiple requests to confer, has not provided a telephone number where he can be reached, and has indicated to all counsel that he has no telephone; accordingly, his position on the Motion is undetermined.

## SUMMARY

Plaintiff requests leave to amend her complaint so the Court, at trial, can consider awarding exemplary damages in connection with her claim that Defendants conspired to engage in fraudulent transfers of assets to frustrate her ability to collect her judgment against Jonathan Pauling. Plaintiff's counsel are confident in her ability to prove *beyond a reasonable doubt* that all Defendants, including FSB, conspired with the specific intent of harming and defrauding Plaintiff.

Internal bank documents that the Court recently ordered FSB to produce contain express references to FSB working with Jonathan Pauling "to get rid of" Plaintiff's judgment and "protect[] the partnership from the plaintiff for the long run." These internal documents squarely refute the argument that FSB and other Defendants have advanced throughout this case—namely, that Defendants' actions were taken for business reasons wholly unrelated to Plaintiff's judgment and the charging order that Judge Buchanan entered against Two Mile Ranch.

## BACKGROUND

1.      At the outset of this case, Plaintiff alleged and FSB (and other Defendants)

expressly denied the following:

- That FSB "had actual knowledge of the State Case and of Amanda Wilson's efforts to collect her judgment against Jon Pauling." [#15-1 at ¶ 44; #60 at ¶ 44]

- That FSB lent money to Lardyn secured by deeds of trust in favor of FSB on transferred property to "protect Jon Pauling and Two Mile Ranch against efforts by Amanda Wilson to collect her judgment." [#15-1 at ¶ 45; #60 at ¶ 45.]

- That FSB "knew that Elyce York and Lardyn were a mere front and shell operation for Jon Pauling, Mark Pauling, and Two Mile Ranch's continuing business operations[,]" and that FSB "knew that the purpose of this elaborate scheme to [transfer] property from Two Mile Ranch to Lardyn and provide new financing to Lardyn was to hinder, delay, and defraud Amanda Wilson in her efforts to collect her judgment against Jon Pauling." [#15-1 at ¶ 46; #60 at ¶ 46.]

- That "[d]espite knowing that Jon Pauling was being actively pursued by judgment creditors, on information and belief [FSB] knowingly assisted Jon Pauling and Mark Pauling to hinder, delay, and defraud Amanda Wilson in her judgment against [Jon] Pauling." [#15-1 at ¶ 48; #60 at ¶ 48]

2.      In June 2020, FSB President Stephen Stull gave deposition testimony denying that

FSB's actions were in any way related to a plan to prevent Plaintiff's collection of her judgment:

> **Q.   You don't think Amanda Wilson should be pulling the bank into Jon Pauling's problem; is that what you're saying?**
>
> A.   I don't think the bank should be getting pulled into this situation.
>
> **Q.   And is that how you look at it, that the bank is being pulled into the situation?**
>
> A.   Yes.
>
> **Q.   You don't look at it as the bank is part of the situation?**

A.   *I don't believe we had anything that we would have done differently.*  Had this never happened, *everything we did would have been done the way it was done if there was no Amanda Wilson lawsuit.*

….

**Q.   Was Jon Pauling trying to use Farmers State Bank's liens to protect assets from collection in this lawsuit?**

A.   I don't know.  *I have no idea how that would work.*

**Q.   Have you and Jon Pauling had conversations about the use of Farmers State Bank's liens to protect assets from collection by Amanda Wilson?**

A.   *No.*

*See* Transcript of Deposition of Stephen Stull, attached hereto as **Exhibit 1**, at 96:5-18, 147:11-20 (emphasis added).

3.      FSB's Executive Vice President and Stephen Stull's father, Richard Stull, similarly testified to the effect that FSB was only minimally aware of Plaintiff's judgment against Jonathan Pauling. For example:

**Q.   Did you ever talk to Jon Pauling about Amanda Wilson's judgment?**

A.   All I know is -- yes, I have.  And he was very closemouthed about it, and so *I do not know that much information about Jon and this Amanda Wilson, whatever, lawsuit.*

. . .

