# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01223-RBJ-STV

**AMANDA WILSON**, a Michigan citizen,

Plaintiff,

v.

**JONATHAN PAULING**, an individual Colorado citizen, **MARK PAULING**, an individual Colorado citizen, **TWO MILE RANCH a/k/a TWO MILE RANCH GENERAL PARTNERSHIP**, a Colorado General Partnership, **ELYCE YORK**, an individual Nebraska or Colorado citizen, **LARDYN CONSULTING LLC**, a Nebraska Limited Liability Company, and **FARMERS STATE BANK**, a Nebraska Corporation.

Defendants.

---

## SECOND AMENDED COMPLAINT
---

Plaintiff Amanda Wilson, for her Second Amended Complaint against Defendants Jonathan Pauling, Mark Pauling, Two Mile Ranch a/k/a Two Mile Ranch General Partnership, Elyce York, Lardyn Consulting LLC, and Farmers State Bank (collectively "Defendants"), states as follows:

### STATEMENT OF THE CASE

This case arises out of a civil conspiracy between Defendant Jonathan "Jon" Pauling and several of his confederates to hinder, delay, and defraud Plaintiff Amanda Wilson in her efforts to collect a civil judgment exceeding $6 million. Jon Pauling was found both criminally and civilly liable for sexually assaulting Amanda Wilson. As described in detail in this complaint, Jon Pauling, his brother Defendant Mark Pauling, his girlfriend Elyce York, multiple entities they control, and the Pauling brother's longtime bank Farmers State Bank, undertook elaborate and concerted

1

**Exhibit 9**

actions to conceal and protect Jon Pauling's assets against collection and to frustrate the civil justice system.

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Amanda Wilson is an individual who resides at 13 Ballard St., Apt. 2, Ypsilanti, MI 48197 and who was at the time of filing this action and remains as of the date of this filing a citizen of the State of Michigan, insofar as she is and has been domiciled in the State of Michigan, having resided in the State of Michigan a substantial time prior to the commencement of this action with the intent to remain in the State of Michigan indefinitely.

2.    Defendant Jon Pauling is an individual who resides at 60773 North Highway 71, Stoneham, Colorado, 80754 and who was at the time of filling this action and remains as of the date of this filing a citizen of the State Colorado, insofar as he is and has been domiciled in the State of Colorado, having resided and worked in the State of Colorado at all times relevant to this action, and indeed his entire adult life, with the intent to remain in the State of Colorado indefinitely.

3.    Defendant Mark Pauling is Jon Pauling's brother and is an individual who resides at 18503 or 18505 County Road 42.5, Sterling, Colorado, 80751 and who was at the time of filing of this action and remains as of the date of this filing a citizen of the State of Colorado, insofar as he is and has been domiciled in the State of Colorado, having resided and worked in the State of Colorado at all times relevant to this action, and indeed his entire adult life, with the intent to remain in the State of Colorado indefinitely.

4.    Defendant Two Mile Ranch a/k/a Two Mile Ranch General Partnership is and was at the time of the filing of this action a Colorado general partnership whose principal place of business is and was at the time of the filing of this action 60773 North Highway 71, Stoneham,

2

Exhibit 9

Colorado, 80754, or alternatively—according to Jon Pauling's previous testimony—18503 County Road 42.5, Sterling, Colorado (despite the fact that "legally it's still probably going to show up as 60773 [North Highway 71, Stoneham, Colorado]").  The totality of the partners of Defendant Two Mile Ranch are and were at the time of the filing of this action Jon Pauling and Mark Pauling, both of whom are and were at the time of filing of this action citizens of the State of Colorado, as alleged in greater detail in the preceding paragraphs.

5.      Defendant Elyce York is an individual who, on information and belief, was at the time of filing of this action as well as the date of this filing a citizen of the State of Nebraska, who resides at 1660 Summit Drive, Sidney, Nebraska, 69162, and is and was at the time of the filing of this action domiciled in the State of Nebraska insofar as she resided in the State of Nebraska prior to the commencement of this action with intent to remain in the State of Nebraska indefinitely.  The property at the 1660 Summit Drive address was owned by a Nebraska entity called Redtail Resources LLC, which is registered to do business in Colorado as Redtail Resources Colorado LLC.  The statement of foreign entity authority and other documents filed for Redtail Resources Colorado LLC were filed by attorney Brian Bates, who is a longtime attorney for Two Mile Ranch and other entities affiliated with Jon Pauling and Mark Pauling. Jon Pauling testified in 2016 that Elyce York lived in a property owned by Two Mile Ranch at 22434 N. Turkey Creek Road, Morrison, Colorado, 80465, but that she had moved out. However, U.C.C. Financing Statements filed by Defendant Farmers State Bank in April of 2017 reflect that Elyce York still lived at the Morrison address.  As such, alternatively, Elyce York is and was at the time of the filing of this action a citizen of the State of Colorado in that she was domiciled in the State of Colorado, having resided in the State of Colorado with the intent to remain in the State of Colorado indefinitely.

Exhibit 9

6.     Defendant Lardyn Consulting LLC is a Nebraska limited liability company whose principal place of business is 2561 S. 125th Ave., Omaha, Nebraska, 68144.  The original sole member and putative manager of Lardyn Consulting LLC was Elyce York, a citizen of either the State of Colorado or the State of Nebraska.  On April 7, 2017, Mark Pauling, who is a citizen of the State of Colorado, as alleged in detail in the preceding paragraphs, obtained a 15% membership interest in Lardyn from Elyce York.  On July 17, 2017, Elyce York transferred a 3% membership interest in Lardyn to Pauling Hauling, LLC, a Colorado limited liability company, whose sole managers and members are Paul Pauling and Lori Pauling, who are Colorado Citizens.   On November 1, 2017, Elyce York transferred a 2% membership interest in Lardyn to Cherry Creek Cattle Company, LLC, a Colorado limited liability company with a principal place of business at 3200 Cherry Creek S. Dr., Suite 380, Denver, CO, whose sole manager is Brian Bates, a Colorado citizen, who resides at 940 Adams Street, Denver, CO.  Documents produced in this case show that Mark Pauling purported to transfer his 15% membership interest to Elyce York Trust #1, which is a Nebraska trust and Nebraska citizen; those documents are backdated to January 1, 2019, but the transfer appears to have taken place on June 20, 2019, approximately two months after this lawsuit was filed.

7.     Defendant Farmers State Bank is a bank regulated by the Federal Deposit Insurance Corporation, whose principal place of business currently and as of the time of the filing of this action is 355 2nd St., Dodge, Nebraska, 68633 and whose state of incorporation currently and as of the time of the filing of this action is the State of Nebraska.  The allegations herein pertain to the branch of Farmers State Bank at 823 Main Street, Bridgeport, Nebraska, 69336 (formerly 501 Main Street, Bridgeport, Nebraska, 69336).   Farmers State Bank repeatedly engaged in transactions with Colorado residents Jon Pauling, Mark Pauling, Elyce York (while she resided in

Exhibit 9

Colorado) and Two Mile Ranch, lent money to Colorado residents and entities controlled by them, encumbered property in Colorado in connection with those loans, filed U.C.C. financing statements in Colorado with respect to those loans, and otherwise engaged in concerted actions to hinder, delay, and defraud the collection (in Colorado) of a Colorado judgment by Plaintiff Amanda Wilson as alleged herein. Farmers State Bank purposely availed itself of this jurisdiction such that the Court's exercise over Farmers State Bank is proper.

8.     This Court has jurisdiction over this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 (exclusive of interest and costs) and because the citizenship of Plaintiff Amanda Wilson is different from that of any Defendant.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2).

## GENERAL ALLEGATIONS

### *The Underlying Judgment in the State Case*

10.     Jon Pauling presented himself as a wealthy rancher in the Sterling, Colorado, area when he first met Amanda Wilson.  Using his wealth to entice Amanda Wilson into spending time with him, he later sexually assaulted her.

11.     In Denver District Court Case No. 2013CV35298 (the "State Case"), on October 23, 2015, Amanda Wilson obtained a jury verdict in her favor against Jon Pauling for claims of assault, battery, and intentional interference with contract.  The State Case pertained to (a) the circumstances surrounding Jon Pauling's sexual assault of Plaintiff, to which he pled guilty in Denver District Court Case No. 2013CR1069, as well as (b) Jon Pauling's use of his network of business entities to employ Plaintiff for a time and to manipulate Plaintiff and groom her for sexual assault.

Exhibit 9

12.     Despite attempts to collect the judgment entered in the State Case following the jury verdict, Plaintiff has been unable to collect any amount owed her as a result of the State Case. In those collection proceedings, Jon Pauling has professed to have no assets or income.

