IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-01224-RBJ-STV

AMANDA WILSON, a Michigan citizen,

Plaintiff,

v.

JONATHAN PAULING, an individual Colorado citizen, et al.

Defendants.

---

## FARMERS STATE BANK'S
## RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND TO PERMIT COURT TO CONSIDER EXEMPLARY DAMAGES

---

Defendant Farmers State Bank ("FSB") here by opposes Plaintiff's Motion for Leave to File Second Amended Complaint (Doc. 82).

Jon Pauling ("JP") sexually assaulted Wilson in 2013.  Wilson obtained a multi-million dollar civil judgment against JP in 2015, but it was uncollectible.  By this lawsuit, Wilson wants FSB "to pick up the bar tab," as her attorneys say.

### THE EVIDENCE AT TRIAL WILL SHOW

JP became a customer of FSB in about January of 2012 when his company Two Mile Ranch Market Company LLC ("Market Co.") borrowed $270,157.00.   Ex. 170.[1]   JP personally guaranteed the debt and pledged as collateral a residence he owned on 7th Avenue in Sterling ("the Residence").  Ex. 168.

In October 2012, a different JP business, JMP Enterprises, borrowed $464,109.00 from

---

[1]       The voluminous deposition exhibits and the deposition testimony cited herein are not filed with the Court now because FSB has not filed a Motion for Summary Judgment, which FSB believes are not favored by the Court.

FSB.  Two Mile Ranch ("TMR") guaranteed that debt.  Ex. 180.  Since its inception in 1986, JP and his brother Mark Pauling ("MP") have been the general partners of TMR.  Ex. 202.

TMR banked with First Tier Bank, which had regulatory issues after the recession.  In late 2012, TMR replaced First Tier Bank's banking relationship with FSB.  On January 11, 2013, FSB made loans totaling $8.65M to TMR ($8.5M) and Market Co. ($150,000.00).  Exs. 181-185.  FSB perfected its security interests in TMR's collateral, recording Deeds of Trust on real property in Logan County and Weld County, requiring security agreements, and filing UCC Financing Statements.  FSB required personal guaranties from JP and MP.  The loans were also cross-collateralized with the Residence and the assets of JP's businesses.

JP sexually assaulted Wilson in February 2013.  He was charged criminally in Denver County District Court Case No. 2013CR001069.  In December 2013, after judgment was entered in the criminal case,[2] Wilson filed a civil suit against JP and several of his entities in Denver District Court Case No. 2013CV035298 ("Wilson's Case").  Ex. 164.  TMR was <u>not</u> a named defendant.  FSB had no knowledge of JP's criminal charges or Wilson's Case until early 2016.

In January 2014, JP borrowed $46,160.00 from FSB.  Ex. 169.  The debt was secured by the pre-existing security agreements and deed of trust on the Residence.   By April 2014, JP's loan was in default, and by summer, FSB was in a workout with TMR.  The prices of cattle, corn, and oil were dropping, as was the value of agricultural land.  TMR's loans were classified, meaning at risk for repayment.  Throughout the rest of 2014, TMR tied to lease its minerals and to sell assets, including mineral interests, to raise cash to pay down debt. Eventually, in May 2015, some mineral interests were sold, part of a farm and ranch TMR owned was sold to Cervi Enterprises and another

---

[2]        JP's probation was terminated in February 2017.

part to MP,[3] and TMR acquired non-agricultural property known as North Turkey Creek as part of a 1031 exchange.[4]

Wilson's Case proceeded to trial against JP[5] in October 2015, and the jury rendered a multi-million dollar verdict. Wilson immediately recorded Transcripts of Judgment in multiple Colorado counties. Ex. 167.[6]  She also sought orders of execution on several vehicles titled in JP's name. Exs. 166, 176-179.

FSB did not know of Wilson's Case before the verdict.  When it learned of the judgment, "[w]e figured out our problem loan that we were working on just got more problematic."  S. Stull 89:20-21.  FSB "contacted legal to find out how it was going to affect us."  *Id.* at 91:16-24.[7]

On November 19, 2015, Wilson also obtained a charging order against JP's interest in TMR ("Charging Order").  Ex. 172.  FSB was not served with it.  In fact, until this lawsuit, FSB did not know it existed and did not know what a charging order was.  Wilson's expert with 40 years in banking explains that she, too, was not familiar with charging orders until <u>after</u> she was retained for this case; her only understanding of charging orders comes from Wilson's attorney and her

---

[3]     MP financed his purchase by borrowing $730,000.00 from FSB and giving TMR a note for $275,000.

