IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01224-RBJ-STV

AMANDA WILSON, a Michigan citizen,

Plaintiff,

v.

JONATHAN PAULING, an individual Colorado citizen,
MARK PAULING, an individual Colorado citizen,
TWO MILE RANCH a/k/a TWO MILE RANCH GENERAL PARTNERSHIOP, a Colorado General Partnership,
ELYCE YORK, an individual Nebraska or Colorado citizen,
LARDYN CONSULTING, LLC, a Nebraska Limited Liability Company, and
FARMERS STATE BANK, a Nebraska corporation,

Defendants.

---

## LARDYN DEFENDANTS' RESPONSE TO MOTION FOR LEAVE TO AMEND TO PERMIT COURT TO CONSIDER EXEMPLARY DAMAGES

---

Defendants Elyce York and Lardyn Consulting, LLC (respectively "Ms. York" and "Lardyn" and collectively the "Lardyn Defendants"), through their undersigned counsel, state the following for their Response to plaintiff's above-referenced motion to amend (hereafter "Mot.Amend., p. __").

### OVERVIEW

Approximately two months before trial and based on alleged late-disclosed emails from defendant Farmers State Bank ("FSB"), plaintiff seeks to add a claim for exemplary damages against the Lardyn Defendants. According to plaintiff, those emails (1) prove that FSB's officers testified untruthfully about when FSB learned that plaintiff had obtained a substantial verdict against judgment debtor Jonathan Pauling ("J. Pauling"), (2) prove that FSB

actively participated in the bankruptcy filing of Two Mile Ranch general partnership ("TMR") for the purpose of helping J. Pauling thwart plaintiff's charging order against J. Pauling's interest in TMR, and (3) prove that Ms. York is simply the "puppet" of J. Pauling. According to plaintiff, without those emails she would have been unable to meet the requirement to prove entitlement to exemplary damages beyond a reasonable doubt. Thus, plaintiff argues, her belated request to add a claim for exemplary damages should be allowed because it is only with the alleged late disclosure of those emails that her claim for exemplary damages became tenable.

As a threshold matter, however, none of the emails relied on by plaintiff shows in any way that the Lardyn Defendants acted either willfully and wantonly or with a conscious intent to harm plaintiff. Moreover, those emails simply elaborate upon allegations that plaintiff previously made. Thus, they do not constitute the type of newly discovered evidence that could justify allowing a belated request to amend. And, finally, the reasonable inferences from those emails do not support a finding of malice or willful and wanton conduct on the part of the Lardyn Defendants. Accordingly, Plaintiff's request to add a claim for exemplary damages against the Lardyn Defendants should be denied.[1]

## ARGUMENT

Plaintiff offers three arguments in support of belated request for authorization to pursue a claim for exemplary damages: (1) the alleged late disclosed emails contradict testimony by certain FSB officers about when they learned of plaintiff's judgment against J. Pauling, (2) those emails contradict defendants' contention that the asset sale to Lardyn had nothing to do

---

[1] Although plaintiff seeks to add a claim for exemplary damages against all defendants through, in part, using sweeping generalizations about what all defendants have or have not said, the question of whether a particular defendant's conduct justifies allowing a claim for exemplary damages must be evaluated on a defendant-by-defendant basis. Therefore, this response is limited to addressing plaintiff's request that she be allowed to pursue a claim for exemplary damages against the Lardyn Defendants.

with helping J. Pauling defeat plaintiff's charging order, and (3) those emails further demonstrate that Ms. York and Lardyn were the mere alter egos of J. Pauling. [*See* Mot.Amend., pp. 11-12.] As shown below, none of those emails identifies any misconduct by the Lardyn Defendants. Nor do they constitute the type of newly discovered evidence that would justify allowing a belated claim for exemplary damages.

First, neither the question of when FSB learned of plaintiff's judgment nor the question of whether the emails cited by plaintiff contradict testimony by certain FSB officers about when they learned of plaintiff's judgment has anything to do with the Lardyn Defendants. Thus, those emails, whether disclosed belatedly or not, do not support plaintiff's request that she be allowed to add a claim for exemplary damages against the Lardyn Defendants.

Second, the emails supposedly establishing that the TMR bankruptcy was filed for improper purposes show no such thing. [*See* Mot.Amend., p. 5, ¶¶6 and 7 and Exhibit 3.] The first of the bankruptcy-related emails simply describes a single employee's understanding that FSB's counsel and TMR's bankruptcy counsel were working on a prepackaged bankruptcy plan and that such a plan would not negatively affect FSB's interests. There is nothing illegal or improper about such plans. *See generally In re NRG Energy, Inc.,* 294 B.R. 71, 82 (Bankr.D.Minn. 2003) (noting that, even two decades ago, so-called "pre-packaged" and "pre-negotiated" bankruptcy plans had been "used extensively in some jurisdictions"). Therefore, discussion about that employee's understanding that FSB was pursuing a prepackaged bankruptcy plan to protect its interests does not give rise to a reasonable inference that FSB was acting improperly, let alone give rise to an inference that the Lardyn Defendants were doing so.

