1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3
   Civil Action No. 19-CV-01224-RBJ
4

5    AMANDA WILSON,

6          Plaintiff,

7          vs.

8    JONATHAN M. PAULING, et al.,

9          Defendants.

10   ----------------------------------------------------------------

11                 REPORTER'S TRANSCRIPT
                 Trial Preparation Conference
12   ----------------------------------------------------------------

13
             Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Judge, United States District Court for the District of
     Colorado, commencing on the 23rd day of March, 2021, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                      APPEARANCES

17   For the Plaintiff:
     ROSS W. PULKRABEK, Keating Wagner Polidori & Free, PC, 1290
18   Broadway, Ste. 600, Denver, CO 80203

19   For the Defendants:
     PETER C. FORBES, Carver Schwarz McNab Kamper & Forbes, LLC,
20   1888 Sherman St., Ste. 400, Denver, CO 80203

21   R. LIVINGSTON KEITHLEY, Antero Law LLC, 1700 Broadway, Ste.
     640, Denver, CO 80290
22
     TRACY A. OLDEMEYER, Cline Williams Wright Johnson & Oldfather,
23   215 Mathews St., Ste. 300, Fort Collins, CO 80524

24
         Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25                 Denver, CO 80294, 303-335-2108

             Proceedings reported by mechanical stenography;
                 transcription produced via computer.

19-CV-01224-RBJ     Trial Prep. Conference     03/23/2021     2

1              *       *       *       *       *

2      (The proceedings commenced at 1:34 p.m.)

3              THE COURT:  Good afternoon.  This is the Wilson

4      versus Pauling case, 19CV1224, set for a trial preparation

5      conference this afternoon.  Who's appearing for the plaintiff?

6              MR. PULKRABEK:  Good afternoon, Your Honor.  Ross

7      Pulkrabek for plaintiff Amanda Wilson.

8              THE COURT:  Thank you, sir.  We'll go through the

9      defendants.  Tell me the name of the defendant you represent

10     and who the speaker will be, please.

11             MS. OLDEMEYER:  Good afternoon, Your Honor.  This is

12     Tracy Oldemeyer representing Farmers State Bank.

13             THE COURT:  Thank you.

14             MR. FORBES:  Good afternoon, Your Honor.  This is

15     Peter Forbes representing Elyce York and Lardyn Consulting,

16     LLC.

17             THE COURT:  All right.  Thank you, Mr. Forbes.

18             Anyone else?

19             MR. KEITHLEY:  Good afternoon, Your Honor.  This is

20     Livingston Keithley appearing on behalf of defendants Mark

21     Pauling and Two Mile Ranch General Partnership.

22             THE COURT:  Thank you, Mr. Keithley.  Anyone else?

23     There's no one on the line representing Jonathan Pauling?

24             MR. FORBES:  Your Honor, Peter Forbes.  That's

25     correct.  You allowed Mr. Pauling's counsel to withdraw.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Trial Prep. Conference     03/23/2021    3

1   Since then Mr. Pauling has not had new counsel enter an

2   appearance.  He's been advised of the conference today,

3   however, but nobody here represents him.

4          THE COURT:  He's elected not to represent himself at

5   the conference, I guess.

6          MR. FORBES:  Your Honor, Peter Forbes.  That does

7   appear to be the case.

8          THE COURT:  Okay.  Well, that's his choice.  The

9   trial preparation conference generally is where I discuss four

10  or five different issues with counsel before trial.  Disputes

11  about witnesses is an issue.  Disputes about exhibits is an

12  issue.  In limine motions is an issue.  Normally jury

13  instructions would be an issue, but that's not applicable

14  here.  And trial and trial procedure is an issue.  And I can

15  tackle those subjects in any order that any of you prefer, and

16  if you don't care, I'll proceed and pick my own agenda.

17         MR. PULKRABEK:  This is Ross Pulkrabek for the

18  plaintiff.  I have no preference, Your Honor.

19         THE COURT:  Okay.

20         MS. OLDEMEYER:  Tracy Oldemeyer --

21         THE COURT:  Then we'll start at the top.  Are there

22  disputes concerning who is going to be a witness in the case?

23         MR. PULKRABEK:  No -- Ross Pulkrabek, again, Your

24  Honor -- I don't believe there are any disputes as to who will

25  be witnesses, and the parties have been conferring about the

19-CV-01224-RBJ    Trial Prep. Conference    03/23/2021   4

1   possibility of certain witnesses testifying remotely, so I

2   think all counsel are interested in your thoughts on whether

3   some of the witnesses may testify remotely and what your

4   requirements may be for that.

5        THE COURT:  Well, to begin, if there's no dispute,

6   then certainly I have no dispute or disagreement about people

7   testifying remotely.  We've been doing remote hearings and

8   even remote bench trials for the last year, and I've gotten

9   quite used to it.  Now, if there is a dispute, I would have to

10  know who the witness is and what the dispute is before I could

11  comment.  I will say, though, just in general, although the

12  pandemic has -- I don't know if gone down is the right

13  expression -- the numbers have declined, the Court has opened

14  itself up again to trials on at least a limited basis.  But

15  still COVID is out there.  Not everyone has been fortunate

16  enough to have been vaccinated yet, and so I will be fairly

17  liberal towards allowing remote testimony even if there is a

18  dispute.  But if there is a dispute and a very good reason for

19  it, I want to hear it.  Is there a dispute from any of the

20  represented defendants about allowing some witnesses to

21  testify remotely?

