1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3
   Civil Action No. 19-CV-01224-RBJ
4

5    AMANDA WILSON,
                                      (Pages 1 - 221)
6         Plaintiff,

7         vs.

8    JONATHAN PAULING, et al.,

9         Defendants.

10   -------------------------------------------------------------

11                    REPORTER'S TRANSCRIPT
                    Bench Trial - Day 1
12   -------------------------------------------------------------

13
          Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Judge, United States District Court for the District of
   Colorado, commencing on the 12th day of April, 2021, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                         APPEARANCES

17   For the Plaintiff:
   ROSS W. PULKRABEK and AARON GOLDHAMER, Keating Wagner Polidori
18   & Free, PC, 1290 Broadway, Ste. 600, Denver, CO 80203

19   For the Defendants:
   PETER C. FORBES, Carver Schwarz McNab Kamper & Forbes, LLC,
20   1888 Sherman St., Ste. 400, Denver, CO 80203

21   R. LIVINGSTON KEITHLEY, Antero Law LLC, 1700 Broadway, Ste.
   640, Denver, CO 80290
22
   TRACY A. OLDEMEYER, Cline Williams Wright Johnson & Oldfather,
23   215 Mathews St., Ste. 300, Fort Collins, CO 80524

24
       Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25               Denver, CO 80294, 303-335-2108

           Proceedings reported by mechanical stenography;
               transcription produced via computer.

1                          I N D E X

2

  PLAINTIFF'S WITNESS                                    PAGE
3
  ELYCE YORK
4     Direct Examination By Mr. Pulkrabek                  93
      Direct Examination (Cont'd) By Mr. Pulkrabek        109
5     Cross-Examination By Mr. Forbes                     177
      Cross-Examination By Ms. Oldemeyer                  210
6     Redirect Examination By Mr. Pulkrabek               214

7

8
                    PLAINTIFF'S
9                   EXHIBITS                     RECEIVED

10            11                              212

11            19                              100

12            26                              110

13            32                              114

14            35                              115

15            41                              119

16            42                              121

17            43                              123

18            52                              126

19            56                              140

20            58                              188

21            64                              147

22            72                              161

23            75                              162

24            79                              153

25            80                              154

19-CV-01224-RBJ      Bench Trial - Day 2        04/12/2021   3

| | | |
|---|---|---|
| 1 | 100 | 158 |
| 2 | 109 | 169 |
| 3 | 110 | 174 |
| 4 | 113 | 164 |
| 5 | 126 | 173 |
| 6 | 150 | 214 |
| 7 | 163 | 169 |
| 8 | | |
| 9 | DEFENDANTS' | |
| | EXHIBITS | RECEIVED |
| 10 | | |
| | 1033 | 104 |
| 11 | | |
| | 2053 | 202 |
| 12 | | |
| | 2054 | 206 |
| 13 | | |
| | 2055 | 207 |
| 14 | | |
| | 2064 | 186 |
| 15 | | |
| | 2068 | 184 |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      4

1                   *         *         *         *         *

2        (The proceedings commenced at 9:01 a.m.)

3              THE COURT:  Good morning.  19CV1224, Wilson versus

4    Pauling.  Appearances, please.

5              MR. PULKRABEK:  Good morning, Your Honor.  Ross

6    Pulkrabek for the plaintiff Amanda Wilson.  I'm here today

7    with Amanda Wilson to my left.  Also with me today is Aaron

8    Goldhamer who just had a baby, and so he's excused from

9    trial duty and will be probably coming and going during this

10   trial.

11             THE COURT:  Well, good for him.

12             MR. GOLDHAMER:  Thank you, Your Honor.

13             MR. FORBES:  Good morning, Your Honor.  Peter

14   Forbes here on behalf of Elyce York and Lardyn Consulting.

15   With me at counsel table is Ms. York.

16             THE COURT:  Thank you.  Anyone else?

17             MR. KEITHLEY:  Good morning, Your Honor.

18   Livingston Keithley appearing on behalf of defendant Mark

19   Pauling and Two Mile Ranch General Partnership.  Mr. Pauling

20   appears with me at my side.

21             THE COURT:  Thank you.

22             MS. OLDEMEYER:  Good morning, Your Honor.  Tracy

23   Oldemeyer appearing on behalf of Farmers State Bank, and I

24   have with me Mr. Steven Stull and Mr. Richard Stull.

25             THE COURT:  All right.  Thank you.  Plaintiff, you

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021     5

 1   can proceed.

 2        MR. PULKRABEK:  Thank you, Your Honor.  Before we

 3   proceed, could I ask for sequestration under Rule 615?  I

 4   see we have multiple participants from the bank.

 5        THE COURT:  Yes, you can ask for it.  You're

 6   entitled to it.  I can't really enforce it because people

 7   are calling in on the call-in line, and I don't know who's

 8   calling in, but yes, granted.

 9        MR. PULKRABEK:  Thank you, Your Honor.

10        MR. FORBES:  Your Honor, I have one preliminary

11   matter too.

12        THE COURT:  Okay.

13        MR. FORBES:  Your Honor, my preliminary matter

14   relates to -- this is Peter Forbes speaking, Your Honor.  It

15   relates to reference in the plaintiff's trial brief to some

16   alleged violations or conspiracy to violate 18 U.S.C. 152

17   and 157, both of which are criminal statutes, relating to

18   criminal conduct in connection with the bankruptcy

19   proceedings.  Your Honor, there was no reference to these

20   statutes in any of the pleadings, and certainly there's no

21   reference to these statutes in the second amended complaint,

22   which is the operative pleading.

23        The second amended complaint specifically alleges

24   that the only conspiracy that plaintiff is pursuing is one

25   to violate the Colorado Uniform Fraudulent Transfer Act.

Sarah K. Mitchell, RPR, CRR

1    Specifically in the second amended complaint Paragraphs 19

2    -- excuse me -- pages 19 to 20, Paragraph 71, the third

3    claim for relief alleges that defendants, and I quote,

4    Agreed by words, conduct, or both to carry out the

5    above-described transfers to hinder, delay, or defraud

6    Amanda Wilson in violation of the Colorado Uniform

7    Fraudulent Transfers Act.

8         Also in Paragraph 76 the allegation is that the

9    exemplary damages should be awarded for, and I quote,

10   Defendant's civil conspiracy to violate the Uniform --

11   excuse me -- Colorado Uniform Fraudulent Transfer Act.  Your

12   Honor, 18 U.S.C. Section 52 sets forth nine separate crimes

13   of varying types in connection with a bankruptcy case,

14   including withholding property from a trustee, knowingly

15   filing a false proof of claim.

16        THE COURT:  Would you get to your point, sir?

17        MR. FORBES:  Yes.  My point, Your Honor, is that we

18   are not consenting to try by express or implied consent any

19   claim involving alleged conspiracy to violate either or both

20   U.S.C. Sections 152 and 157.

21        THE COURT:  Plaintiff?

22        MR. PULKRABEK:  Well, Your Honor, my response to

23   that is brief.

24        THE COURT:  You don't need to respond.  Let's just

25   go ahead with the trial.

 1            MR. PULKRABEK:  Thank you.

 2            THE COURT:  Call your witness.

 3            MR. PULKRABEK:  Oh, opening?

 4            THE COURT:  Well, if you feel you need an opening.

 5   I've read the first five pages of each of your trial briefs.

 6            MR. PULKRABEK:  Your Honor, I'd like to do an

 7   opening to provide some context, if I may.  I think --

 8            THE COURT:  Okay.  Don't just repeat the first five

 9   pages of your trial brief, however.  I've read that.

10            MR. PULKRABEK:  I won't, Your Honor.  Your Honor,

11   is it okay if I stand aside from the lectern to deliver the

12   opening so I can deliver the presentation?

13            THE COURT:  Yes.

14            MR. PULKRABEK:  Thank you.  So, Your Honor, this

15   case is about collusion, concealment, and fraud, and how the

16   defendants worked together to conceal information and

17   prevent Amanda Wilson from collecting her judgment, all to

18   keep millions of dollars of wealth for Jon Pauling and his

19   family.  I want to start with the most important fact that

20   the defendants concealed here.  The evidence is going to

21   show that Jon Pauling and Elyce York not only had a

22   long-term romantic relationship, Jon Pauling not only bought

23   a $1.6 million house in the foothills of Jefferson County

24   for them to live in, the fact is that Jon Pauling and Elyce

25   York have a child together.  They -- Elyce York gave birth

1   to Jon Pauling's child on January 6th, 2016, a little

2   daughter named Skylar Joy Pauling.  You'll see that it took

3   the coordinated efforts of all of these defendants to

4   conceal this and other information from Amanda Wilson while

5   they prevented her from enforcing her judgment against Jon

6   Pauling.

7           You will see that when Jon Pauling answered

8   interrogatories under oath, he specifically denied having a

9   child with Elyce York even though that child had only been

10  born a few weeks earlier.  You'll see that when we -- you

11  may recall when we appeared for the scheduling conference in

12  this case Elyce York denied the existence of a relationship

13  -- a romantic relationship with Jon Pauling, thereby

14  concealing that relationship.  When we served discovery on

15  the bank to get to the bottom of Jon Pauling's control over

16  Elyce York and Lardyn, the bank fought us, withheld e-mails

17  until we got them in discovery showing Jon Pauling has

18  control over Elyce York and Lardyn, even e-mails where the

19  bankers refer to Elyce York as Jon Pauling's puppet.  This

20  is the level of collusion and concealment that we have faced

21  since 2015.

22          So let me give you a brief overview of how the

23  defendants operated to flaunt the verdict that was rendered

24  by a jury of Jon Pauling's peers and showed a contempt for

25  the order that entered by Judge Buchanan.  As I mentioned in

1   our trial brief, this fraud played out in three phases.  The

2   first phase was that the defendants delivered a box of

3   documents to Amanda Wilson's lawyer shortly after this

4   charging order entered.  In that box of documents was an

5   amendment that purported to reduce Jon Pauling's share of

6   the profits from 10 percent to 50 percent.  This was

7   fraudulently backdated to September 15th, 2014.  How do we

8   know it was backdated?  Because the defendant's own federal

9   tax documents from 2014 show that there was no change to the

10  profit percentages during the year of 2014.

11          In addition, the defendants Jon Pauling and Mark

12  Pauling signed a letter directed to Land Title Guarantee

13  Company in 2015 in which they specifically said that there

14  had been no amendments to their original partnership

15  agreement.  And then you'll see that these defendants never

16  treated that amendment as having any significance on their

17  tax returns.  For 2015, '16, '17, and '18 the profit

18  percentages stayed the same, 50/50.  So this was an

19  unsophisticated effort by the Pauling brothers to defraud

20  Amanda Wilson, but it set the tone for the next phase.

21          The next phase of the defendants' fraud, you'll

22  see, is that the Pauling brothers and their longtime bankers

23  Steve Stull and his father Dick Stull, who control Farmers

24  State Bank got together, and you'll hear that the

25  relationship stretches back more than 20 years.  For this

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    10

1    phase of fraud on -- for this next phase of the fraud to

2    work Jon Pauling needed the Stull's cooperation because they

3    hold all the bank debt on Two Mile Ranch.   Jon Pauling

4    suspected that the Stulls would help him protect him and the

5    partnership against Amanda Wilson's judgment because it was

6    in their mutual financial interest.

7           Of course, you'll see bank documents that talk

8    about this bankruptcy protecting the partnership from the

9    plaintiff for the long run.  You'll see the bankers talking

10   about how the only plan was to have a unicorn-like investor

11   group buy Two Mile Ranch out of the bankruptcy.  You'll see

12   that the defendants envisioned that they would by

13   cooperating be able to get a bankruptcy court to stamp

14   approve the judgment.  And you'll see that this wasn't just

15   a fraud on Amanda Wilson.  It was -- it was a fraud on the

16   bankruptcy court as well.

17          Now, you'll see that one of the bank employers

18   confided that this unicorn investor plan made her nervous.

19   Two Mile Ranch then goes ahead and files bankruptcy on

20   July 1st of 2016.  Less than three weeks after that you'll

21   see that Jon Pauling activates his plan with the Stulls to

22   create a new fictional entity, which will be Lardyn.  And

23   you'll see that Jon Pauling contacts Dick Stull under an

24   alias that he was using, Joe Henry.  Now, this e-mail alias

25   is one of the ways that Jon Pauling concealed his activities

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    11

1    while he was on probation for the very sexual assault that

2    he had committed on Amanda Wilson, and he wasn't allowed to

3    use e-mail, text or cell phone.  But you'll see many Joe

4    Henry e-mails in this case.

5            So you'll see that Jon Pauling contacts Dick Stull

6    to set up a new relationship with Elyce York for Lardyn

7    Consulting, which is not in existence yet; however, this is

8    a company that he says will be in Elyce York's name.  From

9    the start, you'll see that Lardyn was this unicorn-like

10   investor that Jon Pauling would control through Elyce York,

11   who was his lover and the mother of his child, all in order

12   to keep the wealth inside his family and out of Amanda

13   Pauling's (sic) hands.  You'll also see that Ms. York did

14   not even meet the bank's lending criteria, but the bank went

15   ahead with this loan all the same.

16           Now, earlier in this case the defense told this

17   story of how it was Elyce York, someone without any

18   experience in the cattle industry, who came up with the plan

19   to acquire the assets.  It was her idea.  You'll hear Dick

20   Stull concede that wasn't true.

21      (Video played.)

22           MR. PULKRABEK:  So it wasn't Elyce York.  The bank

23   concedes that it was Jon Pauling who organized Lardyn, of

24   course.  The bank's internal memos then leave no doubt as to

25   what the defendants' intent in all this was.  Their intent

                         Sarah K. Mitchell, RPR, CRR

1   was to hinder Amanda Wilson from collecting her judgment.

2   You'll see multiple documents to that effect, one here

3   saying -- an internal bank memo saying, Working with Mark

4   and Jon on Chapter 11 to get rid of Jon's judgment so the

5   assets can be sold without concern for legal recourse to the

6   buyers.  As you know, in a Colorado Uniform Fraudulent

7   Transfer Act case ordinarily intent will be inferred from

8   batches of fraud.  Here you have a direct statement of the

9   bank's intent, and this was not just a one-off thing.  Other

10  statements such as, Working with Mark and Jon so that they

11  can get through the Chapter 11 bankruptcy which is being

12  done to protect the proposed asset sale from the judgment

13  against Jon.  And this whole point was to help Mark Pauling

14  and Jon Pauling escape from under the judgment and the

15  charging order that Judge Buchanan had entered.

16         Now, this plan to get this bankruptcy transfer

17  stamped approved by a United States bankruptcy judge was

18  never going to work because it was an insider transfer, and

19  the defendants eventually realized that, so you'll see then

20  the next thing that happens is they abruptly change course.

21  They agree that they will transfer the assets to Lardyn

22  subject to the bankruptcy being dismissed.  And then having

23  reached that new collusive agreement, they went ahead and

24  moved to dismiss the bankruptcy, and the bankruptcy got

25  dismissed, and you'll see that.

1        So then the third phase of the fraud is one that's

2    still continuing to this day.  With that bankruptcy

3    dismissed, the defendants finalized their agreement to

4    transfer the assets in Two Mile Ranch to Lardyn Consulting.

5    Now, this plan, you'll see, involved moving all of Two Mile

6    Ranch's income-producing assets from Two Mile Ranch to

7    Lardyn.  The defendants valued those assets at about

8    $8.7 million, a little north of that.  At the same time what

9    they did is they shifted $7.1 million of debt from Two Mile

10    Ranch over to Lardyn.  That 8.7 minus 7.1 left equity that

11    they transferred into Lardyn of greater than $1.6 million.

12        Now, you'll hear that Two Mile Ranch was holding

13    two -- left holding two assets.  One was this luxury house,

14    a $1.65 million house in the foothills of Jefferson County.

15    That was held in Two Mile Ranch, as well as the promissory

16    note that Mark Pauling had made.  Those assets were enough

17    to cover the remaining bank debt on Two Mile Ranch, but it

18    left nothing for the charging order to reach or Amanda

19    Wilson to collect.  That's the way they did it.

20        Now, you will hear that this left a problem for the

21    bank because everybody knew that Elyce York had no

22    experience in farming, ranching, running feedlots.  She had

23    no experience in bookkeeping, accounting, and business

24    management.  She hadn't even been employed since 2013.  She

25    had a weak financial statement.  She lived still two -- more

1    than two hours away in that house in Jefferson County where

2    she was raising their child.  This is more than two hours

3    away from this farm that she was supposedly acquiring.  So

4    in order to solve that problem, that's when they make Mark

5    Pauling a 15 percent partner in Lardyn.

6         You'll hear even though Elyce York supposedly

7    wholly owned Lardyn she wasn't involved in negotiating that

8    15 percent to Mark Pauling.  There was a question continuing

9    to this day and a dispute apparently among the defendants

10   whether Mark Pauling had ever even met Elyce York or knew

11   her at that time.  You'll see that he received this

12   15 percent and not 50 percent because he had already

13   received distributions from Two Mile Ranch previously,

14   including a valuable $1 million piece of property that he

15   never paid full value for, and then also he had sold his

16   share of the minerals.  So between Mark Pauling and Jon

17   Pauling they had sort of an off-the-book understanding of

18   what each's interest was in Two Mile Ranch, and Mark Pauling

19   received 15 percent of Lardyn.

20        All right.  So you'll hear that the assets then

21   were transferred on April 27th, 2017, from Two Mile Ranch to

22   Lardyn.  The crown jewel of all of this was the mineral

23   rights that Two Mile Ranch owned.  Now, you're going to hear

24   that what the defendants knew was that 23 to 24 new wells

25   had been drilled on the mineral acreage owned by Two Mile

1    Ranch and there were an additional six wells permanent.  The

2    defendants knew that they were just months away from these

3    oil wells going into production and that those would

4    generate millions of dollars in royalties.  They got the

5    minerals out of Two Mile Ranch and over to Lardyn before

6    that happened to ensure that those royalties were not going

7    to be subject to the charging order.

8            And, again, you can see that Jon Pauling -- after

9    the transfer to Lardyn Jon Pauling controls Lardyn.  You've

10   already seen the comment to that effect by the bank's own

11   employees.  However, you'll also see that Jon Pauling is the

12   one that communicated with the bank.  You'll see the large

13   number of text messages that Jon Pauling used to communicate

14   with these bankers as compared to a very small number of

15   text messages between Elyce York.  You will see that after

16   the transfer to Lardyn it's Jon Pauling who starts using the

17   e-mail address for the company, LardynConsulting@gmail.com,

18   and you'll see e-mails between him and the bankers showing

19   that he's the one that controlled Lardyn after the transfer.

20           All right.  So as 2017 wears on, the oil and gas

21   royalties start to come in, and you'll see that Jon Pauling

22   and the Stulls decide to move those mineral interests out of

23   Lardyn and into yet another company called Redtail Resources

24   of which Jon Pauling makes Elyce York a 95 percent owner.

25   You'll see that in 2018 alone the gross rents from oil and

1  gas from these wells were north of $1 million just in that

2  year, and then you'll see how that translates to Elyce

3  York's income.  On her 2018 tax return she reported more

4  than $400,000 in passive income from these oil and gas

5  royalties.  That's vastly more money than she had ever made

6  in her lifetime.  And while these defendants have been busy

7  shifting income over to Elyce York and wealth over to Elyce

8  York, Amanda Wilson still has yet to receive a penny of her

9  judgment.

10        Now, we've already talked about the claims that

11  we're pursuing in this case, one being violation of the

12  Colorado Uniform Fraudulent Transfer Act, the other

13  conspiracy to violate that act.  One thing that I want to

14  point out is that two of these defendants, Elyce York and

15  Lardyn Consulting, never even filed an answer in this case

16  until Friday, literally the last business day before we

17  started trial.  Now, for my client I need to object to that.

18  Under Rule 8(b)(6), the defendants were deemed to have

19  admitted all of the allegations in the complaint because

20  they hadn't answered.

21        I understand if you may not want to go that far,

22  but at a minimum this laundry list of affirmative defenses

23  that they've also asserted in this late-filed answer for the

24  first time, that at a minimum should be stricken.  We submit

25  that the issue as to Elyce York and Lardyn Consulting really

1   should be damages only and not liability because they've

2   confessed it.  As to the other defendants, we acknowledge

3   that the issue should be both liability and damages.

4          I'm going to turn to Elyce York's damages -- or

5   Ms. Wilson's damages because you're going to hear a lot of

6   evidence on damages in this case, and part of the reason for

7   that is that the defendants signed a lot of financial

8   documents on which they represented the amount of wealth

9   they were transferring out of Two Mile Ranch and into Lardyn

10  from -- and equity from Jon Pauling to Elyce York, and they

11  also did deals based on that.  Now, shortly before Amanda

12  Wilson goes to trial against Jon Pauling you'll see that Jon

13  Pauling represented to the bank that his total equity in Two

14  Mile Ranch was more than $3.5 million.  Now, you're going to

15  see a number of bank documents showing that at the time of

16  the transfer of assets from Two Mile Ranch to Lardyn

17  Consulting, they understood that they were transferring 1.6

18  -- more than $1.6 million of equity over to Lardyn

19  Consulting.

20         Now, this -- let me show you this.  These

21  defendants prepared balance sheets that Elyce York signed,

22  and you can see that before the transfer her net wealth is

23  represented as being under 25,000.  After it jumps to more

24  than $1.7 million, and it goes up from there.  These

25  defendants, you'll hear, specifically talked about how Elyce

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    18

1    York was going to get rich overnight simply by transferring

2    these assets.

3         (Video played.)

4         MR. PULKRABEK:  Now, you're also going to see the

5    defendants, if anything, underestimated the amount of wealth

6    that they were transferring because by 2019 on a balance

7    sheet that the bank prepared itself for Elyce York to sign,

8    from the same assets that got transferred, her wealth, her

9    equity has now gone up to just under $3 million.  Now,

10   another thing you're going to see, another data point, if

11   you will, on damages is that these defendants did

12   transactions where they sold interest in Lardyn.  So you're

13   going to see that they sold a 3 percent interest to Paul

14   Pauling for $60,000, a 2 percent interest to Brian Bates,

15   who is one of Jon Pauling's lawyers, for $40,000.  That

16   indicates a valuation at that time of equity in Lardyn of

17   $2 million.

18        And then another thing you'll see is later in June

19   of 2019, Mark Pauling gets out.  He cuts and runs from

20   Lardyn, and he sells his 15 percent interest, and he gets

21   $500,000 from a new trust that is set up for Jon Pauling and

22   Elyce York's child, so the Elyce York Trust buys out Mark

23   Pauling for $500,000.  That indicates a valuation of Lardyn

24   of more than $3.3 million.  We're going to call a certified

25   public accountant named Shari Lutz.  She has expertise in

1    forensic accounting, business valuation, damages.  And she

2    has looked at the financial data, and she's going to confirm

3    for you what you're already seeing here from the evidence

4    which is that Amanda Wilson has been cheated out of more

5    than $3.5 million of her judgment.

6           Now, in a few minutes the defendants are going to

7    stand up, and they're going to tell you that there was never

8    any equity.  They're going to claim that they made a mistake

9    when they valued those mineral interests.  We'll show you in

10   this trial that the defendants themselves valued the mineral

11   interests at $3.4 million.  The way that breaks down is

12   there was the acres with the wells that went in, those 24

13   wells.  They valued that at a little over $2.3 million.

14   Then there was another 1,100 acres that didn't have any

15   wells on it yet.  They assigned that $1,000 an acre for a

16   1.1 million total.  You add those things together, that's

17   the $3.4 million that they said it was worth, and they did

18   deals on that basis.

19          Then when those royalties came rushing in, they

20   filed tax returns under penalty of perjury where they

21   actually represented that the minerals had gotten worth

22   more, north of $4 million.  Now, even though the defendants

23   had these representations that they made, they're going to

24   call an appraiser called Briana Lamphier to testify that the

25   minerals were worth less, and here's what you need to know

about Ms. Lamphier.  The defendants actually hired

Ms. Lamphier to give them a second opinion, a second opinion

on minerals back in 2017.  And Ms. Lamphier didn't get all

the information she requested, and when they got

Ms. Lamphier's appraisal back in 2017, they rejected it.

They don't use it.

        Instead, you'll see that they use those exact

figures -- the $2.3 million figure you saw earlier -- they

use that from the first appraisal they got from a guy named

Steve Brown, and when the Stulls sought participation from

other banks to help them underwrite this transaction, they

gave those other banks Mr. Brown's appraisal, and they did

not give Ms. Lamphier's appraisal that they're going to try

to bring into court during this trial.  And the reason --

and as it turns out, Ms. Lamphier was wrong.  She

underestimated the royalties.

        Another thing that the defendants are going to do

to try to get rid of the equity, you're going to hear there

was a $730,000 loan that Mark Pauling owed.  That was Mark

Pauling's separate loan, and the defendants are going to

argue that Two Mile Ranch signed a guaranty so Two Mile

Ranch should have to pay that entire loan.  You'll hear from

our accountant Ms. Lutz that a guaranty is not from an

accounting standpoint or any other standpoint the same thing

as a debt of Two Mile Ranch, but the other thing you're

1    going to see is that the bank was always more than fully

2    secured on its separate $730,000 loan from Mark Pauling.  It

3    had a huge cushion there.

4          But they want the -- they want Two Mile Ranch to

5    have to pay that $730,000 loan so that they can take money

6    out of Two Mile Ranch and put it in Mark Pauling's pocket.

7    That leaves less money in Two Mile Ranch for Elyce York --

8    or for Amanda Wilson, I'm sorry, to say that would be

9    subject to the charging order.  And they can say, Well,

10   there's $730,000 less equity in Two Mile Ranch because of

11   that.  So this is what the defendants kind of need to happen

12   in order to make their revisionist arguments that the

13   statements that they signed were generated earlier in this

14   case were inaccurate.  You'll also see them trying to pile

15   on legal fees, charges and interest from that bankruptcy

16   where they expressly said they were trying to get rid of the

17   judgment.

18         Now, finally, let me talk about exemplary damages

19   because that's something we're asking in this case.  We

20   believe this is an exemplary damages case because these

21   defendants are -- there's no question they acted

22   fraudulently and willfully and wantonly, but beyond that,

23   they're remorseless, unrepentant, and willfully defying the

24   civil justice system, and let me show you something here.

25   When the bank got served with process in this case, Steve

1    Stull sent this message to Mark Pauling, and he said, Looks

2    like we just got served by the bitch as well.  Called Amanda

3    Wilson a bitch.

4           Now, this is a banker who has never met Amanda

5    Wilson.  The only thing he knows about her is what he's

6    heard from Jon Pauling.  He knows that Jon Pauling was found

7    liable of a sexual assault.  He knows that a Denver District

8    Court judge found the evidence bad enough to warrant

9    punitive damages against Jon Pauling.  But this banker in

10   his bank cast his lot with Jon Pauling long ago.  He vowed

11   to help Jon Pauling get rid of Amanda Wilson's judgment and

12   protect his partnership.  And you'll see that the Stulls

13   stopped being bankers, and instead they became Jon Pauling's

14   accomplices in avoiding justice.

15          At the end of this case you'll know that everything

16   they did was precipitated by one immutable -- and, in fact,

17   it's a stipulated fact -- Amanda Wilson has a valid judgment

18   against Jon Pauling for more than $6.3 million.  And, in

19   fact, today with interest, that judgment is well worth well

20   north of $7 million.  Jon Pauling got his due process, but

21   these defendants still don't want to honor that.

22          The evidence shows -- Ms. Lutz' testimony will

23   confirm -- that Amanda Wilson's been deprived of more than

24   $3.5 million of collection on that judgment, and since this

25   is a case where you're going to see the defendants use

1    different tactics all to achieve the same goal that they

2    entered into in 2015 in preventing Amanda Wilson from ever

3    collecting a penny of this judgment, we think a minimum of a

4    one-to-one ratio of exemplary damages to actual damages

5    would be warranted.  That's why at the end of this case I

6    anticipate asking you to reach a judgment in Amanda Wilson's

7    favor and against these defendants jointly and severally for

8    $7 million.  Thank you, Your Honor.

9         THE COURT:  All right.  Do the defendants wish to

10   make an opening statement?

11        MR. FORBES:  Your Honor, on behalf of Elyce York

12   and Lardyn, I do.

13        THE COURT:  Okay.

14        MR. FORBES:  Good morning, Your Honor, Peter

15   Forbes.  Your Honor, the claims here are under the Colorado

16   Uniform Fraudulent Transfer Act.  There is a well-developed

17   body of jurisprudence under that act, and there are specific

18   legal requirements in order to establish improper transfer

19   under that act.  And, Your Honor, to the extent the

20   defendants -- and I only speak for my clients -- are using a

21   tactic here, the only tactic we're using is to follow the

22   law as set forth in the Colorado Uniform Transfer Act, which

23   I'll call CUFTA, and in the jurisprudence developed under

24   that act and under the uniform act from which it is derived.

25        Your Honor, I will try to avoid repeating our trial

1    brief, but to begin with, obviously CUFTA relates to the

2    transfer of assets.  It doesn't relate to the transfer of

3    equity.  It relates to the transfer of assets, specific

4    assets that are allegedly taken away from the debtor that

5    the debtor could otherwise have realized on, all right?  So

6    that's number one, is the debtor could only realize on what

7    property TMR, Two Mile Ranch -- I'll call it TMR -- had as

8    of the date the charging order was served, because the

9    charging order remedies are limited.

10            They give you the right to either get

11    distributions, or if no distributions are made, you can

12    petition the Court to foreclose on the interest, force a

13    sale, liquidation of the partnership, and get the judgment

14    debtor partner's share of any surplus.  So the question here

15    -- and that I believe is the angle of CUFTA that we're

16    proceeding under here, because there were no distributions.

17    So the question is how much, if any, did TMR have in surplus

18    of as of the date the charging order was served.

19            Now, the one thing that CUFTA does allow that we

20    concede based on the cases we cited is that if there are

21    transfers -- excuse me -- that the charging order procedure

22    allows -- is that if there are transfers that diminish the

23    value of the debtor partner's interest, those transfers can

24    be recaptured if they're in the nature of a fraudulent

25    conveyance.  You've ruled that the fraudulent conveyance

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    25

1    statute applies here, so that is the legal framework that

2    we're looking under.

3            Under that framework, the first question is what

4    was the value of the transferred property as of the date of

5    the alleged transfer.  Here that date was 4/27/17.  So the

6    first question, the first thing plaintiffs have to establish

7    is what was the value of the assets that were transferred.

8    What assets were transferred, Your Honor?  There were three

9    principal assets transferred.  The first was the Logan

10   County farm.  That farm, that sale included water rights.

11   It included the improvements on it.  So that was kind of the

12   one -- first thing that was transferred was the farm.  The

13   second thing that was transferred was the equipment that was

14   used on that farm to conduct operations.  That's a second

15   bundle of assets, as it were.  The third that was

16   transferred was the mineral rights that TMR owned in Weld

17   County.

18           So those are the three assets in question, Your

19   Honor, and the first question that they have to address is

20   what was the value of those assets on the date of the

21   transfer, on 4/27/17.  Your Honor, there were, in fact --

22   Your Honor, there were, in fact, appraisals obtained prior

23   to the transfer.  These are the appraisals that were

24   obtained prior to the transfer.  The farm with the

25   improvements and water rights was appraised by a third party

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    26

1   on 8/23/16.  That was the latest appraisal.  That showed the

2   appraised value was $4,270,000.

3          THE COURT:  Who was the appraiser?

4          MR. FORBES:  It was a gentleman named Moreland.

5   And that is Exhibit 2064, Lardyn Exhibit 2064, Your Honor.

6   It was a third party unaffiliated with the bank, a regular

7   licensed real estate appraiser.  The contract price for that

8   purchase was 4,270,000, and the amount paid by Lardyn at

9   closing was $4,270,000.

10          THE COURT:  And where did Lardyn get the money?

11          MR. FORBES:  Lardyn borrowed the money from Farmers

12   State Bank.

13          THE COURT:  Yes, exactly.

14          MR. FORBES:  Right.  That is exactly right.  It

15   took a loan from Farmers State Bank.  It's been paying that

16   loan ever since.  All right.  But the fact is the -- that is

17   the value of the property.  This is all I'm pointing out

18   here.  Next were the mineral rights.  The contract sales

19   price was 2,200,000.  The appraisal -- there was only an

20   appraisal of the leased mineral rights.  Now, Mr. Pulkrabek

21   talked about these being able to generate millions of

22   dollars, and they knew that was going to happen.  Yes,

23   that's correct, and you'll see this appraisal.  It was done

24   by Gustavson Associates on February 1st, 2017, just two

25   months before the transfer took place.  It appraised those

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    27

1    leased mineral rights, the ones that Mr. Pulkrabek talked

2    about, at $1.36 million.  In other words -- and you'll see

3    it -- it projects the cash flow and discounts it back, and

4    that's the appraised value of all these wells that were

5    about to come online.

6               THE COURT:  Who was the appraiser?

7               MR. FORBES:  A gentleman named Gustavson &

8    Associates.

9               THE COURT:  A gentleman named Gustavson &

10   Associates.  That's an odd name.

11              MR. FORBES:  The actual name of the gentleman?  I'm

12   sorry.  It was done by a company called Gustavson

13   Associates.  As I stand here I cannot give you the exact

14   name of the appraiser.  If you can give me a second and it's

15   critical, I can take a look at the exhibit.

16              THE COURT:  No, it's not critical at this time.

17              MR. FORBES:  That was an appraisal done in

18   February, just two and a half months before the transfer.

19   The next item that was transferred was the equipment, and

20   the contract sales price was 609,000.  The amount paid

21   through the loan was 610,000.  There was an appraisal -- and

22   I'll just put this up so you can see -- we'll talk about

23   that, but it was done by a third-party company called

24   Kraupie.  They did an appraisal of all the equipment that

25   came in at 627,735.  That included $65,000 for hay that was

Sarah K. Mitchell, RPR, CRR

1    not transferred, so the value of the equipment only was

2    562,735.  Those are the appraised values that existed at the

3    time.