**Q.  What did he say? I know he was closemouthed about it, but what did he say?**

A.      I don't recall. He just – he confirmed the fact that there was a lawsuit out there. *See* Transcript of Deposition of Richard Stull, attached hereto as **Exhibit 2**, at 217:4-9, 218:8-11 (emphasis added).

4.      President Stephen Stull testified that, in April 2017—just before the largest transfer in this case—FSB was largely ignorant of Plaintiff's judgment and the charging order.  Exh. 1 at

182:8-184:6. For example, Steven Stull testified, "We didn't know all of this other Lardyn, Elyce, Wilson. All that stuff wasn't out there." *Id*. at 184:4-6.

5.     The Court will recall that FSB resisted production of internal bank emails that referred to Jonathan Pauling and other Defendants. The Court held a hearing on November 9, 2020, concerning this dispute.   [#74.] The Court ordered FSB to produce the internal emails it had withheld from discovery.

6.     Contrary to its denials in pleadings and its executive officers' deposition testimony, FSB's internal emails prove beyond a reasonable doubt that, beginning in the first half of 2016, FSB worked with Jonathan Pauling and Two Mile Ranch with the specific objective of frustrating the judgment and charging order that Judge Buchanan entered in favor of Plaintiff.

7.     An internal FSB bank email between Loan Officer Kelly Roach and Vice President Chris Gray dated May 10, 2016, shows that FSB and the Pauling brothers were working together to protect the Two Mile Ranch partnership from Plaintiff's judgment. Their initial concept was that they could protect the Two Mile Ranch partnership from the Plaintiff's collection activities through a Chapter 11 proceeding.

> Kelly Roach: "Explain to me how TMR filing for bankruptcy is a 'good thing' for FSB?"
>
> Chris Gray: "My understanding is that our attorney and [] their BK attorney will have this agreed upon before going to the BK court and get it stamped approved at that time and then the transaction can take place. *The BK really just protects the partnership from the plaintiff for the long run."*

*See* **Exhibit 3**, attached hereto (emphasis added). This email succinctly shows (a) that FSB was cognizant of Plaintiff's judgment, (b) that FSB began cooperating with the Paulings with the goal of protecting Two Mile Ranch against Plaintiff's judgment no later than the first half of 2016, and

(c) that FSB considered the goal of "protect[ing] the partnership from the plaintiff for the long run" to be in FSB's interests—i.e., "a 'good thing' for FSB."

8.      Along similar lines, Richard Stull authored an internal FSB email dated December 8, 2016, to President Stephen Stull and numerous other bank officers and employees. The email attaches multiple internal FSB "Classified / Watchlist Loan Reports." The reports include the following statements:

> "Working with Mark and Jon on Chapter 11 *to get rid of Jon's Judgement* [sic] so the assets can be sold without concern for legal recourse to the buyers." *See* **Exhibit 4**, attached hereto, at FSB0015256 & FSB0015258.

> "Working with Mark and Jon so they can get through the Chapter 11 Bankruptcy, *which is being done to protect the proposed asset sale from the Judgement [sic] against Jon." Id.* at FSB0015252 & FSB0015254 (emphasis added)*.

Although FSB's terminology was imprecise—Defendants could not "get rid of Jon's Judgement [sic]" by running Two Mile Ranch through a Chapter 11 proceeding—these statements leave no doubt that Defendants' intent was to block Plaintiff from collecting her judgment and avoid the charging order entered by Judge Buchanan.

9.      Two Mile Ranch filed for Chapter 11 protection on July 1, 2016; however, it later (in coordination with FSB) dismissed the Chapter 11 proceeding specifically as a condition precedent to transferring assets to Lardyn Consulting. *See* **Exhibit 5**, attached hereto. The transfer of assets from Two Mile Ranch to Lardyn Consulting occurred on April 27, 2017. (To be clear, these facts were discovered by Plaintiff before FSB's recent production of emails; they are set forth here to give context to the statements made by FSB officers and employees in the recently produced internal emails.)