13.     Through various post-verdict proceedings in the State Case, on December 19, 2018, the Honorable Judge Ross Buchanan amended the judgment in the State Case—increasing the punitive damage award initially rendered by the jury—to total $6,337,704.70.  *See* October 23, 2015, jury verdict in the State Case; July 25, 2018, Order concerning costs in the State Case; December 19, 2018, Order in the State Case, attached hereto as **Exhibit 1**.

14.     In Judge Buchanan's analysis of whether to increase the punitive damage award initially rendered by the jury in the State Case, Judge Buchanan considered Plaintiff's argument that Jon Pauling continued to engage in a pattern of grooming behavior with other vulnerable young women he met at adult entertainment clubs.  Exh. 1 at 5.  Judge Buchanan specifically cited evidence concerning Jon Pauling's grooming of Defendant Elyce York.

> The court agrees with Plaintiff and finds beyond a reasonable doubt that Defendant has, in fact, continued to engage in the same wrongful conduct that was the subject of Plaintiff's claims during the pendency of this case. The evidence at trial demonstrated that, following the assault on Plaintiff and including while this case has been pending, Defendant Pauling has continued to frequent adult entertainment establishments and pay for young women who work as exotic dancers, such as Elyce York, to be taken "off the list," meaning they were not required to dance and instead may sit and drink alcohol and talk with Defendant. According to Ms. York's deposition testimony, which was read at trial, Defendant used this technique over perhaps ten occasions to gain her trust and develop a relationship with her. After gaining her trust, Defendant Pauling began to take her to dinner and shopping; assisted her financially, including loaning her $5,000 to hire a divorce lawyer, giving her money to rent an apartment separate from her estranged husband, preparing and backdating a fraudulent document purporting to be an employment contract and two fraudulent paychecks designed to mislead her prospective landlord that her income was sufficient to afford the rent, loaning both her and her mother money on a no-interest basis, giving her access to a car, and buying her diamond earrings and a necklace worth $3,500. In addition, Defendant Pauling, through one of the Defendant entities he controls, has purchased the multi-million-dollar

Exhibit 9

home in a gated community in the foothills near Denver where Ms. York has resided rent-free with her son since May, 2015. Ms. York testified that she has spent at least one night in a hotel with Mr. Pauling. Although she is aware that Plaintiff claims that Mr. Pauling raped her, she does not believe that occurred, and instead believes that Defendant was "probably" set up. She knows he is a registered sex offender, but it does not concern her. She believes that Defendant is divorced, when in fact he remains married. This is a pattern of "grooming" behavior strikingly similar to that in which Defendant Pauling engaged with Plaintiff and several other exotic dancers….

As the testimony of Plaintiffs expert Janine D'Anniballe made clear, such grooming behavior is a well-recognized precursor to sexually abusive or assaultive behavior, especially where there is a significant differential in power or wealth or age….

*See* Exh. 1 at 5-6 (emphasis added).

15.     Jon Pauling continues to have a close relationship with Elyce York as evidenced by facts described more fully in this complaint.

16.     One of the businesses that had employed Plaintiff—and thus was instrumental to Jon Pauling's grooming behavior with respect to Plaintiff—was a partnership called Two Mile Ranch. Plaintiff sued a number of "Two Mile Ranch" affiliated entities in the State Case as well as other Jon Pauling-controlled entities; however, she did not sue Two Mile Ranch General Partnership in the State Case.

### In concert, Defendants Fraudulently Transfer Property to Avoid Collection of the Judgement in the State Case

17.     Two Mile Ranch a/k/a Two Mile Ranch General Partnership is a general partnership owned by Jon Pauling and Mark Pauling, through which those brothers have transacted business since the 1980s. Specifically, Jon Pauling and Mark Pauling through Two Mile Ranch have owned and managed several agricultural and residential properties and engaged in a variety of farming, ranching, feedlot operations, and other businesses. Jon Pauling and Mark Pauling are experienced, career ranchers and feedlot owners.

Exhibit 9

18.     The General Partnership Agreement of Two Mile Ranch, dated February 14, 1986, states that Jon Pauling and Mark Pauling are co-equal, fifty percent (50%) partners in Two Mile Ranch.

19.     This General Partnership Agreement states the following concerning the management of Two Mile Ranch:

> 1.05 Management. The affairs of the partnership shall be conducted by all of the partners.  In case of a difference of opinion among the partners with respect to the management and policies of the partnership, the decision made by Jonathan M. Pauling shall prevail.

20.     Plaintiff attempted to collect on the judgment in the State Case by obtaining a charging order on Jon Pauling's partnership interest in Two Mile Ranch. To date Plaintiff has collected no money through the charging order.

21.     In the course of collection proceedings in the State Case, on February 10, 2016, Jon Pauling testified that there had been an amendment to the Two Mile Ranch partnership agreement, purportedly on or around September 15, 2014.  This purported amendment reallocated partnership interests, such that his partnership interest was reduced to ten percent (10%) and his brother Mark Pauling's partnership interest was increased to ninety percent (90%).  This purported amendment likewise replaced the above-quoted management provision for Two Mile Ranch to read, "Mark A. Pauling is the Manager of the partnership."

22.     The documentation for the purported reallocation of Jon Pauling's and Mark Pauling's respective partnership interests in Two Mile Ranch was falsely backdated to September 15, 2014. Additionally, it was done to effectuate a fraudulent transfer of assets so that Amanda Wilson would be unable to collect her judgment against Jon Pauling.  Facts that demonstrate that the document was falsely backdated include the following:

8

Exhibit 9

a.  Jon Pauling and Mark Pauling's 2014 Internal Revenue Service Schedule K-1 forms both show that they remained co-equal fifty percent (50%) partners in Two Mile Ranch as of year-end 2014. Jon Pauling and Mark Pauling's ownership interest of 50% as of the end of 2014 contradicts the purported modifications to their respective partnership interests on September 15, 2014.

b.  Jon Pauling and Mark Pauling signed a document to sell Two Mile Ranch real property which confirmed that—as of May 13, 2015—there had been no amendments or modifications to the Two Mile Ranch partnership agreement. The representation by both Jon Pauling and Mark Pauling that they had made no modifications to the partnership agreement was inconsistent with any purported modification on September 15, 2014, or for that matter at any other date at least through May 13, 2015.

c.  As of May 15, 2015, Jon Pauling—and Jon Pauling alone—was still signing loan agreements on behalf of Two Mile Ranch, whereby it lent Mark Pauling two-hundred seventy five thousand dollars ($275,000).

23.  Moreover, Jon Pauling's purported transfer of a forty percent (40%) partnership interest in Two Mile Ranch (i.e. his 50% interest less the 10% interest he retained) to Mark Pauling was for no apparent actual consideration. Instead, Jon Pauling attempted to rationalize the transfer based on some vague perception of what was "fair" between brothers in view of Jon Pauling's misconduct and the fallout from his sexual assault on Plaintiff, as Jon Pauling testified to the following:

Q. How did you figure out -- how did you figure out to change it from 50/50 to 90/10? How did you go about doing that?
A. That's what he said he wanted. I really wasn't in a position to argue.
Q. Why not?
A. Because he was right and I was wrong.
Q. So Mark demanded 90 percent?
A. He just said that that was fair, and I said that's fine.

24.  Additionally, with respect to one of the purported sales of Two Mile Ranch property to Mark Pauling described above, a condition of this sale included the purported grant to "seller Jonathan Pauling" of a rent-free tenancy on this real property.

9

Exhibit 9

***The Pauling Brothers Involve Elyce York and Lardyn in their Scheme to***
***Avoid Paying Amanda Wilson's Judgment***

25.     Lardyn Consulting LLC ("Lardyn") is a Nebraska Limited Liability Company formed on August 24, 2016.

26.     Elyce York is the *nominal* managing member of Lardyn and its registered agent. Elyce York has signed numerous documents to facilitate the creation of Lardyn, maintenance of its status, and transaction of business in Colorado. To be clear, Plaintiff does not believe Elyce York to be the *de facto* manager of Lardyn but rather a straw woman standing in for Jon Pauling.

27.     Mark Pauling is also a member of Lardyn.

28.     According to the Statement of Foreign Authority filed with the Colorado Secretary of State in 2018, Lardyn commenced business operations in Colorado on September 1, 2016.

29.     Brian Bates, a longtime attorney of Two Mile Ranch and various other entities related to Jon Pauling and Mark Pauling, filed this Statement of Foreign Authority.