[4]     In April 2020, Wilson moved for leave to file a Second Amended Complaint (Doc. 56), which FSB opposed (Doc. 58 and Doc. 59), and the court denied for lack of conferral under local rule 7.1(a) (Doc. 66).  Wilson wanted to pursue a new claim that FSB's May 2015 Deed of Trust against North Turkey Creek was not valid.  FSB opposed amendment on the basis of futility, arguing FSB's lien was valid.  Wilson has since abandoned this claim.  Wilson's own expert does not opine that the May 2015 transaction was part of a plan to avoid paying a potential judgment owed Wilson.  Patterson 99:9-15.  She agrees FSB held a valid Deed of Trust, and thus, FSB did nothing wrong by, and she is not critical of, FSB taking title by way of a Deed in Lieu of Foreclosure in December 2019.  Patterson 115: 22-117:2; 163:13-164:4; 180:13-24.

[5]     In September 2015, the defendant entities in Wilson's Case filed for Ch. 7 bankruptcy protection. Ex. 165. The bankruptcy court closed most cases after the Chapter 7 Trustee filed Reports of No Distribution.[5]

[6]     In October 2015, Wilson recorded Transcripts of Judgment in Weld, Jefferson, Adams, Denver, and Arapahoe counties.  In December 2015, she recorded one in Logan County.

[7]     Wilson's expert agrees that a reasonable banker who learns of a lawsuit would reach out to bank counsel and look for "legal ways" for the bank to protect itself.  Patterson 121:14-122:21.

online reading.  Patterson 111:25-112:5; 60:25-62:5.  Relevant to charging orders, Wilson's expert confirms that a bank has <u>no</u> role as to a customer's distributions:

> Q   So what role, in your experience as a banker, does the bank have with determining whether a bank customer should make a distribution?
> A **The bank doesn't decide** if the customer's going to get a distribution.
> Q Who decides whether -- go ahead.
> A  The parties to the entity that you're referring to that would make a distribution. So if it was the owners or the partners or whomever's involved in that would make that decision.

Patterson 120:23-121:7 (bold added).

In January 2016, to aid her effort to collect the judgment from JP, Wilson served FSB in Nebraska with a Colorado subpoena for a 30(b)(6) deposition and subpoena duces tecum for banking information.  Ex. 173.  FSB's attorneys coordinated with Wilson's attorneys as to procedure and requisite court approval for release of customer information, and FSB produced bank records as to JP, JP businesses, TMR, and MP.  Ex. 174 and 175.

In April 2016, FSB served upon TMR, JP, MP, and JP's businesses demand for payment of about $9.6M[8] by May 18, 2016.  They did not make the payments.

On July 1, 2016, TMR filed for Chapter 11 bankruptcy protection.  Exs. 186 and 187.  In its schedules, TMR listed total liabilities of $9.7M and total assets of $8.87M.  The Claims Register reflects 11 claims filed totaling about $9.74M, and, of that total, FSB's claim was $9.6M.  Ex. 189. FSB's Proof of Claim indicated that FSB's secured debt was $8.96M and was unsecured for $618,713.61.  Ex. 190.

On July 5, 2016, FSB began foreclosure on the Residence.  Due to the judgment lien presented by her Transcript of Judgment, Wilson was given notice of the foreclosure and right to

---

[8]     FSB demanded that JP pay $53,600.02 owed on Note 2217 (Ex. 171),  MP pay $748,721.46 owed on Note 2346 (FSB000307), and TMR, JP, MP, and JP's businesses pay the more than $8.8M owed on Notes 2097, 2351, 2352, and 2353 (FSB000308-309).

take out FSB's priority lien.  Ex 171.   In November 2016, FSB obtained title by Confirmation

Deed as a result of it being the bidder.