Similarly, the fact that FSB employees stated that the purpose of the Chapter 11 filing was to protect TMR from plaintiff's judgment or to "protect the proposed asset sale from

Jon's Judgement [sic]" says nothing about any intent or motivation of the Lardyn Defendants. Additionally, the view of a few FSB employees that TMR's bankruptcy filing "protects the partnership from the plaintiff in the long run" was incorrect as a matter of law. Plaintiff was a creditor of J. Pauling, not TMR. As the holder of a charging order, plaintiff could not force TMR to make distributions that could be subjected to the charging order. Instead, she was limited to receiving distributions when and if made. *See JPMorgan Chase Bank, N.A. v. McClure,* 393 P.3d 955, 958 (Colo. 2017); *accord Thomas v. Hughes,* 2020 U.S.Dist. LEXIS 153639 at *7-9 (W.D.Tex.) (Chestney, M.J.) (discussing limited scope of charging order remedy). Therefore, because plaintiff had no rights against the partnership, as a matter of law a prepackaged bankruptcy plan that addressed FSB's right to be repaid for the arm's-length loans it made to TMR had nothing to do with "protect[ing] the partnership from the plaintiff."

Moreover, plaintiff failed to take the steps necessary to have standing to seek a judicial dissolution of TMR and the sale of its assets. *Compare* C.R.S. §7-64-504(2) (authorizing court to foreclose on partner's transferable interest at request of holder of charging order) *with* C.R.S. §7-64-801(1)(f) (authorizing judicial sale of partnership assets at request of transferee of partner's transferable interest). And, even if she had done so, she could only have recovered the liquidation proceeds (if any) available for distribution to J. Pauling after FSB was repaid. *See* C.R.S. §7-64-807(1) (proceeds from liquidation of partnership must first be paid to creditors of partnership).

A forced liquidation typically results in a recovery less than fair market value. *See, e.g., In re RTJJ, Inc.,* 2013 Bankr. LEXIS 481 at *12 ("in a forced liquidation or foreclosure, the Properties would fetch far less than fair market value); *accord Baldwin v. Bader,* 2008 U.S.Dist. LEXIS 56236 at *139 n. 87 (D.Maine) (citing *Black's Law Dictionary* definition

of term "liquidation value"). Here, it is undisputed that in 2012, three years before plaintiff obtained her judgment, FSB obtained a security interest in TMR's assets by virtue of making an arm's-length commercial loan to TMR. It is also undisputed that as of July 1, 2016, when TMR filed for bankruptcy, FSB believed that the balance of its loans to TMR was approximately $9,600,000, which exceeded the fair market value of TMR's assets – and thus by definition exceeded the liquidation value of those assets. [*See* FSB Response To Motion To Amend, pp. 2 and 4 (CM/ECF Document No. 83).] Hence, given FSB's understanding that it had a priority security interest in all of TMR's assets, the erroneous view of several FSB employees that TMR's Chapter 11 filing was necessary to protect FSB's interest in those assets cannot reasonably be said to create an inference of willful and wanton or malicious conduct on the part of FSB – let alone create an inference of such conduct on the part of the Lardyn Defendants, who are not alleged to have had any involvement in FSB's internal deliberations about the benefits *vel non* of TMR's bankruptcy filing.[2]

        Similarly, the view of certain FSB employees in May 2016 that it was highly unlikely that TMR would be able to find a buyer for its assets (*i.e.,* the reference to a "unicorn investor group") had nothing to do with Lardyn. [*See* Mot.Amend., p. 7 and Exhibits 3 and 6.] Nor does the view of those employees about TMR's ability (or inability) to find an investor

---

[2] The Lardyn Defendants emphasize that they are not contending that FSB's Proof of Claim establishes the actual fair market value of TMR's assets or the actual amount of FSB's lien. Instead, the point is that the amounts set forth in the Proof of Claim reflect FSB's *understanding* that TMR did not have equity in its assets at the time of its bankruptcy filing – which understanding demonstrates that FSB did not view TMR as having any excess value that plaintiff could have obtained through her charging order, which in turn negates the contention that FSB had a motivation to use TMR's bankruptcy to harm plaintiff. Or, stated differently, because FSB believed TMR's assets were fully encumbered, it could not reasonably have concluded the bankruptcy would harm plaintiff because, even without the bankruptcy, there would have been no equity for plaintiff to realize upon even if she had taken the steps necessary to request a judicial dissolution under C.R.S. §7-64-801(1)(f), which she had not done.