22        MS. OLDEMEYER:  Your Honor, this is Tracy Oldemeyer

23  for Farmers State Bank.  We have not identified any issue with

24  potential witnesses testifying remotely.

25        THE COURT:  Okay.  How about the rest of you?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Trial Prep. Conference     03/23/2021   5

1          MR. KEITHLEY:  Your Honor, this is Livingston

2    Keithley.  I have not identified any issue either.

3          THE COURT:  Okay.  Mr. Forbes?

4          MR. FORBES:  Your Honor, Peter Forbes.  We have been

5    discussing this between counsel.  We had a fairly long

6    conversation tomorrow -- excuse me -- yesterday, and I don't

7    believe there are any disputes about anybody testifying

8    remotely.  I think, Your Honor, that what the parties

9    contemplate is that the principal witnesses will be in person,

10   that is the defendants, certainly my client intends to be in

11   person, and I understand FSB intends to be in person, and I

12   understand Ms. Wilson intends to be in person.

13         So we'll -- the remote witnesses will be kind of the

14   -- I know every witness's testimony is equal, but I would call

15   them more witnesses who play a less central role maybe would

16   be the way to describe it, and I don't think there's any

17   dispute about those witnesses testifying remotely based on our

18   conversation yesterday, although that's my impression.  I

19   don't want to speak for anybody else.

20         THE COURT:  Well, I think that's what I'm hearing

21   from everyone.  The important thing then is that as to any

22   witness who is going to testify remotely, and by that I mean

23   preferably by video teleconference -- audio teleconference

24   would be a second choice, I'd say, but video teleconference

25   would be the best -- is simply to have your technology setup

Sarah K. Mitchell, RPR, CRR

1    properly communicated with our technology in the courtroom

2    properly so that occurs with as little of a glitch as

3    possible.

4          And the way you make sure that happens is to make a

5    date with our courtroom deputy Julie Dynes who is the person

6    who can meet with you or meet with your delegates to explain,

7    demonstrate, help you with the technology.  I encourage you to

8    do that.  As savvy as you might be about technology, and it's

9    not particularly difficult technology, frankly -- I mean,

10   we're doing video teleconference hearings with people in jail

11   situations -- still, it's helpful to make sure that you check

12   with Julie and know how it's going to work.

13         How about exhibits?  Are there disputes about

14   exhibits?

15         MR. PULKRABEK:  Again, Your Honor, this is Ross

16   Pulkrabek.  We are working through stipulations to

17   admissibility to the extent possible.  I don't know that there

18   are any disputes about exhibits in the sense of disputes I

19   feel need to be addressed by the Court before trial.  I can't

20   speak for the defendants on that.

21         THE COURT:  I'll just go through the defendants in

22   the order that they appeared.

23         Ms. Oldemeyer, any exhibit issues that you want to

24   bring up today?

25         MS. OLDEMEYER:  No, Your Honor.  Other than to let

                    Sarah K. Mitchell, RPR, CRR

1    the Court know that the parties have exchanged preliminary

2    exhibit lists, and as Mr. Pulkrabek mentioned, we're working

3    through stipulations.  Plaintiff has listed 160 exhibits.  I

4    have listed one -- excuse me -- I have listed 76.  We're in

5    the process of removing duplicates, so this will be a very

6    document-intensive case which plays into the Court's COVID

7    protocols, and then also who is a good remote witness versus

8    who's a good live witness based on the number of exhibits they

9    will be shown.  But counsel seem to be working through those

10   issues.

11          Preliminary summaries of voluminous documents have

12   been exchanged, at least Farmers State Bank has circulated its

13   proposed summaries for review and input by opposing counsel,

14   and we await working through any issues related thereto.  I

15   believe Mr. Pulkrabek circulated some proposed demonstrative

16   exhibits this morning, and I haven't had a chance to look at

17   those, but hopefully we can resolve those in advance of

18   showing up on the 12th for trial.

19          Farmers State Bank does have concern about this trial

20   being completed in the number of days the Court has allotted.

21   Initially that was seven.  I don't know if we still have the

22   seven days or not.

23          THE COURT:  Right.  I'll get to that.  How about

24   Mr. Forbes?  Exhibits?

25          MR. FORBES:  Hello, Your Honor.  Peter Forbes here.

1    Your Honor, I agree with the comments of all counsel.  We have

2    exchanged preliminary witness -- excuse me -- exhibit lists.

3    We have attempted to eliminate duplicates from everybody's

4    list and have gone through several iterations of those lists

5    to eliminate those duplicates, and I think we're just about

6    there.  In terms of the stipulations, both Mr. Pulkrabek and

7    Ms. Oldemeyer are correct, we have been working assiduously to

8    stipulate to as many exhibits as possible and have, in fact,

9    stipulated to admissibility of probably something of a third

10   to half of the exhibits.

11        I believe the objections that the parties have

12   retained are going to be essentially to relevance, Your Honor.

13   I don't think there's any question about authenticity with

14   respect to any of the exhibits that the parties have

15   designated.  And Ms. Oldemeyer is correct, she, on behalf of

16   FSB, circulated some 1006 summaries earlier last week.  I

17   circulated some 1006 summaries today.  And Mr. Pulkrabek

18   circulated some demonstrative exhibits today.  So the parties

19   are still working through those.