4           Now, the one asset -- the one asset that did not

5    have an appraisal was the unleased mineral acreage owned by

6    Two Mile Ranch in Weld County.  There was no appraisal for

7    that.  The plaintiffs have not gotten an appraisal for that.

8    There are just some subjective opinions out there about what

9    that was worth.  You'll see if you -- and you find it

10   significant -- the value given to those properties is

11   frequently about $1 million, $1.1 million.  The value here

12   that was paid in addition to the 1.36 for the minerals was

13   about $844,000.  So there is a difference there, but, again,

14   those are not -- there's no appraisal to show that -- by

15   plaintiffs who have the burden to show that the $844,000 did

16   not reflect the fair market value.

17          Remember, it's their burden, and they're not going

18   to have any evidence to meet that burden.  And the reason,

19   Your Honor, is, as I discussed briefly in our trial brief,

20   is they didn't go out and get appraisers.  What they did is

21   they hired their damages expert, and she says, Well, from my

22   perspective as of the date of the transfer, 4/27/17, I think

23   the internal values are those given by Farmers State Bank on

24   some internal loan presentation documents.  Your Honor, our

25   view is that that is not admissible expert opinion.  I won't

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    29

1   go over it.  But basically based on the James River

2   Insurance Company case it's an attempt to substitute lay

3   opinion in an area where the Tenth Circuit has said there's

4   a requirement that you must have expert opinion.  But that's

5   the value piece of things, Your Honor.  I think the value

6   piece of things is covered right there.

7            Okay.  Now, the next thing you've got to look at is

8   debt.  All right, Your Honor, there are going to be two debt

9   calculations you're going to hear, and this is as of

10  4/27/17.  The first debt calculation is going to be by

11  Ms. Lutz, and this is from Ms. Lutz's expert report.  This

12  is her calculation of the -- what's called in CUFTA the

13  valid liens against the property.  In other words -- excuse

14  me -- the amount of debt that was secured by the liens

15  against the property.  She says that the total debt before

16  taking into -- excuse me -- yes, the total debt before

17  taking into account TMR's liability on its guarantee was

18  $8,827,920.  So that was -- that she admits is valid debt.

19  She takes that from the proof of claim filed on 7/1/16.  She

20  admits there was valid debt against this property of

21  $8.8 million.

22           All right.  Now, Your Honor, she omits from that

23  valid debt this guaranty, and the liability on that guaranty

24  per her report as of 7/1/2016 was $754,000.  So she admits

25  that the total debt as of -- and this some -- this is going

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    30

1   to be six -- almost ten months before the transfer -- she

2   admits the total debt was 9,582,264.  Now, Your Honor,

3   you've heard Mr. Pulkrabek say there's some accounting

4   provisions that may say the guaranty shouldn't have been

5   given, it's her opinion it shouldn't have been given.  Under

6   CUFTA all of that is irrelevant.  CUFTA says you take into

7   account all valid liens.  The guaranty was part of the debt

8   owed by Two Mile Ranch and was therefore part of a valid

9   lien against the property.

10           THE COURT:  It kind of makes you wonder, doesn't

11  it, Mr. Forbes, why did they go through all the shenanigans

12  of Lardyn and Elyce York --

13           MR. FORBES:  Well, Your Honor --

14           THE COURT:  -- if the debt already exceeded the

15  value.

16           MR. FORBES:  It actually doesn't make me wonder,

17  Your Honor.

18           THE COURT:  It makes me wonder, sir.

19           MR. FORBES:  It does, I know.  I think what you've

20  got to hear -- what you'll hear from the bank is they had a

21  bad borrower, and they were looking for a way to try to

22  minimize their losses.  Because, yes, they could have

23  foreclosed, and you'll hear them testify -- I don't want to

24  speak on their behalf, but you will hear this --

25           THE COURT:  Well, the documents already speak on

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021     31

1    their behalf.

2          MR. FORBES:  Well, what the documents don't talk

3    about is that if you foreclose, and I think you've seen

4    this, you don't get the fair market value of the property.

5    You get a discounted value for the property, so --

6          THE COURT:  I'm talking about the documents that

7    were shown in the opening statement of the plaintiff --

8          MR. FORBES:  Well, and let me --

9          THE COURT:  -- where the bank people quite clearly

10   are trying to help the Paulings avoid the judgment.

11         MR. FORBES:  Well, Your Honor --

12         THE COURT:  The documents speak for themselves.

13         MR. FORBES:  Your Honor, I guess then I'd direct

14   you to the Park County Sportsmen case I discussed the very

15   first time we were together.  I know you kind of didn't

16   react positively to it.  You may not react positively to it

17   today.  But basically that says if there's no value in the

18   property transferred, it doesn't matter why you do it, all

19   right?  They will tell you what their independent motivation

20   was, Your Honor, but basically you don't have a case if

21   there's nothing in there you could have gotten.  That's why

22   the first question in this case is what the numbers say.

23         Your Honor, going back to the debt totals, that was

24   as of 7/1/16, some ten months before the transfers.  We will

25   ask -- this, Your Honor, is going to be from Exhibit 2049.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   32

1   This is -- this is -- I'll just put this up.  This is a

2   calculation that was provided by the bank in response to an

3   interrogatory.  I asked -- the interrogatory asked them how

4   much was owing under all of the debts secured by the liens.

5           THE COURT:  Mr. Forbes, you represent Ms. York.

6           MR. FORBES:  Yes.

7           THE COURT:  And Lardyn.

8           MR. FORBES:  Yes.

9           THE COURT:  Have you thought about whether you've

10  got a conflict?

11          MR. FORBES:  I do not have a conflict.  I have

12  thought about whether -- I don't know what the question is.

13          THE COURT:  I sure thought about it.

14          MR. FORBES:  What's the question, Your Honor?

15          THE COURT:  I don't know why Ms. York wants to put

16  herself in the middle of this with the potential exposure to

17  her that it has.  Lardyn, if plaintiff is correct, is just a

18  vehicle that the Paulings used to park their assets, but

19  Ms. York is seemingly being used.  She's not a farmer.

20  She's not a rancher.  She's just a person.  She's a mother

21  with a child.  And I'm not sure how you represent her at the

22  same time you're representing Lardyn.

23          MR. FORBES:  Well, Your Honor, I'd point out that

24  Ms. York is sued personally for participating in this

25  transaction.

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   33

1          THE COURT:  Yes, I know that.

2          MR. FORBES:  So I don't know how I can -- there's a

3    conflict between my saying neither she nor Lardyn did

4    anything wrong when she's been sued personally.

5          THE COURT:  Well, if she was used by other people,

6    she might not have done anything wrong.  She might have been

7    a victim here, but Lardyn is not.

8          MR. FORBES:  Your Honor, she doesn't believe she

9    did anything wrong.

10         THE COURT:  Well, we'll see.

11         MR. FORBES:  We will, Your Honor.

12         THE COURT:  She's going to testify under oath.

13         MR. FORBES:  She will testify under oath, Your

14   Honor, and I also find it a little bit -- you're kind of

15   jumping to conclusions when you say she's just a mother and

16   just a person.  Why can't she have learned how to operate

17   this feedlot?  Why is it so unlikely that she could help in

18   the operation of this feedlot?  Why is it so unlikely that

19   she could become a farmer and rancher, Your Honor?  Those

20   are the questions I hope that you will keep an open mind on,

21   and those are the questions that I hope you will listen to

22   the evidence on, because certainly there's been no claim

23   that she was not a farmer or a rancher -- I'm sorry -- that

24   she was a farmer or rancher at the time this happened, but

25   she has become one, Your Honor.  We believe that's what the

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021   34

1   evidence will show.

2           THE COURT:  All right.  Thank you, Mr. Forbes.

3           MR. FORBES:  Your Honor, I hadn't finished my

4   presentation.

5           THE COURT:  All right.

6           MR. FORBES:  Unless you're directing me to finish.

7           THE COURT:  Go ahead.

8           MR. FORBES:  Your Honor, as you heard, Ms. Lutz

9   contends -- she adopts certain values for the property that

10  were transferred.  She also -- and I want to just illustrate

11  this, what the evidence we believe will show you, that these

12  are the values that she adopts.  And if you find that that

13  is admissible evidence on the value as of the date of the

14  transfer, and you find that that's -- the preponderance of

15  the evidence supports those values, and you find that East

16  River Insurance Company allows you to -- excuse me -- James

17  River Insurance Company allows you to consider her opinions

18  based on adopting something from Mr. Steve Stull's loan

19  presentation -- the column here under values is taken

20  directly from her report.  These are the values she assigns

21  to the property that was transferred.

22          THE COURT:  Remind me, who is Ms. Lutz.

23          MR. FORBES:  She is their expert witness on

24  damages.  Your Honor, what we're trying to illustrate here

25  is that if you recognize the debt that was as of 4/27/17,

Sarah K. Mitchell, RPR, CRR

1   the farm was encumbered by liens of $6,566,919.46.  Your

2   Honor, that calculation is -- we're going to show it during

3   trial -- that is because the deed of trust against that farm

4   and the water rights associated with it and improvements

5   that are on it was for $5.5 million plus outstanding

6   interest.  And so assuming she's right and you adopt her

7   value of 4.2 for the farm, which is what she says it was

8   worth on 4/27/17, the date of the transfer, there was no

9   equity in it.  And, Your Honor, under the definition under

10  CUFTA, that means that can't be an asset within the meaning

11  of CUFTA, which means it can't be subject to fraudulent

12  conveyance.

13          The same with the water rights.  She assigns a

14  value of 280,745.  They were encumbered by a deed of trust

15  of 6,566,919.46.  No equity in the property.  Can't be an

16  asset under CUFTA.  Can't be the subject of a fraudulent

17  transfer.  I won't go through the remaining entries, but

18  they all show the same thing.  There's no equity in the

19  property.  In other words, the valid liens against the

20  property exceed the value of the property according to

21  plaintiff themselves.  So you can put aside the appraisals

22  that we obtained -- or excuse me -- we didn't obtain -- the

23  bank obtained them.  You can put aside all the expert

24  testimony by any of the experts presented by the defendants,

25  and using their own statement as to what it's worth there

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    36

1   was no value in this property because the liens against it

2   were excesses of value of the property.  That I believe is

3   what the evidence will show on that.

4         Your Honor, I want to make -- I'd like to make two

5   more points.  One, Your Honor, is you heard a lot of

6   testimony about equity being transferred, partnership

7   equity.  What Ms. Lutz called that was something called

8   partner's capital is what she said.  And this is her

9   calculation, and this is taken directly from her report, the

10   column I'm showing you there.  This is going to be,

11   hopefully, if it's admitted, 2086.  These are the values she

12   shows.  So she comes up with a total value for all assets,

13   not just the assets -- excuse me -- all property owned by

14   TMR, not just the property sold to Lardyn.  Because, Your

15   Honor, the Turkey Creek property and the M. Pauling

16   receivable, Mark Pauling receivable, those weren't

17   transferred to Lardyn.  They stayed with TMR.

18         She says if you take into account the value of all

19   the property, and you reduce the debt by ignoring the

20   guaranty and ignoring the transactions that took place that

21   is the interest and any fees that accrued after July 1,

22   2016, through April 27, 2016, she says there was partner's

23   capital in TMR of $1,772,825, and she says that's what was

24   really transferred to Lardyn, all right?  Your Honor, I

25   won't repeat our trial brief.  Partner's capital, as she

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021        37

1    defined it, is a bookkeeping entry.

2             THE COURT:  Is what?

3             MR. FORBES:  I'm sorry.  It's a bookkeeping entry.

4    It's not an asset that can be subject of ownership.  It's

5    not something that can be subject of ownership.  It's

6    something that is subject of a transfer under CUFTA.

7             THE COURT:  Says whom?

8             MR. FORBES:  The definition of CUFTA says it

9    relates to the transfer of property.  It then defines

10   property as anything that can be the subject of ownership.

11   I believe by definition then a bookkeeping entry cannot be

12   the subject of ownership.  Therefore, a bookkeeping entry

13   cannot be the subject of a transfer under -- and as a matter

14   of logic, Your Honor, excuse me.  A bookkeeping entry cannot

15   be property.  Therefore, it cannot be the subject of a

16   transfer under CUFTA.

17            THE COURT:  So tell me, Mr. Forbes, if your numbers

18   and your analysis is all correct, and plaintiff's numbers

19   and analysis was not correct, is the result that plaintiff's

20   case, if they have a case, falls back on the conspiracy

21   theory and basically on the bank?  Is that where we are?

22            MR. FORBES:  Your Honor, if our numbers are

23   correct, there is no conspiracy claim because there would be

24   no violation of CUFTA.

25            THE COURT:  Oh, there is a conspiracy claim,

1   Mr. Forbes.  There is a conspiracy claim.

2           MR. FORBES:  I'm sorry.  If there's no violation of

3   CUFTA, there's no actual conspiracy is what I meant to say.

4   In other words, the predicate to establish an actual

5   conspiracy, as stated -- I believe is consistent with -- the

6   Park County Sportsmen case wasn't a conspiracy case, but it

7   did say that if there's no actual transfer, then your intent

8   doesn't matter.  The Double Oak case does say -- that is a

9   claim under CUFTA, and it does say, and I think consistent

10  with many Colorado decisions, that if you can't prove an

11  underlying violation, there's no actionable conspiracy.

12  Your Honor, just if I might, just two more numbers to go

13  through and one more statement, and then I'm done.  Excuse

14  me.

15          THE COURT:  You've got to know, Mr. Forbes, that I

16  can't remember all these numbers.

17          MR. FORBES:  Well, Your Honor, I understand that,

18  but I think I want to illustrate to you that we were told

19  that there was millions of dollars of assets that were being

20  transferred, millions of dollars of wealth.  I'm just trying

21  to illustrate to you that there's going to be a lot of

22  evidence that's going to show you there was no wealth left

23  in TMR if you consider all its debts.  I mean, there was

24  $10 million of debt against it.  Your Honor, there was

25  $10 million of debt as of 7/1 -- excuse me -- as of 4/27/17,

1    all right?  So if you use -- even using Ms. Lutz's numbers,

2    and even assuming you can transfer partner's capital when

3    all the debt is considered, there would only be 449,000 in

4    partner's capital.  This is just what the numbers show.  And

5    since if that's what the partnership had, and if that's what

6    the plaintiff could have realized on, at best she could have

7    gotten 50 percent of that amount.

8        So this is not a case involving millions and

9    millions of dollars of damages.  This is a case involving,

10   even using their valuation numbers, if we look at all the

11   debt against it, it's a case involving maybe $250,000 of,

12   quote, partner's equity that was transferred.  And, Your

13   Honor, it's our position, as you know, you can't transfer

14   partner equity.  All you can transfer is assets, and as I

15   showed you, and we hope to show you during trial per the

16   numbers in the exhibits that we've presented and present at

17   trial, there was -- and when you just look at the assets

18   transferred, there was no equity and therefore no fraudulent

19   transfer.

20       It was a partnership encumbered by millions of

21   dollars of debt.  It was a partnership from which Ms. Wilson

22   could have realized essentially nothing had she been able to

23   foreclose on Mr. Pauling's partnership interest, had she

24   been able to force a sale of the partnership interests, and

25   had she then been able to get 50 percent of Mr. Jon

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   40

1    Pauling's -- his interest in surplus of the partnership.

2            Your Honor, the final point that I want to make --

3    two final points.  One, Ms. Lardyn has never hidden from

4    anybody the fact she had a child with Jon Pauling.

5            THE COURT:  Did you mean Elyce York, your client?

6            MR. FORBES:  I did.  I'm not sure what I said, but

7    I did.

8            THE COURT:  You said Ms. Lardyn.

9            MR. FORBES:  I'm sorry.  I did mean Elyce York

10   then.  Thank you, Your Honor.  Yes.  Ms. York has never

11   hidden that from anybody.  The quote that I -- that was put

12   up that I made, the statement I made at the hearing a year

13   and a half ago was that she was not his girlfriend, and she

14   is not his girlfriend, and she has not been his girlfriend

15   for years.  They have a co-parenting relationship, Your

16   Honor, and that's what the testimony will show.

17           Finally, Your Honor, as I said, I hope you will

18   listen with an open mind to the testimony that we will

19   present that Ms. York is, in fact, operating this feedlot,

20   that she's, in fact, involved in it, that she is not a shell

21   for Jon Pauling.  I believe you'll hear evidence that we've

22   presented all of our checks to them that they requested,

23   both for Lardyn and for Ms. York personally, and there's no

24   money going from her to Jon Pauling.  This is how she

25   supports herself and her family.  This is a bona fide

1    operation.  Yes, Jon Pauling helped her get it off the

2    ground.  She's never denied that.  Yes, she didn't have any

3    experience.  She didn't deny that.  But neither of those is

4    a disqualifier for her to try and make a way for herself and

5    her family in the world as long as she didn't do anything to

6    take anything from Ms. Wilson, which the numbers, Your

7    Honor, will show she didn't.  Thank you.

8              THE COURT:  All right.  How about the other

9    defendants?  Mr. Keithley, do you want to say anything?

10             MR. KEITHLEY:  Very briefly, Your Honor.  Thank

11   you.  Your Honor, I represent Mark Pauling and Two Mile

12   Ranch in this litigation, and one of the things I think was

13   missed in the plaintiff's opening argument is the plaintiff

14   wants to style this case as being her versus the world.  She

15   styles this as a large, massive conspiracy between Jon

16   Pauling, Mark Pauling, Two Mile Ranch, Elyce York, Lardyn

17   Consulting, and the bank that had lent over $10 million to

18   Two Mile Ranch.

19             THE COURT:  She's got some pretty good documents

20   out of the bank's files to help her make that argument.

21             MS. OLDEMEYER:  She has documents to establish

22   communications between them.  She has documents to establish

23   that they were communicating amongst each other about how to

24   deal with this debt.  She has documents and she'll present

25   documents at this trial that they were completely talking

1   amongst each other about how to deal with this over various

2   points in time.  What I would point out, Your Honor, for

3   purposes of this trial is that the relationship between

4   Farmers State Bank and Two Mile Ranch predated even when she

5   met Jon Pauling.  These debts predated even when she met Jon

6   Pauling.  Jon Pauling is not here, Your Honor.  The rest of

7   these defendants are trying to be held to task for something

8   Jon Pauling did.  That's the crux of this case.

9        THE COURT:  Yes, I noticed that Jon Pauling isn't

10  here.  Why isn't he?

11        MR. KEITHLEY:  I can't answer that.

12        THE COURT:  You know why he isn't here,

13  Mr. Keithley.  Now tell me, why isn't he here?

14        MR. KEITHLEY:  Your Honor, as best I know he

15  doesn't want to be here.  He already has a $6 million

16  judgment against him.  He has no assets.  His former counsel

17  told you at the pretrial conference he doesn't have any

18  assets, and I think one of the things that's going to be

19  very interesting to come out of this trial is to what extent

20  the plaintiff is able to prove that Jon Pauling has somehow

21  benefited in any way by these transfers, because he didn't.

22        THE COURT:  Well, it's ironic.  It could be that

23  Jon Pauling is the one that comes out of all of this

24  smelling like a rose, because everyone else is picking up

25  the drinks for his mistakes.  That's a possibility.

1          MR. KEITHLEY:  That's the structure of this case at

2    this point, Your Honor.  Ms. Wilson has realized that Jon

3    Pauling has no assets and is now trying to find any other

4    bucket where they can find assets.  That's what this case is

5    about.  My client, Mark Pauling -- and throughout this

6    trial, Your Honor, I don't -- I know normal protocol would

7    have us use last names, and I normally do, but for purposes

8    of this case it's important to use first names.  I will

9    always refer to Jon Pauling as Jon.  I will always refer to

10   my client as Mark, so there's a distinction there because

11   they're brothers, and they were in business together, but

12   they're not the same person, and I can't have any confusion

13   about how -- who Mr. Pauling might be.

14         So Mark and Jon started Two Mile Ranch in 1986 to

15   take over what had been a family ranching and farming

16   operation that goes back to the '60s.  You're going to hear

17   that.  This is not some fly-by-night we're going to start

18   something.  Mark and Jon were in business together for

19   25 years running a ranching operation near Sterling.  And

20   about 2010, after they had been able to operate, been able

21   to grow, they had been able to sell their meat to various

22   packing plants and various customers, Jon was getting tired

23   of being on the ranch all the time, and he saw the business

24   opportunity down in town in Denver to open a farm-to-table

25   market that would sell direct to the customer.

1           Other stores like Whole Foods and Wild Oats were

2    selling meat direct to the customer bypassing all the

3    interim, and Jon thought there was a business opportunity

4    for Two Mile Ranch there.  So they agreed, and they got

5    financing from Farmers State Bank to start something called

6    The Market.  They leased a storefront on South University

7    Boulevard.  They built out that storefront over the course

8    of a year to build a small market where they could sell

9    their meat, they could sell other ancillary items like rubs

10   and produce.  And they lost all their money because of that,

11   because The Market didn't operate at a profit from day one.

12           You're going to hear Mark testify that The Market

13   is what did in Two Mile Ranch.  Up until that time, it had

14   pretty much broken even.  They weren't making gobs of money.

15   They weren't rich by any stretch of the imagination.  They

16   were ranchers out in Sterling.  But they did okay.  After

17   they started The Market, there were no distributions.  They

18   were operating at a loss, the money was bleeding out, and

19   there just wasn't the demand that Jon thought there would be

20   down at The Market.

21           THE COURT:  When was this market opened?

22           MR. KEITHLEY:  It was opened in October or November

23   of 2012, Your Honor.  They started to build out in

24   approximately 2011.  In 2014, Mark starts learning about all

25   the financial improprieties that Jon had entered into with

1    regard to The Market, and he's upset beyond belief at his

2    brother.  Not only had Jon moved down to Denver and was

3    coming back a couple times a week to the ranch to have

4    meetings with Mark, but he was primarily in Denver now.

5    Mark came to learn he had discovered a nightlife scene, and

6    he learned that Mark -- excuse me -- Mark learned that Jon

7    had been using money to fund other business opportunities

8    that Mark didn't even know about.  Jon had opened a wine

9    store near The Market to try and sell wine and liquor and

10   beer.  He had no idea.

11       THE COURT:  So everybody is going to point the

12   finger at Mark -- or Jon because Jon isn't here.  That's the

13   -- that's the strategy.

14       MR. KEITHLEY:  Your Honor, Mark is going to point

15   his finger at Jon because Jon was his business partner, and

16   one of the critical issues in this case is was there any

17   equity left in Two Mile Ranch at any point.  So, yes, we're

18   going to point to Jon because Jon stripped Two Mile Ranch of

19   any equity that it had before Ms. Wilson was ever assaulted,

20   before Ms. Wilson ever achieved her judgment, and certainly

21   before any of these transactions forming the basis of her

22   claims now.

23       Now, because of all these financial problems,

24   Farmers State Bank was on top of Two Mile Ranch's head

25   because they weren't able to service their debt.  They were

1  having to make substantial interest payments.  They were

2  trying to pay off the debt that you've already seen

3  Mr. Forbes run through.  And they weren't able to do it, and

4  the bank was concerned that they wouldn't be able to do it

5  the way things were looking.  This was especially

6  problematic for Mark.  He was a partner in Two Mile Ranch,

7  and he had guarantees on millions of dollars of debt to

8  Farmers State Bank.  This was on him as much as anything

9  else.

10       When he learned about all of these financial

11  troubles, Your Honor, Mark and Jon sat down and executed

12  what you've already seen from the plaintiff, which was an

13  amendment to their partnership agreement, and under that

14  amendment, because Jon had already stripped so much money

15  out of the company, they agreed that profits going forward

16  would go 90 percent to Mark and only 10 percent to Jon.

17       THE COURT:  And Ms. Wilson had already sued Jon by

18  that point?

19       MR. KEITHLEY:  That's correct.  She had not

20  achieved a judgment, but she had already sued Jon.  But this

21  wasn't about Ms. Wilson, Your Honor, this change, and it had

22  nothing to do with trying to avoid Ms. Wilson 's ability to

23  collect her judgment.  This had to do with the fact that Jon

24  had been taking money from the partnership.  From his

25  brother's perspective he had been taking money from his

1    brother.  Mark didn't even know about Ms. Wilson until after

2    she filed that lawsuit against Jon, and he had nothing to do

3    with the assault.  He had nothing to do with Jon's

4    relationship with her, whatever that might have been.  He

5    didn't know who this person was.

6           What he did know was that the bank was on top of

7    Two Mile Ranch about its existing debt and inability to

8    service it, and now he's learning about these other problems

9    Jon was getting into.  Mark had to save Two Mile Ranch.

10   Unfortunately, it was beyond that point.  Two Mile Ranch

11   started selling assets to repay the bank.  It had to sell

12   part of its ranch -- or it had to sell part of the ranch in

13   Sterling to a neighbor based on an appraised value.  Mark

14   purchased the other half of that.  They had to sell their

15   cattle herd to pay the bank and to pay interest on the debt.

16   And ultimately Two Mile Ranch had to file for bankruptcy

17   after the bank called the notes.

18          Now, the plaintiff wants to style that filing of

19   bankruptcy as somehow being a collusive activity in

20   furtherance of a conspiracy.  It's exactly the opposite,

21   Your Honor.  What a bankruptcy is by its very definition is

22   a debtor's legal ability to work with its creditors to

23   satisfy the debts.  That's all it is.  What's important to

24   realize here, plaintiff wasn't a creditor of Two Mile Ranch.

25   Two Mile Ranch was dealing with its main creditor that had

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    48

1   $10 million of debt, which was the bank.  It's entirely

2   natural, expected, common, and, frankly, appreciated by the

3   bankruptcy court when a debtor works with its major

4   creditors to come up with a plan to satisfy the debt.

5        The problem Two Mile Ranch had and the problem Mark

6   had was nobody wanted to do business with Two Mile Ranch

7   anymore.  By this point in time the judgment had entered

8   against Jon.  The jury had rendered its verdict.  Nobody

9   wanted to do business with him.  Not in the marketplace.

10  Not in Sterling.

11        THE COURT:  Well, apparently Lardyn did.

12        MR. KEITHLEY:  I'll get to Lardyn, Your Honor.  But

13  there were -- there was a significant question whether or

14  not these assets would satisfy this debt and whether or not

15  Mark would still be liable for any remaining deficiency had

16  Two Mile Ranch been unable to satisfy those debts.

17        Now to Lardyn and the entry of Ms. York.  Now,

18  Ms. York entered the picture offering to buy the assets

19  through Lardyn if she could obtain proper financing to start

20  a feedlot operation.  Now, there's a difference between what

21  Two Mile Ranch had been doing and what she was proposing to

22  do .  Two Mile Ranch was a breeding operation.  You'll hear

23  Mark testify that they raised cattle.  They bred and they

24  raised cattle to be able to sell their herd for the highest

25  profit.  That's not what Ms. York was proposing.  Ms. York

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      49

1    was proposing to open a huge feedlot.

2              THE COURT:  Ms. York was proposing.

3              MR. KEITHLEY:  Other people could do that.

4              THE COURT:  And Mark is going to take the stand and

5    say that was all Ms. York and she was wanting to do that?

6              MR. KEITHLEY:  Your Honor, not that it was all

7    Ms. York's idea.  This was a collective decision.

8              THE COURT:  I hope he doesn't say that, because if

9    he says that, his credibility is done.

10             MR. KEITHLEY:  Well, he was involved in those

11   discussions.  He's not going to deny that, Your Honor, and

12   he's not going to deny that Jon Pauling was involved in

13   those discussions either.  He's not going to destroy his

14   credibility.  Everyone knows Jon Pauling was involved in

15   these discussions.  The reason was Jon Pauling was the one

16   who had been managing the finances of Two Mile Ranch for

17   25 years, and even though everyone hated this fact, he was

18   the one who could build the relationship between Ms. York

19   and the bank to try to recover something.  He knew what was

20   left.  They wanted to try and save Two Mile Ranch, but they

21   couldn't.

22             The next question was are we just going to hand the

23   assets back to the bank and hope they recover and not come

24   after us for a deficiency or find another buyer.  Here's

25   another thing you'll hear Mr. Pauling testify to, Your

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    50

1    Honor.  Ms. York was not the only proposed buyer.  They were

2    trying to find other buyers high and low.  All the assets,

3    some of the assets.  Nobody wanted to buy it.  They had --

4    these buyers had problems with their own financing or other

5    issues, but they weren't able to find a viable buyer.

6    Ultimately they did transfer these assets to Lardyn.

7              Now, I want to pick back up on one of the questions

8    you had for Mr. Forbes in his opening and one of the themes

9    that plaintiff has identified in her opening statement, this

10   idea that Ms. York didn't have any experience whatsoever,

11   had no management experience, no business experience, no

12   cattle experience.  For all we know she's a second grader.

13             THE COURT:  She's a what?

14             MR. KEITHLEY:  A second grader, Your Honor.

15   Someone who --

16             THE COURT:  A second grader?

17             MR. KEITHLEY:  A second grader.  Someone who

18   doesn't even have basic math skills and certainly is not

19   qualified --

20             THE COURT:  Well, I don't know why you would say

21   that.  I certainly don't think she's a second grader.

22             MR. KEITHLEY:  I don't either, Your Honor.

23             THE COURT:  I think she might be a victim.

24             MR. KEITHLEY:  Well, I don't think she's a second

25   grader, and that's my point, Your Honor.  Ms. York has been

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    51

1   operating Lardyn since she bought these assets.  I would ask

2   you to listen very closely to Ms. York's testimony,

3   Mr. Pauling's testimony, and the testimony of the other

4   witnesses as to exactly how involved she is in the

5   operations of Lardyn, and how she's been able to

6   successfully operate Lardyn.  Not Jon Pauling.  She's not a

7   straw woman.  She's not some poor helpless victim.  She's a

8   business entrepreneur.  She's a small businessowner.

9        The only reason we're standing here today is

10   because she used to have a relationship with Jon Pauling.

11   If this had been someone who didn't date Jon Pauling or

12   didn't have a child by Jon Pauling, we wouldn't even be

13   here.  But the plaintiffs want to malign her and say she's

14   not qualified to operate Lardyn simply because of that

15   former relationship.  That's not fair to her.  It's not fair

16   to Mark.  It's not fair to the bank.  It's not fair to any

17   of us.

18        Now, Mark has continued to be involved in Lardyn.

19   He can testify to what he's done.  He can testify to what

20   Ms. York has been doing and how she's managed the books and

21   the business operations.  Although Jon helped with

22   transition in the beginning, Ms. York is the one who's been

23   making decisions and running the company.  She's negotiated

24   with customers and vendors.  She's managed the contracts.

25   She's dealt with the bank.  That has been her, not either of

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    52

1    the Paulings, Your Honor.

2          At the end of the day, Your Honor, with these CUFTA

3    claims, it's the plaintiff's burden to prove that Mark and

4    Two Mile Ranch intentionally transferred these assets for

5    the purpose of preventing her from collecting upon them.

6    Two different elements there.  They intentionally

7    transferred them for her not to be able to collect it.

8    There's already been briefing, and we don't have to go back

9    over the question today, although we will by the end of this

10   trial, of whether Ms. Wilson ever was or is a creditor of

11   Two Mile Ranch.  We contend under the case law that she's

12   not.  She was a creditor of Jon Pauling.  Under the

13   partnership law in Colorado she can at most get a charging

14   order upon any payments he would otherwise receive from Two

15   Mile Ranch.  Well, if there's no distributions going on, if

16   the company is upside down, they're not even able to service

17   their debt, there's nothing to pay her.  There was nothing

18   there.  That's point one.

19          Point two is that we have to keep in mind there's

20   another creditor in this room, Your Honor.  It's Farmers

21   State Bank.  Farmers State Bank had at least -- and it's

22   undisputed -- $8.8 million of debt to Two Mile Ranch.  We

23   believe it's closer to $10 million as Mr. Forbes pointed

24   out.  Ms. Wilson's claims want you to ignore that fact and

25   want you to only think she is the creditor being harmed

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   53

1   here.  All of this transaction is to harm her.  Well, what

2   about Farmers State Bank's rights as a creditor of Two Mile

3   Ranch?

4            THE COURT:  I suspect that their counsel will talk

5   about the bank's rights.

6            MR. KEITHLEY:  Perhaps she will.

7            THE COURT:  Perhaps you better stick with your

8   client.

9            MR. KEITHLEY:  Well, I want to highlight it now,

10  Your Honor, because it impacts Two Mile Ranch on the intent

11  point.  I don't know how there can be a violation of CUFTA

12  when Two Mile Ranch is dealing with the creditors it did

13  actually have based upon claims from someone who wasn't even

14  a creditor of Two Mile Ranch.  That's my point.  Even

15  assuming Ms. Wilson could show she has a right to claim

16  payment from Two Mile Ranch's assets directly, Your Honor,

17  she can't still prevail under CUFTA because of this priority

18  issue.  She can't leap in front of the bank.  The bank is

19  not just a creditor.  It's a secured creditor.

20            What's relevant at the end of the day, Your Honor,

21  in this case is the financial relationship between Two Mile

22  Ranch and the bank.  This is going to be a

23  document-intensive case.  It's going to be a

24  numbers-intensive case.  I think we all recognize that.  The

25  reason for that is the plaintiff holds the burden to

1    establish that there was any equity left in Two Mile Ranch

2    when these assets were transferred.  It's her burden to show

3    that there was money to be distributed at all to Jon

4    Pauling.  If she can't show that, Your Honor, and we don't

5    believe she can, then there's no violation of the statute

6    plain and simple.  And if there's no violation of the

7    statute, as Mr. Forbes ended with, there's also no

8    conspiracy here.