10.      Both before and after the transfer of assets from Two Mile Ranch to Lardyn Consulting, FSB bank employees explicitly acknowledged and expressed concern about the

6

fictitious nature of the transaction. For example, the aforementioned May 10, 2016 email exchange between Kelly Roach and Chris Gray included the following:

> Chris Gray: "The only plan they have, though, is for this *'unicorn like investor group'* to buy them out of BK."

> Kelly Roach: "I hope it all works out and in the 60-90 days that Dick is telling me but like you said this *'unicorn investor group'* just really has me nervous."

Exh. 3 (emphasis added).

11.     Richard Stull and Stephen Stull similarly acknowledged the fictitious nature of the transaction by using quotes when describing the "investor" or "investor group" that would acquire assets from Two Mile Ranch. For instance, in an email dated June 3, 2016, Richard Stull wrote the following:

> Now they just need the *"investor"* deal [sic] to get brought into the deal.

> My opinion is that the *"investor"* is the group that has formed an LLC and the true identity of those individuals will not be disclosed, which is okay with me as long as we move forward.

*See* **Exhibit 6** (emphasis added), attached hereto.

12.     FSB's officers and employees fully understood and even jokingly bemoaned the fact that Jonathan Pauling controlled Lardyn Consulting and Elyce York. For example, the following is an email exchange between Kelly Roach and Chris Gray shortly after Two Mile Ranch transferred its assets to Lardyn Consulting:

> Chris Gray: "I hope we are upgrading, but it just seems like we are rewriting all the same loans into *different names all still controlled by Jon.*"

> Kelly Roach: "I have yet to 'meet' any of them but Jon and Mark. . . .  We NEVER get rid of customers. They just go from one to another. [REDACTED], *TMR to Lardyn,* Lardyn to Pauling Hauling."

> Chris Gray: "*TMR to York.*"

*See* **Exhibit 7**, attached hereto (emphasis added).

13.     Indeed, FSB's understanding that the transfer of assets from Two Mile Ranch to Lardyn Consulting was a fiction insofar as Jonathan Pauling controlled Elyce York and Lardyn Consulting persisted long after the transfer. For example, in an email exchange on June 4, 2019—more than two years after the asset transfer—Kelly Roach wrote that Elyce York "is Jon's puppet." Vice President Jarrod Hamik replied, "110%." *See* **Exhibit 8**, attached hereto (FSB 0019761).

## LEGAL AUTHORITY

When leave to amend pleadings is requested before trial, "[t]he court should freely give leave [to amend a pleading] when justice so requires." F.R.C.P. 15(a)(2). Indeed, the Court may grant leave to amend pleadings during and even after trial. *See* F.R.C.P. 15(b).

"A general presumption exists in favor of allowing a party to amend its pleadings[.]" *Collins v. Diversified Consultants Inc.*, Civil Action No. 15-cv-02115-RBJ-NYW, 2016 U.S. Dist. LEXIS 4219, at *3 (D. Colo. Jan. 12, 2016) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "[T]he non-moving party bears the burden of showing that the proposed amendment is sought in bad faith, that it is futile, or that it would cause substantial prejudice, undue delay or injustice." *Id.* (citing *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc*, 175 F.3d 848, 859 (10th Cir. 1999)).

Where the scheduling order's deadline for amendment of pleadings has passed, the Court should permit amendment on a showing of "good cause[.]" *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1247 (10th Cir. 2015) (quoting *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014)). Good cause "may be satisfied…if a plaintiff learns new information through discovery…." *Strope v. Collins*, 315 F. App'x 57, 61 (10th Cir. 2009) (quoting *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 n.4 (10th Cir. 2006)).

In Colorado, the trier of fact may assess exemplary damages "for a wrong done to the person or to personal or real property" when "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." C.R.S. § 13-21-102(1)(a). "Conduct is willful and wanton if it is a dangerous course of action that is *consciously chosen* with knowledge of facts, which *to a reasonable mind creates a strong probability that injury to others will result.*" *Stamp v. Vail Corp.,* 172 P.3d 437, 449 (Colo. 2007) (emphasis added, citation omitted). "Malice" in this context means an "an intention or desire to harm another [usually] seriously through doing something unlawful or otherwise unjustified." *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 232 P.3d 277, 286 (Colo. App. 2010) (citation and punctuation omitted, brackets in original); *see also Biggs v. Biggs*, 241 P. 539, 540 (Colo. 1925) (malice is deliberate intent to wrong another or reckless disregard of the rights of others).