30.     Brian Bates likewise filed a periodic report for Lardyn with the Colorado Secretary of State on March 31, 2019.

31.     Lardyn's registered agent in Colorado is Brian Bates.

32.     Upon information and belief, to be confirmed through discovery, Elyce York has received compensation for her involvement in Lardyn and other assistance to Jon Pauling and Mark Pauling through the aforementioned Redtail Resources LLC, with which Jon Pauling and Mark Pauling's attorney Brian Bates also is involved.

33.     Despite being a co-member in Lardyn with Elyce York, Mark Pauling testified in November of 2016 that he had never met Elyce York.

**Exhibit 9**

34.     Consistent with Judge Buchanan's above-quoted findings, Jon Pauling testified that, for a time, Elyce York lived rent-free at a property in Jefferson County, Colorado, titled in the name of Two Mile Ranch.

35.     In 2017, the Pauling brothers caused Two Mile Ranch to transfer large tracts of real property to Lardyn.  Namely, in late April of 2017, Two Mile Ranch transferred parcel(s) of real property located at or around 18503 and/or 18505 and/or 18507 County Road 42.5 in Sterling, Colorado, to Lardyn for a purported sales price of four million two hundred and seventy thousand dollars ($4,270,000).

36.     As of April 2019, Jon Pauling and Mark Pauling are continuing their business of ranching and operating feedlots through Lardyn.  Lardyn is in the process of obtaining or has obtained state certification to operate a feedlot at 18413 County Road 42.5. That address is for all intents and purposes identical to the location (18503 County Road 42.5) where Jon Pauling and Mark Pauling, through Two Mile Ranch, have operated irrigated farm, ranching, and feedlot operations. *See* Jeff Rice, *County P&Z OKs feedyard expansion*, JOURNAL-ADVOCATE, April 17, 2019.[1]

37.     Unlike Jon Pauling and Mark Pauling, Elyce York is not a famer, rancher, or feedlot operator by trade. To the contrary, she is a young dancer who, as Judge Buchanan found in the State Case, also was groomed by Jon Pauling. Notwithstanding her nominal title as the manager of Lardyn, it is not credible that Elyce York would be the brains, brawn, or investor behind a

---

[1]  Available at  http://www.journal-advocate.com/sterling_local_news/ci_32581616/county-p-z-oks-feedyard-expansion (last accessed April 24, 2019, discussing an application to Colorado's Logan County Commissioners to amend and renew a special use permit to increase current permitted capacity of 2,500 head of cattle to 5,000 head of cattle for a feedlot at 18413 County Road 42.5).

11

Exhibit 9

feedlot operation based out of the same location where Jon Pauling and Mark Pauling have operated their farm, ranch, and feedlot businesses for many years.

38.     Lardyn is a mere alter ego of Jon Pauling and Two Mile Ranch and its longstanding ranching operation.

39.     Two Mile Ranch is an alter ego of Jon Pauling and Mark Pauling used to facilitate fraud, including the avoidance of Amanda Wilson's collection efforts.

40.     Lardyn also is a mere alter ego of Jon Pauling and Mark Pauling used to facilitate fraud, including the avoidance of Amanda Wilson's collection efforts.

41.     Elyce York is a straw woman for Jon Pauling's interest in Lardyn and a co-conspirator of Jon Pauling and Mark Pauling.

### *Farmers State Bank Assists in transactions concerning the Transferred Properties*

42.     The Pauling brothers and their businesses have a longstanding business relationship with Farmers State Bank.

43.     At least through 2014 and 2015, Farmers State Bank continued to extend credit terms to Two Mile Ranch based on Jon Pauling's signature alone on behalf of Two Mile Ranch.

44.     Farmers State Bank had actual knowledge of the State Case and of Amanda Wilson's efforts to collect her judgment against Jon Pauling. In particular, Amanda Wilson engaged in post-judgment discovery that included issuing a subpoena to Farmers State Bank for banking records pertaining to Two Mile Ranch and related business activities of Jon Pauling and Mark Pauling. Farmers State Bank produced documents in response to that subpoena. There is no doubt that Farmers State Bank was fully aware of the State Case, Amanda Wilson's judgment, and her efforts to collect it including against the assets of Two Mile Ranch.

**Exhibit 9**

45.     In order to protect Jon Pauling and Two Mile Ranch against efforts by Amanda Wilson to collect her judgment, Jon Pauling and Mark Pauling arranged for Farmers State Bank to lend money to Lardyn, with such loans secured by deeds of trust in favor of Farmers State Bank on the transferred property. Farmers State Bank, which had loaned Jon Pauling and Mark Pauling millions of dollars over the years, and which had profited richly from such loans, willingly participated in that scheme.

46.     The bankers at Farmers State Bank know Jon Pauling and Mark Pauling personally and have a longstanding, highly lucrative relationship with them. They know Jon Pauling and Mark Pauling to be experienced ranch and feedlot operators operating at the location at issue. When Farmers State Bank providing new financing to Lardyn, with Elyce York as the *nominal* managing member of Lardyn who signed various documents in connection with the financing, it knew that Elyce York and Lardyn were a mere front and shell operation for Jon Pauling, Mark Pauling, and Two Mile Ranch's continuing business operations. Indeed, in connection with providing financing to Lardyn, Farmers State Bank required Mark Pauling to co-sign one or more documents as a member of Lardyn. Farmers State Bank knew that the purpose of this elaborate scheme to transferring property from Two Mile Ranch to Lardyn and provide new financing to Lardyn was to hinder, delay, and defraud Amanda Wilson in her efforts to collect her judgment against Jon Pauling.

47.     Moreover, the U.C.C. Financing Statements filed by Farmers State Bank in Colorado with respect to its loans to Lardyn and Elyce York reflect Farmers State Bank's security in livestock and crops, farm and ranching equipment, and profits obtained from farming and ranching operations.

**Exhibit 9**

48.     Despite knowing that Jon Pauling was being actively pursued by judgment creditors, on information and belief Farmers State Bank knowingly assisted Jon Pauling and Mark Pauling to hinder, delay, and defraud Amanda Wilson in her efforts to collect her judgment against Jon Pauling.

### FIRST CLAIM FOR RELIEF
*Violation of the Colorado Uniform Fraudulent Transfer Act*
*Transfer of Jon Pauling's Partnership Interest in Two Mile Ranch*
*Against Jon Pauling, Mark Pauling, and Two Mile Ranch*

49.     The allegations in the preceding paragraphs are incorporated by reference.

50.     Under the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), C.R.S. § 38-8-101 *et seq.*, any transfer made or obligation entered into by a debtor "with actual intent to hinder, delay or defraud" a present or future creditor is actionable.  C.R.S. § 38-8-105(1)(a).

51.     At all times relevant to Jon Pauling's purported transfer of the majority of his partnership interest in Two Mile Ranch to Mark Pauling, Jon Pauling was a "debtor" of Amanda Wilson as defined by C.R.S. § 38-8-102(7).

52.     At all times relevant to Jon Pauling purported transfer of the majority of his partnership interest in Two Mile Ranch to Mark Pauling, Amanda Wilson was a "creditor" of Jon Pauling with a "claim" against Jon Pauling as defined by C.R.S. § 38-8-102(3) and (5).

53.     C.R.S. § 38-8-105 sets forth the various, non-exclusive factors (also known as "badges of fraud") that inform whether the debtor acted with "actual intent" to hinder, delay, or defraud a creditor.  Actions and transfers by the Defendants establish the existence of several badges of fraud, including but not necessarily limited to the following:

   a.  Whether "the transfer or obligation was to an insider[.]"  C.R.S. § 38-8-105(2)(a). Mark Pauling is an insider of Jon Pauling (C.R.S. § 38-8-102(8)(a)(I)) and Two Mile Ranch is an insider of Jon Pauling (C.R.S. § 38-8-102(8)(a)(II)).

   b.  Whether the debtor "retained possession or control of the property transferred

**Exhibit 9**

after the transfer[.]" C.R.S. § 38-8-105(2)(b). Jon Pauling testified that he continued to work at the feed lot described at n. 1, *supra*, and Jon Pauling retains control over the former Two Mile Ranch property through this control over Elyce York and thereby his control over Lardyn, with the cooperation of Mark Pauling as a fellow member of Lardyn.

c. Whether, prior to the transfer, "the debtor had been sued[.]" C.R.S. § 38-8-105(2)(d). Prior to the above transfers, Jon Pauling had been successfully sued.

d. Whether the transfer "was of substantially all the debtor's assets[.]" C.R.S. § 38-8-105(2)(e). The transfer of 40% of his 50% partnership interest in Two Mile Ranch was of substantially all of Jon Pauling's meaningful assets, as evidenced by Jon Pauling's sworn pleas of poverty during Ms. Wilson's collection attempts in the State Case.

e. Whether the "value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred[.]" C.R.S. § 38-8-105(2)(h). The value that Jon Pauling received for the transfer of his Two Mile Ranch partnership interest (apparently nothing) is not reasonably equivalent to the value of the asset transferred.

f. Whether the debtor "was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred[.]" C.R.S. § 38-8-105(2)(i). Throughout the collection attempts in the State Case, Jon Pauling testified that he is insolvent.