Though not listed as a creditor of TMR,[9] Wilson had actual knowledge of TMR's Chapter

11 case.[10]  Wilson did not enter an appearance in the Chapter 11 case, request notice and a right to

be heard as a party in interest under 11 U.S.C. § 1109(b), or file an objection to any motion.

During the nine (9) months the Chapter 11 case was pending, FSB was doing what

Wilson's own expert says it should have been doing.[11]  FSB was balancing the pros and cons of

foreclosure and the timing thereof, while TMR reported on TMR's efforts to find an investor to

---

[9]     The Charging Order did not make her a creditor of TMR.  *Board of Cty. Comm'rs of Cty. of Park v. Park Cty. Sportsmen's Ranch, LLP*, 271 P.3d 562, 571 (Colo. App. 2011); *Merrill Ranch Properties, LLC v. Austell*, 784 S.E.2d 125 (Ga. App. 2016); *In re Nilhan Developers, LLC*, 622 B.R. 795, 803 (Bankr. N.D. Ga. (2020).

[10]     It came up throughout Wilson's Rule 69 exam of MP in November 2016.

[11]     Patterson 144:18-146:25:
Q Based on all the information that you have, in April of 2017, you, as a reasonable banker, would have done what?
A I would have asked them to bring me a qualified borrower. Or I would have had to take action to be able to protect my loans. . . If it means foreclosure, it means foreclosure. If it means collecting other assets. Whatever it means to get my loan paid back, I would take those actions, and every action is different in every single case, as you know, being an attorney for a bank.
. . .
Q Okay. Another option on the menu of options was to take action to protect the loans by foreclosing on the collateral.
A Yes. That would be a possibility.
Q Okay. What else is on the menu of options?
A I -- I don't know right offhand, because again, every case is different. It depends on what the borrower comes to the table with, offering. You look at every option available to you.
Q Are you testifying to an opinion that Farmers State Bank failed to consider any option available to it on that menu of options in April of 2017?
A I'm not stating that they failed to do anything. I'm simply stating here what they did, not what they failed to do.
Q Okay. But by stating what your opinion is that they shouldn't have allowed the sale of assets to Lardyn, you're being critical of their decision, correct?
A Yes, I am.
Q And so I want you to tell me, in your opinion, what is the options that they should have -- what is the path they should have taken?
A I cannot tell you that. I can tell you that I do not believe it was a good decision to make a loan for $7.1 million to an entity that was owned 85 percent by an individual who has absolutely no experience in farming and ranching.
Q Who was going in business with Mark Pauling, who had decades of experience in farming and ranching. True?
MR. PULKRABEK: Form.
A Mark Pauling had experience. What his level of experience was, I don't know. From everything I have seen, Mark Pauling was the boots on the ground, take care of the day-to-day business of feeding the cattle and doing things. Jon Pauling did all of the planning, strategics, financial, modeling, everything else that was provided to the bank in the form of financial information was provided by Jon.  . . .

payoff current debt or provide an income stream sufficient to service debt.  In sum, FSB wanted

to and was trying to find a way to minimize its loss.  As Steve Stull explained:

> A  So they were in a down cycle as a business.  They were losing money.  We were
> in a workout situation.  We were trying to get out of Two Mile Ranch, which had
> issues of its own.   They tried to get it restructured in bankruptcy, could not do that.
>
> So after that they started looking for a buyer for the asset.  They tried to put together
> investment groups.  They tried all sorts of things.  And we got down to a business
> decision of, do you loan money to an upstart or do you foreclose on the existing
> one.  And when you foreclose on a property the bank is going to get 70 cents on the
> dollar if they're lucky and we would take a big loss.
>
> So those type of things go into play.  When you make the decision whether Mark
> has the ability to handle the cattle and does Elyce have the ability to do the
> bookkeeping, those are things that we look at. . .