group have anything to do with the transaction between Lardyn and TMR that occurred in April 2017, almost a year later.  The Lardyn Defendants also submit it would be a bridge too far to allow a belated claim for exemplary damages because certain FSB employees put quotations around the phrase "investor group," which use of quotation marks is ambiguous at best (*i.e.,* the use of quotations can just as easily indicate reference to a nominative term as it can indicate skepticism about a statement).  That is particularly true in the case of the Lardyn Defendants, who were not involved in preparing those emails.

The view of two FSB employees that there was no substance to certain vehicle loans also says nothing about the transfer at issue, which did not involve vehicles but which instead involved ranching and mineral assets.  [*See* Mot.Amend. p. 7 and Exhibit 7.]  Further, plaintiff has presented no basis for finding that either of those employees was authorized to speak for FSB, was authorized to bind FSB, was making those statements in the course and scope of their duties on behalf of FSB or – most critically – was making those statements on behalf of the Lardyn Defendants and/or that the Lardyn Defendants agreed to or ratified those statements.  Thus, those statements also fail to provide a basis for belatedly allowing an exemplary damage claim against the Lardyn Defendants.

Finally, a single statement in an email from single FSB employee two years after the transaction in question stating that the employee regarded Ms. York as simply being J. Pauling's "puppet" does not inject a new issue into this case.  To the contrary, from the inception of this case plaintiff has been contending that Ms. York and Lardyn were simply J. Pauling's alter ego.  [*See* First Amended Complaint, pp. 9 and 11, ¶¶26 and 41 (CM/ECF Document No. 15-1).]  Further, plaintiff claimed at least seven months ago that Ms. York's status as an alleged "proxy" for J. Pauling was conclusively established by evidence it had already obtained,

including evidence that Ms. York and J. Pauling had a child together.  [*See* Proposed Second Amended Complaint (Redline Version), pp. 10-11, ¶¶23 and 28-29 and pp. 19-20, ¶¶70-76 (CM/ECF Document No. 56-2).]  Hence, there is no justification for plaintiff's delay in seeking to add a claim for punitive damages based of the alleged delayed production of an email setting forth the view of a single FSB employee that Ms. York was simply J. Pauling's puppet – particularly because the email referring to Ms. York as a "puppet" itself shows that the author was not being serious, in that the author concludes by stating that "What am I saying. . . . Sometimes I am the damn puppet."  [*See* Mot.Amend., Exhibit 8.]

## CONCLUSION

For the reasons set forth above, even if plaintiff's request to add a claim against the Lardyn Defendants for punitive damages was timely, plaintiff has failed to make out a *prima facie* case of willful and wanton or malicious conduct by those defendants.  Therefore, plaintiff has failed to establish the threshold requirement for asserting such a claim under C.R.S. §13-21-201(1)(a).  But plaintiff's claim is not timely, and plaintiff has not shown any justification for allowing an amendment to add such a claim at this late date.  Accordingly, plaintiff's request that she be granted leave to add a claim for exemplary damages against the Lardyn Defendants should be denied.

Dated:  February 16, 2021
         Denver, Colorado

Respectfully submitted,

CARVER SCHWARZ McNAB KAMPER
& FORBES, LLC

By: *s/Peter C. Forbes*
   Peter C. Forbes
   1888 Sherman Street — Suite 400
   Denver, Colorado 80203
   Telephone: 303.893.1815
   Fax: 303.893.1829
   pforbes@csmkf.com

*Attorneys for the Lardyn Defendants*

## CERTIFICATE OF SERVICE

        I hereby certify that on February 16, 2021, the undersigned caused a true and correct copy of the above and foregoing to be served upon the following via the CM/ECF system:

Ross W. Pulkrabek
Aaron D. Goldhamer
Keating Wagner Polidori Free, PC
1290 Broadway — Suite 600
Denver, Colorado 80203
agoldhamer@keatingwagner.com
rpulkrabek@keatingwagner.com

Christopher Wenzel Carr
Dill Carr Stonbraker & Hutchings, P.C.
455 Sherman Street
Suite 300
Denver, CO 80203
ccarr@dillanddill.com

Beau Bryan Bump
Tracy A. Oldemeyer
Cline Williams Wright Johnson & Oldfather
Fort Collins
215 Mathews Street
Suite 300
Fort Collins, CO 80524
bbump@clinewilliams.com
toldemeyer@clinewilliams.com

                *Peter C. Forbes*
By:_____