20        But at this point we seem to be working well

21   together.  To the extent there are objections to the 1006

22   summaries, hopefully we will get those, and if we can't

23   resolve them before trial, we'll be able to at least focus in

24   on those objections when those exhibits are offered at trial.

25   So I think we're working well together to eliminate time at

1    trial that would otherwise be taken up with having exhibits

2    being identified, verified, and admitted.

3            THE COURT:  Mr. Keithley?

4            MR. KEITHLEY:  Your Honor, this is Livingston

5    Keithley.  I've got nothing further to add beyond the

6    statements of previous counsel.

7            THE COURT:  Okay.  So let me say this about exhibits.

8    This is a bench trial, of course, and whatever exhibits are

9    admitted I will need to read, and I hope somewhere in your

10   hearts there is room for a little pity on the poor judge who

11   has to deal with this, namely me.  But the fewer exhibits that

12   you have, the better I will like it.  I encourage what you

13   call demonstrative exhibits.  I know what you mean by that.

14   To me an exhibit is an exhibit, and I always treat the

15   demonstrative exhibits and other exhibits the same in terms of

16   marking, admitting, and so forth.  Try to limit yourself.

17   Just throwing a whole lot of stuff at me and in the record at

18   lickety-split pace is not necessarily going to be helpful

19   advocacy.

20           As far as stipulations are concerned, it certainly

21   will speed up the trial if you can stipulate to exhibits.

22   Somebody said there's no authenticity issue, and that's

23   typically the case.  If there is a legitimate relevance

24   objection or hearsay objection or some other objection, fine.

25   Usually that isn't the case.  And if you stipulate to

19-CV-01224-RBJ     Trial Prep. Conference     03/23/2021   10

 1   admissibility and then offer the exhibit, it comes right in

 2   without delay.  If you stipulate to a long list of exhibits

 3   and then don't use them, I'm not going to admit the ones you

 4   don't use, but I'll admit the ones that you use.

 5          Now, you have to also remember as a practical matter,

 6   to make a decision on relevance I have to read the document.

 7   And also it might not be obvious to me depending on the stage

 8   of the case whether it's relevant or not, but either way I

 9   have to read the document.  The old saying is you can't unring

10   the bell.  Now, I know that we judges and appellate judges,

11   you know, say that a trial judge in a bench trial will simply

12   ignore that which shouldn't be considered, and I will.  I will

13   do that, but still I will have seen it.

14          My advice is get down to your really important

15   exhibits.  Try to stipulate to as much as you can.  That's

16   really all I can say.  I would shudder to think that

17   somebody's going to put in 160 documents.  If you have to, you

18   have to.  That's really all I have to say about exhibits.

19          Motions in limine.  Does anybody have a motion in

20   limine that they want to make?

21          MR. PULKRABEK:  For the plaintiff, no, Your Honor, we

22   do not have any motions in limine.

23          MS. OLDEMEYER:  Tracy Oldemeyer for Farmers State

24   Bank.  No, no motions in limine.

25          THE COURT:  All right.  Thank you.

                           Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ    Trial Prep. Conference    03/23/2021    11

1          Mr. Forbes?

2          MR. FORBES:  Your Honor, Peter Forbes.  No motions in

3     limine.

4          THE COURT:  Okay.  And, Mr. Keithley?

5          MR. KEITHLEY:  Your Honor, at this time, no motions

6     in limine either.  Thank you.

7          THE COURT:  You know, you folks are working so well

8     together that I guess it surprises me just a little bit when

9     Mary tells me that when she contacted you about whether you

10    were planning to go to trial, you told her apparently among

11    other things that there was no prospect at all for settlement.

12    Is that true?

13         MR. PULKRABEK:  For the plaintiff, Your Honor, yes,

14    I'm afraid it is.  We did attend a mediation at Judicial

15    Arbiter Group with former Judge Leland Anderson, and that was

16    not a successful mediation, so I have to say I think there is

17    no prospect of settlement at this time.

18         THE COURT:  Okay.  Well, I get that.  And if Leland

19    couldn't get it settled, that tells me something too, because

20    he's been pretty darn successful in his mediation career.

21    And, of course, the settlement issue is none of my business

22    anyway, but I will simply say this and then don't need to say

23    anything more about it.  As I understand it, Ms. Wilson filed

24    a lawsuit against Mr. Jonathan Pauling in state court, and it

25    went to trial to a jury I think presided over by Judge

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Trial Prep. Conference     03/23/2021     12

1    Buchanan in the Denver District Court.  The jury rendered a

2    large verdict against Mr. Pauling, and then Judge Buchanan

3    added more to it.  I don't remember from your papers what the

4    number was or is with interest, but it's a lot of money.  But

5    everybody knows that a judgment is as good as it is

6    collectible, and Mr. Jonathan Pauling hasn't paid the

7    judgment, hasn't paid any of it.

8            So what this case is is really a collection action on

9    a large scale, if I understand it, and I haven't really dug

10   into the case too much.  But as I understand it, the effort is

11   going to be to say that due to a series of shenanigans, let's

12   call it, that the defendant Mr. Pauling managed to deplete

13   himself of assets and make himself judgment proof, and the

14   assets ended up with his brother or his brother's company or

15   with this Lardyn company that they created or with the bank

16   that's been dealing with the Paulings for years.