9          Under Colorado law and the Double Oak Construction

10   case, a conspiracy requires an underlying harm and an

11   underlying violation of its own that it keys on to.  At the

12   end of the day, Your Honor, this wasn't a conspiracy to

13   defraud Ms. Wilson or to move assets beyond her reach.  Mark

14   Pauling is not his brother's keeper.

15         THE COURT:  Well, the bank's documents sure

16   wouldn't suggest that, Mr. Keithley.

17         MR. KEITHLEY:  Well, from the bank's perspective,

18   and I don't want to put myself in their shoes -- they have

19   their own competent counsel who will speak in a minute, Your

20   Honor.  From the bank's perspective and from Two Mile

21   Ranch's perspective, either we find a buyer for these assets

22   or we give them back to the bank.  Either way they weren't

23   going to stay with Two Mile Ranch because Mark was not going

24   to stay in business with his brother.  Plain and simple.  So

25   that's why it comes back to the date of the transfer.

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   55

1   That's why it comes back to Ms. Wilson's burden to show that

2   there was anything she could have possibly recovered had

3   there not been this transfer to Lardyn.  That's why it's

4   important.

5          Mark Pauling is not his brother's keeper, and he's

6   not responsible for his brother's debts and obligations,

7   period.  Ms. Wilson can't use CUFTA as a tool to make all of

8   those around Jon who are now sitting in this courtroom

9   suddenly have to pay for his debts.  That's not what that

10  statute was designed to do.  If she can't show that there

11  was any equity left in Two Mile Ranch, then there was

12  nothing of value transferred, in the end, Your Honor,

13  although it's unpalatable as we stand here today given the

14  size of the judgment Ms. Wilson holds, she needs to pursue

15  Jon, not the people around Jon who are trying to take care

16  of Two Mile Ranch's debts.

17         THE COURT:  You're getting a little repetitive,

18  Mr. Keithley.

19         MR. KEITHLEY:  And on that, Your Honor, I thank you

20  for your time.

21         THE COURT:  All right.  Let's take a ten-minute

22  break here, and then I'll hear from the bank lawyer.

23         THE COURTROOM DEPUTY:  All rise.  Court is in

24  recess.

25         (Break was taken from 10:30 a.m. to 10:41 a.m.)

                        Sarah K. Mitchell, RPR, CRR

1          THE COURT:  Ms. Oldemeyer.

2          MS. OLDEMEYER:  Good morning, Your Honor.  May it

3    please the Court, counsel.  The evidence in this case will

4    show that Ms. Amanda Wilson obtained a judgment in October

5    of 2015.  That judgment was against Jon Pauling.  The

6    judgment at the time it was entered was uncollectible.  Jon

7    Pauling owned little in his name outright, and what he did

8    own was pledged to Farmers State Bank to secure large

9    amounts of debt that exceeded the value of the assets.  The

10   bank had secured that debt by its valid liens against the

11   collateral.  Banks make loans.  They charge interest.  They

12   charge late fees.  They expect to get paid back in full.

13   They protect themselves in the event of problems with a

14   borrower.

15          The harsh realities here are 50 percent of zero is

16   zero.  Ten percent of zero is zero.  This is not a case

17   where the big bad bank is harming Ms. Amanda Wilson.  It is

18   not the bank's job to protect Amanda Wilson.

19          THE COURT:  Then why did the bank in its internal

20   documents say that's precisely what they were doing?

21          MS. OLDEMEYER:  Your Honor, you're going to hear

22   from many bank witnesses and the people who authored those

23   particular highlights that Mr. Pulkrabek put up in his

24   opening statement, and they are going to provide the context

25   for every one of those statements.  You'll hear from the

1   persons themselves.

2          THE COURT:  They have to be very, very careful,

3   and, in fact, here's what I want to say to everyone who

4   takes the stand in this case.  We're talking about money,

5   and I think perhaps the amount of money that the plaintiff

6   is seeking is one reason why we're here.  Sometimes pigs get

7   fat, but hogs get butchered.  But we're talking about money.

8   Once they take the stand and take the oath, now we're

9   talking about their obligation to tell the truth, and if

10  they don't, they're under penalty of perjury.  Now, we're

11  talking about criminal penalties, and so every one of you

12  folks that takes the stand bear that in mind.  It's very

13  important.

14         MS. OLDEMEYER:  Your Honor, Mr. Dick Stull and

15  Mr. Steve Stull have been under oath for seven hours in

16  depositions.  They have nothing to hide.  The bank's files

17  have been opened in this case.  Loan committee meeting

18  minutes, loan presentation memos, files, all the underlying

19  documents for these transactions.  Mr. Jon Pauling's

20  liabilities at the time the judgment was entered, he owed

21  Farmers State Bank -- and this is just one creditor --

22  approximately $9 million.  His assets, he owned a home at

23  717 7th Avenue in Sterling, Colorado, in which his mother

24  lived.  He did not live there.  He had equipment left over

25  from the failed businesses that Mr. Keithley described, and

1    he had his economic interest in Two Mile Ranch General

2    Partnership.  This is before the judgment.

3           The notes to Farmers State Bank were all debts that

4    Mr. Jon Pauling has personally guaranteed, and Mr. Keithley

5    described that idea to start the natural grocery store in

6    Denver that just did not work out just prior to this

7    judgment by Amanda Wilson.  And the Court's concern about

8    the judgment against Amanda Wilson was in October of 2015,

9    but she sued Mr. Jon Pauling prior to that, that's correct.

10   The bank didn't know about the lawsuit, period.

11          Mr. Jon Pauling had lots of unhappy creditors, and

12   Mr. Steve Stull is going to walk you through that history in

13   painful detail.  Dick Stull too, but plaintiff gets to

14   choose the order of its witnesses, and you don't need to

15   hear it twice, so Steve Stull will be the primary witness to

16   walk through this banking relationship from start to finish.

17   You'll hear from Mike Stull, brother of Steve and son of

18   Dick.  You'll hear from Mr. Chris Gray who's coming in from

19   Omaha.  He's also an officer of the bank.  You'll hear from

20   Kelly Roach who was a loan officer and employee of the bank.

21   You'll hear from Jarrod Hamik who started with the bank as

22   well.

23          This is one example, this is Exhibit 12, and this

24   talks about essentially, Your Honor, what was going on even

25   before the judgment was entered, and you'll see in December

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    59

1   of '14, they were liquidating assets.  They were liquidating

2   assets, in particular mineral rights.  Why?  Because the

3   bank is saying, You got to pay us back.  You're not

4   servicing your debt.  Sell things.  Pay down your debt.

5   You'll see on that same exhibit on the cover page the e-mail

6   with that attached was sent to an e-mail address

7   PaulingJM1963@gmail.com, and sure, there's beginning words

8   that say Joe Henry.  When the bank communicated with Jon

9   Pauling, they communicated with that e-mail address which

10  they associated with Jon Pauling, which was Pauling, J for

11  Jon, M for his middle initial, 1963 for his date of birth.

12  There's no alias.  There's no top-secret code of

13  communication.  You'll hear evidence and argument from --

14          THE COURT:  Joe Henry is not an alias?

15          MS. OLDEMEYER:  Joe Henry is not an alias.

16          THE COURT:  What is it?

17          MS. OLDEMEYER:  I don't know what it is.  It shows

18  up when you e-mail PaulingJM1963.  Who put it there and why

19  --

20          THE COURT:  Well, it sure looks like an alias.

21          MS. OLDEMEYER:  Well, Your Honor, if you believe

22  that, the evidence you will hear is that when the bank

23  communicated with Jon Pauling, they communicated to that

24  e-mail address, and they did it long before they knew about

25  Amanda Wilson.  They did it long before the e-mails that

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    60

1    they were able to start producing in this case going all the

2    way back to December of 2014.  It's not new.  It's not

3    different.  It's not secret.  It doesn't violate

4    know-your-customer rules under this federally regulated

5    industry.

6              THE COURT:  What's your definition of an alias if

7    that isn't one?

8              MS. OLDEMEYER:  A nickname.  I don't know.

9              THE COURT:  A nickname?

10             MS. OLDEMEYER:  Sure.

11             THE COURT:  Joe Henry is a nickname for Jon

12   Pauling.

13             MS. OLDEMEYER:  The person who can answer the

14   question who set up that e-mail account, Mr. Jon Pauling,

15   isn't here.  I don't know if it's in Exhibit 1003, which is

16   his Rule 69 transcript.

17             THE COURT:  By the way, where is Mr. Pauling?  I

18   asked the other lawyer.  Where is he?

19             MS. OLDEMEYER:  I have no idea, Your Honor.

20             THE COURT:  He's a defendant in this case.

21             MS. OLDEMEYER:  He absolutely is, and he was

22   represented by counsel who withdrew.

23             THE COURT:  And he's got this long, long, long

24   relationship with the Stulls.  Where is he?

25             MS. OLDEMEYER:  Your Honor, that's a

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    61

 1    mischaracterization of the relationship.  They have a

 2    banking relationship.  The bank is in this lawsuit because

 3    of that man.  There's no love lost there.

 4         THE COURT:  Well, I think the bank may be in this

 5    lawsuit because of things the bank did.  At least that's

 6    what the plaintiff is saying.

 7         MS. OLDEMEYER:  Sure.  That is exactly what the

 8    plaintiff is saying, and there's two sides to every story,

 9    and, Your Honor, you've been a lawyer a long time, a judge

10    in state court and federal court.  You know there's two

11    sides to every story, and as counsel already mentioned, the

12    defense will be putting on a case.

13         THE COURT:  The old statement that I remember was

14    no matter how thin the pancake, it always has two sides.

15         MS. OLDEMEYER:  It has two sides.  And I always

16    like to quote Paul Harvey:  Now you're going to hear the

17    rest of the story.  We ask that the Court consider this

18    evidence that we're putting forth about the relationship

19    long before the bank ever knew about the Amanda Wilson

20    judgment, and that includes e-mailing their customer, and

21    there's references to Mark, yourself, and Elyce -- that's

22    Elyce York -- and what's going on there.  They're

23    liquidating assets.  They sold minerals to Black River in

24    2013.  They had a contract to sell the rest of the minerals

25    to Black River in September of 2014.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   62

1           THE COURT:  Why would the bank person call

2   Ms. Wilson a bitch?

3           MS. OLDEMEYER:  I'll get to that, Your Honor.

4           THE COURT:  Get to that right now.

5           MS. OLDEMEYER:  It's important to have context.

6   June 20, 2019, in the morning, two loans closed.  The first

7   was a Small Business Administration loan that they had been

8   working on for months so that the custom feedlot could be

9   expanded, get more cattle in to custom feed to generate

10  revenue to service the debt.  So the SBA loan was a good

11  thing.  The same day another loan closed right after that.

12  That's where Mr. Mark Pauling received $500,000 to get his

13  interest in Lardyn sold.  Why?  Because the bank was putting

14  pressure on Mark to pay off the balance of the debt owed on

15  Two Mile Ranch because he had a personal guaranty, and so

16  Mark did that transaction so that the cash could come to the

17  bank.

18          That afternoon, that very afternoon -- I mean, it's

19  crazy how coincidental it is, but that afternoon Mr. Chris

20  Gray, who's in Dodge, Nebraska, gets served with process of

21  this lawsuit.  The bank had no idea the bank was a party to

22  this lawsuit until Mr. Chris Gray got served.  And so

23  Mr. Stull, who had heard from Mark that Mark had been sued,

24  sends that text.  Mr. Steve Stull, he absolutely sent that

25  text.  He was angry.  He was angry he wasn't told the bank

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   63

1   had been brought into this mess, and that's the basis for

2   that text.  And the exhibit of texts, it's pages, Your

3   Honor, pages.  We can pick out one, sure.  It's awful.  Does

4   he wish he didn't do -- didn't say it?  Of course he does.

5          THE COURT:  Well, how would you or any woman feel

6   to be called that, by a bank officer of all things.

7          MS. OLDEMEYER:  It wasn't to her.  He was not

8   communicating with Ms. Wilson.  He was communicating with

9   Mark Pauling, and, Your Honor --

10         THE COURT:  He called Mark Pauling a bitch?

11         MS. OLDEMEYER:  No, no, no.  He texted Mark Pauling

12  and said -- I think the words are, The bitch served us as

13  well.  He was referring to her, but it wasn't to her.

14         THE COURT:  Uh-huh.

15         MS. OLDEMEYER:  So to back up, when -- I believe I

16  answered the judge's questions about that text.

17         THE COURT:  Your answer should have said that this

18  guy ought to be ashamed of himself.

19         MS. OLDEMEYER:  He will.  I don't need to reread

20  his deposition to you.  He brought it up, but, Your Honor,

21  you'll hear the evidence in this case, and it's going to

22  come in in bits and spurts.  It's long.  It goes over years.

23  But bottom line in this phase in December of 2019, Two Mile

24  Ranch and its owners were trying to service the debt.

25  Farmers State Bank is a Nebraska bank.  It doesn't have much

Sarah K. Mitchell, RPR, CRR

  1    experience with Colorado, in particular Weld County mineral

  2    interests, but it knew enough that any income streams from

  3    that, royalties and lease payments, should be served as

  4    collateral to Farmers State Bank.  At this point in time,

  5    Your Honor, the entire agricultural industry -- and I don't

  6    know how to get rid of those red lines.  I apologize.

  7              THE COURT:  Touch the screen in the bottom right.

  8              MS. OLDEMEYER:  Wow.  Thank you, Your Honor.

  9              The entire agricultural industry in this time

 10    period of December 2014, cattle prices were down, corn

 11    prices were down, ag land values were down, oil and gas

 12    prices were down.  It wasn't unique to Two Mile Ranch.

 13    Farmers State Bank had multiple agricultural borrowers in

 14    trouble.  The things that serve as collateral, a lot of them

 15    are commodities.  They fluctuate.  It's a volatile market.

 16              So a community bank, Farmers State Bank is a

 17    community bank, and you'll hear from its expert Charlie

 18    Holmes.  He's a community banker with decades of experience,

 19    and he's going to explain to you what a community bank is

 20    and that it's different when it serves these small rural

 21    areas.  He's very different than plaintiff's expert,

 22    Ms. Patterson, who you'll hear from.  And it's interesting,

 23    Ms. Patterson, though, doesn't really support the arguments

 24    Wilson's counsel is making in this case, and you'll hear the

 25    multiple times that she says that.

                        Sarah K. Mitchell, RPR, CRR

 1              But these brothers were liquidating.  They had been

 2      in business together for 30 years.  It was time to settle up

 3      with Farmers State Bank and part ways.  So this deal that

 4      they were talking about in December of '14, it took months

 5      to put together, and it didn't get put together until May of

 6      2015.  And in May of 2015, as you'll see in Exhibit 1003,

 7      what happened was certain assets were sold and certain

 8      assets were purchased.

 9              Cervi Enterprises is a third party.  It bought the

10      South Ranch in Weld County.  Mark Pauling bought the North

11      Ranch, and I did my arms different.  North Ranch.  Cervi

12      also bought some mineral interests at that time.  And as

13      this summary shows, the loan numbers are on the far left

14      column, the original note balance by note number, and then

15      the balance remaining at certain periods of time.  And these

16      transactions between May 14th and May 21st, that's a period

17      of time in which multiple transactions took place, and

18      you'll hear about a bridge loan.  A bridge loan is a

19      temporary loan so that certain deals can happen and all the

20      deals can take place.

21              What's important for the Court to recognize is

22      although plaintiff is going to argue that somehow Turkey

23      Creek wasn't properly pledged as collateral and didn't serve

24      as collateral after May 21st, 2015, that's just wrong.

25      That's just absolutely wrong, under the way it works in the

1   banking industry and under the applicable law.  What

2   happened was the debt on May 14th, 2015, was that, and after

3   the transactions closed on the 21st, it was that.  Just

4   about the same with another note to Mark Pauling for his

5   purchase of the ranch.  So the bank's collateral position

6   remained the same, and the bank was protected.  And North

7   Turkey Creek in Jefferson County, Colorado, from the bank's

8   understanding, was acquired to get out of some of the ag

9   land and into something different.

10          Again, Farmers State Bank had -- this transaction

11  had nothing to do with the Wilson lawsuit.  Farmers State

12  Bank didn't even know it was pending.  It had everything to

13  do with approving a liquidation process that had been going

14  on for months, trying to pay down debt and reducing risk by

15  getting out of ag, some of the ag land.  This is the deed of

16  trust.  This is Exhibit 15 at 284 to 85.  This is a copy

17  they chose of the unrecorded deed of trust, but it was

18  recorded on May 19th.

19          And the reason we're going to argue about that is

20  because one of the many Whac-A-Mole theories of recovery in

21  this case has been that the bank improperly took a deed in

22  lieu on Turkey Creek and improperly had a spurious loan on

23  record for multiple years because this promissory note,

24  2288, was paid off in that bridge loan exercise.  That's

25  just incorrect.  As the deed of trust states, it's very

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    67

1    clear, this secures the debt and future advances.  And so

2    plaintiff's argument, we have to address it.  But that deed

3    of trust was effective as of May 18th, 2015, and recorded in

4    Jefferson County.

5            And then you'll see communications after this.

6    Exhibit 1024 is November of 2015 where the bank internally

7    is saying the Two Mile Ranch guys are not selling assets as

8    agreed upon.  Change it to watch, watch.  Exhibit 1025, this

9    is September 2015.  This is where Jon Pauling's entities,

10   not Two Mile Ranch General Partnership, but all of the other

11   entities that had been sued by Amanda Wilson in her state

12   court case, they filed for bankruptcy.

13           So Farmers State Bank learns of the judgment, and

14   Mr. Stull will tell you he learned of the judgment, and what

15   did he do?  He picked up the phone and called Cline Williams

16   law firm.  Why?  To make sure the bank wasn't adversely

17   impacted.  So that's what Farmers State Bank did first.

18   January 16th, Ms. Wilson serves a subpoena on Dick Stull in

19   Bridgeport for bank records of Two Mile Ranch and others.

20   Those are Exhibits 1030, 1031, 1032.  In the course of

21   discussions about serving a Colorado valid subpoena across

22   state lines into Nebraska when you're asking about bank

23   records of non-judgment debtors, there was discussion that

24   you'll see between Mr. Pulkrabek and the attorneys.

25           Ultimately the bank turned over records through

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    68

1   Cline Williams law firm in April of 2016.  In the course of

2   that, Mr. Stull will explain that Farmers State Bank learned

3   it had not perfected liens on certain vehicles.  Also on

4   April of 2016, Farmers State Bank sends demands for payment.

5   Those are Exhibits 1038, 1039 and 1040.  Why?  Because the

6   bank wanted to get paid.

7          What was Two Mile Ranch -- or excuse me -- Jon

8   Pauling and Two Mile Ranch doing?  Jon Pauling was busy

9   answering the interrogatories that Mr. Pulkrabek pointed

10  out.  That's Exhibit 19.  And, again, other than the one

11  comment in there about -- he pulled up about a child, those

12  are accurate interrogatories from what my cursory review

13  showed of the one-inch document.  Then on February 16th

14  Mr. Pulkrabek takes Jon Pauling's Rule 69 exam.  That

15  transcript is Exhibit 1033.  And like him or not, what he

16  testified to was the truth, Mr. Jon Pauling.  I owe

17  everything to Farmers State Bank.  I have pledged everything

18  to Farmers State Bank.

19          THE COURT:  Why would I want to believe anything

20  Jon Pauling said when he out and out lied about his child?

21          MS. OLDEMEYER:  Your Honor, he's talking about

22  debts he owed Farmers State Bank, and they're accurate, and

23  they're consistent with what the bankers are testifying to.

24  They're valid liens to secure debt previously owed.  Two

25  Mile Ranch prepared to file for bankruptcy.  What was Wilson

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   69

1    doing?  Exhibit 1026, you'll see the docket sheet.  She does

2    have a charging order issued in that case on November 15th.

3    That document is never served on the bank, because as you

4    will hear from plaintiff's own expert, Ms. Patterson, and

5    you'll hear from Mr. Holmes, the bank doesn't have a role in

6    a charging order.  A charging order goes to the entity, and

7    those decision-makers decide about distributions, et cetera.

8           Exhibit 1027, she's recording transcripts of

9    judgment.  Those are liens against real estate.  Those are

10   behind the bank's previously-recorded liens.  Exhibit 1029,

11   that's where the bank executed on the house in Sterling.

12   Ms. Wilson and her attorneys got notice.  They had tried to

13   execute on it in the state court case, but they gave up.

14   They understood the bank was previously lying on that

15   Sterling residence, and when it was foreclosed she was going

16   to get nothing.

17          Exhibits 1034, 1035 --

18          THE COURT:  What happened to Mr. Pauling's mother?

19          MS. OLDEMEYER:  So what happened was it went

20   through a sheriff's sale.  The bank took title to that home

21   per a sheriff's deed.  The brothers then bought the home for

22   mom.

23          THE COURT:  Uh-huh.  What did they buy the home

24   with if they didn't have any money?

25          MS. OLDEMEYER:  There are multiple brothers.  Paul,

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    70

1   Mark, there's others.  I don't know all their names.

2           THE COURT:  Oh, it's the other brothers that bought

3   the home for mom.

4           MS. OLDEMEYER:  Correct.

5           THE COURT:  Not Mark and Jon.

6           MS. OLDEMEYER:  No.  Jon didn't buy that home for

7   sure.  I don't know -- I'd have to look at the loan

8   documents to see if Mark was a party to it, but --

9           THE COURT:  Did Jon take advantage of the other

10  brothers too or just Mark?

11          MS. OLDEMEYER:  I think Mr. Mark Pauling will have

12  to explain the relationship with the brothers.  From the

13  bank's perspective, again, we're looking at Two Mile Ranch

14  which is Mark and Jon.  There's communications about Pauling

15  Hauling.  I think that's an entity that does trucking,

16  important in that ag business of transporting cattle and

17  feed and all the things associated with it.  I'm trying to

18  think if there's another brother.  But -- there are, and

19  Mr. Stull can explain that.  But the importance of that

20  event, Your Honor, isn't that Ms. Pauling got to stay in her

21  home because her other sons stepped in and allowed that to

22  happen.

23          THE COURT:  Well, that's pretty important.

24          MS. OLDEMEYER:  It is, but what's important is the

25  bank got paid, and the bank took that money and applied it

1    to Two Mile Ranch debt.  So this is one of the exhibits

2    you'll see, Your Honor.  This is Exhibit 23.  This is May of

3    2016.  This is before Two Mile Ranch files for Chapter 11

4    bankruptcy protection, and you'll see Ms. Kelly Roach

5    e-mailing Chris Gray, Tell me why it's a good thing for

6    filing for bankruptcy, and Chris Gray responds.

7            THE COURT:  Who's Chris Gray?

8            MS. OLDEMEYER:  He's an officer of Farmers State

9    Bank.  He's the one in Dodge, Nebraska.  He'll be here in

10   person on Wednesday.  And he will tell you what I understood

11   was we expected this would happen months ago.  Why?  Because

12   they weren't servicing their debt.  That's what happens when

13   you don't service your debt.  You've either got to sell

14   assets, give it back to the bank, or seek protection of the

15   automatic stay.  The bankruptcy -- BK stands for bankruptcy

16   -- doesn't hurt us.  We have the assets tied up, and the

17   debt is valid.  That's 100 percent accurate.

18            So he's explaining what is happening, and

19   Mr. Pulkrabek likes to point out the quotes, words in

20   quotes.  Like good things in quotes up here.  Unicorn

21   investor groups in quotes.

22            THE COURT:  That's Lardyn, right?  That's the

23   unicorn?

24            MS. OLDEMEYER:  The unicorn-like investor group.

25   This is before they even filed for bankruptcy because --

1          THE COURT:  That's Lardyn, right?  The unicorn --

2          MS. OLDEMEYER:  No, Your Honor.  We'll go through

3     the next series of months.

4          THE COURT:  Who's the investor if it's not Lardyn?

5          MS. OLDEMEYER:  Jon and Mark are out trying to

6     bring people in.  The bank's not privy to that.  The bank is

7     not being told who they're trying to bring in, but what

8     they're trying to do is bring in somebody with capital who

9     can invest and then that can get -- pay down debt.

10         THE COURT:  What is a unicorn-like investor group?

11         MS. OLDEMEYER:  Whatever Jon and Mark are trying to

12    put together.  Because Two Mile Ranch needs to sell its

13    assets, and they need a buyer for the assets.

14         THE COURT:  So when it's in quotes you're saying

15    that came from Jon and Mark?

16         MS. OLDEMEYER:  I'm telling you, yes, Your Honor,

17    that Jon and Mark are telling the bank we're going to put

18    together --

19         THE COURT:  A unicorn investor.

20         MS. OLDEMEYER:  An investor group to infuse capital

21    to help pay down debt and to either buy assets or under a

22    Chapter 11 reorganization or do something.  This is the very

23    preliminary stages in May of 2016 before bankruptcy was

24    filed.

25         THE COURT:  Well, what's a unicorn?  What is it?

Sarah K. Mitchell, RPR, CRR

1           MS. OLDEMEYER:  Your Honor, Mr. Chris Gray will

2    explain exactly what he meant when he typed that if that

3    would be helpful.

4           THE COURT:  Okay.

5           MS. OLDEMEYER:  Right here, my understanding --

6    this is what Mr. Pulkrabek likes to point out -- my

7    understanding is that our attorney, Cline Williams, and the

8    bankruptcy attorney will have this agreed upon before the

9    bankruptcy court, get it stamped approved, and at that time

10   the transaction can be placed.  The bankruptcy really just

11   protects the partnership from the plaintiff for the long

12   run.

13          THE COURT:  So the bankruptcy court was going to

14   just stamp this thing.  Didn't work out, did it?

15          MS. OLDEMEYER:  Mr. Mark Pauling and Jon Pauling

16   couldn't put together a plan of reorganization, that is

17   correct.

18          THE COURT:  Who was the bankruptcy judge to whom

19   this was assigned?

20          MS. OLDEMEYER:  Your Honor, the docket sheet is in

21   there.  I don't know if it's Judge Rosania, but the docket

22   sheet is an exhibit.  But bankruptcy is not a conspiracy.

23   It's a good way for the borrowers to separate from Farmers

24   State Bank.  Workouts are normal.  You have to have

25   communication.  It's best for the bank getting paid, and

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021        74

1    Ms. Wilson's own expert Ms. Patterson admits that.  Two Mile

2    Ranch and its principals were always delaying and not

3    providing full disclosure.

4            Exhibit 24C --

5            THE COURT:  So wait a minute.  You just said Two

6    Mile Ranch and its principals -- that's Mark and Jon --

7            MS. OLDEMEYER:  Uh-huh.

8            THE COURT:  -- were always delaying and not

9    providing full disclosure.  So now the bank in this lawsuit

10   in this courtroom is pointing the finger at Mark and Jon

11   both, and saying they were always delaying and not providing

12   full disclosure.

13           MS. OLDEMEYER:  No, Your Honor.

14           THE COURT:  But these other documents that we've

15   seen suggested that the bank was trying to help Jon and Mark

16   get out of this judgment against Jon.  How do you square

17   those two things?

18           MS. OLDEMEYER:  They're absolutely reconcilable.

19   My statement that Two Mile Ranch was always delaying and not

20   providing full disclosure relates to this plan, this

21   Chapter 11 plan they're trying to put together.  Don't

22   worry, bank.  Hold off.  Don't file a motion for relief from

23   stay so you can take all of our stuff.  Please don't do

24   that.  We got something.  We got something.  That's what I'm

25   referring to, is when they ultimately filed on July 1st,

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    75

1    2016, the expectation, as you'll see from Kelly Roach's

2    statement here, it was supposed to happen very quickly, 60

3    to 90 days.

4            THE COURT:  Who is Kelly Roach?

5            MS. OLDEMEYER:  She's a bank representative who

6    you'll hear from, Your Honor.  She's a loan officer at the

7    bank, and she will testify remotely.  But she will explain

8    her understanding was this is all going to happen, and it's

9    going to happen quickly, and --

10           THE COURT:  And the bankruptcy judge is just going

11   to stamp it approved and -- not too many judges do that, not

12   our bankruptcy judges.

13           MS. OLDEMEYER:  Your Honor, it's not collusive to

14   communicate and work out a plan.  A Chapter 11 plan of

15   reorganization requires cooperation between debtors and

16   creditors.  There are some creditors who don't cooperate.

17   There are some relationships that get adversarial.  There

18   are some where it's, Hey, let's figure out a way to maximize

19   the bank's recovery and minimize Jon and Mark's personal

20   exposure.  That was the dynamic at play here.  It had

21   nothing to do with Ms. Amanda Wilson, other than when you

22   look at Two Mile Ranch's assets, which again, she's not a

23   creditor of Two Mile Ranch, okay?  What she has is her

24   interest in anything left over after everything is

25   liquidated, if anything, and only that portion that would go

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    76

1    to Jon Pauling.  That's it.  She's not a creditor of Two

2    Mile Ranch General Partnership.

3              Oh, so this is an exhibit you'll hear about JB and

4    Don.  So banks have lending limits, okay?  Community banks,

5    federal regulators.  They come in, they do examinations,

6    they make sure you're not violating your lending limits.

7    Ms. Patterson, Ms. Wilson's expert, will say it is not

8    unusual for a community bank to have participants.  In this

9    instance, JB and Don are two other banks who participated

10   out part of the big Two Mile Ranch debt that's close to

11   $9 million, okay?

12             THE COURT:  JB and Don are banks?

13             MS. OLDEMEYER:  Individuals at banks, Your Honor.

14   JB Suddarth, I think, and I can't remember Don's last name.

15   But the bank representatives will say we have to report them

16   to the participants who we got into this big loan and tell

17   them what's going on and communicate to them, because

18   they're asking what's the deal?  Why isn't the debt being

19   serviced?  Where are the interest payments?  These are

20   important things to banks.  And so Mr. Dick Stull -- or

21   excuse me -- Steve Stull sends this communication, and,

22   again, the investor group that they've discussed the details

23   but have not finalized the agreement, because the investor

24   group does not want to be known until the bankruptcy

25   attorney sees the plan and gives a preliminary, okay, what

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    77

1    he is reporting is what he's being told.  None of this is

2    nefarious.

3            Two Mile Ranch files Chapter 11 bankruptcy on

4    July 1st.  It hired legal counsel, Arthur

5    Lindquist-Kleissler.  He prepared the necessary documents.

6    Things start going on, but by November, we're not seeing a

7    plan.  Jon and Mark are still communicating with the bank

8    saying there's going to be a plan, there's going to be a

9    plan.  Will you help finance any deal if there's a new

10   borrower for assets?  And so Exhibit 31 from November 4th of

11   2016, to Lardyn Consulting and Elyce York, you will hear

12   that that is an entity formed in -- it was formed in August

13   of 2016, to my memory.  The first loan was to Elyce for

14   startup business expenses the month prior to that.  What

15   were the startup business expenses?  Hiring the folks to do

16   the organizational documents, et cetera.

17           There's going to be a dispute because I know

18   Mr. Pulrabek believes that the first loan was for a car for

19   Elyce York.  Your Honor, the evidence will show the car was

20   pledged as collateral for the bank.  Why?  Because the banks

21   don't make loans without collateral.  And not only did the

22   car serve as collateral, but Paul Pauling guaranteed that

23   loan personally.  So this is important.  Exhibit 31, this is

24   really important language right here.

25           THE COURT:  Who's Paul Pauling?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021     78

1            MS. OLDEMEYER:  The brother.  Another brother.  I

2    think he's associated with the Pauling Hauling company that

3    has the transportation.  Ms. Patterson --

4            THE COURT:  Why was Paul Pauling involved with a

5    car for Ms. York?

6            MS. OLDEMEYER:  He was involved with guaranteeing a

7    loan for Lardyn Consulting.  At this point in time, the plan

8    is a reorganization is still in the works.

9            THE COURT:  Wow.

10           MS. OLDEMEYER:  So Ms. Patterson, who's

11   Ms. Wilson's expert, will tell you what I would have

12   expected the bank to be doing in a Chapter 11 was telling

13   the borrowers go find a qualified investor.  Exhibit 31 is

14   exactly what the bank was doing in November of 2016, telling

15   the borrowers, go find a qualified investor, and not only do

16   that, we've got to have it by November.  Why?  Because we

17   got all this debt that's not being serviced, and we have

18   participants who are asking questions.  Exhibit 1050 is a

19   November e-mail about getting sales contracts before the

20   court.  The Two Mile Ranch had entered into a contract with

21   the Stanleys who are neighbors for a sale of Weld County

22   land.  Why?  Because it's selling off bits and pieces to

23   service debt.  And Two Mile Ranch did that .

24           November of 2016, Mark Pauling had his Rule 69

25   taken by Mr. Pulkrabek, and clearly Ms. Wilson knew about

                     Sarah K. Mitchell, RPR, CRR

1    the bankruptcy because she asked -- Mr. Pulkrabek asked

2    Mr. Pauling all about the bankruptcy.  What's interesting is

3    you'll notice Ms. Wilson was not a creditor listed in the

4    bankruptcy proceeding.  Why?  Because she wasn't a creditor

5    of Two Mile Ranch General Partnership.  All she had was the

6    charging order against any right to distribution that Jon

7    Pauling might get in the future.  There was no filing of a

8    proof of claim as a creditor by Ms. Wilson.  There was no

9    notice and request -- or no filing of an entry of appearance

10   and request for notice as an interested party.