Exemplary damages in Colorado are available pursuant to statute. *See Sky Fun 1 v. Schuttloffel*, 27 P.3d 361, 370 (Colo. 2001). Colorado's exemplary damages statute was originally enacted in 1889 and was amended during the tort reform movement in 1986 to limit the permissible ratio of exemplary damages to actual damages. *Id.* The Colorado Supreme Court has held that original statute, as well as its amended version, empower both judges in bench trials and juries in jury trials to award exemplary damages and that limitations on the permissible ratio of exemplary damages to actual damages apply equally in both jury trials and bench trials. *Id.*

A plaintiff is prohibited by Colorado law from including a claim for exemplary damages in "any initial claim for relief." C.R.S. § 13-21-102(1.5)(a). If a plaintiff establishes *prima facie* proof of an opposing party's fraudulent, malicious, or willful and wanton conduct, a trial court should permit the plaintiff to amend the complaint so that the trier of fact may consider exemplary damages at trial. *Id.* Although Plaintiff carries the burden of proving the propriety of exemplary

damages beyond a reasonable doubt at trial, the standard for pleading exemplary damages "is a lenient standard" that requires only a *prima faice* showing as opposed to a complete presentation of evidence that would be presented at trial. *Stamp*, 172 P.3d at 450.

Finally, there is established precedent for the award of exemplary damages in a bench trial for claims of civil conspiracy to violate the Colorado Uniform Fraudulent Transfer Act. *See Double Oak Constr., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97 P.3d 140, 145-49 (Colo. App. 2003). The Colorado Court of Appeals in *Double Oak Construction* held that, although a trial court cannot award exemplary damages solely in connection with a statutory claim under the Colorado Uniform Fraudulent Transfer Act, it may award exemplary damages in connection with a tort claim for civil conspiracy to violate the Colorado Uniform Fraudulent Transfer Act. *See id.* Recognizing that *Double Oak Construction* is not binding precedent on a United States District Court, the case is analogous to this case, has remained undisturbed precedent for 18 years, and has been followed in the District of Colorado. *See Fifth Third Bank v. Morales,* No. 16-cv-01302-CMA-STV, 2017 U.S. Dist. Lexis 208288 *17 (D. Colo. 2017), attached as Appendix A.

## ARGUMENT

The applicable procedural rules and law are sufficiently flexible to permit trial courts to entertain a motion for exemplary damages first made during trial. The purpose of this Motion, however, is to lay the groundwork and address any objections in advance of trial so that the Court can consider awarding exemplary damages against some or all Defendants, should the Court conclude that the evidence and interests of justice warrant such an award.

With the production of FSB's internal bank emails, Plaintiff's counsel are confident that the evidence at trial will dispel any "reasonable doubt" as to the intentions of all Defendants, including FSB. Throughout this litigation Defendants have asserted—and doubtless will continue

to assert—that their actions in transferring assets from Two Mile Ranch to Lardyn Consulting were unrelated to Plaintiff's judgment against Jonathan Pauling and her charging order against Two Mile Ranch. The Court may contrast  the allegations that FSB (and other Defendants) denied with what FSB's officers and employees expressly stated in internal emails.

- Defendants denied that FSB "had actual knowledge of the State Case and of Amanda Wilson's efforts to collect her judgment against Jon Pauling." [#15-1 at ¶ 44; #60 at ¶ 44] They denied that FSB lent money to Lardyn secured by deeds of trust in favor of FSB on transferred property to "protect Jon Pauling and Two Mile Ranch against efforts by Amanda Wilson to collect her judgment." [#15-1 at ¶ 45; #60 at ¶ 45.] They denied that, "[d]espite knowing that Jon Pauling was being actively pursued by judgment creditors, on information and belief [FSB] knowingly assisted Jon Pauling and Mark Pauling to hinder, delay, and defraud Amanda Wilson in her judgment against [Jon] Pauling." [#15-1 at ¶ 48; #60 at ¶ 48].