54. The reduction of Jon Pauling's partnership interest in Two Mile Ranch is a "transfer" as that term is defined in C.R.S. § 38-8-102(13).

55. The above-described transfer was made with actual intent to hinder, delay, or defraud Amanda Wilson, a creditor of Jon Pauling. This transfer violated C.R.S. § 38-8-105(1)(a). Jon Pauling's actual intent may be inferred by the existence of multiple badges of fraud, including but not necessarily limited to those set forth in C.R.S. § 38-8-105(2)(a), (b), (d), (e), (h), and (i).

56. Likewise, the above-described transfer was made without Jon Pauling receiving reasonably equivalent value in exchange at a time (following his arrest for the sexual assault of Amanda Wilson) when Jon Pauling reasonably should have believed that he would face liability beyond his ability to pay as that liability became due. C.R.S. § 38-8-105(1)(b)(II).

57. Additionally, or in the alternative, the transfers were made without Jon Pauling

Exhibit 9

receiving reasonably equivalent value and rendered Jon Pauling insolvent such that they violated C.R.S. § 38-8-106(1).

58.     Mark Pauling, Jon Pauling, and Two Mile Ranch agreed by words, conduct, or both to carry out the foregoing transactions, and all cooperated in carrying out these transfers.

59.     Amanda Wilson is entitled to any or all remedies set forth in C.R.S. § 38-8-108 as follows:

      a.  Avoidance of the transfer to the extent necessary to satisfy her claims;

      b.  An attachment or other provisional remedy against the assets transferred or other property of Jon Pauling, Mark Pauling, or Two Mile Ranch;

      c.  Judgment for one and one-half the value of the assets transferred or for one and one-half the amount necessary to satisfy her claims, whichever is less, jointly and severally against Jon Pauling, Mark Pauling, or Two Mile Ranch;

      d.  An injunction against further disposition by Jon Pauling, Mark Pauling, or Two Mile Ranch of assets already transferred or of other property, appointment of a receiver to take charge of the assets transferred, and any other relief the circumstances may require.

### SECOND CLAIM FOR RELIEF
*Violation of the Colorado Uniform Fraudulent Transfer Act*
*Transfer of Two Mile Ranch Property to Lardyn*
*Against Jon Pauling, Mark Pauling, Two Mile Ranch, Elyce York, and Lardyn*

60.     The allegations in the preceding paragraphs are incorporated by reference.

61.     The fraudulent transfer of the majority of Jon Pauling's Two Mile Ranch partnership interest was the first step in hindering Amanda Wilson's collection efforts, and the transfer of Two Mile Ranch property to Lardyn was the second step.

62.     At the time when Two Mile Ranch transferred property to Lardyn, Jon Pauling was a "debtor" of Amanda Wilson as defined by C.R.S. § 38-8-102(7).  Mark Pauling and Two Mile Ranch were likewise "debtors" of Amanda Wilson due to their involvement in the earlier fraudulent transfer of Jon Pauling's partnership interest in Two Mile Ranch to Mark Pauling.

**Exhibit 9**

63.     C.R.S. § 38-8-105 sets forth the various, non-exclusive factors that inform whether the debtor acted with "actual intent" to hinder, delay, or defraud a creditor.  Various actions and transfers by the Defendants establish the existence of several badges of fraud, including but not necessarily limited to the following::

a.  Whether "the transfer or obligation was to an insider[.]"  C.R.S. § 38-8-105(2)(a). Lardyn and Elyce York are insiders of Jon Pauling, Mark Pauling, and Two Mile Ranch.  Lardyn is an insider of Jon Pauling because Lardyn is controlled by Elyce York, who is controlled by and a proxy for Jon Pauling, with Mark Pauling's assistance. C.R.S. § 38-8-102(8)(a)(IV).  Lardyn is likewise an insider of Jon Pauling because of this "affiliate" and agency relationship. C.R.S. §§ 38-8-102(1); 38-8-102(8)(d); 38-8-102(8)(e).  Lardyn is likewise an insider of Two Mile Ranch for these same reasons.  Elyce York is an insider of Jon Pauling, Mark Pauling, and Two Mile Ranch for those same reasons.

b.  Whether the debtor "retained possession or control of the property transferred after the transfer[.]"  C.R.S. § 38-8-105(2)(b).  Jon Pauling testified that he continued to work at the feed lot described at n. 1, *supra*, and Jon Pauling retains control over the former Two Mile Ranch property through this control over Elyce York and thereby his control over Lardyn, with the cooperation of Mark Pauling as a fellow member of Lardyn.  Similarly, Two Mile Ranch's purported managing partner Mark Pauling is likewise a member of Lardyn— whose purported managing member does not appear to have any ranching experience—and as such both Mark Pauling and Two Mile Ranch retain control of the transferred property.

c.  Whether, prior to the transfer, "the debtor had been sued or threatened with suit[.]" C.R.S. § 38-8-105(2)(d).  Prior to the transfer of Two Mile Ranch's property to Lardyn, Jon Pauling had been successfully sued by Amanda Wilson.  Likewise, Two Mile Ranch had a charging order entered against it.

d.  Whether the transfer "was of substantially all the debtor's assets[.]"  C.R.S. § 38-8-105(2)(e).  The transfer of Two Mile Ranch property to Lardyn appears to be substantially all of Two Mile Ranch's meaningful assets.  As evidenced by Jon Pauling's sworn pleas of poverty during Ms. Wilson's collection attempts in the State Case, he had already transferred substantially all of his assets.

e.  Whether the "value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred[.]"  C.R.S. § 38-8-105(2)(h).  On information and belief, Lardyn had no effective means to actually pay to Two Mile Ranch the purported sale price for the property transferred by Two Mile Ranch, and Two Mile Ranch received nothing of value from Lardyn for the transfer.

Exhibit 9

f.  Whether the debtor "was insolvent or became insolvent shortly after the transfer was made[.]"  C.R.S. § 38-8-105(2)(i).  Throughout the collection attempts in the State Case, Jon Pauling testified that he is insolvent.  As the property transferred by Two Mile Ranch was substantially of its property, it too became insolvent.

64.  The transfer of the Two Mile Ranch property to Lardyn is a "transfer" as that term is defined in C.R.S. § 38-8-102(13).

65.  This transfer was made with actual intent to hinder, delay, or defraud Amanda Wilson, a creditor of Jon Pauling, Mark Pauling, and Two Mile Ranch.  This transfer violated C.R.S. § 38-8-105(1)(a).  Jon Pauling, Mark Pauling, and Two Mile Ranch's actual intent may be inferred by the existence of multiple badges of fraud, including but not necessarily limited to those set forth in C.R.S. § 38-8-105(2)(a), (b), (d), (e), (h), and (i).

66.  Likewise, this transfer was made without Two Mile Ranch, Jon Pauling, or Mark Pauling receiving reasonably equivalent value in exchange at a time when they should have reasonably believed that they would incur liability beyond their ability to pay as that liability became due.  C.R.S. § 38-8-105(1)(b)(II).

67.  Additionally, or in the alternative, the transfers were made without Two Mile Ranch, Jon Pauling, or Mark Pauling receiving reasonably equivalent value and rendered them insolvent such that they violated C.R.S. § 38-8-106(1).

68.  Mark Pauling, Jon Pauling, Two Mile Ranch, Elyce York, and Lardyn agreed by words, conduct, or both to carry out the foregoing transaction, and all cooperated in carrying out these transfers.

69.  Amanda Wilson is entitled to any or all remedies set forth in C.R.S. § 38-8-108 as follows:

a.  Avoidance of the transfer to the extent necessary to satisfy her claims;

b.  An attachment or other provisional remedy against the assets transferred or other

Exhibit 9

property of Jon Pauling, Mark Pauling, Two Mile Ranch, Elyce York, or Lardyn;

c. Judgment for one and one-half the value of the assets transferred or for one and one-half the amount necessary to satisfy her claims, whichever is less, jointly and severally against Jon Pauling, Mark Pauling, Two Mile Ranch, Elyce York, or Lardyn;

d. An injunction against further disposition by Jon Pauling, Mark Pauling, Two Mile Ranch, Elyce York, or Lardyn of assets already transferred or of other property, appointment of a receiver to take charge of the assets transferred, and any other relief the circumstances may require.