S.  Stull 85:19-86:12.[12]   As noted  in  the  CLASSIFIED/WATCHLIST  LOAN  REPORT  from

November 30, 2016:

| PRESENT STATUS (Include increases or decreases in outstanding balance, past due and non-performing status and progress or deterioration) |
| --- |
| Working with Mark and Jon so they can get through the Chapter 11 Bankruptcy, which is being done to protect the proposed asset sale from the Judgement against Jon.  The buyers want this to settle legal claims.  The buyers want this to settle legal claims. Last quarter Oil Prices have increased substantially from the lows from last quarter so the value of the Mineral rights have been increased.  Like wise we have ordered new appraisals on the Farm and the North Turkey Creek Ranch and expect the values to change slightly down for the farm and slightly up for North Turkey Creek Ranch.
Bank has pulled O&E reports for all real estate for Two Mile Ranch, a General Partnership; Mark Pauling; and Jon Pauling.  Only one Judgement appears of record which is on the house that is in Jon Pauling name only.   The bank has requested legal counsel to start the foreclosure process on Jon Pauling which includes this house which is cross secured for all of our loans.  Record does show that Farmers State Bank has a priority position on all real estate pledged as collateral. |

(Doc. 82-4).  Some of the emails Wilson cites in her motion as admissions of a conspiracy simply

reflect that TMR was reporting on its efforts, and, in large part, the identity of potential investors

and their true level interest in an asset sale was not known to FSB.

On February 28, 2017, TMR moved to dismiss the Chapter 11 case because it was unable

to put forth a viable plan of reorganization.  TMR's motion to dismiss was granted on March 31,

2017.  The reality at the time was that TMR's operation was unable to pay its operating expenses,

was unable to refinance or find investors (other than MP and York), and as a result, did not have

---

[12]      Wilson's expert agrees that is expensive for a bank to foreclose and take on "other real estate owned" or
OREO property, as there are expenses such as the cost to foreclose to get control of the property, the cost to repair and
maintain the property, taxes, insurance, holding costs, and selling costs.  Patterson 63:7-22.

value as a going concern.  TMR had no money to make distributions to partners. TMR could save time and expense by proceeding with an asset sale to Lardyn outside of bankruptcy.  Lardyn planned to use the farm and ranch to operate as a feedlot.  The asset sales would not be concealed from anyone; the deeds transferring title to real property are public record.

Both of Wilson's experts in this case testified that they do not have an opinion whether, had FSB elected to foreclose on collateral, there would have been any money to pay any creditors other than FSB or to make distributions to MP or to Wilson as a result of the Charging Order. Patterson 127:8-21 and 147:5-15; Lutz 92:3-194:6.

In April 2017, TMR sold assets to Lardyn for $7.1M as follows:

- o Logan County farm and ranch land - $4.27M (Exs. 192, 193, and 195)
- o Machinery and equipment - $610,000 (Ex. 196)
- o Weld County Mineral interests - $2.22M (Exs. 194-195)

Lardyn could not get financing elsewhere, so FSB financed Lardyn's purchase.[13]  Before and after the sale, TMR's obligations to FSB were as follows:

| Outstanding Debts on 4/28/2017 | | | | |
|---|---|---|---|---|
| Loan # | Payoff | Principal | Interest /Other | Type |
| 2097 | 79,910.61 | 74,980.15 | 4,930.46 | Direct |
| 2351 | 676,235.64 | 620,521.47 | 55,714.17 | Direct |
| 2352 | 8,502,341.67 | 7,600,000.00 | 902,341.67 | Direct |
| 2353 | 33,048.36 | 32,256.07 | 792.29 | Direct |
| 2541 | 5,725.00 | 5,725.00 | | Guaranty |
| 2346 | 730,000.00 | 730,000.00 | | Guaranty |
| 2508 | 11,223.93 | 11,223.93 | | Guaranty |
| Expenses and Fees | $103,140.87 | | $103,140.87 | |
| Totals | 10,141,626.08 | 9,074,706.62 | 1,066,919.46 | |

| Use of funds 4/28/2017 | | | |
|---|---|---|---|
| Loan # | Payoff | Paid | Remaining Balance |
| 2097 | 79,910.61 | 79,910.61 | 0.00 |
| 2351 | 676,235.64 | 676,235.64 | 0.00 |
| 2352 | 8,502,341.67 | 6,260,957.71 | 2,241,383.96 |
| 2353 | 33,048.36 | 33,048.36 | 0.00 |
| 2341 | 5,725.00 | | 5,725.00 |
| 2346 | 730,000.00 | | 730,000.00 |
| 2508 | 11,223.93 | | 11,223.93 |
| Expenses and Fees | $103,140.87 | | $103,140.87 |
| Lardyn's Closing Fees | | 49,847.68 | |
| Totals | 10,141,626.08 | 7,100,000.00 | 3,091,475.76 |

Ex. 197.  Proceeds from the sale went to pay down TMR's pre-existing debt.