17           And the plaintiffs are saying that's where the money

18   is, and we want it, and they're saying everything we did was

19   done for legitimate reasons and go away .  To me there's some

20   potential exposure here just by the fact that you've got this

21   case and it's about to go to trial.  It almost seems to me

22   that at this point Ms. Wilson has nothing, and something is

23   always better than nothing.  So it seems to me that there

24   ought to be some number that nobody would like but people

25   would rather accept than take the risk of ending up either

19-CV-01224-RBJ     Trial Prep. Conference      03/23/2021   13

1   with nothing or with this big, big state court judgment to

2   pay.  That's the end of my lecture, folks.

3           Let's move on to trial.  Somebody -- I think it was

4   Ms. Oldemeyer -- raised concern about length of time.  First

5   of all, we actually have another case that was selected as a

6   backup pilot trial, a jury trial, and we're trying to find out

7   what they're doing and so forth, but I think that won't stand

8   in the way of your case for a couple of reasons.  First, in

9   that case it's an FLSA case, if you know what that means, Fair

10  Labor Standards Act.  They reached a settlement months ago,

11  and then they couldn't reduce it to writing for anybody to

12  accept.  But that kind of situation tends to resolve itself.

13  And, secondly, your case by a slight narrow margin is older

14  than that case, so you're going to end up going to trial, and

15  your trial date is April 12th, so you can count I think pretty

16  much on that.

17          But then in that -- that takes us through the week of

18  April 12th.  We have other things that are scheduled that

19  week, but not trial.  There may be an interruption here or

20  there, but we generally try to clear things out.  But then we

21  get to the week of the 19th, and I have another case, and this

22  time it's a jury case, and it's an older case than yours set

23  for trial on -- I think it's going to probably go.  We had our

24  trial prep conference with them just, I think, last week, and

25  every indication they gave is that it's going to go.

Sarah K. Mitchell, RPR, CRR

1      In fact, they too are worried about whether they can

2  try their case in five days, and what I told them was -- I

3  told them two things.  The first thing is under our protocol

4  you can only start two jury trials -- you can only start one

5  jury trial per day typically, and there -- there are --

6  there's another case that -- I think there was another case.

7  Maybe they've all gone away now, and if they have, for sure

8  that other case will start on Monday.  I was thinking it might

9  start Tuesday.  Let's say that it starts on Monday the 19th.

10  I told them that the longest I could possibly go with them is

11  to Monday the 26th of April, and the reason for that is

12  because on Tuesday the 27th of April I'm leaving.  I won't be

13  back for several days.

14      So getting back to your case, unless the Harris case

15  settles, and it could, all I could give you are the five days.

16  Now, the defendants always worry are we going to get squeezed

17  on time.  No.  They'll ask, Well, are you going to put us on a

18  chess clock?  I probably won't do that unless that's what the

19  parties all want.  But the one good thing about a bench trial

20  -- and it's the only good thing -- judges, at least this

21  judge, and I think most judges, would much prefer a jury trial

22  to a bench trial -- but the one good thing about a bench trial

23  is we don't have to finish it in five days.  You're not

24  finished, everybody's been efficient, everybody's acted

25  reasonably, we get to the end of the day on Friday, and you're

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ    Trial Prep. Conference    03/23/2021    15

 1   not finished, we'll finish it sometime.  Not to worry.  Not

 2   April 19th.  If the Harris case goes, it goes.

 3          But if it's not that day, it's another day.  And

 4   because -- well, you start forgetting after a while.  We'll

 5   try to give you as early a date to finish your case as

 6   possible, but we don't have to worry about a jury.  This whole

 7   dispute is already quite old, and if you have to wait a little

 8   longer, you have to wait a little longer.  Does that answer

 9   your question, Ms. Oldemeyer?

10          MS. OLDEMEYER:  It absolutely does, Your Honor.

11   Thank you.

12          THE COURT:  How about trial procedures?  We have our

13   jury protocols -- jury trial protocols up on the website, and

14   much of that applies as well to a bench trial, but if you have

15   any particular questions you'd like to ask about how this is

16   going to work, feel free.

17          MR. PULKRABEK:  Yes.  This is the plaintiff, Your

18   Honor.  So I think all counsel have some questions about how

19   best to utilize exhibits with the witnesses in light of the

20   protocols.  Should we have witnesses wear gloves or should we

21   have multiple exhibit binders, one for each witness?  What do

22   you think is working best?

23          THE COURT:  Well, it would be an unusual case if you

24   are dependent upon hard copies.  Most of the time exhibits are

25   displayed electronically.  Let's start there.  Are you not

                    Sarah K. Mitchell, RPR, CRR

1    going to do that?

2          MR. PULKRABEK:  I think we were just kind of waiting

3    to get some guidance from the Court.  I can -- personally I

4    can do either.  For remote witnesses, one thing that I've

5    found that is working well is not to have to display the

6    exhibit on the screen at the same time the witness is

7    testifying, so for them we might want to send them hard

8    copies.  But if it works more efficiently just to do things

9    electronically or on the Elmo, we can do it that way.