11          So, Your Honor, Exhibit 1004 is the debt, and

12   you've heard a lot about the debt, but bottom line, the

13   total debt at the time of bankruptcy just by Two Mile Ranch

14   alone was in excess of $8.8 million, and when you add in Jon

15   Pauling's personal loan and Mark Pauling's note, you get to

16   9.6, and Two Mile Ranch had guaranteed Mark's note.  This

17   July 1st date, that's the date of the bankruptcy.  So when

18   you file bankruptcy, everything stops.  What is the date --

19   the amount you owe as of that date?  And so this date, the

20   proof of claim wasn't filed by the bank until February of

21   2017, okay?  In between this July 1st date and February 2017

22   was the foreclosure on the Sterling home.  It was applied to

23   this note first, and then it was applied to 2353.

24          The evidence will show that when the bank filed its

25   proof of claim, it did not include what we call the leftover

1   after OREO, other real estate owned.  When a bank takes on

2   OREO property, it's highly regulated.  You have to have an

3   appraisal.  There's sales costs.  There's all sorts of

4   things.  And those were left over, and the bank didn't

5   include it in its proof of claim.  Why?  Oversight.  Not

6   intending to overstate debt, not intending to understate

7   debt.  The bank knew it was unsecured.  And so these are

8   things you'll hear about because in hindsight, we're looking

9   at it, and we're like, Oh, there's another $32,000 in debt

10  owed.

11         The bank's proof of claim is Exhibit 1046, and it

12  hasn't been stipulated to, but Mr. Dick Stull or Steve Stull

13  will talk about this document.  There's three pages with the

14  math of what is the debts owed, and then the value of the

15  collateral, and they are unsecured.  And you will see the

16  notes, the amount of loans due at that time, and all of the

17  deed of trusts securing that, including the deed of trust

18  against Turkey Creek in Jefferson County.  And there's

19  72 pages of support.  It doesn't include these two notes,

20  2353 and 2217.  Why?  Because the Sterling house had been

21  sold.  The loan proceeds had been applied.  Why state debt

22  that has been paid off?  No property in 2016.  That's a big

23  deal in an ag industry.  How are you going to make money if

24  you're not putting crops in the field?

25         Bankruptcy assets.  This is how the bank determined

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      81

1   whether it was fully secured or unsecured.  And you've heard

2   a lot about these, but the Logan County farm and ranch was

3   appraised at $4.27 million, and you'll hear from Mr. Blake

4   Moreland.  He will testify he did the appraisal.  That is an

5   appraisal that even plaintiff's own expert doesn't question.

6   The Weld 240 acres, $58,500.  That was what was sold to the

7   Stanleys.  Turkey Creek, that's based on appraisal from

8   JoAnn Apostol.  If we have to go there because they're still

9   questioning Turkey Creek, we'll have JoAnn testify remotely.

10          The other scheduled values, what makes up the

11   difference for the value of collateral --

12          THE COURT:  Ms. Oldemeyer, I can't possibly keep up

13   with you.

14          MS. OLDEMEYER:  Okay.

15          THE COURT:  Have you heard the expression you can't

16   see the forest for the trees?  You lawyers are so inundated

17   with the trees, that I'm not sure you're seeing the forest.

18          MS. OLDEMEYER:  My concern, Your Honor, is that the

19   Court is not seeing the forest, and that's a very valid --

20   your point to me -- and I apologize, I will slow down.  I

21   will not go into this level of detail in my opening

22   statement.  You want to hear the evidence, and arguments

23   aren't evidence.  But, Your Honor, if the Court has heard

24   plaintiff's case and really from questions believes -- and

25   the bank is absolutely digging out of a hole, the bank lied,

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    82

1   the bank's credibility, they better not -- you know, I have

2   to explain what's going on.

3          THE COURT:  I don't know if the bank lied or didn't

4   lie.  Mr. Stull would certainly do himself a great benefit

5   if he is absolutely candid in his testimony.  What I'm

6   saying is the forest here seems to be from the documents

7   that Ms. Wilson got this big judgment over in the Denver

8   court against Jon Pauling, and for whatever reason, the bank

9   or people that represented the bank were trying to help him

10  dodge that bullet, and that's what the documents say.

11         MS. OLDEMEYER:  Your Honor, that's what plaintiff

12  argues the documents say.

13         THE COURT:  Well, I didn't care what they arguably

14  said.  That's a lawyer talking.  I was just looking at the

15  documents.

16         MS. OLDEMEYER:  Yeah.

17         THE COURT:  The documents speak for themselves.

18         MS. OLDEMEYER:  Well, let's look at a few more

19  documents, some that the defense would like the Court to see

20  in addition to hearing from the witnesses who typed those

21  and explain the context of them.  This was going to be a

22  blood bath if these assets of Two Mile Ranch went to

23  auction.  The estimates that Darrell Kraupie, another

24  witness you'll hear from, was saying and telling the bank

25  what happened, it was awful for the bank.  Exhibit 36, this

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   83

1    is from January of 2017.  Once again, there's supposed to be

2    this big plan of reorganization that's coming there, and the

3    bank is saying you're going to take a deed in lieu or you

4    can find a qualified investor.  And this is what they like

5    to argue right here.

6         Make a chance -- you have the chance to make

7    something from the oil rights.  The reason we're here in

8    this court, Your Honor, is about 60 producing net mineral

9    acres.  This does not mean the bank saw equity.  This does

10   not mean the bank is being nice or generous to Jon Pauling

11   or Mark Pauling or Two Mile Ranch.  The bank is assessing

12   its risk and trying to minimize its risk and its loss in

13   light of a terrible ag industry with multiple borrowers and

14   problems.  It is in light of the current situation.  Buyers

15   smell a bargain with OREO property.  The bank takes on the

16   expense of OREO property where the bank steps into the chain

17   of title and risk of trying to sell that.  There's

18   commissions.  There's insurance.  There's all sorts of

19   expense.  The bank was not trying to hinder or delay

20   Ms. Wilson's ability to collect through the charging order

21   whatsoever.

22        THE COURT:  Then why did the bank person say what

23   was said in those e-mails?

24        MS. OLDEMEYER:  We'll -- we're going to go through

25   them, Your Honor.

Sarah K. Mitchell, RPR, CRR

1          THE COURT:  Well, yes.  And actually I want the

2    person who actually wrote the words, not the lawyer trying

3    to put lipstick on the pig.

4          MS. OLDEMEYER:  They're all coming, Your Honor.

5    Mr. Chris Gray in person, Ms. Kelly Roach remotely, Jarrod

6    Hamik, because there's other good stuff from Jarrod Hamik,

7    and you'll hear from Dick Stull.  All of those.  You'll hear

8    from those people.  We will have them for the Court.

9          THE COURT:  Okay.

10         MS. OLDEMEYER:  The Exhibit 141, that's the

11   bankruptcy document, and none of that is being argued here

12   by Wilson that anything was lied or improper or illegal.

13   What Ms. Patterson, who's their expert, says is this was all

14   done to conceal things.  Absolutely not.  These are public

15   filings to which any attorney could look.  The deeds after

16   the sales outside of the bankruptcy court process are of

17   public record.  There's nothing being concealed.

18         The three options were being reduced to two.  This

19   qualified investor plan for reorganization was not coming

20   together.  Bankruptcy is expensive.  You've got the debtors'

21   lawyers getting paid.  You've got the bank's lawyers getting

22   paid.  Motions cause delay.  The bank is in the first

23   secured position.  Ms. Wilson was not speaking up.  She

24   didn't object to dismissal.  And you've got planting season,

25   second crop year, coming up, because this is now in

1   February.  They filed a motion to dismiss the bankruptcy

2   case.  Exhibit 1057 is anticipation of that.  This is

3   March 2nd of 2017.

4           And you'll hear from those present, not all of

5   them, some of them, and then some of the people who were

6   present as guests explaining what was going to happen and

7   why, and what the bank's logic was.  And then this is an

8   exhibit -- I apologize, I didn't put the exhibit number, but

9   it's the commitment letter for the deal to Lardyn, York,

10  with York and Pauling as members.  FirsTier, which was the

11  first plan, they were going to take that loan to another

12  bank.  You'll see Exhibit 148.  By March 9th, 2017, FirsTier

13  is not going to do the $4.6 million request.

14          So you've heard all this, what was sold to Lardyn

15  and why.  This is just as --

16          THE COURT:  I haven't heard the why, Ms. Oldemeyer.

17  I've heard what was sold.  I haven't heard the why.

18          MS. OLDEMEYER:  Right.  The bank -- from the bank's

19  position is we want to minimize our loss.

20          THE COURT:  And so you do that by lending more

21  money to Lardyn.

22          MS. OLDEMEYER:  Not more money.  Not more money.

23  And so $7.1 million, keeping other assets, but this is what

24  -- the Weld County minerals are why we're here, the

25  producing and the nonproducing.  What happened to the sale

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021      86

1    proceeds?

2          THE COURT:  The bank lent money to Lardyn, yes?

3          MS. OLDEMEYER:  $7.1 million.  It did.  That's

4    correct.  And then where did that money go?  As you'll see

5    from Exhibits 58 and 59, the money went to Lardyn

6    Consulting.  There's the 7.1 million.  Then it went right

7    out over to pay down Two Mile Ranch debt.  That's

8    Exhibit 59.  So you can trace those proceeds.

9          THE COURT:  So the bank paid down the debt with its

10   own money.

11         MS. OLDEMEYER:  Correct.

12         THE COURT:  Right.

13         MS. OLDEMEYER:  But the bank chose that avenue, and

14   they'll explain their logic.  It was a business decision.

15         THE COURT:  Okay.

16         MS. OLDEMEYER:  The other alternative was take

17   title to all of those assets, pay commissions, pay

18   insurance, hope you can find a borrower in a depressed ag

19   industry.  They felt this was the decision that was

20   appropriate for the bank.  The bank was no worse off if

21   Lardyn failed.  So this shows -- Exhibit 1006 shows the

22   total amount of debt before and the total amount remaining

23   in Two Mile Ranch after.  There's still 3 million in debt in

24   Two Mile Ranch where Mark and Jon Pauling had personally

25   guaranteed.  Exhibit 1007 is the detail for all these

                    Sarah K. Mitchell, RPR, CRR

1    expenses.  The appraisals, the lawyers, the foreclosure on

2    Sterling, all of these things that are properly expenses

3    that a bank puts onto the amount of debt owed by a borrower.

4          The motive.  Why?  You questioned the bank's -- why

5    did the bank do this.  Mr. Pulkrabek would have the Court

6    believe it was because they wanted to help Jon Pauling or

7    they wanted to hurt Amanda Wilson or both.  I submit to you,

8    Your Honor, that was not the motivation.  A federally

9    regulated bank, which doesn't have this longstanding

10   relationship that Mr. Pulkrabek likes to have the Court

11   believe, it just isn't there.  Steve Stull was at FirsTier

12   Bank as a loan officer in an earlier part of his career.

13   Then he left banking.  Then the Stull family got into

14   Farmers State Bank at the end of 2011.  Their relationship

15   with Jon Pauling and Mark Pauling and Two Mile Ranch started

16   at that point.

17         THE COURT:  Gosh, I thought I heard the other

18   lawyer saying it was a longstanding relationship, and not

19   the plaintiff lawyer either.

20         MS. OLDEMEYER:  I don't know which --

21         THE COURT:  These other couple lawyers that spoke.

22         MS. OLDEMEYER:  I think Mr. Keithley mentioned that

23   Mr. Stull knew the Paulings from his loan officer position

24   at FirsTier.  That's the detail I'm providing, but it wasn't

25   like he was an owner of a bank, which is what his position

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    88

1   with Farmers State Bank is.  He has a small equity interest.

2   Jon Pauling is the elephant in this room.  He was

3   radioactive.  He filed for bankruptcy.  He'd had businesses

4   go south.  The bank and Ms. Wilson both shared one goal.

5        THE COURT:  Jon Pauling isn't any elephant in the

6   room.  He's not even here.

7        MS. OLDEMEYER:  That's a very good point.  They

8   shared one goal, which was to get paid, minimize your loss.

9   There's two different explanations from the evidence, and

10  the Court is going to have to decide which one is

11  believable.  Yes, every witness will swear to tell the truth

12  in this courtroom.

13       THE COURT:  Yes, they will.  And if they don't,

14  they're looking at something worse than money.

15       MS. OLDEMEYER:  That's correct, Your Honor.  And I

16  don't think any witness needs to be reminded the importance

17  of this, and the seriousness.

18       THE COURT:  Well, I think maybe they do.

19       MS. OLDEMEYER:  I don't know why the Court would

20  draw that conclusion already not having heard from anybody.

21       THE COURT:  Because you folks -- you lawyers are

22  telling me that things in the documents just don't matter.

23  There's an explanation.  There's this.  There's that.  And

24  you're awash with numbers.  I can't remember all these

25  numbers.  Maybe after I spend a week I'll understand them

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    89

1   better, but I can read, and you folks don't want to see

2   what's right there to be read.  That's why I thought it was

3   important to remind them.

4        MS. OLDEMEYER:  I think, Your Honor, written word

5   and numbers are two different types of reading.  The numbers

6   provide context to the written word, and the numbers show

7   there was nothing there.

8        THE COURT:  Okay.  You've been going for an awfully

9   long time.  Maybe wrap it up.

10       MS. OLDEMEYER:  I don't mean to argue with the

11  Court.  Maybe --

12       THE COURT:  No.  You're not arguing with me.

13  You're just trying to answer my questions.  That's all.  And

14  I appreciate that.

15       MS. OLDEMEYER:  There was assets that weren't sold

16  and what happened to them.  North Turkey Creek, I mentioned,

17  sold.  Mr. Steve Stull will tell you, what happened with

18  that?  The bank did a charge-off.  How much?  $588,000.

19  That's lucrative?  That's making money?  That's helping Jon

20  Pauling?  No.  It is the result of, again, the business

21  decisions.

22       THE COURT:  You sound like you're making a closing

23  argument now.

24       MS. OLDEMEYER:  The 275,000 loan got paid off, I

25  mentioned, with the SBA loan.  Nearly two years after the

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    90

1   sale of the loan to Lardyn almost to the day Wilson files

2   this CUFTA lawsuit.  And I believe what we're arguing about

3   in this case, among other things that I couldn't squash

4   before we got to the courtroom, is this Gustavson -- her

5   name is Briana Lamphier, and she will also be testifying.

6   She did two -- she did an appraisal of the 60 net mineral

7   acres that were producing.  She updated it for the

8   April 17th closing, and she'll be here.  She'll defend her

9   work, and she'll explain what it was.

10          You will not hear from an appraiser who did a

11  mineral appraisal of the producing and/or nonproducing to

12  support Ms. Wilson's claims that there was millions of

13  dollars in here.  You will not see oil and gas royalty

14  checks from Whiting Oil that went anywhere other than to the

15  bank and that the bank did anything with them except pay

16  down debt, because it had a security interest in those

17  documents.

18          I submit to you, Your Honor, that the evidence will

19  show there was nothing here for Ms. Wilson at the end of the

20  day, and you will even hear both experts of Ms. Wilson --

21  Ms. Patterson and Ms. Lutz will testify they do not hold the

22  opinion that had all the assets of Two Mile Ranch been

23  liquidated that were sold to Lardyn and the others, they

24  cannot say there would have been anything left over for

25  Ms. Wilson.  Once everything is liquidated it goes in the

Sarah K. Mitchell, RPR, CRR

1   pot.  You pay off Farmers State Bank.  What's left in that

2   pot, if anything, would go to Jon and Mark.  Then instead of

3   going to Jon it would go to Amanda Wilson.  They say very

4   clearly we cannot tell you there would have been anything

5   left over.

6           This is the big appraisal, Exhibit 39.  A different

7   value for those mineral appraisals, $2.3 million.  And we'll

8   hear a lot about it.  This is an internal bank memo.

9           THE COURT:  It's not helping you to go flipping

10  through these things.  I can't even read as fast as you're

11  flipping.  Are you pretty close to being done?

12          MS. OLDEMEYER:  I am, Your Honor.  This is

13  Exhibit 44, page 1.  This is what they want the Court to

14  look at.  That's the $3.4 million figure.  We submit to you,

15  Your Honor, you cannot view that number in a vacuum, and you

16  have to look at the big picture of what the bank was facing

17  at the time, and look inside Exhibit 44, which has multiple

18  credit reports in there and collateral analysis.  The one

19  plaintiff wants the Court to look at is the one that is

20  non-discounted showing equity.  This is the discounted

21  figure showing that there was no equity left after discounts

22  were applied and the assets were sold.  And there are

23  additional pages in there that you have to put side by side

24  to compare.

25          Your Honor, we submit to you that the evidence will

 1  show Ms. Wilson got an uncollectible judgment, and that

 2  Farmers State Bank's decision was nothing other than an

 3  exercise of its business judgment.  Had someone maybe chosen

 4  to do something different and take all of the assets and

 5  liquidate them doesn't prove that there would have been

 6  anything left over for Ms. Wilson, and Monday morning

 7  quarterbacking by Ms. Patterson saying a first loss is the

 8  best loss does not mean that the bank's decision to kick the

 9  can down the road and let Lardyn have a go at a commercial

10  feedlot operation means it was a violation of CUFTA or a

11  fraudulent transfer or that that was even an asset.  Thank

12  you, Your Honor.

13          THE COURT:  Well, maybe it's time to hear some

14  evidence.

15          MR. PULKRABEK:  Thank you, Your Honor.  A couple

16  quick questions.  First of all, do you want us conducting

17  examinations from the table or from the lectern?

18          THE COURT:  From the table.

19          MR. PULKRABEK:  Okay.  Second question, would you

20  like your exhibit binders now or later?

21          THE COURT:  Doesn't matter.  You're going to put

22  the exhibits up on the screen?

23          MR. PULKRABEK:  We will, yes.  Okay.

24          THE COURT:  Are you going to call a witness?

25          MR. PULKRABEK:  Yes.  We call Elyce York.

1         ELYCE YORK

2    was called as a witness and, having been duly sworn, was

3    examined and testified as follows:

4                        DIRECT EXAMINATION

5    BY MR. PULKRABEK:

6    Q.  Ms. York, let's start out with a question.  Where is Jon

7    Pauling?

8    A.  He said that he didn't want to be here.  He said all that

9    it would do is hurt everybody with him being here is what he

10   told me when I asked him if he was going to be present or not.

11   Q.  And where is he?

12   A.  I have no idea.

13   Q.  When's the last time you talked to him?

14   A.  Just the other day when he saw Skylar.

15   Q.  Okay.  I want to start by asking you some questions about

16   your relationship with Jon Pauling.  You met Jon Pauling in

17   2011?

18   A.  Yes.

19   Q.  You were working at Shotgun Willie's?

20   A.  Yes.

21   Q.  Jon Pauling was a customer at Shotgun Willie's?

22   A.  Yes.

23   Q.  And in the fall of 2013, you became romantically involved

24   with Jon Pauling?

25   A.  Yes.

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    94

 1   Q.  And about that same time you stopped working at Shotgun

 2   Willie's?

 3   A.  I did.  I was going through a divorce.

 4   Q.  Since quitting Shotgun Willie's you haven't had any

 5   employment by a third party?

 6   A.  No.

 7   Q.  And just for the record, no, you have not had any

 8   employment; is that accurate?

 9   A.  That is accurate.  I've had little babysitting jobs here

10   and there and things like that, but not actual employment.

11   Q.  All right.  And you already mentioned that at the start of

12   your romantic relationship with Jon Pauling you were going

13   through a divorce, correct?

14   A.  Yes.

15   Q.  You have a son from that marriage?

16   A.  I do.

17   Q.  And so at the time that you stopped working and started

18   seeing Mr. Pauling in the fall of 2013, you were taking care

19   of a young son; is that fair?

20   A.  What are you saying?

21   Q.  At the time you stopped working at Shotgun Willie's and

22   you started dating Mr. Pauling, you were caring for a

23   one-and-a-half-year old son?

24   A.  Yes.

25   Q.  Now, part of your relationship with Jon Pauling involved

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    95

1   him providing you with financial assistance?

2   A.  No.  I mean, he helped give me money here and there every

3   once in a while, but nothing substantial.  I mean, a lot of

4   the money that I ever got from Jon was when I was working at

5   Shotguns.

6   Q.  And so, for instance, your ex-husband was not paying child

7   support?

8   A.  No, he's not, and he still is not to this day.

9   Q.  So Jon Pauling loaned you some money during that period of

10  time; isn't that fair?

11  A.  He loaned $5,000 to me for the divorce court.

12  Q.  And then another thing that Mr. Pauling helped you with

13  was to rent an apartment?

14  A.  Yes.

15  Q.  The rent was $2,000 a month?

16  A.  Right.

17  Q.  And you told Jon Pauling that you needed to be able to

18  show the landlord proof of employment?

19  A.  Yes.

20  Q.  Jon Pauling prepared a document that looked like an

21  employment contract between you and he?

22  A.  Yes.

23  Q.  And you submitted that document to the leasing company?

24  A.  Yes, I did.

25  Q.  But, in fact, you were never employed by Jon Pauling?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    96

1   A.   No, I was not.

2   Q.   Now, let me ask you about the Turkey Creek property, the

3   house on North Turkey Creek Road that we heard Ms. Oldemeyer

4   mention a little bit, and I want to ask you some questions

5   about that.  First of all, that house, that's the house in the

6   foothills of Jefferson County?

7   A.   Yes, it is.

8   Q.   And the address was 22424 North Turkey Creek?

9   A.   22434.

10  Q.   Okay.  You first saw that property in 2014?

11  A.   Yes.

12  Q.   You visited that property with Jon Pauling?

13  A.   I did.

14  Q.   You put in an offer to purchase that property?

15  A.   I did.

16  Q.   And then the plan even when you put in that offer was that

17  Jon Pauling was going to buy the property?

18  A.   Yes.

19  Q.   So, for instance, you didn't have $50,000 to do the

20  earnest money deposit?

21  A.   No.

22  Q.   And you didn't have any banking relationships back in

23  2014?

24  A.   No.

25  Q.   You understood that the Turkey Creek property was going to

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021      97

1   be Jon Pauling's property?

2   A.   Yes.

3   Q.   But you were the one who signed the purchase offer on it?

4   A.   Yes.

5   Q.   Now, I want to move forward into the 2015 timeframe.   In

6   about March or April 2015, you became pregnant with Jon

7   Pauling's child?

8   A.   Yes.

9   Q.   In May 2015, you moved into that North Turkey Creek

10  property?

11  A.   Yes.

12  Q.   Yes?

13  A.   Yeah.   It probably was around that time.

14  Q.   You did not pay rent to live there?

15  A.   No.

16  Q.   It was your understanding that it was Jon Pauling's house?

17  A.   Yes.

18  Q.   Jon Pauling would make visits a couple times a month?

19  A.   Yes.

20  Q.   Then in January of 2016, you gave birth to Jon Pauling's

21  child?

22  A.   Yes.

23  Q.   And you had a daughter?

24  A.   Yes.

25  Q.   The daughter's name is --

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    98

1    A.   Skylar.

2    Q.   Skylar Joy Pauling?

3    A.   Yes.

4    Q.   Skylar Joy Pauling was born on January 6th, 2016?

5    A.   Yes.

6    Q.   Jon Pauling was not present for the birth?

7    A.   No.

8    Q.   But Jon Pauling visited you less than a week after you

9    gave birth to Skylar Pauling?

10   A.   Yes.

11   Q.   Then you continued to be in a romantic relationship with

12   Jon Pauling after Skylar Pauling's birth?

13   A.   It wasn't -- I mean, we had hooked up here and there a

14   couple times, but I wouldn't say that we were in a

15   relationship relationship.

16   Q.   Well, you were in a co-parenting relationship at a

17   minimum?

18   A.   What?

19   Q.   A co-parenting relationship with him at that time?

20   A.   Yes.

21   Q.   And just to kind of step back for just one second, there's

22   this term in the fraudulent transfer act called cosanguinity.

23   It means related by blood.  So let's just be clear, you are

24   within two degrees of cosanguinity with Jon Pauling?

25            MR. FORBES:  I'm going to object to the form of the

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    99

 1   question, Your Honor.  It's unclear.  It's vague.

 2        THE COURT:  It's unclear to me too.  Sustained.

 3   Q.  (By MR. PULKRABEK) All right.  You are related to Jon

 4   Pauling through Skylar Joy Pauling?

 5   A.  No, not at all.

 6   Q.  Well, you're both her parents.  You're both parents of

 7   that child?

 8   A.  That doesn't mean I'm related to him.

 9   Q.  Okay.  I'm just going to map it out.

10   A.  I understand what you're saying, but I disagree.

11   Q.  Well, Skylar Joy Pauling is your blood relative?

12   A.  Yes.

13   Q.  She is also Jon Pauling's blood relative?

14   A.  Yes.

15   Q.  Okay.

16   A.  But I'm not blood relatives with Jon Pauling.

17   Q.  Now, you continue to have a sometimes on/off hooking up

18   relationship with Jon Pauling, as you put it, continuing into

19   2017?

20   A.  Yeah.

21   Q.  And at least as of your deposition in August 2020, there

22   had been no new men in your life in terms of a romantic

23   relationship?

24   A.  No.

25   Q.  That's no that's wrong or no I'm correct?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      100

1   A.  You're correct.

2   Q.  Okay.  Now, one of the issues in this case is concealment

3   of your and Jon Pauling's relationship and Skylar Pauling, so

4   I want to ask you some questions about what's been marked

5   trial Exhibit 19 and has been stipulated.

6          MR. FORBES:  Your Honor, I object to the prefatory

7   comment about one of the --

8          THE COURT:  Sustained.  The implication is that she

9   concealed something, and I haven't heard that.  But what's

10  the exhibit?

11         MR. PULKRABEK:  The exhibit is Exhibit 19.

12         THE COURT:  Exhibit 19.  All right.  The objection

13  was sustained, but Exhibit 19 is a stipulated exhibit, and

14  it's admitted.

15      (Plaintiff's Exhibit 19 received.)

16  Q.  (By MR. PULKRABEK) Now, Ms. York, I want to show you this

17  exhibit and walk you through a couple parts of it.  Are you

18  able to see that, Ms. York?

19  A.  Yes.

20  Q.  Okay.  So let me just walk you through this exhibit.  If I

21  back out a little bit you'll be able to see that it's

22  Plaintiff's Trial Exhibit 19, and it is --

23         THE COURT:  Hold on a second.  Those were the

24  lawyers for Wilson?

25         MR. PULKRABEK:  Those are the lawyers for Wilson,

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   101

 1   yes.  That's myself.  I served the interrogatories.

 2          THE COURT:  Laura Wolf was a law clerk of mine once

 3   upon a time.  Did you know that?

 4          MR. PULKRABEK:  I think I knew that, yes, Your

 5   Honor.  Yes.

 6          THE COURT:  She's not involved in this case at all?

 7          MR. PULKRABEK:  She won't be testifying.

 8   Q.  (By MR. PULKRABEK) All right.  So you can see that the

 9   date on this is February 3rd, 2016?

10   A.  Yes.

11   Q.  All right.  And the name of the judgment debtor was Jon

12   Pauling.  You can see that, correct?

13   A.  Yes.

14   Q.  Then if we go to the last page here, you can see that Jon

15   Pauling signed these interrogatory responses?

16   A.  Yes.

17   Q.  Do you recognize his signature there?

18   A.  Yes.

19   Q.  And he signed it on February 3rd, 2016, correct?

20   A.  Yes.

21   Q.  And he signed that under -- it says false statement is

22   punishable as perjury which is a felony.  You see that?

23   A.  Yes.

24   Q.  All right.  And then you also see it was stamped by the

25   deputy clerk of the Denver District Court?

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   102

1   A.  Yes.

2   Q.  Now, I want to look at this particular question that was

3   asked of Mr. Pauling.  It asked children, do you have any

4   children?  If so, state the full legal name of each child and

5   for each -- then provides more information.

6           MR. FORBES:  Your Honor, might I ask that counsel

7   give us a page?

8           MR. PULKRABEK:  This is Bates labeled Wilson 6817.

9           MR. FORBES:  Thank you.

10          THE COURT:  Aren't you able to see this document?

11          MR. FORBES:  I can't see it from there.  Old eyes.

12          THE COURT:  You can pull that screen over so that

13  you can see it.

14          MR. FORBES:  I can.  I was following on the paper,

15  Your Honor.

16          THE COURT:  Well, it's got the page number right on

17  there.

18          MR. FORBES:  I couldn't see it, Your Honor.  I'm

19  sorry.  Your Honor, I'll just move my chair so I can see.

20  Q.  (By MR. PULKRABEK) So, Ms. York, you see that Jon Pauling

21  denied having any children?

22  A.  Yes.

23  Q.  And he denied having any children after you gave birth to

24  Skylar Joy Pauling?

25  A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021        103

1    Q.  And after he had visited you to see his new baby?

2    A.  Yes.

3    Q.  Now, I want to ask you about what has been previously

4    marked Exhibit 1033, and this -- I'm going to pull this up.

5    This also has been stipulated.  And what this is is the

6    deposition of Jon Pauling that was given on February 10th,

7    2016.  Do you see that?

8    A.  Yes.

9         MR. PULKRABEK:  And, Your Honor, I think you just

10   said a moment ago that you had admitted Exhibit 19.  I move

11   to admit this as well.

12        THE COURT:  Okay.  How long of a document is this?

13        MR. PULKRABEK:  It is -- it's a 46-page document.

14   I mean, I suppose what I really care about is you taking

15   notice or admitting the portions of it that I read.

16        THE COURT:  Yeah, I'd rather not have to read a

17   40-page document if there's only one line or two that you

18   want me to see.

19        MR. PULKRABEK:  Okay.  What I'll do is I will ask

20   you to admit those portions that I am about to refer to, and

21   it will be fairly selective, Your Honor.

22        THE COURT:  And the other lawyers can admit other

23   portions.  That's fine.

24        MS. OLDEMEYER:  Your Honor, prior to trial we

25   designated -- did designations and cross-designations, so

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021      104

1    Exhibit 1033 is a redacted transcript to show those

2    designations and cross-designations.

3              THE COURT:  Oh.

4              MS. OLDEMEYER:  I would offer Exhibit 1033.

5              MR. PULKRABEK:  Your Honor, I don't object to the

6    entire document coming in, but I understand your point.  You

7    don't want to read it all, so at least for my part I'm going

8    to point out to you what I care about.

9              THE COURT:  Okay.  Well, she says it's only

10   portions anyway, so 1033 is admitted.

11       (Defendant's Exhibit 1033 received.)

12   Q.  (By MR. PULKRABEK) Okay.  Let me -- as you can see, this

13   was a deposition given February 10th, 2016, correct?

14   A.  Yes.

15   Q.  Now, let me direct your attention to page 41 of this

16   document.  You can see the page numbers that are here, and I'm

17   going to refer you to page -- starting at page 188, line 3.

18   You can see that I asked Mr. Pauling about the Turkey Creek

19   property.  Do you see that?

20   A.  Yes.

21   Q.  And I said, I've got some more questions for you about

22   22424 North Turkey Creek Road.  You've been to that property,

23   I take it?  And his answer was, No, I'm not allowed to.  Do

24   you see that?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

1   Q.  That is inconsistent with your testimony that Mr. Pauling

2   not only visited the property when you and he looked at buying

3   it, but he would also visit you one or two times a month?

4   A.  Yes.

5   Q.  And I went on.  You've never been to that property?

6   Answer, No.  I've never done a safety plan for it, so...

7   Question, Were you looking at that property even back in 2014?

8   Uh-huh.  Question, But you never personally visited it?  No is

9   his answer.  You see all that?

10  A.  Yes.

11  Q.  So none of that was true?

12  A.  No.

13  Q.  All right.  Then I asked Mr. Pauling some questions about

14  his relationship with you, and so I want to ask you about

15  that.  On page 191 starting at line 7, I asked Mr. Pauling,

16  For some period of time Elyce York was living at that

17  property, right?  Answer, Right.  Question, How did Two Mile

18  Ranch General Partnership enter into some arrangement to have

19  Elyce York living at that property?  Answer, She needed a

20  place to live.  There's three empty houses there.  Didn't see

21  any harm in it.  Didn't have to have somebody run up there and

22  look after it.  Somebody was living there.  Did Two Mile Ranch

23  General Partnership have any written lease with Elyce York?

24  No.  And she's no longer living there?  No.  And that was a

25  false statement by Mr. Pauling?

19-CV-01224-RBJ       Bench Trial - Day 2     04/12/2021     106

1   A.  Right.  Because this was in 2016, correct?

2   Q.  2016.

3   A.  Yeah, that's false.

4   Q.  As of February 10th, 2016, you were living at that

5   property?

6   A.  Yes.

7   Q.  Now, I go on, And she's no longer living there?  Answer,

8   No.  Do you know where she is now?  Answer, no.  That was also

9   false?

10  A.  Which one are you saying?  Sorry.

11  Q.  Do you know where she is now?  Answer, No.

12  A.  Right.  Yeah, that's false.

13  Q.  Jon Pauling absolutely knew where you were?

14  A.  Yeah.

15  Q.  He visited you and Skylar?

16  A.  Yes.

17  Q.  Then next question, Do you have a relationship with Elyce

18  York at this time?  Answer, No.  That was false as well?

19  A.  I wouldn't say it's necessarily a relationship, but like I

20  said, we had sex here and there.

21  Q.  Well, and you were both parents of Skylar Joy Pauling.

22  That's a kind of relationship?

23  A.  A co-parenting relationship.

24  Q.  Then Mr. Pauling says -- well, I ask, You did in the past,

25  right?  Answer, Before I went on probation.  I'm not allowed

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    107

 1   to be in a relationship while I'm on probation.  Do you see

 2   that?

 3   A.  Yes.

 4   Q.  Okay.  So Mr. Pauling was not telling the truth insofar as

 5   he suggested that the last time he had had a relationship with

 6   you was before he went on probation?

 7   A.  Right.  And I think a lot of the reason that we weren't

 8   together was because of probation.