  **But in fact FSB's own President, Executive Vice President, and other bank employees specifically discussed how FSB was working with Jonathan Pauling to "protect[] the partnership from the plaintiff," Exh. 3, and "to get rid of Jon's Judgement [sic]," Exh. 4.**

- Defendants denied that FSB "knew that Elyce York and Lardyn were a mere front and shell operation for Jon Pauling, Mark Pauling, and Two Mile Ranch's continuing business operations[,]" and that FSB "knew that the purpose of this elaborate scheme to [transfer] property from Two Mile Ranch to Lardyn and provide new financing to Lardyn was to hinder, delay, and defraud Amanda Wilson in her efforts to collect her judgment against Jon Pauling." [#15-1 at ¶ 46; #60 at ¶ 46.]

  **But, in their internal emails, FSB remarked how they were simply "rewriting all the same loans into different names all still controlled by Jon," called Elyce York Jonathan Pauling's "puppet," and acknowledged the blatantly fictitious nature of the transaction by referring to the "unicorn like investor group" and putting the word "investor" in quotes. Exhs. 3, 6, 7, 8.**

- Richard Stull and Steven Stull denied under oath that Plaintiff's judgment played any role in FSB's actions. Stephen Stull said, "We didn't know all of this other Lardyn, Elyce, Wilson. All that stuff wasn't out there." Exh. 1 at 184:4-6. Richard Stull said that Jonathan Pauling "was very closemouthed about it, and so I do not know that much information about Jon and this Amanda Wilson, whatever, lawsuit." Exh. 2 at 217:4-9.

11

> **But in fact the Stulls exchanged internal "Classified / Watchlist Loan Reports" that expressly stated that FSB was working with Jonathan Pauling and Mark Pauling "to get rid of Jon's Judgement [sic]" and "protect the proposed asset sale from the Judgement against Jon." Exhs. 3-4.**

In summary, the internal FSB emails put the proverbial lie to Defendants' denials. They cast aside all doubt as to whether Defendants, including FSB, acted with actual intent that their conduct harm Plaintiff by preventing her from collecting her judgment. They wholly refute Defendants' contention that their conduct was driven by business considerations unrelated to avoiding the judgment and charging order.

The emails specifically refer to cooperation between FSB, the Paulings, and Two Mile Ranch for the purpose of "get[ting] rid of Jon's Judgement" and protecting "the partnership" from "the plaintiff" and "the Judgement against Jon," leaving no doubt that Defendants' conduct specifically was attended by an intent to harm Plaintiff. The internal emails also show, in express terms, that FSB was fully aware that the putative "investor" who supposedly would acquire assets from Two Mile Ranch was a fiction, a "unicorn." FSB and the other Defendants carried out this fiction in furtherance of their written objective of getting rid of Plaintiff's judgment and protecting the Pauling brothers' partnership from Plaintiff (*i.e.,* from the charging order), thereby, perpetrating a fraud on Plaintiff. Having received these internal communications, Plaintiff is confident she can prove that all Defendants—including FSB—had the requisite "evil intent" (*Frick v. Abell*, 198 602 P.2d 852, 854 (Colo. 1979)) to support the imposition of exemplary damages, should the Court determine that such damages are warranted.

FSB's statements in internal emails constitute *prima facie* evidence of a case for exemplary damages. The emails are crystal clear on their face that the Defendants conspired to help Jonathan Pauling and Mark Pauling "get rid of" Plaintiff's judgment by transferring assets to a fictitious

"investor" that they fully understood was "still controlled by Jon." The parties need not debate whether circumstantial evidence will permit an inference that the standard for exemplary damages can be satisfied in this case; FSB's internal emails are direct evidence that show on their face that Defendants' engaged in coordinated conduct with the specific intent to injure and defraud Plaintiff.