**THIRD CLAIM FOR RELIEF**
*Conspiracy to Violate the Colorado Uniform Fraudulent Transfer Act*
*Against Jon Pauling, Mark Pauling, Two Mile Ranch,*
*Elyce York, Lardyn, and Farmers State Bank*

70.     The allegations in the preceding paragraphs are incorporated by reference.

71.     As set forth above, Jon Pauling, Mark Pauling, Two Mile Ranch, Elyce York, Lardyn, and Farmers State Bank agreed by words, conduct, or both to carry out the above-described transfers to hinder, delay, or defraud Amanda Wilson in violation of the Colorado Uniform Fraudulent Transfers Act.

72.     These Defendants performed one or more acts—namely, the execution of the above transactions—to accomplish their unlawful goals.

73.     These actions have caused Amanda Wilson damage in an amount to be determined at trial.

74.     Additionally, all Defendants have profited from their participation in the conspiracy to hinder, delay, and defraud Amanda Wilson. Farmers State Bank has benefitted and profited through its continuing financing of Jon Pauling and Mark Pauling's operations in Colorado; Jon Pauling and Mark Pauling have benefitted and profited from their ability to continue those operations; and Elyce York has benefitted from free housing in Morrison, Colorado as well as, on information and belief, compensation funneled through Redtail Resources LLC. All of those

Exhibit 9

benefits and profits were jeopardized by Amanda Wilson's collection efforts, which is why all Defendants conspired to hinder, delay, and defraud Amanda Wilson.

75.     All co-conspirators acted with wrongful intent to hinder, delay, and defraud Amanda Wilson, and are jointly and severally liable for any damages that may be awarded against one, including without limitation damages and statutory multipliers available under C.R.S. § 38-8-108(c).

## EXEMPLARY DAMAGES

76.     Defendants' civil conspiracy to violate the Colorado Uniform Fraudulent Transfer Act and the harm that Defendants thereby caused to Plaintiff were "attended by circumstances of fraud, malice, or willful and wanton conduct" within the meaning of C.R.S. § 13-21-102.

77.     Beginning during the first half of 2016, all Defendants entered into conspiracy for the specific, agreed-upon purpose of causing harm to Plaintiff by preventing her from enforcing her judgment against Jonathan Pauling and enforcing the charging order against Two Mile Ranch.

78.     At that time, Defendants knew that Two Mile Ranch owned valuable assets, specifically including mineral interests that were under development by Whiting Petroleum. They knew that Whiting Petroleum soon would begin producing oil and gas from more than 24 wells that would generate royalties paid to Two Mile Ranch. Defendants believed the mineral interests were very valuable and that the oil and gas royalties from the wells would be very substantial.

79.     During 2016 and continuing into 2017, representatives of Farmers State Bank communicated with the Paulings about the value of Two Mile Ranch's mineral interests, the expectation that Two Mile Ranch was on the verge of receiving substantial royalties, and the desire of the Paulings to realize the benefit of those royalties.

Exhibit 9

80.     However, it was patently obvious, and Defendants fully understood and appreciated, that the Paulings would not be able to realize the benefit of the forthcoming oil and gas royalties to Two Mile Ranch or any other anticipated future income of Two Mile Ranch so long as Plaintiff was pursuing enforcement of her judgment against Jonathan Pauling and enforcement of her charging order against Two Mile Ranch.

81.     Accordingly, beginning in or about the Spring of 2016 and continuing thereafter into 2017, representatives of Farmers State Bank, including President Stephen Stull and Executive Vice President Richard Stull, discussed plans with Jonathan Pauling and Mark Pauling specifically to protect Two Mile Ranch from Plaintiff's charging order and to otherwise prevent Plaintiff from collecting her judgment against Jonathan Pauling.

82.     The plan between Farmers State Bank and the Paulings to protect Two Mile Ranch from Plaintiff's judgment was discussed within Farmers State Bank, as evidenced by the following May 10, 2016, email between Farmers State Bank Loan Officer Kelly Roach and Vice President Chris Gray:

> Kelly Roach: "Explain to me how [Two Mile Ranch] filing for bankruptcy is a 'good thing' for [Farmers State Bank]?"
>
> Chris Gray: "My understanding is that our attorney and [] their BK attorney will have this agreed upon before going to the BK court and get it stamped approved at that time and then the transaction can take place. *The BK really just protects the [Two Mile Ranch] partnership from the plaintiff [Amanda Wilson] for the long run*."

(emphasis added).

83.     Along the same lines, Richard Stull authored an internal Farmers State Bank email dated December 8, 2016, to President Stephen Stull and numerous other bank officers and employees. The email attaches multiple internal Farmers State Bank "Classified / Watchlist Loan Reports." The reports include the following statements:

Exhibit 9

"Working with Mark and Jon on Chapter 11 *to get rid of Jon's Judgement* [sic] so the assets can be sold without concern for legal recourse to the buyers."

"Working with Mark and Jon so they can get through the Chapter 11 Bankruptcy, *which is being done to protect the proposed asset sale from the Judgement [sic] against Jon.*"

(emphasis added).

84.     Initially, Defendants' plan involved using a Chapter 11 proceeding before the United States Bankruptcy Court for the District of Colorado to protect Two Mile Ranch from Plaintiff's judgment. Defendants conceived that Two Mile Ranch could present a plan to transfer assets to a new entity that would appear to have an arms-length relationship to Two Mile Ranch and the Paulings and that approval by the Bankruptcy Court would bar Plaintiff from being able to enforce her judgment against the new entity.

85.     Even while Defendants were planning for the Chapter 11 proceedings, however, they recognized that it was a fiction that an arms-length investor would acquire assets from Two Mile Ranch. For instance, in their email exchange on May 10, 2016, Ms. Roach and Mr. Gray referred to the theoretical investor as a "unicorn-like investor group" and expressed skepticism about the bankruptcy plan on that basis. Similarly, Stephen Stull and Richard Stull referred to the theoretical investor group using quotation marks—as in "investor" and "investor group"—as an acknowledgement of the fiction.

86.     Two Mile Ranch filed its Chapter 11 petition on July 1, 2016.

87.     During the bankruptcy case, while the Paulings were telling Farmers State Bank that Two Mile Ranch's mineral interests were worth in excess of $3.4 million, they represented to the Bankruptcy Court and creditors that the mineral interests were worth substantially less.

88.     Additionally, during the Chapter 11 bankruptcy proceeding, the Paulings on behalf of Two Mile Ranch (which was a debtor in possession) and Lardyn entered into an agreement with

22

Exhibit 9

Richard Stull of Farmers State Bank that they would obtain appraisals of the mineral rights without disclosing those appraisals in the bankruptcy proceedings.

89.     During the bankruptcy, Defendants came to realize that a transfer of assets from Two Mile Ranch to Lardyn would be subject to scrutiny by the Bankruptcy Court. For that reason, all Defendants entered into an agreement that Two Mile Ranch would file a motion to dismiss the Chapter 11 proceeding and that Two Mile Ranch would proceed with the transfer of assets to Lardyn immediately following dismissal of the bankruptcy case. Defendants coordinated their activities in relation to the dismissal of the bankruptcy and transfer of assets to Lardyn.

90.     At all times, it was obvious—and representatives of Farmers State Bank actually knew and appreciated—that Lardyn would be controlled by Jonathan Pauling. The Stulls' references to the "unicorn-like investor group" and "investor group," in quotes, are noted above and are evidence of Farmers State Bank's knowledge of the fraudulent nature of the scheme. Additionally, however, Farmers State Bank's officers and employees explicitly discussed how Jonathan Pauling controlled Lardyn and Elyce York. For example, the following is an email exchange between Kelly Roach and Chris Gray shortly after Two Mile Ranch transferred its assets to Lardyn:

> Chris Gray: "I hope we are upgrading, but it just seems like we are rewriting all the same loans into *different names all still controlled by Jon*."
>
> Kelly Roach: "I have yet to 'meet' any of them but Jon and Mark. . . . We NEVER get rid of customers. They just go from one to another. [REDACTED], *TMR to Lardyn,* Lardyn to Pauling Hauling."
>
> Chris Gray: "*TMR to York.*"

(emphasis added).

91.     Farmer State Bank's recognition that Jonathan Pauling controlled Elyce York continued after Two Mile Ranch transferred assets to Lardyn. For example, in an email exchange

Exhibit 9

on June 4, 2019, Kelly Roach wrote that Elyce York "is Jon's puppet." Vice President Jarrod Hamik replied, "110%."