As far as the prices Lardyn paid, Wilson's expert testified:

- *Farm and Ranch*:  she is unaware of any evidence to indicate that the price for the land in

  Logan County of $4.27M (based on an appraisal) was for less than reasonably equivalent

---

[13]     TMR's North Turkey Creek property was not sold.  TMR listed it for sale with a broker, but it did not sell. Ultimately, FSB took a Deed in Lieu in December 2019, incurring significant expenses to repair, hold, and sell.  FSB sold it in September 2020 at a loss.

value.  Lutz 44:16-45:3; 80:15-81:6.

- *Machinery and Equipment*:  TMR did <u>not</u> sell the equipment at $610,000 for less than reasonably equivalent value.  Lutz 44:16-45:3; 81:7-82:13.

- *Minerals*:  as to the mineral interests in Weld County sold for $2.2M, she does <u>not</u> know or <u>cannot</u> state:

    o  which of the mineral interests where producing and which were non-producing (Lutz 47:18-50:13 and 52:14-19);

    o  which of the mineral interests were appraised by Gustavson at $1.36M (Lutz 48:16-49:14);

    o  the value of the non-producing mineral interests sold (Lutz 53:13-17 and 53:18-56:4); or

    o  whether the mineral interests listed on the Contract to Buy and Sell Minerals for $2.2M were sold for less than reasonably equivalent value (Lutz 51:17-52:13).

Wilson does <u>not</u> have an appraiser who will testify at trial that he or she appraised the mineral interests sold as of April 2017 and the value was greater than the sale price of $2.22M.  Wilson's case is grounded in a reference in an FSB loan presentation memo to $3.4M.[14]

Wilson filed this lawsuit two years after the sale of assets to Lardyn.  FSB never denied that it communicated with Lardyn through JP, MP, and York, or that JP helped out in Lardyn's business after the sale, or that the bank considered JP at times as a representative of management serving at the request of York or MP.  R. Stull 51:1-24; 65:11-19; 67:4-9; 67:17-68:2; 69:12-70:9; 95:22-96:8.  Prior to Wilson's depositions of Richard and Steve Stull in June 2020,[15] FSB

---

[14]  The value of mineral interests fluctuate significantly, in part because the volatility of the price of oil and gas. Wilson's expert admits that, while the price might have increased in 2018 and 2019, the price in November 2020 was lower than it has been in the last several years, so the value of the minerals interests has come down.  Lutz 50:14-51:16; 59:11-61:1; 100:20-23.

[15]  Wilson listed a 30(b)(6) deposition of FSB in the Scheduling Order.  Doc. 52 at 13.  Thereafter, over FSB's objection (Doc. 62), the Court granted Wilson's request to add two (2) seven hour depositions of FSB officers Richard and Steve Stull to her list of ten (10) depositions.  Doc. 63.

produced over ten thousand pages of loan committee minutes, loan presentation memos, loan files (including appraisals), as well as emails and texts between representatives of FSB and JP, York, and MP, prompting a rare compliment from Wilson's attorneys:

> **From:** Ross W. Pulkrabek [mailto:Rpulkrabek@keatingwagner.com]
> **Sent:** Thursday, May 14, 2020 4:21 PM
> **To:** Tracy A. Oldemeyer <toldemeyer@clinewilliams.com>
> **Cc:** Aaron D. Goldhamer <Agoldhamer@keatingwagner.com>
> **Subject:** Farmers State Bank - follow up on discovery re text messages
>
> Dear Tracy,
>
> Setting aside that we represent opposed parties in this case, I do want to credit that you are the one defense attorney who so far as disclosed what appear to be fairly comprehensive emails as well as text messages.

Lender liability laws precluded FSB from dictating whom Lardyn chose, like JP, to rely upon for assistance with Lardyn's new feedlot operation.

## ARGUMENT

A court may deny leave upon a showing of undue delay, unfair prejudice, and futility of amendment. *Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571, 1585 (10th Cir.1993); *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013).