10          THE COURT:  Okay.  For the use of exhibits in the

11   courtroom, unless somebody is unable to display them

12   technologically, in this day and age I would find that

13   difficult to imagine, but unless you are unable to do that, I

14   would greatly prefer that you display your documents

15   electronically.  You should have whomever is going to be your

16   document displayer, whoever is going to man your computer

17   well-versed in finding and displaying your exhibits.

18          A hard copy -- because there's no way that I'm likely

19   to decide this case from the bench at the end of a long trial

20   with all these exhibits you're talking about, I'll probably

21   have to take it under advisement, I'll probably get some good

22   assistance from one of my law clerks on the case, so we're

23   going to need a set for the Court of the hard copies for use

24   after the trial.  We're going to need a set of hard copies for

25   the court reporter for her use in case anyone orders a

19-CV-01224-RBJ      Trial Prep. Conference      03/23/2021      17

1    transcript, any part of the trial.  And sometimes I will ask

2    the court reporter to help me with at least a copy of her

3    rough transcript, it's nothing final, it's nothing official

4    that you can have, but something she can do for me so I don't

5    have to be burdened with taking voluminous notes, keeping up

6    with everything necessarily.  I can go back and check my

7    notes.  So we need a set of hard copies for her and a set of

8    hard copies for me.

9          I don't think you need a set of hard copies for the

10   witness stand, but in every trial it seems people do that.  I

11   don't really understand that, because if a witness can look at

12   the exhibits on his or her monitor, they can use a stylus and

13   draw on the electronic version, they can circle things, they

14   can write things, they can put arrows, so can you, Counsel,

15   and I don't know why a witness really needs a hard copy.  But

16   it's best if there is a set for the witness box.

17          Other than that, we don't need or want hard copies.

18   Now, the exception is remote witnesses.  Yes, I think you

19   should get them hard copies of any exhibits you're going to be

20   asking them about.  That's the only practical way that that

21   will work.  But for the courtroom, no.

22          Sarah, you're on there.  If you can stop reporting

23   for a minute, do we need one for the record or just one for

24   you and one for the Court?

25          (Discussion held off the record.)

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ    Trial Prep. Conference    03/23/2021    18

1     THE COURT:  So I would say to you counsel all we need

2  is two sets of hard copies.  That's it.  We don't need one for

3  the witness stand.  If something happens to your technology

4  and a witness needs to see a hard copy, we'll have my set

5  there.  We'll have Sarah's set there.  That's all we need.

6  Does that answer your question?

7     MR. PULKRABEK:  I believe it does, Your Honor.  And

8  then in terms of getting the electronic copies to you and to

9  the court reporter, how would you like us to do that and by

10  what date?

11     THE COURT:  You mean hard copies?  I don't need the

12  hard copies before the trial.  The court reporter probably

13  doesn't need the hard copies before the trial either.  You can

14  bring them with you to trial on the first day.

15     MR. PULKRABEK:  Okay.  And I thought I heard the

16  court reporter express that she would like an electronic copy.

17  Maybe I misheard, but should we just bring that with us the

18  first day as well like on a thumb drive?

19     THE COURT:  Sarah, you want yours on a thumb drive?

20  Maybe you don't even want a hard copy.  Then we only need one

21  set of hard copies, and that's what I'll call the original.

22  That's the copy I'll refer to after the evidence and arguments

23  have concluded.  That's the copy that will be ultimately

24  preserved for the appellate court, and I think there will be

25  an appeal no matter what I do.  But that's all we need is one

19-CV-01224-RBJ      Trial Prep. Conference      03/23/2021      19

1   good set of hard copies and eliminate your duplicates, and

2   then plaintiff can bring its non-duplicate exhibits, the other

3   party can bring theirs.  Okay.  Next question.

4          MR. FORBES:  Judge, this is Peter Forbes.  It's not

5   necessarily a trial question, but I think all parties would

6   like to provide you with chronologies of events they think are

7   significant as well as trial briefs.  There's some issues of

8   law here obviously because we've got a claim by a personal

9   creditor of a partner against -- trying to levy or collect her

10  judgment through a charging order.  We'd like to brief the

11  procedures relating to that.  We'd like to brief some other

12  legal issues.  I'm sure plaintiff wants to brief some issues

13  as well.

14          The question I have is in terms of providing you with

15  a trial brief, what date would be appropriate to provide that?

16  I know a lot of the state courts want it ten days in advance

17  of trial.  I don't know if you have a preference.  And then

18  the other question was with respect to chronologies.  I know

19  in your summary judgment procedures you encourage parties to

20  present those .  Although we don't have summary judgments

21  here, I think all parties agree that chronologies would be

22  helpful.  And so how, if you would accept those, do you want

23  us to provide those?  In other words, would they be just

24  provided as, you know, non-substantive exhibits to you on the

25  morning of trial?  Would you like them in connection with the

1    trial briefs?  If you have any preference on that, those are

2    the two questions I had, Your Honor.  Thank you.

3           THE COURT:  Well, in part A of your question, what

4    you called chronologies, what I could call a timeline -- I

5    think we're talking about the same thing -- that is extremely

6    helpful.  The most helpful chronology of all would be a simple

7    chronology that would lay out the timing of all the key events

8    in one timeline.  If you start giving me each parties'

9    separate timeline, it becomes less valuable but still

10   valuable.  The importance to which I attach a timeline perhaps

11   might be illustrated by the fact that at least in one CLE

12   presentation that I made, and maybe more than one, when I got

13   to the question of timelines, I got out of my chair and got

14   down on my knees in front of the audience and begged them to

15   give us timelines.  I was trying to make a point in a little

16   bit of a dramatic way.