 9   Q.  Next question, Do you communicate with Elyce York right

10   now?  Answer, Once in a great while.  Not very often, no.

11   That was false?

12   A.  Yes.

13   Q.  Next question, How do you communicate with her?  Answer, I

14   haven't, so I really can't say.  I'm not going to say I

15   haven't communicated with her, but I don't.  Well, it is false

16   when he said he hadn't communicated with you?

17   A.  Yeah.

18   Q.  Question, When is the last time you talked with her?

19   Answer, I can't remember.  It's probably been way back before

20   the civil trial, the civil trial being in October of 2015.

21   That was false?

22   A.  Yes, false.

23   Q.  All right.  Now, based on all this, you know that Jon

24   Pauling was trying to conceal his relationship with you from

25   Amanda Wilson?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    108

 1          MR. FORBES:  Objection, Your Honor.  Calls for

 2     another's state of mind.

 3          THE COURT:  Overruled.

 4     A.  Can you repeat that now, please?

 5     Q.  (By MR. PULKRABEK) You know Jon Pauling was trying to

 6     conceal his relationship with you from Amanda Wilson?

 7     A.  Yes, I guess so.

 8     Q.  Now, let me shift gears a little bit.

 9          THE COURT:  We're going to stop in about four

10     minutes.  If you're shifting gears, would this be a good

11     time to stop?

12          MR. PULKRABEK:  I think I can do this in a minute

13     or two, Your Honor.

14          THE COURT:  Okay.

15          MR. PULKRABEK:  Then we can stop.

16     Q.  (By MR. PULKRABEK) All right.  Ms. York, some questions

17     about your awareness of Amanda Wilson's lawsuit against Jon

18     Pauling.  You gave a deposition in the Amanda Wilson versus

19     Jon Pauling lawsuit?

20     A.  Yes.

21     Q.  Your deposition was in August of 2015?

22     A.  That sounds about right.

23     Q.  And you were pregnant with Jon Pauling's child at that

24     time?

25     A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021   109

1   Q.  And then later Jon Pauling told you that a judgment had

2   entered against him in that lawsuit?

3   A.  Yes.

4           MR. PULKRABEK:  Your Honor, we can stop now.

5           THE COURT:  All right.  Is an hour enough time for

6   everybody to get out, get some lunch, and get refreshed, or

7   would you like more time?

8           MR. PULKRABEK:  I think an hour would be fine for

9   plaintiff, Your Honor.

10          THE COURT:  Ms. Oldemeyer is nodding.

11  Mr. Keithley?

12          MR. KEITHLEY:  Yes, Your Honor.

13          THE COURT:  Mr. Forbes?

14          MR. FORBES:  Yes, Your Honor.

15          THE COURT:  Let's shoot for about 1 o'clock.

16          THE COURTROOM DEPUTY:  All rise.  Court is in

17  recess.

18      (Break was taken from 11:57 a.m. to 1:01 p.m.)

19          THE COURT:  Good afternoon, everyone.

20          Ms. York, would you resume the stand, please.

21  You're still under oath.

22          MR. PULKRABEK:  Thank you, Your Honor.

23                  DIRECT EXAMINATION (Cont'd)

24  BY MR. PULKRABEK:

25  Q.  Ms. York, let me move forward now to your loan application

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    110

1   with Farmers State Bank in 2016, okay?  Jon Pauling is the one

2   who introduced you to Farmers State Bank?

3   A.  Yes.

4   Q.  And Farmers State Bank is about two and a half to three

5   hours away from the Turkey Creek house where you were living?

6   A.  Yes.

7   Q.  Then in July of 2016, you worked with Jon Pauling to apply

8   for a loan at Farmers State Bank?

9   A.  Yes.

10  Q.  And you worked with Jon Pauling on a loan with Farmers

11  State Bank both in your name and in the name of Lardyn

12  Consulting?

13  A.  Just Lardyn Consulting, I believe.

14  Q.  Let's look at -- let's start looking at Exhibit 26, which

15  is stipulated.

16       MR. PULKRABEK:  I'll move to admit Exhibit 26.

17       THE COURT:  It's admitted.

18    (Plaintiff's Exhibit 26 received.)

19       MR. PULKRABEK:  Thank you, Your Honor.

20  Q.  (By MR. PULKRABEK) Ms. York, Exhibit 26 -- let me back out

21  and see the whole document here -- this first page is a

22  personal financial statement that you submitted to Farmers

23  State Bank on July 1st of 2016; is that correct?  Down below

24  we can see the date?

25  A.  Yes.

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021       111

1    Q.   Okay.   So July 21st, 2016, and that's your signature on

2    the first page of the statement, right?

3    A.   Yes.

4    Q.   Okay.   Then we see the name on this first statement is

5    Elyce York, correct?

6    A.   Yes.

7    Q.   Then if we go further down in this document to the third

8    page, this is a personal financial statement on a U.S. Small

9    Business Administration form as of July 21st, 2016, correct?

10   A.   Yes.

11   Q.   And so in this one we have the name Elyce York we can see

12   there, correct?

13   A.   Yes.

14   Q.   And you list your home address.   We've established you

15   were living at Turkey Creek.   This is a different address?

16   A.   Yes.   This is my parents' address.

17   Q.   Okay.   The business name of the applicant is Lardyn

18   Consulting, LLC, correct?

19   A.   Yes.

20   Q.   Now, as of July 21st, 2016, Lardyn Consulting, LLC did not

21   even exist yet?

22   A.   No.   I don't believe so.

23   Q.   Then further down on this financial statement to the Small

24   Business Administration is listed salary, $120,000.   Do you

25   see that?

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    112

1    A.  Yes.

2    Q.  Now, Jon Pauling helped you fill this out, correct?

3    A.  Yes.

4    Q.  And you put salary, $120,000 on this form.  You were not

5    earning a salary of $120,000?

6    A.  No.

7    Q.  And then you signed and dated this SBA loan application or

8    personal financial statement form on July 21st, 2016.  That's

9    your signature, correct?

10   A.  Yes.

11   Q.  All right.  And you understood the importance of being

12   truthful when you're filling out bank paperwork?

13   A.  I understand that, yes.

14   Q.  Now, after you applied for a loan with Farmers State Bank

15   they did enter into a loan agreement with you and Lardyn

16   Consulting; is that accurate?

17   A.  Yes.

18   Q.  And they loaned you -- at that point in July of 2016, they

19   loaned you $45,000?

20   A.  Yes.

21   Q.  And that $45,000 was used in part to pay a lawyer to set

22   up Lardyn Consulting?

23   A.  Yeah, fees, and then I used some of it to live off of

24   also.

25   Q.  Okay.  That was my next question.  Then the other part of

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021       113

1   the $45,000 was used for your personal living expense?

2   A.  Yes.

3   Q.  To take care of yourself, your son, and now Skylar

4   Pauling, correct?

5   A.  Yes.

6   Q.  In the Turkey Creek house where you were living?

7   A.  Yes.

8   Q.  And separately Jon Pauling never was separately paying you

9   any kind of child support or maintenance?

10  A.  No.  He's not paid child support.

11  Q.  Now, let me ask you a few more questions about Lardyn.

12  The purpose of setting up Lardyn -- let me back up a second.

13  Strike that.  You did eventually set up Lardyn in August of

14  2016, correct?

15  A.  Yes.

16  Q.  That's when the articles of organization and the papers

17  that the lawyer prepared got signed?

18  A.  Right.  I believe so.

19  Q.  And the purpose of setting up Lardyn in August 2016 was to

20  acquire the farm from Two Mile Ranch?

21  A.  Yes.

22  Q.  And Jon Pauling is the one who got all of the financing in

23  place for that?

24  A.  Yes.

25  Q.  All right.  I'd like to now look at Exhibit 32.  Let me

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021      114

1   put this away and bring up Exhibit 32.

2          THE COURT:  It's stipulated, and it's admitted.

3       (Plaintiff's Exhibit 32 received.)

4   Q.  (By MR. PULKRABEK) Okay.  So Exhibit 32, Ms. York, is an

5   e-mail that Steve Stull sent to you on November 8th, 2016,

6   correct?

7   A.  Yes.

8   Q.  We've already heard that Steve Stull is the president and

9   CEO of the bank, and that was your understanding at the time

10  too, correct?

11  A.  Yes.

12  Q.  And the subject here is 2015 tax return.  Do you see that?

13  A.  Yes.

14  Q.  Then if we zoom in a little bit, Mr. Stull wrote to you

15  and said, Elyce, we will need your personal tax return for

16  2015 in order to get Jon a commitment letter on Lardyn

17  Consulting, LLC.  Do you see that?

18  A.  Yes.

19  Q.  So what Mr. Stull was proposing to you at that time was

20  you needed to get your personal tax return for 2015 to the

21  bank, and when you did that, then the bank would send Jon

22  Pauling a commitment letter for Lardyn Consulting?

23  A.  Right.  For me.  The commitment letter would have been to

24  me.  Jon was just helping get it all set up.

25  Q.  Now, let's look at Exhibit 35, which I believe is

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021       115

1   stipulated.  I want to talk --

2           THE COURT:  35 is admitted.

3       (Plaintiff's Exhibit 35 received.)

4           MR. PULKRABEK:  Thank you, Your Honor.

5   Q.  (By MR. PULKRABEK) So Exhibit 35 -- I'll back out here --

6   there are two pages to this.  But Exhibit 35 is an e-mail

7   exchange that you had with Steve Stull at the bank, correct?

8   A.  Yes.

9   Q.  And that is dated December 19th, 2016 --

10  A.  Yes.

11  Q.  -- right?  Okay.  And if we back down the page to see how

12  this started earlier on December 19th, 2016, we see that you

13  had been communicating with Kelly Roach, correct?

14  A.  Yes.

15  Q.  Now, we can see that Ms. Roach forwards your communication

16  to Mr. Stull, Steve Stull, and says, Please see Elyce's

17  response regarding us not having the tax returns.  You see

18  that?

19  A.  Yes.

20  Q.  Okay.  And then Mr. Stull -- I'm going to go through

21  Mr. Stull's e-mail to you and then your response to Mr. Stull,

22  and I'll have some questions about that.  So Mr. Stull writes

23  to you, Elyce, Jon did tell me why you did not have them done,

24  which I understood why you didn't already have them to us, but

25  certainly was not okay with it and told him we'd like them as

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    116

1    soon as possible.  If the current plan is approved and Lardyn

2    is a borrower on the farm, we will have to have them.  We

3    require this of all commercial borrowers.  You see that?

4    A.  Yes.

5    Q.  So even as of December of 2016, Mr. Stull is still trying

6    to get your tax returns?

7    A.  What did you say?  Sorry.  I can't hear you.

8    Q.  Even as of December 19th, 2016, Mr. Stull, Steve Stull at

9    the bank is still asking you for your tax returns for these

10   loans?

11   A.  Yes.

12   Q.  Then he says, When we started this loan I requested the

13   information but helped you out at that time of need with the

14   understanding that we would get the information soon

15   thereafter.  Had I known you haven't done them and weren't

16   going to get them done, I would not have done the original

17   loan.  You see that?

18   A.  Yes.

19   Q.  So Mr. Stull is referring to you not having done your 2015

20   tax returns?

21   A.  Yes.

22   Q.  Then he says, Things have changed because nothing is

23   moving forward as promised or planned, and I have exhausted my

24   good will with my board, and I am now required to start

25   getting more information and have more transparency.  Do you

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    117

1   see that?

2   A.   Yes.

3   Q.   Then he says down here, Jon said with the change last week

4   you would be able to get by.   You understood that Mr. Stull

5   was communicating with Jon Pauling about your loan slash

6   Lardyn's loan, correct?

7   A.   Yes.

8   Q.   So even though the borrower on this loan is you and Lardyn

9   Consulting, it's really the bank talking to Jon about your

10  loan.   You understood that?

11  A.   Yeah, because he was trying to help get it all set up for

12  me.

13  Q.   Okay.   Now, I want to talk about your response to

14  Mr. Stull.   You respond to Steve Stull and you say, Lardyn

15  will not be a part of the entity buying the farm in Turkey

16  Creek.   They decided they wanted more separation.   Do you see

17  that?

18  A.   Yes.

19  Q.   All right.   I want to focus on the statement about more

20  separation.   So, first of all, focusing on the "they" in they

21  wanted more separation, it's your understanding through Jon

22  Pauling that there was at this point in time an investor group

23  that was talking to Jon Pauling about potentially buying the

24  farm; is that right?

25  A.   Yes.

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    118

 1   Q.  And that other investor group was headed by Alan Dill of

 2   the Dill & Dill law firm?

 3   A.  Yes.

 4   Q.  And the Dill & Dill law firm was the same law firm

 5   representing Jon Pauling both in this case and in the Amanda

 6   Wilson versus Jon Pauling case?

 7   A.  Yes.

 8   Q.  And that law firm explained to Jon Pauling that they

 9   didn't want to be part of an investor group that you were a

10   part of?

11   A.  Yes.

12   Q.  Because there was not enough separation between you and

13   Jon Pauling, correct?

14   A.  I would say so.

15   Q.  That was your understanding from Jon Pauling?

16   A.  Well, I mean, I think the biggest thing is they didn't

17   want to be a part of the lawsuit at all, and they didn't want

18   to get drug into court if they were an investor group buying

19   any of the assets.

20   Q.  And you communicated with Steve Stull about this fact that

21   the other investor, the lawyers believed there was a lack of

22   separation?

23   A.  Yes.

24   Q.  Okay.  Now, the next thing I want to focus on -- let me

25   get rid of this exhibit.  So the next thing I want to focus on

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      119

1   is moving forward in time, Lardyn's acquisition of assets.

2   Okay?  So let's look at Exhibit 41, which is I believe

3   stipulated.

4              THE COURT:  41 is admitted.

5        (Plaintiff's Exhibit 41 received.)

6   Q.  (By MR. PULKRABEK) All right.  Ms. York, you can see that

7   Exhibit 41 is a -- it's actually a two-page document, but

8   they're both titled contract to buy and sell minerals.  Do you

9   see that?

10  A.  Yes.

11  Q.  And focusing on this first page here, the first contract

12  to buy and sell minerals is dated February 27th, 2017.  Do you

13  see that?

14  A.  Yes.

15  Q.  And at that time the inserted purchase price was

16  $1,945,000, correct?

17  A.  Correct.

18  Q.  Then we can see that this is -- this is a contract between

19  Two Mile Ranch General Partnership and Lardyn Consulting,

20  right?

21  A.  Yes.

22  Q.  Now, I want to focus on -- we can look at your signature.

23  So you signed this on 2/26/17, accurate?

24  A.  Yes.

25  Q.  And then Jonathan Pauling and Mark Pauling signed this on

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    120

1    2/28/2017, right?

2    A.  Yes.

3    Q.  Now, one of the terms of this contract to buy and sell

4    minerals was this:  The closing date for this contract will

5    immediately follow the date of a pending Two Mile Ranch

6    bankruptcy dismissal.  Do you see that?

7    A.  Yes.

8    Q.  Now, you did not -- you did not personally prepare this

9    contract?

10   A.  No.

11   Q.  You don't know who did?

12   A.  No.

13   Q.  And Jon Pauling and Mark Pauling are the ones who told you

14   you should buy the minerals?

15          MR. KEITHLEY:  Objection, compound, Your Honor.

16          THE COURT:  All right.  Rephrase.

17   Q.  (By MR. PULKRABEK) The question is Jon Pauling -- I can

18   break it into two parts.  Jon Pauling told you to buy the

19   minerals?

20   A.  Yes.

21   Q.  And Mark Pauling told you to buy the minerals?

22   A.  Yes.  I think that is part of if I wanted to buy the farm,

23   I needed to buy the minerals and everything to go along with

24   it.

25   Q.  They are the ones that told you to buy these minerals?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021     121

1    A.   Yes.

2    Q.   Now, at the point in time before Lardyn acquired assets

3    from Two Mile Ranch, there were wells that were going in, but

4    they hadn't started producing yet?

5    A.   Yeah.

6    Q.   And you knew that the wells were going to be producing

7    later that year?

8    A.   Yes.

9    Q.   Jon Pauling told you that the wells were going to start

10   producing later in the year?

11   A.   Yes.  That's what he said.

12   Q.   As to the purchase price amount, whether it's this first

13   one on the first page, 1,945,000, or on the second page where

14   we see 2,220,000, there was no negotiation over that price?

15   A.   No.

16   Q.   And when you say no, I just want to be clear, you're

17   agreeing with me, there was no negotiation?

18   A.   I didn't negotiate the price.

19   Q.   Now, let's look at Exhibit 42.

20        THE COURT:  Admitted.

21      (Plaintiff's Exhibit 42 received.)

22   Q.   (By MR. PULKRABEK) Exhibit 42 starts with -- as you can

23   see, it starts with an e-mail from yourself to Steve Stull at

24   the bank dated March 1st, 2017, with the subject equipment

25   contract.  Do you see that?

1  A.  Yes.

2  Q.  Then we can look at the equipment contract.  Page 2 is an

3  equipment list, and it's only signed at this point by you and

4  Jon Pauling.  Do you see that?

5  A.  Yes.

6  Q.  Then the third page is titled equipment bill of sale and

7  contract.  You see that, correct?

8  A.  Yes.

9  Q.  And the price listed on it at this point in time was

10  $609,000.  You see that?

11  A.  Yes.

12  Q.  And then under additional provisions, same thing we saw

13  with that earlier mineral contract.  It says the closing date

14  for this contract will be immediately following the date of a

15  pending Two Mile Ranch bankruptcy dismissal.  You see that?

16  A.  Yes.

17  Q.  So the agreement that was reached between you and Jon

18  Pauling and Mark Pauling was that you would buy these assets,

19  and that they would dismiss the bankruptcy so that you could

20  buy the assets after the bankruptcy was dismissed?

21  A.  I really don't know why they had to wait for the

22  bankruptcy to be up for me to buy them, so I can't really

23  answer that exactly.  But, yes, that is what I agreed to do is

24  buy it once the bankruptcy was dismissed.

25  Q.  Now, do you know whether the motion to dismiss the

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    123

1   bankruptcy had even been filed yet as of the date signed here,

2   February 27th, 2017?

3   A.  I have no idea.

4   Q.  Okay.  And you didn't prepare this bill of sale?

5   A.  No.

6   Q.  And you didn't do any investigation into the equipment

7   that Lardyn was going to be acquiring from Two Mile Ranch?

8   A.  I did not.  There was an appraisal done on it, so I just

9   used the appraisal.

10  Q.  Now, let's look at Exhibit 43.  Also stipulated, I

11  believe.

12          THE COURT:  Admitted.

13      (Plaintiff's Exhibit 43 received.)

14  Q.  (By MR. PULKRABEK) Okay.  Here we have a contract to buy

15  and sell real estate, parens, land with the buyer Lardyn

16  Consulting, LLC, and the seller Two Mile Ranch General

17  Partnership dated February 27th, 2017, right?

18  A.  Yes.

19  Q.  And if we want to skip all the way to the end of this, we

20  can see your signature, Jon Pauling's signature, and Mark

21  Pauling's signature all on February 28th, 2017, correct?

22  A.  Yes.

23  Q.  All right.  Now, I want to go to the second-to-last page

24  of this exhibit, and there are some additional provisions and

25  attachments to this contract, and I want to ask you about a

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2     04/12/2021    124

1   couple of these.  So one of them -- one of the particular

2   terms that got written into this is paragraph 3, lender,

3   buyers, and sellers agree that any judgment of record or

4   unrecorded will in no way cloud or affect transfer of clear

5   title to the buyers.  Do you see that?

6   A.  Yes.

7   Q.  So as part of this contract there was concern on some

8   level over Amanda Wilson's judgment; is that right?

9   A.  I didn't have concern.  I guess I didn't -- I haven't seen

10  this contract in a long time, so, I mean, I would say there

11  was concern by them, yeah.

12  Q.  And did you draft this contract?

13  A.  No.

14  Q.  Did you have anybody draft it for you?

15  A.  No.  I think this is just a -- can you go back to the top?

16  Q.  Do you know -- do you know who drafted this contract?

17  A.  I do not.

18  Q.  All right.  In paragraph 6 there's another term.  It says

19  exact date of closing will be determined at the time of the

20  bankruptcy dismissal.  Do you see that?

21  A.  Yes.

22  Q.  So, once again, we see that Two Mile Ranch was in

23  bankruptcy.  You, Mark Pauling, and Jon Pauling all entered

24  into an agreement that the bankruptcy would be dismissed and

25  the purchase would occur after the dismissal?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    125

1   A.  Yes.

2   Q.  We talked a little bit about a term called due diligence

3   during your deposition.  Do you remember that?

4   A.  Yes, I do.

5   Q.  And you didn't do any due diligence before signing this

6   contract to acquire the farm from Two Mile Ranch?

7   A.  I did not.

8   Q.  We're done with Exhibit 43.  Now, I want to focus on some

9   balance sheets that you -- that bear your signature here, so I

10  want to go to Exhibit 52, which I believe is stipulated.

11          THE COURT:  It doesn't show that it's stipulated,

12  no.

13          MR. PULKRABEK:  Okay.

14          MS. OLDEMEYER:  Your Honor, I have no objection to

15  Exhibit 52.

16          THE COURT:  How about the other two?

17          MR. FORBES:  Sorry, Your Honor.  I need to get it

18  down.  There's a lot of notebooks.  Your Honor, I object to

19  page number FSB006037 to the extent it's being offered to

20  show the value of assets that were transferred because this

21  is not a qualified expert opinion, and -- yes, for the same

22  reason I object to page FSB006029, again, because it's

23  derived from the statement of asset values that have not

24  been qualified as expert opinion.

25          MR. KEITHLEY:  No objection by Mark Pauling and Two

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/12/2021    126

1    Mile Ranch.

2            THE COURT:  All right.  Two of the parties --

3    defendants do not object.  The Lardyn defendant does object.

4    The Court overrules the objection.  Exhibit 52 is admitted.

5         (Plaintiff's Exhibit 52 received.)

6    Q.  (By MR. PULKRABEK) All right.  So, Ms. York, I'm just

7    going back to the first page of this document here.  What you

8    can see is it's an e-mail from Joe Henry who you know to be

9    Jon Pauling, correct?

10   A.  Yes.

11   Q.  And it is being sent on April 21st, 2017, to Steve Stull

12   with a copy to Dick Stull.  The subject on this is loan docs.

13   Do you see all that?

14   A.  Yes, I do.

15   Q.  Okay.  And then there are a number of attachments.

16   A.  Yes.

17   Q.  And Jon Pauling writes, Steve and Dick, attached are the

18   documents that you requested in your commitment letter.  It

19   goes on to talk about insurance policies and extending the

20   loan commitment.  Do you see that?

21   A.  Yes.

22   Q.  And then he signs this, Thanks, Jon?

23   A.  Yes.

24   Q.  This might be the first Joe Henry e-mail that we looked at

25   so far in this trial, but this -- sometimes it's signed by Jon

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021        127

1   Pauling, sometimes they're not, right?

2          MR. FORBES:  Object to the initial comment, Your

3   Honor.  It's not part of the question.

4          THE COURT:  Overruled.  But I'd like to ask you,

5   Ms. York, who is Joe Henry?  Where does that come from?

6          THE WITNESS:  I have no idea.

7          THE COURT:  Does that strike you as an alias?

8          THE WITNESS:  Well, yeah.

9          THE COURT:  Me too.

10          THE WITNESS:  But then he signs it as Jon, so I

11   don't really understand why he put Joe Henry up there and

12   signs Jon Pauling here.

13          THE COURT:  I don't get it either.  It's a mystery.

14   Q.  (By MR. PULKRABEK) Okay.  Let's look at some of the

15   attachments to this e-mail.  So if we go to page 3 of this

16   Exhibit 52, we can see that this is a balance sheet that bears

17   your signature on it.  Do you see that?

18   A.  Yes.

19   Q.  And so just to kind of go through this, I might want to at

20   this point write some things up on the board if I can find

21   myself a pen.

22          MR. PULKRABEK:  Your Honor, do you mind if I grab a

23   pen from the whiteboard over there?

24          THE COURT:  No, I don't mind.

25   Q.  (By MR. PULKRABEK) So, Ms. York, we'll just go through

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    128

1  this slowly.  What we see is your name at the top, and then

2  it's got the date 3/15/2017.  Do you see that?

3  A.  Yes.

4  Q.  And one of the items under here that I've highlighted,

5  $70,000 for investments, do you see that?

6  A.  Yes.

7  Q.  You don't recall having $70,000 in investments, do you?

8  A.  No.  I just think that's possibly the household furniture

9  and the vehicle.

10 Q.  Okay.  Well, you do have a separate line for household

11 furniture and vehicles up here.

12 A.  Right.

13 Q.  You see that?

14 A.  Yeah.  And that's the total of those two added together,

15 but that would be --

16 Q.  Okay.

17 A.  A lot of these usually have schedules with them that will

18 describe to you exactly the breakdown of what they are, but I

19 don't think that you had those in here.

20 Q.  All right.  Now, just kind of focusing more on my question

21 on investments, you didn't have any stocks?

22 A.  No.

23 Q.  You didn't have any bonds?

24 A.  No.

25 Q.  You didn't have retirement accounts?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021        129

1   A.   No.

2   Q.   Okay.  In any event, this page shows your net worth as of

3   3/15/2017 to be 125,420.  Do I have that right?

4   A.   Yes.

5   Q.   Okay.  So I'm going to write that up on this board just so

6   we can keep track of this.  So 3/15/2017 was 125,420, right?

7   A.   Yes.

8   Q.   Okay.  And you and Jon Pauling put this balance sheet

9   together, right?

10  A.   Yeah, he helped me.

11  Q.   Okay.  And then going to the next page here, we see that

12  there is a balance sheet bearing the date 5/1/2017.  You see

13  that?

14  A.   Yes.

15  Q.   And you also signed that balance sheet -- you signed it on

16  4/21/2017.  You see that?

17  A.   Yes.

18  Q.   And that's your signature, right?

19  A.   Yes.

20  Q.   And you and Jon Pauling prepared this balance sheet

21  together as well, correct?

22  A.   Yes.

23  Q.   Now, this balance sheet is forward looking to May 1st,

24  2017, correct?

25  A.   Right.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 2      04/12/2021    130

1   Q.  And so this is before -- you're signing this before the

2   transfer of assets, but it's looking to what your balance will

3   be after the transfer of assets, correct?

4   A.  Correct.

5   Q.  Because we know that the assets were transferred on

6   April 27th of 2017, right?

7   A.  Yeah, I believe so.

8   Q.  Okay.  So looking forward, as of 5/1/2017 your net worth

9   was going to be $1,739,211, right?

10  A.  Right.

11  Q.  So let's put that up here.  5/1/2017, 1,739,211.  Okay.

12  Now, as part of this balance sheet the big asset is under

13  investments, Lardyn, 85 percent.  You see that?

14  A.  Yes.

15  Q.  And so what you and Jon Pauling working through this

16  together determined was that after Lardyn Consulting acquired

17  assets from Two Mile Ranch your net worth was going to be

18  $1,739,211, correct?

19  A.  Yes.  This -- yeah, he helped me on doing a lot of these

20  in the beginning because I didn't really know how to do it, so

21  I believe that amount came from like everything combined, oil

22  and gas and just over a certain amount of years what you'd

23  make off your oil and gas and things like that.  But like I

24  said, it doesn't have the schedule with it to be able to tell

25  exactly what.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021      131

1    Q.  What you and Jon Pauling discussed when you put these two

2    different balance sheets together, the one we saw on the

3    previous page, 3/15/2017, and the next one dated 5/1/2017,

4    what you and he discussed was that your net worth was going to

5    go from that 125,400 figure to this $1,739,000 figure simply

6    by virtue of Lardyn acquiring these assets from Two Mile

7    Ranch?

8    A.  Yeah.  I think that's what he said would happen.

9    Q.  Now, let's look at page 12 of this PDF.  The Bates number

10   on it we can see is FSB6037.  This is a balance sheet for

11   Lardyn, LLC as of May 1st, 2017, correct?

12   A.  Correct.

13   Q.  And you provided that with your signature?

14   A.  Yes.

15   Q.  Dated 4/21/17, correct?

16   A.  Yes.

17   Q.  And you were providing this information to the bank in

18   anticipation of Lardyn acquiring the assets, correct?

19   A.  Right.

20   Q.  You knew the bank had asked for this information?

21   A.  Yes.

22   Q.  And you understood that there was going to be an actual

23   transaction of assets between Two Mile Ranch and Lardyn on the

24   basis of information you provided to the bank?

25   A.  Yes.

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    132

1    Q.  And these values that are listed on your personal balance

2    sheet and on the Lardyn balance sheet, that's part of the

3    basis for the transaction, correct?

4    A.  I have no idea.

5    Q.  Now, you -- on this particular balance sheet you got these

6    asset values from Jon Pauling; is that right?

7    A.  Yes.  And I actually went back and asked him after

8    deposition what -- you know, because I don't know where he got

9    some of the numbers from, and he said with the oil and the gas

10   and the minerals what he was doing was looking at it from an

11   operator standpoint, not a royalty holder standpoint.  And he

12   said operator standpoint, you look at the total reserves of

13   the oil that's under the land.  You can take it over a 13-year

14   period and show that that's what you can make off of it.

15   While that should not have been on there as accurate because

16   that's not what you do use, it should have just been royalty

17   amount on there, not an operator amount.

18   Q.  All right.  First point, and then I'll follow up on what

19   you just said, but the first point is -- you know, my more

20   narrow question to you is you got these values from Jon

21   Pauling?

22   A.  Yeah.

23   Q.  Okay.  Now, I'll go ahead and follow up on what you just

24   said.  It sounds like Mr. Pauling did some research into

25   different valuations, operator values and things like that; is

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    133

1   that right?

2   A.  Yeah.

3   Q.  And Mr. Pauling had owned these mineral rights -- or Two

4   Mile Ranch had owned these mineral rights for quite some time

5   you understood?

6   A.  Right, the royalties.

7   Q.  And, in fact, they had already been receiving royalties on

8   two wells that were drilled on the property for quite some

9   time, right?

10          MR. KEITHLEY:  Objection, foundation.

11          THE COURT:  Sustained.

12  Q.  (By MR. PULKRABEK) Okay.  Do you know that Two Mile Ranch

13  had been -- had two wells already on the property?

14  A.  Well, I didn't know until I saw, like, the appraisal with

15  the two wells and stuff in there.  I don't know how long

16  they've been getting paid off of them.

17  Q.  Okay.  But Jon Pauling had put together some sort of an

18  analysis, and he provided you with the data.  Is that the

19  upshot of it?

20  A.  Yeah.

21  Q.  Okay.  Now, on this particular balance sheet that you

22  signed off on provided to the bank, there are different asset

23  values that I want to focus on.  So starting off there is

24  values for alfalfa for $10,000.  Do you see that?

25  A.  Yes.

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    134

1   Q.   Corn for 80,250, correct?

2   A.   Yes.

3   Q.   Silage for $125,000, correct?

4   A.   Yes.

5   Q.   And that's all stuff that Jon Pauling was intimately

6   familiar with at that time, right?

7   A.   Yes.

8   Q.   Okay.  So Jon Pauling certainly would be expected to know

9   from what you know of him how much alfalfa, corn, and silage

10  he had?

11  A.   Right.

12  Q.   Okay.  Now, going down to the next lines -- well, first

13  let's add this up.  It adds up to about $215,000; is that

14  right?

15  A.   Where at?  That one?

16  Q.   Yeah.  $10,000 plus $80,000 plus $125,000, that's 215,000?

17  A.   Yes.

18  Q.   Okay.  So when we see other values of alfalfa, corn, and

19  silage that might be earlier, this is the one you and Jon

20  Pauling actually sat down and said, Okay, after the transfer

21  it's going to be $215,000 of feed?

22  A.   Yeah, that's what he said.

23  Q.   Okay.  Now, intermediate assets was machinery, equipment,

24  vehicles, totaling $650,000.  You see that?

25  A.   Yes.

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021     135

1    Q.  Okay.  Those are all -- that's all machinery, equipment,

2    vehicles that Jon Pauling and Mark Pauling owned through Two

3    Mile Ranch?

4    A.  Honestly, I don't remember exactly what he put all in

5    there.  The -- I would say, yeah, that would be for the

6    equipment lists that we had just looked at.

7    Q.  All right.  And did you really know what you were buying

8    or did you just kind of do what Jon Pauling suggested and buy

9    these particular assets?

10   A.  Honestly, I just wanted to own a farm, so I took the

11   appraised values on these and just went with it.

12   Q.  All right.

13   A.  I should have done more work and looked into everything

14   further.

15   Q.  Next line item here is land, $4,500,000.  You see that?

16   A.  Yeah.

17   Q.  Okay.  And do you have an understanding of how long Two

18   Mile Ranch had owned this land?

19   A.  No, I do not.

20   Q.  All right.  One of the things you got with the land when

21   you bought it were -- you got the irrigation equipment, right?

22   A.  Yes.

23   Q.  You also got water rights; is that right?

24   A.  Yes.

25   Q.  Okay.  So it wasn't just strictly speaking land only?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    136

1   A.   No.   It was all combined in the one loan.

2   Q.   And the value that Jon Pauling told you and that you

3   accepted on this balance sheet was $4.5 million for the land?

4   A.   Yes.

5   Q.   All right.   And then under minerals rights there are two

6   things listed here.   There's the production, and that has the

7   number $2,301,120?

8   A.   Uh-huh, yes.

9   Q.   That's a fairly specific number, correct?

10  A.   Yes.

11  Q.   Okay.   And so you understood that the production, that's

12  the acreage that has wells on it that is going to produce

13  royalties.

14  A.   The production means it's the ones that will have wells on

15  them.   They didn't have wells on them during this time.   They

16  only had the two that were producing.   So I would assume just

17  going off past numbers and everything that was a number that

18  he came up with if there was a certain amount of wells that

19  came into production later on.