Good cause exists to allow Plaintiff to amend her pleadings to seek exemplary damages. FSB resisted producing internal emails and did not do so until late 2020, after being ordered to do so by the Court. The reason for FSB's earlier resistance is now fully apparent. The emails prove beyond any reasonable doubt that all Defendants knew Jonathan Pauling controlled Lardyn Consulting through Elyce York as his proxy and that Defendants' specific intent in transferring assets from Two Mile Ranch to Lardyn Consulting was to prevent Plaintiff from enforcing her judgment against Jonathan Pauling and the charging order against Two Mile Ranch.

Based on conferral, Plaintiff understands that Defendants other than Jonathan Pauling will argue that they will be prejudiced if the complaint is amended such that the Court may consider at trial whether the evidence warrants an award of exemplary damages. Plaintiff disagrees. First, the rules specify that "[t]he court should freely give leave when justice so requires." F.R.C.P. 15(a)(2). Justice favors an amendment that will allow the Court to award of exemplary damages if it finds beyond a reasonable doubt that such damages are warranted. The Court will only award exemplary damages if it is satisfied beyond a reasonable doubt that such damages are warranted and that awarding exemplary damages is indeed proper to achieve justice.

Second, in the context of leave to amend pleadings, "prejudice" refers to the kind of surprise that a party might face if forced to defend itself against entirely new and unanticipated factual circumstances or legal claims not already at issue in the case. *Compare Hom v. Squire,* 81 F.3d 969, 973 (10th Cir. 1996) (finding prejudicial a motion "to add an entirely new and different

claim to [the plaintiff's] suit little more than two months before trial'"), *with Gillette v. Tansy*, 17 F.3d 308, 313 (10th Cir. 1994) (finding no evidence of prejudice when the "Petitioner's [amended] claims track the factual situations set forth in his [original] claims"), *Childers v. Indep. Sch. Dist. No. 1*, 676 F.2d 1338, 1343 (10th Cir. 1982) (ruling that the district court's refusal to allow an amendment was "particularly egregious in this case because the subject matter of the amendment was already alleged in the complaint"), and *R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749, 751-52 (10th Cir. 1975) (finding no prejudice when "[t]he amendments did not propose substantially different issues"). Here, consistent with precedent, exemplary damages relate to the same substantive civil conspiracy claim against Defendants that has been pending throughout this case. The proposed amendment does not alter the subject matter of this case or the theory of relief. Instead, the proposed amendment is made so that the Court may consider awarding exemplary damages for a claim already part of this case.

The proposed Second Amended Complaint is attached hereto as **Exhibit 9**. Pursuant to D.C.COLO.LCivR 15.1, a redlined version of the proposed Second Amended Complaint as compared to the present Amended Complaint is attached hereto as **Exhibit 10**.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff leave to amend her complaint so that she may seek, and the Court may consider, exemplary damages based on the evidence to be presented at trial.

DATED: January 26. 2021

s/ Ross W. Pulkrabek
Keating Wagner Polidori Free, P.C.
Ross W. Pulkrabek
1290 Broadway, Suite 600
Denver, CO 80203
Phone: (303) 534-0401
Email: rpulkrabek@keatingwagner.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I, Amanda Sauermann, hereby affirm that on January 26, 2021, I electronically served a copy of the foregoing on the following counsel for Defendants in this matter:

Beau Bryan Bump, Tracy A. Oldemeyer
Cline Williams Wright Johnson & Oldfather
215 Mathews Street Suite 300
Fort Collins, CO 80524
bbump@clinewilliams.com
toldemeyer@clinewilliams.com

R. Livingston Keithley
Antero Law, LLC
1700 Broadway, Suite 640
Denver, Colorado 80290
lkeithley@anterolaw.com

Peter C. Forbes
CARVER SCHWARZ McNAB KAMPER
& FORBES, LLC
1888 Sherman Street — Suite 400
Denver, Colorado 80203
pforbes@csmkf.com

I also mailed via U.S.P.S. and emailed a copy of the foregoing to Jonathan Pauling at the below addresses:

60773 North Highway 71
Stoneham, CO 80754
paulingjonathan2@gmail.com

/s/ Amanda Sauermann
Amanda Sauermann