92.     Throughout the entire course of conduct commencing at least as early as the first half of 2016 and continuing thereafter, Defendants' actions were "attended by circumstances of fraud, malice, or willful and wanton conduct" within the meaning of C.R.S. § 13-21-102. Defendants' actions were specifically directed at causing harm to Plaintiff by preventing her from enforcing her judgment against Jonathan Pauling ("Working with Mark and Jon on Chapter 11 to get rid of Jon's Judgement [sic]" and "protect the proposed asset sale from the Judgement [sic] against Jon"). Defendants' actions also were fraudulent in that all Defendants operated with the knowledge that Lardyn Consulting was a fictitious "investor" controlled by Jonathan Pauling and yet acted with the intent to create a false impression in the minds of others, specifically including Plaintiff, that Two Mile Ranch's assets had been transferred in an arms-length sale, with the goal of hindering Plaintiff's collection of her judgment.

93.     For the foregoing reasons, Plaintiff asks that the Court entertain the possibility of awarding exemplary damages against Defendants and do so if the Court determines that exemplary damages are warranted by the evidence presented at trial. To be clear, Plaintiff's request for exemplary damages is in relation to her tort claim for civil conspiracy and not her statutory claims pled herein.

### Prayer for Relief

Plaintiff Amanda Wilson prays for the following relief:

A.  An award of damages to be determined at trial, including, without limitation, any enhanced damages contemplated by C.R.S. § 38-8-108;

B.  Any other remedy set forth in C.R.S. § 38-8-108;

C.  Statutory and mandatory interest on all sums awarded;

24

Exhibit 9

D.  An award of costs and attorney fees as may be award by applicable law;

E.  An award of exemplary damages pursuant to C.R.S. § 13-21-102; and

F.  Any other relief as is proper.

Dated: January 26, 2021

Respectfully submitted,

/s/ *Ross W. Pulkrabek*
Ross W. Pulkrabek
Aaron D. Goldhamer
Keating Wagner Polidori Free, PC
1290 Broadway, Suite 600
Denver, Colorado 80203
303.534.0401
rpulkrabek@keatingwagner.com
agoldhamer@keatingwagner.com

**Exhibit 9**

Exhibit 1
to Second Amended Complaint

**Exhibit 9**

| | |
|---|---|
| DISTRICT COURT, COUNTY OF DENVER, STATE OF COLORADO.<br><br>Court Address:<br>1437 Bannock Street<br>Denver, CO 80237<br>_____<br>Plaintiff: AMANDA WILSON<br>v.<br><br>Defendants:  JONATHAN M. PAULING et al<br>_____ | DATE FILED: December 19, 2018 10:55 PM<br>CASE NUMBER: 2013CV35298<br><br><br><br><br>▲ COURT USE ONLY ▲<br>_____<br>Case Number: 13CV35298<br><br><br>Div.:   275          Ctrm: |

## ORDER RE: PENDING MOTIONS

THIS MATTER comes before the Court on the parties' pending post-trial motions.  The Court, having reviewed the motions, the responses, the replies, the court file, the applicable law, and being otherwise fully advised in the premises HEREBY ORDERS as follows:

### I.        Background

Following a jury trial, in its Amended Judgment issued on October 29, 2015, *nunc pro tunc* October 23, 2015, this court entered judgment for Plaintiff and against Defendant Pauling for economic damages in the amount of $732,136.00, non-economic damages in the amount of, $936,030.00, and punitive damages in the amount of, $2,250,000.00, and awarded Plaintiff costs and prejudgment interest. However, the court did not reduce the prejudgment interest to a sum certain.

The parties have been unable to appeal the amended judgment entered on October 29, 2015 because it was not a final, appealable judgment. In a show cause order, the court of appeals noted that the October 29, 2015 Amended Judgment  does not appear to be a final, appealable order because (1) claims remain outstanding against the entity Defendants and the court did not certify the order for purposes of appeal pursuant to C.R.C.P. 54(b); and (2) the award of

**Exhibit 9**
**Exhibit 1**

prejudgment interest has not been reduced to a sum certain. This Order shall address all
remaining matters in this case and final judgment shall enter.[1]

## II.    Plaintiff's Motion to Amend the Judgment in Include Prejudgment Interest and Defendant Pauling's Unopposed Motion for Forthwith Order Granting Plaintiff's Motion for Award of Prejudgment Interest

On November 2, 2015, Plaintiff filed her Motion to Amend the Judgment to Include
Prejudgment Interest in the Court's Calculation of Actual Damages. On December 1, 2015,
Defendant Jonathan Pauling withdrew his Opposition to Plaintiff's Motion to Amend the
Judgment to Include Prejudgment Interest in the Court's Calculation of Actual Damages.
Furthermore, Defendant Pauling filed an Unopposed Motion for Forthwith Order Granting
Plaintiff's Motion for Award of Prejudgment Interest on June 22, 2016.

While the Motion requests that the court "amend" the judgment to add prejudgment
interest, the court finds that the  sixty-three-day deadline under C.R.C.P. 59(j) does not apply to
Plaintiff's Motion because prejudgment interest remained unresolved by the jury verdict and the
Motion was not directed at obtaining post-judgment relief from the jury verdict or the Amended
Judgment, but rather was directed at reducing the award of prejudgment interest which the court
made in the Amended Judgment to a sum certain. *See Church v. American. Standard.Ins. Co. of
Wisc.*, 742 P.2d 971, 972 (Colo. App. 1987). *See,* C.R.S. § 13-21-101(1)("[I]t is the duty of the
court in entering judgment for the plaintiff… to add to the amount of damages assessed by the
verdict of the jury… interest on such amount calculated at the rate of nine percent per
annum…"). Therefore, the court still has jurisdiction to amend the judgment to include
prejudgment interest.

Accordingly, the Motion is GRANTED and the court amends the Amended Judgment to
include prejudgment interest, at a rate of 9% per annum, pursuant to C.R.S. §13-21-101(1), in the
total amount of $430,971.24. The court's calculation of prejudgment interest is set forth in the
table on page 10, *infra,* which calculation duplicates that contained in Plaintiff's Motion.
Defendant's Unopposed Motion is DENIED AS MOOT.

## III.    Plaintiff's Motion to Dismiss with Prejudice the Entity Defendants

On July 25, 2018, Plaintiff filed her Motion to Dismiss with Prejudice Entity Defendants.
Defendants did not respond.

Therefore, pursuant to to C.R.C.P. 121§ 1-15(3), the Motion is GRANTED AS
CONFESSED, and the entity Defendants are HEREBY DISMISSED WITH PREJUDICE.

---

[1] The court sincerely apologizes to the parties and counsel for the very significant and inexcusable delay in
resolving these matters and entering final judgment in this matter. There were reasons for the delay, but none of
which rise to the level of an adequate explanation.

Exhibit 9

### IV.    Defendant Pauling's Motion for Rule 54(b) Certification of Final Judgment Against Mr. Pauling, Defendant Pauling's Motion to Certify and Supplement the Record on Appeal

On June 22, 2016, Defendant Pauling filed a Motion for Rule 54(b) Certification of Final Judgment Against Mr. Pauling and a Motion to Certify and Supplement the Record on Appeal after the Colorado Court of Appeals issued its show cause order questioning whether the Amended Judgment was a final, appealable order. Initially, Plaintiff opposed these Motions; however, Plaintiff withdrew her opposition to the Motions.

Because the prejudgment interest has now been reduced to a sum certain and the claims against the remaining entity Defendants have been resolved, the court shall enter final judgment in this matter from which the parties may appeal, if they choose. Therefore, the necessity of a C.R.C.P. 54(b) certification and certifying and supplementing the record on appeal has been eliminated and these Motions shall be DENIED AS MOOT.

### V.    Plaintiff's Motion to Amend Judgment to Increase Punitive Damages Award

On November 9, 2015, Plaintiff filed her Motion to Amend the Judgment to Increase Punitive Damages Award to three times the amount of actual damages awarded by the jury because of Defendant Pauling's actions during the pendency of this litigation. On December 21, 2015, Defendant Pauling filed his Response in Opposition to Plaintiff's Motion. On January 11, 2016, Plaintiff filed her Reply in support of the Motion.

#### a.    Jurisdiction to Rule on the Motion

Again, the title of Plaintiff's Motion includes the phrase "amend judgment," which is one form of relief which can be sought through a post-trial motion pursuant to C.R.C.P. 59(a)(4). At a hearing on March 9, 2016, Defendant Pauling took the position that Plaintiff's Motion to Increase the Punitive Damage Award should be deemed denied, because the court did not dispose of it within 63 days, as required by C.R.C.P. 59(j). More recently, however, Defendant Pauling has acknowledged that the Motion to Increase Punitive Damages is not subject to the provisions of Rule 59(j) under Colorado law. *See,* Defendant Jonathan M. Pauling's Reply in Support of Motion for Rule 54(b) Certification of Final Judgment against Mr. Pauling, filed July 20, 2016, at 3, n. 1. However, because this is a matter of subject matter jurisdiction, which parties and the court cannot simply agree exists, the court must determine as a preliminary matter whether it still has jurisdiction to decide this Motion.