Wilson claims FSB's motivation in April 2017 to allow TMR to sell some assets to Lardyn was <u>not</u> to minimize FSB's loss. Wilson claims FSB's motivation was to participate in a plan to prevent Wilson from collecting any future TMR distribution(s) to JP by way of the Charging Order. Motion at 6, ¶8. FSB argues that is not true. Rather, as an alternative to foreclosure, FSB decided to give York and MP, through their new entity named Lardyn, a chance on their plan to use the farm and ranch land to operate a feedlot. All Wilson's banking expert can say is that she would not have made the same decision had she been in FSB's shoes.[16] Patterson 144:18-146:25.

Wilson argues there is good cause for granting leave to amend to include exemplary

---

[16] Wilson's expert states that FSB did not violate any state or federal law or any state or federal regulation. Patterson 90:18-91:10.

damages now.  She argues that a handful of FSB internal emails recently produced show FSB's explanations of its decision-making process are "lies" (Motion at 12), and, up until now, Wilson's attorneys had not requested exemplary damages against any defendant because they were not confident that they could prove entitlement to them beyond a reasonable doubt.[17]  Motion at 2 and 10.  As explained in the detailed history above, the internal emails do not support that argument.[18]

## A.  The amendment is futile.

Under CUFTA, TMR was never a debtor of Wilson, and TMR's property was never an asset.  *Mountain States Bank v. Irvin*, 809 P.2d 1113, 1115 (Colo. App. 1991); C.R.S. § 38-8-102(2)(a) and (7); *Board of Cty. Comm'rs of Cty. of Park v. Park Cty. Sportsmen's Ranch, LLP*, 271 P.3d 562, 571 (Colo. App. 2011).

As to her ability to reach JP's interest in potential distributions from TMR, Wilson's sole remedy is through the Charging Order.  FSB had no knowledge of the Charging Order and would not have a role in TMR's decision about distributions.

Wilson has offered no evidence that she sustained damages as a result of TMR's decision in April 2017 to sell some of its property.  Prior to April 2017, there is no evidence TMR was making money from operations.  Rather, its "business as usual" resulted in TMR falling short on the cash it needed to service its debt.   Wilson was not injured by the April 2017 sale because the property sold was fully encumbered.  There was no equity.

---

[17]     Wilson concedes that some statements in the emails are inaccurate.  For example, on page 6:  "Although FSB's terminology was imprecise – Defendants could not "get rid of Jon's Judgement [sic] by running Two Mile Ranch through a Chapter 11 proceeding  . . ."

[18]     Notably, in her proposed pleading, Wilson is not correcting allegations she now knows to be inaccurate, such as: "Farmers State Bank, which had loaned Jon Pauling and Mark Pauling millions of dollars over the years, **and which had profited richly from such loans**, . . ." and "[t]he bankers at [FSB] know [JP and MP] personally and have a **longstanding, highly lucrative relationship** with them."    Doc. 82-10, ¶¶ 45 and 46 (bold added).

Further, Wilson has no evidence that TMR's assets were sold for less than reasonably equivalent value, or, alternatively, if FSB had foreclosed, there would have been anything left after paying TMR's debt for TMR to distribute.  Nothing was placed out of her reach.  *Megabank Financial Corp. v. Alpha Gamma Rho Fraternity,* 841 P.2d 318 (Colo. App. 1992).

In addition, if liability is found, the proper remedy under CUFTA here, when FSB was never a debtor of Wilson, might be to undo the sale and put the parties in their prior positions or to appoint a receiver, not to award monetary damages.   C.R.S. § 38-88-108(a), (c), and (d).

Lastly, acknowledging there <u>is</u> Colorado case law on point to the contrary, FSB argues that statute does not provide for exemplary damages in a bench trial.

> In all civil actions in which damages are assessed **by a jury** for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, **the jury**, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages.

C.R.S. § 13-21-102(1)(a) (bold added).  Colorado's Legislature knows the difference between a jury trial and a non-jury trial.  For example:

> Any party may demand a **trial to the court** to determine the existence or nonexistence of the parent and child relationship. No party may demand a **jury trial**, and notwithstanding any demand which may have been made, **trial shall be to the court and not to a jury**.