17          As far as trial briefs are concerned, Mr. Forbes,

18   again, the more paper you pile on me, the less quickly you're

19   going to get a result.  There's only so much that a judge and

20   a law clerk can do, and you're just one of a gazillion cases

21   that we've got nipping at our heels.  And so if you envision

22   giving me some lengthy trial brief and everybody else is going

23   to match, don't.  Just don't.  If you can give me a very

24   efficient five-page summary of the key legal points, great.

25   And if the defendants can give me -- the other parties can

```
 1   give me something like that, fine.  If you keep it limited
 2   like that, yes, I'll read it.  If you file 20- or 25-page
 3   briefs times five, I've got to tell you, I'm probably not
 4   going to read them.  I might glance at them.  I might ask my
 5   law clerks to read them, but I don't have the time for that.
 6   Judge Kane once said I might have the time, but I don't have
 7   the patience.  I will say I don't even have the time.
 8          But if you can give me a good, concise, short trial
 9   brief with your key legal points, fine.  When?  If they're
10   nice, short trial briefs, the case is going to start on on
11   Monday the 12th, if you can get them to me by Thursday
12   the 8th, I'll try to get them read over the weekend.  Next?
13          MR. FORBES:  Your Honor, I just wanted to -- Peter
14   Forbes again.  The parties have stipulated to a form of
15   timeline which has many of the key events in it, but the
16   parties obviously disagree on other events as to whether
17   they're key events.  So we will be presenting you with a
18   stipulation with respect to, for example, when the attack on
19   Ms. Wilson occurred, when the judgments were entered, when FSB
20   began its relationship with Two Mile Ranch partnership, when
21   certain loan transactions occurred, things like that.  But
22   with respect to other aspects of the case, the parties
23   disagree whether events are significant or not.
24          So I know I'll heed your comments, but just to let
25   you know, you will be getting at least that, an agreed upon or
```

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ    Trial Prep. Conference    03/23/2021    22

1   part of a, in essence, agreed upon partial timeline, and that

2   was what I meant by the term chronology, you're right, Your

3   Honor.  The parties then I guess will remain free to submit

4   whatever else they want to, and you'll either look at it or

5   not, heeding your comments that shorter and more focused is

6   better.

7         Similarly with the trial briefs, Your Honor, there

8   are a lot of -- from our perspective, many novel issues in

9   this case based on what we believe to be a novel approach that

10  the plaintiff is taking to try to establish the existence of a

11  fraudulent conveyance, so I don't think I can -- just in

12  advance, I'd like to do it in five pages.  I don't think so.

13  I think it will end up being more like ten, but I will heed

14  your admonition to keep it as short as possible.

15        THE COURT:  Well, do what you have to do, Mr. Forbes.

16  All I can tell you is what I tell lawyers and law students

17  when I teach or counsel, and that is at the end of the day

18  what you're trying to do is advocate.  You're not trying to

19  file the best, the longest, the most extensive brief that you

20  can devise .  You're not trying to just fill up the record for

21  your inevitable appeal.  What you're trying to do is to

22  convince, in this case, one man that you're right.  In a jury

23  case you're trying to convince seven jurors that you're right.

24  It's not the quantity.  It's the quality.  It's being

25  sensitive to what the finder of fact wants and needs that

 1   defines good advocacy.  Now, you do what you want with it.

 2          Any other questions?

 3          MR. KEITHLEY:  Your Honor, this is Livingston

 4   Keithley.  I just have a couple of logistical questions.  The

 5   first one has to do with witnesses and how many times a

 6   witness is on the stand.  Your procedures strongly suggest

 7   that your preference is to have an individual only on the

 8   stand once and then down, and that you don't normally

 9   entertain objections that cross-examination is beyond the

10   scope, for example.

11          It's our understanding in exchanging witness lists

12   with the plaintiff that the plaintiff intends to call many of

13   the defendants or defendant representatives in their case.  I

14   just want to make sure we're of the correct understanding

15   that, for example, if my client is called and testifies for

16   half an hour on direct examination, that it's the Court's

17   expectation that anything the defendants need to elicit from

18   my client Mark Pauling while he is there on the stand, even if

19   it's beyond the scope of the plaintiff's inquiry, is allowed,

20   or conversely, that you would prefer us to call him in a

21   defendant's case in chief.  That's my first question.

22          THE COURT:  That's a fair question.  I think,

23   generally speaking, that it's a good idea, and it's a courtesy

24   many times for the witness to not put the witness on Monday

25   and then expect the witness to come back on Thursday for the

19-CV-01224-RBJ    Trial Prep. Conference      03/23/2021   24

1   other side to have at him, so that's why I say that would be

2   my first choice.  But it's not a command.  It's just a

3   preference.  I want you guys to try the case the way you think

4   is the most effective for your clients, and if you think it

5   would be more effective for Mr. Pauling to answer the

6   plaintiff's questions and then to wait until your case to put

7   on the rest of the story, that's okay.  I'm not going to say

8   you can't do that.  If that's what you and Mr. Pauling think

9   is in the best interest of your client, and he doesn't mind

10  coming back and testifying a second time, okay.