20  Q.   And then there was next to this this word rights.   There

21  is $1,100,000.   You understood -- or did you understand -- you

22  tell us -- do you know what that was about?

23  A.   The 1.1 I believe was for -- I thought was for the

24  appraised producing mineral acres, and then the other portion

25  would have been the unleased acres is what my impression was.

Sarah K. Mitchell, RPR, CRR

1   Q.  Okay.  So you didn't really know which one was which?

2   A.  Well, production would be -- that's the mineral rights,

3   and then the oil, and I believe -- somehow.  I guess not

4   fully.

5   Q.  Okay.  Regardless, these are the values that Jon Pauling

6   gave you, and you accepted them and put them on the balance

7   sheet that you signed?

8   A.  Yes.

9   Q.  Now, did you do any due diligence into the oil and gas

10  that Lardyn was acquiring?

11  A.  I did not.

12  Q.  And at the time that Lardyn acquired the assets from Two

13  Mile Ranch, did it have any assets?

14  A.  Can you repeat the question, please?

15  Q.  Yes.  At the time that Lardyn acquired assets from Two

16  Mile Ranch, did it have any assets before that?

17  A.  Did Lardyn have any assets?

18  Q.  Right.

19  A.  No.

20  Q.  Okay.  Now, I want to change gears and talk to you about

21  your communications with Farmers State Bank before closing on

22  this loan, okay?  Now, first of all, am I correct that you did

23  not meet Dick Stull until closing time when Lardyn acquired

24  the farm?

25  A.  Right.  I don't think so.  I think I only met with Steve

19-CV-01224-RBJ     Bench Trial - Day 2     04/12/2021   138

1   before then, if I remember right.

2   Q.  And then you think you probably met with Steve Stull for

3   the first time in 2017?

4   A.  No.  That would have been '16.

5   Q.  Okay.  You met him at the bank in Bridgeport?

6   A.  Yes.

7   Q.  Nebraska?

8   A.  Yes.  Bridgeport, Nebraska.

9   Q.  You went there with Jon Pauling?

10  A.  Yes.

11  Q.  And you had the baby Skylar Pauling with you in the

12  stroller?

13  A.  Yeah.

14  Q.  And that meeting lasted between 45 minutes to an hour?

15  A.  Probably around that.

16  Q.  As between you and Jon Pauling, Jon Pauling did most of

17  the talking?

18  A.  Yeah, I would say so.

19  Q.  You don't remember Steve Stull asking you any questions

20  about your employment history?

21  A.  Not that I remember, no.

22  Q.  And you had never raised cattle?

23  A.  No, I had not.

24  Q.  And you didn't have any experience growing crops?

25  A.  No.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    139

1   Q.  You didn't tell Steve Stull that you had any background in

2   ranching?

3   A.  No.

4   Q.  Or feedlot operations?

5   A.  No.

6   Q.  Or farming?

7   A.  No.

8   Q.  Or in accounting?

9   A.  No.

10  Q.  Or bookkeeping?

11  A.  No.

12  Q.  Or business administration?

13  A.  No.

14  Q.  And you didn't have experience in those things?

15  A.  No, I did not.

16  Q.  You said nothing to Steve Stull that would suggest to

17  someone else that you personally had a background in

18  agriculture, did you?

19  A.  No.  I mean, I probably said I grew up in a farming

20  community, but I didn't ever personally work in agriculture.

21  Q.  Now, Steve Stull told you that Farmers State Bank would

22  not finance Lardyn unless you found people who would be part

23  of it, and it wasn't just going to be you alone?

24  A.  Yes.

25  Q.  And during the meeting you talked about Mark Pauling being

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    140

1   your partner in Lardyn?

2   A.  Yes.

3   Q.  And ultimately Mark Pauling had a 15 percent interest in

4   Lardyn?

5   A.  Yes.

6   Q.  But you did not negotiate with Mark Pauling over

7   15 percent versus some other percentage?

8   A.  No.  I can't really remember where the 15 percent came up.

9   He had an employment contract also where he was paid monthly

10  to work there, but I don't remember the 15 percent and why

11  that number was chosen.

12  Q.  And you can't recall who came up with 15 percent for Mark

13  Pauling's percentage?

14  A.  I cannot.

15  Q.  Just a quick question I may have forgotten to ask about

16  Lardyn, but Lardyn is actually named in part after Skylar

17  Pauling; is that right?

18  A.  Yes.  I took the L-A-R out of Skylar's name and the D-Y-N

19  out of my son Bradyn's name and put them together and made

20  Lardyn.  That's how I came up with the name.

21  Q.  I want to look at Exhibit 56, and that is stipulated.

22          THE COURT:  56 is admitted.

23      (Plaintiff's Exhibit 56 received.)

24  Q.  (By MR. PULKRABEK) Exhibit 56 is the settlement statement

25  for when Lardyn closed on the asset acquisition from Two Mile

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    141

1    Ranch, correct?

2    A.  Correct.

3    Q.  And if we go down, that's your signature you see there,

4    correct?

5    A.  Yes.

6    Q.  You recognize Mark Pauling and Jon Pauling's signatures?

7    A.  Correct.

8    Q.  All right.  So if we go back up in terms of the values

9    that were paid at closing, there was $4.27 million, $4,270,000

10   paid for the land?

11   A.  The farm.

12   Q.  That's for the farm?

13   A.  Yeah.  That's for that property.

14   Q.  Just a moment ago we had looked at the Lardyn balance

15   sheet that indicated the farm would have a value of

16   $4.5 million just a few days after the settlement statement,

17   correct?

18   A.  Right.  And as you can see on there, Jon inflated a lot of

19   numbers that weren't correct, so...

20   Q.  Yes.  And you signed it?

21   A.  Yeah.

22   Q.  Okay.  Now, the Weld County minerals on here, you paid --

23   or Lardyn paid, I should say, $2,220,000.  That's the same

24   that we saw on that second contract, correct?

25   A.  For the oil and gas and the minerals.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    142

1   Q.  Right.  That's what was paid for the oil and the gas and

2   the minerals.  Okay.  And then separately you paid for the

3   equipment, but that's not showing up on this settlement

4   statement; is that right?

5   A.  It's not.  There's a separate bill of sale for that.

6   Q.  Just in terms of the expense to go through this exercise,

7   there was a -- there were settlement charges paid by Two Mile

8   Ranch of $48,803, correct?

9   A.  I don't know if that was paid by -- by Two Mile Ranch or

10  if that's what came out of the total $7.1 million loan.  I

11  think that was a part of that $7.1 million loan, the closing

12  costs and everything.

13  Q.  All right.  The -- going back and looking at this, we

14  talked a little bit about crops, and there's no line item here

15  for crops, correct?

16  A.  Correct.

17  Q.  And there's no line item here for water rights, is there?

18  A.  No.  Those were included in the sale.

19  Q.  My point is there's no separate line for --

20  A.  No, there's not.

21  Q.  Let's go ahead now -- well, let me just ask you.  Lardyn

22  basically had $0 in its bank account at the time that it

23  acquired these assets; is that true?

24  A.  Yeah.

25  Q.  Okay.  And Lardyn did not come out of pocket in any way,

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2     04/12/2021     143

 1   shape, or form to acquire these assets in the sense of putting

 2   in its own equity?

 3   A.  No, it didn't.  I had Mark get a loan in the beginning

 4   after this was done to be able to buy corn seed and everything

 5   to be able to plant crops and stuff like that, but...

 6   Q.  All the money to buy these assets actually came from

 7   Farmers State Bank?

 8   A.  Yeah.

 9   Q.  And then you understood that Farmers State Bank was just

10   taking that money and was going to pay down Two Mile?

11   A.  I didn't know exactly what they were doing with it.

12   Q.  Okay.  Now, after -- after this closing on April 27th,

13   2017, you continued to live at the North Turkey Creek property

14   in Morrison, Colorado?

15   A.  Yeah.

16   Q.  And, in fact, you had your son enrolled in an elementary

17   school just up the road?

18   A.  Yeah.

19   Q.  So on a day-to-day basis you were taking your son to

20   elementary school, coming back to the Turkey Creek house and

21   taking care of Skylar Pauling?

22   A.  When this all closed, that was right at the beginning of

23   summer, so I was up at the farm most of the time, and I stayed

24   at the farm.  There's three houses on there.  And once school

25   started for him in the fall, I could really only go up there

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021     144

1    if he had days off or the weekends.

2    Q.  And you didn't move out of the Turkey Creek house until

3    May 2018 when your son finished his school year?

4    A.  Yeah.

5    Q.  So you close in April of 2017.  You eventually move out of

6    the Turkey Creek house a little more than a year later?

7    A.  Yes.

8    Q.  And the Turkey Creek house is about two hours from the

9    farm in Sterling?

10   A.  Yeah.

11   Q.  So it's too far to be doing any kind of daily commute?

12   A.  That's not true at all.  There is many times I went up

13   there daily.  Yeah, it's a long time in the car, but my kids

14   have -- they're used to it.

15   Q.  And you couldn't do it during the school year when your

16   son is in kindergarten, though.  You would agree with that?

17   A.  No.  Just on the weekends usually, or if he had holidays

18   or teacher in-service days, then I was there.

19   Q.  Now, I want to shift gears a little bit and talk about

20   some sales of interest in Lardyn Consulting that occurred

21   after this transfer of assets, okay?

22   A.  Okay.

23   Q.  One sale that occurred was you sold -- you took -- you had

24   an 85 percent interest in Lardyn, and you took three percent

25   of that, and you sold it to Pauling Hauling?

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    145

1    A.   Yes.

2    Q.   And Pauling Hauling is Paul Pauling and Lori Pauling?

3    A.   Yes.

4    Q.   Paul Pauling being one of Jon Pauling and Mark Pauling's

5    brothers?

6    A.   Yes.  And then when he got divorced, she got out of it,

7    and it was just him on there.

8    Q.   All right.  So that sale, that took your 85 percent down

9    to 82 percent.  Now, Paul Pauling through Pauling Hauling

10   owned three percent?

11   A.   Yes.

12   Q.   And you sold the three percent to him for $60,000?

13        MR. FORBES:  Your Honor, I'm going to object to the

14   relevance of the transaction.  The question in the case

15   doesn't involve the value that somebody placed on this

16   entity Lardyn at some indeterminate time after the

17   transaction, so I don't think it's probative of the issues

18   in this case.

19        MR. PULKRABEK:  Well, Your Honor, I completely

20   disagree.  We've got multiple data points and financial data

21   points in this case you're going to see that point to the

22   value of Lardyn.  And they want to say there's no equity

23   that was ever transferred in Lardyn, yet we have actual

24   deals and sales occurring shortly after this transfer that

25   are reflective of the equity in Lardyn.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    146

1           MR. FORBES:  Your Honor, this is not a case

2    involving the equity in Lardyn.  This is a case involving

3    the value of the assets of Two Mile Ranch on 4/27/17.

4    Lardyn --

5           THE COURT:  Thank you.  Objection overruled.

6           MR. PULKRABEK:  Thank you, Your Honor.

7    Q.  (By MR. PULKRABEK) All right.  So you sold the three

8    percent for $60,000?

9    A.  Yes.

10   Q.  Okay.  And then there was a subsequent sale to Cherry

11   Creek Cattle Company.  It was two percent of your interest,

12   right?

13   A.  Yes.

14   Q.  So you took two percent, that reduced you from 82 percent

15   to 80 percent --

16   A.  Yes.

17   Q.  -- right?  And you sold that for $40,000?

18          MR. FORBES:  Your Honor, I apologize for

19   interrupting.  I need to make a record.  I object on the

20   same grounds of relevance.

21          THE COURT:  All right.  Overruled.

22   A.  Yes.

23   Q.  (By MR. PULKRABEK) Okay.  So that was $20,000 per

24   percentage point that you were selling Lardyn?

25   A.  Yeah, that's what I did.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    147

1   Q.   So you add up 20 times 100, that's $2 million, right?

2   A.   Right.

3   Q.   Okay.   Now, Cherry Creek Cattle Company is owned by Brian

4   Bates, right?

5   A.   Yes.

6   Q.   Brian Bates was one of Jon Pauling's attorneys?

7   A.   Yes.

8   Q.   Brian Bates also did legal work for Two Mile Ranch?

9   A.   I don't know.   I believe so.

10   Q.   Let's talk about Exhibit 64, and this is stipulated.

11          THE COURT:   It's admitted.

12      (Plaintiff's Exhibit 64 received.)

13   Q.   (By MR. PULKRABEK) So, Ms. York, as you can see from

14   Exhibit 54, this is an e-mail from the address

15   LardynConsulting@gmail.com and actually shows up as Lardyn

16   Consulting, correct?

17   A.   Yes.

18   Q.   And it's dated December 4, 2017, sent to Steve Stull at

19   the bank, subject financials, correct?

20   A.   Yes.

21   Q.   All right.   And so just to put it in context, December 4,

22   2017, is now somewhere between seven and eight months after

23   Lardyn Consulting has acquired assets from Two Mile Ranch?

24   A.   Yes.

25   Q.   And if we look at who signed the e-mail, this is an e-mail

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    148

1   actually being sent by Jon Pauling?

2   A.  Yes.

3   Q.  So after Lardyn acquired these assets, Jon Pauling starts

4   using the e-mail address LardynConsulting@gmail.com?

5   A.  Yeah, if there's things that needed to be sent, I would

6   let him use it.

7   Q.  And so Jon Pauling was using the Lardyn Consulting e-mail

8   address to send information about Lardyn's business with your

9   knowledge and consent?

10  A.  Yes.

11  Q.  You were fully on board with that?

12  A.  Yeah, I thought that was okay.  It wasn't an issue.

13  Q.  Okay.  And so when you would send e-mail, generally you

14  would use your ElyceYork@gmail.com e-mail address, correct?

15  A.  When I -- a lot of times with the bank, yes.  But I used

16  Lardyn also.

17  Q.  Now, Jon Pauling writes in this e-mail, Steve, attached

18  are the financials you requested last week.  I also attached

19  an income statement for Lardyn through the end of November.

20  Do you see that?

21  A.  Yes.

22  Q.  And then further down he says, I am currently working with

23  the owners of 1280 Royalties to purchase mineral rights and

24  cattle feeding.  Do you see that?

25  A.  Right.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2     04/12/2021    149

1   Q.  He doesn't say Elyce and I.  He just says I?

2   A.  Right.

3   Q.  Then a little further down he says, The Lardyn financials

4   are what I will be showing First Central Bank in McCook.  You

5   see that?

6   A.  Yes.

7   Q.  No mention of you doing that with him?

8   A.  No.

9   Q.  And, in fact, I don't see your name showing up on this

10  first page at all.

11  A.  No.  Not in this e-mail.

12  Q.  Okay.  Now, if we look at the fourth page of this

13  particular document, which you can see that's got the Bates

14  number 4143, this is another Lardyn Consulting balance sheet

15  that Jon Pauling was forwarding to the bank, correct?

16  A.  Looks like it, but none of these were even signed, so...

17  Q.  This one isn't signed?

18  A.  Yeah, this one isn't signed, so I don't --

19  Q.  But Jon Pauling is the one that is providing this

20  information to the bank?

21  A.  Yes, it looks like he did.

22  Q.  Okay.  And then on the next page Mr. Pauling was also

23  providing cash flows to the bank for Lardyn Consulting?

24  A.  Yeah.  I wasn't quite sure how to do cash flows and stuff

25  still, so he was helping me learn how to do cash flows.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    150

1   Q.  Okay.  Just to kind of unpack that, when you bought

2   through Lardyn Consulting in your name -- when you acquired

3   these assets, you didn't know how to do any of this stuff?

4   A.  I did not.  But I have been learning over the last time

5   I've been doing it.

6   Q.  And to the extent that you've been learning, it's been Jon

7   Pauling teaching you?

8   A.  Not always.  I have an Excel program that you can go

9   through and add stuff in, and it will do all the math and

10  things like that.  So, yeah, most of the time it was him

11  teaching me.

12  Q.  And if we go down to 4154 in this document, here's -- now

13  we see a company called Redtail Resources, LLC.  You see that?

14  A.  Yes.

15  Q.  So kind of the tail end of 2017, that's when Redtail

16  Resources gets talked about; is that right?

17  A.  I believe so, yeah.

18  Q.  We'll look into it a little bit more, but the basic gist

19  of Redtail Resources is it acquired the mineral rights from

20  Lardyn?

21  A.  Yeah.  Just so the farm could be on one and the oil,

22  mineral, and gas could just be a separate company on another.

23  Q.  All right.  Now, in this particular e-mail that we're

24  looking at right now, Exhibit 64, Jon Pauling has attached a

25  balance sheet for Redtail Resources dated 1/1/2018.  Do you

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    151

1   see that?

2   A.   Yes.

3   Q.   And on this balance sheet Jon Pauling is saying that the

4   producing acres, the value is $2,623,140?

5   A.   Right.  And that's on if you add 24 wells in production

6   out of 29 that were totaled, and like I stated before, this

7   was more an operator side, not a royalty side.  So if you're

8   an operator, it would be worth a lot more money side than just

9   being a royalty.  So he did an evaluation to -- like I said,

10  on the operator side to see what all the reserves were

11  underneath the land around there going off the producing wells

12  there and came up with a number that you would have as an

13  operator, not as a royalty holder.

14  Q.   This is -- this is the number that your company, Lardyn

15  Consulting, this is the number that your company was providing

16  to the bank on this day?

17  A.   Right.

18  Q.   Okay.  And then also the $1,100 for the mineral acres that

19  didn't have wells on it?

20  A.   Right.  But I believe that was something that Jon and

21  Steve were working on.  I really have no idea to see why they

22  were looking to see the valuation of it as an operator rather

23  than as a royalty holder, so...

24  Q.   Well --

25  A.   I think it was just to look to see over time what you

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    152

1    could get paid off the oil that's in the ground if all the

2    wells were producing.

3    Q.  Jon Pauling is doing all this stuff with the bank, and

4    you're not directly involved, right?

5    A.  What did you say?

6    Q.  Jon Pauling is doing all this banking stuff, the financial

7    stuff with the bank, and you're not the one that's directly

8    involved in overseeing it?

9    A.  No, not a lot of this stuff on the oil and stuff.  I just

10   wanted to sell the stuff right away.  I didn't understand the

11   oil and the gas and the minerals, and I still would like to

12   sell it, but it's not going to happen.  They're not worth

13   anything right now, so...

14   Q.  I want to talk to you about the transfer then of these

15   minerals into -- from Lardyn into Redtail Resources.

16   A.  Might I add, if you go back and look at that last

17   document, you can see on there it shows the net worth of those

18   only being 400-and-whatever-some thousand dollars.  So if that

19   explains further on, you know, the numbers would be over like

20   a 13-year period.

21   Q.  Your lawyers will have an opportunity to ask you

22   questions.

23   A.  Okay.

24   Q.  Okay.  All right.  Let's talk about the transfer of the

25   assets into Redtail Resources from Lardyn Consulting.  Do you

19-CV-01224-RBJ       Bench Trial - Day 2      04/12/2021    153

1   recall there were two documents that were signed to effectuate

2   that transfer?

3   A.  I don't remember.

4   Q.  All right.  Let's go ahead and look at them.  One is

5   Exhibit 79.  Exhibit 79 --

6          THE COURT:  79 is admitted.

7      (Plaintiff's Exhibit 79 received.)

8   Q.  (By MR. PULKRABEK) Okay.  So Exhibit 79 is called the

9   assumption agreement?

10  A.  Okay.

11  Q.  And if we want to look down towards the end of it, we can

12  see that you signed it on behalf of Lardyn Consulting?

13  A.  Yes.

14  Q.  And you signed it on behalf of Redtail Resources?

15  A.  Yes.

16  Q.  And you signed it on behalf of yourself as a member?

17  A.  Yeah, as a managing member.

18  Q.  Okay.  No question these are your signatures here?

19  A.  No.

20  Q.  Okay.  So let's go back up and look at it.  And the

21  assumption agreement says it's entered into March 27th, 2018,

22  by and among Farmers State Bank, Bridgeport.  So you

23  understood that Farmers State was actually a party to this

24  agreement?

25  A.  Agreeing to allow the separation between the two or what

                 Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021     154

1    are you saying?

2    Q.  Did you understand that Farmers State Bank was a party to

3    this agreement?

4    A.  Yes.

5    Q.  Okay.  And then the other parties are Lardyn Consulting,

6    Redtail Resources, yourself, Pauling Hauling, and Cherry Creek

7    Cattle Company, correct?

8    A.  Yes.

9    Q.  The legal effect of this agreement we'll go through in

10   detail later.  I want to look at the other agreement, which is

11   Exhibit 80.  I've got more questions for you on that one.  So

12   80 is stipulated.

13          THE COURT:  Yes.  It's admitted.

14      (Plaintiff's Exhibit 80 received.)

15   Q.  (By MR. PULKRABEK) So I'm going to walk you through this

16   one.  This one is called contribution and assumption

17   agreement, and this is between Lardyn Consulting, Redtail

18   Resources, and then says made with the knowledge and consent

19   of Farmers State Bank, Bridgeport, and it goes on to say is

20   expressly made subject to the following agreed-upon statements

21   of fact.  Do you see that?

22   A.  Yes.

23   Q.  And then you -- you went ahead and signed this document as

24   well, correct?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    155

1    Q.  And so did Paul Pauling and Brian Bates?

2    A.  Yes.

3    Q.  So we're going to go through this one in a little bit more

4    detail.  First I want to look at Recital D of this agreement,

5    and we've already seen that up above it said that this is

6    expressly made subject to the following agreed-upon statements

7    of fact.  In Recital D it says the value of the mineral

8    interest is equal to or greater than the amount of the

9    indebtedness encumbering the mineral interest that Redtail

10   will assume as part of the transfer of the mineral interest to

11   Redtail by Lardyn.  Do you see that?

12   A.  Yes.

13   Q.  All right.  So this agreement was made subject to that

14   being an agreed-upon statement of fact, correct?

15   A.  What being agreed upon statement of fact?  That D?

16   Q.  What we just saw in Recital D.

17   A.  Yes.

18   Q.  And this was made with Farmers State Bank's knowledge and

19   consent as well?

20   A.  Yes.

21   Q.  And then if we go to look at what the indebtedness

22   encumbering the mineral interest was, we look at paragraph F.

23   That says the indebtedness to Farmers State Bank secured by

24   the mineral interest is evidenced by a promissory note dated

25   April 27th, 2017, in the original principal amount of

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2     04/12/2021    156

1    $7,100,000 made by Lardyn and payable to Farmers order and

2    having a current principal balance of $2,896,143.92 as of the

3    date of this agreement.  Do you see that?

4    A.  Yes.

5    Q.  All right.  So when we're talking about doing deals about

6    the value of the mineral interest, between paragraph D and

7    paragraph F there's an agreement that the value of the mineral

8    interest is equal to or greater than $2,896,143.92?

9    A.  Okay.

10   Q.  Is that right?

11   A.  Yeah.

12   Q.  Okay.  Now, if we go down further to Recital N, Recital N

13   says prior to acquisition of the mineral interest, Redtail has

14   no assets or income, correct?

15   A.  Correct.

16   Q.  So Redtail was assuming debt to get the mineral interest,

17   correct?

18   A.  I'm not sure what you're saying.

19   Q.  Redtail was taking over Lardyn's debt on the mineral

20   interests?

21   A.  Oh, yeah, it did take over some, I believe.

22   Q.  But Redtail was not itself contributing any new equity to

23   purchase the mineral interests?

24   A.  No.  Just what you get off the producing wells.

25   Q.  Because Redtail had no assets at the time this happened?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/12/2021    157

1   A.   No.

2   Q.   Okay.  This also goes on to talk about what the ownership

3   of Redtail is going to look like in Recital O.  And so you

4   understood that after Redtail acquired these minerals, the

5   ownership of Redtail would be you with 95 percent, Pauling

6   Hauling with three percent, and Cherry Creek Cattle Company

7   with two percent?

8   A.   Yes.

9   Q.   Now, Mark Pauling, who had 85 -- or he had 15 percent of

10  Lardyn; is that right?

11  A.   Yes.

12  Q.   And Lardyn is giving up these minerals to go into Redtail,

13  correct?

14  A.   Yes.

15  Q.   Do you have an understanding of why Mark Pauling did not

16  become any member of Redtail?

17  A.   I don't remember exactly what it was, but I thought it had

18  something to do with lending limits or something.  For him.

19  I'm not sure.  I can't honestly remember.

20  Q.   So there's a bank reason not to make Mark Pauling a member

21  of Redtail?

22  A.   I believe so.  I think so.

23  Q.   And the bank was -- were you working directly with the

24  bank on these documents or was Jon Pauling?

25  A.   Jon Pauling probably handled all of them or most of them.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    158

1   I mean, I worked with him on them, but a lot of the stuff kind

2   of went over my head at this time because I was still trying

3   to learn everything and grasp it all, so...

4   Q.  All right.  Let me shift gears a little bit.  Now, we're

5   going to talk about Mark Pauling's sale of his interest in

6   Lardyn.

7           THE COURT:  Okay.  Before you do that, let's take a

8   ten-minute break.

9           MR. PULKRABEK:  Yes, sir.

10          THE COURTROOM DEPUTY:  All rise.  Court is in

11   recess.

12      (Break was taken from 2:16 p.m. to 2:28 p.m.)

13          THE COURT:  Okay.

14          MR. PULKRABEK:  May I proceed?

15          THE COURT:  Yes.

16   Q.  (By MR. PULKRABEK) So shifting gears, I'm going to talk

17   about the sale of Mark Pauling's 15 percent interest.  Let's

18   look at Exhibit 100 on this.  I show that it's stipulated.

19          THE COURT:  It's admitted.

20      (Plaintiff's Exhibit 100 received.)

21   Q.  (By MR. PULKRABEK) So, Ms. York, Exhibit 100 is an LLC

22   membership certificate with the name Lardyn Consulting, LLC

23   handwritten in here.  Do you see that?

24   A.  Yes.

25   Q.  Is that your handwriting?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      159

1   A.  Yes, it is.

2   Q.  Okay.  I'm guessing what you did -- tell me if I'm right

3   -- you found something online and printed it out that looked

4   like an LLC membership and filled in the blanks?

5   A.  Yeah.

6   Q.  And this is a document that you needed for the bank?

7   A.  Yeah, I think they just wanted us to do them so they have

8   the membership certificates.

9   Q.  So in 2019, there was a trust that was created called the

10  Elyce York Trust Number 1?

11  A.  Yes.

12  Q.  And that is a trust of which Skylar Pauling is a

13  beneficiary, correct?

14  A.  Yes, and Bradyn, my son.

15  Q.  And you are a trustee?

16  A.  Yes.

17  Q.  Now, on this membership interest down at the bottom you

18  had signed as cotrustee.  Do you see that?

19  A.  Yes.

20  Q.  Was Mark Pauling at one point in time a cotrustee as well?

21  A.  Yes.

22  Q.  And is there another cotrustee today?

23  A.  No.

24  Q.  All right.  So at its inception the Elyce York Trust

25  Number 1 for the benefit of your two children was overseen by

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      160

1   you and Mark Pauling as trustees?

2   A.   No.   I don't think that that ever was finalized with Mark

3   being on there.   This might have been done during that time

4   and I just forgot to go back and change it, but I'm the only

5   trustee on the trust once it was filed.

6   Q.   Regardless, this portion of the membership certificate

7   down here that talks about for $500,000 received, that is the

8   amount of money that was paid to Mark Pauling by the Elyce

9   York trust to acquire his 15 percent interest in Lardyn

10  Consulting?

11  A.   Yes.

12  Q.   And in terms of the date that that happened, I'm going to

13  ask you if you are able to tell us, and if not, we'll get

14  there later in this case, but can you confirm for us that the

15  date that Mark Pauling was paid that $500,000 was June 20th,

16  2019, the same day that Lardyn Consulting closed on that SBA

17  loan?

18  A.   Yes.

19  Q.   Okay.   Now, Ms. York, I want to ask you about some other

20  balance sheets that you signed, so let's look at Exhibit 72.

21  And we'll move through these fairly quickly.

22  A.   Okay.

23       MR. PULKRABEK:   And I believe Exhibit 72 -- I

24  better check that one.

25       THE COURT:   72 is admitted.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2     04/12/2021    161

1              (Plaintiff's Exhibit 72 received.)

2              MR. PULKRABEK:   Okay.

3    Q.  (By MR. PULKRABEK) So backing out here, Ms. York, that's

4    your signature on Exhibit 72, correct?

5    A.  Yes, it is.

6    Q.  The date is January 2nd, 2018?

7    A.  Yes.

8    Q.  And this is a personal balance sheet for you?

9    A.  Yes.

10   Q.  And just going back down to your net worth, we'll put that

11   up on the board, that is $2,039,693.45, correct?

12   A.  Yes.  That's what it says.

13   Q.  So I'm going to write that down here.  1/2/2018,

14   2,039,693.45.  So your balance is going up.  Your personal net

15   worth is going up as reported on these balance sheets?

16   A.  Correct.

17   Q.  And we can also see that the majority of your net worth is

18   still in Lardyn and Redtail, correct?

19   A.  Correct.

20   Q.  So in terms of where your net worth is originating from,

21   there's the transaction from Two Mile Ranch to Lardyn, and

22   then there's the movement of the minerals into Redtail.

23   That's where most of your net worth comes from?

24   A.  Yes.  And just through paying off debt and things of that

25   nature.  I mean, I don't remember exactly what these numbers

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    162

1    mean on this.  Like I said, there's no schedule to go along

2    with this it looks like either unless you have that on here to

3    be able to explain it because the schedules always explain

4    exactly what everything meant.

5    Q.  Okay.  Let's look at a couple other balance sheets here,

6    and we'll be done with the balance sheets.  Let's look at

7    Exhibit 75.

8          MR. PULKRABEK:  That's stipulated, Your Honor.

9          THE COURT:  It's admitted.

10        (Plaintiff's Exhibit 75 received.)

11   Q.  (By MR. PULKRABEK) Okay.  So Exhibit 75 starts with an

12   e-mail to Dick Stull, you're copying Mike Stull, Steve Stull

13   appears to be blind copied, with a subject balance sheets,

14   income statements signed note as of March 8th, 2018.  Do you

15   see that?

16   A.  Yes.

17   Q.  And here you say something about a feed note, and then you

18   say also attached is the current Lardyn Consulting, Redtail

19   Resources, and my personal balance sheet and income statement.

20   Then you sign Elyce York.  You see that?

21   A.  Yes.

22   Q.  And we talked a little bit earlier about how you had a

23   different e-mail address than Lardyn Consulting.  It's

24   ElyceYork@gmail.com.  That's the one you used to send this

25   e-mail, right?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2       04/12/2021    163

1   A.  Yes.

2   Q.  So let's go ahead and look at page 9 of this exhibit.  If

3   we back out, we can see the Bates number is LAR E-mail 2399.

4   This is a personal balance sheet for you as of 3/7 of 2018,

5   correct?

6   A.  Correct.

7   Q.  And on here the net worth is 2,412,172, correct?

8   A.  Correct.

9   Q.  So that's more even than we saw on January 2nd, 2018.  So

10  let's write that down.  3/7/2018, and the number on that was

11  2,412,172.  And then if we look at page 11, a couple further

12  in here, this is a balance sheet for Redtail Resources as of

13  3/7/2018, correct?

14  A.  Correct.

15  Q.  And you signed that, correct?

16  A.  Yes.

17  Q.  And you dated it 3/7/2018?

18  A.  Yes.

19  Q.  And this was what you provided to the bank, correct?

20  A.  Yes.

21  Q.  And at least for this date you said that the producing

22  minerals were valued at $2,726,951.  Do you see that?

23  A.  Yeah, like I said, that was if you were an operator, not a

24  royalty owner.

25  Q.  I'm not asking the basis for it.  I'm just asking this is

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    164

 1   the number you provided to the bank?

 2   A.  Yeah.

 3   Q.  Okay.  And then the other mineral acres continue to list

 4   at $1,100,000, correct?

 5   A.  Yes.

 6   Q.  For a total for the minerals that you told the bank of

 7   $3,826,951?

 8   A.  Correct.

 9   Q.  Okay.  Finally, let's go and look at Exhibit 113, and this

10   is stipulated.

11          THE COURT:  It's admitted.

12       (Plaintiff's Exhibit 113 received.)

13   Q.  (By MR. PULKRABEK) All right.  Here we have an e-mail from

14   you to Jarrod Hamik dated March 2019, March 20th, 2019.  Do

15   you see that?

16   A.  Yes.

17   Q.  Okay.  And, again, this is coming from your gmail -- your

18   ElyceYork@gmail.com account, correct?

19   A.  Yes.

20   Q.  Jarrod Hamik, he's one of the bank employees?

21   A.  Yes.

22   Q.  And you write -- well, if we actually start down further,

23   Jarrod Hamik had sent to you an e-mail saying, Hi, Elyce.

24   Please see the attached balance sheets that need to be signed

25   by you personally.  Please just sign and do not date.  Scan

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    165

1   them back to me once they are signed.  Please let me know if

2   you have any questions.  So that's what the bank employee sent

3   to you, correct?

4   A.  Yes.

5   Q.  And Mr. Hamik, according to his signature here, he's a

6   vice president of the bank?

7   A.  Yes.

8   Q.  And then your response to Mr. Hamik was, Jarrod, here you

9   go.  Please let me know if you need anything else, correct?

10  A.  Yes.

11  Q.  Now, if you go down to the next page, let me back out a

12  little bit, but you can see -- this is a different format of

13  balance sheet than any that we've seen before so far in this

14  case?

15  A.  Yes.

16  Q.  So this was not -- this was not in the form that you

17  prepared.  This was in a different form?