Pursuant to C.R.C.P. 59(j),

The court shall determine any post-trial motion within 63 days (9 weeks) of the date of the filing of the motion. Where there are multiple motions for post-trial relief, the time for determination shall commence on the date of filing of the last of such motions. Any post-trial motion that has not been decided within the 63-day determination period shall, without further action by the court, be deemed denied.

Exhibit 9

Here, Plaintiff's Motion to Increase the Punitive Damage Award was filed on November 9, 2015, Defendant's Response thereto (following one extension) on December 21, 2015, and Plaintiffs Reply (following another extension) on January 11, 2016. As it happens, January 11, 2016 was the 63rd day following November 9, 2015, and therefore the court would have needed to rule on the motion the same day it became fully briefed, if C.R.C.P. 59(j) applies.[2]

However, the court still has jurisdiction to rule on Plaintiff's Motion to Amend Judgment to Increase Punitive Damages Award. In *Smeal v. Oldenettel*, the Colorado Supreme Court determined that the trial court retained jurisdiction to rule on plaintiff's new trial motion after the expiration of the time limitation contained in C.R.C.P. 59(j) because plaintiff's claim against a codefendant remained unresolved and the trial court had not entered an order certifying its judgment as final. 814 P. 2d 904 (Colo. 1991). As the Court of Appeals noted in *Church v. American Standard Ins. Co., supra,*

> Where motions filed following a jury trial pertained to unresolved, substantive claims raised in the complaint, they are not actually directed at obtaining post-judgment relief, and accordingly, the provisions of C.R.C.P. 59 do not apply. Even though the motions here were denominated as post-judgment motions, the type of the relief sought fixes their actual nature. The statutory claim for treble damages, attorney's fees, and interest remained unresolved by the jury verdict. Therefore, we conclude that there was no final judgment adjudicating all the claims and the rights and liabilities of the parties until the trial court issued its written ruling. *See* C.R.C.P. 54(b).

742 P.2d at 972. [3] Similarly, until the date of this Order, Plaintiff retained unresolved claims against the entity Defendants and this court had not entered an order certifying its judgment as final pursuant to C.R.C.P. 54(b). Thus, the court has jurisdiction to address the merits of Plaintiff's Motion to Amend Judgment to Increase Punitive Damages Award.

### b. Court's Increase of the Jury's Exemplary Damages Award

The Colorado General Assembly has given trial courts discretion to increase a jury's award of exemplary damages in two circumstances. Pursuant to C.R.S. § 13-21-102(3),

> [T]he court may increase any award of exemplary damages, to a sum not to exceed three times the amount of actual damages, if it is shown that:

---

[2] In fact, given that Plaintiff's Reply was filed at 10:47 PM, the court would have had exactly one hour and 13 minutes to rule on the Motion before it lost jurisdiction!

[3] The court acknowledges and appreciates defense counsel's professionalism in citing controlling precedent from Colorado which had not previously been cited to the court, including during the hearing on March 9, 2016. *See,* C.R.P.C. 3.3(a)(2).

**Exhibit 9**

(a) The defendant has continued the behavior or repeated the action which is the subject of the claim against the defendant in a willful and wanton manner, either against the plaintiff or another person or persons, during the pendency of the case; or

(b) The defendant has acted in a willful and wanton manner during the pendency of the action in a manner which has further aggravated the damages of the plaintiff when the defendant knew or should have known such action would produce aggravation.

Under the punitive damage statute, "willful and wanton conduct means conduct purposefully committed which the actor must have realized is dangerous, done heedlessly and recklessly without regard to consequences, or of the rights and safety of others, particularly the plaintiff." C.R.S. § 13-21-102(1)(b). *See, Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005). The statutory requirements of "willful and wanton conduct" are met when "the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result." *Id.* To increase an award of exemplary damages, the court must make its findings beyond a reasonable doubt. C.R.S. § 13-25-127(2). "The size of a punitive damages award is committed in the first instance to the discretion of the fact finder, and a reviewing court will not disturb the award absent an abuse of that discretion." *Coors*, 112 P.3d at 67.

## 1.   Continued Behavior

First, Plaintiff argues that, pursuant to C.R.S. § 13-21-102(3)(a), the court should increase the jury's award of punitive damages due to Defendant Pauling's wrongful conduct during the pendency of the case that was the subject of Plaintiff's claims. The specific wrongful conduct Plaintiff highlights is Defendant Pauling's "continued grooming behavior with other vulnerable, young women he met at adult entertainment clubs." Mot. at 5. Defendant argues that this alleged conduct is legally and factually insufficient to warrant an increase in punitive damages. Specifically, Defendant Pauling argues that grooming was not the subject of Plaintiff's claims and is not a cognizable claim in Colorado.

The court agrees with Plaintiff and finds beyond a reasonable doubt that Defendant has, in fact, continued to engage in the same wrongful conduct that was the subject of Plaintiff's claims during the pendency of this case. The evidence at trial demonstrated that, following the assault on Plaintiff and including while this case has been pending, Defendant Pauling has continued to frequent adult entertainment establishments and pay for young women who work as exotic dancers, such as Elyce York, to be taken "off the list," meaning they were not required to dance and instead may sit and drink alcohol and talk with Defendant. According to Ms. York's deposition testimony, which was read at trial, Defendant used this technique over perhaps ten occasions to gain her trust and develop a relationship with her. After gaining her trust, Defendant Pauling began to take her to dinner and shopping; assisted her financially, including loaning her $5,000 to hire a divorce lawyer, giving her money to rent an apartment separate from her estranged husband, preparing and backdating a fraudulent document purporting to be an employment contract and two fraudulent paychecks designed to mislead her prospective landlord

Exhibit 9

that her income was sufficient to afford the rent, loaning both her and her mother money on a no-interest basis, giving her access to a car, and buying her diamond earrings and a necklace worth $3,500. In addition, Defendant Pauling, through one of the Defendant entities he controls, has purchased the multi-million-dollar home in a gated community in the foothills near Denver where Ms.York has resided rent-free with her son since May, 2015. Ms. York testified that she has spent at least one night in a hotel with Mr. Pauling. Although she is aware that Plaintiff claims that Mr. Pauling raped her, she does not believe that occurred, and instead believes that Defendant was "probably" set up. She knows he is a registered sex offender, but it does not concern her. She believes that Defendant is divorced, when in fact he remains married.  This is a pattern of "grooming" behavior strikingly similar to that in which Defendant Pauling engaged with Plaintiff and several other exotic dancers, including Leslie Muirhead and Natalie LaDouceur.

Defendant argues that such grooming was not itself a claim for relief, and that Mr. Pauling has not sexually assaulted anyone other than Plaintiff.  However, the court does not interpret the operative language of the punitive damages statute – "has continued the behavior or repeated the action which is the subject of the claim"- quite so narrowly.  As the testimony of Plaintiffs expert Janine D'Anniballe made clear, such grooming behavior is a well-recognized precursor to sexually abusive or assaultive behavior, especially where there is a significant differential in power or wealth or age.  This has been true with respect to Defendant's relationships with both Plaintiff Wilson and Ms. Muirhead.

The trial evidence indicated that Defendant had violated the protection order entered in the criminal case by coming to Plaintiff's place of employment, an adult entertainment establishment where she had resumed exotic dancing, three times after the sexual assault occurred. While these episodes apparently pre-date the pendency of this case, and therefore are not a separate basis for increasing the punitive damage award, the court nevertheless finds them relevant in the limited sense that they indicate a sense of entitlement, as well as a consciousness of his conduct and a recognition that injury would result to the Plaintiff, and therefore further support the finding that Defendant Pauling continues to engage in the patterned behavior at issue in this lawsuit. Reply at 6, fn. 7. Simply put, Defendant Pauling has thus far failed to learn from his past mistakes and correct his destructive behavior, indicating that the presumed deterrent effect of punitive damages is warranted in this matter. *See Coors*, 112 P.3d at 65 ("The general purposes of punitive damages under section 13–21–102 are punishment of the defendant and deterrence against the commission of similar offenses by the defendant or others in the future.").