C.R.S. § 19-4-128 (bold added); *see also* C.R.S. §13-32-101(4)(a) ("In a civil case in which there is a contested trial to the court or a trial to a jury . . ."). In *Sky Fun 1 v. Schuttloffel*, 27 P.3d 361 (Colo. 2001), the Colorado Supreme Court did look beyond the clear and unambiguous word "jury" in the statute to allow exemplary damages to be considered in a bench trial.  However, statutes should be applied as written.  *E-470 Public Highway Authority v. Kortum Investment Co., LLLP*, 121 P.3d 331 (Colo. App. 2005).  It is not the province of courts to rewrite a statute.  To reach the desired result, the Legislature needs to amend the statute to change "jury" to "factfinder"

or somehow incorporate the concept of a bench trial.  In this case, because Wilson did not demand a jury, the statute by its terms does not allow Wilson the remedy of exemplary damages.

**B.  The amendment is untimely.**

The date for amending pleadings was extended from April 3 to April 27, 2020.  Doc. 52 at 11, ¶9(a), Doc. 54, Doc. 55.  Not much discovery had taken place by that date.   Wilson argues that the timing of her motion now – three months before trial - is due to "[i]nternal bank documents the Court recently ordered FSB to produce."  Motion at 2.  Wilson argues that "FSB resisted production of internal bank emails that referred to Jon Pauling and other Defendants" and FSB was ordered "to produce the internal emails it had withheld from discovery."  Motion at 5, ¶ 2 and 13.  Contrary to the impression created by Wilson's attorneys, FSB has not been dilatory and has not withheld documents.

As noted above, by May 2020, FSB had produced over ten thousand pages of loan committee minutes, loan presentation memos, loan files (including appraisals), as well as emails and texts, prompting a rare compliment from Wilson's attorneys.  FSB was not "withholding" anything.  A corporation and its employee do not constitute the 'two or more persons' required for a civil conspiracy, and a conspiracy cannot exist involving only a corporation and its officers or employees. *Zelinger v. Uvalde Rock Asphalt Co*., 316 F.2d 47, 52 (10th Cir. 1963).

On June 29, 2020, after fourteen hours of deposition testimony from the Stulls, Wilson served more discovery with the following request for production:

> 16.    Please produce any and all communications among and between employees, agents, personnel, or officers of FSB since 2015 pertaining to Jonathan Pauling, Mark Pauling, Two Mile Ranch General Partnership, Lardyn Consulting LLC, Redtail Resources, LLC, or Elyce York.

On July 29, 2020, FSB properly objected to this extremely broad request, which included voluminous, privileged communications between FSB and its attorneys over a very active 5 year period,[19] as follows:

> RESPONSE:   Objection under Fed. R. Civ. P. 26(b)(1) as seeking information not relevant to a claim or defense and not proportional to the needs of the case in light of the considerations listed in the rule.  The Request asks for the production of "any and all communications" and cover a seven year period despite all of the documents previously produced, such as loan committee minutes.   Moreover, the broad and unlimited scope of the Request encompasses the production of attorney-client privileged information.

In late October, after the parties' failed mediation, Wilson's attorneys challenged the objection. By November 4, 2020, counsel were discussing potential revisions to narrow the scope of internal emails from potentially over forty employees to six (6) senders/recipients[20] and the time frame. After a discovery dispute hearing was held November 9, 2020, the Court approved the narrowed search terms and entered an order setting the date range and a due date of November 30.  Doc. 74. After FSB's attorney spent days reviewing emails for responsiveness and privilege, 7,576 more pages were produced on November 30:

> SUPPLEMENTAL RESPONSE:  In accordance with the parties' discussions in advance of and the Court's order during the discovery dispute hearing held November 9, 2020, the bank produces non-privileged, internal bank emails bates numbered FSB013899-FSB021475 that were:
>
> - sent or received by any of the following bank officers:  Richard Stull, Stephen Stull, Mike Stull, Chris Gray, Kelly Roach, or Jarrod Hamik
> - received by anyone with an email address ending in  @fsb-ne.com (although there are also in this production emails with the bank customers identified below, which would be duplicative of some emails previously produced)
> - with content about bank customers Jonathan Pauling, Mark Pauling, Two Mile Ranch General Partnership, Lardyn Consulting LLC, Redtail Resources, LLC, or Elyce York

---

[19]    The legal work included responding to the subpoena in Wilson's Case, the demands for payment, the foreclosure on the Residence, and TMR's Chapter 11.