11           Furthermore, although I want to minimize the number

12  of people that are in the courtroom for health and safety

13  reasons, the party is entitled to a client representative, and

14  if Mr. Pauling is your client representative and he's planning

15  to sit through the whole thing, then maybe he doesn't care

16  anyway.  You can make that decision.

17           MR. KEITHLEY:  Okay.

18           THE COURT:  What's your second --

19           MR. KEITHLEY:  Thank you, Your Honor.  And that gives

20  me a good amount of guidance, and I think you also anticipate

21  my second question, which just has to do with the logistics

22  within the courtroom and where, frankly, everyone is going to

23  sit.  We have, as we understand it conferring with counsel, I

24  think we've all conservatively identified that there will be

25  the plaintiff in attendance, but there will also be client

19-CV-01224-RBJ      Trial Prep. Conference      03/23/2021    25

1    representatives -- at least three representatives for the

2    various defendants, as well as Ms. Oldemeyer, Mr. Forbes, and

3    myself.  And we would expect we're going to be spread out in

4    the courtroom, but I thought it might be helpful to have that

5    conversation here just so we can all anticipate and advise our

6    clients what to expect when we arrive to sit about who will

7    sit at defense counsel table versus who might sit in the

8    gallery and where.

9         THE COURT:  You know, that really is as much a matter

10   for you folks to decide for your own health and safety reasons

11   as it is for us, especially because, again, there won't be

12   jurors that we have to worry about.  So I guess I don't really

13   care how many of you sit at the defense table.  I would think

14   you would care.  I would think that you would care for more

15   reasons than just your own health and safety.

16        I remember a case that I tried with one of my

17   partners -- I think the partner was then even an associate --

18   many, many years ago.  I'm talking maybe sometime in the '70s

19   or early '80s.  I don't remember when.  But I remember a

20   situation where there were two defendants, my client and the

21   other defendant, and I thought it was to my advantage my

22   client was not sitting at the same table with the other

23   defendant, because I thought the other defendant was going to

24   go down big time, and I didn't want my client to be linked

25   with the other defendant particularly, and so in that

19-CV-01224-RBJ      Trial Prep. Conference      03/23/2021   26

1   particular case, believe it or not, I brought in a little card

2   table and set it up with the Court's permission in the

3   courtroom.  My client and I and my co-counsel sat there all by

4   ourselves at that separate card table.  My point is there may

5   be various reasons why you do or do not want to sit at the

6   same table as somebody.

7          In our courtroom, for any of you who haven't been in

8   our courtrooms recently, we've got the two lawyers' tables,

9   one right in front of the jury box, one over on the other

10  side, that are parallel to the length of the courtroom, and

11  then there are two separate tables that are still inside the

12  bar, not part of the gallery, but are separate tables, one on

13  each side.  And often those are used for additional parties

14  and their lawyers or for technical people or for paralegals.

15  I guess you guys can figure out yourself how you want to sit

16  and where you want to sit.

17         I want you to maintain social distancing from my

18  staff, that is absolute, and from the bench as well, even

19  though I will have been and have been vaccinated, and each

20  member of my staff by then I think will have been vaccinated

21  times two.  Even so, I want you to maintain social distancing

22  from my staff and from me.  And I want you and will order that

23  you always at all times have your masks on, and that's for you

24  and your client and your witnesses and everybody.

25         But where you sit, I don't care.  If somebody wants

Sarah K. Mitchell, RPR, CRR

1    to sit in the jury box, it's okay with me.  Some lawyer and

2    lawyer's client want to sit in the more comfortable chair --

3    maybe it's not more comfortable, but they're comfortable.

4    Take a look at the courtroom when you come over and talk with

5    Julie about technology and figure out your own seating plan.

6            What's next?

7            MR. KEITHLEY:  Thank you, Your Honor.  One last final

8    question in terms of communications with our clients and

9    communications with other counsel including our defense

10   counsel.  Does the Court, given the COVID protocols, the fact

11   that we are going to be spread out throughout the courtroom

12   and we will likely be socially distanced from discussions with

13   our own client, will it be permissible for the Court if we are

14   allowed to communicate via electronic device with our clients

15   and with other counsel such as texting or sending e-mails in a

16   nondisruptive manner during the trial?

17           THE COURT:  I have no problem with that, but we also

18   have -- because IT provided us with -- devices, and they work

19   great.  It's a little headset, and if you turn the headset on,

20   and, say, your client turns her headset on, you can

21   communicate back and forth by whispering through that headset.

22   You know, the real reason that we -- one of the many reasons

23   we came up with it was to avoid bench conferences.  And I've

24   got a headset up there at the bench, and I can put my headset

25   on, and the lawyers can sit at their tables, and we can have a

19-CV-01224-RBJ     Trial Prep. Conference     03/23/2021     28

1   bench conference without anybody getting out of their chair.

2   In fact, these devices work if you're not even in the same

3   room.