18  A.  Yes.

19  Q.  And as we saw from the e-mail itself, this was actually

20  something that the bank created and sent to you?

21  A.  Yes.

22  Q.  So earlier we saw that you were preparing balance sheets

23  and then sending them to the bank, correct?

24  A.  Yes.

25  Q.  And now here's the bank actually generating the balance

19-CV-01224-RBJ      Bench Trial - Day 2     04/12/2021    166

1   sheet to have you sign, correct?

2   A.  Yes.

3   Q.  And if we look at this, this says it is as of

4   January 28th, 2019, correct?

5   A.  Yes.

6   Q.  All right.  The date on it is January 28th, 2019.  It says

7   combined balance sheet.

8   A.  I was just looking at the March 14th, 2019, date that's

9   also on it, so...

10  Q.  Well, it says that --

11  A.  But that's as of --

12  Q.  Here it says -- this is even better -- here it says as of

13  --

14  A.  Yeah.

15  Q.  -- 1/28/2019.

16  A.  Yeah.

17  Q.  And Ms. -- it says your name at the top.  It doesn't say

18  Lardyn or Redtail.  This is how we know it's your personal

19  balance sheet, correct?

20  A.  Yeah, I'd say so.

21  Q.  All right.  And then you signed that, correct?

22  A.  Yes.

23  Q.  Okay.  That's your indication that you agree with it?

24  A.  Yes.

25  Q.  And under total owner equity on this one we see

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    167

1    $2,997,308, correct?

2    A.  Correct.

3    Q.  That is the balance sheet figure that the bank prepared

4    for you to sign -- sent to you to sign, and you did sign?

5    A.  Yes.

6    Q.  So let's go ahead and put that figure up on the board as

7    well.  Now, we have -- actually, I'm not going to put that one

8    up because there's another one.  There's a slightly later one.

9    We'll put that one up instead.  So the next page of this has a

10   York balance sheet as of 3/7/2018.  You see that?

11   A.  Yes.

12   Q.  Same thing, the bank prepared it for you, sent to it you,

13   you signed it?

14   A.  Yes.

15   Q.  All right.  And here we have it says 2,403.91.  So this

16   one is a little bit lower, right?

17          THE COURT:  Was the other one '19 or '18?

18          MR. PULKRABEK:  This -- you're right, Your Honor.

19   Thank you.  I knew there was a reason why you're a judge and

20   I'm not.  You're right.  So let's put that one on there

21   because that is the one I wanted to put on there.  1/28/19,

22   and the amount of that is 2,973,308.

23   Q.  (By MR. PULKRABEK) So there we have different balance

24   sheets, different figures that you signed over time, correct?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    168

1  Q.  And I didn't write down the one from the initial balance

2  sheet that we already looked at, but we could if we wanted go

3  back and check that out.  It's already been admitted.  This

4  one here, do you remember this one where you listed $67,500?

5  A.  Yes.

6  Q.  Okay.  Now, there's an exhibit that I created to try to

7  summarize all this, and let me -- let me see if I can pull

8  this one up here.  So this is -- this is one that sort of

9  summarizes what we've written on the board plus that initial

10 balance sheet.  Do you see that?

11 A.  Yes.

12 Q.  And so just to kind of walk through what this shows --

13         THE COURT:  What exhibit is this, please?

14         MR. PULKRABEK:  This is -- I'm sorry, Your Honor.

15 This is 163.  It has not been stipulated yet, but I'd like

16 to offer this under exhibit Rule 1611 and/or 1006 to

17 summarize the balances that we saw on those other balance

18 sheets in one place.

19         MR. FORBES:  Your Honor, I object.  The question in

20 the case has nothing to do with Ms. York's net worth after

21 owning and operating the assets.  Objection on grounds of

22 relevance.

23         MS. OLDEMEYER:  And, Your Honor, under Rule 1006,

24 we agree this adequately states the content of the

25 underlying documents that have been reviewed.  We have

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      169

1   similar summaries under Rule 1006 to present as well.  And

2   so with the understanding this is being offered under that

3   appropriate rule, we have no objection.

4          MR. KEITHLEY:  Your Honor, on behalf of Mark

5   Pauling and Two Mile Ranch, we would join the relevance

6   objection of Lardyn and Ms. York.

7          THE COURT:  All right.  It's just a summary of

8   these other documents.  Objection overruled.  It's admitted.

9      (Plaintiff's Exhibit 163 received.)

10  Q.  (By MR. PULKRABEK) A few more topics here, and we're

11  getting close to the end of your examination.  All right.  So

12  I want to ask about -- we've heard a little bit about the

13  minerals.  Talking a lot about the minerals and representation

14  of value of the minerals, so I want to talk to you about

15  Exhibit 109.

16         THE COURT:  109 is admitted.

17     (Plaintiff's Exhibit 109 received.)

18  Q.  (By MR. PULKRABEK) Okay.  So Exhibit 109, Ms. York, is an

19  e-mail you sent from your ElyceYork@gmail.com account, and you

20  sent that to Steve Stull, Richard Stull, and Kelly Roach at

21  the bank?

22  A.  Yes.

23  Q.  On March 14th, 2019, correct?

24  A.  Yes.

25  Q.  And it's entitled Redtail federal tax return.  You see

19-CV-01224-RBJ       Bench Trial - Day 2     04/12/2021     170

1   that?

2   A.  Yes.

3   Q.  And then you say -- you write to them and you say, I'm

4   attaching my federal tax return, right?

5   A.  Yes.

6   Q.  Okay.  So let's go ahead and look at the federal tax

7   return here.  First of all, this tax return, as with other

8   Lardyn and Redtail tax returns, that would be prepared by Ken

9   Skipworth?

10  A.  Yes.

11  Q.  So Ken Skipworth was somebody that Jon Pauling put you in

12  touch with?

13  A.  Yes.  And it was also Mark's tax guy also.

14  Q.  Okay.  So you didn't go out and find your own tax person.

15  You went with Jon Pauling and Mark Pauling's tax preparer,

16  correct?

17  A.  Yeah, I went with their recommendation.

18  Q.  All right.  So what we have here is the U.S. return of

19  partnership income for 2018 for Redtail Resources, correct?

20  A.  Correct.

21  Q.  And we can see the principal business activity over here,

22  that's oil revenue, right?

23  A.  Yes.

24  Q.  Over in this section?

25  A.  Yes.

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021      171

1   Q.  Okay.  Then if we look down below we can see that you

2   signed the federal tax return for Redtail under penalty of

3   perjury, correct?

4   A.  Correct.

5   Q.  And it says, I declare that I examined this return

6   including the accompanying schedules and statements.  Do you

7   see that language?

8   A.  Yes.

9   Q.  Then it goes on to say, To the best of my knowledge and

10  belief this is true, correct, and complete, right?

11  A.  Yes.

12  Q.  And you signed and dated that March 12th, 2019?

13  A.  Yes.

14  Q.  Now, as we look through here, you see it's got a schedule

15  on page LR E-mail 1509, it's page 8 of this particular

16  exhibit, and that schedule is titled Schedule L, line 13,

17  other assets.  Do you see that?

18  A.  Yes.

19  Q.  If we zoom in on it, this has a breakdown of the minerals,

20  correct?

21  A.  Correct.

22  Q.  And at least to the IRS under penalty of perjury what you

23  told them was that 60 net mineral acres were worth $2,551,026.

24  You see that?

25  A.  Yes.  Because I believed there was more oil wells in

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021      172

1    production at that time.

2    Q.  And for the additional 1,065 net mineral acres that didn't

3    have wells on them, you wrote down $1,618,200.  Do you see

4    that?

5    A.  Yes, because those became leased.  They weren't unleased

6    anymore.

7    Q.  And so then, at the end of 2018, your representation to

8    the United States government was that the minerals were worth

9    $4,169,226?

10   A.  Yes.  That year.

11   Q.  And 2018 is the year that you generated substantial income

12   personally from the oil revenues from Lardyn and Redtail,

13   correct?

14   A.  I didn't take any income personally from Redtail.

15   Everything that Redtail got it went to paying down the note to

16   the bank, Farmers State Bank.

17   Q.  Okay.  We'll look at your personal tax return in a moment.

18   If we look at the final page of this tax return, it is

19   Form 8825 called rental real estate income and expenses.  Do

20   you see that?

21   A.  Yes.

22   Q.  And then there it breaks down into A and B.  B is oil

23   revenue.  Do you see that?

24   A.  Yes.

25   Q.  Okay.  And if we go down here and look at Column B, we can

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      173

1    see that the gross rents reported for oil revenue to the

2    United States government just for Redtail for 2018 was

3    $616,145, correct?

4    A.  Yes.

5    Q.  Okay.  Now, let's look at Exhibit 126, and this is

6    stipulated.

7           THE COURT:  Admitted.

8        (Plaintiff's Exhibit 126 received.)

9    Q.  (By MR. PULKRABEK) So, Ms. York, here on Exhibit 126 we

10   have you sending an e-mail from your ElyceYork@gmail.com

11   account to Kelly Roach?

12   A.  Yes.

13   Q.  3/24/2020, subject tax returns.  You see that?

14   A.  Yes.

15   Q.  And you see this is the U.S. return of partnership income

16   for Redtail for 2019, correct?

17   A.  Yes.

18   Q.  And you haven't signed this one yet, but you did forward

19   it to the bank, correct?

20   A.  Correct.

21   Q.  And it has Ken Skipworth's signature on it, right?

22   A.  Yes.

23   Q.  And if we look at page 10 in 2019, just to confirm that it

24   wasn't a mistake to put it on there in 2018 -- 2019, you

25   represented to the United States government that the minerals

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021        174

1    were valued at $4,169,206, correct?

2    A.  Yeah, I would assume because of the oil production and

3    also those unleased acres being leased at the time too.

4    Q.  Okay.  All right.  And then let's go ahead and look at

5    Exhibit 110.  Exhibit 110 is your -- that's stipulated.

6           THE COURT:  It's admitted.

7       (Plaintiff's Exhibit 110 received.)

8    Q.  (By MR. PULKRABEK) This is your personal federal and state

9    tax return for -- and you're forwarding that to Steve Stull

10   and Jarrod Hamik, correct?

11   A.  Correct.

12   Q.  Again, just an observation, that's coming from your

13   ElyceYork@gmail.com e-mail, right?

14   A.  Yes.

15   Q.  So here's your 1040 individual tax return which you signed

16   on April 15th, 2019, correct?

17   A.  Correct.

18   Q.  This is for tax year 2018, right?

19   A.  Yes.

20   Q.  And you prepared it yourself?

21   A.  Yes.

22   Q.  Okay.  And if we go down -- let's see, first we can start

23   right here.  On line 6 for total income you reported $392,668,

24   total income in 2018, right?

25   A.  Yes.  That's right.

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    175

1   Q.   This is the first year -- first full year after the assets

2   have been transferred from Two Mile Ranch to Lardyn, right?

3   A.   Yes.

4   Q.   And in that first full year you made $392,668 according to

5   what you reported to the federal government, right?

6   A.   Me personally made 392?  I thought that was the -- I don't

7   know.  I didn't personally take out $392,000.

8   Q.   This is the total income you reported to the IRS on this

9   tax return.

10  A.   Well, I think I messed it up.

11  Q.   If we go further down to line 17 here, there's a line

12  item $400,000 that includes rental real estate, royalties.

13  You see that?

14  A.   Right.

15  Q.   Okay.  And there's a schedule that we can look at here.

16  The fifth page of this document is called income or loss from

17  partnerships and S Corporation.  You see that?

18  A.   Yes.

19  Q.   Okay.  And here's what you reported on your schedule.

20  You've got income coming in, passive income and loss.  You see

21  that?

22  A.   Yes.

23  Q.   Okay.  And you have Lardyn Consulting, Lardyn Consulting,

24  Lardyn Consulting, and Redtail Resources written there, right?

25  A.   Right.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      176

1   Q.   Then under passive income for those different entities,

2   you have $328,271, $5,373, 66,880 -- it totals up to a little

3   over $400,000 in passive income, correct?

4   A.   Right.  And wouldn't that just go off the total income

5   that Lardyn and Redtail made, that percentage, and then that's

6   what you put down?

7   Q.   So the first full year after this transfer you had passive

8   income from Lardyn and Redtail of over $400,000?  That's the

9   question.

10  A.   Right.  That's what it says.  You add all of the oil and

11  gas.  You have the corn crop.  I mean --

12  Q.   Now, we talked about how you stopped working back in 2013

13  other than a couple babysitting jobs here and there, right?

14  A.   Right.

15  Q.   This was by far -- in 2018 this was by far the most money

16  you ever made in your life?

17  A.   Yes.

18  Q.   And you understand that Amanda Wilson at the same time

19  hasn't collected a penny of her judgment?

20  A.   I didn't know if she had collected anything or not.  I

21  assumed she didn't, I guess.

22        MR. PULKRABEK:  I have no further questions for

23  this witness.

24        THE COURT:  Okay.  Well, Mr. Forbes, you seem to be

25  taking the lead on the defense side, so you can cross first.

                    Sarah K. Mitchell, RPR, CRR

1           MR. FORBES:  Your Honor, just with this witness,

2   because she's my client, Your Honor, might I try one thing?

3   We had a problem with my connection earlier.  It might be

4   working now.  Might I have two minutes of indulgence to see

5   --

6           THE COURT:  Yes, of course you can.

7           MR. FORBES:  Thank you.  Your Honor, in light of

8   the technical difficulties I am having, my assistant Diane

9   Wziontka, W-z-i-o-n-t-k-a, will join me at counsel table to

10  display the exhibits, if that's acceptable.

11          THE COURT:  That's fine.

12          MR. FORBES:  Thank you, Your Honor.

13          THE COURT:  But please sit at the table when you

14  examine.

15          MR. FORBES:  Your Honor, while we're working on the

16  technical issues, I will begin just to avoid wasting time.

17                     CROSS-EXAMINATION

18  BY MR. FORBES:

19  Q.  Ms. York, while we're working on the technical issues, can

20  you give your -- give the judge and the rest of us a little

21  background about yourself in terms of where you grew up and,

22  you know, where you went to high school, whether you graduated

23  from high school, just a narrative of kind of your background

24  prior to moving to Colorado.

25  A.  Yeah.  I grew up in Bennington, Nebraska.  Went there my

19-CV-01224-RBJ     Bench Trial - Day 2     04/12/2021     178

1   whole life.  Graduated high school there.  Did some

2   cosmetology school.  I worked at Panera Bread, Hollywood

3   Diner, Applebee's.  I worked at the 20's also in Omaha.  I

4   moved to Colorado -- Greeley, Colorado, in 2009 sometime and

5   worked at a bar there.  Then I moved down into Denver where I

6   worked at Shotgun Willie's.  I got divorced from my husband

7   there and lived up at Turkey Creek trying to kind of just get

8   away from him.  I lived at 3860 I guess before that, but then

9   he found me there, and then I went up to the Turkey Creek

10  address just to get away from him.

11  Q.  Let me interrupt you there, if I might.  You said that

12  your husband found you at another address, and that's why you

13  moved to Turkey Creek.  Can you explain that?

14  A.  Well, yeah.  He was very abusive and everything, so during

15  all that I -- my attorney during the divorce court got it to

16  where I did not have to give him my personal address.  If he

17  wanted to do anything, he could mail, he had to do it through

18  a PO box, and any exchanges with custody and kids you had to

19  do at the police station.

20  Q.  Now, when was that that you got the ability not to have to

21  give your husband your actual home address?

22  A.  That would have been in 2013 or '14.

23  Q.  All right.  And at that point you had met Mr. Pauling,

24  Mr. Jon Pauling; is that correct?

25  A.  Yeah.  Well, I met him in 2011.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2       04/12/2021    179

1   Q.  Okay.  And what is your relationship with Mr. Jon Pauling

2   today?

3   A.  Just co-parenting.

4   Q.  And -- I'm sorry.

5   A.  If I asked him to help out, if I need help out on

6   anything, he'll be there to help out too around the farm, like

7   processing cattle and stuff, so...

8   Q.  All right.  And when did it become a co-parenting

9   relationship as opposed to some kind of romantic or physical

10  relationship?

11  A.  Probably -- I mean, it wasn't really a relationship at the

12  point of when he was on probation and stuff.  Like I said

13  before, it was more just kind of a sexual relationship.  Yes,

14  I got pregnant.

15  Q.  When did that aspect of your relationship end, the sexual

16  aspect of it?

17  A.  Probably 2017.

18  Q.  Okay.  And so since then -- do you remember when in 2017?

19  Before or after Lardyn purchased the ranch and the water

20  rights, et cetera?

21  A.  I would assume before.  I think it was early.

22  Q.  Since then your relationship with him has been only

23  co-parenting?

24  A.  Yes.

25  Q.  Okay.  You were asked some questions at the very end of

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    180

1   your testimony about Ms. Wilson's judgment.  When you were

2   dating Mr. Pauling back in 2013, 2014, 2015, did he tell you

3   about the lawsuit that Amanda Wilson had filed?

4   A.  Yeah, he ended up telling me eventually.

5   Q.  Okay.  And did he tell you anything about the outcome of

6   that lawsuit?

7   A.  He said that they got a judgment.  I wasn't sure for how

8   much.

9   Q.  All right.  Did he ever mention to you that he wanted you

10  to help him avoid having his having to pay Ms. Wilson?

11  A.  No, he did not.

12  Q.  In connection with this purchase of the farm, was there

13  any discussion between you and Jon Pauling about doing this so

14  he could avoid Ms. Wilson realizing on her judgment?

15  A.  No, not at all.

16  Q.  How about any discussion with Mark Pauling?  Did that ever

17  come up in your discussions with Mark Pauling?

18  A.  No.

19  Q.  How about your discussions with the bank, to the extent

20  they occurred?  Did it ever come up in your discussions with

21  the bank?

22  A.  No.

23  Q.  All right.  I want to turn now to the actual transaction

24  that gives rise to this lawsuit.  Where did the idea of your

25  possibly purchasing the Two Mile Ranch property come from?

1   A.  Jon had brought it up to me because I always talked about

2   how I wanted to get into farming and cattle and everything

3   like that, so he had brought up the option of looking at

4   purchasing this property.

5   Q.  All right.  And was that of interest to you?

6   A.  Yes, it was.

7   Q.  Had you had any experience in managing a feedlot before?

8   A.  No.

9   Q.  In running cattle before?

10  A.  No.

11  Q.  In operating any kind of business before?

12  A.  No.

13  Q.  Why was that of interest to you?

14  A.  It's just something that always has been interesting to

15  me.  I've always loved cattle.  I've always loved just growing

16  plants, just getting into the soil, and doing all that.  It's

17  just a new career for me.  You can't dance forever, and you

18  can't do things like that, waitressing.  I just thought it

19  would be a good way to start a career.

20  Q.  Now, why did you think you'd be able to do this if you'd

21  never done anything like this before, that is operate a

22  feedlot and operate a business?

23  A.  Because you go through so many people that are willing to

24  help you between vets, nutritionists, agronomists.  I could

25  ask Mark anything.  He had been doing it for many, many years,

1   so he had the knowledge of doing it.  I figured if I needed

2   any help on anything else I could go to Jon and ask Jon for

3   help.

4   Q.  Did you think there was anything wrong with asking Jon for

5   help?

6   A.  No, I did not.

7   Q.  Have you ever hidden from any of the lawyers in this case

8   the fact that you asked Jon for help?

9   A.  No.

10   Q.  All right.  I want to talk about some details about the

11   actual purchase itself.

12        MR. FORBES:  Could we put up Exhibit 41?  This has

13   been admitted, Your Honor.  And if you could go to the

14   second page of Wilson 41.  Excuse me.  It's on Exhibit 41.

15   I apologize, Your Honor.

16   Q.  (By MR. FORBES) And you should have in front of you now

17   page 2 of Exhibit 41.  Is this the final contract that you

18   signed on behalf of Lardyn with Two Mile Ranch to purchase

19   their mineral interests?

20   A.  I believe so.

21        MR. FORBES:  If we could go down, scroll down.

22   A.  Yes, it is.

23   Q.  (By MR. FORBES) All right.  And the price in that contract

24   was for how much?

25   A.  2.2 million.  2.22 million.

1   Q.  Now, did you ever see an appraisal of any of the minerals

2   you were purchasing before the closing occurred?

3   A.  Yes.  The producing had an appraisal on it.

4   Q.  All right.  I want to ask you to take a look at Lardyn

5   Exhibit 2068.  If you need to look at more pages, please -- if

6   you could scan that down a little bit so she can see the

7   entire page.  Is Exhibit 2078 the appraisal that you saw

8   before Lardyn closed on the purchase of the minerals from Two

9   Mile Ranch?

10  A.  I can't really see much of this exhibit right here.

11          MR. FORBES:  If you could scroll through the pages

12  for the witness slowly so she can kind of see what's there,

13  please.

14  A.  Yes, I believe it is.

15          MR. FORBES:  All right.  Your Honor, we offer 2068.

16  It is not stipulated, Your Honor.

17          MR. PULKRABEK:  Your Honor, this is a third-party

18  appraisal.  I think it's hearsay, and I suppose it's expert

19  testimony as well.

20          THE COURT:  All right.  He's objected as hearsay.

21  What's your response?

22          MR. FORBES:  Your Honor, at this point we're

23  offering the appraisal just to show that it was a document

24  that Ms. York saw and to establish that she was acting in

25  good faith.

19-CV-01224-RBJ       Bench Trial - Day 2      04/12/2021    184

1          THE COURT:  Objection overruled.  It's admitted.

2      (Defendant's Exhibit 2068 received.)

3  Q.  (By MR. FORBES) Ms. York, we can see on the very first

4  page it says it's a mineral appraisal as of February 1st,

5  2017, right?

6  A.  Yes.

7  Q.  And it states it was prepared for Farmers State Bank.  Are

8  you with me?

9  A.  Yes.

10 Q.  Okay.  I want to go in the appraisal to the third page,

11 which should be the first page of the transmittal letter, and

12 if we can go to the third paragraph stating on the effective

13 date.  I'm not sure if you can highlight that.  Could you read

14 the third paragraph of that to yourself, and I want to ask you

15 some questions about it.

16 A.  Okay.

17 Q.  All right.  Is the information described in that paragraph

18 concerning the status of the drilling on Two Mile Ranch's

19 mineral interests consistent with your understanding at the

20 time Lardyn purchased the mineral interests from Two Mile

21 Ranch?

22         THE COURT:  You said you weren't offering it for

23 its truth.

24         MR. FORBES:  I'm not.  I asked her whether that was

25 consistent with her understanding.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      185

1        THE COURT:  How is that different from offering it

2   for its truth?

3        MR. FORBES:  Well, Your Honor, I could ask a longer

4   question, if you prefer.  I will do that.

5        THE COURT:  I suggest that you ask an appropriate

6   question.

7        MR. FORBES:  Okay.

8        THE COURT:  That one wasn't.

9   Q.  (By MR. FORBES) As of -- as of the time Lardyn purchased

10  the minerals, did you have an understanding that Two Mile

11  Ranch had a royalty interest in two wells drilled by Whiting

12  that had been producing or were producing at that time?

13  A.  Yes.

14  Q.  And did you also have an understanding that Whiting was

15  planning on drilling and completing additional wells?

16  A.  Yes.

17  Q.  If we'd go to the second page of this transmittal letter,

18  page 00031, and without stating whether this statement is true

19  or not, do you see in the second full paragraph on page 000031

20  of Exhibit 68 that the appraisal at that time of the market

21  value of the interest in the property that was subject of this

22  appraisal was 1.36 million?

23  A.  Yes.

24  Q.  And did you see that number before Lardyn purchased the

25  minerals from TMR?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021    186

1    A.  I saw it, yes.

2    Q.  Okay.  Turning now to the farm itself, prior to the time

3    Lardyn purchased the farm, did you ever see an appraisal

4    reflecting -- strike that.  Prior to the time Lardyn purchased

5    the farm, did you ever see an appraisal of the farm?

6    A.  Yes.

7    Q.  And if you would turn to -- in the exhibits to Lardyn

8    Exhibit 2064, and if you would please scroll through the first

9    few pages of that.  My question to you is going to be after

10   looking at that, is that the appraisal of the Logan County

11   farm that you saw prior to the time that Lardyn purchased that

12   property from Two Mile Ranch?

13   A.  Yes.

14         MR. FORBES:  Your Honor, we offer 2064.

15         MR. PULKRABEK:  Same objection as the last

16   objection, Your Honor.

17         THE COURT:  It's not admitted for the truth of what

18   it asserts, but only that she says in response to a leading

19   question that she saw it.

20         MR. FORBES:  Your Honor, that is the limited

21   purpose for which I'm offering it.

22      (Defendant's Exhibit 2064 received.)

23         MR. FORBES:  Can you turn to page 000077?  Can you

24   go down to the summary of facts and conclusions?

25   Q.  (By MR. FORBES) And, Ms. York, can you take a look at the

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/12/2021    187

1   summary of facts and conclusions there and tell me if you saw

2   that before Lardyn purchased the Logan County ranch from Two

3   Mile Ranch?

4   A.  I believe so, yes.

5           THE COURT:  You believe so?

6           THE WITNESS:  Well, I don't remember this exact

7   form, but I paid the 4.27 for the property there.

8   Q.  (By MR. FORBES) So just to clarify, is this the appraisal

9   that you saw before?

10  A.  Yes.  That's the appraisal that I saw.

11  Q.  Okay.  And is what you're saying you just don't remember

12  specifically looking at the summary of facts and conclusions

13  we're looking at now?

14  A.  Yeah, I just don't remember it now.

15  Q.  Okay.  But you did read through it back then; is that

16  correct?

17  A.  Yes.

18  Q.  Okay.  All right.  And you also -- did you also -- Lardyn,

19  I think we've established, purchased some equipment from Two

20  Mile Ranch, right?

21  A.  Yes.

22  Q.  And did you see an appraisal of that equipment before

23  Lardyn purchased that equipment?

24  A.  Yes.

25          MR. FORBES:  Turn, if you would, to Exhibit

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    188

1   Number 2067.  If you could scroll through to let the witness

2   see this.

3   Q.  (By MR. FORBES) And do you recognize Exhibit 2067?

4   A.  Yes.

5   Q.  Can you tell us what Exhibit 2067 is?

6   A.  It's an equipment list appraisal.

7   Q.  Is this the appraisal of the equipment that you saw before

8   Lardyn closed on its purchase of Two Mile Ranch?

9   A.  Yes.

10  Q.  I'd like to put up now Wilson Exhibit 58, and if you could

11  look through Wilson Exhibit 58.

12          THE COURT:  That one is stipulated.  It's admitted.

13      (Plaintiff's Exhibit 58 received.)

14          MR. FORBES:  Thank you, Your Honor.

15  Q.  (By MR. FORBES) Can you take a look at the last page of

16  Exhibit 58?

17  A.  Yes.

18  Q.  All right.  And in the lower left-hand corner there's a

19  check there?

20  A.  Yes.

21  Q.  Image of a check.  Can you tell us what that check was

22  for?

23  A.  That was for the equipment purchase.

24          MR. FORBES:  Can you now put up Exhibit 2083?

25          Your Honor, I offer Exhibit 2083 as a Rule 611(a)

Sarah K. Mitchell, RPR, CRR

1    evidentiary summary and also as a Rule 1006 summary of the

2    contract sales price that Lardyn paid of the -- not for the

3    truth, but the values that Lardyn was on notice of at the

4    time of the closing and the amount paid by Lardyn for the

5    assets that it purchased.

6             MR. PULKRABEK:  Your Honor, I have to object.

7             THE COURT:  Just say object and what the ground is.

8             MR. PULKRABEK:  I object.  Grounds.

9             MR. FORBES:  I'm sorry, what?

10            MR. PULKRABEK:  I object.  It doesn't meet the

11   requirements for a Rule 1006 summary.

12            THE COURT:  I agree.  Sustained.

13            MR. FORBES:  Your Honor, I'd also offer it under

14   Rule 611 as an evidentiary summary to help organize the

15   evidence for the Court.

16            THE COURT:  Okay.  Sustained.

17            MR. FORBES:  So -- I'm sorry.  On both grounds

18   you're sustaining it.  Okay.  I just wanted to be sure, Your

19   Honor.

20   Q.  (By MR. FORBES) Now, I want to take a look at Exhibit 41,

21   Wilson 41.  I'm sorry.  43 is the exhibit I'd like.

22            THE COURT:  43?

23            MR. FORBES:  43, Your Honor.

24   Q.  (By MR. FORBES) 43 has been admitted.  Ms. York, do you --

25   you were asked some questions before about certain values that

1  were shown on balance sheets that were prepared and asked some

2  questions about whether the entries for real estate did or

3  didn't include water rights.  Do you remember those questions?

4  A.  Yes.

5  Q.  All right.  When you purchased the property, the real

6  property in Logan County from Two Mile Ranch, did the purchase

7  include water rights?

8  A.  Yes.

9  Q.  If we look at page 2, which is TMR 000505, and the

10  description of the property there towards the end of it, does

11  it identify the water rights that you are purchasing pursuant

12  to this contract?

13  A.  Yes.

14  Q.  Now, Ms. York, we looked through some information that was

15  available to you at the time of the purchase concerning

16  appraised values for the farm, for the equipment, and for the

17  leased mineral rights that were being developed by Whiting.

18  Prior to the purchase did you ever see an appraisal of the

19  unleased acreage?

20  A.  No.

21  Q.  After the closing have you ever seen an appraisal of the

22  unleased acreage?

23  A.  No.

24  Q.  The -- we looked at the purchase contract for the

25  minerals, and saw that the purchase price was 2.2 million,

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021     191

1   correct?

2   A.  Yes.

3   Q.  And that was in excess of the appraised value of

4   1.36 million for the developed minerals, correct?

5   A.  Yes.

6   Q.  How, if you know, was the additional $840,000 or so

7   included in the purchase price and for what purpose was that

8   additional 840,000 -- and by that I mean the 840,000 in

9   addition to the appraised value for the developed mineral

10  interests?

11  A.  That went to buying unleased acres.

12  Q.  I'm sorry?

13  A.  That went to buying the unleased acres.

14  Q.  And how is that amount established, the 840,000 for the

15  unleased acres?

16  A.  I thought that the bank came up with that amount.

17  Q.  All right.  We looked at some internal valuations during

18  your examination, and let's start by looking at Exhibit 52.

19  If you'll go to -- we have Exhibit 52 up on the screen.  It's

20  been admitted.  Let's go in Exhibit 52 -- in the lower

21  right-hand corner there will be a Bates number FSB0006037.  It

22  should be a Lardyn, LLC balance sheet as of May 1, '17.  Yes,

23  that's it.  Okay.  And if you could just go up so we can see

24  the very top with the date on it.  So do you remember giving

25  some testimony on this in your examination by the plaintiff's

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    192

1    counsel?

2    A.  I believe so.

3    Q.  And let's take a look at some entries that are on this.

4    You see one of the assets included on here under current

5    assets is cash in the amount of $350,000?

6    A.  Yes.

7    Q.  And so under this preclosing balance sheet that was listed

8    as an asset of Lardyn, right?

9    A.  Right.

10   Q.  Did Lardyn have $350,000 in cash after the closing on

11   May 1, 2017?

12   A.  I don't believe so, no.

13   Q.  Was there any cash left over from the loan?

14   A.  No.  I think it went to paying all the loans.

15   Q.  And did Lardyn have alfalfa, corn, and silage on site

16   after the closing?

17   A.  There might have been some silage, but I don't remember

18   there being alfalfa or corn.

19   Q.  And the long-term assets, you were asked about that.  You

20   talked about the land, and my question to you is did you

21   prepare that valuation for the entry land there?

22   A.  No.

23   Q.  Who prepared that?

24   A.  Jon prepared that.

25   Q.  By that you mean Jon Pauling?

                        Sarah K. Mitchell, RPR, CRR

1   A.  Jon Pauling.

2   Q.  Okay.  And did you have an understanding about whether

3   that value included water rights and other improvements,

4   fixtures on the property, or whether it was just land itself?

5   A.  It should have included the water rights and -- the water

6   rights and the irrigating equipment and that.

7   Q.  All right.  Up in the upper right-hand corner there are

8   some items, current debts, do you know what those items were?

9   A.  I think the 46,000 would have been the loan that they'd

10  given me.  Mark Pauling, he had taken out a loan to be able to

11  get corn seed to plant that year, and I was just paying him

12  back once the crop had been harvested, so -- and then the

13  interest payment.

14  Q.  All right.  Now, there's also under the long-term debt

15  column, it says Farmers State, $7,100,000.  Do you see that?

16  A.  Yes.

17  Q.  Do you know if that was the same as, less than, or greater

18  than the amount of debt Two Mile Ranch had prior to the

19  transaction?

20  A.  I did not know Two Mile Ranch's debt.

21  Q.  Okay.  Let's now go to Exhibit 64.  That's Wilson 64.  Do

22  you recall being asked some questions about this exhibit?

23  A.  What did you say?

24  Q.  Do you recall being asked some questions about this

25  exhibit?

```
19-CV-01224-RBJ        Bench Trial - Day 2    04/12/2021    194
```

1   A.  Yes.

2   Q.  All right.  Now, we can't really do that that easily

3   because we can't flip back and forth between exhibits, but

4   let's see if we can do this without needing to do that.  Let's

5   go to page FSB 004143.  That's going to be four pages in.  All

6   right.  And this is a balance sheet as of what date, Ms. York?

7   A.  January 1st, 2018.

8   Q.  All right.  And under the current assets, I see an entry

9   for accounts receivable, 468,010.  Do you see that?