## 2.      Further Aggravation

Second, Plaintiff argues that, pursuant to C.R.S. § 13-21-102(3)(b), the court should increase the jury's award of punitive damages on account of Defendant Pauling's willful and wanton conduct during the pendency of the case, which has further aggravated Plaintiff's damages. Specifically, Plaintiff contends that an increase in punitive damages is warranted because Defendant Pauling has engaged in abusive litigation tactics and engaged in an abuse of process by directing bad faith filings for bankruptcy in order to improperly delay trial. Defendant argues that "Plaintiff's claims are unavailing and provide no basis to increase the punitive damages award." Resp. at 9.

**Exhibit 9**

The court finds that, beyond a reasonable doubt, Defendant Pauling acted in a willful and wanton manner during the pendency of this action, causing aggravation to Plaintiff's damages. Primarily, Defendant Pauling directed all of the entity Defendants, which he controlled, to file for Chapter 7 bankruptcy protection less than one month before trial, which had the effect of automatically staying the case against those entities, then attempted to stay the case against himself as well. Colorado courts have regarded such abusive litigation tactics as justifying a trebling of punitive damages. *See, Gen. Steel Domestic Sales, LLC v. Bacheller*, 291 P.3d 1, 12 (Colo. 2012) (affirming trial court's trebling the exemplary damages award for discovery abuses and filing a C.A.R. 21 petition for the purpose of delay); *see generally Tait ex rel v. Hartford Underwrtiers Ins. Co.*, 49 P.3d 337 (Colo. App. 2001) (affirming the trial court's increase of punitive damages for abusive litigation conduct including attempting to remove the case to federal court without a good faith basis).

Here, the court concludes that the entities' bankruptcy filings were clearly a litigation tactic used solely to delay trial because the entity Defendants did not list any creditors besides Plaintiff (with her claim listed as "unknown") and did not list any assets. With no assets, the bankruptcy proceeding did not change the status quo of the companies. In his Response, Defendant Pauling does not even attempt to justify the bankruptcy filing as anything more than a litigation tactic to avoid allowing Plaintiff to recover a possible damage award against the entity Defendants. Resp. at 15-16. However, Defendant Pauling, who did not personally file for bankruptcy, then attempted to use the automatic stay issued as a result of the bankruptcy filings by the entity Defendants to continue a continuance of the trial against himself as well. In two emergency hearings held on September 24 and 28, 2015, counsel for Defendant Pauling argued for a continuance based upon the bankruptcy filings of the entity defendants and their resulting automatic stays. *See,* Order Re: Defendant Pauling's Motions to Continue Trial, September 30, 2015, at 3. In fact, however, clear legal authority demonstrated that the case was not stayed against Defendant Pauling, a solvent individual, as distinct from the entities he controlled. *See Id.* (citing *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1330 (10th Cir. 1984)). Thus, the court concludes that the entities' bankruptcy filings and Defendant Pauling's attempt to bootstrap the resulting automatic stay into a delay of the trial against him individually were calculated and illegitimate litigation tactics of the type which should not be tolerated, and meet the test of C.R.S. § 13-21-102 (3)(b). Defendant Pauling's litigation-related misconduct required Plaintiff to incur unnecessary litigation expenses to respond to his efforts to delay the trial and the bankruptcy filings and appear at several hearings related to these issues. Additionally, beyond increasing Plaintiff's litigation expenses, this misconduct aggravated her damages by preventing her from possibly recovering her attorney's fees from the entity Defendants pursuant to her Title VII claim, and by causing her additional emotional harm to be forced to continue litigation against the entity Defendants. Reply at 6, fn. 5.

Additionally, Defendant Pauling and the entity Defendants, at the direction of Defendant Pauling, misused the discovery process, which further aggravated Plaintiff's damages. Defendant Pauling used written discovery and her deposition to attempt to harass and intimidate Plaintiff in a manner that was disproportionate and inappropriate, especially in light of the fact that the sexual assault itself was essentially uncontested. In a status conference on August 19, 2015, the court felt it necessary to grant a protective order and offer to have Plaintiff's deposition be

Exhibit 9

conducted in the courtroom in order to eliminate intimidation. *See* Plf.'s Mot. for Protective Order, July 28, 2015. Furthermore, Defendant Pauling plead affirmative defenses that he failed in any way to litigate in an attempt to intimidate and harass Plaintiff. In sum, the court finds that Defendant Pauling's litigation-related behavior was extraordinary and abusive and constituted a pattern of attempts to delay, intimidate, and harass Plaintiff, and Defendant knew or reasonably should have known that such actions would further aggravated Plaintiff's damages by causing her increased litigation expenses and emotional harm. *Gen. Steel Domestic Sales, LLC*, 291 P.3d at ¶ 13.

For all the foregoing reasons, the court finds that an increase in the jury's punitive damage award is appropriate under C.R.S. § 13-21-102(3)(a) and (b). As to the amount of the increase, the court finds that it is appropriate under the circumstances to increase the punitive damages to double the amount of actual damages. Based on its careful and independent consideration of the evidence, as discussed above, the court finds that this is the appropriate amount of punitive damages to adequately punish Defendant Pauling and deter future similar conduct by himself and others.. Thus, the court shall increase the punitive damage award to $4,198,274.48.[4]

The court declines Plaintiff's invitation to increase the punitive damage award to the statutory maximum of three times the amount of actual damages. C.R.S. § 13-21-102(3). With respect to the conduct which continued during the pendency of this case, the court notes that grooming conduct is inherently nuanced, and its force somewhat diminished when the "target" of such grooming is an adult, as opposed to a child. Moreover, it was essentially uncontested that Defendant's assault on Plaintiff followed his first-time ingestion of marijuana edibles, which caused him to act in a manner he never had previously toward Plaintiff, despite the antecedent grooming. Further, to punish a party unduly for aggressive discovery and litigation tactics would run the risk of deterring zealous advocacy, which lawyers are duty-bound to engage in on behalf of their clients.

## VI.    Conclusion

For all the foregoing reasons, the court HEREBY ORDERS as follows:

c.   Plaintiff's Motion to Amend the Judgment to Include Prejudgment Interest is GRANTED and the court HEREBY AMENDS  the Amended Judgment entered on October 29, 2015 to include prejudgment interest, at a rate of 9% per annum, C.R.S. §13-21-101(1), in the amount of $430,971.24. The calculation of this amount is set forth on the table on page 10, *infra.*

d.   Defendant Pauling's Unopposed Motion for Forthwith Order Granting Plaintiff's Motion for Award of Prejudgment Interest is DENIED AS MOOT.

---

[4] $2,099,137.24 ($732,136.00 (economic damages) + $936,030.00 (noneconomic damages) + $430,971.24 (prejudgment interest)) x 2 = $4,198,274.48. *See generally Vickery v. Evans*, 266 P.3d 390 (Colo. 2011) (finding that the amount of actual damages includes prejudgment interest).

**Exhibit 9**

e.  Plaintiff's Motion to Dismiss is GRANTED and Defendants Pauling
Management Group Co., LLC, Two Mile Ranch Cattle Feeders Co., LLC,
Two Mile Ranch Land Co., LLC, Two Mile Ranch Market Co., LLC, and
Two Mile Ranch Processing Co., LLC are HEREBY DISMISSED WITH
PREJUDICE.

f.  Defendant Pauling's Motion for Rule 54(b) Certifications of Final Judgment
Against Mr. Pauling is DENIED AS MOOT.

g.  Defendant Pauling's Motion to Certify and Supplement the Record on Appeal
is DENIED AS MOOT.

h.  Plaintiff's Motion to Amend Judgment to Increase Punitive Damages Award
is GRANTED IN PART.  The court HEREBY AMENDS the Amended
Judgment of October 29, 2015 to ENTER JUDGMENT in favor of Plaintiff
Amanda Wilson and against Defendant Jonathan Pauling for exemplary
damages in the total amount of $4,198,274.48.

i.  Because the prejudgment interest has now been reduced to a sum certain and
the claims against the entity Defendants have been resolved, the court
determines that a final, appealable judgment has been entered in this matter
and all applicable appellate timelines shall apply from the date of this Order.

DATED this 19th day of December, 2018

BY THE COURT:

_____
Ross B.H. Buchanan
Denver District Court Judge

Exhibit 9

# PREJUDGMENT INTEREST

| FROM | TO | DAYS | PRINCIPAL | RATE | INTEREST |
|------|------|------|-----------|------|----------|
| 2/26/13 | 12/3/13 | 281 | $1,668,166.00 | 9% | $115,583.34 |
| 12/4/13 | 12/3/14 | 365 | $1,783,749.34 | 9% | $160,537.44 |
| 12/4/13 | 10/23/15 | 323 | $1,944.286.78 | 9% | $154,850.46 |
| **Total Pre-Judgment Interest: $430,971.24** | | | | | |

Exhibit 9