[20]    Wilson had already also subpoenaed records directly from appraisers and others.

- for the date range of January 1, 2015 through the date after the November 9, 2020 discovery dispute hearing at which the court ordered the production of emails after April 29, 2019 (the date Plaintiff filed this suit).

There are no responsive emails between January 1, 2015 and November 25, 2015. The first responsive email is November 25, 2015.

Redactions in black have been made to portions of certain records to protect content that relates to:  other bank customers, proprietary or confidential information of the bank, attorney work product, and attorney/client privileged communications.  In addition, a privilege log of attorney/client protected communications and protected attorney work product for the responsive date range is produced herewith.  To the extent on the privilege log there is an FW: or an RE: without reference to an attorney as a sender or a recipient on the exchange, that communication was a forward or communication of a privileged communication string from the bank's attorneys with one or more officers of the bank to other officers of the bank, which maintains the privilege.

On December 3, 2020, FSB's attorney had a one and a half hour call with Wilson's attorneys in follow up to October's failed mediation.  Wilson's attorneys brought up FSB's recent production (1) indicating they had questions about FSB's privilege log,[21]  and (2) asking if they needed to take preservation depositions of certain FSB employees who were authors or recipients of certain emails or if FSB would confirm those witnesses will appear at trial.  In addition, they stated their intent to seek leave to amend to include "bad facts," their motives to do so, including their predictions of the impact of "bad facts" on the Court, the media, and bank regulators.  After discussion, FSB's counsel indicated she would oppose amendment.

Likely because amendment had already been addressed with her, FSB's attorney was not included in the email Wilson's attorneys sent all other defense counsel twenty (20) days later on December 23, 2020.  That email was separately forwarded by Wilson's attorneys to FSB's attorney.  Upon her review, FSB's attorney believed the forward was a courtesy, given her prior requests that all counsel be included on all communications so that everyone in the case was on

---

[21]     The privilege log for the production <u>after</u> the search scope was narrowed contained 749 entries.  On December 3, 2020, Plaintiff's counsel took issue with eighty two (82) entries on the privilege log emails on the privilege log, and FSB responded with explanations on December 21, 2020.

the same page at all times.  She did not interpret the forward as a request reconfirm FSB's opposition to amendment.[22]

The bench trial in this case begins April 12, 2021.  All claims and all defenses should already be set so the parties can focus on trial preparations, and not be distracted by responding to amended pleadings.

## CONCLUSION

For all of the foregoing reasons, FSB requests that the Court deny Wilson's motion.


FARMERS STATE BANK,
Defendant

By:     /s/Tracy A. Oldemeyer
            Tracy A. Oldemeyer, #28246
            CLINE WILLIAMS
                WRIGHT JOHNSON & OLDFATHER, L.L.P.
            215 Mathews Street, Suite 300
            Fort Collins, Colorado 80524
            Telephone: (970) 221-2637
            Fax: (970) 221-2638
            toldemeyer@clinewilliams.com

---

[22]     The above history regarding conferral was articulated to Wilson's attorneys on an e-mail exchange on January 21, 2021, and in the phone call the next day.

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of February, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Ross W. Pulkrabek
Aaron D. Goldhammer
Keating Wagner Polidori Free, PC
1290 Broadway, Suite 600
Denver, CO 80203
rpulkrabek@keatingwagner.com
agoldhamer@keatingwagner.com

Jonathan Pauling
paulingjonathan2@gmail.com

R. Livingston Keithley
Antero Law, LLC
1700 Broadway, Suite 640
Denver, CO  80290
LKeithley@anterolaw.com

Peter C. Forbes
Carver Schwarz McNab Kamper & Forbes, LLC
1888 Sherman Street, Suite 400
Denver, CO 80203
pforbes@csmkf.com

/s/*Tracy A. Oldemeyer*
Tracy A. Oldemeyer

4848-2832-0474, v. 4

16