4         I remember in one of our judge's meetings way back

5   when we were going through the whole process of developing a

6   protocol for pandemic trials -- I think it was Phil Brimmer

7   who went into a jury deliberation room, and I was sitting on

8   the bench, and we put those headsets on, and we could just by

9   whispering -- literally whispering -- communicate with each

10  other loud and clear.  The only problem we've had with those

11  devices in the trials that I've had where they were used is

12  that lawyers and judges -- this judge sometimes -- forget to

13  whisper, and you start speaking out loud and it defeats the

14  purpose.  But those devices are there and available.  But if

15  you need to use your phones and text or e-mail, given the

16  circumstances that we face in the pandemic, I'm fine with

17  that.

18        MR. KEITHLEY:  Okay.  Thank you very much, Your

19  Honor.  That is all the questions that I have on my list.

20        THE COURT:  Okay.  Those were good questions.  Any

21  other questions?

22        MS. OLDEMEYER:  Your Honor, this is Tracy Oldemeyer

23  for Farmers State Bank, and my only question, which you might

24  find odd given I'm the one worried about time, will the Court

25  allow opening statements, and if so, how much time will this

19-CV-01224-RBJ     Trial Prep. Conference     03/23/2021     29

1    Court allow each party?

2          THE COURT:  Well, if you have reviewed my practice

3    standards, but I know that your question is because these are

4    strange times, and I've modified my procedures just a little

5    bit, but my belief all through my time as a judge has been not

6    to put any time limits on opening statements or closing

7    arguments.  The only time limit that I put on it is that if it

8    starts to get repetitive or boring, I'll say let's move on,

9    but I'm not going to put a clock on your opening.

10         MS. OLDEMEYER:  Okay.  Thank you.

11         THE COURT:  I hope you'll rein yourself in,

12   Ms. Oldemeyer.

13         MS. OLDEMEYER:  I'll do my best, Your Honor.  Knowing

14   if I had a set amount of time is helpful to prioritization,

15   but I understand what the Court is saying.

16         THE COURT:  If you want me to put a limit on you,

17   Ms. Oldemeyer, I'll do it for you because you're a nice

18   person.

19         MS. OLDEMEYER:  Only if you do it for everybody, Your

20   Honor.

21         THE COURT:  Well, tell me how much time you'd like to

22   have, and I'll say yes.

23         MS. OLDEMEYER:  I have not conferred with

24   Mr. Pulkrabek, but we might have touched on the subject

25   briefly.  So I don't know, Mr. Pulkrabek, if you had a time

19-CV-01224-RBJ   Trial Prep. Conference   03/23/2021   30

1   for plaintiff that you were considering.

2          MR. PULKRABEK:  No.  I have not given a thought to

3   time limits at this point.

4          THE COURT:  I mean, really guys, if -- I don't want

5   to encourage Mr. Forbes, I'm a little bit afraid of him, but

6   if you're going to be submitting these lengthy briefs, you may

7   not need to spend too much time in your openings.  If he

8   really can limit himself and rein himself in and give me a

9   concise, focused legal brief and not argue the facts, stick to

10  the law, then an opening statement will be of a little bit

11  more value.

12         It seems to me in a case like this, which is a bench

13  trial, I would be hard pressed to understand why anybody would

14  need more than, say, 30 minutes to do an opening statement,

15  but I'm not going to put a time limit on you.  Just that if

16  you give a good, concise opening statement for 15 minutes, I

17  think you're twice as good as if you do it in 30 minutes.  I'm

18  winking at you now.

19         MS. OLDEMEYER:  Thank you, Your Honor.  That's

20  helpful guidance.  Thank you.  No further questions from the

21  bank.

22         THE COURT:  Anything else today, ladies and

23  gentlemen, that you want to ask about having to do with the

24  case?  I can tell you what I think the Broncos are going to do

25  in the upcoming draft, but maybe it's better to stick to the

19-CV-01224-RBJ     Trial Prep. Conference     03/23/2021     31

1   case.

2          MR. PULKRABEK:  For the plaintiff, I don't have

3   anything further at this time.

4          MR. FORBES:  Your Honor, Peter Forbes here, and the

5   only thing I have to say is no need to fear.  I have heard

6   your comments and will not be submitting any lengthy exegesis.

7          THE COURT:  Okay.  That's a Blackburnian word, by the

8   way.

9          MR. FORBES:  Well, I guess, Your Honor, hopefully

10  that's a good category from your perspective.

11         THE COURT:  Well, I think we all admire Judge

12  Blackburn's extensive vocabulary, let's say.  All right then,

13  folks, if there's nothing else, the important thing in this

14  world is that you stay healthy and your families stay healthy

15  and safe.  And just bear in mind whether you can settle your

16  case or not, it's money.  It's just money.  Stay healthy, stay

17  safe.  That's more important.  And we'll see you on the 12th

18  of April at 9 o'clock.

19         MR. FORBES:  Peter Forbes.  Thank you, Your Honor.

20         MR. KEITHLEY:  Thank you, Your Honor.

21         MR. PULKRABEK:  Thank you, Your Honor.

22         MS. OLDEMEYER:  Thank you.

23         THE COURT:  I'll say good-bye.

24      (The proceedings were concluded at 2:39 p.m.)

25

                    Sarah K. Mitchell, RPR, CRR

1                          REPORTER'S CERTIFICATE

2

3           I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10          Dated this 13th day of May, 2021.

11

12

13

14               /s/ Sarah K. Mitchell

15                 SARAH K. MITCHELL
                  Official Court Reporter
16          Registered Professional Reporter
                Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                      Sarah K. Mitchell, RPR, CRR