10  A.  Yes.

11  Q.  What was that for?

12  A.  That would have been cattle.

13  Q.  Could you explain?

14  A.  Prepay on cattle for feed and yardage.

15  Q.  Prepay by whom?

16  A.  Carr Ag and Todd Fessler.

17  Q.  And who are Carr Ag and Todd Fessler?

18  A.  They're cattle feeders that feed at my feedlot.

19  Q.  Customers of Lardyn?

20  A.  Yeah.

21  Q.  Okay.  All right.  And then let's go down to total

22  intermediate assets, and that summarizes vehicles, trailers,

23  equipment, et cetera?

24  A.  Yes.

25  Q.  And that's at this point $249,535, right?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    195

1   A.  Right.

2   Q.  And do you remember previously when we looked at that in

3   the 4/21/17 balance sheet it was over $600,000?

4   A.  Yes.

5   Q.  Do you know why it went down on this balance sheet?

6   A.  Because that one was paid down.

7   Q.  Okay.  Then there's long-term assets real estate.  Now, do

8   you remember that was 4,500,000 at the previous one we looked

9   at?

10  A.  Yes.

11  Q.  And now it's recorded at what?  4,412,500?

12  A.  Yes.

13  Q.  Do you know why that went down?

14  A.  Probably due to either crops -- selling crop or the cattle

15  feeding.  Just being able to pay off some debt from those.

16  Q.  Okay.  Now, speaking of debt, if we go over to the other

17  side, it shows long-term debt.  Do you remember the long-term

18  debt shown on the last balance sheet we looked at?

19  A.  The $7.1 million?

20  Q.  Right.

21  A.  Yes.

22  Q.  And this is long-term debt of $2,761,993?

23  A.  Yes.

24  Q.  Can you explain the reason that long-term debt went down

25  so much for purposes of this balance sheet?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    196

1   A.  Well, that just shows Central Bank on there.  There was

2   three banks involved, I believe; Farmer State, Central Bank,

3   and then I can't remember the other one's name, but they all

4   had a part in the loan.

5   Q.  So does that reflect Lardyn's entire long-term debt as of

6   May 1, 2018, the 2,761,993?

7   A.  I'm not sure if that's the total long-term debt, but just

8   shows Central Bank's long-term debt.

9   Q.  Okay.  And Redtail, let's go to FSB 004154.  Do you see

10  before you a balance sheet for Redtail now as of 1/1/2018?

11  A.  Yes.

12  Q.  And what does it show the net worth of Redtail was as of

13  that date?

14  A.  $423,140.

15  Q.  And there are values for both the producing acreage and

16  the nonproducing acreage; is that correct?

17  A.  Yes.

18  Q.  Was the asset value shown for the 60 net mineral acres, 24

19  wells in production, 29 wells total, was there an appraisal to

20  support that number?

21  A.  No.

22  Q.  Do you know how that number was created?

23  A.  Yeah.  Like I said before, Jon was coming up and trying to

24  show from an operator standpoint what it would be worth, not a

25  royalty standpoint of what it would have been worth.  So on

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 2     04/12/2021   197

1   the operator side you look at the wells that are producing at

2   the time and how much they're producing for, and you look at

3   the reserves of how much oil is under the surface going off

4   the wells that you do have producing, and then try to come up

5   with a figure of what you think that those assets would be

6   worth over like a 13-year period.

7   Q.   Was Lardyn a producer or a royalty owner with respect to

8   acreage?

9   A.   Royalty owner.

10   Q.   Then we go to net mineral acres, 1,085 net mineral acres.

11   Do you know the basis for the $1,100,000 value shown there?

12   A.   In 2018 I believe that those became leased, so...

13   Q.   So how does that number relate to the leasing of those

14   acres?

15   A.   I guess I'm not sure what you're asking.

16   Q.   I'm just wondering.  You said they became leased, I'm

17   wondering how does the fact they became leased affect how you

18   came up with the $1,100,000 value?

19   A.   Well, before at the 840 or 7 or whatever number that was,

20   before on there, and you add the lease agreement into there,

21   which was about roughly 300,000, and that's where you'd come

22   up with that number.

23   Q.   Okay.  Let's -- I think the next one we talked about on

24   your direct was Exhibit 72.  That's, again, Ms. Wilson's

25   Exhibit 72.  I'm sorry.  That was the wrong number.  Let's put

19-CV-01224-RBJ     Bench Trial - Day 2     04/12/2021    198

1   up 73 then.

2          THE COURT:  73 you want now?

3          MR. FORBES:  I'm sorry, Your Honor.  My notes here

4   are not tracking with the exhibits in the book, so my

5   apologies.  I will abandon that for the time being, Your

6   Honor.  Let's go to Exhibit 113.

7   Q.  (By MR. FORBES) You were asked about some questions about

8   Exhibit 113, correct?

9   A.  Yes.

10         THE COURT:  I don't think so.

11         MR. FORBES:  I'm sorry, what, Your Honor?

12         THE COURT:  I don't think so.  I don't show it as

13  being admitted, and I would have --

14         MS. OLDEMEYER:  I have it as admitted, Your Honor.

15  I don't know if that means anything.

16         THE COURT:  Okay.

17         MR. FORBES:  Do you recall, Your Honor,

18  Mr. Pulkrabek asked questions about the balance sheet that

19  was prepared by FSB and signed by Ms. Lardyn (sic)?  If you

20  don't --

21         THE COURT:  I don't remember, but she said that it

22  was admitted.  I must have missed it.

23         MR. PULKRABEK:  It was, Your Honor.  I agree with

24  that.

25  Q.  (By MR. FORBES) Ms. York, this was prepared -- signed by

19-CV-01224-RBJ       Bench Trial - Day 2       04/12/2021    199

1   you in March of 2019; is that correct?

2   A.  Yes.

3   Q.  If you'd turn to page FSB 10053.  Ms. York, can you take a

4   look at that, and under -- if we go down under long-term

5   assets, there's -- you see the entries for real estate FMV and

6   farm RE improvements?

7   A.  Yes.

8   Q.  Total value is how much shown there?

9   A.  Total asset value -- are you just --

10  Q.  Just those long-term assets.

11  A.  4,321,998.

12  Q.  Right.  Were the numbers for real estate FMV based on an

13  appraisal Lardyn had obtained?

14  A.  No.

15  Q.  Were the farm RE improvements based on an appraisal Lardyn

16  had obtained?

17  A.  No.

18  Q.  What were those values based on?

19  A.  This would have been -- wait, I can't scroll up, I guess.

20  So in 2019 -- okay.  You can scroll back down now -- in 2019 I

21  expanded the feedlot, so the improvements -- it would have

22  jumped those up just with all of the expansions that were

23  done, and then on equipment and everything too, we'd kind of

24  gone back and forth with the bank if the leased equipment

25  needed to be put on there, if it doesn't need to be put on

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021        200

1   there.   I didn't think you needed to put leased equipment on

2   balance sheets and stuff, but they wanted me to add them to

3   the balance sheets, so there's a lot of fluctuation going back

4   and forth with the equipment and things also.

5   Q.   (By MR. FORBES) Ms. York, while we're talking right here

6   you mentioned something about a feedlot expansion?

7   A.   Yeah.

8   Q.   Can you tell the Court what that was about?

9   A.   Yeah.   When I bought it it was only a 2,500-head feedlot,

10  and I expanded it up to a 5,000-head feedlot and then also got

11  it state permitted for a 5 -- and then I got state permitted

12  for a 10,000 head, but I only run 5,000 head.

13  Q.   Now, when you say you did it, was it actually you doing it

14  or did Jon Pauling do it?

15  A.   No.   I did this.

16  Q.   Can you tell the Court what you did in terms of getting

17  the feedlot expanded from the 2,500 permitted cattle facility

18  to a 10,000 permitted cattle facility?

19  A.   Yes.   So I worked with AGPRO is the company out there that

20  comes through and tells you exactly what you need to do and

21  get done for everything.   Those plans were already there when

22  I got the place, so it already had all the engineering and

23  everything mapped out for it.   So basically what I needed to

24  do is go into planning and zoning, have a planning and zoning

25  meeting, and then from that a couple weeks later went to the

Sarah K. Mitchell, RPR, CRR

1   county commissioners, and you just have to give them your

2   report, tell them what you're doing, how you can be of benefit

3   to the community, and just kind of show them your overall

4   plans on the engineering and everything, and then they tell

5   you if they agree or not, and they agreed to go forward and

6   gave me the special use permit and everything.

7   Q.   Once you got that special use permit, did you -- that is

8   Lardyn -- do anything in terms of physical construction of the

9   property to take advantage of the authorization to go up to

10  10,000 head?

11  A.   I haven't gone up to the 10,000 head, no.  But right now

12  I'm at the 5,000.  I had a guy come in and build 2,500 head

13  more pens.  I had a new pond put in, a lagoon built.  Took

14  clay from one of the other ponds, put it in that to line that

15  pond.  I called all the places that I needed to to get just

16  all the pipe that you use, get the water.  I mean, I had to

17  hire the welders, the construction crews.  I mean, I did

18  everything on that.

19  Q.   Did you do that or did Jon Pauling do that?

20  A.   No, I did that.

21  Q.   How were you able to do that?  You had no experience in

22  running a feedlot.  You'd never been involved in agriculture.

23  Can you explain to the Court how you were able to do that?

24  A.   Going through AGPRO.  You hire them, and they pretty much

25  walk you through the whole process, and even things the state

1    will tell you if things are up to code and stuff like that.

2    They come in and do inspections.  But mainly I dealt with

3    Valene on that, and she'll go over all the paperwork with you,

4    make sure the engineering construction is all correct.  They

5    go with you to the planning and zoning and the county

6    commissioners.  They pretty much get all your documentation

7    together for you, and that's how you do it.

8    Q.  And did you also have to get some state authorization for

9    that expansion?

10   A.  Yeah.  I got a CAFO permit.

11   Q.  All right.  And although it's an acronym, can you tell us

12   what CAFO stands for?

13   A.  Yeah, it's a concentrated animal feedlot operation.

14   Q.  I want to switch to Exhibit 2053, which is going to be a

15   Lardyn exhibit.  Ms. York, can you tell us what Exhibit 2053

16   is?

17   A.  It's for the permit application, for the CAFO permit.

18          MR. FORBES:  And, Your Honor, we'd offer 2053.

19          MR. PULKRABEK:  No objection.

20          THE COURT:  Admitted.

21      (Defendants' Exhibit 2053 received.)

22          THE COURT:  I assume you other lawyers don't have

23   an objection.  If you do, speak up.

24          MS. OLDEMEYER:  No objection, Your Honor.

25          MR. KEITHLEY:  No objection.

                    Sarah K. Mitchell, RPR, CRR

1   Q.  (By MR. FORBES) And I want to use a couple pages from 2053

2   to help you explain for us some of the operations of the

3   feedlot under Lardyn.  If you could turn -- if you could thumb

4   through it, you'll come to a map that says -- it's kind of a

5   pen-and-ink map.  Can you explain what the cross-hatched areas

6   on this page of Exhibit 2053 show?

7   A.  Those are all the cornfields.

8   Q.  What do you, if anything, have to do with the cornfields

9   in operating Lardyn?

10  A.  So that's a whole process.  So you need to get the fields

11  ready.  You till them.  You disk them.  You go through, you

12  pack them.  Mark is the one that does the corn planting,

13  because I haven't done that, and that's easier to mess up than

14  tilling and disking.  And then once it's planted you go back

15  through, and you'll ditch it, and then you have to make a

16  ditch along -- like along W2 Field, you have to go through a

17  ditcher and actually make an irrigation ditch right through

18  there.  Over on fields M4, M2, and M3, that's all irrigated --

19  or the gates, irrigated pipe.  They have little gates on them.

20  You bring those out after you're done farming, put them all

21  along the field.  You open up the little gates to let water in

22  and out, water in to certain parts of the field, and turning

23  them off.  Like W3, those are the irrigation pipes -- or

24  tubes.  They're like little tubes.  So when the water comes

25  down, you have to get it -- get the water to go down the

19-CV-01224-RBJ        Bench Trial - Day 2       04/12/2021    204

1    roads, and then you pretty much just water them.  I have the

2    nutritionist that comes and tests out the nutrients in the

3    soil every year before and after crop, and he's the one that

4    lets you know what type of nutrients that you need to put on

5    it depending if you're low or high in any of the nutrients,

6    phosphorous, nitrate, boron.  I mean, they test for everything

7    and tell you what you need to do.  High pH -- this is high pH

8    soil out here, so they give you high pH corn seed.  He's also

9    who I go through to get the corn seed.  And they pretty much

10   just help you go over everything to make sure you have the

11   best production that you can have.  They're there to teach you

12   and help you and educate you, and you can call them any time,

13   and if you're having issues they come through.  They check for

14   spider mites and other issues.  So if you're over-watering,

15   under-watering.  They have maps and everything, thermal maps

16   that you can look at a map to even just look at to see if some

17   of your fields are too wet, if they're too dry.  If they need

18   water.

19   Q.  Okay .

20   A.  I mean --

21   Q.  Do you actually go out in the fields and do that work or

22   is that something that Jon Pauling or somebody else does?

23   A.  No.  Mark and I do all the irrigating.

24   Q.  If you go a little further in this document we'll come to

25   a page that's got a kind of a schematic with some squares on

Sarah K. Mitchell, RPR, CRR

1    it.  There it is.  Right.  And, Ms. York, can you explain to

2    us what this page which is labeled LAR000024 is.

3    A.  Yes.  This is the feedlot that's shown in all the squares,

4    and it shows the direction of the way water -- wastewater will

5    run out of the pens and everything and collect into the ponds.

6    Q.  Is there any indication -- any way -- strike that.  Would

7    this be helpful in showing us how the expansion and where the

8    expansion was?

9    A.  Yes.  Is this the pen to use?

10   Q.  Yes.

11   A.  So the bunks were already in here along this line and this

12   line.  Those were poured when I had bought it.  So went in,

13   did the pipes all around here.  Put the gates in.  Did all

14   this.  Put the gates in.  Had to build pond five over here,

15   and took some of the dirt -- it's more like clay -- out of

16   this pond over here to line this pond over here so that it was

17   certified.  And that was the expansion part that I did.

18   Q.  And you say you did it.  Did you actually get out there

19   with a hammer and nail and a shovel or a bulldozer or whatever

20   --

21   A.  Well, I hired a welder to do all the welding, which would

22   be the Paulings' nephew Justin.  To my knowledge he's the one

23   that built his whole side too, so I just had him come back and

24   build the part that I expanded.  You hire people to come in

25   and pour the concrete.  Justin put in the waters on the

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021        206

 1   concrete pads.  So, I mean, you hire people to come in and do

 2   the water and everything.  Hired construction crews, Schlosser

 3   Construction that came in and dug out this pond and replaced

 4   it with the dirt and the clay out of this pond.

 5   Q.  All right.  And turn, if you would, to Exhibit 54.  Excuse

 6   me, 2054.  2054.  After you've had a chance to take a look at

 7   this, Ms. York, I want to ask you what is this, 2054?

 8   A.  This is just through the state.  It's not the -- it's a

 9   non-permitted registration form for the 2,500-head feedlot

10   that I had.  It became permitted once I built and did the

11   5,000-head feedlot, and I got it permitted and approved for

12   10,000 so that if I ever wanted to keep expanding and

13   everything that I could, and I already had these permits in

14   place.

15   Q.  And if you turn to the second page, which has a Bates

16   number of LAR000087, can you tell us whose signature that is

17   on that page?

18   A.  That's my signature.

19           MR. FORBES:  Your Honor, we offer Exhibit 2054.

20           MR. PULKRABEK:  No objection.

21           THE COURT:  It's admitted.

22      (Defendant's Exhibit 2054 received.)

23   Q.  (By MR. FORBES) Now, turn to Exhibit 2055.  Take a look

24   through that, and tell me if you've had a chance to take a

25   look at that, and we can proceed when you've had that chance.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/12/2021     207

1   A.  Yeah, we can proceed.

2   Q.  Do you recognize Exhibit 2055?

3   A.  Yes.

4   Q.  Can you tell us what Exhibit 2055 is?

5   A.  This would be a state inspection that's done.

6          MR. FORBES:  Your Honor, we offer 2055.

7          MR. PULKRABEK:  No objection.

8          THE COURT:  2055 is admitted.

9     (Defendant's Exhibit 2055 received.)

10  Q.  (By MR. FORBES) Can you tell us what the state does in

11  terms of inspecting the feedlot and what your interaction is,

12  if any, with the state inspectors?

13  A.  Yes.  So when they come out, they go over -- you have a

14  book that you have to keep and keep track of levels on

15  everything.  You have to keep in your manure samples, your

16  soil samples.  You have to keep track of precipitation.  If it

17  rains, snows, hails, you have to mark that down.  You have to

18  keep track of if you haul any of the manure out of your pens.

19  You have to keep track of the ponds.  You have to do pond

20  inspections.  Meaning, if they have water in them.  You have

21  to keep track of the water levels, and if they're above the

22  pump down, you need to pump it out to get them to the

23  appropriate levels that they need to be at.  They make sure

24  that you clean your ponds every 6 to 10 months if you have had

25  wastewater that has gone into your ponds.  That's just the

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      208

1    book in itself.  And there's probably some things that even

2    I'm missing in there.  They have a nutrient management plan to

3    kind of go over with that.  You just go through and, you know,

4    they'll give you what nutrients you have and everything, and

5    it gives you kind of diagrams to go off of if you're lacking

6    or if you have too much of something.  He'll also go around

7    the whole feedlot and inspect the ponds, the pens, the

8    ditches, I mean, everything to make sure that it's all state

9    compliant.  They'll check the markers in the ponds to make

10   sure they're done exactly how they need to be.  Make sure that

11   there's no erosion on the pond, there's no weeds and grass and

12   everything growing up into the -- growing through them so they

13   don't break through the liner.  They make sure that everything

14   is still flowing in the right direction.  If something like

15   one of the pens seems like it's kind of getting uneven, they

16   make sure that the wastewater is still going down into the

17   ponds and everything the directions that they need to be.  If

18   they're not, then you need to correct them.  I just had a

19   state inspection a couple weeks ago and passed everything.

20   They didn't have anything for me to fix, and so everything is

21   up to code for them, so...

22   Q.  And who deals with the state inspectors?  Is it you?  Is

23   it Jon Pauling?  Is it somebody else?

24   A.  No.  I generally deal with them most of the time.  A lot

25   of times Mark will sit in on the meetings too.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/12/2021    209

1    Q.  All right.  A couple more questions.  Were you ever told

2    by Jon Pauling prior to the time that Lardyn purchased

3    property from Two Mile Ranch that he and Mark had made an

4    amendment to their partnership agreement?

5    A.  No.

6    Q.  Did you ever -- did you have any involvement whatsoever in

7    any amendment that they made to their partnership agreement?

8    A.  No.

9    Q.  Did you ever even know about any amendment that they made

10   to their partnership agreement until this case was filed?

11   A.  No.

12   Q.  Since Lardyn purchased the property from Two Mile Ranch,

13   have you ever -- you through Lardyn -- ever paid any money to

14   Jon Pauling?

15   A.  No.

16   Q.  Have you, Elyce York, ever paid any money to Jon Pauling

17   since the purchase took place?

18   A.  No.

19   Q.  Were you asked to turn over all Lardyn's checks and its

20   checking account to plaintiff in this case?

21   A.  Yes.

22   Q.  And did you do that?

23   A.  Yes.

24   Q.  How about with your personal checks and your personal

25   checking account, were you asked to do that?

                         Sarah K. Mitchell, RPR, CRR

```
       19-CV-01224-RBJ      Bench Trial - Day 2     04/12/2021    210
```

 1    A.  Yes.

 2    Q.  Did you do that too?

 3    A.  Yes, I did.

 4         MR. FORBES:  No further questions, Your Honor.

 5         THE COURT:  All right.  Mr. Keithley, do you have

 6    any questions?

 7         MR. KEITHLEY:  No, Your Honor.  No questions at

 8    this time.

 9         THE COURT:  Ms. Oldemeyer, do you have any

10    questions?

11         MS. OLDEMEYER:  I have just a few, Your Honor.

12                         CROSS-EXAMINATION

13    BY MS. OLDEMEYER:

14    Q.  I'm going to stand up just because of the distance.

15    Ms. York, in your testimony I thought you said something about

16    a deposition in Amanda Wilson's case.  Did I hear that word?

17    A.  Yes.

18    Q.  So you were deposed before or after trial?

19    A.  Before.

20    Q.  Before.  And who took your deposition?

21    A.  It would have been -- I think his name was Q.

22    Q.  One of the attorneys representing --

23    A.  Yeah, one of the attorneys, and then he had a lady there

24    with him also.  I can't remember her name.

25    Q.  Okay.

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    211

1   A.  I believe it was the one that you guys were talking about

2   earlier that you said you'd worked with before.

3            MR. FORBES:  Your Honor, I'm sorry.  Might we have

4   the record reflect that the "you" -- she was not looking at

5   Ms. Oldemeyer when she said "you."

6            THE COURT:  What?

7            MR. FORBES:  It was -- never mind.

8            THE COURT:  Wait a minute, she was not looking at

9   Ms. Oldemeyer?

10            MR. FORBES:  Yes, Your Honor.  The "you," it's

11   ambiguous when she said "you."

12            THE COURT:  I think she was looking at me.

13            MR. FORBES:  Yes, Your Honor.  That's correct.

14            THE COURT:  Okay.  Whatever.

15   Q.  (By MS. OLDEMEYER) Just for clarity, Ms. York, have you

16   and I ever met before today?

17   A.  No.

18   Q.  You did have your deposition taken in this case via Zoom,

19   however, correct?

20   A.  Yes.

21   Q.  I want to ask you about one exhibit, and I'm just going to

22   put it up on the Elmo for ease, so let me approach.  This is

23   Exhibit 11, Trial Exhibit 11.

24            THE COURT:  That's a stipulated exhibit, so it's

25   admitted.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    212

1          (Plaintiff's Exhibit 11 received.)

2              MS. OLDEMEYER:  It's not working.

3              THE COURTROOM DEPUTY:  I apologize.  Something

4    happened this morning, and I never got it --

5              MS. OLDEMEYER:  That's okay.  I'll do it another

6    way.

7              MR. FORBES:  We can display 11 for you if that

8    would be helpful.

9              MS. OLDEMEYER:  That would be wonderful.  Thank

10   you.

11   Q.  (By MS. OLDEMEYER) Exhibit 11, I know you can only see a

12   portion of it, but this is an agreement -- a contract to buy

13   and sell real estate residential, and do you see paragraph 2,

14   parties and property, buyer Elyce M. York and Elyce M. York.

15   Do you see that?

16   A.  Yes.

17   Q.  And do you see in the upper right-hand corner a date filed

18   January 11, 2016, at 10:47 p.m. in case 2013-CV-35298?  Do you

19   see that stamp?

20   A.  Yes.

21   Q.  Do you know what that relates to?

22   A.  No.

23   Q.  You did sign a contract to buy and sell real estate in

24   September of 2014 related to the Turkey Creek property?

25   A.  Yes.

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2     04/12/2021    213

1              MS. OLDEMEYER:  We'd offer Exhibit 11.

2              MR. PULKRABEK:  No objection.

3              THE COURT:  Admitted.

4    Q.  (By MS. OLDEMEYER) I also want to clarify, Mr. Pulkrabek

5    showed you e-mails where you were using an ElyceYork@gmail.com

6    e-mail address.  Do you recall that?

7    A.  Yes.

8    Q.  Is that the only e-mail address you used?

9    A.  LardynConsulting@gmail.com also.

10   Q.  You also use that one?

11   A.  Yes.

12   Q.  Now, there were questions about your tax returns and

13   $392,000 in income and $400,000 in passive income, and I just

14   want to make sure I understand.  Did you get that amount of

15   money?

16   A.  No, not me personally.

17   Q.  Where did it go?

18   A.  I have no idea.  Honestly, I think it might have been to

19   pay taxes or I'm not sure.

20   Q.  Okay.  But you personally didn't take that sum of money?

21   A.  No, I did not.

22   Q.  And didn't direct it to somebody else?

23   A.  No.

24   Q.  With respect to any royalty checks that are directed to

25   Lardyn Consulting or made payable to Lardyn Consulting for

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/12/2021    214

1    royalties, who gets those checks?

2    A.  The bank.

3    Q.  And the name of the bank is?

4    A.  Farmers State Bank.

5            MS. OLDEMEYER:  Thank you.  No further questions.

6            THE COURT:  Redirect?

7            MR. PULKRABEK:  Yes, Your Honor.

8                          REDIRECT EXAMINATION

9    BY MR. PULKRABEK:

10   Q.  All right.  So one of the things that your attorney asked

11   you about earlier, Ms. York, had to do with the feedlot and

12   the feedlot expansion?

13   A.  Right.

14   Q.  And it was your testimony that you did the feedlot

15   expansion.  Do you remember that testimony?

16   A.  Yes.

17   Q.  So I'd like to show you -- I'm going to need to plug in

18   here -- show you what's been marked Exhibit 150.  And I know

19   it's reflected stipulated.

20           THE COURT:  Well, that's true.  It's admitted.

21       (Plaintiff's Exhibit 150 received.)

22   Q.  (By MR. PULKRABEK) Okay.  So, Ms. York, this is an e-mail

23   from you to Jarrod Hamik, Steve Stull, and Kelly Roach on the

24   8th of May, 2019, with title special use permit, and you say

25   attached is the special use permit resolution from Logan

19-CV-01224-RBJ        Bench Trial - Day 2      04/12/2021    215

 1   County.  Do you see that?

 2   A.  Yes.

 3   Q.  And then when we go and look at the resolution itself,

 4   this is the resolution that authorizes the 500-head feedlot,

 5   correct?

 6   A.  5,000 head.

 7   Q.  The 5,000-head feedlot.  So then I want to focus on the

 8   second whereas clause, what it says -- sorry -- what it says

 9   is, Whereas the board of Logan County commissioners

10   established a special use permit -- established a special use

11   permit on the identified land for a 5,000-head cattle feedlot

12   on the 26th day of January 2010, for Jonathan Pauling, DBA,

13   Two Mile Ranch.

14   A.  Yes.

15   Q.  With such operation continuing to present and now under

16   the ownership of Lardyn Consulting under full compliance with

17   all applicable federal, state, county, and Northeast Colorado

18   Health Department regulations.  You see that, don't you?

19   A.  Yes, I do.

20   Q.  Now, that special use permit that, quote, I did this or

21   you did this, was already in place since 2010?

22   A.  Actually, they didn't follow up on it and keep up on it

23   how they were supposed to so they let it fall through.  When I

24   went in and got the special use permit, and they're only

25   permitted for like 250-head cattle, so I had to redo the

19-CV-01224-RBJ       Bench Trial - Day 2     04/12/2021    216

 1   special use permit.
 2   Q.  Ms. York, the resolution says what it says.  We can see it
 3   right there.
 4   A.  Well, and I'm telling you exactly what I had to do.
 5   Q.  Now, next question.  There was some testimony about a
 6   number of CDPHE documents -- I don't know if I said that right
 7   -- but that you signed, and these were marked as Exhibit 2053
 8   was the first one, so let me see if I can pull that one up.  I
 9   want to look at the timing.  So 2053 was admitted.  Now, the
10   timing on this document that you've offered to show that you
11   were working with CDPHE is September 18, 2019.  Do you see
12   that?
13   A.  Yes.
14   Q.  That is several months after this lawsuit was filed,
15   correct?
16   A.  I've worked with them before and after the lawsuit was
17   filed.
18   Q.  Well, this document reflects something after the lawsuit
19   was filed you were working with them.  Do you see that?
20   A.  Yeah.  I believe I was still working with them.  I still
21   work with them to this day.  I was working with them two weeks
22   ago.
23   Q.  And so the evidence that you've offered here is evidence
24   that postdates the filing of this lawsuit.  That's my point.
25   You agree with me, right?

19-CV-01224-RBJ     Bench Trial - Day 2     04/12/2021     217

1   A.  Postdates the filing of -- I have worked with them pretty

2   much since the beginning that I have owned the farm, and I

3   still work with them to this day.  I just had Jeanine there

4   helping out with the state inspection a couple weeks ago that

5   I passed.

6   Q.  Let's look at 2055.  Date of inspection here says

7   6/4/2019.  That's also after this lawsuit was filed, correct?

8   A.  Correct.

9   Q.  Okay.  And then Ms. Oldemeyer asked you some questions

10  about $400,000 that you saw you reported on your federal tax

11  return, and your testimony was you have no idea where that

12  went.  But I want to ask you a couple questions about a house

13  that you bought, if I could find my notes on this.  There was

14  a house that you bought in Sidney, Nebraska; is that correct?

15  A.  Yes.

16  Q.  Is it true that you bought that in 2018?

17  A.  Yes.

18  Q.  And you paid about $400,000 for that, correct?

19  A.  Yes, with $36,000 down.

20  Q.  Okay.  And that's a house that sits on a golf course in

21  Sidney?

22  A.  Yes.

23  Q.  And how many square feet is that house?

24  A.  About 55, 5,600 square feet.

25  Q.  Okay.  55, 5,600 square feet.  How many bedrooms?

19-CV-01224-RBJ        Bench Trial - Day 2     04/12/2021    218

1   A.  It has four bedrooms.

2   Q.  All right.  So you got a four-bedroom house for you and

3   your two kids?

4   A.  Yeah, I have family that comes to visit every month to

5   every other month, so --

6   Q.  Well --

7   A.  -- it's nice to have the extra room for them.

8   Q.  -- in fact, Jon Pauling will sometimes stay at that house

9   too, does he not?

10  A.  Yeah, if Skylar is having a really bad night with all of

11  her medical issues, I'll have him come stay to help out.

12  Sometimes it's a battle, and usually if she gets sick we end

13  up in the hospital, so it's easier to have them there and to

14  be prepared so -- when we do end up in the ER.

15  Q.  And, you know, Jon Pauling is, after all, the father of

16  this child?

17  A.  Yes.

18  Q.  So he would be expected to provide a place for this child

19  to live, would he not?

20  A.  Well, he lives out at the farm, so he has that house.  He

21  doesn't need to provide for me or my child to live.  I can

22  provide for her to live.

23  Q.  You don't think that Jon Pauling has done anything at all

24  to provide for you and your children in this case?

25  A.  Well, if I asked for help and stuff, he'll come help out

1   at the farm, so in a way he provides in that manner.  And if,

2   you know, I need him to watch her, he watches her and

3   everything.  So, yeah, I guess he provides for her.

4   Q.  Is it your testimony sitting here today that Jon Pauling

5   has done nothing other than occasionally watch Skylar to

6   provide for Skylar and you?

7   A.  Yes.

8   Q.  Even though your net wealth simply by virtue of this

9   transfer went from $125,000 to more than $1.7 million?

10  A.  Well, like I said, he helped me facilitate this deal and

11  get the loan with the bank.

12  Q.  And even though your reported net worth to Farmers State

13  Bank on the balance sheet they prepared to you is almost

14  $3 million today?

15  A.  Yeah.  I see that, and I believe that goes back to the oil

16  and gas that I have explained a few times.

17  Q.  Okay.

18  A.  So it's not a correct number.

19  Q.  Last questions that I have for you, and I want to give you

20  a -- I'm going to ask you, are you under any duress by Jon

21  Pauling to have engaged in these transactions or did you do it

22  completely of your own free will?

23  A.  I did this of my own free will.

24  Q.  And you understand that now is the time to clarify this,

25  that if you -- if you were a victim in this, now is your time

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021      220

1    to speak up.  If you were a victim, please, will you let us

2    know?

3          MR. FORBES:  Object to the form of the question.

4    It's compound, argumentative.

5          THE COURT:  The objection is overruled.

6          MR. FORBES:  Of course.

7    Q.  (By MR. PULKRABEK) All right.  So, Ms. York, I want to

8    give you a complete opportunity to just make it 100 percent

9    clear for us if you have been a victim in this at all, if Jon

10   Pauling has exercised undue influence, if this was not your

11   idea, it was his and you went along with it against your will,

12   explain.

13   A.  I did nothing against my will.

14   Q.  Thank you.

15         MR. PULKRABEK:  No further questions.

16         THE COURT:  All right.  Thank you for your

17   testimony.

18         Perhaps, unless you've got somebody that has to

19   testify this afternoon, that's as far as we're going to go

20   today.  I can't take any more of this today.

21         MS. OLDEMEYER:  Can I ask a clarifying question,

22   Your Honor?  There will be no recross?  The counsel had

23   stipulated to direct, kind of cross/direct --

24         THE COURT:  No.  You've had your chance to ask your

25   cross.  All right.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/12/2021    221

1           MS. OLDEMEYER:  And that's for all witnesses for

2     the entire trial?

3           THE COURT:  I don't know.  That's my rule for this

4     witness.  9 o'clock in the morning.  I think you folks ought

5     to think about what's going on and what potential risks

6     you're taking.

7           MR. FORBES:  Your Honor, it takes two to tango.

8           THE COURT:  I think it takes four to tango, and I

9     think you ought to tango.  Otherwise somebody is going to be

10    very unhappy they didn't.

11          MR. FORBES:  Your Honor, we tried.

12          THE COURT:  Good night.

13          THE COURTROOM DEPUTY:  All rise.  Court is in

14    recess.

15       (The proceedings were concluded at 4:22 p.m.)

16

17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

1                          <u>REPORTER'S CERTIFICATE</u>

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4   United States District Court for the District of Colorado, a

5   Registered Professional Reporter and Certified Realtime

6   Reporter, do hereby certify that I reported by machine

7   shorthand the proceedings contained herein at the time and

8   place aforementioned and that the foregoing pages constitute a

9   full, true and correct transcript.

10         Dated this 11th day of May, 2021.

11

12

13

14         _____/s/ Sarah K. Mitchell_____

15                   SARAH K. MITCHELL
                     Official Court Reporter
16            Registered Professional Reporter
                 Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR