1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3
     Civil Action No. 19-CV-01224-RBJ
 4

 5    AMANDA WILSON,
                                          (Pages 222 - 447)
 6          Plaintiff,

 7          vs.

 8    JONATHAN PAULING, et al.,

 9          Defendants.

10    ------------------------------------------------------------

11                    REPORTER'S TRANSCRIPT
                       Bench Trial - Day 2
12
      ------------------------------------------------------------
13
              Proceedings before the HONORABLE R. BROOKE JACKSON,
14    Judge, United States District Court for the District of
      Colorado, commencing on the 13th day of April, 2021, in
15    Courtroom A902, United States Courthouse, Denver, Colorado.

16                         APPEARANCES

17    For the Plaintiff:
      ROSS W. PULKRABEK, Keating Wagner Polidori & Free, PC, 1290
18    Broadway, Ste. 600, Denver, CO 80203

19    For the Defendants:
      PETER C. FORBES, Carver Schwarz McNab Kamper & Forbes, LLC,
20    1888 Sherman St., Ste. 400, Denver, CO 80203

21    R. LIVINGSTON KEITHLEY, Antero Law LLC, 1700 Broadway, Ste.
      640, Denver, CO 80290
22
      TRACY A. OLDEMEYER, Cline Williams Wright Johnson & Oldfather,
23    215 Mathews St., Ste. 300, Fort Collins, CO 80524

24
          Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25                 Denver, CO 80294, 303-335-2108

              Proceedings reported by mechanical stenography;
                  transcription produced via computer.

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021    223

 1                          I N D E X

 2
     PLAINTIFF'S WITNESSES                              PAGE
 3
     MARK PAULING
 4      Direct Examination By Mr. Pulkrabek             225
        Cross-Examination By Mr. Keithley               260
 5      Cross-Examination By Ms. Oldemeyer              311
        Cross-Examination By Mr. Forbes                 341
 6      Redirect Examination By Mr. Pulkrabek           343
     RICHARD STULL
 7      Direct Examination By Mr. Pulkrabek             351
        Cross-Examination By Ms. Oldemeyer              396
 8

 9
                      PLAINTIFF'S
10                    EXHIBITS                    RECEIVED

11           2                                    225

12           3                                    227

13           4                                    232

14           5                                    233

15           7                                    239

16           9                                    236

17           15                                   245

18           16                                   243

19           18                                   432

20           22                                   259

21           24A                                  356

22           25                                   359

23           31                                   249

24           33                                   437

25           34                                   362


                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021   224

| | | |
|---|---|---|
| 1 | 38 | 442 |
| 2 | 45 | 370 |
| 3 | 47 | 379 |
| 4 | 54 | 255 |
| 5 | 55 | 255 |
| 6 | 57 | 256 |
| 7 | 73 | 389 |
| 8 | 74 | 390 |
| 9 | 91A | 257 |
| 10 | 95 | 391 |
| 11 | 12 | 353 |
| 12 | 131 | 384 |
| 13 | 132 | 392 |
| 14 | 141 | 254 |
| 15 | | |
| 16 | DEFENDANTS' EXHIBITS | RECEIVED |
| 17 | 1008 | 413 |
| 18 | 1009 | 415 |
| 19 | 1021 | 424 |
| 20 | 1024 | 429 |
| 21 | 1030 | 429 |
| 22 | 1031 | 430 |
| 23 | 1043 | 334 |
| 24 | 1052 | 442 |
| 25 | 1080 | 425 |

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    225

1                *         *         *         *         *

2         (The proceedings commenced at 9:01 a.m.)

3              THE COURT:  Good morning.  Ready to go?

4              MR. PULKRABEK:  Yes, sir.

5              THE COURT:  All right then.

6              MR. PULKRABEK:  Plaintiff calls Mark Pauling.

7              THE COURT:  Okay.  Mr. Pauling.

8                          MARK PAULING

9    was called as a witness and, having been duly sworn, was

10   examined and testified as follows:

11             THE COURT:  Thank you, sir.

12                      DIRECT EXAMINATION

13   BY MR. PULKRABEK:

14   Q.  Mr. Pauling, you are Jonathan Pauling's brother?

15   A.  Yes.

16   Q.  And I'd like to -- I'd like to begin with some questions

17   about Two Mile Ranch General Partnership, and particularly I'm

18   going to start with some questions about Exhibit 2, which has

19   been stipulated.

20             THE COURT:  Exhibit 2 is admitted.

21         (Plaintiff's Exhibit 2 received.)

22   Q.  (By MR. PULKRABEK) Mr. Mark Pauling, Exhibit 2 is the

23   general partnership agreement of Two Mile Ranch, correct?

24   A.  Correct.

25   Q.  And you and your brother Jonathan Pauling entered into

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    226

1   this partnership agreement February 14th, 1986?

2   A.  Correct.

3   Q.  And if we go all the way to the last page, you can see

4   your and Jonathan Pauling's signatures?

5   A.  Yes.

6   Q.  All right.  Now, I want to direct your attention to just a

7   couple articles in this agreement, the first being article

8   1.05.  Article 1.05 says, The affairs of the partnership shall

9   be conducted by all the partners.  In case of a difference of

10  opinion among the partners with respect to the management and

11  policies of the partnership, the decision made by Jonathan M.

12  Pauling shall prevail?

13  A.  Yes.

14  Q.  So that was one of the -- that was one of the terms that

15  you and Jonathan Pauling agreed to back in 1986?

16  A.  Yes.

17  Q.  And the partnership operated under that term continuing

18  for decades moving forward?

19  A.  Yes.

20  Q.  Now, if we look at Article 4.02, that says, The net

21  profits and losses of the partnership shall be computed on the

22  cash basis of accounting.  After deducting the salaries and

23  all other expenses, the net profits and losses shall be

24  allocated to the partners after the end of each partnership

25  accounting year in the following percentages, to wit, Jon M.

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021   227

1   Pauling, 50 percent; Mark A. Pauling, 50 percent.  Do you see

2   that?

3   A.   Yes.

4   Q.   And, again, the partnership operated on that basis from

5   1986 decades moving forward?

6   A.   Yes.

7   Q.   Now, I want to ask you about an amendment.  So let me

8   direct your attention to Exhibit 3, which has been stipulated.

9        THE COURT:  All right.  Exhibit 3 is admitted.

10       (Plaintiff's Exhibit 3 received.)

11   Q.   (By MR. PULKRABEK) Exhibit 3 is titled Amendment to Two

12   Mile Ranch, parens, a Colorado General Partnership.  You see

13   that?

14   A.   Yes.

15   Q.   And it says date September 15, 2014?

16   A.   Yes.

17   Q.   To the right of that do you see there's an exhibit sticker

18   where it says Exhibit 202, deponent Pauling, date 2/10/16?

19   A.   Yes.

20   Q.   And this was a -- this was an exhibit that was marked in

21   both Jonathan Pauling's deposition as well as your deposition

22   back in 2016.  Do you recall that?

23   A.   Well, not for his, but probably mine.

24   Q.   Under Article 1.05 it says, Mark Pauling is the manager of

25   the partnership.  Do you see that?

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    228

1  A.  Yes.

2  Q.  And then under Section 4.02, profits and losses, it says,

3  The net profits and losses of the partnership shall be

4  computed on the cash basis of accounting.  After deducting

5  salaries and all other expenses, the net profits and losses

6  shall be allocated to the partners after the end of each

7  partnership accounting year in the following percentages, to

8  wit, Jonathan M. Pauling, 10 percent; Mark A. Pauling,

9  90 percent?

10  A.  Yes.

11  Q.  And you signed this document?

12  A.  Yes.

13  Q.  And so did Jonathan Pauling?

14  A.  Yes.

15  Q.  Now, going back to the date, even if we just -- we will

16  assume for the sake of argument for the moment the date is

17  accurate --

18  A.  Yes.

19  Q.  -- that date is after Amanda Wilson was sexually assaulted

20  by Jonathan Pauling?

21          MR. KEITHLEY:  Objection, foundation, Your Honor.

22          THE COURT:  On what basis?

23          MR. KEITHLEY:  Foundation, Your Honor.  There's not

24  an adequate foundation that this witness has that knowledge.

25          THE COURT:  Wasn't he found guilty in a criminal

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    229

 1  proceeding?

 2          MR. KEITHLEY:  No, Your Honor.  This is Mr. Mark

 3  Pauling.  Mark Pauling is the brother operating Two Mile

 4  Ranch.

 5          THE COURT:  Yes, I know.

 6          MR. KEITHLEY:  Jon Pauling was the person found

 7  guilty.

 8          THE COURT:  Jon Pauling pled guilty to sexual

 9  assault on Ms. Wilson.

10          MR. KEITHLEY:  Yes, Your Honor.

11          THE COURT:  And what's the foundation that is

12  lacking?

13          MR. KEITHLEY:  The question --

14          THE COURT:  Mark wouldn't have known that?

15          MR. KEITHLEY:  The question was whether he knew

16  when Ms. Wilson was assaulted.

17          THE COURT:  Oh, all right.  Go ahead and lay some

18  foundation then.

19  Q.  (By MR. PULKRABEK) Let me see if I can go about it a

20  different way.  Mr. Pauling, you've stipulated through counsel

21  that Ms. Wilson was assaulted by your brother back in 2013,

22  haven't you?

23  A.  I believe so.

24  Q.  Okay.  You stipulated through counsel that Ms. Wilson

25  filed a lawsuit in the Denver District Court against your

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      230

1    brother in 2013?

2    A.  Right.  After the verdict or the plea deal was done, yes.

3    Q.  All right.  So, yeah, just looking at the face of this

4    document --

5    A.  Uh-huh.

6    Q.  -- September 15, 2014, is after both of those events?

7    A.  Yes.

8    Q.  And, in fact --

9         THE COURT:  Mr. Keithley, were you not a party to

10   this stipulation?

11        MR. KEITHLEY:  No, Your Honor, I was.  What I want

12   to make sure was there isn't a suggestion that at the time

13   -- I was unclear about counsel's question, whether he was

14   trying to infer that this witness knew about the sexual

15   assault at the time he entered into this.  That foundation

16   has not been laid.  The timing -- the timing is what we have

17   stipulated to.  The dates are stipulated.  However, this

18   witness's knowledge -- I don't want there to be an adverse

19   inference as to his particular knowledge as to these

20   exhibits, Your Honor.  That's what I'm trying to be careful

21   of.

22   Q.  (By MR. PULKRABEK) Mr. Pauling, the Exhibit 202 that we

23   were looking at a moment ago, you didn't provide that

24   personally to Amanda Wilson or her counsel, did you?

25   A.  I did not personally, no.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    231

1   Q.  All right.  I want to show you what has already been

2   marked an exhibit, Exhibit 1033, which is Jonathan Pauling's

3   deposition testimony in February 2016, and I want to direct

4   your attention to testimony that he gave at page -- page 163.

5   I'm going to put that up on the screen.  Jonathan Pauling

6   testified as follows.  I asked the question, I wanted to make

7   sure I understand.  Early December 2015 -- and I'll take

8   Mr. Carr's word for it that it was December 4th of 2015 -- is

9   when you provided Ms. Wilson's lawyers with Exhibit 202?

10  Answer, Yes.  I think that's when they first got this too as

11  far as I know.  Do you see that?

12  A.  I see it.

13  Q.  All right.  You have no -- no evidence that the amendment

14  Exhibit 202 slash Exhibit 3 was provided to Amanda Wilson or

15  her lawyers prior to December 4th, 2015?

16  A.  Not that I know of.

17  Q.  And you're aware that a charging order entered against Two

18  Mile Ranch?

19  A.  Yes.

20  Q.  You're aware that the date of that charging order is

21  November 19, 2015?

22  A.  Yes.

23  Q.  So the chronology of events is that the charging order

24  enters November 19, 2015, and approximately two weeks later on

25  December 4, 2015, is when Amanda Wilson and her lawyers are

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    232

1   first delivered a copy of the amendment?

2   A.  I would assume so, if that's what you say.

3   Q.  The amendment was backdated by you and Jonathan Pauling?

4   A.  No.

5   Q.  Let's look at what's been marked Exhibit 4, and that is

6   stipulated I believe.

7          THE COURT:  Exhibit 4 is admitted.

8      (Plaintiff's Exhibit 4 received.)

9   Q.  (By MR. PULKRABEK) Mr. Pauling, Exhibit 4 is a form --

10  federal form or Schedule K-1 to the 2014 tax returns for Two

11  Mile Ranch.  Do you see that?

12  A.  Yes.

13  Q.  And it covers the period beginning January 1st, 2014, and

14  ending December 31st, 2014?

15  A.  Yes.

16  Q.  Now, the amendment that we were talking about, Exhibit 3,

17  that date on that is September 15th, 2014, so that falls

18  within this period that we're talking about on the form K-1?

19  A.  Yes.

20  Q.  And we go down, here's -- you can see this is Jonathan

21  Pauling's form K-1.  Do you see that?

22  A.  Yes.

23  Q.  All right.  And then the form K-1, as they always do, has

24  beginning and ending profit and loss percentages.  Do you see

25  that?

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    233

1   A.  Yeah.

2   Q.  And you can see that the profit and loss percentages

3   remained the same?

4   A.  Yes.

5   Q.  In 2014, correct?

6   A.  Correct.

7   Q.  And while we're at it, why don't we look at Exhibit 5.

8          THE COURT:  Exhibit 5 is admitted.

9      (Plaintiff's Exhibit 5 received.)

10  Q.  (By MR. PULKRABEK) Exhibit 5 is the Schedule K-1 for the

11  same period, January 1st to December 31, 2014, for you.  Do

12  you see that?

13  A.  Yeah.

14  Q.  And also on your K-1 the profit and loss percentages

15  remained the same throughout 2014?

16  A.  Yes.

17  Q.  You understand, of course, that the form K-1 is a schedule

18  to federal tax documents?

19  A.  Yes.

20  Q.  And you understand, of course, that federal tax documents

21  are documents that are filed with the Internal Revenue Service

22  under penalty of perjury?

23  A.  Yes.

24  Q.  And when you personally file your tax returns with the

25  IRS, you would attach the Schedule K-1?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021        234

1   A.   Yes.

2   Q.   And that also on your individual behalf is filed under

3   penalty of perjury?

4   A.   Yes.

5   Q.   So either the amendment marked as Exhibit 3, the date on

6   that is not correct, or these K-1s are not correct.

7   A.   Well, I can explain that, if you would let me.

8   Q.   My question was a little narrower, and you'll have an

9   opportunity to explain with your counsel.

10  A.   Okay.

11  Q.   So my question is simply either the amendment is incorrect

12  or the K-1 is incorrect.

13  A.   That part of --

14          MR. KEITHLEY:  Objection.  I'm sorry.  Objection,

15  Your Honor.  I don't know what the question is.  I think

16  that was a declarative statement.

17          THE COURT:  You don't know what the question was?

18  You weren't listening?

19          MR. KEITHLEY:  Your Honor, I was listening.  I

20  don't think there was a question pending.  Mr. Pulkrabek's

21  statement was either the amendment is incorrect or the K-1s

22  are incorrect.  Mr. Pauling offered to explain, and

23  Mr. Pulkrabek told him not to, so I'm not sure what the

24  question is.

25          THE COURT:  When Mr. Pulkrabek told him not to,

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021        235

1    then he said one or the other has to be true.  That was his

2    question.

3            MR. KEITHLEY:   Okay.

4    A.   That part of the K-1 is not correct.

5    Q.   (By MR. PULKRABEK) Now, let's just for a moment here,

6    let's compare what's going on in Exhibit 3 to what's going on

7    in Exhibit 4.  Exhibit 3 is a document solely between you and

8    Jonathan Pauling?

9    A.   Correct.

10   Q.   There's no indication it was delivered to anybody else

11   prior to December of 2015?

12   A.   Correct.

13   Q.   Exhibits 4 and 5 are between Two Mile Ranch, you

14   individually, Jonathan Pauling individually, and the United

15   States of America?

16   A.   Correct.

17   Q.   And that document, that was delivered to the United States

18   of America?

19   A.   Yes.

20   Q.   And representations were made on that document?

21   A.   Yes.

22   Q.   Exhibit 3 is not something that gets filed with the United

23   States under penalty of perjury?

24   A.   If you say so.

25   Q.   Does it?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      236

1   A.  I don't know.

2   Q.  Do you have any reason to believe that you ever filed

3   Exhibit 3 under penalties of perjury with the United States of

4   America?

5   A.  Not that I know of.  We are not required to.

6   Q.  Exhibits 4 and 5 are documents that get filed under

7   penalty of perjury?

8   A.  Yes.

9   Q.  Let's continue.  In addition to the K-1s for 2014 we have

10  Exhibit 9.  Let me show you Exhibit 9.

11        THE COURT:  Exhibit 9 is stipulated.  It's

12  admitted.

13      (Plaintiff's Exhibit 9 received.)

14  Q.  (By MR. PULKRABEK) Exhibit 9 is a compilation, as you can

15  see, of several additional K-1s, the first page being for

16  2015.  Do you see that?

17  A.  Yes.

18  Q.  And this is for you individually?

19  A.  Yes.  It says Two Mile Ranch there and me personally, yes.

20  Q.  But this is your --

21  A.  Yes, that's my personal one.

22  Q.  -- K-1.  And you filed this with your taxes?

23  A.  Yes.

24  Q.  And what did you inform the United States government in

25  2015 with the beginning and ending partnership percentages for

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021    237

1   Two Mile Ranch?
2   A.  I basically said 50 percent of the losses of my share was
3   $882,293.
4   Q.  Okay.  And what did you tell the United States government
5   were the profit and loss percentages for the year?
6   A.  50/50.
7   Q.  Okay.  That was what you told the government in 2015.
8   Let's look at 2016.  What did you tell the government in 2016?
9   A.  Same thing.
10  Q.  What did you tell the government in 2017?
11  A.  Same thing.
12  Q.  What did you tell the government in 2018?
13  A.  Same thing.  That one there is not the correct one sent,
14  by the way.
15  Q.  It's not the correct one sent?
16  A.  No, it's not.
17  Q.  Let me zoom in --
18  A.  No.  The reason being is I know that the total amount is
19  different on the ending capital account.
20  Q.  Okay.
21  A.  Because my tax man had figured those wrong.
22  Q.  Let me zoom in on this.  It's a little hard to see.  See
23  that number down there that I just highlighted?
24  A.  Yeah.  But he could have sent it, but he had to amend it
25  then also.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    238

1   Q.   Okay.  TMR is the Bates label on this?

2   A.   Is the what?

3   Q.   TMR is the Bates label on these documents?  Do you see

4   that?

5   A.   I'm sure.

6   Q.   TMR, that was Two Mile Ranch?

7   A.   Uh-huh.

8   Q.   In this very lawsuit you produced certain documents?

9   A.   I believe you had my tax preparer give you these.

10  Q.   Two Mile Ranch produced documents in this case.  Am I

11  right about that much?

12  A.   I'm sure we did.

13  Q.   You were asked to pull together documents to produce in

14  this case?

15  A.   Well, I was asked to produce a lot.  I'm not sure if these

16  particular tax returns were in that bunch or if you got these

17  from my tax preparer.

18  Q.   And I think we can deal with this particular issue of TMR

19  a little bit later, but did you produce accurate or inaccurate

20  information to us in this lawsuit, Mr. Pauling?

21  A.   Well --

22        MR. KEITHLEY:  Objection, argumentative, Your

23  Honor.

24        THE COURT:  Rephrase the question.

25  Q.   (By MR. PULKRABEK) When you produced documents to us, did

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021     239

1    you use diligent efforts to produce the correct documents?

2    A.  Yes.

3    Q.  Now, I want to ask about another document in addition to

4    these federal documents.  Exhibit 7.

5            THE COURT:  That's admitted as a stipulated

6    document.

7        (Plaintiff's Exhibit 7 received.)

8    Q.  (By MR. PULKRABEK) I'll put this in a little bit of

9    context.  Back in 2015, you and Jonathan Pauling through Two

10   Mile Ranch did a number of real property transactions?

11   A.  Correct.

12   Q.  There was a sale of real property to Cervi Enterprises?

13   A.  Correct.

14   Q.  There was a sale of real property called the North Ranch

15   to you individually?

16   A.  Correct.

17   Q.  Two Mile Ranch acquired title to the North Turkey Creek

18   property?

19   A.  Correct.

20   Q.  In connection with those real property transactions, Land

21   Title Guarantee Company was engaged to handle closing matters?

22   A.  Yes.

23   Q.  As part of Land Title's work, Land Title issued this --

24   this letter for you and Jonathan Pauling to sign?

25   A.  Yes.

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    240

1    Q.  Dated May 13, 2015?

2    A.  Yes.

3    Q.  And that is after the date that we see stamped on the top

4    of the amendment?

5    A.  Yes.

6    Q.  In this letter, you and Jonathan Pauling signed and

7    verified this statement:  We, the undersigned here, confirm as

8    of the date of this letter that there have been no amendments,

9    modifications, or revisions to the trust agreement slash

10   operating agreement or other constituent documents of the Two

11   Mile Ranch, a Colorado General Partnership.

12   A.  That is correct.  There is a story behind that too, or a

13   reason, I should say.

14   Q.  Again --

15        THE COURT:  Next question.

16   Q.  (By MR. PULKRABEK) So comparing this letter to Exhibit 3,

17   we've already established that Exhibit 3 is solely between you

18   and Jonathan Pauling, whereas Exhibit 7 is a representation

19   made by you and Jon Pauling to Land Title Guarantee Company,

20   correct?

21   A.  Correct.

22   Q.  For its reliance in connection with a real property

23   transaction, correct?

24   A.  Correct.

25   Q.  And that real property transaction involved the sale of

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    241

1   real property for hundreds of thousands of dollars?

2   A.   Correct.

3   Q.   Now, I want to change gears and ask you some questions

4   about these real property transactions in 2015.  Some of them

5   I think we've already covered.  The first one I want to ask a

6   little more about is the North Ranch property.  Can you tell

7   us where that is located?

8   A.   North of Stone, Colorado, 20 miles.

9   Q.   In what county?

10  A.   Weld.

11  Q.   Okay.  And so when we're thinking about the properties

12  that Two Mile Ranch owned back in 2015, there were properties

13  in Weld County?

14  A.   Yes.

15  Q.   There is what's known as the farm in Logan County?

16  A.   Yes.

17  Q.   And that's located near Sterling?

18  A.   Yes.

19  Q.   We talked a little bit about mineral interests.  The

20  mineral interests are in Weld County?

21  A.   Yes.

22  Q.   Okay.  So the North Ranch property in Weld County was a

23  property that you personally acquired from Two Mile Ranch on

24  May 15, 2015?

25  A.   Yes.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021    242

1   Q.  The sale price of that property was $1 million?

2   A.  Yes.

3   Q.  And as part of that purchase price you gave Two Mile Ranch

4   a promissory note for $275,000?

5   A.  That is correct.

6   Q.  The balance of the purchase was financed by you through

7   Farmers State Bank?

8   A.  Correct.

9   Q.  And you gave Farmers State Bank a promissory note to pay

10  them back the amount that you financed?

11  A.  Yes.

12  Q.  And you gave them a deed of trust on this million-dollar

13  ranch property?

14  A.  Yes.

15  Q.  Now, at the same time Two Mile Ranch sold other real

16  property in Weld County to Cervi Enterprises, which is a

17  company owned by a gentleman named Mike Cervi?

18  A.  Correct.

19  Q.  That Cervi property, was that called the South Ranch?

20  A.  Correct.

21  Q.  And that was sold for $917,000?

22  A.  Correct.

23  Q.  The sale of these properties was done as part of what's

24  called a 1031 exchange?

25  A.  Correct.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      243

1    Q.  And the exchanged property was the property on North

2    Turkey Creek in Jefferson County?

3    A.  Correct.

4    Q.  The property -- the North Turkey Creek property, that's a

5    residential property?

6    A.  It's zoned agricultural.

7    Q.  Regardless of whether it's zoned agricultural, it's got a

8    house on it?

9    A.  It does, and two cabins.

10   Q.  Okay.  Let me show you what's been marked Exhibit 16.

11          THE COURT:  Admitted.

12       (Plaintiff's Exhibit 16 received.)

13   Q.  (By MR. PULKRABEK) So Exhibit 16 you'll see is a

14   promissory note?

15   A.  Yes.

16   Q.  Signed by both you and Jonathan partner --

17   A.  Yes.

18   Q.  Or Jonathan Pauling.

19   A.  Correct.

20   Q.  And then Richard Stull, Executive Vice President, signed

21   on behalf of the bank?

22   A.  Yes.

23   Q.  And the purpose we can see here it says purchase of

24   property slash Morrison, Colorado?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    244

1   Q.  So this is the promissory note in connection with the

2   North Turkey Creek property which we talked about a moment ago

3   being an exchange, a 1031 exchange, correct?

4   A.  Correct.

5   Q.  And if we look at the date on this, we can see that it's

6   for -- the loan number is 2288.  You see that?

7   A.  Yes.

8   Q.  The date on the promissory note is 5/15/2015?

9   A.  Correct.

10  Q.  And it's got a maturity date of 5/18/2016?

11  A.  Correct.

12  Q.  The loan amount is 1 -- a little over 1.6 million?

13  A.  Correct.

14  Q.  Now, the purchase price of that North Turkey Creek

15  property was $1,650,000?

16  A.  I believe so.

17  Q.  So we've already established that the North Turkey Creek

18  property was the exchange property in the 1031 exchange.  What

19  was going on with this note was essentially a short bridge

20  until the 1031 exchange proceeds came in?

21  A.  Yes.

22  Q.  And then if we look at page 3 of this document, we can see

23  5/15/2015 is the loan date?

24  A.  Yes.

25  Q.  And then 5/20/15 there's a principal and interest payment

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 2     04/13/2021     245

1   being made?

2   A.  Correct.

3   Q.  And that results in what is shown here as a zero balance

4   or a blank balance?

5   A.  Yes.

6   Q.  So in essence, loan 2288 was paid off in a matter of five

7   days?

8   A.  Correct.  I guess.

9   Q.  Now, let's look also at Exhibit 15, which I believe is

10  stipulated.

11          THE COURT:  Admitted.

12      (Plaintiff's Exhibit 15 received.)

13  Q.  (By MR. PULKRABEK) So Exhibit 15 is a deed of trust

14  between Two Mile Ranch and Farmers State Bank, correct?

15  A.  Correct.

16  Q.  And the identified property is the North Turkey Creek

17  property?

18  A.  Correct.

19  Q.  Okay.  We can see in paragraph 3 here it talks about a

20  maximum obligation limit not to exceed $2 million.  Do you see

21  that?

22  A.  I do.

23  Q.  And then in terms of the specifically described secured

24  interest under paragraph A here, it's typed in, promissory

25  note 2288 dated 5/15/2015 with a maturity date of 5/18/2016.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    246

1   Do you see that?

2   A.  Yes.

3   Q.  So there was the deed of trust that was put on the North

4   Turkey Creek property, the legal effect of which we can

5   discuss later, but that was something that you and Jonathan

6   Pauling did sign, correct?

7   A.  Correct.

8   Q.  So immediately after these real property transactions

9   occur in 2015, just to kind of speak broadly about the assets

10  of Two Mile Ranch, Two Mile Ranch holds title to this piece of

11  property on North Turkey Creek, right?

12  A.  Encumbered, yes.

13  Q.  And Two Mile Ranch holds a $275,000 promissory note that

14  you gave to Two Mile Ranch in connection with your acquisition

15  of the North Ranch?

16  A.  Correct.

17  Q.  Then other assets include the farm property located near

18  Sterling?

19  A.  Correct.

20  Q.  Mineral interests located in Weld County?

21  A.  Yes.

22  Q.  Equipment, vehicles, things of that nature for farming?

23  A.  Yes.

24  Q.  There are water rights that are owned?

25  A.  Yes.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021   247

1   Q.   Feed?  There's some feed that the ranch had?

2   A.   Back then?  I don't know for sure.  Could have.  I'm sure

3   there was.

4   Q.   Irrigation equipment?

5   A.   Yes.

6   Q.   All right.  Now, let me ask you -- I'm going to change

7   topics here.  I want to ask you some questions about Elyce

8   York.  The first question I want to ask you is this.  Confirm

9   for us that in your deposition that we took of you on

10  November 30, 2016, you denied ever having met Elyce York?

11  A.   I had not met her yet at that time.

12  Q.   And you also denied even knowing who Elyce York was in

13  that deposition?

14  A.   If that's what I said.

15  Q.   Well, let's look at it.

16  A.   Well, I'm sure I did.  You wouldn't have brought it up

17  otherwise.

18  Q.   So now I need to understand whether your prior testimony

19  was incorrect or correct as to whether you knew who Elyce York

20  was as of November 30, 2016.

21  A.   I'm just trying to search my memory.  I believe I knew who

22  she was, but not anything in connection with what's going on

23  here today.

24  Q.   All right.  So can you explain to me why when you told me

25  November 30, 2016, in your deposition you did not know who

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021   248

1    Elyce York was, why did you say that?

2    A.  Well, it's -- to me knowing a person is meeting them

3    personally.  You can read about somebody's name in the paper

4    anywhere and know about the person.  I hadn't met her yet, and

5    I took that question as being that.

6    Q.  Well, you said -- let me bring up your deposition, if you

7    don't mind.  All right.  So I did ask you here on page 72 of

8    your deposition, Have you ever met Elyce York?  You said no.

9    So you're telling me that's accurate as of November 30th, you

10   had not met Elyce York?

11   A.  That is correct.

12   Q.  Okay.  Then I asked you some questions about the North

13   Turkey Creek property here.  Do you see that?  I started

14   asking you, Why did you and Mr. Pauling purchase the North

15   Turkey Creek property?  You said an investment?

16   A.  Correct.

17   Q.  Then I asked you, Did you ever try to put that in Elyce

18   York's name?  You said no.  Do you see that?

19   A.  Correct.

20   Q.  Then I said, Are you aware that Elyce York was living at

21   that property for some period of time?  And your response is,

22   I don't know who Elyce York is.

23   A.  Correct.

24   Q.  So did you know that Elyce York was living at the North

25   Turkey Creek property or not?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021   249

1   A.  At a later date.

2   Q.  So as of November 30, 2016, you didn't know that she had

3   been living at the North Turkey Creek property?

4   A.  No, I did not.

5   Q.  And you had heard her name, but you -- you had heard her

6   name or not?

7   A.  Well, that's five, six years ago.  I'm trying to remember

8   how I came about her name, if it was in discussions with my

9   brother about The Market.  I don't remember the actual

10  content.  That's possible.  I couldn't tell you for sure.  I

11  know that I did not meet her prior to that time.

12  Q.  Your brother had had a child with Elyce York prior to this

13  time?

14  A.  Prior to that time?

15  Q.  Your deposition was on November 30, 2016.  Skylar Joy

16  Pauling was born January 6, 2016, more than ten months

17  earlier.

18  A.  I thought it was 2017.  Sorry.

19  Q.  Let me show you Exhibit 31.

20       MR. PULKRABEK:  Your Honor, I believe this is

21  stipulated.

22       THE COURT:  Yes.  It's admitted.

23    (Plaintiff's Exhibit 31 received.)

24  Q.  (By MR. PULKRABEK) So during the -- during the Two Mile

25  Ranch bankruptcy you were the partner as between you and Jon

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021      250

1    Pauling who was signing documents in that bankruptcy?

2    A.   Correct.

3    Q.   The bankruptcy was filed July 1st of 2016?

4    A.   Correct.

5    Q.   And it continued on until March 31st of 2017 when it was

6    dismissed?

7    A.   Correct.

8    Q.   So this exhibit here, Exhibit 31, is during the period of

9    time of the bankruptcy when you were the one signing documents

10   for Two Mile Ranch?

11   A.   Well, we still -- both of us had to still sign documents.

12   It wasn't just me.

13   Q.   But the question really is the document that we're now

14   looking at is during that period of time in the bankruptcy?

15   A.   Yes.

16   Q.   And this is an e-mail from Steve Stull to Joe Henry -- we

17   know that is Jonathan Pauling -- dated November 8, 2016.  You

18   see that?

19   A.   I see that.

20   Q.   It says subject, proposed commitment letter, correct?

21   A.   Yes.

22   Q.   And then so Steve Stull is sending a proposed commitment

23   letter, which we can see on page 2 of this document.  Do you

24   see that?

25   A.   Correct.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 2       04/13/2021    251

1   Q.  So even though we can see that the letter dated

2   November 4, 2016, is addressed to Lardyn Consulting, LLC,

3   Elyce York, it's being sent to Jon Pauling.  You see that?

4   A.  I see that.

5   Q.  Now, I want to ask you in connection with your testimony

6   just a moment ago that you didn't really -- it sounds like you

7   didn't really know who Elyce York was.  Were you aware that

8   even before your deposition Farmers State Bank was sending a

9   commitment letter through Jon Pauling to Elyce York with

10  respect to providing credit to purchase Two Mile Ranch's

11  assets in the Chapter 11?

12  A.  Could you scroll down just -- I would suppose I was

13  familiar with that, yes.

14  Q.  So you did know who Elyce York was in connection with

15  Lardyn Consulting prior to your deposition?

16  A.  I would -- well, I don't know that I was made aware of

17  this letter before then or not.  I could not say.

18  Q.  The question is more straightforward.  Did you or did you

19  not know who Elyce York was before you gave your deposition

20  testimony?

21  A.  I would assume, like I've said before, that at that

22  particular time when I gave my deposition I didn't really know

23  her.  I mean, I hadn't met her yet.  I mean, yes, I guess you

24  would say that I knew of her.

25  Q.  Okay.  Let's move on.  I want to ask you a couple

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    252

1   questions about a document we looked at yesterday in

2   connection with Elyce York's deposition, Exhibit 41.  This

3   contract to buy and sell minerals.  Do you see that?

4   A.  Yes.

5   Q.  Elyce York signed this on February 26, 2017, and then you

6   and Mark Pauling signed this on February 28th of 2017,

7   correct?

8   A.  Correct.

9   Q.  And it had this provision in here, the closing date for

10  this contract will immediately follow the date of a pending

11  Two Mile Ranch bankruptcy dismissal.  Do you see that?

12  A.  Yes.

13  Q.  Did you put that language in this contract?

14  A.  I did not.  I think it was part of the form.

15  Q.  You're telling me that there's a form --

16  A.  Well, no -- let me rephrase that.  Yes, we did.  As Two

17  Mile Ranch we did put that in there, yes.

18  Q.  Who?  You?  Jon Pauling?  Which one?

19  A.  No.  It was me.

20  Q.  All right.

21  A.  We were trying to get settled up with the bank, you know,

22  in a quick manner.

23  Q.  Okay.  So let's break this down a little bit.  There's an

24  agreement for the sale of minerals for north of nearly

25  $2 million according to this document, correct?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2       04/13/2021    253

1  A.  Correct.

2  Q.  That is contingent on Two Mile Ranch obtaining dismissal

3  of its bankruptcy?

4  A.  That was the plan, yes.

5  Q.  So you, Jon Pauling, and Elyce York all agreed what was

6  going to happen here was Two Mile Ranch would seek dismissal

7  of its bankruptcy, once the bankruptcy was dismissed, then

8  there would be this exchange of money and minerals?

9  A.  That was one of the avenues, yes.

10  Q.  And it was, in fact, a contract that you signed?

11  A.  Yes.

12  Q.  Do you know when you -- do you know when you moved or when

13  Two Mile Ranch moved to dismiss the bankruptcy?

14  A.  I believe it was in April.

15  Q.  All right.  Let me show you Exhibit 141, because I don't

16  want --

17  A.  My memory is not clear on the actual date.

18          MR. PULKRABEK:  So Exhibit 141, Your Honor, I'm

19  sorry, I don't recall if this is stipulated or not.

20          MR. KEITHLEY:  It is stipulated, Your Honor.

21          THE COURT:  Yes, it's stipulated.  You want it

22  admitted, I take it?

23          MR. PULKRABEK:  Let me see if I can refresh the

24  witness's memory.

25          MS. OLDEMEYER:  I move to admit Exhibit 141.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021     254

1            MR. PULKRABEK:  Okay.  I don't object.

2            THE COURT:  Well, okay.  It's admitted then.

3        (Plaintiff's Exhibit 141 received.)

4    Q.  (By MR. PULKRABEK) Okay.  You can see here, Mr. Mark

5    Pauling, that -- there was a question earlier who was the

6    bankruptcy judge, the Court had asked that question.  The

7    bankruptcy judge was Elizabeth E. Brown?

8    A.  Correct.

9    Q.  And if we want to look at the dismissal paperwork, here we

10   have an entry on February 28, 2017.  Docket entry number 78,

11   it says motion to dismiss case for other reasons.  Unable to

12   put forth a viable plan of reorganization, filed by Arthur

13   Lindquist-Kleissler on behalf of Two Mile Ranch, a Colorado

14   General Partnership, correct?

15   A.  Correct.

16   Q.  So just, again, the chronology of events here, there's

17   this agreement to sell the minerals that gets put together.

18   Elyce York signs it on February 26, 2017.  It contains an

19   agreement that the bankruptcy will be dismissed by Two Mile

20   Ranch after which the minerals will be sold in exchange for

21   nearly $2 million, and you and Jonathan Pauling signed on

22   February 28th, and your bankruptcy lawyer then moves to

23   dismiss the case?

24   A.  Correct.

25   Q.  I'm not going to go through the other documents, but you

                    Sarah K. Mitchell, RPR, CRR

1  saw the other documents yesterday that contained similar

2  provisions with respect to the sale of the Sterling farm as

3  well as the equipment, all that was conditioned on dismissal

4  of the bankruptcy?

5  A.  Correct.

6  Q.  Then in terms of actions that you undertook to actually

7  convey the assets to Lardyn, let's look at a few exhibits

8  here.  We have Exhibit 54, which is I believe stipulated.

9        THE COURT:  Okay.  It's admitted.

10     (Plaintiff's Exhibit 54 received.)

11  Q.  (By MR. PULKRABEK) And, Mr. Pauling, you signed this

12  mineral deed knowingly, voluntarily conveying minerals to

13  Lardyn Consulting on April 27, 2017?

14  A.  Correct.

15  Q.  Same thing with Exhibit 55.  This has to do with water

16  rights.  I believe this is stipulated.

17  A.  Correct.

18        THE COURT:  55 is admitted.

19     (Plaintiff's Exhibit 55 received.)

20  Q.  (By MR. PULKRABEK) Okay.  So you signed Exhibit 55 as well

21  for getting the water rights?

22  A.  Yes.

23  Q.  57, so that there's no question that these properties were

24  actually transferred, Exhibit 57 is stipulated.

25  A.  Correct.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2     04/13/2021    256

1           THE COURT:  Admitted.

2       (Plaintiff's Exhibit 57 received.)

3   Q.  (By MR. PULKRABEK) This is for the land.  You signed that?

4   A.  Correct.

5   Q.  And then one last thing.  Let me show you Exhibit 91A.

6   Small point, but there was some -- there were some minerals

7   that you forgot to convey, and so you had to sign a later

8   quitclaim deed on the minerals; is that correct?

9   A.  It wasn't that we had forgot.  It went back to the South

10  Ranch.  We had bought that ranch from Farmer's Home

11  Administration, and they did not transfer a partial interest

12  in those acres at that time that they were required to do so.

13  Q.  Okay.

14          MR. PULKRABEK:  Your Honor, I think 91A is

15  stipulated.

16  A.  But that's what those had to do with.

17          THE COURT:  91A.

18  Q.  (By MR. PULKRABEK) Jon Pauling --

19          THE COURT:  You want 91A admitted?

20          MR. PULKRABEK:  Yes.

21          THE COURT:  What are you going to do with all these

22  documents that you're putting into the record?

23          MR. PULKRABEK:  I guess, Your Honor, I suffer from

24  some paranoia that failure to introduce the action deeds

25  conveying these assets could become an issue.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 2     04/13/2021     257

 1          THE COURT:  Okay.  Well, I'm suffering from

 2   terminal tediousness.

 3          MR. PULKRABEK:  Okay.  I'll try to pick it up, Your

 4   Honor.

 5      (Plaintiff's Exhibit 91A received.)

 6   Q.  (By MR. PULKRABEK) With respect to this quitclaim deed,

 7   there was no further consideration made?

 8   A.  No, there was not.  I don't believe there was, no.

 9   Q.  All right.

10   A.  It's a very small amount.  I don't -- it's only like one

11   or two mineral acres.  It's not a very large amount.

12   Q.  All right.  Let me show you, in May of 2016 before the

13   bankruptcy was filed --

14   A.  Could you repeat that, please, your date?

15   Q.  Yes.  In May of 2016 before Two Mile Ranch filed

16   bankruptcy, you obtained a payoff statement from Two Mile

17   Ranch?

18   A.  From Two Mile Ranch or from Farmers State Bank?

19   Q.  I'm sorry.  From Farmers State Bank.  You obtained a

20   payoff statement for Two Mile Ranch from Farmers State Bank?

21   A.  Correct.

22   Q.  The payoff statement did not include amounts for this

23   $730,000 loan when you acquired the North Ranch?

24   A.  I don't see that document in front of me.  If you can

25   bring it up.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021     258

1    Q.  Let me show it to you.

2            MR. PULKRABEK:  Exhibit 22 is stipulated, Your

3    Honor.

4            THE COURT:  Apparently it's not.

5            MR. PULKRABEK:  I can lay a foundation unless the

6    defendant bank doesn't have an objection.

7            MS. OLDEMEYER:  Your Honor, may I have just a

8    second?  No objection to 22.

9            MR. KEITHLEY:  Your Honor, on behalf of Mark

10   Pauling and TMR, I do have a foundational objection only

11   because this does not indicate it was sent to Mr. Pauling,

12   but we can establish that.  We can move forward.

13   Q.  (By MR. PULKRABEK) I'll see if I can establish that, Your

14   Honor.

15           MR. FORBES:  Your Honor, no objection from the

16   Lardyn defendants.

17           THE COURT:  Are you trying to show this was sent to

18   Mark?

19           THE WITNESS:  Can I say something to you, Judge?

20           THE COURT:  Sure.

21           THE WITNESS:  That ToniPauling@hotmail.com, that

22   actually was going to me.  It was my wife's at the time, my

23   wife's e-mail.  I did not have e-mail for myself at that

24   time, so -- and my counsel is not aware of that.

25           MR. KEITHLEY:  Your Honor, based on the witness's

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    259

 1   statement, I would withdraw my objection.  Thank you.  No

 2   objection.

 3            THE COURT:  22 is admitted.

 4       (Plaintiff's Exhibit 22 received.)

 5   Q.  (By MR. PULKRABEK) So this was an e-mail that was sent to

 6   you by the bank on May 4, 2016?

 7   A.  Okay.

 8   Q.  And that's before the bankruptcy?

 9   A.  Correct.

10   Q.  And if we go to the second page -- rather the third page,

11   it says payoff letter?

12   A.  Okay.

13   Q.  And there's -- it says new payoff, 5/4/16.  You see that?

14   A.  Uh-huh.

15   Q.  This is a payoff for Two Mile Ranch General Partnership?

16   A.  Correct.

17   Q.  And if we look at the payoff amounts that the bank

18   provides to you before the bankruptcy, we've got the loans

19   listed here, 2097, 2217, 2315, 2352, 2353?

20   A.  Correct.

21   Q.  You see those?  None of those loans are the $730,000

22   principal loan that you had with Farmers State Bank over the

23   purchase of the North Ranch?

24   A.  Well, it wouldn't be because this was just for Two Mile

25   Ranch General Partnership.

                          Sarah K. Mitchell, RPR, CRR

```
19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    260
```

1   Q.  Right.  So if we're looking at about a month and a half

2   before the bankruptcy gets filed, this is the payoff that the

3   bank provided to you?

4   A.  Correct.

5   Q.  8,862,208, right?

6   A.  Yes.  This just reflects the loans.

7   Q.  Okay.

8   A.  No guarantees.

9         MR. PULKRABEK:  Your Honor, those are all the

10  questions I have for Mark Pauling.

11        THE COURT:  All right.  Mr. Keithley,

12  cross-examination.

13        MR. KEITHLEY:  Thank you, Your Honor.

14                      CROSS-EXAMINATION

15  BY MR. KEITHLEY:

16  Q.  Good morning, Mr. Pauling.

17  A.  Good morning.

18  Q.  Could you please describe for the Court your current

19  employment status?

20  A.  With Lardyn?

21  Q.  Yes.

22  A.  I basically do farm, feedlot work, contract labor.

23  Q.  And what are your roles and responsibilities in -- as that

24  employee of Lardyn?

25  A.  Taking care of the animals, the feeding, the care for

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    261

1    them, the farming, the irrigating, sometimes calling to

2    procure feeds, that kind of stuff.

3    Q.  Is this a full-time position for you?

4    A.  Yes.

5    Q.  Where do you live right now?

6    A.  I live at the farm north of Sterling.

7    Q.  What -- we've heard a lot so far in this case about Lardyn

8    Consulting.  What is your understanding of what Lardyn

9    Consulting is?

10   A.  It now is a farming feedlot operation.

11   Q.  And what does that mean?

12   A.  Well, that's the business she's in.  I mean, I guess I

13   don't quite understand.

14   Q.  When -- can you describe for the Court what a feedlot

15   operation is very briefly?

16   A.  Well, there's different types of feedlots.  You have a

17   commercial operation, which is what Elyce runs, as compared to

18   what we used to do.  What we used to do is we fed cattle of

19   our own, whereas a commercial, that's basically you don't own

20   the cattle.  You just feed and take care of these cattle for

21   people that send their cattle to your feedlot to finish or to

22   grow.  Our operation was totally different.  We were a

23   registered breeding operation concentrating mainly on genetics

24   of the carcass, and that's why we decided to build the feedlot

25   to improve our ability to get more scientific data on our

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    262

1   cattle.

2   Q.  And, Mark, if I can, and I'm not insulting you, I'm going

3   to refer to you as Mark, if that's okay?

4   A.  That's fine.

5   Q.  Mark, when you're using the terms we and our, are you

6   talking about Two Mile Ranch?

7   A.  Yes.

8   Q.  You and Jon --

9   A.  Yes.

10  Q.  -- is what you're referring to?

11  A.  Uh-huh.

12  Q.  Okay.  Does Lardyn own its own herd of cattle?

13  A.  No.

14  Q.  Is it any sort of a breeding operation?

15  A.  No.

16  Q.  How would you describe Lardyn being different than what

17  Two Mile Ranch was?

18  A.  Well, it's a totally different enterprise.  I mean, when

19  you're doing commercial feedlot, you're basically getting

20  other people to bring cattle to your lot to feed so that they

21  can realize profits from efficient feeding and selling them at

22  a later date.

23  Q.  And what did -- you talked a moment ago about Two Mile

24  Ranch being involved in genetics and raising of its own herd.

25  Can you briefly describe what Two Mile Ranch used to do?

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    263

1   A.  Well, we were a seed stock producer in registered Black

2   Angus, and early on we saw the economic upside if we decided

3   to concentrate on the carcass.  The American Angus Association

4   was the first breed to do so, to concentrate on the end

5   product, and we just kind of followed right behind them.

6   Q.  And we've already established through Ms. York that she's

7   the owner of a certain majority percentage of Lardyn.  Is that

8   your understanding as well?

9   A.  Yes.

10  Q.  Now, you used to be a 15 percent owner in Lardyn before,

11  correct?

12  A.  Correct.

13  Q.  Do you still have that 15 percent ownership interest?

14  A.  I do not.

15  Q.  When did you first acquire that 15 percent?

16  A.  Prior to the closing of the -- of Two Mile Ranch to

17  Lardyn.

18  Q.  The sale of the assets from Two Mile Ranch to Lardyn?

19  A.  Uh-huh.

20  Q.  Were you an original founding owner of Lardyn?

21  A.  No.

22  Q.  Mr. Pulkrabek has asked you some and shown you some

23  documents and asked you some questions about the contracts

24  being signed to terminate the bankruptcy and initiate the

25  process for the sale of those .  Do you remember him showing

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    264

1   you those?

2   A.   Yes.

3   Q.   And the date on those was February 28th of 2017, correct?

4   A.   Uh-huh.

5   Q.   Were you an owner of Lardyn at that point in time?

6   A.   No.

7   Q.   So you became an owner between February --

8   A.   Yes.

9   Q.   -- 28th and the April closing?

10  A.   Yes.

11  Q.   Okay.  When did you sell your ownership interest in

12  Lardyn?

13  A.   June of 2019.

14  Q.   And why did you sell it?

15  A.   The bank was pressuring Two Mile Ranch to make some

16  movement on its debt owed to Farmers State Bank, and I decided

17  to sell my percentage so I could do two things, hit two birds

18  with one stone, so to speak.  I could then pay off my $275,000

19  promissory note plus six percent interest.  And then what was

20  left over, a large portion of that I paid on principal toward

21  the Two Mile Ranch.

22  Q.   Did you retain any of that money from that sale?

23  A.   Some.

24  Q.   How much?

25  A.   I would say it was like 80,000.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    265

1    Q.  And what was that for?

2    A.  I had been basically up to that point before being

3    employed by Lardyn being -- living off of credit cards, so

4    some of that went to pay off credit cards.  And then with all

5    of this going on, I needed to pay some attorneys.

6    Q.  In terms of Lardyn's operations, you're still familiar

7    with how Lardyn operates and who has what responsibilities,

8    correct?

9    A.  Correct.

10   Q.  What are your -- we talked about your responsibilities.

11   How would you describe Ms. York's responsibilities for Lardyn?

12   A.  She's responsible for running the business.

13   Q.  And what does that mean?

14   A.  That means she's the one that talks to the creditors.

15   She's the one that talks to the vendors.  She's the one that

16   talks to the experts.  She's the one that talks to Farmers

17   State Bank.

18   Q.  Does she consult with you about those vendors?

19   A.  On occasion, yes.

20   Q.  But whose ultimate decision is it?

21   A.  It's hers.

22   Q.  What involvement are you aware of Jon Pauling having with

23   regard to Lardyn's operations?

24   A.  None.  He was involved in the setup as far as getting this

25   deal put together.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021     266

1   Q.  One of the main contentions, as you know, in this case is

2   that Ms. York is simply a straw woman --

3   A.  Right.

4   Q.  -- for Jon Pauling.  Do you agree with that?

5   A.  I do not.

6   Q.  Why not?

7   A.  Well, because -- I guess do you want me to go into the

8   long story?

9   Q.  The short one for now.

10  A.  Because, I mean, she's put herself at risk here on her

11  own.  She's willing to put her name on a piece of paper to

12  show that she's liable for this much money, and she has been

13  progressing as from day one until now as to becoming more

14  knowledgeable within the business.

15  Q.  Let me ask you about your understanding or your awareness

16  of Jon Pauling's involvement with Lardyn's operations.  Is Jon

17  an owner of Lardyn?

18  A.  No.

19  Q.  Is he an employee?

20  A.  No.

21  Q.  Is he a contractor, to your knowledge?

22  A.  No.

23  Q.  Does he do work for Lardyn from time to time?

24  A.  I think once in a while Elyce will ask him for some

25  financial advice.  If I need help, if I'm short of people to

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      267

1    process cattle out there, I will ask him to see if he's

2    available.

3    Q.   Now, you talked a moment ago about Jon helping Ms. York

4    set up Lardyn and start running the business.  How did he

5    assist her, to your knowledge?

6    A.   Basically with financing.

7    Q.   What do you mean?  Did he provide money to her?

8    A.   No, no, no.  As far as financial advice, filling out

9    documents and that kind of stuff.

10   Q.   And has that pretty much ended by this point in time?

11   A.   By now, yes.

12   Q.   Let me change gears, Mark, and ask you about the ranch and

13   the farm.  We've heard a lot of discussion about the ranch and

14   the farm that Two Mile Ranch own.  How -- was it Two Mile

15   Ranch that just started the ranch?

16   A.   Yes.

17   Q.   The ranch and the farm, had your father originally been

18   involved in those operations?

19   A.   The farm in question, no.  The ranch, yes.  When he came

20   back from Korea, he went into business partnerships with his

21   uncle with the farm northwest of Sterling, and in '62 he

22   bought this North Ranch property with his uncle, and then I

23   believe it was '65 he bought his uncle out.

24   Q.   And why did he buy the ranch?

25   A.   He had an affinity for cattle and horses.  He didn't

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    268

1   really like farming that much.

2   Q.  Did he also work on a farm as well?

3   A.  At -- you mean the one in question?

4   Q.  Not this specific land in question, but farming generally.

5   A.  Well, when he came back from Korea he learned to do wheat

6   farming, dry land farming.

7   Q.  Where did you grow up?

8   A.  At the ranch.  I was born in '61, but we moved to the

9   ranch in '63, I believe.  So I was just barely two years old.

10  Q.  And we heard some questions briefly in this case yesterday

11  about your siblings.  How many do you have?

12  A.  I have four brothers.

13  Q.  Who are they?

14  A.  Paul is the oldest, Dave, Tim, me, then Jon.

15  Q.  So you went very fast there.  Can you say it again a

16  little bit more slowly for the court reporter?

17  A.  Paul is the oldest.  Then Dave, then Timothy, then me,

18  then Jon.

19  Q.  Did all five of you also work on the ranch at some point

20  in time as well?

21  A.  Yes.

22  Q.  How did Jon get involved in ranching?

23  A.  Well, basically what had happened is my father had got

24  sick and was no longer able to take care of the ranch like he

25  needed to, and Jon was still in high school.  He was a senior,

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021       269

1    and my dad made the request to the superintendent to see if

2    Jon couldn't quit school.  He had enough credits to graduate,

3    so -- to help him out, and they agreed with that.  Jon

4    graduated, got his diploma, but that's how Jon got started

5    helping out dad.

6    Q.  And what were you doing at that point in time?

7    A.  At that time I was working at a machine shop in Kimball,

8    Nebraska.

9    Q.  And approximately when was this, what year?

10   A.  That would have been 1981.

11   Q.  And can you describe briefly for the Court how we get from

12   1981 when Jon starts buying Angus cattle up until the

13   formation of Two Mile Ranch in 1986, what happened in that

14   timeframe?

15   A.  Dad's health had deteriorated to the point where he

16   couldn't do anything, and so he was getting in trouble with

17   his bank at that time, and Jon and I put a plan together in

18   '86 to satisfy the bank through Farmer's Home.

19   Q.  And let me just ask the question, why was it only you and

20   Jon?  Why weren't your other three brothers involved in Two

21   Mile Ranch?

22   A.  They had gone on with their lives.  They were doing other

23   things.

24   Q.  They were older than the two of you, and they had already

25   started moving down career paths?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    270

1   A.   Uh-huh.

2   Q.   So the purpose of Two Mile Ranch was to buy the ranch,

3   continue the operations, and begin a breeding operation?

4   A.   Correct.

5   Q.   What was your involvement in 1986 when Two Mile Ranch was

6   first formed?

7   A.   Basically I was providing cash flow, if you want to be

8   blunt about it.  I would still help on the weekends and

9   whatnot, but basically helping with cash flow.

10  Q.   How so?

11  A.   By my paycheck through working at the machine shop.

12  Q.   And how long did you continue working at the machine shop?

13  A.   I worked -- I think I believe until 2007.  In 19 --

14  January 1st of 1989 is when I bought the machine shop from the

15  existing owner, and the owner financed me.

16  Q.   And you continued --

17  A.   Yes.

18  Q.   -- owning and operating the machine shop through that

19  point in time?

20  A.   Yes.

21  Q.   You just said you sold it in 2007?

22  A.   Yes.  Didn't even actually sell it.  We just closed it up

23  because we couldn't find buyers for that type of equipment,

24  and there's -- you don't need the details, I guess.

25  Q.   When did Two Mile Ranch obtain what has been referred in

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021    271

1   the case as the farm?

2   A.   Would have been December of 2002.

3   Q.   And why did you obtain the farm?

4   A.   The reason was because prior to that point we had been

5   sending our calves for -- to a feedlot in Kansas to be grown,

6   to be butchered later to get carcass data for the breeding

7   operation for data for EPDs and everything like that.  So it

8   was getting quite expensive to ship those cattle, and then we

9   just figured we could do a better job doing it ourselves, keep

10  a better eye on the cattle, and then expand what we could do

11  there, because by doing that, we could also -- besides feeding

12  our own calves, we could feed our customers' calves.  We would

13  either buy their calves or they would retain ownership and

14  then finish them out, and then we would send them to the

15  packing place, but we would also get carcass data on all their

16  cattle too.

17  Q.   Did Two Mile Ranch join a national association?

18  A.   Well, Two Mile Ranch didn't.  Jon was a member of the

19  America Angus Association.

20  Q.   What is that?

21  A.   That is the leading breed in the United States as far as

22  numbers.  They control all of the relevant data associated

23  with the Angus breed in the United States.

24  Q.   Can you please briefly describe for the Court the

25  importance of the data and the metrics you've described?  Why

19-CV-01224-RBJ        Bench Trial - Day 2       04/13/2021    272

1    were you tracking the data as to the carcass of these cattle?

2    A.   It goes back to economics.  Because of the times and

3    everything, the packing plants unbeknownst to most producers

4    did not tell the producers that you would get premiums on

5    carcasses that were choice or prime.  That was just something

6    that the little guys just didn't -- weren't aware of.  And by

7    the American Angus Association coming out with their program,

8    it became a little more well known.  And those premiums mean a

9    lot on an individual carcass.  At times you would get a $200

10   carcass premium on the right individual.

11   Q.   So you were trying to create the best meat you possibly

12   could?

13   A.   Uh-huh.

14   Q.   Was Two Mile Ranch profitable between 1986 and about 2010?

15   A.   Yes, I would say it was.  We were continuing to expand.

16   Q.   What would you do with any profits that you earned year

17   over year?

18   A.   Put it back into the business.

19   Q.   In what way?

20   A.   Update on equipment, but more importantly we would update

21   our genetics as far as bulls.  The animals that we would AI to

22   or the bulls we would buy to basically breed the cows.

23   Q.   Was there ever a point in time with your previous bank

24   where you got into financial trouble where the assets wouldn't

25   cover the loans to your previous bank?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    273

1   A.   No.

2   Q.   And just so we have the name on that, what was the

3   previous bank that Two Mile Ranch used to work with?

4   A.   The name that they're using now is FirsTier, but back when

5   we started it was First State Bank.

6   Q.   Okay.  So you have this scientific breeding operation

7   moving forward and growing.  Can you describe in a 2010-2011

8   timeframe how Jon's involvement in the business changed?

9   A.   To tell you the truth, he was getting burned out.  He was

10  not being able to find the right genetics to continue what we

11  wanted to do.  It was actually throwing our cattle backwards.

12  So a decision was made within the Angus -- America Angus

13  Association was detrimental to what we were doing, and he was

14  getting to the point of being very frustrated and burned out.

15  Q.   And how did he express that frustration to you?

16  A.   At first we were contemplating, you know, just wrapping it

17  up, selling out.  But we got -- we got to brainstorming, and

18  we decided, well, what if we decide to do branded beef product

19  and go from that, you know, and be able to sell our product

20  directly to the customer.  Basically it's from conception to

21  consumption type.

22  Q.   And how big was Two Mile Ranch's operation at that point

23  in time?  How many head of cattle did you have?

24  A.   We were up to about 700, 800, somewhere in there.

25  Q.   So this was not a small operation?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 2      04/13/2021      274

1   A.   No.

2   Q.   Was it just you and Jon working on the ranch?

3   A.   For the most part it was me, his -- myself, Jon, and his

4   wife, and we would -- at that particular time we'd usually

5   have one hired man.

6   Q.   And in terms of responsibilities as to the duties for Two

7   Mile Ranch, we've looked previously at the partnership

8   agreement that said for management purposes you would consult

9   on things, but it was Jon's decision that controls.  Do you

10  remember looking at that language?

11  A.   Yes.

12  Q.   Why did you agree to that particular provision?

13  A.   Because in the end someone has to make a decision, but Jon

14  and I, we thought a lot alike, so it's not like we had a lot

15  of disagreements.  There might be initial disagreements, but

16  in the end we would usually come to a consensus.  I can count

17  maybe one time where he actually had to do that, and I don't

18  even -- I don't even think that happened.

19  Q.   Now, in this 2010 timeframe, as you described, Jon was

20  getting burnt out, was he still out in the pens and out in the

21  fields working with you on the operation side?

22  A.   Yes.

23  Q.   You came up with the idea to establish something called

24  The Market, correct?

25  A.   Correct.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021      275

1   Q.   What is The Market?

2   A.   The Market was a place where we could finalize our

3   conception to consumption.   Basically a place to sell our beef

4   retail.

5   Q.   And did you come up with the idea?   Did Jon come up with

6   it?

7   A.   It was a joint thing.

8   Q.   And the idea you described before was to be able to sell

9   directly to the consumer?

10  A.   Yes.

11  Q.   Were you just going to sell beef?

12  A.   At the time the initial plan was that.   We might -- we

13  might do things that were associated with grilling.   You know,

14  like the difference in rubs and that kind of stuff, maybe some

15  barbecue equipment.   Basically just focusing on the meat, that

16  was the initial.

17  Q.   And were you going to start this yourselves?

18  A.   At first, no.   We tried to get investors to help us out

19  with that, because real estate along the Front Range is fairly

20  expensive.

21  Q.   Ultimately you went to -- you went to Farmers State Bank

22  to obtain financing; is that right?

23  A.   Correct.   Well, not Farmers.   We initially went to

24  FirsTier.

25  Q.   And did FirsTier agree to loan money to start The Market?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2     04/13/2021     276

1   A.  At first.

2   Q.  And what happened?

3   A.  Their banks that they had in Colorado were starting to

4   fail.  There were a lot of commercial banks that were failing,

5   and so they were getting hit pretty hard, and so their lending

6   limits were also shrinking on the ranch side, so we ran up

7   against lending limits at that point.

8   Q.  How long did it take you from the time you first obtained

9   financing until you actually opened The Market?  How long was

10  that period of time?

11  A.  A little over a year.

12  Q.  And you mentioned you had -- FirsTier ran into some

13  lending limit regulatory trouble.  Why did you switch to

14  Farmers State Bank?

15  A.  At that time they had what we needed.  We needed those

16  additional funds.

17  Q.  Did you know Steve Stull?

18  A.  Yes.

19  Q.  How?

20  A.  He had -- he was an employee of FirsTier.  He may have

21  been there when it was Compass.  I don't remember.  But that

22  is how we met with Steve Stull.

23  Q.  Now, the build-out for The Market, you said it took about

24  a year.  Was it under budget?

25  A.  No.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    277

1   Q.  So how much over budget was it?

2   A.  I think it was almost a million and a half.

3   Q.  And when did The Market open?

4   A.  November of 2013.  I'm not sure about the year.

5   Q.  2013 or 2012?

6   A.  It's one of those.

7   Q.  Okay.  Do you remember if there was ever a profit from The

8   Market?

9   A.  Never.

10  Q.  What -- what do you remember the lease cost being for The

11  Market space that they had?

12  A.  Just a monthly lease on where The Market was at was like

13  42,000 a year.

14  Q.  A year or a month?

15  A.  A month.

16  Q.  Okay.  I thought you said a year, so I wasn't sure.  What

17  was -- did you work down at The Market?

18  A.  No.

19  Q.  Who was primarily running The Market down here in Denver?

20  A.  Jon.

21  Q.  And can you describe quickly for the Court kind of how

22  things changed between you and your brother at this timeframe

23  when The Market opened?

24  A.  Well, I was involved out here in Sterling and north of

25  Sterling, and he was basically trying to take care of the

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      278

1   stuff up there in Denver, so we saw less of each other.

2   Q.  How often did he come back to Sterling?

3   A.  Maybe once or twice a week.

4   Q.  Was he living in Denver primarily?

5   A.  At times he would stay at motels and whatnot.

6   Q.  You mentioned his wife.  Was his wife living in Denver

7   with him, do you know?

8   A.  No.  She was out here, north of Stone.

9   Q.  She was still helping on the ranch?

10  A.  Uh-huh.

11  Q.  Let me ask you a little bit about the financial

12  circumstances --

13          THE COURT:  Just a second, Mr. Keithley.

14          MR. KEITHLEY:  Yes, Your Honor.

15          THE COURT:  Sarah, do you need a break?

16          THE COURT REPORTER:  Sure.

17          MR. KEITHLEY:  I was going to take a break after

18  two questions, but I can take a break now, Your Honor.

19          THE COURT:  No.  Two questions, let's see if you

20  can do it.

21          MR. KEITHLEY:  Okay, Your Honor.

22  Q.  (By MR. KEITHLEY) I was starting, Mr. Pauling, with regard

23  to the financial structures.  Obviously Farmers State Bank

24  loaned the money to Two Mile Ranch, correct?

25  A.  Correct.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ         Bench Trial - Day 2      04/13/2021    279

1    Q.  And did you have to personally guarantee that debt?

2    A.  Yes.

3           MR. KEITHLEY:  I promised two questions, Your

4    Honor.  Let's go ahead and take a quick break.

5           THE COURT:  Good for you, Mr. Keithley.  For you a

6    couple of beers means two.

7           MR. KEITHLEY:  That's right, Your Honor.

8           THE COURTROOM DEPUTY:  All rise.  Court is in

9    recess.

10       (Break was taken from 10:27 a.m. to 10:45 a.m.)

11          MR. KEITHLEY:  May I proceed, Your Honor?

12          THE COURT:  Yes.

13          MR. KEITHLEY:  Thank you.

14   Q.  (By MR. KEITHLEY) Now, Mark, we were talking about The

15   Market.  The Market was not part of Two Mile Ranch General

16   Partnership; isn't that right?

17   A.  That is correct.

18   Q.  How was The Market set up legally for operation?

19   A.  It was set up as an LLC.

20   Q.  Who were the members of the LLC?

21   A.  Of The Market at the time it was just Jon and me.

22   Q.  And the loans for The Market's operation from Farmers

23   State Bank, those were to that LLC; isn't that right?

24   A.  Not specifically to the LLC.  It was funded with

25   guarantees, I should say, from Two Mile Ranch, but, yes, it

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 2     04/13/2021     280

1   was specifically from -- to The Market, yes.

2   Q.  Okay.  So Jon moved down to the Denver area in 2012 when

3   The Market opened.  After that did you -- did you really know

4   kind of what his lifestyle was here in Denver once he had

5   moved down here?

6   A.  No.  Not what was going on.

7   Q.  You were busy up on --

8   A.  Uh-huh.

9   Q.  On the ranch.  Now, did a point in time arrive when you

10  did learn about some improprieties by Jon?

11  A.  Yes.

12  Q.  And can you describe for the Court how you first learned

13  about some financial difficulties with Two Mile Ranch, first

14  of all.

15  A.  Well, normally I would be in charge of ordering feed or

16  fuel or something like that, and the financial end of it was

17  always handled by Jon through Farmers State Bank to handle

18  those bills.  And I was getting denied.  People were saying

19  no, we're not bringing you any more.  You haven't paid for

20  this, that kind of stuff.

21  Q.  You mentioned Jon managed the finances for Two Mile Ranch?

22  A.  Yes.

23  Q.  What was your involvement at that point in time, 2012 to

24  2014, with the finances?

25  A.  Basically I was -- I wasn't involved strongly, I would

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021    281

1    say.  I was just mainly given an overview and then agreed to

2    it, if I deemed it was the right thing to do.

3    Q.  So move forward to 2014, suddenly your vendors aren't

4    delivering product to you; is that right?

5    A.  The vendors, yes.

6    Q.  And what steps did you take to figure out why they

7    wouldn't deliver?

8    A.  Well, first I decided to find out why.  You know, they

9    said, well, they weren't getting paid, and so I just went back

10   from there, and then found out that basically our operating

11   capital had been maxed out.

12   Q.  Two Mile Ranch's operating capital?

13   A.  Yes.

14   Q.  And what was the source of the operating capital?

15   A.  Farmers State Bank.

16   Q.  What did you learn about where that money had gone?

17   A.  A lot of that money had been wire transferred through JMP

18   Enterprises from Farmers State Bank to a bank in Colorado that

19   was basically for Cherry Hills Wine Shop.

20   Q.  You just mentioned two companies we haven't heard about

21   yet.  What is JMP Enterprises?

22   A.  JMP Enterprises was a company my brother formed on his

23   own, and Cherry Hills Wine was a shop he bought next to The

24   Market, or leased, and decided to run his own wine shop there.

25   Q.  When did you first learn about those two companies?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    282

1   A.  At that time.  Well, I knew about JMP Enterprises, but as

2   far as the wine shop, that was then.

3   Q.  And you said money was being wired from Two Mile Ranch --

4   A.  Yes.

5   Q.  -- through JMP to Cherry Creek Wine?

6   A.  Uh-huh.

7   Q.  Did you have any idea what the money was being used for?

8   A.  No.

9   Q.  Did you talk with Jon about it?

10  A.  Yes.

11  Q.  Can you describe your conversation with Jon about that for

12  the Court?

13  A.  He really wasn't forthcoming where it went.  He said it

14  was just to expenses and don't worry about it, it's coming

15  back.

16  Q.  What was your reaction to learn that he had taken all the

17  money out of Two Mile Ranch's operating capital?

18  A.  I wasn't happy at all.

19  Q.  Were you upset?

20  A.  Yes.

21  Q.  How upset?

22  A.  To the point I made that document, basically to that

23  September 15th document.

24  Q.  Were you considering shutting down Two Mile Ranch?

25  A.  Yes.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    283

1   Q.   Why?

2   A.   Well, when you lose -- we've been in business for a lot of

3   years, and nothing like that had ever happened, and when he

4   wasn't exactly forthcoming as to how the money had been spent,

5   I decided I just was done with it.

6   Q.   Did you want to continue in business with him?

7   A.   No.

8   Q.   Why didn't you just terminate Two Mile Ranch that day?

9   A.   Well, because of the debt involved.  It's not something

10  you can just walk away from.

11  Q.   You testified before you had a personal guaranty on that

12  debt, right?

13  A.   Yes.

14  Q.   Was it important to you to make sure the bank was repaid?

15  A.   Very important.

16  Q.   Why?

17  A.   It's what we do.

18  Q.   What do you mean?

19  A.   We always pay our debts.

20  Q.   Now, at this point in time in 2014, putting aside the fact

21  that your operating capital had now disappeared, how was Two

22  Mile Ranch doing in The Market?  How was it doing financially?

23  A.   Losing money precipitously.

24  Q.   Can you explain why?

25  A.   Bad marketing, bad judgments within the business itself.

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021    284

 1   Not really doing the work that they needed to do, because

 2   instead of staying with the meat, they decided to also go into

 3   organic foods and all that kind of stuff without doing due

 4   diligence as to how they were going to acquire it and then

 5   sell it at a competitive price.

 6   Q.  This is at The Market down in town?

 7   A.  Yes.

 8   Q.  What about their pricing for other ancillary goods?  What

 9   was your impression of that?

10   A.  It was way overpriced.  There was no way to get people to

11   buy it.  One example is I knew of milk being sold for $9 a

12   gallon.  That's not going to move very fast.

13   Q.  What about -- what about the financial condition of the

14   general partnership?  How was the general partnership doing

15   with its herding and ranching operation?

16   A.  Well, we were still doing fine.  I mean, the prices were

17   still steady.  Our annual sales of bulls and whatnot was still

18   increasing.

19   Q.  Was the general partnership profitable in 2014?

20   A.  I don't know that I've actually broken that out, because

21   everything was involved and included me, so I don't know that

22   I actually know how profitable we were.  I know that it should

23   have been.

24   Q.  But for the operating capital being depleted?

25   A.  Uh-huh.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    285

1   Q.  Now, you mentioned the amendment, and if on my table, if

2   we could pull up what I have open as Exhibit 3, please.  Now,

3   we looked at this before in your direct examination, this

4   amendment to the general partnership agreement, correct?

5   A.  Correct.

6   Q.  And you drafted this document?

7   A.  With my brother, yes.

8   Q.  Now, the date on it, September 15th of 2014, you testified

9   before that you believe that's when you drafted this.  Why?

10  A.  Because that's when we did.

11  Q.  Now, the change in Section 105 to management, you're

12  changing the language to say that you are the manager of the

13  partnership?

14  A.  Correct.

15  Q.  Why did you change that provision?

16  A.  Because I was going to have the final say.

17  Q.  You didn't want Jon to have involvement in the

18  decision-making process?

19  A.  No.  He still has decision-making.  You know, we still did

20  that, but I was the one that said yes or no.

21  Q.  You wanted to take out the sentence that said the ultimate

22  decision was Jon Pauling's?

23  A.  Yes.

24  Q.  And just so we can compare and contrast those, I'll also

25  put up Exhibit 2.  And if we go to that section, you're

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      286

1   talking here --

2   A.   Yes.

3   Q.   -- the decision made by Jonathan M. Pauling shall prevail.

4   That's what you wanted to take out; is that correct?

5   A.   Yes.

6   Q.   Now, the other change you made in this amendment was a

7   change to the profits and losses calculation.  Start here.

8   Were you trying to take away 40 percent of Jon's ownership

9   interest in the company?

10  A.   No.

11  Q.   What were you doing with this change?

12  A.   Basically it's just the net profits and losses.  Basically

13  anything that we garnered off of it.

14  Q.   How did you come up with a split of 90/10?

15  A.   Because in my mind at the time I still thought there might

16  be some equity there.  Also, it was an elevated or accelerated

17  rate that possibly would get us back to zero, and if things

18  had healed, then maybe we could go back to 50/50.

19  Q.   At this point in time, did you know about Amanda Wilson?

20  A.   No.

21  Q.   When did you first learn about Amanda Wilson's claims

22  against Jon?

23  A.   Basically the day before the plaintiff's counsel went

24  public with the judgment.

25  Q.   Did you know he was having a trial?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021    287

1   A.   No.

2   Q.   Did you know he had been sued?

3   A.   No.

4   Q.   So when you drafted this, you didn't know that he had a

5   former acquaintance suing him for damages?

6   A.   No.  It was specifically before the mismanagement of

7   funds.

8   Q.   From this point in time onward, September 15th of 2014 on,

9   did Two Mile Ranch ever have any profit?

10  A.   No.

11  Q.   Why not?

12  A.   Well, there again, it goes back to being the business we

13  were is a very personal -- it's face-to-face with our

14  customers.  And when they went public with it, well, we -- how

15  would you say it?  Customers lost their trust in Jon, and me

16  by association.

17  Q.   Why was it important for the customers to have trust in

18  Jon and you in your business?

19  A.   Well, because our main business was the selling of

20  breeding bulls, and bulls are very important to a breeding

21  operation because they account for 50 percent of the genetic

22  makeup of the calves they sire, whereas the cow itself, she's

23  two and a half percent.  So the bull sales was very important.

24  It's very important to a producer of what he is purchasing.

25  Q.   And you also sold your cattle on what was called private

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    288

1    market; is that right?

2    A.  Well, we sold our bulls through what was known as private

3    treaty, not an auction.  Private treaty is that face-to-face,

4    they come visit your facility, they look at the bulls, they

5    see what the price is, and then they either buy them or not.

6    Q.  So personal trust by your customers was extremely

7    important in Two Mile Ranch's operations?

8    A.  Yes.  Because a lot of why you buy a bull is not just

9    because of how he looks, but it's also the EPDs.  EPDs are

10   provided because of the data you personally send in on those

11   animals.

12   Q.  Let me open up one of the exhibits that we previously

13   looked at with Mr. Pulkrabek this morning, Exhibit Number 9.

14   And these are some of the K-1 schedules?

15   A.  Correct.

16   Q.  That were filed with the IRS, correct?

17   A.  That's correct.

18   Q.  Now, Mr. Pulkrabek asked you why these did not have the

19   partnership percentages changed even after this amendment was

20   signed and told you you'd have an opportunity to discuss that

21   with your counsel.  Do you remember him saying that?

22   A.  Yes, I do.

23   Q.  Why didn't these partnership share of profit and loss and

24   capital percentages change?

25   A.  The reason I never told the tax preparer about that was as

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021    289

1    I learned later in that year that we were in bad shape, and if

2    you look at line L, you can see that those are large negative

3    numbers, and at that point I said what does it matter?

4    Q.   Okay.

5    A.   It's -- yes, I probably should have had him change it, but

6    in my thinking it's such a large negative number, who cares?

7    Q.   And if I open -- let's start in sequence here.  Let's

8    start with Exhibit Number 5.  I'm going to take that down.

9    That was the unredacted copy.  Here's the redacted one.  This

10   was your Schedule K-1 for 2014, correct?

11   A.   Correct.

12   Q.   For Two Mile Ranch?

13   A.   Correct.

14   Q.   And if we scroll down and look in Box L, we see Two Mile

15   Ranch had a loss that year; isn't that right?

16   A.   Correct.

17   Q.   And your attributed amount of that was a negative 33,144;

18   is that right?

19   A.   Yes.

20   Q.   Now, if we move on to number nine, I'll start with 2015.

21   Here it shows there an increase.  What was that increase from

22   in 2015?

23   A.   Well, if you notice, there's some capital contributed.

24   That was partially of what I paid in, and the increase was

25   probably from asset sales.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    290

1   Q.  And we scroll further down to page 4 of Exhibit 9, and we

2   look here, Box L of your 2016 K-1?

3   A.  Uh-huh.

4   Q.  Only about an $8,000 gain?

5   A.  Yeah, what year was that again?

6   Q.  This is 2016.

7   A.  Yeah.  Okay.

8   Q.  Does that sound right to you?

9   A.  Yes.  That should be fairly accurate.

10  Q.  You mentioned you had a tax preparer.  Who was your tax

11  preparer?

12  A.  Ken Skipworth.

13  Q.  Can you describe for the Court how you understood

14  Mr. Skipworth would put together the tax documents for the

15  year?

16  A.  Through the previous years Jon would always take our bank

17  statements to him, and then he would go through those.

18  Q.  Did Two Mile Ranch, the general partnership, have any

19  formal financial books and records?

20  A.  No.

21  Q.  Did it have like a QuickBooks file?

22  A.  No.

23  Q.  How did you track your financial inflows and outflows?

24  A.  Just Jon did that just with the checking account.

25  Q.  At the end of the year you would provide that information

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    291

1   --

2   A.  Yes.

3   Q.  -- to the tax preparer?

4   A.  Uh-huh.

5   Q.  Back in Exhibit 9, if we keep going through, this is your

6   -- on page 6 of this exhibit, this is your 2017 K-1, correct?

7   A.  Correct.

8   Q.  And that shows an increase of $1.2 million.  What was that

9   for?

10  A.  That was probably from the sale of certain assets.

11  Q.  And we'll get to the 2017 sales in a moment, but just as

12  we're looking at it now, in 2017, Two Mile Ranch did not sell

13  all of its assets to Lardyn; isn't that correct?

14  A.  That's correct.

15  Q.  We'll come back to that.  Let me go ahead and turn that

16  off.  Let's move forward to 2015.  We heard testimony about

17  sales of the ranch in 2015 to Cervi Enterprises, the South

18  Ranch, correct?

19  A.  Correct.

20  Q.  And did Two Mile Ranch have a herd at that point in time?

21  A.  Trying to remember when we started selling it off.  We had

22  already sold some of the cattle off, so we had nothing down

23  there.  What we did have left was on the North Ranch.

24  Q.  And you mentioned you started selling it off.  Why were

25  you selling off your herd?

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    292

1   A.  To satisfy Farmers State Bank.

2   Q.  The bank was demanding that you make payments on the

3   loans?

4   A.  Yes.

5   Q.  So you sell the South Ranch to Cervi.  And you purchased

6   the North Ranch; isn't that right?

7   A.  Correct.

8   Q.  And that was the ranch that you had grown up on?

9   A.  Yes.

10  Q.  Now, did you just pull a number out of the air to figure

11  out how much you were going to have to pay?

12  A.  No.  There's an appraisal done.

13  Q.  Is that how you came up with the million dollars --

14  A.  Yes.

15  Q.  -- for the North Ranch?

16  A.  Uh-huh.

17  Q.  What do you recall the approximate appraised value being

18  for the North Ranch?

19  A.  It was a million dollars and 14,000 dollars, I believe.

20  Q.  Why did you get an appraisal prior to that transaction?

21  A.  Because I knew that with this judgment everything needed

22  to be sold, and I guess -- the judgment wasn't the biggest

23  deal there.  The biggest deal there was basically I owed this

24  much money to Farmers State Bank with personal guarantees.

25  And, secondarily, because of the judgment everything had to be

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021    293

1    sold at value or higher.

2    Q.   You were concerned that the bank was going to come after

3    you if you didn't pay fair market value?

4    A.   Yes.

5    Q.   Now, you mentioned the judgment.  You had recently learned

6    about the judgment that had entered --

7    A.   Yes.

8    Q.   -- is that right?  Do you feel like the judgment affected

9    Two Mile Ranch?

10   A.   Well, as far as operations, yes.

11   Q.   How so?

12   A.   Because Two Mile Ranch couldn't operate like it used to.

13   You could not sell your breeding stock anymore.  If you have

14   no customers, you basically then go away from selling bulls to

15   selling steers at the public auction markets.

16   Q.   Now, also in 2015 we talked about the sales of the ranch

17   being for a 1031 exchange, correct?

18   A.   Uh-huh.

19   Q.   And the purchase of the property at Turkey Creek -- on

20   Turkey Creek?

21   A.   Uh-huh.

22   Q.   What is your understanding of why Two Mile Ranch was

23   purchasing the Turkey Creek property?

24   A.   Well, there's two reasons.  A, like I said, Jon was

25   burning out.  He needed to do something else rather than being

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021   294

1    out there looking after cows.  We looked at it as an

2    investment opportunity either to subdivide or make it into

3    something like a wedding venue that he could do on his own.

4    The reason we did 1031 was to basically limit the taxation on

5    capital gains.

6    Q.  And how many acres was the Turkey Creek property?

7    A.  Just shy of 40.

8    Q.  And I think you testified this morning it had a house and

9    two outbuildings on it, correct?

10   A.  One house, two cabins, a barn.

11   Q.  And at the time did you know Ms. York was living there?

12   A.  No, I did not.

13   Q.  Jon --

14   A.  She couldn't have been.  Because I hadn't bought it yet.

15   Q.  Do you know if she moved in there after you bought it?

16   A.  Well, I do now.

17   Q.  When did you first learn that Ms. York had been living at

18   the Turkey Creek property?

19   A.  I couldn't put a date to that.

20   Q.  When Jon told you about this opportunity, did he tell you

21   he needed to buy this house for his girlfriend?

22   A.  No.  That was never in the discussion.

23   Q.  Did you know that Jon was dating anyone at that point in

24   time?

25   A.  No.

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021    295

1    Q.   Did Jon tell you who found that property?

2    A.   He said he did.

3    Q.   What did he say about that?

4    A.   About the property?

5    Q.   About finding the property.

6    A.   Well, that he had just been online and was searching

7    through the different realtors in the area.

8    Q.   Now, in terms of negotiating a 1031 exchange, did you

9    negotiate primarily with the bank or did Jon?

10   A.   At that time I had Jon do it.

11   Q.   Why?

12   A.   Because I was busy doing other work at the farm.

13   Q.   Was the farm listed for sale at that point in time?

14   A.   We -- what date?  I mean, basically with us going under

15   water, the whole plan was to sell the farm.  I don't remember

16   the exact date.  We did get with a realtor, Jim Coakley at

17   Omni West, to try to sell the property.  I don't remember that

18   exact date.

19   Q.   Moving forward into 2016, we've already heard Two Mile

20   Ranch declares for bankruptcy protection under Chapter 11 of

21   the bankruptcy code, correct?

22   A.   Correct.

23   Q.   And you authorized Two Mile Ranch to do that?

24   A.   Yes.

25   Q.   Why did Two Mile Ranch file for bankruptcy protection?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    296

1    A.  Basically I did not want to have to be foreclosed on, then

2    because of a foreclosed sale those assets usually sell for 60,

3    70 cents on the dollar, and I wasn't willing to just be liable

4    for another one and a half, $2 million I would somehow have to

5    pay, so that gave me more time to find a buyer.

6    Q.  Had the bank called the notes by that point in time?

7    A.  They had not called them.  I mean, we had discussions that

8    you need to get something done here, and they were starting to

9    basically say we're going to have to do this.

10   Q.  They were threatening to call the notes, though?

11   A.  Yes.

12   Q.  Throughout the bankruptcy, were you trying to find

13   potential buyers for Two Mile Ranch?

14   A.  Yes.  Well, not Two Mile Ranch, but the farm.

15   Q.  Just for the reporter's sanity, if you'd wait until I

16   finish my question, even if you think you know where I'm going

17   until you start, that will help her out.

18   A.  Okay.

19   Q.  Now, we've heard -- you know, you've seen documents using

20   the term unicorn, a unicorn buyer group.  Is that your word?

21   A.  No.

22   Q.  Have you ever used that word to describe a buyer group for

23   Two Mile Ranch's assets?

24   A.  No.

25   Q.  Do you have any idea where that came from?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    297

1   A.  Just employees at Farmers State Bank.

2   Q.  Can you describe for the Court, please, what efforts you

3   took to try and find buyers for Two Mile Ranch's assets during

4   the bankruptcy?

5   A.  I reached myself personally out to a couple of individuals

6   I knew.

7          THE COURT:  Was it for -- he's saying he was

8   looking for a buyer for the farm.  You're saying Two Mile

9   assets.  Are you talking about the same things?

10          THE WITNESS:  Well, yes, we are.

11          MR. KEITHLEY:  We started talking about the farm,

12   and now I'm talking about the bankruptcy, Your Honor, and my

13   question to him was trying to find buyers for --

14          THE COURT:  For what?

15          THE WITNESS:  Well, at that particular time what

16   involved the Two Mile Ranch was the remaining assets was

17   basically the farm and the minerals, because the ranch land

18   had been sold to Mr. Cervi and myself, and the only other

19   property was North Turkey Creek.  There was a 240-acre

20   parcel still left in Weld County that was not attached to

21   the north place that was still under Two Mile Ranch.  That

22   particular piece we sold to Dan Stanley, his family, at a

23   later date.

24   Q.  (By MR. KEITHLEY) So, Mark, in terms of talking with

25   buyers, what did you do to try and find buyers for these

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021   298

1   remaining assets in Two Mile Ranch?

2   A.  Well -- repeat the question.

3   Q.  What did you do to try and find buyers for the remaining

4   assets in Two Mile Ranch?

5   A.  Well, there's only a few individuals I could reach out to,

6   and the only other avenue was to get in contact with the

7   realtor.

8   Q.  And did you list the property for sale?

9   A.  Yes.

10  Q.  And did you get any potential offers?

11  A.  We got offers, but for far less of what we were asking.

12  Q.  What do you mean by far less?

13  A.  Like on the farm, we were asking like 4.2 million.  We got

14  an offer of 3.

15  Q.  Did you have an appraisal of the farm at 4.2?

16  A.  Yes.

17  Q.  And that's why you were asking for 4.2?

18  A.  Uh-huh.

19  Q.  Do you know if Jon was reaching out to other potential

20  buyers as well?

21  A.  No.

22  Q.  When did you first talk to Jon about potentially

23  transferring the assets to this company called Lardyn?

24  A.  It was during the bankruptcy.

25  Q.  When did you first learn about Lardyn?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    299

1   A.  Well, somewhere in that time -- between when we filed it

2   -- I don't remember if it was January that year or December of

3   the previous year, somewhere in there that things were just --

4   I don't remember the exact month.  It was in that time.

5   Q.  Did you ever obtain or receive -- I should ask it this way

6   -- did you ever receive any full-price offers for Two Mile

7   Ranch's assets from any other buyer except Lardyn?

8   A.  No.

9   Q.  Now, we had some questions this morning about your

10  understanding of who Ms. York was and her relationship to Jon

11  and her relationship to Lardyn.  When did you first learn

12  about Ms. York?

13  A.  There, again, I don't know.  I mean, it's -- learning

14  about her as far as what?  As to what?

15  Q.  Well, we've seen some of the documents that you signed,

16  like Exhibit 41, which I'll put on the screen here, this

17  contract to buy and sell minerals?

18  A.  Uh-huh.  Well, that's December of 2017 -- or not December,

19  but February.

20  Q.  February.  So how soon before that did you learn about the

21  potential to sell these assets to Lardyn?

22  A.  Well, same, because that has to do with Lardyn.  I knew

23  about Elyce when I knew about Lardyn.

24  Q.  Were you concerned about Jon -- Jon's suggestion that Two

25  Mile Ranch sell these assets to Lardyn?

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021     300

1   A.  At first I was, yes.

2   Q.  Why?

3   A.  Well, because I knew nothing about her.  I knew nothing

4   about what was going to happen there.

5   Q.  Why did you ultimately agree to enter into these

6   contracts?

7   A.  Mainly because we had gotten no traction on selling

8   anything at all.  The bank was pressuring us to get something

9   done through discussions and stuff.  That's why they made me a

10  15 percent -- gave me the 15 percent basically was she needed

11  someone experienced, and I guess I provided that to help with

12  the farm, and in the end, it's like you put the emotion aside,

13  and you just -- we got to figure out a way to get this done so

14  Farmers State Bank is paid.

15          THE COURT:  Can you explain to me how a person with

16  no experience, no money, who had been working as an exotic

17  dancer at Shotgun Willie's could buy a multiple-million

18  dollar property?  That makes absolutely no sense to me.

19          THE WITNESS:  You have to put all the other factors

20  into consideration there.  The bank was looking at a huge

21  loss.

22          THE COURT:  Pull your mask up, please.

23          THE WITNESS:  The bank was looking at a huge loss

24  if they foreclosed and sold them as distressed assets.  I

25  was looking at it as losing not only my ranch because of

                    Sarah K. Mitchell, RPR, CRR

1   certain equity that I had in it, because of those

2   guarantees.  Basically I was not willing to have Farmers

3   State Bank foreclose on those properties, and then me being

4   responsible for the remaining, because --

5          THE COURT:  Look, Mark, sitting over there is

6   Ms. Dynes, our courtroom deputy.

7          THE WITNESS:  I would give her the same

8   opportunity.  I would give her the --

9          THE COURT:  You can figure out a way for Julie

10  Dynes to purchase a multimillion-dollar ranch?

11         THE WITNESS:  If she was willing to do it, I would.

12  Because anyone can learn.  Anyone can have an opportunity.

13  Prior experience does not dictate as to what she can do if

14  you're willing to learn and have people around you who can

15  help you do the job.

16         THE COURT:  So you could go out here on 16th Street

17  on the mall and find a homeless person, and that homeless

18  person could be set up as the owner of a $4 million ranch?

19  This makes no sense.

20         THE WITNESS:  No, no, no, that's a lot different.

21         THE COURT:  Why?

22         THE WITNESS:  Why?  Because you're expecting me

23  just to go out there and pick a guy, and it's not -- it's

24  not the same.  She was not -- she's not a homeless person.

25  Homeless people can be -- who knows what.  I mean, there is

1   -- I didn't see --

2           THE COURT:  I couldn't buy a ranch -- I doubt if

3   there's anybody in the room that could buy a ranch for

4   $4 million.  But somehow Ms. York, who seems like a very

5   nice person, was set up by you guys to buy this huge

6   property when she had absolutely no money.

7           THE WITNESS:  Correct.

8           THE COURT:  She has as much money as the homeless

9   person.

10          THE WITNESS:  Well, this was basically Farmers

11  State Bank and Two Mile Ranch coming to an agreement that if

12  we can make this work, what's the harm?  If it doesn't work,

13  we're still where we're at.  We had -- I mean, would you be

14  willing to lose one and a half million dollars?  No.  No one

15  wants to do that.  Everyone was going to try and work out of

16  it, and we were grasping at straws at that time.  From the

17  time we were in distress to the time we dismissed the

18  bankruptcy was taking a lot of time, a lot longer than it

19  was supposed to.

20          THE COURT:  And it's a coincidence that there was

21  this big judgment against Jon, and it's a coincidence that

22  the bank was saying we got to help Jon get around this

23  judgment.

24          THE WITNESS:  Well, that's their language.  That's

25  not mine.

Sarah K. Mitchell, RPR, CRR

1      THE COURT:  No.  That's their language, but this

2  Lardyn is being created as a ranch mogul at the same time

3  that the bank's people are saying we've got to figure out

4  how to help Jon avoid the judgment.  It's all coincidence?

5      THE WITNESS:  I wouldn't say it's coincidence.

6  Q.  (By MR. KEITHLEY) Mark, let me ask you this.  Was it your

7  intention to move these assets so that the plaintiff could not

8  get to the assets?

9  A.  No.

10  Q.  Okay.  Let me ask you another question on the judge's

11  questions here.  It was a key requirement for this transfer to

12  be approved that you stay involved; isn't that right?

13  A.  Yes.

14  Q.  Why?

15  A.  Because I knew the operation.

16  Q.  So what?

17  A.  So what?  I mean, basically she has that helping hand.  I

18  mean, she has that ability to operate just by asking me and

19  giving her advice.  And then through that advice, you know, I

20  basically channel her to other experts in the field, you know,

21  through different experts.  I mean, from nutritionists to the

22  people that prepare the -- our agronomists and anything like

23  that as far as making the farm and feedlot more efficient.

24  She used the same company that we had done when it was when we

25  went to build the feedlot.  She decided to go with AGPRO also,

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021       304

1    and they're well known in their field, and they're very good

2    at it.

3    Q.   Now, you mentioned to the Court a moment ago about what

4    was the other alternative option.  What was the only other

5    alternative option you knew about if you didn't sell these

6    assets to Lardyn?

7    A.   Foreclosure.

8    Q.   Meaning what?

9    A.   Basically they foreclose on the properties.  They sell

10   them at a distressed price, and basically what's left over is

11   left to me to pay.

12   Q.   You felt you would be on the hook because of your personal

13   guarantees here?

14   A.   Yes.

15   Q.   Did the judgment Ms. Wilson had against Jon even enter

16   your mind?

17   A.   At that time it didn't even matter because we were at

18   zero.  We were at negative.

19   Q.   So why did you stay involved in Lardyn?  Why not just walk

20   away?

21   A.   Because I've learned to know Elyce.  I've learned to see

22   that she's a person who -- she doesn't like to give up.  She

23   stays in it.  She likes to be involved in it.  She's learning.

24   She's showed to me a lot of promise.  So why not?  She's

25   paying me a wage.

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    305

1   Q.  If you can briefly, can you describe a little bit for the

2   Court what your concerns were about Elyce's background and

3   experience going into this deal?

4   A.  Background really wasn't.  I mean, it's just lack of

5   experience.  Background had nothing to do with it.

6   Q.  Did you have the same concerns that the Court is

7   expressing?

8   A.  No.

9   Q.  Why not?

10  A.  Well, when I initially met her you kind of get an idea for

11  the person you're dealing with, and she seems to be a fine

12  upstanding person.  You get that read from a person usually in

13  your first contact.

14  Q.  Let's say this had not been Elyce York who had a former

15  romantic relationship with your brother.  Let's say -- not to

16  use the Court's words, a homeless man off the street, but

17  let's say it's an old high school friend from high school in

18  Sterling.  What's the difference between your high school

19  friend in Sterling and selling it to Elyce?

20  A.  Really nothing.

21  Q.  You were willing to give someone a shot?

22  A.  I'm willing to give anyone -- someone a shot.

23  Q.  Was Ms. Wilson a creditor of Two Mile Ranch as far as you

24  knew?

25  A.  No.

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    306

1  Q.  Why not?

2  A.  She never sued Two Mile Ranch General Partnership.  We

3  were not part of the judgment.

4  Q.  Prior to this litigation, prior to coming here this week

5  for this trial, had you ever met Ms. Wilson?

6  A.  No.

7  Q.  Do you hold any ill will toward Ms. Wilson?

8  A.  To be honest, I suppose I do.

9  Q.  Why?

10 A.  Because I believe that the charges she filed against him

11 were false.

12 Q.  But you know that a jury --

13 A.  Yes.

14 Q.  -- of Jon's peers entered the judgment against him?

15 A.  Uh-huh.

16 Q.  And you're willing to honor that?

17 A.  Uh-huh.

18 Q.  Were you trying, Mark, to move assets out of Two Mile

19 Ranch so Ms. Wilson couldn't collect her judgment?

20 A.  No.

21 Q.  Did you take any actions with the intent to prevent her

22 from collecting that judgment?

23 A.  No.

24 Q.  To your knowledge, has Jon received any benefit from the

25 transfer of these assets over to Lardyn?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    307

1   A.   No.

2   Q.   Did he get any money out of that transaction?

3   A.   No.

4   Q.   Now, we talked briefly about you selling your ownership

5   interest in Lardyn, your 15 percent interest in Lardyn in

6   2019, correct?

7   A.   Correct.

8   Q.   When did you come to agreement with Ms. York on that

9   transaction?

10  A.   Probably six or seven months prior to that.

11  Q.   Before the closing of the transaction?

12  A.   Before the closing.

13  Q.   And that -- that transaction closed July 20th of 2019.

14  Does that sound right?

15  A.   That's correct.

16  Q.   You heard in opening statement yesterday Mr. Pulkrabek

17  characterize your sale as cutting and running.  Do you

18  remember that?

19  A.   Yes.

20  Q.   What was your impression of his characterization of that?

21  A.   Wrong.

22  Q.   Why?

23  A.   Because I'm still involved.  I still work for her.

24  Q.   Why did you sell your 15 percent interest?

25  A.   There, again, the bank was pressuring to get some movement

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021     308

1   on the Two Mile Ranch note, and I did that through the sale of

2   that 15 percent there, again, to pay off my $275,000

3   promissory note that I had with Two Mile Ranch.  I assessed a

4   six percent interest on that, and then part of those other

5   proceeds I also just did capital contribution to reduce the

6   debt.

7   Q.  At the time that you agreed with Ms. York to sell your

8   interest, had you any awareness of this lawsuit?

9   A.  Of this lawsuit?  I believe I was served before closing.

10  Q.  But when you agreed with Ms. York to sell your 15 percent

11  --

12  A.  No.

13  Q.  -- had this lawsuit even been filed?

14  A.  No.

15  Q.  Had you received any demand whatsoever from Ms. Wilson?

16  A.  No.

17  Q.  And as you sit here today, you don't have any ownership

18  interest in Lardyn, correct?

19  A.  Correct.

20  Q.  Do you have any ownership interest in Redtail?

21  A.  No.

22  Q.  We mentioned that there was an asset after 2017 remaining

23  in Two Mile Ranch which was the Turkey Creek property?

24  A.  Correct.

25  Q.  What happened to the Turkey Creek property?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    309

1  A.  We had engaged also through a realtor to try to sell the

2  property, and, of course, with all the publicity out there

3  they could never get a decent offer on it, and so the bank

4  ended up foreclosing on it.

5  Q.  You ended up signing a deed transferring it to the bank?

6  A.  Yes.

7  Q.  Has that satisfied all of Two Mile Ranch's debt to the

8  bank?

9  A.  No.

10  Q.  How much -- as you sit here today, how much do you believe

11  Two Mile Ranch still owes the bank?

12  A.  Probably in excess of 400,000.

13  Q.  After Ms. Wilson obtained her judgment and there was the

14  publicity you talked about, Mark, would anybody do business at

15  Two Mile Ranch?

16          MR. PULKRABEK:  Foundation.

17          THE COURT:  Did you say something?

18          MR. PULKRABEK:  Yes.  I said foundation.

19          THE COURT:  Sustained.

20  Q.  (By MR. KEITHLEY) I'll rephrase.  After Ms. Wilson

21  obtained her judgment and there was the publicity around the

22  judgment against Jon, did you have any new customers come to

23  you at Two Mile Ranch?

24  A.  No.

25  Q.  And what happened to your existing customers?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      310

1    A.   They disappeared.

2    Q.   And did you approach any other banks to potentially work

3    with you to continue Two Mile Ranch?

4    A.   No.

5    Q.   Do you have a feeling if any banks would have worked with

6    you?

7    A.   They would not have.

8    Q.   What was your focus in transferring these assets to

9    Lardyn?  What was the main reason you agreed to that,

10   Mr. Pauling?

11   A.   Mainly because it was a full-value purchase that went

12   toward the indebtedness of Two Mile Ranch.

13   Q.   You wanted to make sure to get the bank repaid?

14   A.   Yes.

15   Q.   Why was that your primary focus?

16   A.   Because I owed it.

17   Q.   Are you the type of person who walks away from a debt,

18   Mark?

19   A.   No.

20        MR. KEITHLEY:  Thank you, Mark.  I don't have any

21   further questions.

22        MS. OLDEMEYER:  Your Honor, may I ask a few

23   questions?

24        THE COURT:  Sure.  Of course.

25

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      311

1                              CROSS-EXAMINATION

2    BY MS. OLDEMEYER:

3    Q.  I'll stand up so you can see me, Mr. Pauling.

4    A.  That's fine.

5    Q.  I want to inquire about a few topics Mr. Pulkrabek touched

6    on during your direct examination.  He mentioned Exhibit 91A,

7    which was a mineral interest transfer involving about one to

8    two mineral acres.  Do you remember that testimony?

9    A.  Yes.

10   Q.  Was that a cleanup transaction of title?

11   A.  Yes, I believe -- no.  That actually -- that actually

12   became known initially because of some exploration out there.

13   A company that was going to be drilling was doing a deed

14   search to -- for a lease, I believe, and that is how that was

15   found.

16   Q.  And so was there a prior deed from the USDA to Two Mile

17   Ranch on that one to two mineral acres?

18   A.  No.  It was still held by Farmer's Home, and basically

19   they had to get in touch with Farmer's Home to transfer those

20   to Two Mile Ranch and then from Two Mile Ranch to Lardyn.

21   Q.  What's Farmer's Home?

22   A.  Farmer's Home Administration.  They were a lending -- do I

23   need to explain that or does everyone know what Farmer's Home

24   is?

25   Q.  No, we don't.  Can you explain it to me?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    312

1   A.  Farmer's Home was a lending -- a lending vehicle for young

2   farmers to get into.  It was kind of like a bank, so to speak.

3   It's not a bank, but it was --

4   Q.  Government entity?

5   A.  Yes.

6   Q.  Okay.  I'm going to show you Exhibit 22 that Mr. Pulkrabek

7   asked you about.  I've got the first page of Exhibit 22 up,

8   and he asked you about page 3, the payoff letter.  Do you

9   recall that testimony?

10  A.  Yes.

11  Q.  And he pointed out that note 2346, your 730,000 loan to

12  Farmers State Bank, is not included on that payoff letter.  Do

13  you recall that?

14  A.  Yes.

15  Q.  What is the very last page of that exhibit?

16  A.  There it is.

17  Q.  So in the left-hand corner there's a borrower with a

18  number and then loan 2346, correct?

19  A.  Correct.

20  Q.  And your name appears on that same line, correct?

21  A.  Correct.

22  Q.  And the loan balance is $730,000, correct?

23  A.  Correct.

24  Q.  So it was part of the package that was sent with the

25  payoff letter, correct?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    313

1   A.  Correct.

2   Q.  You mentioned Toni Pauling, is --

3   A.  She was my wife.

4   Q.  Okay.  And you're now divorced?

5   A.  Yes.

6   Q.  And you mentioned you did not have an e-mail prior to a

7   certain point in time.

8   A.  Correct.

9   Q.  Okay.  What is your e-mail address, sir?

10  A.  It's dirtmagnet1961@gmail.com.

11  Q.  1961, the year of your birth?

12  A.  Yes.

13  Q.  Is dirt magnet an alias?

14  A.  Well, it's a -- it was a name my mom liked to call me when

15  I was a kid.

16  Q.  Did you use that dirtmagnet1961@gmail.com to communicate

17  with the bank?

18  A.  Yes, I do.

19  Q.  And do you believe the bank understood that when they

20  e-mailed with you at that e-mail address they were

21  communicating with you?

22  A.  Yes.  That was the e-mail address I told them to

23  communicate me to at that time.

24  Q.  I want to talk a little bit about a house at 717 7th

25  Avenue in Sterling, Colorado.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021        314

1   A.  Okay.

2   Q.  Are you familiar with that house?

3   A.  Yes.

4   Q.  Who lived in that house in the year 2015, '16?

5   A.  My mother.

6   Q.  Who owned that house?

7   A.  Well, it was titled in Jon's name, but it was purchased by

8   proceeds from a lease that Whiting had paid Two Mile Ranch out

9   there on the mineral acres.

10  Q.  When was that purchase?

11  A.  I'm not sure.  I can't tell you the date.

12  Q.  Did it predate 2010?

13  A.  No, I don't recall.

14  Q.  Okay.

15  A.  You're going to have to tell me when it is, if you know.

16  Q.  I don't.

17  A.  It seems like it was in prior to 2010.  I couldn't tell

18  you the exact date.  That's too long ago.

19  Q.  Okay.  Did your mom live there for a considerable period

20  of time?

21  A.  Yes, until her death.

22  Q.  And she died when?

23  A.  Two years ago now.

24  Q.  What happened to that home when the bank communicated that

25  it wanted to be paid on the notes like in this demand letter,

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      315

1    Exhibit 22 that we're looking at?

2    A.   Basically they did a foreclosure on it, did a sheriff's

3    sale, and that's what happened.

4    Q.   And then what happened after that?

5    A.   My brother -- one of my brothers got financing to purchase

6    it at the sheriff's sale.

7    Q.   Purchase it at the sheriff's sale or after the bank

8    foreclosed?

9    A.   Well, after.

10   Q.   Steve Stull, you mentioned, was an employee at FirsTier

11   bank that you knew?

12   A.   Yes.

13   Q.   Was your relationship with him anything more than a

14   banker?

15   A.   Just that.

16   Q.   I didn't hear your answer.

17   A.   Just that.

18   Q.   Okay.   Thank you.   As you sit here today, is your

19   relationship with Steve Stull anything more than a banker?

20   A.   No.

21   Q.   And a codefendant?

22   A.   Right.

23   Q.   One of the answers you gave in response to Mr. Livingston

24   Keithley's questions were that you needed the operating funds,

25   the operating funds should have been there for Two Mile Ranch,

Sarah K. Mitchell, RPR, CRR

1   but they had been depleted.  Remember when you were describing

2   that?

3   A.  Yes.

4   Q.  Just from a big picture perspective, can you explain to me

5   why somebody would need to borrow money on an operating line

6   in order to make money?

7   A.  Well, because ag is very -- you don't get an income stream

8   on a day-to-day basis, So the operating line is to get you

9   through those times up till when you can start selling your

10  product.  You have no income stream until you start selling

11  your product.

12  Q.  And what was Two Mile Ranch's product in --

13  A.  Cattle.

14  Q.  -- the 2015 timeframe?  It was cattle?  Is that a cyclical

15  business?

16  A.  Pardon me?

17  Q.  Is there a good time to sell, a bad time to sell?

18  A.  Well, yes, there is.

19  Q.  What is it?

20  A.  Well, since we were selling -- since we were selling

21  breeding stock, basically we started selling our bulls in

22  January, and usually through early spring.

23  Q.  Okay.  Ms. York testified yesterday about planting corn

24  and described the process.  Before the Logan County farm was

25  sold to Lardyn, did Two Mile Ranch grow corn?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 2       04/13/2021    317

1   A.  Yes.

2   Q.  So that -- was that an income-generating crop?

3   A.  Well, not income generating because it was -- in a sense

4   it was.  It was basically to raise feed to feed the cattle in

5   our little feedyard.

6   Q.  So you wouldn't sell it to an elevator, grain elevator or

7   anything?

8   A.  No.

9   Q.  You'd literally use it right there, consume it on site?

10  A.  Yes, usually in the form of silage.  We also grew alfalfa

11  at that time.  We put up the hay, so the hay that was grown

12  off the farm was used in the feedlot, plus to feed the cows

13  out at the ranch.

14  Q.  Okay.  So silage, alfalfa, and hay, those are things that

15  are grown but used for purposes of the cattle operation?

16  A.  Yes.

17  Q.  In 2016 did you -- well, let me ask a different question.

18  The corn that Two Mile Ranch grew for purposes of feeding its

19  cattle, could it grow corn and do something else with it if it

20  didn't have any cattle?

21  A.  Yes.

22  Q.  What could it do?

23  A.  Well, you could sell it to the elevator or to a feedlot

24  directly.

25  Q.  And did Two Mile Ranch grow corn in the calendar year

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021   318

1    2016?

2    A.  I'm not sure the year that we skipped.  There was one year

3    we did not.

4    Q.  Okay.  And when is corn typically planted?

5    A.  In the spring, usually late April, and then early May.

6    Q.  You were describing your logic of why you were willing to

7    become a member of Lardyn with Elyce York.  Do you recall that

8    testimony?

9    A.  Yes.

10   Q.  And you mentioned the only other option was foreclosure,

11   leaving you with something to pay for Farmers State Bank?

12   A.  Right.

13   Q.  That something to pay Farmers State Bank, that -- your

14   logic included even if all of the mineral interests sold by

15   Two Mile Ranch were sold too?

16   A.  Uh-huh.

17   Q.  Correct?

18   A.  Correct.

19   Q.  We heard argument that those mineral interests were worth

20   millions.  Mr. Mark Pauling, how could it possibly be that you

21   would owe anything left over if those mineral interests were

22   worth millions?

23   A.  Well, the controlling interest out there, who had leased

24   and was doing the operation out there was Whiting Oil, and if

25   anyone is familiar with that, Whiting Oil was in very big

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    319

1   trouble at that time, and it was very stop and go.  People

2   within the industry were just waiting for them to go bankrupt.

3   So we just never knew.  I mean, it's like we'll wait to see.

4   If it's there, it's there, when it happens, if it happens.

5   Q.  But, Mr. Pauling, oil is like liquid gold.  How could a

6   producer possibly be going into -- potentially going into

7   bankruptcy?

8         MR. PULKRABEK:  Argumentative.

9   A.  Well, I can't speak for Whiting, but it's -- they were in

10  trouble.

11        MR. PULKRABEK:  I said argumentative, Your Honor.

12        THE COURT:  Yeah.  Every once in a while there's a

13  little peep that comes out of you.  Sometimes I hear it.

14  Sometimes I don't.  I don't know what you're doing over

15  there.  You wanted to make an objection?

16        MR. PULKRABEK:  I objected and said argumentative.

17        THE COURT:  Overruled.

18  Q.  (By MS. OLDEMEYER) Mr. Pauling, you answered some

19  questions about the sale of your 15 percent interest in

20  Lardyn, and I think you mentioned a month, July 20th of 2019.

21  If the documents reflect June 20th, 2019, would you dispute

22  the documents?

23  A.  Would you repeat that?

24  Q.  Yeah.  In your testimony you said you actually sold,

25  consummated the sale of your 15 percent interest in Lardyn

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    320

1   Consulting in July of 2019?

2   A.  That's -- well, it was June 20th, I believe.  June 20th of

3   2019.

4   Q.  The same day the SBA loan closed?

5   A.  Yes.

6   Q.  And you mentioned Turkey Creek, and you said you never got

7   a decent offer.  What was a decent offer in your mind?

8   A.  Something that was close to one and a half million.  The

9   appraisal on the property is 1.65.  We initially listed it at

10  2 million just going off The Market of what things had been

11  going for.  That was kind of what the realtor had suggested.

12  And to find out that, like I said, everybody gets on the

13  Internet and does research and found out it was owned by Two

14  Mile Ranch, so I think the best offer we got was a million

15  dollars.

16  Q.  Did Two Mile Ranch sell mineral acres to Black River?

17  A.  Yes.

18  Q.  And do you recall when that sale took place?

19  A.  Not the exact date.

20  Q.  Do you recall the year approximately -- I'm going to

21  withdraw that question.  Can you tell me why Two Mile Ranch

22  sold the minerals?

23  A.  At that particular time the reason I did it -- or Jon and

24  I did it was because Two Mile Ranch had no operating capital,

25  so I believe what I did was if I could sell just these few

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021    321

1    acres, we would get some money to then operate Two Mile Ranch

2    for a year.

3    Q.   Between the years 2014 and 2017, what did cattle prices do

4    roughly?

5    A.   It's always cyclical, but basically a general drop.

6    Q.   Between 2014 and 2017 what did corn prices do?

7    A.   Basically drop.

8    Q.   To your knowledge, between 2014 and 2017, what did ag land

9    prices do there in the Logan County area?

10            MR. PULKRABEK:  Foundation.

11            THE COURT:  Sustained.

12   Q.   (By MS. OLDEMEYER) Are you familiar with what properties

13   around the farm in Logan County, Colorado, did as far as sales

14   in the 2014 to 2017 frame -- timeframe?

15   A.   They were selling for less.

16   Q.   And do you know what the price of oil and gas was as a

17   mineral owner, roughly what it was doing between 2014 and

18   2017?

19   A.   Up and down.  I mean, it was very volatile.

20   Q.   Did you have a contract to sell minerals to Black Acre

21   that fell through?

22   A.   Yes.

23   Q.   Why did it fall through?

24   A.   Because they deemed that -- they couldn't get financing

25   from the one person, and then the other person backed out

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021     322

1    because of lack of confidence in the field.

2    Q.  Let me put up Exhibit 1046, and I'll represent to you,

3    Mr. Pauling, that Exhibit 1046 is a 75-page document that is

4    Farmers State Bank's proof of claim filed in the Two Mile

5    Ranch bankruptcy proceeding on February 27th, 2017.  Are you

6    familiar with that proof of claim?

7    A.  Yes.

8    Q.  And in that proof of claim do documents like the deed of

9    trust against the Logan County property, the deed of trust

10   against the Weld County mineral interests, security

11   agreements, are these in the proof of claim?

12   A.  Yes.

13           MS. OLDEMEYER:  We would offer Exhibit 1046.

14           MR. PULKRABEK:  It's hearsay.

15           THE COURT:  Ms. Oldemeyer?

16           MS. OLDEMEYER:  Your Honor, we're offering it to

17   show the existing valid liens against the property that

18   Mr. Mark Pauling signed, and I can go page by page and go

19   through the deed of trust, and then have Mr. Stull talk

20   about amount of debt and how it's calculated.  I'll lay the

21   foundation page by page with Mr. Pauling on the security,

22   the liens.

23   Q.  (By MS. OLDEMEYER) Why don't I go to page 60.  Can you see

24   that, sir?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    323

1   Q.  Did you personally sign the note 2346 on May 15th, 2015?

2   A.  Yes, I believe so.

3   Q.  That's the $730,000 loan amount?

4   A.  Yes.

5   Q.  To buy the North Ranch, correct?

6   A.  Yes.

7   Q.  And on page 60 the purpose of this note is stated as

8   purchase of Weld County ranch, correct?

9   A.  Correct.

10  Q.  And your signature appears there?

11  A.  Yes.

12  Q.  And the security listed over here on the left-hand box,

13  did you initial the deed of trust dated 5/15/2015?

14  A.  Yes.

15  Q.  You mentioned earlier in your testimony that there was a

16  $275,000 note back to -- from you to Two Mile Ranch?

17  A.  Correct.

18  Q.  PDF page 74 of Exhibit 1046, is this a copy of that

19  $275,000 note?

20  A.  Yes.

21  Q.  Did you sign it on May 15th, 2015?

22  A.  I believe I did.

23  Q.  Does your signature appear on that document?

24  A.  Yes.

25  Q.  And the purpose as stated is carryback on ranch sale,

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    324

1  correct?

2  A.  Correct.

3  Q.  And when the bank provided funds for you to purchase the

4  north -- let me strike that.  Let's go to page 62.  Do you

5  know what page 62 is?

6  A.  That's the deed of trust.

7  Q.  And that is the deed of trust relating to you, Mark

8  Pauling, as the debtor?

9  A.  Yes.

10  Q.  And we have a recording stamp of Weld County, Colorado,

11  correct?

12  A.  Correct.

13  Q.  And on page 64 do you see a maximum obligation of -- and

14  I'm going to blow that up --

15  A.  I see it.

16  Q.  -- a million dollars?

17  A.  Yeah.

18  Q.  And then the secured debt defined there, promissory note

19  2346, with the date that we looked at -- I don't know if

20  that's a three or five, but you signed that note on 5/15,

21  correct?

22  A.  Correct.

23  Q.  And also mentioned a loan to the borrower in the amount of

24  1,005,000 plus interest and all extensions, renewals,

25  modifications, or substitutions thereof.  Do you see that?

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021        325

1   A.  Yes.

2   Q.  So when the bank loaned you the money to purchase the

3   North Ranch, did they want you to pledge any collateral?

4   A.  The ranch, yes.

5   Q.  The North Ranch?

6   A.  Yes.

7   Q.  And do you believe you did that?

8   A.  Yes.

9   Q.  I'm on page 72.  Is that your signature that appears on

10  page 72?

11  A.  Yes.

12  Q.  And did you sign this in Kimball, Nebraska?

13  A.  I believe so.  Yes, we did.

14  Q.  And I'm turning your attention to page 58.  Did Two Mile

15  Ranch guarantee that debt?

16  A.  Yes.

17  Q.  And on page 58 of Exhibit 1046, is that a guaranty dated

18  May 15th, 2015?

19  A.  Yes.

20  Q.  Your signature must appear on it.  Bear with me.  Does

21  your signature appear at the bottom of page 58?

22  A.  Yes, it does.

23  Q.  On July 1st, 2016 when Two Mile Ranch filed for Chapter 11

24  bankruptcy, had Two Mile Ranch previously pledged as

25  collateral the farm and ranch that Two Mile Ranch owned in

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    326

1   Logan County, Colorado?

2   A.  Yes.

3   Q.  Turn your attention then to page -- in 1046 to page 37.

4   Can you explain for the Court what is on page 37 of

5   Exhibit 1046?

6   A.  Well, it's the deed of trust.

7   Q.  And it's recorded in Logan County, Colorado?

8   A.  Yes, it is.

9   Q.  On January 14th, 2013?

10  A.  Yes.

11  Q.  And your initials appear at the bottom of the page of --

12  A.  Yes.

13  Q.  And the next page of that deed of trust, I'm on page 38 of

14  Exhibit 1046, did that secure a maximum obligation limit not

15  to exceed 5.5 million?

16  A.  Yes.

17  Q.  And that cap, that maximum obligation does not include

18  interest and any other fees and charges validly made pursuant

19  to this security agreement, correct?

20  A.  Correct.

21  Q.  Or any other advances made to protect lender's security,

22  correct?

23  A.  Correct.

24  Q.  Page 43 of that Exhibit 1046, did you sign this deed of

25  trust on June -- excuse me -- January 11th, 2013?

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    327

1    A.  Yes.

2    Q.  With respect to the mineral interests in Weld County, when

3    Farmers State Bank took an interest in the Weld County

4    property as a security interest, had the minerals been

5    separated from the land in January of 2013?

6    A.  No.

7    Q.  Turning your attention to page 21, on page 21 of

8    Exhibit 1046, is that another deed of trust?

9    A.  Yes.

10   Q.  This one recorded in Weld County, Colorado?

11   A.  Yes.

12   Q.  And that was also January 14th, 2013, it was recorded,

13   correct?

14   A.  Correct.

15   Q.  And then the deed of trust is dated January 11th, 2013?

16   A.  Correct.

17   Q.  And do your initials appear at the bottom of that page?

18   A.  Yes.

19   Q.  On page 22 of Exhibit 1046 does a similar paragraph appear

20   with the maximum obligation limit of $5.5 million?

21   A.  It does.

22   Q.  And it has the same language as the Logan County deed of

23   trust we previously looked at about that cap does not include

24   interest and other fees and interest, correct?

25   A.  Correct.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    328

1   Q.  And on page 28, does your signature appear on that deed of

2   trust for the Weld County property?

3   A.  Yes.

4   Q.  And did you sign that on or about January -- well, did you

5   sign it on January 11th, 2013?

6   A.  Yes.

7   Q.  On July 1st, 2016, when Two Mile Ranch filed for

8   bankruptcy protection, had Two Mile Ranch previously pledged

9   as collateral to Farmers State Bank the North Turkey Creek

10  property in Jefferson County, Colorado?

11  A.  Yes.

12  Q.  Turning to page 47 of Exhibit 1046, is that a copy of a

13  deed of trust recorded on May 19th, 2015, in Jefferson County,

14  Colorado?

15  A.  It is.

16  Q.  And it has an effective date of May 18th, 2015?

17  A.  Correct.

18  Q.  Is that the date that the purchase -- that Two Mile Ranch

19  purchased from the current owner of Turkey Creek?

20  A.  It's pretty close.  I'm sure it is.

21  Q.  Do your initials appear on that deed of trust?

22  A.  Yes.

23  Q.  Turning to page 49, on that deed of trust -- on page 49 of

24  Exhibit 1046, does it also contain a maximum obligation limit?

25  A.  Yes.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      329

1    Q.  And the principal amount secured was $2 million, correct?

2    A.  Correct.

3    Q.  And it contains a similar language from the other deed of

4    trust we looked at with the limitation does not include

5    interest or other fees and charges validly made pursuant to

6    the security agreement, correct?

7    A.  Correct.

8            THE COURT:  Ms. Oldemeyer, what point are you

9    making with all this?

10           MS. OLDEMEYER:  Your Honor, the Court has --

11   there's no stipulation as to the amount of the valid liens

12   against the property that was sold to Lardyn.  That is the

13   crux of this case.  And since there's no stipulation as to

14   the admissibility of this document, until I lay a foundation

15   for the debt part of it through the banker, this person

16   needs to identify I signed that deed of trust, it was valid,

17   et cetera.  This is the crux of the valid lien argument for

18   CUFTA.

19           THE COURT:  Okay.  Well, we're going to have to

20   finish this testimony after lunch.

21           MS. OLDEMEYER:  Thank you, Your Honor.

22           THE COURT:  1 o'clock.

23           THE COURTROOM DEPUTY:  All rise.  Court is in

24   recess.

25       (Break was taken from 12:00 p.m. to 1:00 p.m.)

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2     04/13/2021    330

1           THE COURT:  Okay, Ms. Oldemeyer.  Carry on.

2  Q.   (By MS. OLDEMEYER) Mr. Pauling, before the lunch break I

3  pulled up Exhibit 1046, page 54, which is the PDF page of that

4  exhibit, and does your signature appear on that page?

5  A.   Yes.

6  Q.   Of the deed of trust?

7  A.   Yes.

8  Q.   With respect to security agreements, did Two Mile Ranch

9  sign security agreements pledging machinery, equipment,

10 vehicles, pledging them as collateral for the loans?

11 A.   Yes.

12 Q.   I'm on page 16 of 1046.  Is that a commercial security

13 agreement for those items I just mentioned?

14 A.   Yes, it is.

15 Q.   Excuse me.  And on that page in particular there's

16 specific items listed under the property description.  The

17 boxes are all checked, and then there's actually items listed

18 there, correct?

19 A.   Correct.

20 Q.   And those are checked as business and agricultural use of

21 property, correct?

22 A.   Correct.

23 Q.   Does your signature appear there?

24 A.   Yes.

25 Q.   Just so I don't forget to ask, we looked at a lot of

                    Sarah K. Mitchell, RPR, CRR

1    documents, and I asked you if your signature appeared.  Did

2    you see your brother's signature also on those documents?

3    A.  Yes.

4    Q.  And that's his original signature?

5    A.  Yes.

6    Q.  And to your knowledge, does this commercial security

7    agreement contain any cap or maximum obligation limit, if you

8    know?

9    A.  Not that I'm aware of.

10   Q.  On page 18 of Exhibit 1046, is this a second commercial

11   security agreement?

12   A.  Yes, it is.

13   Q.  And it has on the property description, again, all of the

14   boxes checked for the form items, and then there's no specific

15   property description listed, correct?

16   A.  Correct.

17   Q.  And then did you sign this, Mr. Pauling, on or about

18   January 11th, 2013?

19   A.  Yes.

20   Q.  And you understood you were pledging any Two Mile assets,

21   machinery, equipment, vehicles, and all the things listed in

22   the commercial security agreement as collateral for the debts

23   that Two Mile Ranch was incurring with Farmers State Bank?

24   A.  Yes.

25   Q.  I'm going to go to Exhibit -- page 7 of Exhibit 1046.  And

19-CV-01224-RBJ       Bench Trial - Day 2     04/13/2021    332

1   I can blow this up.  I see you're leaning over there.

2   A.  It's because my glasses are fogging over.

3   Q.  On page 7, Exhibit 1046, is this an actual note for loan

4   number 2097?

5   A.  Seems to be, yes.

6   Q.  And in the amount of $600,000?

7   A.  Yes.

8   Q.  And this was the purpose stated at the bottom of that

9   page, refinance debt with FirsTier bank, correct?

10  A.  Correct.

11  Q.  And there's no signature, but there's a mention, attached

12  signature page on this note, correct?

13  A.  Correct.

14  Q.  Tell -- can you explain why your signature appears so many

15  times on page 9 of Exhibit 1046?

16  A.  Because that was also all of the LLCs that Two Mile Ranch

17  made in order to do The Market.

18  Q.  And did you also sign personally as an individual,

19  Mr. Pauling?

20  A.  Yes, I did.

21  Q.  So is that you personally guaranteeing the debts of Two

22  Mile Ranch, Colorado General Partnership, and all these LLCs?

23  A.  Yes.

24  Q.  On the next note, is that note number 2351 dated May 15th,

25  2015, in the amount of a million dollars?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 2      04/13/2021    333

1   A.  Correct.

2   Q.  Does your signature appear on that note individually?

3   A.  Yes.

4   Q.  And as a member of Two Mile Ranch?

5   A.  Yes.

6   Q.  And your brother's signature also appears?

7   A.  Correct.

8   Q.  I'm going to go to page 13 of Exhibit 1046.  This is loan

9   number 235, also dated May 15th, 2015, in the amount of

10  $7.6 million.  Do you see that?

11  A.  Yes, I do.

12  Q.  And there's a reference to a renewal of previously

13  existing notes, correct?

14  A.  Correct.

15  Q.  Are those Two Mile Ranch notes?

16  A.  Yes, I believe so.

17  Q.  Does your signature appear on page 13 of Exhibit 1046?

18  A.  Yes.

19  Q.  Both as a member of Two Mile Ranch General Partnership and

20  individually?

21  A.  Correct.

22  Q.  And then I think we covered that.  Exhibit 1043 --

23  Mr. Pulkrabek asked you about the filing of bankruptcy and

24  schedules.  Exhibit 1043 contains some summary of assets and

25  liabilities for Two Mile Ranch, the Colorado General

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2     04/13/2021    334

1   Partnership, filed on July 20th, 2016.  Are you familiar with

2   those schedules?

3   A.   Yes.

4   Q.   And on here you're listing assets and liabilities?

5   A.   Correct.

6   Q.   And were those schedules subsequently amended in January

7   of 2017 -- 2016, excuse me?

8   A.   I believe so.

9           MS. OLDEMEYER:  We'd offer Exhibit 1043.

10          MR. PULKRABEK:  Objection, hearsay.

11          THE COURT:  All right.  Here we go again.  1043.

12   Were these actual filings in the bankruptcy case?

13          MS. OLDEMEYER:  They're filings in the bankruptcy

14   case, Your Honor.

15          THE COURT:  I'll take judicial notice of them.

16   Overruled.  Admitted.  We don't have time to go through all

17   this again.  They're bankruptcy filings, Mr. Pulkrabek, and

18   I don't know what your objection is, but they're admitted.

19      (Defendants' Exhibit 1043 received.)

20   Q.   (By MS. OLDEMEYER) Exhibit 141 --

21          THE COURT:  They're admitted for the purpose of

22   showing they were filed in the bankruptcy court, not

23   necessarily for the truth of what they contain.

24          MS. OLDEMEYER:  Right.

25   Q.   (By MS. OLDEMEYER) Mr. Pauling, did you personally review

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      335

1   the schedules of assets and liabilities of Two Mile Ranch

2   before they were filed?

3   A.  Yes.

4   Q.  Did you leave any assets of Two Mile Ranch off the

5   schedules?

6   A.  No.

7   Q.  Did you do your best to be thorough and complete in the

8   filing that you filed in bankruptcy court?

9   A.  Yes.

10  Q.  Were you committing bankruptcy fraud?

11  A.  No.

12  Q.  Exhibit 141 is the document that's been admitted through

13  Mr. Pulkrabek, but I just want to ask you about a few entries.

14  I'm on page -- let me find the exhibit, Your Honor.  Who is

15  Mr. Arthur Lindquist-Kleissler?

16  A.  He was my counsel for the bankruptcy for Two Mile Ranch.

17  Q.  On page 2 of this exhibit, entry number 16, did you file

18  an application with the bankruptcy court to employ him and pay

19  a retainer in the amount of $25,000?

20  A.  Yes.

21  Q.  That was through?

22  A.  Farmers State Bank.

23  Q.  And that was approved by the bankruptcy court?

24  A.  Yes.

25  Q.  But you said the funds to pay that retainer came from

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021      336

1    Farmers State Bank?

2    A.  I believe so.

3    Q.  I'm going to show you Exhibit 41 -- or excuse me --

4    line 41 on Exhibit 141.  Who is Kerry Endsley?

5    A.  He was a realtor in the Front Range area.  He was the one

6    that conducted the Turkey Creek property sale.

7    Q.  A real estate broker for selling the assets?

8    A.  Yes.

9    Q.  I'm going to ask about line 35, entry 35.  Who is Darrell

10   Kraupie?

11   A.  He is another appraiser/realtor.

12   Q.  And is he also an auctioneer?

13   A.  Yes, he is.

14   Q.  So did Two Mile Ranch retain him to investigate an auction

15   of Two Mile Ranch assets?

16   A.  Correct.

17   Q.  Line 53, who is LIV Sotheby's International Realty?  Do

18   you know?

19   A.  I do not know them specifically.

20   Q.  Could that also be the entity associated with Mr. Endsley?

21   A.  That's probably the company he worked with, yes, I guess.

22   Q.  I'm going to ask you about entry number 64.  Strike that,

23   Your Honor.  So I'm going to ask you about entry 78 within

24   Exhibit 141.  Did you cause Two Mile Ranch's attorney to file

25   on your behalf a motion to dismiss the case in the bankruptcy

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    337

1   Chapter 11?

2   A.  Yes.

3   Q.  And that was filed on or about February 28th, 2017?

4   A.  Correct.

5   Q.  And it was for reasons unable to put forth a viable plan

6   of reorganization?

7   A.  Yes.

8   Q.  Did you file reports of operations in the bankruptcy

9   court?

10  A.  Can you repeat that?

11  Q.  I'm going to direct your attention to number 72, filing

12  72.  Did you file reports of operations --

13  A.  Yes.

14  Q.  -- for Two Mile Ranch?

15  A.  Uh-huh.

16  Q.  And to your knowledge, are these bankruptcy court filings

17  public record?

18  A.  Yes.

19  Q.  With respect to the list of creditors that Two Mile Ranch

20  filed, did Two Mile Ranch owe anybody else near as much as it

21  owed Farmers State Bank?

22  A.  No.

23  Q.  Did anyone have a lien against the Logan County farm

24  recorded prior to January 1st, 2013, that was still in

25  existence?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    338

1   A.  Not that I'm aware of.

2   Q.  Did anyone have a lien against the Weld County land and

3   mineral interests recorded prior to January 1st, 2013, that

4   hadn't been released?

5   A.  No.

6   Q.  And maybe with a few exceptions, did anybody to your

7   knowledge have a lien against Two Mile Ranch's machinery,

8   equipment, and vehicles that predated Farmers State Bank's?

9   A.  I'm trying to remember if some of the vehicles bought

10  through -- through different financing.

11  Q.  There might be a few that you did -- I'm going to give you

12  an example.  John Deere might have financed the purchase of --

13  your purchase of a particular item of machinery?

14  A.  Right.

15  Q.  Okay.  And First State Bank -- excuse me -- Farmers State

16  Bank wouldn't have a lien -- a first lien against that

17  particular item, right?

18  A.  Right.

19  Q.  But generally speaking, most everything else to your

20  knowledge Farmers State Bank had the first lien?

21  A.  Yes.

22  Q.  Mr. Pulkrabek asked you about your deposition in November

23  of 2016 and talked to you about your testimony.  Were you

24  asked about the Two Mile Ranch bankruptcy during that Rule 69

25  exam?

Sarah K. Mitchell, RPR, CRR

1   A.  I believe he did ask me questions, yes.

2   Q.  Nobody has yet touched on North Sterling Irrigation, a

3   lease of water.  Do you know anything about that?

4   A.  Yes, I do.

5   Q.  Can you explain to the Court North Sterling Irrigation's

6   lease for water.

7   A.  Okay.  Initially when we bought the farm, North Sterling

8   Irrigation District, you could not sell your water outside the

9   district.  You could sell it to another member within the

10  district, but you could not sell it outside the district.  You

11  couldn't sell it to an entity upriver.  And I don't remember

12  the date, but the members decided because of the scarcity of

13  water and everything like this that they decided to form their

14  own company called Point of Rocks which enabled them as a

15  group of -- not everyone was required to join Point of Rocks,

16  but I think in order for it to pass there had to be 85 percent

17  of the ownership willing to do this.  And they formed this

18  company called Point of Rocks which then enabled us as a group

19  to then lease water to certain entities if they so desired.

20          THE COURT:  Sir, will you keep pulling your mask

21  up.

22          THE WITNESS:  It keeps falling.  I'm sorry, sir.

23  Q.  (By MS. OLDEMEYER) And so was Two Mile Ranch part of that

24  Point of Rocks group?

25  A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021   340

1   Q.  So that was a highly lucrative income stream for Two Mile

2   Ranch?

3   A.  No.  I wouldn't say it's highly lucrative.  It's -- it's

4   better than using the water to just grow crops.  It's actually

5   a better cash deal, so to speak.

6   Q.  And was water used for fracking purposes?

7   A.  On the second company that was formed, Point of Rocks II

8   it was.  The first one went to Xcel Energy.

9   Q.  And with respect to those income streams, those are noted

10  in the financial -- let me rephrase my question.  With respect

11  to that income stream, where did the money go?

12  A.  Well, most of the money at first goes to the irrigation

13  district, and to -- basically at the time they were willing to

14  improve the dam, very specifically the spillway.  So part of

15  those proceeds went to that, and then it was distributed

16  amongst the members on a percentage basis of how many acre

17  feet you own.

18  Q.  And then with respect to any income that Two Mile Ranch

19  received, where did it go?

20  A.  Well, it went to operations or to Farmers State Bank to

21  satisfy a note.

22          MS. OLDEMEYER:  I have no further questions, Your

23  Honor.

24          THE WITNESS:  Can I also say something about the

25  Point of Rocks?  Basically the first one is still ongoing.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      341

1           MR. PULKRABEK:  Your Honor, I object.  There's no

2    question pending.

3           THE COURT:  Sustained.

4           Mr. Forbes.

5                         CROSS-EXAMINATION

6    BY MR. FORBES:

7    Q.  Your Honor, I'd ask that Mr. Pauling -- what did you want

8    to say about the Point of Rocks companies?

9    A.  Basically the first Point of Rocks is still in existence

10   as far as income stream because Xcel continues to lease that

11   water.  The second one for fracking was something that Whiting

12   was doing through another company called BNN Energy, and they

13   made their first payment and a partial on the second, and they

14   guaranteed us for five, and they haven't paid anything since.

15   Q.  When you say guaranteed you for five, guaranteed you for

16   five what?

17   A.  Basically in that five-year period they come up to the

18   estimated amount of water they would need, and they would pay

19   that in that five-year period.

20   Q.  When did that contract begin, to the best of your

21   recollection?

22   A.  '17, I believe.

23   Q.  And you recall then they made a few payments and since '17

24   haven't made any?

25   A.  No.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    342

1   Q.  Okay.  No I'm wrong or no they haven't made any since

2   then?

3   A.  No, they have not made any payments.

4   Q.  Okay.  How about the North Weld Irrigation District.

5   A.  The North Sterling.

6   Q.  North Sterling, excuse me.  North Sterling Irrigation

7   District.  Did TMR -- while you were with TMR, did it ever

8   receive any monies from North Sterling Irrigation District

9   with respect to its lease of water?

10  A.  No.  Because we couldn't -- we could not sell water.  If

11  we decided to lease some of our personal water to within a

12  member of the district, that was okay, but you did not have to

13  do that through district if that was just between the members,

14  and I suppose the district had some oversight there.  That

15  basically what it amounted to is you informed the district

16  this is what we were doing, because they always keep track of

17  the amount of water you use.  Well, if this guy has run out,

18  and he orders more water, they want to know where it's coming

19  from, because they won't let him have it.

20          THE COURT:  Mr. Pauling, pull your mask up and keep

21  it up.

22          THE WITNESS:  Sorry.

23          MR. FORBES:  No further questions for Mr. Pauling.

24          THE COURT:  Redirect?

25          MR. PULKRABEK:  Yes, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    343

1                        REDIRECT EXAMINATION

2    BY MR. PULKRABEK:

3    Q.  Mr. Pauling, I want to start with the testimony that you

4    gave about Cherry Creek Wine Company earlier.  As I understood

5    your testimony, the adjustment from 50 percent of the

6    partnership profits to 10 percent of the profits was in

7    relation to Jon Pauling's diversion of funds to Cherry Creek

8    Wine Company.  Is that your testimony?

9    A.  Yes.

10   Q.  That is totally different from what you told us in 2016

11   under oath, isn't it?

12   A.  I don't remember having that discussion with you.

13   Q.  Let's look at your deposition testimony.  Starting at

14   page 100 of your prior deposition in November 2016, I asked

15   you the question, Jon Pauling gave you a 40 percent interest

16   in distributions; is that correct?  Your answer, Yes.  Okay,

17   and it's your testimony that happened in 2014?  Answer, To the

18   best of my recollection.  Question, And that was to compensate

19   you for something?  Answer, Yes.  Question, What was it

20   intended to compensate you for?  Answer, The lack of

21   productivity, comma, the time he was spending away from the

22   business.  Okay.

23   A.  That's correct too.

24   Q.  Question, Okay.  Answer, The legal fees that Two Mile

25   Ranch had incurred for protecting itself.

                           Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      344

1    A.  That's correct too.

2    Q.  Now, let's go down.  On 101, line 11, All right.  So one

3    component of what Jon Pauling was compensating you for by

4    giving you the 40 percent profit distribution was

5    approximately half a million dollars in legal fees.  What

6    else?  Answer, Lack of productivity.  Question, Anything else?

7    Answer, That's about it.  That was your testimony in 2016.

8    There's no mention of Cherry Creek Wine Shop at all?

9    A.  There isn't, no.

10   Q.  Okay.  Now, next I want to talk to you about some

11   testimony you gave concerning an appraisal.  I want to make

12   sure I understood your testimony.  Then I'll ask you some

13   questions.  You testified about an appraisal that was done on

14   the North Ranch.  Do you recall that?

15   A.  I believe so.

16   Q.  And as I heard your testimony, what you told us was that

17   you got that appraisal because you knew that with this

18   judgment everything needed to be sold at fair market value or

19   higher.  Is that your testimony?

20          MR. KEITHLEY:  Objection, mischaracterizes the

21   testimony.

22          THE COURT:  Who said that?

23          MR. KEITHLEY:  I did, Your Honor.  Objection,

24   mischaracterizes the witness's prior testimony.

25          THE COURT:  Well, that's odd because he said he did

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      345

1    say that.

2          THE WITNESS:  No.  I started to say it that way,

3    but I corrected myself.

4          THE COURT:  Okay.  Say it the right way then.

5          THE WITNESS:  The right way was the reason things

6    had to be sold at value is because in the end if there's a

7    deficit, I am still liable for it no matter what.  Do you

8    understand that?  I mean, if I sold it for half a million,

9    that still, as my guarantees, doesn't put a half a million

10   to Two Mile Ranch's debt.

11         THE COURT:  Actually what I understand is that you

12   did say it was because of the judgment that things had to be

13   sold.

14         THE WITNESS:  I started to say that, that's true,

15   but I stopped myself.

16         THE COURT:  Actually, you said it twice this

17   morning.  I've got it in my notes.

18         THE WITNESS:  Well, if you go back to the audio

19   yield, you'll see that I actually did stop myself and

20   rephrase what I was saying, Your Honor.

21   Q.   (By MR. PULKRABEK) And just to clarify, Mr. Pauling, the

22   judgment hadn't even been entered yet at the point in time you

23   bought the North Ranch?

24   A.   Correct.

25   Q.   So --

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021       346

1    A.  Why would I even -- you understand that?  I mean, that's

2    not -- the reason was that I needed to satisfy the bank debt.

3    Q.  Next topic here, Mr. Pauling, is the 1031 exchange.  Now,

4    you gave extensive testimony about how Jon Pauling essentially

5    embezzled funds, as I understood it.  Was that the gist of it?

6            MR. KEITHLEY:  Objection, calls for a legal

7    conclusion and is argumentative.

8            THE COURT:  Overruled.

9    A.  I would not say embezzled.

10   Q.  (By MR. PULKRABEK) Now, throughout this period of time,

11   Jon Pauling had no personal bank accounts?

12   A.  I don't know about that.

13   Q.  Everything he owned was through Two Mile Ranch, didn't you

14   know that?

15   A.  I don't know about his personal.

16   Q.  All right.  So after describing to me what Jon Pauling had

17   done with respect to diverting funds to Cherry Creek Wine

18   Shop, you let him be in charge of the entire 1031 exchange

19   transaction with the bank?

20   A.  I don't see the -- why that would be a bad thing if he was

21   handling that paperwork.

22   Q.  And if, in fact, Jon Pauling had become -- was no longer

23   the manager by the time you did the 1031 change --

24   A.  That didn't mean he stopped doing things for me.

25   Q.  Well, if he wasn't the manager, you were delegating to

19-CV-01224-RBJ       Bench Trial - Day 2     04/13/2021     347

1   someone who was not the manager and who you felt

2   misappropriated funds to handle a multiple-million dollar

3   banking transaction?

4   A.  Yes.

5   Q.  Okay.  I wrote down, if I understood your testimony

6   correctly, that you bear ill will against Ms. Wilson and

7   believe the charges filed against her -- him, meaning your

8   brother, were false.

9   A.  Correct.

10  Q.  And you're sitting here even today offering your opinion

11  that the charges filed against him were false?

12  A.  It was more reinforced by your first exhibit yesterday

13  when I saw the picture of my brother.

14  Q.  You're aware that your brother pled guilty to a criminal

15  offense?

16  A.  I am.  I understood that.  There's a lot of other things

17  that go into that, and you know that.

18  Q.  You're aware that a jury --

19  A.  Yes.

20  Q.  -- rendered a verdict in the civil case against him?

21  A.  I am.

22  Q.  You're aware that that verdict was entered as a judgment?

23  A.  I am.

24  Q.  You're aware; isn't that right?  You're aware of that?

25  A.  Yes.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    348

1   Q.  And even today you bear ill will against Ms. Wilson?

2   A.  I believe it has been proven time and time again in other

3   cases where guilty parties are then proven innocent.

4   Q.  You --

5   A.  Just because you have this, does not mean it actually

6   happened.

7   Q.  You also blame Amanda Wilson for your business losses?

8   A.  I would say that she was a distraction to my brother.

9   Q.  Beyond that you blame Amanda Wilson and the judgment and

10  what you have described as publicity for lost customers?

11  A.  I don't believe it was Ms. Wilson that got in front of the

12  cameras and did the publications and everything like that.  I

13  believe it was the counsel that did that.

14  Q.  You blame Ms. Wilson for not being able to sell assets at

15  the price that you want?

16  A.  No, not personally.

17  Q.  Last set of questions.  We've talked about -- or you

18  talked about Jon Pauling and Elyce York had talked about Jon

19  Pauling providing advice, as it's been put, financial advice

20  or assistance.  What does he get paid for that?

21  A.  He doesn't.

22  Q.  Okay.  Then when he comes and helps out on the farm, what

23  does he get paid for that?

24  A.  He doesn't.

25  Q.  Now, with Jon Pauling not getting paid for any of that,

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 2     04/13/2021   349

1    and with no property in his name, can you explain how is this

2    person alive?

3            MR. KEITHLEY:  Objection, relevance.

4            THE COURT:  Sustained.  I don't get the question at

5    all.

6            MR. PULKRABEK:  Your Honor, I'll rephrase.

7    Q.  (By MR. PULKRABEK) How does he pay for his food?

8    A.  Through the --

9            MR. KEITHLEY:  Objection, relevance, Your Honor.

10            THE COURT:  Overruled.

11   A.  Through the generosity of others.

12   Q.  (By MR. PULKRABEK) And who are the others?

13   A.  Family members, friends.  I don't know the whole list.

14   Q.  How does he pay for shelter?

15   A.  He has a home on the North Ranch.

16   Q.  How does he pay for electricity?

17   A.  I pay for the utilities, and in return he does some work

18   for me out there or when I occasionally ask him to come help

19   me work out at the farm.

20   Q.  How does he pay for gas?

21            MR. KEITHLEY:  Objection to this entire line of

22   questions on relevance, Your Honor.

23            THE COURT:  It's not irrelevant to me.

24            THE WITNESS:  It's the same thing.

25            THE COURT:  Overruled.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      350

1      THE WITNESS:  It's the same thing.  Same answer.

2   Q.  (By MR. PULKRABEK) So Mr. Pauling lives off of your

3   generosity?

4   A.  Partially.

5   Q.  Elyce York's generosity?

6   A.  I couldn't say that.  I would say no to that.

7      MR. PULKRABEK:  No further questions, Your Honor.

8      THE COURT:  Thank you, sir.  You may return to your

9   chair.

10      Next.

11      MR. KEITHLEY:  I'm sorry, Your Honor.  I must

12   interject.  Do I get a recross based upon the scope of the

13   redirect?

14      THE COURT:  No, sir, but you can call him in your

15   case.

16      MR. KEITHLEY:  Your Honor, we discussed at the

17   pretrial conference --

18      THE COURT:  Sir.

19      MR. KEITHLEY:  Yes, Your Honor.

20      THE COURT:  Next witness.

21      MR. PULKRABEK:  Your Honor, the plaintiff calls

22   Richard Stull.

23                  RICHARD STULL

24   was called as a witness and, having been duly sworn, was

25   examined and testified as follows:

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    351

 1                 THE COURT:  Thank you, sir.

 2                 THE WITNESS:  I want to disclose to you that I've

 3       got a cell phone that I need to adjust to hear everybody, so

 4       once I am done with it, I'll put it up here for your view.

 5                 THE COURT:  So how does that work?  It ties into

 6       your -- it helps you hear?

 7                 THE WITNESS:  This is where I set it.  So I think

 8       I'm okay now.

 9                 THE COURT:  Okay.

10                 MR. PULKRABEK:  May I proceed, Your Honor?

11                 THE COURT:  Yes.

12                              DIRECT EXAMINATION

13       BY MR. PULKRABEK:

14       Q.  Mr. Stull, if at any point in time you don't hear a

15       question that I ask, will you please just let me know you

16       didn't hear it?

17       A.  Yes.  I'll go like this.

18       Q.  Okay.  Thank you.  Mr. Stull, I want to start with some

19       questions about your role at Farmers State Bank.

20       A.  Okay.

21       Q.  Your title is executive vice president?

22       A.  That's correct.

23       Q.  And by way of background, Farmers State Bank was acquired

24       in 2011 by a company called Farmers State Bank Shares?

25       A.  That's correct.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      352

1   Q.  You personally were involved in the acquisition of Farmers
2   State Bank through that holding company?
3   A.  That is correct.
4   Q.  You're one of the shareholders in the bank holding
5   company?
6   A.  That is correct.
7   Q.  And as we know, your son is the president and CEO of the
8   bank?
9   A.  That is correct.
10  Q.  I want to take you back to 2014 and ask you some questions
11  about your involvement in Jon Pauling and Elyce York's plans
12  to buy the North Turkey Creek property.
13  A.  Okay.
14  Q.  Okay.  You understood there to be a contract between JMP
15  Enterprises and Elyce York for the purchase of that property?
16  A.  Yes.
17  Q.  And you had a conversation with Jon Pauling about why
18  Elyce York and JMP were jointly on that contract to buy the
19  residential property?
20  A.  Yes, I'm sure I did.
21  Q.  And then I want to focus on the exhibit, Exhibit 12.
22       MR. PULKRABEK:  I believe it's stipulated, Your
23  Honor.
24       THE COURT:  I'm sorry.  You're right.  It's
25  stipulated and admitted.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 2      04/13/2021      353

1          (Plaintiff's Exhibit 12 received.)

2     Q.   (By MR. PULKRABEK) All right.  So, Mr. Stull, this is an

3     e-mail that you sent to Joe Henry slash Jon Pauling on

4     December 12th, 2014?

5     A.   That's correct.

6     Q.   And you wrote, Jon, I am forwarding the commitment letter

7     to you.  Understand that we will still need to have Mark,

8     yourself, and Elyce here at the bank to sign the closing

9     documents.

10    A.   That's correct.

11    Q.   So even going back into at least the December 2014

12    timeframe you were aware of Elyce York?

13    A.   That's correct.

14    Q.   And the connection to Jon Pauling?

15    A.   Well, that was unclear, I believe, but, yes, I was aware

16    of Elyce.

17    Q.   All right.  And then the closing on the North Turkey Creek

18    property, that happened in May of 2015?

19    A.   Yes, that is correct.

20    Q.   And it was your understanding that at some point in time

21    Jon Pauling was living at that property?

22    A.   Yes.  That was after the closing, I believe.  That's what

23    I have knowledge of.

24    Q.   Do you recall asking Jon Pauling if he had moved into the

25    Turkey Creek house yet and if it was meeting his expectations?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021        354

1    A.  Yes.  And there was an e-mail to that effect.

2    Q.  All right.  Now, I want to jump forward to the time that

3    you were served with a subpoena in this lawsuit.

4    A.  Okay.

5    Q.  Or in -- rather, not in this lawsuit, but in the

6    underlying Amanda Wilson versus Jon Pauling lawsuit, okay?

7    A.  Okay.

8    Q.  And I want -- I'd like to look at the bank's file with

9    relation to the subpoena, so let me go to what has been marked

10   Exhibit 18.  And do you see -- just preliminarily, do you see

11   that the Bates number on this document is FSB, it's Farmers

12   State Bank 1?

13   A.  Correct.

14   Q.  Okay.  FSB produced documents out of its files as part of

15   this lawsuit, and this was page number 1, and then it

16   continued after that, correct?

17   A.  Correct.

18   Q.  All right.  So the first document we see here is the

19   transcript of judgment.  You understood that to be the

20   transcript of judgment for the underlying lawsuit?

21   A.  Would you restate that because I didn't quite hear what

22   you said.

23   Q.  Yes.  You understood this transcript of judgment to have

24   been entered in connection with the underlying lawsuit, the

25   Amanda Wilson versus Jon Pauling lawsuit?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021     355

1    A.  Yes.

2    Q.  All right.  And then as we go forward, we have a charging

3    order on Two Mile Ranch General Partnership, correct?

4    A.  Correct.  Number four.

5    Q.  Yes.  Page number 4.  And that was signed by Judge Ross

6    Buchanan of the Denver District Court on November 19th, 2015?

7    A.  That's correct.  That's what the document says.

8    Q.  Okay.  And then going forward to page 8 of this document

9    is a subpoena to attend and produce, and it is to Richard A.

10   Stull, Executive Vice President of Farmers State Bank.  Do you

11   see that?

12   A.  I do.

13   Q.  And if we look in the upper corner here, the date filed

14   with the Clerk of the Court for Morrill County, Nebraska, was

15   January 11th, 2016, correct?

16   A.  That's correct.

17   Q.  And that's about the time that you were served with

18   process for the subpoena to attend and produce?

19   A.  That's correct.

20   Q.  So as of at least January of 2016, you're personally aware

21   of the judgment having been entered in the Amanda Wilson

22   versus Jon Pauling lawsuit?

23   A.  That's correct.

24   Q.  And not only were you aware that judgment had entered, you

25   are aware that Amanda Wilson was making efforts to collect

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    356

1   that judgment against Jon Pauling?

2   A.  I am assuming, yes.

3   Q.  You are aware of that part of Amanda Wilson's efforts to

4   collect the judgment against Jon Pauling implicated Two Mile

5   Ranch?

6   A.  Yes.  Two Mile Ranch, but I don't think it said Two Mile

7   Ranch General Partnership.  But yes, Two Mile Ranch.

8   Q.  Now let me go to a communication that you had and jump

9   forward to 20 -- June 2016.  I want to look at what's been

10  marked Trial Exhibit 24A.  And this is, if I recall,

11  stipulated.

12          THE COURT:  24A, yes, admitted.

13      (Plaintiff's Exhibit 24A received.)

14  Q.  (By MR. PULKRABEK) So, Mr. Stull, this is an e-mail that

15  starts off -- it starts off with Richard Garden at Cline

16  Williams law firm being forwarded to you by Steve Stull, and

17  then you have a response on June 3rd, correct?

18  A.  That is correct.

19  Q.  And you wrote this to Steve Stull, Mike Stull, and Chris

20  Gray.  Mike Stull is one of your sons?

21  A.  That's correct.

22  Q.  And Chris Gray is a vice president of the bank?

23  A.  He is, yes.

24  Q.  And you write to these other bank gentlemen, Now they just

25  need the, quote, investor, end quote, deal to get brought into

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2       04/13/2021    357

1    the deal.  My opinion is that the, quote, investor is the

2    group that has formed an LLC and the true identity of those

3    individuals will not be disclosed, which is okay with me as

4    long as we move forward.

5    A.   That's correct.

6    Q.   All right.  At this point in time, there was already

7    discussion of Two Mile Ranch filing bankruptcy?

8    A.   Yes, I believe that's correct in the timeline.

9    Q.   And you've -- you've seen also the e-mail that talks about

10   a unicorn-like investor?

11   A.   Repeat that.

12   Q.   Have you seen the e-mail that talks about a unicorn-like

13   investor.

14   A.   Yes, I think there was one from one of the officers to

15   that effect.

16   Q.   Now, as the executive vice president of Farmers State

17   Bank, you have the authority to tell Jon Pauling that, no,

18   Farmers State Bank is not going to go ahead with a plan that

19   involves a, quote, investor, end quote?

20   A.   I could do that.  But any investor group at any point in

21   time, if they were part of the loan, that would have to be

22   disclosed and so forth.

23   Q.   You had authority to tell Jon Pauling that the bank would

24   not go along with any unicorn-like investor?

25   A.   That was never discussed as a unicorn.  It was an

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      358

1    investor, yes, group that we didn't have disclosed to us who

2    those investors were.

3    Q.  And as the executive vice president of the bank -- let me

4    -- let me back up.  Are you -- in the hierarchy of the bank,

5    who do people defer to as really being in charge, you or Steve

6    Stull?

7    A.  Steve Stull is the president of the bank.  He is in charge

8    of the bank overall for everything.  Executive vice president,

9    that is my title, yes.

10   Q.  All right.  So as the father of the bank president and

11   also Mike Stull who I understand to be a vice president, as

12   well as Chris Gray, vice president, you're telling these

13   gentlemen that it's okay with you if the identity, the true

14   identity of these individuals is not disclosed as long as you

15   move forward.  That's what you were telling these people?

16   A.  As long as we had an investor group, yes.

17   Q.  And you understand as the elder ambassador for Farmers

18   State Bank that your words carry meaning?

19   A.  Just as all of our words have meaning, yes.

20   Q.  All right.  Let's go forward --

21   A.  If you want me to say that I don't care if we have an

22   investor group that keeps secret, no, that would have to be

23   disclosed at some point in time because of -- that's just part

24   of regulation.  We all know that.

25   Q.  Not to belabor the point, Mr. Stull, but what you wrote

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      359

1    here is, quote, The true identity of those individuals will

2    not be disclosed which is okay with me as long as we move

3    forward.  That's what you wrote?

4    A.  At this point, yes.

5    Q.  Now, let's look at -- I want to look at Exhibit 25, which

6    has been stipulated.  So Exhibit 25 is July 20th of 2016 --

7            THE COURT:  Exhibit 25 is admitted.

8            (Plaintiff's Exhibit 25 received.)

9            MR. PULKRABEK:  Thank you, Your Honor.

10   Q.  (By MR. PULKRABEK) July 20th, 2016, that's less than three

11   weeks after Two Mile Ranch files bankruptcy?

12   A.  Yes.

13   Q.  And you have Jon Pauling -- you know at this point that

14   Joe Henry is the same as Jon Pauling?

15   A.  Exactly.  Always has been.

16   Q.  And, in fact, you remember when I deposed you, you looked

17   in your phone and you searched for Jon Pauling's e-mail

18   address under Joe Henry?

19   A.  Yes.

20   Q.  Okay.  Now, Jon Pauling sends this to you on July 20th,

21   and he makes a very specific loan request.  Do you see this?

22   A.  I do.

23   Q.  He tells you the request is for $45,000, payments

24   amortized over four years with a balloon payment in six

25   months.  Six months of payments will be kept on account at

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021      360

1    Farmers State Bank with automatic payment.  So he's laying out

2    exactly what he wants?

3    A.  Yes.

4    Q.  And then he goes on to say, Loan would be to Elyce York,

5    who you already know is affiliated with Jon Pauling?

6    A.  Yes.

7    Q.  Then he says, Or if you would prefer, it could be set up

8    in Lardyn Consulting of which she is the only member.  Do you

9    see that?

10   A.  I do see that.

11   Q.  Now, is this the first time you heard of Lardyn

12   Consulting?

13   A.  This -- I'm not sure what day this is.  I'm sure we had

14   heard of Lardyn Consulting, or I cannot answer that question

15   without going and looking at different information, but I

16   would assume I know it was Elyce York and/or it would be set

17   up as the Lardyn Consulting which we now know is Elyce.

18   Q.  And, Mr. Stull, you understood, didn't you, that what was

19   happening was now that Two Mile Ranch was in bankruptcy, Jon

20   Pauling was using Elyce York slash Lardyn Consulting to set up

21   a loan?

22   A.  You're confusing that information, because what date did

23   Two Mile Ranch General Partnership take out a bankruptcy?

24   What was the date?

25   Q.  It's July 1st, 2016, about 19 days before this e-mail is

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 2          04/13/2021    361

1   when the bankruptcy was filed.

2   A.   Okay.  So, yes, we knew that Two Mile Ranch was in

3   bankruptcy, Chapter 11 for reorganization, yes.

4   Q.   And you knew that what was happening here was Jon Pauling

5   was using Elyce York slash Lardyn Consulting to take out a

6   loan?

7   A.   I didn't know that for sure at the time.  As we look back

8   on it, we can see that Lardyn Consulting and Elyce York were

9   being formed or was formed to be acquiring the -- some of the

10  assets of Two Mile Ranch General Partnership because that was

11  part of -- needed to be done -- the assets of Two Mile Ranch

12  General Partnership, which was all in default, needed to be

13  sold or have a reorganization plan or some effect or the bank

14  would have to foreclose and take over the assets.

15  Q.   As of the date of this e-mail Lardyn Consulting did not

16  exist as a legal entity?

17  A.   I don't think they probably did.

18  Q.   Okay.  Now, here we have an example of Jon Pauling

19  communicating with Farmers State Bank for Lardyn Consulting

20  slash Elyce York.  You would agree that you had numerous

21  communications with Jon Pauling about getting documents for

22  Elyce York or from Elyce York?

23  A.   Absolutely.

24  Q.   You had --

25  A.   As a -- as a partner in the Two Mile Ranch General

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2       04/13/2021    362

1    Partnership, he was helping to sell the assets of Two Mile

2    Ranch General Partnership just as I would think Mark was

3    trying to sell assets of Two Mile Ranch General Partnership to

4    reduce debt which would not be uncommon, but that's where we

5    are.

6    Q.  You had text messages with Jon Pauling where you asked him

7    to get things signed by Elyce York?

8    A.  Oh, yes, absolutely.

9    Q.  You had e-mails between you and Jon Pauling where you

10   asked him to get things signed by Elyce York?

11   A.  Absolutely.

12   Q.  When you wanted to communicate with Elyce York, sometimes

13   you would communicate through Jon Pauling?

14   A.  Absolutely.

15   Q.  You formed your own opinion that there was a relationship

16   between Jon Pauling and Elyce York?

17   A.  Oh, absolutely.

18   Q.  And now I want to take a look at some later documents

19   within the bank.  Let's look at Exhibit 34.

20        MR. PULKRABEK:  Exhibit 34 is stipulated, Your

21   Honor.

22        THE COURT:  Right.  It's admitted.

23     (Plaintiff's Exhibit 34 received.)

24   Q.  (By MR. PULKRABEK) So, Mr. Stull, Exhibit 34 is an e-mail

25   that you sent on December 8th, 2016, to a number of people

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    363

1   within Farmers State Bank?

2   A.  That's correct.

3   Q.  You sent it to Mr. Stull, Mr. Gray, Mr. Hamik, Ms. Roach

4   -- these are names that we've heard in connection with this

5   case so far?

6   A.  Yes.

7   Q.  And then other people as well?

8   A.  Yes.

9   Q.  And then there were a number of -- the subject was updated

10  watch list reports, correct?

11  A.  That's correct.

12  Q.  And then there are a number of attachments?

13  A.  That's true.

14  Q.  So I want to look -- I want to focus on some of these

15  attachments here.  Let's start with the second page.  So you

16  can see that this is a watch list report in reference to Two

17  Mile Ranch, correct?

18  A.  Two Mile Ranch and debtors, exactly.

19  Q.  For the month ending 11/30/2016?

20  A.  Yes.

21  Q.  And then under present status it says, quote, Working with

22  Mark and Jon so they can get through the Chapter 11

23  bankruptcy, which is being done to protect the proposed asset

24  sale from the judgment against Jon, correct?

25  A.  That's correct.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021        364

1    Q.   And we've already seen how you knew about the judgment

2    against Jon at least by the beginning of 2016?

3    A.   Yes.

4    Q.   And so this was a statement that you -- you were including

5    in a watch list report e-mail to the bank at large, the bank

6    employees at large?

7    A.   Yes.   That was -- that statement was included.

8    Q.   To communicate with the bank at large what the bank was

9    doing in relation to the Chapter 11 bankruptcy?

10   A.   Yes.   Chapter 11 bankruptcy.

11   Q.   And to communicate to the bank at large what the purpose

12   of it was?

13   A.   The purpose of a Chapter 11 bankruptcy is for

14   reorganization.

15   Q.   The legal purpose is reorganization, correct?

16   A.   Yes.   Which is being done to protect those assets.   Yes.

17   Q.   Here the purpose was to protect -- quote, to protect the

18   proposed asset sale from the judgment against Jon.   That's

19   what is written?

20   A.   I agree with that.   That's what it says.

21   Q.   Now, then it goes on to say, quote, The buyers want this

22   to make sure they are not subject to future legal claims.   Do

23   you see that?

24   A.   That's why you take Chapter 11, yes.

25   Q.   Now, I want to focus on the term buyers in this sentence.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      365

1   The buyers are the company Lardyn owned by the mother of Jon

2   Pauling's child?

3   A.   Okay.   Put this backwards to the date again.   November --

4   November 30th, which would be after the closing of Lardyn.

5   Q.   And since we've already seen how you communicated with

6   Elyce York through Jon Pauling, what's really happening here

7   is it's Jon Pauling telling you that on the other end of this

8   transfer he wants to make sure there aren't any legal claims,

9   correct?

10  A.   The buyers, whether one or more buyers -- I was taking it

11  the buyers want to make sure there are no legal claims,

12  whatever -- whatever those particular assets were.   Yes.

13  Q.   Okay.   The next sentence under present status says, Since

14  the last quarter oil prices have increased substantially from

15  the lows from last quarter, so the value of the mineral rights

16  has been increased.   Do you see that?

17  A.   I do.

18  Q.   Now, the mineral rights were something that the bank was

19  talking about internally in relation to transferring assets

20  from Two Mile Ranch?

21  A.   You keep saying transfer.   They were all sales, so that

22  would be a difference between a true sale and a transfer.

23  But, yes, there were different assets that were being sold.

24  There were assets of Two Mile Ranch General Partnership.

25  Mineral interests happened to be one, yes.

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    366

1    Q.  And, sir, my question really is the bank was talking

2    internally about the mineral rights in connection with all of

3    this?

4    A.  I did not understand your question.  Please repeat it.

5    Q.  One of the points of focus when the bank talked about this

6    transaction was the mineral rights?

7    A.  Absolutely.

8    Q.  Okay.  If we go down further on this page, there's an

9    internal collateral analysis.  Do you see that?

10   A.  I do.

11   Q.  And here next to minerals is the gross amount $3,850,000?

12   A.  I see that.

13   Q.  Now, the bank then provides a discount to reach a

14   collateral value, correct?

15   A.  That's correct.

16   Q.  But the gross value is that 3.85 figure?

17   A.  That's correct.

18   Q.  Further down we see the bank listing total collateral of

19   $11,724,552?

20   A.  That's correct.

21   Q.  Now, a little bit of that, for example, if we go to the

22   top here refers to equity in Mark's ranch, so that's not an

23   asset that was owned by Two Mile Ranch?

24   A.  Not a guaranteed portion, no.

25   Q.  Right.  There's also a home in Sterling that I understand

19-CV-01224-RBJ        Bench Trial - Day 2       04/13/2021    367

1   the bank foreclosed on?

2   A.   That is correct.

3   Q.   But setting aside those assets, you understand that the

4   minerals, the equipment, the machinery, North Turkey Creek,

5   the agricultural real estate, those were assets of Two Mile

6   Ranch?

7   A.   Those were assets that I believe that Two Mile Ranch had

8   listed on there.

9   Q.   Now, let me go to another page in this document.  This

10  page is FSB 15256.  Here you see a borrower listed Jonathan M.

11  Pauling, correct?

12  A.   I do.

13  Q.   And under present status here it says, Working with Mark

14  and Jon on Chapter 11 to get rid of Jon's judgment so the

15  assets can be sold without concern for legal recourse to the

16  buyers?

17  A.   That's exactly correct.

18  Q.   And that's what the bank was doing at that time?

19  A.   We were working with them.  When a borrower is in

20  bankruptcy, you work with them, yes.

21  Q.   All right.

22  A.   And basically that's what you're doing in bankruptcy.

23  Q.   And this is the message that you broadcast to the bank

24  employees at large as to what the bank was doing?

25  A.   Yes.  In the watch list it says the parties were working

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      368

1   with Mark and Jon on the Chapter 11, and that would -- yes.

2   And there were judgments out there from various sources I

3   think in addition to the one that Amanda Wilson had.

4   Q.   And you were trying to get rid of it?

5   A.   We aren't.  The borrowers are.

6   Q.   You're working with the borrowers to try to get rid of the

7   judgment?

8   A.   Yes.  That's what it states.

9   Q.   Okay.  While we're in this document, there was another

10  report for borrower Mark Pauling.  Do you see that?

11  A.   I do.

12  Q.   And that's for loan 2346 with the principal amount of

13  $730,000?

14  A.   That's correct.

15  Q.   And here under present status it says, Working with Mark

16  and Jon on the Two Mile Ranch Chapter 11.  Mark's payment is

17  tied up in monies owed to him, and the plan should be approved

18  shortly.  In addition, Mark does have calves to sell to make

19  his payments.

20  A.   I see that.

21  Q.   Then further down we have the bank's internal collateral

22  analysis.  Do you see that?

23  A.   I do.

24  Q.   Collateral for Mark's $730,000 loan consisted of cows,

25  calves, of course Mark's ranch.

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    369

1   A.  Excuse me.  Let me shut this thing off.

2   Q.  The bank's collateral added up to 1,210,000?

3   A.  That's correct.

4   Q.  There was a surplus or a margin of $436,000?

5   A.  That's correct.

6   Q.  The bank was very well secured with respect to Mark

7   Pauling's $730,000 debt?

8   A.  That's correct.

9   Q.  More than fully secured?

10  A.  That's correct.  But --

11  Q.  Now --

12  A.  -- Mark also owed Two Mile Ranch General Partnership money

13  for the down payment here which is not reflected because that

14  was not debt to the bank.

15  Q.  Farmers State Bank obtained more than one appraisal of the

16  minerals?

17  A.  I think we obtained two and then -- yes, we did.

18  Q.  And the bank was aware prior to the dismissal of the

19  bankruptcy that the agreement had been reached to sell assets

20  upon dismissal of the bankruptcy to Lardyn.  The bank was

21  aware of that?

22  A.  Yes.  The bank was aware of once the bankruptcy was

23  dismissed, then sales would move forward.

24  Q.  And the bank supported that plan?

25  A.  And what?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021    370

1   Q.  I'm sorry?

2   A.  What did you ask, that last question?

3   Q.  And the bank supported that plan?

4   A.  To sell assets, yes, to reduce debt.

5   Q.  All right.  I want to focus in then on this other

6   appraisal, and I'm going to ask you some questions about

7   what's been marked Exhibit 45.

8   A.  Okay.

9        MR. PULKRABEK:  Your Honor, that's a stipulated

10  exhibit.

11       THE COURT:  Yes, it is.  It's admitted.

12       (Plaintiff's Exhibit 45 received.)

13  Q.  (By MR. PULKRABEK) This is an e-mail that you sent on

14  March 27th, 2017, to JB Suddarth, Don Moore.  Then there's

15  Ryan at First Central Bank as well.  Do you see that?

16  A.  Yes, Ryan Moore.

17  Q.  Okay.  Tell us who is JB Suddarth.

18  A.  JB Suddarth is one of the owners, officer shareholders of

19  the Henderson State Bank in Henderson, Nebraska.

20  Q.  And who is Don Moore?

21  A.  Don Moore is president of First Central Bank in McCook,

22  Nebraska.

23  Q.  And Ryan Moore?

24  A.  Ryan Moore is Don's son, and I believe he is the credit --

25  senior credit officer at First Central.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ         Bench Trial - Day 2      04/13/2021    371

1    Q.  So these are the gentlemen that are the heads of other

2    banks?

3    A.  Yes.

4    Q.  And you sometimes work with these other gentlemen on

5    participation in loans; isn't that true?

6    A.  Yes.

7    Q.  The reason -- the reason for that is Farmers State Bank,

8    either because it has lending limits or just because it would

9    like to allocate risk across the portfolio, it will invite

10   other banks to participate?

11   A.  Yes.  Normally it was a lending limit reason, but, yes, if

12   we have, yes, a large loan, could be a new loan, we would

13   reach out to them and see if they were interested before we

14   tell a customer that we would have interest in looking at it.

15   Q.  In this e-mail what you were doing is you were

16   soliciting -- or soliciting or inviting Henderson State Bank

17   and First Central Bank to participate in the underwriting of

18   Lardyn?

19   A.  That's correct, I believe.  I'm sure it is.

20   Q.  So what you tell these gentlemen is -- you can see here --

21   Two Mile Ranch has a motion before the bankruptcy court to

22   have the Chapter 11 dismissed, and that's one thing you write?

23   A.  Yes.

24   Q.  So this is prior to dismissal of the Chapter 11.  Is that

25   -- was that your understanding?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021      372

1  A.  I believe that's correct, yes.

2  Q.  And then you write, At this point it looks as if there

3  will be a deed in lieu of foreclosure on the Logan County farm

4  slash feedyard, the mineral interests, the machinery,

5  equipment, vehicles, and the 240 acres of grass located in

6  Weld County, also, a $275,000 note from Mark Pauling to Two

7  Mile Ranch will be assigned to us, and the guarantees will

8  stay in place.  You refer to the 240 acres is still under

9  contract with the Stanley family for $72,000, and then you say

10  Lardyn Consulting, LLC will immediately buy the balance of

11  these assets for $700,000, which is their request, correct?

12  A.  $7 million.

13        MR. PULKRABEK:  I'm sorry?

14  A.  $7 million.

15  Q.  (By MR. PULKRABEK) Thank you for correcting me.  I'm so

16  sorry.  So just in terms of the structure that you are

17  describing in this particular e-mail, it sounds like you were

18  describing to them that there would be a foreclosure by

19  Farmers State Bank of the assets, and then the essential

20  assets of the business -- the income-producing assets of the

21  business would be sold to Lardyn?

22  A.  Yes.  And I think that was at one point in time the way we

23  thought it would be handled.

24  Q.  Okay.

25  A.  But --

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021    373

1    Q.   In terms of Farmers State Bank's position in that

2    contemplated transaction, Farmers State Bank was what would be

3    known as the lienor or the lienholder?

4    A.   Yes.   Farmers State Bank would be the -- was at the point

5    in time of the bankruptcy the lienholder, and then after the

6    sale they would also be the lienholder in the Lardyn

7    Consulting assets that were bought from Two Mile Ranch.

8    Q.   Okay.   Then further down in this e-mail you say, I am

9    including a mineral appraisal along with an appraisal we had

10   completed for us on the Logan County farm in August.   Just

11   focusing on that first part, I am including a mineral

12   appraisal, by this time you had received an appraisal from a

13   woman named Briana Lamphier of Gustavson & Associates?

14   A.   That's correct.

15   Q.   You had received that appraisal, but that is not the

16   appraisal that you provided in this e-mail to Henderson Bank

17   and First Central Bank?

18   A.   I don't recall.   Can I see the document?

19   Q.   Yes.

20   A.   Yes.   Because I know that we had two different appraisals.

21   One was I think from a Steve Brown it was.

22   Q.   Let's first look at the Steve Brown appraisal.   Okay.   FSB

23   15729 is one of the documents that you forwarded to Henderson

24   and First Central, and that is a printout of an e-mail from

25   Steve Brown to Joe Henry slash Jon Pauling, correct?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 2        04/13/2021    374

1   A.  That is correct.

2   Q.  And that is dated Wednesday, February 8th, 2017?

3   A.  That's correct.

4   Q.  Now, kind of cutting to the chase here, in this third full

5   paragraph, fourth full paragraph, Steve Brown writes this:

6   Quote, Bottom line is that applying an industry standard

7   present value discount of 10 percent per annum results in a

8   net value per well of 95,880, and then he writes, Multiply

9   that to get a total value of 2,301 -- or $2,301,120.  You see

10  that?

11  A.  I do.

12  Q.  So I want to focus on this particular number, $2,301,120.

13  This is where -- this is the source of the value figure for

14  the producing minerals that then we see in Farmers State

15  Bank's discussion of the proposed one, correct?

16  A.  Yes.  I'm sure that's correct.

17  Q.  So let's look at where Farmers State Bank uses that

18  figure.  This 15733 -- page 15733 is a document called Farmers

19  State Bank of Dodge credit review, correct?

20  A.  That's correct.

21  Q.  And it lists officers Dick and Steve, that's you and your

22  son?

23  A.  That's correct.

24  Q.  The date on it is 3/22/2017?

25  A.  Correct.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    375

1    Q.  And then, again, you had Ms. Lamphier's appraisal by then?

2    A.  Yes, we did.  Didn't we?  No, I'm not sure.  But I think

3    -- I think you're correct.

4    Q.  All right.  Getting to this next page here under general

5    discussion, there's a long -- it's just a long narrative of

6    what's going on, correct?

7    A.  It is a long narrative.

8    Q.  I want to focus on a couple points of this narrative.  One

9    of the points that is included also in the purchase is all

10   mineral interest in Weld County of a 240-acre parcel that

11   presently has two wells under production and another 24 that

12   have been drilled with a production valuation of $2,301,120,

13   plus 1,100 acres of additional mineral interest valued at

14   $1,000 per acre of $1,100,000?

15   A.  Correct.

16   Q.  So that's -- we can see the same figure $2,301,120 being

17   used by Farmers State Bank in the discussion section, correct?

18   A.  That's correct.

19   Q.  And that's because Farmers State Bank was using that

20   figure from Steve Brown's appraisal?

21          MR. FORBES:  I'm going to object, Your Honor.  I

22   haven't seen an appraisal from Steve Brown.

23          THE COURT:  I'm not sure that that's an objection

24   that I find in the rules of evidence.

25          MR. FORBES:  I'm sorry.  It's an objection to form,

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      376

1    Your Honor.

2          THE COURT:  Still overruled.

3    Q.   (By MR. PULKRABEK) All right.  Mr. Stull, the question was

4    Farmers State Bank was adopting the 203 -- $2,301,120 figure

5    from Mr. Brown's appraisal?

6          MR. FORBES:  Same objection, Your Honor.

7    Q.   (By MR. PULKRABEK) Go ahead, Mr. Stull.

8          THE WITNESS:  May I answer, Your Honor?

9          THE COURT:  Yes.

10   A.   Anyway, yes, that was.

11   Q.   (By MR. PULKRABEK) Okay.  Then to go on there was, as

12   you're noting here, an additional approximate 1,100 acres

13   valued at $1,000 per acre.  There's a discussion here about

14   how you reach that valuation, so I want to highlight that.  It

15   says the 1,000-per-acre value is based out of their 100 net

16   mineral acres for $2,050 per acre in 2015 and $5,000 per acre

17   for 60 net mineral acres in 2013 in the same locations,

18   correct?

19   A.   I see that.

20   Q.   So the $1,000-per-acre valuation is, in fact, less than

21   either of these other two sales?

22   A.   Using those figures, yes.

23   Q.   So if anything, it appears to be conservative?

24   A.   Yes.  I mean, using those numbers, yes, it is

25   conservative.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021      377

1   Q.   Further down it says approximate value of the assets is

2   $8,786,000, correct?

3   A.   That's what it says, yes.

4   Q.   Now, one other point of note in here has to do with the

5   water and the ranch valuation, so let me highlight that.  It

6   says the Logan County farm was appraised for the bank back in

7   August 2016 with a value of $4,270,000, which was before the

8   new water lease was negotiated by North Sterling Irrigation

9   District?

10  A.   Yes.  That's what it says.

11  Q.   And you understood that the renegotiation was favorable in

12  terms of valuation?

13  A.   Yes.

14  Q.   So in all likelihood, again, $4,270,000 also was

15  conservative?

16  A.   That is based off of the appraised value that -- yes, from

17  a licensed appraiser.

18  Q.   Finally, let me turn to another page that was included in

19  the packet you gave for consideration of these other banks.

20  This is a balance sheet that was included in the packet for

21  Lardyn, LLC.  Do you see that?

22  A.   Yeah.

23  Q.   Of course, Lardyn, LLC hadn't already acquired the assets,

24  but this was a pro forma type nature?

25  A.   It doesn't even have the right name on it.  It would be

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    378

1   Lardyn Consulting, LLC.

2   Q.  But just in terms of the figures that are being provided

3   to First Central and Henderson banks on this balance sheet, it

4   lists the land at $4.5 million?

5   A.  Yes.  These are numbers that were given to us proposed as

6   what that would look like.

7   Q.  Okay.  We'll get to that in a moment, but just for now, it

8   says $4.5 million for the land.  Again, for the production

9   it's the same number we saw from the Steve Brown e-mail?

10  A.  Yes.

11  Q.  2,301,000, correct?

12  A.  Yes.

13  Q.  And then $1,100 -- or $1.1 million, I'm sorry, for the

14  nonproducing rights?

15  A.  Right.

16  Q.  Okay.  So you were providing -- this is the information

17  you provide to these two banks for purposes of doing a deal

18  with them on participation?

19  A.  We don't do a deal with loan participants.  We send the

20  information we have in hand so that they can do their own

21  analysis.  That is one thing that is required by banking

22  regulations.  Each bank has to analyze their own methods.

23  Q.  Be that as it may, this is the information that you

24  provided to those other banks for their analysis?

25  A.  Yes, it is.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021     379

1  Q.  And you did not provide the Briana Lamphier appraisal to

2  these other two banks in this e-mail?

3  A.  Not that I know of.  But it was for less money.  I know

4  that.  And probably the reason we didn't was because it was

5  tied back into the numbers that were on this 2,301,000.

6  Q.  Okay.  And then in terms of the way the participation

7  works, the bank that is soliciting participation, in this case

8  Farmers State Bank, will have the master agreement or the

9  master loan agreement with the customer, correct?

10  A.  Yes.  They will have the loans.

11  Q.  And then the bank will also have agreements with the

12  participating banks?

13  A.  Yes.  There are loan participation agreements.

14  Q.  So it's not as though the participating banks do a

15  separate loan with the customer.  This is a deal that is done

16  between Farmers State Bank and the participating members?

17  A.  That is correct.

18  Q.  Then let's look at Exhibit 47.

19        THE COURT:  47 is admitted.

20     (Plaintiff's Exhibit 47 received.)

21  Q.  (By MR. PULKRABEK) So Exhibit 47 is a follow-up e-mail

22  from you to Mr. Suddarth dated March 28th, 2017, correct?

23  A.  Correct.

24  Q.  And you write, JB, Steve indicated that he had visited

25  with you this afternoon after you and I had a conversation.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    380

1   For clarity as to the $7,100,000 request that I had sent out

2   earlier, I think there must be some confusion as to the

3   loan-to-collateral value.  I am attaching the front sheet of

4   our old LPM form showing the collateral and a discounted

5   value, a second sheet showing no discounted value, and then

6   also our new form showing no discounted collateral value.  Do

7   you see that?

8   A.  Yes, I do.

9   Q.  All right.  And let me direct your attention then to this

10  page, loan presentation memorandum -- this is Farmers State

11  Bank's old format, I take it?

12  A.  That's correct.

13  Q.  All right.  And going down on this page we can see

14  different collateral values listed for assets totaling

15  $8,735,745 correct?

16  A.  That's correct.

17  Q.  And then not providing any discount factor, which would be

18  in this column, we can see that the total collateral minus the

19  $7.1 million loan leaves a net margin of $1,635,745, correct?

20  A.  That is correct.

21  Q.  And that was -- that was the bank's own collateral

22  analysis prior to the transfer?

23  A.  That -- that is information that was provided to us, yes,

24  by the borrower that we put in here without any discount with

25  our own values.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    381

1   Q.  And that's the analysis that was implemented on this form,

2   correct?

3   A.  This is what the form says, yes.

4   Q.  And it's the analysis that the bank provided to

5   Mr. Suddarth for his consideration and clarification and --

6   A.  Yes.  Follow-up information provided for collateral, if

7   you'll go back to the previous e-mail.

8   Q.  This was the information that the bank provided to

9   Mr. Suddarth so he could consider his bank participating in

10  underwriting the Lardyn loan?

11  A.  Okay.

12  Q.  Isn't that true?

13  A.  This is what it said.  If we go to the third paragraph, I

14  am attaching the front sheet of the old LPM, which we just

15  referenced, showing the collateral value and discount value.

16  A second sheet showing no discounted value, and then also our,

17  quote, new form showing no discounted value.  But this one

18  does not show the discounted value, so I don't know if you're

19  missing something on this form, because we always discount,

20  and I don't see that on this form.  So have you got another --

21  have you got another exhibit you're missing?

22  Q.  Mr. Stull, your lawyer, if she wants, can walk you through

23  how a discounted value would work.

24        MS. OLDEMEYER:  Your Honor, may I hand the witness

25  a hard copy of the five-page exhibit?  I think it's a

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021   382

1    five-page exhibit.  He showed him one of the five pages --

2    sorry -- two of the five pages.  If you're not going to show

3    the witness --

4            THE COURT:  I don't know if the attorney objects to

5    that.

6            MR. PULKRABEK:  I do object to it, Your Honor.  I

7    think it's fair game for Ms. Oldemeyer to follow up with the

8    witness, but I don't want to take my time going through

9    things that she may want to explore.

10           THE COURT:  Okay.  Let's keep going.  Well, first,

11   let me ask Sarah, do you need a break yet?

12           THE COURT REPORTER:  Sure.

13           THE COURT:  Let's take a ten-minute break here.

14           THE COURTROOM DEPUTY:  All rise.  Court is in

15   recess.

16       (Break was taken from 2:30 p.m. to 2:47 p.m.)

17           MR. PULKRABEK:  May I proceed?

18           THE COURT:  Yes.

19   Q.  (By MR. PULKRABEK) Mr. Stull, I want to ask you some

20   questions about what you knew of Elyce York at the point in

21   time that Farmers State Bank proceeded to loan Lardyn

22   $7.1 million, okay?  So first of all, you knew very little of

23   Ms. York's background?

24   A.  That is correct.

25   Q.  You knew nothing specifically about Ms. York?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    383

1   A.  Nothing specific.

2   Q.  You did not inquire into her work history before loaning

3   Lardyn $7.1 million?

4   A.  No.

5   Q.  To your knowledge, she had no qualifications in ranching?

6   A.  Not to my knowledge, she didn't.

7   Q.  To your knowledge, she had no experience in feedlot

8   operations?

9   A.  None.

10  Q.  Or farming?

11  A.  None.

12  Q.  In fact, you knew nothing about Ms. York's work experience

13  at all?

14  A.  That's correct.

15  Q.  And you knew nothing about her educational experience?

16  A.  No, I didn't.

17  Q.  What you do recall of Elyce York's financial history was

18  that she did not have a very substantial financial statement?

19  A.  That is correct.

20  Q.  I'd like to look at the text messages exhibit.  It's

21  Exhibit 131.  We're not going to go through all of the text

22  messages.

23          MS. OLDEMEYER:  That's a stipulated exhibit.

24          MR. PULKRABEK:  Yes.

25          THE COURT:  All right.  It's admitted.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    384

1       (Plaintiff's Exhibit 131 received.)

2   Q.   (By MR. PULKRABEK) The highlighted portion of this I'll

3   use, okay?  So, Mr. Stull, your phone number -- your cell

4   phone number is this number 308 --

5   A.   279-0153 is correct.

6   Q.   Right.  And then you would text message with Jon Pauling

7   at this other number, 970-380-0542, correct?

8   A.   I'm assuming that's the correct number.

9   Q.   All right.  So just -- we'll look at a few of these as

10  examples of the communication you would have.  But if we look

11  at 12/15/2017, that's a little more than seven months, almost

12  eight months after the closing between Lardyn and Two Mile

13  Ranch, correct?

14  A.   Yes, it is.

15  Q.   And so, for instance, the first record of a text message

16  that you have here from Farmers State Bank is this one where

17  Jon Pauling texts Dick, members of Lardyn, Elyce, Mark,

18  Pauling Hauling, and Cherry Creek Cattle Company, 80/15/3/2

19  ownership.  Do you see that?

20  A.   Yes, I do see that.

21  Q.   So Jon Pauling is the one who is communicating to you what

22  the ownership of Lardyn is?

23  A.   Yes.  That is correct, if that's his phone number.

24  Q.   On the next one you ask Jon Pauling, Will you have Elyce

25  send us the amendment to the LLC showing the ownership?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021      385

1   Thanks.  Correct?

2   A.  That is correct.

3   Q.  Now, this string of text messages continues forward

4   between you and Jon Pauling for several pages, right?

5   A.  Yes.

6   Q.  So, for example, we could go -- let's back out here and go

7   down to the second page here.  We can see in January 2018 he's

8   asking your recommendation for a Nebraska accounting firm for

9   Lardyn?

10  A.  Yes.

11  Q.  In the end of January he's asking if you are available for

12  a meeting.  He says, I have a lot of things to go over,

13  Lardyn, Redtail, Carr Ag and TMR.

14  A.  Yes.

15  Q.  And these texts just -- they continue throughout 2018 and

16  into 2019, correct?

17  A.  That is correct.

18  Q.  So, for instance, here we have in March of 2019,

19  March 20th, 2019, Jon Pauling writes to you, Dick, Faesslers'

20  bill will be approximately $64,000 for March.  They ran out of

21  prepay on March 13th.  Their cost per day is $3,477.58 with

22  current consumption.  Do you see that?

23  A.  I do.

24  Q.  Now, that sounds to me like fairly day-to-day operational

25  stuff of Lardyn Consulting, would you agree?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021     386

1    A.  I would say that is probably correct.  Faesslers is one of

2    their large customers, feeding customers at that time.

3    Q.  Another example of just the day to day would be right up

4    here, 179 head bought for Carr Ag.  Do you see that?

5    A.  I do.

6    Q.  Just real quick on Carr Ag, you understand that to be

7    associated with the Carr family?

8    A.  Yes.

9    Q.  And that would be relatives of Chris Carr, the lawyer that

10   represented Jon Pauling?

11   A.  I think they're related.  I don't know the true

12   relationship there, but, yes, I would assume that that's

13   correct.

14   Q.  Okay.  Now, if we look here on 3/20, it talks about, Also,

15   trust has been modified removing Mark as a trustee.  Do you

16   see that one?

17   A.  Yes, I do.

18   Q.  So Jon Pauling is communicating with the bank about the

19   removal of Mark Pauling, who we heard earlier was the

20   cotrustee of the Elyce York Trust Number 1?

21   A.  Yes.

22   Q.  And then you ask him, Can we get the trust papers to us

23   ASAP?  I'll make sure we get them to Jarrod.  Thanks.  Is that

24   right?

25   A.  Yes, that's what it says.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2     04/13/2021     387

1  Q.  Jarrod was Jarrod Hamik?

2  A.  That's correct.

3  Q.  And he was heading up the SBA loan guarantee?

4  A.  He was, yes.  He was doing that portion of the loan.

5  Q.  All right.  And so as you can see, the continues -- the

6  communications by text message between you and Jon Pauling

7  continue through April and into even -- I'm sorry -- through

8  March and even into April 2019, correct?

9  A.  Yes, that's correct.

10  Q.  Now, when Farmers State Bank produced the text messages,

11  you produced just one text message between yourself and Elyce

12  York?

13  A.  I don't know.

14  Q.  Well --

15  A.  If that's what it is, I would assume that's correct.

16  Q.  Let's take a look at page 30 of this document.  So, again,

17  we have your phone number, correct?

18  A.  That is my number.

19  Q.  And I believe this to be Elyce York's number.  I think we

20  can track that down later.  But there's one message here.  It

21  says, Could you have Mark give me the code for the gate at

22  Turkey Creek?  Appraiser said code doesn't work.

23  A.  Yes.  That's what that says.

24  Q.  And that's in November -- I'm sorry -- that's in October

25  of 2019 after this lawsuit was filed?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021     388

1   A.  That's correct.

2   Q.  Just to be clear, even though we looked at this set of

3   text messages between you and Jon Pauling starting in December

4   of 2017, you had -- you had text messages with Jon Pauling

5   before that, correct?

6   A.  I don't know.

7   Q.  You --

8   A.  I probably did, because I'm not sure how I communicated

9   with him, but it was by phone, but let's assume, yes, probably

10  it was.

11  Q.  More likely than not you did?

12  A.  More likely than not.  But I got this phone in 2018, so I

13  do know that.

14  Q.  Jon Pauling also coordinated the transfer of the minerals

15  out of Lardyn into Redtail?

16  A.  Ask that question again.

17  Q.  Jon Pauling also coordinated the transfer of the minerals

18  from Lardyn into Redtail?

19        MR. KEITHLEY:  Objection, vague.

20  A.  I don't think that's correct.  I think Elyce requested

21  that.

22        THE COURT:  Overruled.

23  Q.  (By MR. PULKRABEK) Let's look at --

24  A.  It could have been some communication through Jon, yes.

25  Q.  Let's look at Exhibit 73.

                    Sarah K. Mitchell, RPR, CRR

```
19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    389
```

1    A.  Okay.

2            THE COURT:  It's admitted.

3        (Plaintiff's Exhibit 73 received.)

4    A.  I see it.

5            MR. PULKRABEK:  Your Honor, that's a stipulated

6    exhibit.

7            THE COURT:  Yes, it's admitted.

8    Q.  (By MR. PULKRABEK) So, Mr. Stull, here's an e-mail dated

9    January 26th, 2018, from you to Steve Stull and Mike Stull,

10   Chris Gray, and Dustin Chester, all at the bank?

11   A.  Yes, that's correct.

12   Q.  Subject, Lardyn slash Redtail, correct?

13   A.  It is.

14   Q.  All right.  So in this e-mail you write, Jon called this

15   afternoon requesting that we send a copy of all the original

16   loan documents to their legal counsel to get all of the

17   mineral interests into Redtail.

18   A.  I see that, yes, that's correct.

19   Q.  All right.  Then further down on this page, you say, Told

20   Jon we would not send anything to the attorney before tomorrow

21   at the earliest.  Correct?

22   A.  That's correct.

23   Q.  You also say, Also, told Jon we need to review the loan

24   documents to make sure that we are not restricted in some way

25   to have the loan assumed by another borrower.  I have looked

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021     390

1    over our documents, and I don't see anything that would

2    prevent us from doing so.  Correct?

3    A.  That's correct.

4    Q.  Now, at least on this e-mail there's no mention of Elyce

5    York or any communication with Elyce York about the Redtail?

6    A.  No.  Lardyn Consulting in my mind is Elyce York.

7    Q.  Let me make it even simpler.  You don't see Elyce York's

8    name on this?

9    A.  No.  Her name isn't on here.

10   Q.  Let's look at another one, Exhibit 74.

11           THE COURT:  All right.  It's admitted.

12       (Plaintiff's Exhibit 74 received.)

13   Q.  (By MR. PULKRABEK) And in this e-mail we see it's from you

14   to Ron Antonio, Steve Stull, Kelly Roach, and

15   LardynConsulting@gmail.com, subject Redtail Resources, LLC,

16   correct?

17   A.  Yes, that's correct.

18   Q.  ElyceYork@gmail.com, that's not one of the recipients of

19   this?

20   A.  That's correct.

21   Q.  And you write, Ron, Jon Pauling indicated to Steve this

22   morning that the transaction between Lardyn Consulting, LLC

23   and Redtail Resources, LLC will be completed next week.

24   A.  That's correct.

25   Q.  All right.  Would you agree Jon Pauling was coordinating

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    391

1   the transfer of interests to Redtail?

2   A.  I would agree that that's who we were communicating with,

3   yes.

4   Q.  We talked a little bit earlier about representations that

5   you made to Henderson Bank and First Central Bank, information

6   you provided to them.  In addition you made representations

7   about equity in Lardyn to at least one other third-party

8   business; is that right?

9   A.  I didn't follow your question.  Ask that again.

10  Q.  You, Dick Stull, made representations to a third-party

11  agricultural business about the equity or net worth of Lardyn

12  Consulting?

13  A.  I don't know.

14  Q.  All right.  Let's look at --

15  A.  I don't recall.

16  Q.  Let's look at Exhibit 95.

17  A.  Nutrien, yes.

18          MR. PULKRABEK:  Your Honor, I believe this is a

19  stipulated exhibit.

20          THE COURT:  It probably is.  All right.  Admitted.

21      (Plaintiff's Exhibit 95 received.)

22  Q.  (By MR. PULKRABEK) And in this exhibit, Nutrien Ag

23  Solutions requested Farmers State Bank to provide credit

24  information on Lardyn Consulting, correct?

25  A.  That's correct.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    392

1   Q.  And you personally signed and dated this October 2nd,

2   2018?

3   A.  Yes, I did.

4   Q.  This was after minerals had been moved into Redtail,

5   correct?

6   A.  That -- I'm sure it is.

7   Q.  And in this document sent to Nutrien Ag you said the

8   estimated net worth of Lardyn was $1.7 million?

9   A.  That's what I have on there, yes.

10  Q.  Okay.  The last e-mail -- the last document I want to ask

11  you about, Mr. Stull, and we'll be done, is -- it's been

12  marked Exhibit 132.

13        THE COURT:  Okay.  Admitted.

14    (Plaintiff's Exhibit 132 received.)

15  Q.  (By MR. PULKRABEK) And I want to start with further down

16  in this e-mail chain on November 30th, 2017, you sent an

17  e-mail to the loan committee called Mark Pauling request.  Do

18  you see that?

19  A.  I do.

20  Q.  You say, I'm attaching an LPM limited for Mark.  As per

21  the e-mail last week and our discussion in loan committee

22  today, Mark is requesting $25,000 loan for a cash settlement

23  for his divorce.  Do you see that?

24  A.  I do.

25  Q.  And then you say he did pay off his operating loan in

19-CV-01224-RBJ        Bench Trial - Day 2     04/13/2021    393

1    full, paid interest up to date on his real estate loan.

2    Correct?

3    A.   Correct.

4    Q.   Then there's a reply from a gentleman named Kevin Kudera,

5    or Kudera.  Can you tell us who he is?

6    A.   Yes.  Kevin Kudera.

7    Q.   What's his position at the bank?

8    A.   He's executive vice president.

9    Q.   So Mr. Kudera writes to you and the loan committee, Yes,

10   kind of amazing.  Down from 4,756,900 to 382,940 in five

11   years.  Right?

12   A.   Yes.

13   Q.   So Mr. Kudera is commenting on Mark Pauling paying off

14   what he terms an amazing amount of debt during this period?

15        MR. KEITHLEY:  Objection, foundation and hearsay.

16        THE COURT:  Overruled.

17   A.   I would not say that.  Let me read the rest of the e-mail,

18   please.

19   Q.   (By MR. PULKRABEK) You want to go up or down?

20   A.   Yes.  Let's go down.  I think this goes back to the

21   original -- and I'm guesstimating what this is, but Mark with

22   Two Mile Ranch, and then -- I don't know.  But he has paid

23   down that much.  That's November of '17.  I don't know what

24   Kevin's comment was.  I didn't take it that way.  But --

25   Q.   Well, you say, I know.  So you took it some way.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021     394

1   A.  Yes.  I wouldn't take it the way you indicated it.

2   Q.  Okay.  So explain to us how --

3   A.  Assets had deteriorated from 4,756,900 down to 382,000 in

4   five years, that's amazing.  And my response is I know, and

5   that's not only for this customer, but it's amazing what

6   happens when a brother is accused of having a loose zipper,

7   and that's always something that can affect values no matter

8   what customer it is.

9   Q.  Let's talk about this isn't it amazing what happens when a

10  brother is accused of having a loose zipper comment of yours.

11  So you used the word accused.  You understand the difference

12  between being accused of something and a guilty plea?

13  A.  Yes, I do.

14  Q.  You understand the difference between being accused and

15  having a jury enter a verdict?

16  A.  Yes.  And I -- if I wanted to go into detail with Kevin

17  about all that, yes, I would have said not only, and then I

18  could have expounded on it, but I chose not to do that because

19  he knew what the situation was.

20  Q.  Let me talk about loose zipper.  Do you equate a sexual

21  assault with somebody having a loose zipper?

22  A.  You know what, I think you're taking that out of context,

23  but this was a comment that I should not have made or

24  responded to in the first place.  But I did, and, yeah, I

25  don't like -- I don't like seeing this in front of me.  But I

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021       395

1   made those accusations and/or responded in this way.

2   Q.  Can you tell us where did you learn this euphemism loose

3   zipper?

4   A.  Huh?

5   Q.  Where did you learn this?

6   A.  The comment loose zipper, probably when I was in high

7   school.  Everybody knew what it meant.

8   Q.  Is this something --

9   A.  That would go back a lot of years.

10  Q.  Sitting here today are you willing to acknowledge that

11  this wasn't just an accusation about Jon Pauling having a

12  loose zipper?  It was something much more serious than that?

13  A.  Well, yes.  Because if you look at what Kevin said here,

14  kind of amazing, this loan request, and I would like to see

15  what the loan request is, the LPM, if you can produce it,

16  because I can see exactly what we're looking at in the

17  timeframe.  But yes, I made the comment, and I assume that you

18  can make it correct that the assumption is that I put in

19  accused is the same as knowing.

20       MR. PULKRABEK:  I have no further questions for

21  this witness.

22       THE COURT:  Okay.  Ms. Oldemeyer, I think you

23  probably should go first.

24

25

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    396

1                         CROSS-EXAMINATION

2    BY MS. OLDEMEYER:

3    Q.  Mr. Stull, I'm going to start with the exhibit that was

4    just on the screen.  I think it was Exhibit 132, and I don't

5    have it pulled up, but if you give me a moment.  It was the

6    one you were just looking at, Mr. Stull.  The comment about a

7    loose zipper.  I think your words were you should not have

8    made that in the first place.  Is that your testimony?

9    A.  Yeah, I shouldn't have said it in the first place.

10   Q.  And why are you saying you shouldn't have said it in the

11   first place?

12   A.  That's kind of out of character for me to make comments

13   about individuals in a derogatory way.  That's just -- I try

14   not to do that.

15   Q.  And as you sit here today, do you in any way intend to

16   minimize what Ms. Wilson experienced?

17   A.  No.  None whatsoever.

18   Q.  Can you hear me okay, sir?

19   A.  No.  I can hear you.

20   Q.  How old are you, sir?

21   A.  Well, I'm 79 years young.

22   Q.  Where do you live?

23   A.  Bridgeport, Nebraska.

24   Q.  About how far from Denver, Colorado, is that?

25   A.  Three hours .

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    397

1   Q.   About how far from Sterling, Colorado, is that?

2   A.   Oh, right at an hour.

3   Q.   Where do you work?

4   A.   Farmers State Bank.

5   Q.   How long have you worked at Farmers State Bank?

6   A.   Since November 7th, 2011.

7   Q.   Can you relate for the judge very briefly your history in

8   the banking industry.  Did it start in November of 2011?

9   A.   No.  My banking career started September 11th, 1963, at

10  the Guardian State Bank in Lyons, Nebraska, where I started in

11  as an officer trainee.  That company moved me to Valentine,

12  Nebraska, ten years later in 1973 where I was vice president

13  and cashier of the bank.  I was there until 1973 when the

14  organization bought a bank in Bridgeport, Nebraska, and they

15  transferred me to Bridgeport, and I became president of that

16  bank, and I served with that company for a little over

17  25 years.  And then I went to work for a group that owned feed

18  yards as well as a bank in Lyons, and I became a president and

19  CEO of the bank, and we started that in Bridgeport.  The

20  shareholders were mostly cattle feeders, and then they sold

21  that bank to National Bank of Commerce, which was later sold

22  to Wells Fargo, and I retired from Wells Fargo in April of

23  2007.  And then in January of 2010, I went to work for a small

24  bank on a part-time basis supposedly, which I gave them the

25  commitment to work for them for two years to help them with

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021       398

 1    some large ag credits that they had.  And so basically I've

 2    been in banking for 55 years.

 3    Q.  With kind of a brief hiatus between April 2007 and January

 4    of 2010?

 5    A.  Well--

 6    Q.  Is that right?

 7    A.  Yes.  Yes.

 8    Q.  And then the part-time basis for two years, and then you

 9    went from that to in November of 2011 Farmers State Bank?

10    A.  Yes.

11    Q.  And your highest degree of education you received?

12    A.  A high school education from Alliance High School.  I went

13    to Western Junior College for a year and a half, and then one

14    semester to Chadron State College in Chadron, Nebraska.

15    Q.  And are you married, sir?

16    A.  No.

17    Q.  Have you ever been married?

18    A.  Yes, I have.

19    Q.  How long were your married?

20    A.  Roughly 52 years.

21    Q.  And your wife passed way?

22    A.  Yes, she did.

23    Q.  Approximately when did your wife pass away?

24    A.  First time on December 28th, 2014.  And then she was

25    revived, and then she passed away on June 14th, 2015.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      399

1          MR. PULKRABEK:  Your Honor, sorry to interrupt.

2    But Amanda Wilson is overcome by emotion, and she needs to

3    step down.  With your permission --

4          THE COURT:  Sure.

5          MR. PULKRABEK:  -- I would like her to be excused.

6          THE PLAINTIFF:  Thank you.

7          THE COURT:  Do you need to take a recess?

8          MR. PULKRABEK:  No, Your Honor.  I don't know that

9    she's going to want to come back today.  So I would suggest

10   we carry on.

11         THE COURT:  Okay.

12   Q.  (By MS. OLDEMEYER) Mr. Stull, you described your wife was

13   revived, and so she was very ill, and then got medical

14   attention, and then ultimately passed away?

15   A.  Yes.  Yes.  She was in and out of the hospital in

16   intensive care about four different times between December and

17   June.

18   Q.  Okay.  Thank you.  And how many children do you have?

19   A.  Seven.

20   Q.  How many boys, how many girls?

21   A.  Four boys, three girls.

22   Q.  And is Steve Stull to my left one of your sons?

23   A.  Steve Stull is our third child, yes.

24   Q.  Okay.  And there's a Mike Stull?

25   A.  Yes.  He's our fifth child.

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 2       04/13/2021    400

 1   Q.  Those two are in banking, correct?

 2   A.  That's correct.

 3   Q.  And do you have any other sons who are in banking?

 4   A.  No.

 5   Q.  And then with respect to the three girls, are any of them

 6   in banking?

 7   A.  My oldest daughter is a director of the bank, and my

 8   second daughter is a loan analyst at the bank.

 9   Q.  And those two daughters, when you refer to the bank,

10   that's Farmers State Bank in Bridgeport?

11   A.  Yes, it is.

12   Q.  In Bridgeport?

13   A.  Well, Farmers State Bank is actually chartered down in

14   Dodge, Nebraska, but, yes, Julie works in the Bridgeport

15   branch.

16   Q.  And your oldest daughter who's a director, then you're

17   clarifying she's a director of the entire organization?

18   A.  That's correct.

19   Q.  With all branches?

20   A.  Correct.

21   Q.  How many branches are there?

22   A.  We've got eight locations throughout Nebraska.

23   Q.  And none in Colorado?

24   A.  None in Colorado.

25   Q.  What is a community bank?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021        401

1    A.  Well, a community bank is a smaller bank that are usually

2    in smaller communities.  They're part of the community.  They

3    get involved in the community in a local basis.  There's

4    regional banks, there's national banks, there's investment

5    banks.  But ours is a smaller community-type bank where we try

6    to be more hands on.

7    Q.  Okay.  And does some of the business of Farmers State

8    Bank, which has eight locations in Nebraska, cross into

9    Colorado?

10   A.  Would you repeat that?

11   Q.  Does some of the business of Farmers State Bank, which has

12   eight locations in Nebraska, does some of its business carry

13   over into Colorado?

14   A.  Yes.

15   Q.  Is banking a for-profit industry?

16   A.  Yes, it is.

17   Q.  And how does a bank make money?

18   A.  Well, there's various reasons -- or ways, but most banks

19   work off of a spread between what are deposits and what we

20   loan out.  We work off that spread to pay expenses, including

21   salaries, overhead expense.  We pay out interest to our

22   customers, real estate taxes.

23   Q.  And with respect to making loans, those are done pursuant

24   to written agreements with bank customers?

25   A.  Yes.  They're all on loan documents.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ         Bench Trial - Day 2    04/13/2021   402

1    Q.  And the bank states in those agreements the rate of

2    interest that it's going to charge, correct?

3    A.  That's correct.

4    Q.  And any late fees if payments aren't made on time?

5    A.  That's correct.

6    Q.  And any fees for overdrafts if there's a checking account

7    overdrawn?

8    A.  Yes.

9    Q.  And what happens if a borrower fails to make a payment and

10   defaults, correct?

11   A.  Yes, there's a default rate.

12   Q.  All those terms were spelled out in writing for bank

13   customers, correct?

14   A.  Absolutely.

15   Q.  And if the bank -- or excuse me -- if the bank customer

16   doesn't like those terms, the bank customer can choose to go

17   to some other bank?

18   A.  Absolutely.

19   Q.  And try to get a loan somewhere else?

20   A.  That's correct.

21   Q.  In the agreements between the bank and the borrower, who

22   gets to decide what's going to happen if a borrower is not

23   making timely payments?

24   A.  Well, the first thing we do is try to work with a

25   customer, but ultimately if the loan is in default, then it's

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021   403

1    up to the bank to send out a letter demand and start

2    foreclosure proceedings.

3    Q.  And when you say up to the bank, is the bank you, Dick

4    Stull?

5    A.  The bank is the company with -- we use our legal firm to

6    help us with the default letters and go through all the

7    process of making a demand and going through foreclosures.

8    Q.  Is that a decision that you can make on your own or is it

9    a group at the bank?

10   A.  Usually it is a loan committee decision, if not the senior

11   -- senior management.

12   Q.  Okay.

13   A.  Which would include five or six different people within

14   the bank.

15   Q.  If a bank is deciding whether to start that foreclosure

16   process, what are some of the factors that the bank might

17   consider?

18   A.  Well, we can extend the loan.  We can go through a workout

19   process.  We can -- there's many options.  I keep relating

20   back to the farm crisis of the mid-'80s when a lot of farms

21   throughout the whole United States were in default, and

22   community banks tried to work with their customers to get them

23   through that down cycle.  So that's what we try to do is work

24   -- try to work with the customers to --

25   Q.  And a little bit more in the weeds of working with

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    404

1    customers, what are you doing?  What's part of the

2    decision-making process?

3    A.  Well, we're trying to minimize our losses.  If there is a

4    loss -- what you have to do -- you try to put a current value

5    on all the assets that the customer has, and what you have to

6    do is look at outside experts that work on -- have knowledge

7    on current market -- market conditions of like property, let's

8    say for real estate.  So you would get a real estate

9    appraisal.  In Two Mile Ranch's case, they had mineral

10   interests, so you try to find people that have interest or

11   knowledge of what the marketability of mineral interests are.

12   Equipment, machinery equipment, usually you can go to two

13   different sources.  You can go to a machinery equipment

14   dealer.  They can go out and put a value on different types of

15   machinery and equipment because a lot of it is specialized,

16   and/or you can go to somebody who is in the business of having

17   farm options, and they can kind of give you a good idea as to

18   what comparable sales have been.  Livestock, you have various

19   daily markers that you can go to for meat.  In Bridgeport, I

20   like to go to the Torrington livestock auction and/or Ogallala

21   livestock auction.  Those are -- have websites.  There are --

22   a lot of people sell their cattle of all classes.  When I say

23   all classes, that means cattle operators, eatery, so that

24   gives you a pretty good market right there.  But what you try

25   to do is get the best -- best information you can for all the

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    405

1   collateral and try to see where that is compared to the amount

2   of debt the borrower has.  Then what you -- once you get the

3   values, you know there's going to be sale expenses associated

4   with it, because if there is real estate, a lot of times you

5   have to make the real estate taxes current.  You have to make

6   sure that all the assets are covered by insurance, so you may

7   have to advance money for that.  So anyway, there's lots and

8   lots of different decisions you have to go through, and there

9   is no cookie cutter way of saying, okay, this is the way you

10  do it.

11  Q.  Thank you.  With respect to then those people that you

12  described getting the values, you mentioned going outside the

13  bank.  The bank doesn't have that in-house expertise?

14  A.  We do not.  We have people within the bank that can give

15  you values of cattle real quickly, something that is traded

16  daily on the market.  For other assets -- we can do internal

17  real estate valuations, but if we're looking for a true value

18  that anybody should look at, you try to go outside just so

19  that there's no conflict of interest.

20  Q.  And in all the things you're describing, the loan

21  documents that we've talked about, or this work with valuing

22  collateral, that generates a lot of paper, correct?

23  A.  That's correct.

24  Q.  And you keep those documents, correct?

25  A.  We do.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    406

1   Q.  That's why bankers have a box named after them?

2   A.  Or two, yes.

3   Q.  So you yourself are not an expert in the valuation of

4   mineral interests, are you?

5   A.  I have never valued mineral interests in my life.

6   Q.  Are you a licensed appraiser?

7   A.  No.

8   Q.  Is banking a regulated industry?

9   A.  Highly regulated.

10  Q.  For those who may not be familiar with the banking

11  industry and regulations, in four sentences or a short tweet

12  can you kind of explain is it regulated at the federal level?

13  A.  Okay.  We've got federal statutes, and we've got state

14  statutes.  A lot of these different states have different --

15  different statutes that we have to be cognizant of.  But, yes,

16  we're regulated.  We, Farmers State Bank, we are regulated by

17  the Nebraska Bank -- Department of Banking, the FDIC, and then

18  we -- because we do have a holding company, we have the

19  federal reserve that also -- those are regulations that we

20  have to abide by.

21  Q.  We've heard -- I think we might hear testimony about

22  something called a bank examination.  Again, just very

23  briefly, what is a bank examination?

24  A.  Okay.  A bank examination is the regulators, whichever it

25  happens to be, state or FDIC, they come in and look at the

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    407

1  safety summaries of the bank.  The FDIC also does numerous

2  BSAs.  That means there's seven or more different copies they

3  look at at the bank to make sure that we're of safety and

4  soundness.  We have all of our disclosures.  We have our CRA,

5  which is Community Reinvestment Act.  So it's a broad scope.

6  Q.  And you're using a term of art there, safety and

7  soundness.  For those who aren't familiar with that term, big

8  picture, what does that mean?

9  A.  Okay.  Safety and soundness, the loans in your portfolio

10  are collateralized, they're current, all the documents are

11  there.  Then we also look at the overall portfolio,

12  loan-to-deposit ratio, you know, are you making money.  If

13  you're not making money, then you've got issues with the

14  regulators.

15  Q.  With respect to that bank examination you described either

16  at the state level or the FDIC, is that something that happens

17  to banks if the banks are bad banks?

18  A.  No.  All banks should expect to be examined every

19  18 months, and then the FDIC and the Nebraska Department of

20  Banking will share their examination reports, and they usually

21  alternate every other year.

22  Q.  When you say share, what do you mean share?

23  A.  Share what they do, the results of the examination.  They

24  may forward it to the other examining -- or department.

25  Q.  So interagency --

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    408

1   A.  So everybody knows what it is.  And you've got some

2   issues, for example, if you have certain loans that are

3   delinquent or they're seeing issues with, they have exit

4   reviews, and usually your directors are involved in those exit

5   reviews, so that you have to discuss them with your directors

6   and make them part of your board minutes that you have

7   discussed.

8   Q.  Throughout the relationship that Two Mile Ranch had with

9   Farmers State Bank that began in about January of 2013, for

10  Two Mile Ranch through today, have you ever hidden information

11  from anybody doing a bank examination?

12  A.  Have I ever hidden anything?

13  Q.  Yeah.

14  A.  No.  There would be no reason to hide anything.

15  Q.  With respect to Lardyn Consulting and the sale that

16  occurred beginning in April of 2017 and after, or even a loan

17  made before that sale -- I think there's a loan made in August

18  of 20 -- might have been July of 2016 to Elyce York for

19  startup expenses for Lardyn, have you ever tried to hide any

20  of that information from a bank examiner?

21  A.  None.

22  Q.  Is that information in the bank's files, is that public

23  information?

24  A.  It is not public information, what's in the loan files.

25  That's confidential information, and that's -- that is one

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    409

1    thing that is very, very important in banking is information

2    is kept confidential.

3    Q.  And is it kept confidential pursuant to impositions by

4    federal or state law?

5    A.  Yes.

6    Q.  It's not something you choose to do.  You have to do it to

7    be in compliance?

8    A.  Exactly.

9    Q.  I'm going to switch gears a little bit.  Have you ever

10   been to an establishment that's in or near Denver named

11   Shotgun Willie's?

12          MR. PULKRABEK:  Relevance.  Objection, relevance,

13   Your Honor.

14          THE COURT:  Sustained.

15   Q.  (By MS. OLDEMEYER) The allegation in this lawsuit is that

16   you and Jon Pauling have more than a banking relationship.  Is

17   that true?

18   A.  None whatsoever.

19   Q.  Is Jon Pauling or Mark Pauling, or any member of the

20   Pauling family for that matter, a friend of yours?

21   A.  Friends, but not socially.

22   Q.  You don't socialize?

23   A.  We do not.

24   Q.  Are they related to you?

25   A.  No.

Sarah K. Mitchell, RPR, CRR

```
19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    410
```

1   Q.   Even by marriage?

2   A.   No.

3   Q.   You are aware that the allegations in this case are that

4   the bank conspired with Jon Pauling, Mark Pauling, Two Mile

5   Ranch and Elyce York and Lardyn Consulting to prevent Amanda

6   Wilson from collecting on her judgment through a charging

7   order on Two Mile Ranch.  Are you aware of that allegation?

8   A.   I am aware of that.

9   Q.   Is that allegation true?

10  A.   No.

11  Q.   Do you personally have any motivation to have conspired to

12  harm Amanda Wilson?

13  A.   None whatsoever.

14  Q.   Harm her financially?

15  A.   No.

16  Q.   Do you personally want to hurt her financially?

17  A.   Absolutely not.

18  Q.   Have you ever met her prior to today?

19  A.   Never.

20  Q.   To your knowledge, does anyone else at Farmers State Bank

21  have any motive to prevent Amanda Wilson from collecting a

22  judgment through her charging order on Two Mile Ranch?

23  A.   None whatsoever.

24  Q.   At the bank, as the executive vice president, are you

25  accountable to anybody?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021    411

1    A.  Well, I'm accountable to Steve as -- just because

2    president, executive vice president, yeah, and the board of

3    directors.  That's exactly who we're accountable to.

4    Q.  The board of directors of the bank is composed of how many

5    people?

6    A.  I think we've got 14 directors, and that would be of the

7    holding company.

8    Q.  I'm sorry?

9    A.  That is the holding company board of directors.

10   Q.  Is that the board of directors that you're accountable to?

11   A.  Yes, it is.

12   Q.  Are they all employees of Farmers State Bank?

13   A.  No.

14   Q.  Do you have outside directors?

15   A.  Absolutely.

16   Q.  And what is an outside director?

17   A.  An outside director is someone who is not in the

18   day-to-day operations of the bank.  That could be and most of

19   them are shareholders of the bank.

20   Q.  Could it be somebody with accounting expertise or legal

21   expertise?

22   A.  We've got a variety of board members.  We have people that

23   are involved in agriculture.  We've got accountants.  We've

24   got investment people.  We've got people in the livestock

25   business, grain business.

                          Sarah K. Mitchell, RPR, CRR

```
19-CV-01224-RBJ      Bench Trial - Day 2     04/13/2021    412
```

 1   Q.  Lots of expertise?

 2   A.  Lots of a broad specter.

 3   Q.  In the year 2013, Farmers State Bank started lending to

 4   Two Mile Ranch, correct?

 5          MR. PULKRABEK:  Leading.  Objection, leading, Your

 6   Honor.

 7          THE COURT:  Sustained.

 8          MS. OLDEMEYER:  I'm just trying to expedite.

 9          THE COURT:  Really?

10          How are you doing, Mr. Stull?

11          THE WITNESS:  I'm doing fine.

12          THE COURT:  You need any kind of a break?

13          THE WITNESS:  I'm fine.

14          THE COURT:  I'm 74.  You're 79.

15          THE WITNESS:  Don't let them know that we slow

16   down.

17          THE COURT:  Well, I just know that sometimes people

18   need a break.

19          THE WITNESS:  Yes.

20          THE COURT:  That's all.

21   Q.  (By MS. OLDEMEYER) I'm going to start showing you some

22   exhibits.

23   A.  Okay.

24   Q.  And offering them.  I put up on the screen in front of you

25   Exhibit 1008, and I have to shrink it down to show you.  Are

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    413

1   you generally familiar with this two-page exhibit, 1008?

2   A.  Yes, I am.

3   Q.  What is Exhibit 1008?

4   A.  Well, it's a motion that was in loan committee to loan Two

5   Mile Ranch $270,000 to purchase refrigeration units for a

6   store in Denver.  It was set up on monthly payments.  Farmers

7   State Bank is taking deed of trust on a rental house and also

8   on the farm equipment and vehicles as collateral.

9   Q.  So --

10          THE COURT:  Would you like the document to be

11  admitted?

12          MS. OLDEMEYER:  I would offer stipulated

13  Exhibit 1008.

14          THE COURT:  It's admitted.

15      (Defendant's Exhibit 1008 received.)

16  Q.  (By MS. OLDEMEYER) And on the top of page one it says loan

17  meeting, 12/15/11.  Do you see that?

18  A.  I do.

19  Q.  Is that the beginning of the bank's relationship with this

20  particular borrower that's noted on page 2 of Exhibit 1008?

21  A.  Yes, it is.

22  Q.  And is that Two Mile Ranch General Partnership or is that

23  TMR Market Company?  What is that?

24  A.  That is Two Mile Ranch Market, LLC.

25  Q.  This document has some highlights on it.  Mr. Stull, when

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021   414

1    the bank was sued by Amanda Wilson, did you personally gather

2    all of the loan committee minutes?

3    A.  Yes, I did.

4    Q.  And you personally went through them and you highlighted

5    the relevant portions related to the borrowers that are at

6    issue in this lawsuit?

7    A.  Yes, I did.

8    Q.  And you went all the way back to 2011?

9    A.  I did.

10   Q.  And to whatever existed at the time, correct?

11   A.  Yes.

12   Q.  And they've been produced in this lawsuit?

13   A.  Yes.

14   Q.  So anybody who wanted to read all of those could read the

15   whole history if they wanted to, correct?

16   A.  Absolutely.

17   Q.  I might point you to a few that are relevant to this case,

18   but this one shows basically the beginning of the

19   relationship, correct?

20   A.  Yes, it does.

21   Q.  I'll show you 1009.  What is Exhibit 1009?

22   A.  Okay.  This is a guaranty, and it's guaranteeing -- it's

23   to Farmers State Bank and Two Mile Ranch for the debts of Two

24   Mile Ranch.

25   Q.  Is it dated, sir?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    415

1    A.  Yes, it is.  It's dated January 18th, 2012, and it is

2    signed by Jon Pauling, and it says secured deed of guaranty,

3    which is a first deed of trust on the rental house, I believe.

4    Q.  You're looking at above the signature line, there's a

5    typewritten entry dated 1/18/2012?

6    A.  Yes.

7    Q.  So Mr. Jon Pauling was personally guaranteeing a loan that

8    Farmers State Bank was making to Two Mile Ranch Market

9    Company, correct?

10   A.  That's correct.

11          MS. OLDEMEYER:  Has 1009 been received, Your Honor?

12          THE COURT:  I'll admit it now, yes.

13      (Defendant's Exhibit 1009 received.)

14   Q.  (By MS. OLDEMEYER) What is Exhibit 1010?

15   A.  It's a real estate deed of trust dated January 18th, 2012.

16   Grantor is Jon M. Pauling, a married person.  Trustee is Logan

17   County public trustee in Sterling.  And the lender is Farmers

18   State Bank.

19   Q.  And is it also dated January 18th, 2012?

20   A.  Yes, it is.

21   Q.  And what is a deed of trust?

22   A.  A deed of trust is you're making the security interest or

23   perfecting interest in a certain piece of property.  This

24   happens to be -- it's got the legal description here of the

25   west 80 feet of the south half of lot 18, replat of Mabray

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    416

1   addition, first filing, city of Sterling, Logan County,

2   Colorado, which would be in Sterling.

3   Q.   Okay.  Does it also have a property address at 717 South

4   7th Avenue?

5   A.   Yes, it does.

6   Q.   And so this property at 717 South 7th Avenue was pledged

7   as collateral for the loans that the bank was making to Two

8   Mile Ranch Market Company?

9   A.   That's correct.

10  Q.   And what's the significance of recording it?

11  A.   Well --

12        MR. PULKRABEK:  Your Honor, I'm going to object

13  based on relevance.  Specifically I don't think this

14  witness's opinion of the significance of recording is

15  relevant to this case.

16        THE COURT:  I'm not sure that this whole document

17  is relevant to the case, but it was a stipulated document.

18  Okay.  The objection is sustained.  The Court knows what a

19  deed of trust is.  The Court knows where you record it.

20  These are such basic things.

21        MS. OLDEMEYER:  And I appreciate that, Your Honor.

22  I am concerned that the record needs to reflect this because

23  the Court has already indicated that it doesn't agree with

24  the defense's position that CUFTA requires an analysis of

25  what is an asset, and the definition of an asset is --

Sarah K. Mitchell, RPR, CRR

1           THE COURT:  I haven't said any such thing, ma'am.

2           MS. OLDEMEYER:  My impression, I'm sorry, from the

3    Court's comments has been that, and so I don't mean to be

4    tedious or belabor, but these are the underlying documents

5    that create the liens.  If they were stipulated or we could

6    enter into stipulations to expedite this process, we

7    wouldn't have to go through this exercise, but because that

8    has not been done, we have to go through this laborious

9    task.  I do not --

10          THE COURT:  You've got your adjective right.  It is

11   laborious.

12          MS. OLDEMEYER:  It absolutely is.

13          THE COURT:  It's laborious, it's tedious, it's

14   dull, and it doesn't seem to me that it helps you or anyone

15   with resolution of this case.  On the other hand, it's a

16   stipulated exhibit.  I've admitted those for the others, so

17   I'll admit them for you too.  Onward.

18   Q.  (By MS. OLDEMEYER) With respect to the home at 717 South

19   7th Avenue in Sterling, Colorado, did the bank ultimately take

20   title to that?

21   A.  Yes, we did.

22   Q.  Why?

23   A.  For nonpayment of the loan, and we had to foreclose on it.

24   Q.  And the bank had a right to do it?

25   A.  Yes, it did.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2     04/13/2021    418

1    Q.  And did it give notice to the borrowers through its legal

2    counsel?

3    A.  Yes.

4    Q.  And with respect to the foreclosure process, was that done

5    through the court system using Farmers State Bank's legal

6    counsel?

7    A.  Yes.

8    Q.  And do you know if Amanda Wilson's attorneys were given

9    notice of that foreclosure process?

10   A.  I -- I think so, but I can't say for sure right now unless

11   I see the -- but I think we did.

12   Q.  I'm going to direct your attention to another exhibit.

13   I'll turn your attention to Exhibit 1039.  I do not think this

14   is a stipulated exhibit.  No.  Is Cline Williams law firm the

15   attorney representing Farmers State Bank?

16   A.  Yes, it is.

17   Q.  And they represented Farmers State Bank in that

18   foreclosure process?

19   A.  Yes, they are.

20   Q.  And Exhibit 1039 contains some documents related to that

21   foreclosure process, and I want to turn your attention to the

22   certificate of mailing and posting of notice on page 7.

23   A.  Yes.

24   Q.  Does this refresh your memory as to whether Amanda Wilson

25   judgment creditor was given notice?

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    419

1   A.  Yes, she was.

2   Q.  And then she was also given notice through her attorneys

3   at Ross Whiting Pulkrabek, and Jones & Keller?

4   A.  Yes, it was.

5   Q.  On page 8 was she given notice through her attorneys at

6   Qusair Mohamedbhai?

7   A.  Yes.

8   Q.  That firm?

9   A.  Yes.

10  Q.  I think it's called Rathod Mohamedbhai, LLC, excuse me.

11  Do you know why Amanda Wilson was given notice?

12  A.  Well, she was a judgment creditor is what it said on here.

13  Q.  And a judgment creditor of Jon Pauling's, correct?

14  A.  Yes.

15  Q.  Was she a judgment creditor of Two Mile Ranch?

16  A.  No.

17  Q.  This was an asset owned in Jon Pauling's name, correct?

18  A.  Correct.

19  Q.  Once the bank foreclosed on it, was there any money left

20  over?

21  A.  No.

22  Q.  So no money went to Amanda Wilson, correct?

23  A.  None whatsoever.

24  Q.  Were you being mean when you did that?

25  A.  No.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2       04/13/2021    420

1    Q.   You were doing what?

2    A.   Following the law, the statutes.

3    Q.   Were you trying to maximize the bank's recovery?

4    A.   Yes.

5    Q.   Years 2014 and 2015, were Jon Pauling or Mark Pauling or

6    their entities, were they borrowers in a strong financial

7    position?

8    A.   In '14 I think they were struggling, and they were having

9    financial issues, and, in fact, I think they were in default,

10   if I remember right.

11   Q.   Did the bank do anything other than that workout process

12   that you described?

13   A.   Well, we tried to figure out the best way to resolve and

14   maximize the amount that we could collect from the assets, and

15   I know that we worked with Two Mile Ranch, Jon and Mark, about

16   selling the Logan County farm and machinery equipment, all the

17   assets at public auction, and so there was a process in place.

18   The auctioneer said you're not going to get close to what you

19   are needing, because the market just is not -- is not strong

20   at this time, and so it didn't end up going that way.

21   Q.   I'm going to show Exhibit 12.  Exhibit 12 is one of the

22   e-mails you looked at with Mr. Pulkrabek, and this is from

23   December of '14.  Do you recall this document?

24   A.   Yes.

25   Q.   And in this e-mail, among other things, you say, Also at

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021   421

1    that time I would like to have you bring the contract on the

2    ranch that Mark is buying.  Do you see that?

3    A.   I do.

4    Q.   Is that the North Ranch we've heard testimony about?

5    A.   That -- well, I haven't heard any testimony, but we've

6    always referred to it as the North Ranch, which is the north

7    part of the Weld County Two Mile Ranch.

8    Q.   And so you're discussing it in December of '14.  Do you

9    recall when it closed?

10   A.   I'm sorry.  You're going to have to repeat it.

11   Q.   The discussion here is in December of 2014 about the North

12   Ranch.  Do you recall when that sale actually closed?

13   A.   I would have to look at the document.  We've got so many

14   of them here.

15   Q.   Okay.  I want to ask you about --

16   A.   I think it was in early -- I don't know.

17   Q.   Okay.

18   A.   With sincere -- I really can't remember the date.

19   Q.   Okay.  And that's fair.  Let me ask you about this e-mail.

20   When you e-mailed -- when you wanted to reach out to Jon

21   Pauling and communicate by e-mail, what e-mail address did you

22   use?

23   A.   Well, I would use Joe Henry, PaulingJM1963@gmail.com.

24   Q.   In using an e-mail address Joe Henry, and then the actual

25   e-mail address, are you violating something called know your

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    422

1    customer rules?

2    A.   No.

3    Q.   What's -- just for those who aren't in banking, what's a

4    know your customer rule?

5    A.   Well, you've got to know who you're communicating with,

6    and I've been communicating with Jon at this e-mail address

7    for forever.

8    Q.   And one of the things that Mr. Pulkrabek asked you about

9    were text messages that you had with Jon Pauling.  When this

10   lawsuit was filed, did you -- did you pay the cell phone

11   company to try to recover as many texts as far back as they

12   could?

13   A.   Absolutely.

14   Q.   And so as far back as they could, you got them and

15   produced them in this case?

16   A.   Absolutely.

17   Q.   And that's the exhibit in this --

18   A.   That's correct.

19   Q.   That you looked at.  Same with e-mails.  You went back as

20   far as you could to find e-mails?

21   A.   That's correct.

22   Q.   And those, again, the bank had to retain somebody outside

23   to come help do that?

24   A.   That's correct.

25   Q.   Page 3 is the letter that was attached to that e-mail.  It

19-CV-01224-RBJ       Bench Trial - Day 2       04/13/2021    423

1   refers to 22434 North Turkey Creek Road in Morrison, Colorado.

2   Does your signature appear on that letter?

3   A.  Well, you know what, there's a typo on here that just

4   jumps out at me.  It's Turkey Creek, not creed.

5   Q.  Thank you.  So with respect to this letter you wrote, the

6   second paragraph refers to all the terms and the conditions

7   have been resolved except for the collateral -- excuse me --

8   collected funds from the sale of certain mineral rights that

9   are under contract but not have yet closed.  Do you recall

10  those mineral rights being under contract?

11  A.  Yes, I do.

12  Q.  Did that close?

13  A.  No.

14  Q.  And you continue, Once the collected funds have been

15  received, the bank will be in a position to move forward with

16  the closing and funding of the loan request, correct?

17  A.  That's correct.

18  Q.  So between the time you sent this letter in December of

19  2014, things changed with respect to expectations that you

20  thought were going to happen, correct?

21  A.  That's correct.

22  Q.  So there were other ways that -- well, why were those

23  minerals under contract?

24  A.  Well, because the minerals were being sold on a separate

25  basis, and I can't even remember who it was, but they had

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    424

1   agreed upon a price, and they went to their bank, and their

2   bank didn't loan them the money, and I can't even remember who

3   the -- who that was with.

4   Q.  With respect to that, though, who would get the proceeds

5   from the sale of the mineral interests?

6   A.  Two Mile Ranch.

7   Q.  And then what would Two Mile Ranch do with them?

8   A.  Pay down debt.

9   Q.  Exhibit 1021.  Did you, Dick Stull, receive this e-mail

10  that Steve Stull sent to Jon Pauling on February 23rd, 2015?

11  A.  Yes.

12  Q.  And, again, is this discussing in February 2015 the bank's

13  needs for the customer to complete certain things to pay down

14  debt?

15  A.  Yes.

16  Q.  Does it support the bank's position that at this point in

17  time Two Mile Ranch General Partnership was liquidating?

18  A.  Yes.

19          MS. OLDEMEYER:  We offer Exhibit 1021.

20          MR. PULKRABEK:  No objection.

21          THE COURT:  Okay.  It's admitted.

22      (Defendant's Exhibit 1021 received.)

23  Q.  (By MS. OLDEMEYER) Exhibit 1080.  Exhibit 1080 is similar

24  to Exhibit 21 but has a few more pages attached to it.  Did

25  you, Dick Stull, receive this communication from Steve Stull

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021     425

1    in February 2016 about Two Mile Ranch?

2    A.   Yes, I did.

3    Q.   And did it attach a financial statement for Two Mile

4    Ranch?  The first attachment, what's TMR FS, do you know?

5    A.   Yes.  5/1/15, that would be a financial statement.

6    Q.   And then the Two Mile LPM.  What's an LPM?

7    A.   That's a loan presentation memo.

8    Q.   And it has the date 5/7 of 2015, correct?

9    A.   Yes, it does.

10            MS. OLDEMEYER:  We would offer Exhibit 1080.

11            MR. PULKRABEK:  No objection, Your Honor.

12            THE COURT:  It's admitted.

13        (Defendant's Exhibit 1080 received.)

14   Q.   (By MS. OLDEMEYER) So one of the things that Mr. Pulkrabek

15   talked to you about was parts of the loan presentation memo of

16   May of 2015, and in particular the value of collateral listed

17   in this column.  I don't know if you're looking at this exact

18   one, but you were looking at one like this, correct?

19   A.   Correct.

20   Q.   So there's a column for value and a column for a discount

21   factor -- or a DISC factor.  What's a DISC factor?

22   A.   That's discount value.  That is a value -- expected value

23   that we use for collateral purposes to make sure that --

24   because assets go up and down, and so we try to always make

25   sure it's closer to the market value.  Because if you have a

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    426

1   distressed loan, and you have to liquidate, there's always

2   lots of expenses that go along with any liquidation.

3   Q.  Excellent.  And with respect to the information from this

4   column here, value, do those numbers come from the -- the

5   financial statement provided by the borrower?

6   A.  Yes.  It looks like those numbers are directly from those

7   numbers.

8   Q.  Why would the bank just adopt the value set for collateral

9   from a borrower?

10  A.  Well, we can -- when somebody submits a financial

11  statement to you, we as the bank cannot just change the values

12  willy-nilly.  We have to use the values that a customer

13  presents.

14  Q.  So you take the numbers the customer presents, and then

15  you do your own internal analysis, correct?

16  A.  We do our own valuation according to -- yes.  We get -- we

17  do give our own evaluation, yes.

18  Q.  Loan presentation memos, for whose use are loan

19  presentation memos?

20  A.  Those are used for loan committee, which is -- we take

21  them to loan committee so everybody can look at what that

22  value is, what the margins are within, whether it cash flows.

23  I mean, there's a whole bunch of other things that go into --

24  Q.  Are loan -- are loan presentation memos prepared for

25  creditors of a borrower other than the bank?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021      427

1    A.  No.  No.

2    Q.  So, for example, this loan presentation memo with the

3    numbers in it, were they prepared for Amanda Wilson who might

4    have been a creditor of Jon Pauling's at the time?

5    A.  No.

6    Q.  I just want you to explain the narrative here, this

7    background information.  Does that accurately describe what

8    was going on at the time?

9    A.  Yes.  They were in the process of liquidating real estate,

10   livestock, machinery, equipment, and the South Ranch under

11   contract with Cervi Enterprises.  Cervi had already bought the

12   mineral interests from Two Mile Ranch.

13   Q.  Some of the documents and some of the ones you were asked

14   about on direct examination, with respect to background

15   information or present status narratives, can you tell if you

16   wrote that or if somebody else wrote that?

17   A.  I can't tell.  I may have written part of it and somebody

18   else may have written portions of it.

19   Q.  Okay.

20   A.  And that goes with -- the same if you have two officers

21   working on the same credit are responsible.  That's the same

22   with the watch list.  I don't know if the narrative was all

23   mine or if it was a combination.

24   Q.  Right.  But you're not denying that certain statements

25   that are exhibits in this case are part of the formal bank

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021     428

1    records, correct?

2    A.  That's correct.

3    Q.  On page 7, this is a comparative analysis over multiple

4    years.  This is looking historically, correct?

5    A.  That's correct.

6    Q.  And then the tax returns spread, again, that's historical

7    stuff, right?

8    A.  That's correct.

9    Q.  And then the Officers Dick Stull and Stephen Stull.  For

10   this particular borrower, Two Mile Ranch General Partnership

11   and JMP of Colorado, were the two officers in charge you and

12   your son Stephen Stull?

13   A.  That's correct.

14   Q.  Exhibit 1024 is an e-mail sent from Mike Stull to a large

15   group of people that include you, correct?

16   A.  That does.

17   Q.  And it has an attachment, watch list notes, correct?

18   A.  It does.

19   Q.  And that's a three-page exhibit.  Turning to the last

20   page, that's watch list notes from a meeting 9/3/15, correct?

21   A.  That's correct.

22   Q.  And here Two Mile Ranch is noted as changed to, quote,

23   watch, watch, end quote, unless Stephen disagrees with the new

24   classification.  You're referring to Stephen Stull?

25   A.  Yes, it would be.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    429

1    Q.  Okay.  And so is this a heads-up that this borrower,

2    somebody needs to be paying attention?

3    A.  That is, yes.

4           MS. OLDEMEYER:  I would offer Exhibit 1024.

5           MR. PULKRABEK:  No objection.

6           THE COURT:  All right.  It's admitted.

7        (Defendant's Exhibit 1024 received.)

8    Q.  (By MS. OLDEMEYER) Exhibit 1030.

9           THE COURT:  Well, this one is stipulated, so I'll

10   just admit it.

11       (Defendant's Exhibit 1030 received.)

12   Q.  (By MS. OLDEMEYER) Were you, Mr. Dick Stull, served with a

13   copy of a subpoena for your deposition in the Colorado state

14   court case?

15   A.  Yes, I was.

16   Q.  So this was a Colorado subpoena served upon you in

17   Nebraska, correct?

18   A.  Yes, it is.

19   Q.  And it refers to Amanda Wilson, plaintiff and judgment

20   creditor, and Jon Pauling is defendant, judgment debtor.  You

21   see that?

22   A.  That is correct.

23   Q.  What did you do when you received that?

24   A.  Well, first thing we did is to call our legal counsel, and

25   I think we spoke to David Routh at Cline Williams in Lincoln,

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ         Bench Trial - Day 2      04/13/2021    430

1   Nebraska, and then he got us in contact with you.

2   Q.  Okay.  And is Exhibit 10 -- 1031 then to your knowledge

3   what transpired thereafter with a motion in the Colorado court

4   authorizing the bank to release information relating to Two

5   Mile Ranch General Partnership, correct?

6   A.  Yes, it is.

7   Q.  Because Two Mile Ranch General Partnership is an entity,

8   correct?

9   A.  Yes, it is.

10  Q.  And information was being sought about that borrower which

11  was not judgment creditor of Amanda Wilson's, correct?

12  A.  That's correct.

13          MS. OLDEMEYER:  We offer Exhibit 1031.

14          MR. PULKRABEK:  No objection.

15          THE COURT:  Okay.  It's admitted.

16      (Defendant's Exhibit 1031 received.)

17  Q.  (By MS. OLDEMEYER) And then ultimately, Mr. Stull, did the

18  bank receive the subpoena issued to produce certain documents

19  in that Colorado state court case?

20  A.  Yes, we did.

21  Q.  And did the bank produce those records?

22  A.  Yes.

23  Q.  There was something interesting that occurred on direct.

24  When the bank produced those records, do you remember if they

25  had Bates numbers?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021   431

1   A.  I'm sure they did.

2   Q.  And with respect to those Bates numbers, do you recall

3   what they were?  What they looked like?

4   A.  No.  Would you -- if you can present it to me so I can

5   see.

6         MS. OLDEMEYER:  Your Honor, may I use this to

7   refresh the witness's recollection or should I approach?

8         THE COURT:  Sure.

9         MS. OLDEMEYER:  I can use the Elmo.

10  Q.  (By MS. OLDEMEYER) With respect to Farmers State Bank's

11  initial disclosures under Rule 26 in this case, Amanda Wilson

12  versus Jon Pauling and others, did the -- was there -- it's

13  out of focus.  With respect to those documents produced, did

14  they have a Bates number with a date from April of 2016?

15  A.  I believe they did.

16  Q.  And there were 280 pages produced, correct?

17  A.  Yes.

18  Q.  And they're described as documents previously produced by

19  the bank in response to Wilson's subpoena to the bank in case

20  number 13CV35298.  Do you see that?

21  A.  Yes.  I'm sure that's correct.

22  Q.  And then there were other documents, miscellaneous

23  documents related to the case number that have the FSB Bates

24  number.  Do you see that?

25  A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2     04/13/2021    432

1   Q.  When Mr. Pulkrabek showed you Exhibit 18, I want to make

2   sure it's clear --

3          THE COURT:  Exhibit 18.  I don't have that as

4   admitted.  Is it?

5          MS. OLDEMEYER:  It is, Your Honor.

6          MR. PULKRABEK:  I believe you did admit it, Your

7   Honor.

8          THE COURT:  Okay.

9          MS. OLDEMEYER:  You know what, Your Honor?  He

10  talked about it, but he didn't ask it be admitted, and it's

11  not a stipulated exhibit, so I will ask that it be admitted.

12         MR. PULKRABEK:  I certainly don't object.

13         THE COURT:  Okay.  18 is admitted.

14     (Plaintiff's Exhibit 18 received.)

15  Q.  (By MS. OLDEMEYER) With respect to the transcript of

16  judgment and the charging order and all the other documents in

17  there, what's the Bates number that appears on the bottom of

18  the page?

19  A.  FSB00001.

20  Q.  Okay.  So that's not part of the documents that were

21  previously produced back in April 2016 as part of the bank's

22  file, correct?

23  A.  I assume that's correct.

24  Q.  So to your knowledge, when did the bank first became aware

25  of this charging order against Two Mile Ranch General

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021        433

1    Partnership, do you know?

2    A.   I didn't know.  I really don't know what day it was.

3    Q.   Do you -- after 50-some years in banking, before this

4    lawsuit was filed with Amanda Wilson where the specific

5    allegations are that the bank engaged in activity to defeat

6    the charging order against Two Mile Ranch General Partnership,

7    did you even know what a charging order was?

8    A.   No.  And I'm still not sure if I know for sure.

9    Q.   Exhibit 1041.  Well, let me ask you this.  Do you recall

10   if you personally started ordering appraisals of certain

11   assets owned by Two Mile Ranch?

12   A.   Well, I don't know if we did immediately.  I know that we

13   ordered them, you know, so that we would try to figure out

14   what we had.

15   Q.   I'm showing you Exhibit 1041.  Does this refresh your

16   memory as to whether you personally ordered appraisals?

17   A.   Yes, I did.

18   Q.   What's OREO property?

19   A.   Other real estate owned.

20   Q.   And for purposes of other real estate owned, is that

21   property the bank takes title to?

22   A.   The bank takes title to it, yes, and we have to carry it

23   on the bankbooks.  It goes from whatever it was as a loan, and

24   then we have to book it as other real estate owned.

25   Q.   For purposes of planning to take on property through

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    434

1   foreclosure as OREO property, is the bank required to get an

2   appraisal?

3   A.  Yes, we are.

4   Q.  So in May of 2016 did you order certain appraisals of Two

5   Mile Ranch property in preparation for taking it on as OREO?

6   A.  Yes, we did.

7   Q.  I'm not going to ask you these questions because we're

8   going to hear from the folks who did those appraisals.  I'm

9   trying to expedite things here because I know the Court would

10  greatly appreciate it.  Exhibit 31.  I guess here's my

11  question.  The loan committee minutes, were you doing your

12  best to accurately -- the group -- well, first of all, who

13  takes the minutes for the loan committee?

14  A.  What's that?

15  Q.  Who types up the minutes for the loan committee?

16  A.  We have different people assigned.  Right now one of the

17  officers out of our Spencer location takes the minutes for the

18  -- but somebody is designated to take the minutes.

19  Q.  And then does the loan committee review and approve the

20  minutes after they're typed up?

21  A.  Absolutely.

22  Q.  To make sure they accurately reflect what the loan

23  committee did, correct?

24  A.  Yes.

25  Q.  Is Exhibit 1049 a copy of the loan committee minutes from

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      435

1   October 5th, 2016; is that correct?

2   A.   That is correct.

3   Q.   And with respect to those loan committee minutes, the

4   people who are present at that meeting are listed on each of

5   the committee minutes by name, correct?

6   A.   That is correct.

7   Q.   And then if people are absent, they're listed, correct?

8   A.   That's correct.

9   Q.   If there are guests, they're listed, correct?

10   A.   Yes.

11   Q.   And so the folks who are listed as present or guests would

12   have heard the communication going on about any particular

13   borrower, correct?

14   A.   Absolutely.

15   Q.   In these loan committee minutes there's a bunch of

16   redactions.  Is that because you don't want people to see that

17   information?

18   A.   No.  I don't know why that is -- because we have legal

19   counsel, and that is privileged information I guess is why we

20   have that redacted.

21   Q.   It relates to different borrowers, correct?

22          MR. PULKRABEK:  Objection, leading.

23          THE COURT:  Sustained.

24   Q.   (By MS. OLDEMEYER) In loan committee do you talk about

25   multiple borrowers in one meeting?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021    436

1    A.  Oh, yes, absolutely.

2    Q.  Okay.

3    A.  Many.

4    Q.  And in this particular one, this is from October of 2016.

5    It mentions that the Paulings have been working with an

6    investor -- I can't do it from down here -- working with an

7    investor and are working to get a contract that will pay the

8    bank in full.  Do you see that?

9    A.  I do.

10   Q.  Is that an accurate reflection of the events occurring in

11   October of 2016?

12   A.  That was what had been presented to loan committee, yes.

13   Q.  And who's the investor?

14   A.  I don't know who the investors were.  We would ask.  We

15   never would be able to get any specific names as to investors.

16   Is that uncommon?  Not really, because if you have a group of

17   people -- just like a new business that started up in Nebraska

18   just recently, and its press release was new investor group.

19   Well, it will come out eventually, but --

20   Q.  Here the word is singular, investor, meaning one, right?

21   A.  Well, it could be one investor or it could be a

22   corporation with lots of people.  It could be an LLC with

23   different members, and you would refer to it as the singular

24   or it would have plural.

25   Q.  Counsel asked you questions about Lardyn Consulting, and I

Sarah K. Mitchell, RPR, CRR

1    just want to find out from you, Dick Stull, what role -- from

2    August of 2016 and after, what did you understand Lardyn

3    Consulting was going to be?

4    A.  Well, Lardyn Consulting -- excuse me -- Lardyn owns the

5    farm and feedlot operation in Sterling, Colorado.  What they

6    were trying to do is to make this a commercial feedyard,

7    expand the yards so that there could be more cattle, and raise

8    feed which they can sell, mark it up, you get a profit.

9    Feedlot operations, if you can get a feedyard full, and you

10   can keep it full six months out of the year to nine months,

11   they can be real profitable.  Now, you're going to always have

12   to buy more feed because nobody can raise enough feed to feed

13   all those cattle.  But, yes, a commercial feedlot operation

14   would be the, quote, main operation.

15          MS. OLDEMEYER:  Exhibit 33, I think this has been

16   admitted.  It has not.  It's a stipulated exhibit.  I'd

17   offer Exhibit 33.

18          MR. PULKRABEK:  No objection.

19          THE WITNESS:  Okay.

20          THE COURT:  All right.  It's admitted then.

21      (Plaintiff's Exhibit 33 received.)

22   Q.  (By MS. OLDEMEYER) With respect to this communication, did

23   you, Dick Stull, send this communication that appears below to

24   Mark Pauling?

25   A.  I did.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2      04/13/2021      438

1    Q.  On November 29th, 2016?

2    A.  Yes.

3    Q.  And other people were copied on it, correct?

4    A.  Yes.

5    Q.  I want to ask you about -- on page 2 of that exhibit, did

6    you send this portion on page 2, Mr. Stull, on the day before

7    the 28th?

8    A.  Yes.

9    Q.  And for what purpose were you sending this in November of

10   2016?

11   A.  Well, just trying to get the property liquidated.

12   Q.  And with respect to the paragraph down here, I just know

13   that it will take a while for the Court to approve all this,

14   but surely it would be beneficial to all involved if we at

15   least had contracts, do you see that?

16   A.  Yes, I do.

17   Q.  Are you referring to what court?

18   A.  Well, it would be to bankruptcy court.

19   Q.  Where the Chapter 11 is pending?

20   A.  Yes.

21   Q.  And in your mind in November of 2016, it's going to take a

22   while for the bankruptcy court to act on anything that's put

23   in front of it, correct?

24   A.  It always does, yes.

25   Q.  And in this e-mail did you intend to -- never mind.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2     04/13/2021    439

1   Exhibit 34, that's the watch list language that Mr. Pulkrabek

2   referred you to -- I'll pull it up again -- that he pointed

3   out various parts of this?

4   A.  Yes.

5   Q.  Watch list loan report.  With respect to the first two

6   sentences in the -- I'm skipping background down to present

7   status.  In November of 2016, was that an accurate statement

8   of the present status, that the bank was working with Mark and

9   Jon so they can get through the Chapter 11 bankruptcy which is

10  being done to protect the proposed asset sale from the

11  judgment against Jon.  The buyers want this to make sure they

12  are not subject to future legal claims.  Do you see that?

13  A.  Yes.

14  Q.  And who are the buyers?

15  A.  Well, if you didn't clear title to it to make sure you

16  have clear title, I don't know that there would be any buyers.

17  So when you say buyers, that could be one of our customers in

18  Bridgeport, somebody in Sterling, but they would want to make

19  sure that the title was free and clear of all judgments or

20  liens, and -- so anyway.

21  Q.  And with respect to the word the buy ers, like was there

22  an investor group?  Was that referring to Elyce York?  Was

23  that referring to Elyce York and somebody else?  Who are the

24  buyers?

25  A.  Not sure who the buyers are according to this, because I'm

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    440

1   sure -- I don't know.  I can't --

2   Q.  I'm going to pull up Exhibit 1052.

3          MS. OLDEMEYER:  And, Your Honor, it's 4:30.  I will

4   not finish in the next 15 minutes, but if we took a break at

5   the end of the day when the Court wants one, I might be able

6   to streamline a little bit and finish very quickly with

7   Mr. Stull in the morning, just depending on the Court's

8   preference.

9          THE COURT:  Is that what you're asking for?

10         MS. OLDEMEYER:  I'm going to keep going as long as

11  you will allow me, but I know yesterday we broke at like --

12         THE COURT:  Ms. Oldemeyer, you're kind of like an

13  Energizer Bunny.  You would keep going until midnight if I

14  let you.

15         MS. OLDEMEYER:  And I understand that's the Court's

16  -- that's why I asked.

17         THE COURT:  But you're not going to finish anyway,

18  right?

19         MS. OLDEMEYER:  Not today.  But if I had -- if the

20  Court wanted to break, I would try to after this exhibit

21  streamline the balance so we can get done.

22         THE COURT:  What about the rest of you?  Do you

23  want to break now or do you want to hang in there for

24  another half an hour?  I don't care today.

25         MR. PULKRABEK:  Your Honor, from my perspective,

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 2        04/13/2021     441

1    I'm a little concerned about how long some of this is

2    taking, and so I would like to get through as much as we

3    can.

4             MR. FORBES:  Your Honor, from my perspective,

5    streamlining is always preferable to non-streamlining, so

6    I'd go for it.

7             THE COURT:  You'd go for that, keep going?

8             MR. FORBES:  No.  I go for let's break, let

9    Ms. Oldemeyer streamline, and come back.

10            THE COURT:  Okay.  We'll go to 4:45 and stop.

11            MS. OLDEMEYER:  Thank you, Your Honor.

12   Q.  (By MS. OLDEMEYER) Mr. Stull, I put up Exhibit 1052.  Did

13   you, Dick Stull, send this communication on December 19th,

14   2016?

15   A.  Yes, I did.

16   Q.  And were you -- who's JB again?

17   A.  JB Suddarth is I think the executive vice president of

18   Henderson State Bank in Henderson, Nebraska.

19   Q.  Why in December of 2016 would you be communicating with

20   Henderson in Nebraska, Henderson State Bank?

21   A.  Well, I'm sure that they were participating in a loan with

22   Two Mile Ranch.

23   Q.  And so does a participant care?

24   A.  Well, they're participating in a loan that we have booked

25   in Bridgeport for Farmers State Bank, and so they need to

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2     04/13/2021    442

1    receive notice because they're part of the loan.

2              MS. OLDEMEYER:  We would offer Exhibit 1052.

3              MR. PULKRABEK:  This is hearsay, Your Honor.

4              THE COURT:  Overruled.  I'll admit the document.

5         (Defendants' Exhibit 1052 received.)

6    Q.  (By MS. OLDEMEYER) In your communications with the

7    participating banks, were you doing your best to be truthful

8    and accurate as to what was going on at the time?

9    A.  Absolutely.

10             MS. OLDEMEYER:  Exhibit 38 is a stipulated exhibit.

11   I'd offer Exhibit 38.

12             THE COURT:  Okay.  It's admitted.

13        (Plaintiff's Exhibit 38 received.)

14   Q.  (By MS. OLDEMEYER) Mr. Stull, on February 1st of 2017, did

15   you send this e-mail that's on the top portion of the first

16   page of Exhibit 38?

17   A.  Yes, I did.

18   Q.  And does this -- can you tell the Court what was going on

19   in early February 2017 with respect to the issues in the

20   pending Chapter 11 reorganization?

21   A.  Let me read this, because I want to see what this is.

22   Q.  Do you need me to make it smaller so you can read the

23   whole thing?

24   A.  No.  Okay.  The question again?

25   Q.  What was going on generally in February -- early February,

19-CV-01224-RBJ          Bench Trial - Day 2      04/13/2021    443

1    February 1st, 2017, with respect to the Chapter 11 case?

2    A.  I think it was coming fairly close to being asked to be

3    released or let them get out of bankruptcy.

4    Q.  Were you putting pressure on the bank -- well, let me ask

5    you about this last paragraph.  As I stated before, we're

6    getting down to a timeline to get some motions filed with the

7    Court.  What motions were being considered?

8    A.  Well, a motion for dismissal.

9    Q.  What about a motion for relief from stay?  What's that?

10   A.  I can't answer that.

11   Q.  If somebody's in bankruptcy court and you want to

12   foreclose, do you have to ask the bankruptcy court's

13   permission?  Do you know?

14   A.  Oh, yes.  They have to get approval for any sale of any

15   assets.

16   Q.  Including a foreclosure by the bank?

17        MR. PULKRABEK:  Leading.  Objection, leading.

18        THE COURT:  Sustained.

19   Q.  (By MS. OLDEMEYER) Exhibit 148, at some point in time was

20   there a consideration that Two Mile Ranch for purposes of its

21   plan would get a loan from FirsTier Bank?

22   A.  Yes.  That was part of the -- part of the process, yes.

23   Jon was trying to get and Mark were trying to get a loan

24   through FirsTier Bank.

25   Q.  And did FirsTier Bank agree to make the loan?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021    444

1   A.   No.

2   Q.   They declined, right?

3   A.   They declined.

4   Q.   Do you remember when that occurred?

5   A.   Probably '17, but we've got it in a memo somewhere.

6   Q.   I put up Exhibit 148.  Does that refresh your memory about

7   when the bank learned that FirsTier was not going to fund?

8   A.   Yes.  Early March of 2017.

9   Q.   I'm not offering Exhibit 148.  Exhibit 46 -- I'm not

10  offering it, but I want to ask Mr. Stull if he recalls, did

11  there come a point in time in March of 2017 that Jon Pauling

12  told you he had just finished talking to a small investor that

13  might buy in at a million-dollar level?

14  A.   Absolutely.

15  Q.   And did that happen?

16  A.   No.

17  Q.   I do want to ask you about Exhibit 47.  That's the one --

18  this is the one Mr. Pulkrabek asked you about, and it's

19  referring to the three attachments; the old LPM form showing

20  the collateral and discounted value, the second sheet showing

21  no discounted value, and then your new form showing no

22  discounted collateral value?

23  A.   Right.

24  Q.   So page 2, the portion of the LPM from March 22nd, 2017,

25  with the discounted values?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 2      04/13/2021    445

1    A.  Yes.

2    Q.  And what's the net margin there?

3    A.  $168,000, but that also includes a required cash deposit

4    of 350,000, which I don't think is on here.

5    Q.  You said that requires a cash deposit?

6    A.  Yes.  That's part of the collateral.

7    Q.  Where was that money going to come from?

8    A.  Well, that was part of the -- part of the information that

9    was provided by Lardyn for the loan closing.  That was

10   supposed to be put in a money market account.

11   Q.  And throughout this -- these months here, these critical

12   months from January of 2016 through the sale of Lardyn in

13   April 2017, was the bank represented by legal counsel?

14   A.  Yes.

15   Q.  The name --

16   A.  Cline Williams was our legal counsel.

17   Q.  I want to ask you about Exhibit 49.  I apologize.

18           THE COURT:  Maybe this would be a good time to

19   recess?

20           MS. OLDEMEYER:  Thank you, Your Honor.  That would

21   be helpful.

22           MR. PULKRABEK:  Your Honor, may I take up one

23   matter that I think has just been raised by the testimony I

24   want to clarify?  It sounds as though there is a whiff of an

25   advice of counsel defense being injected into this case.  I

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021     446

1    don't think that was raised as an affirmative defense, nor

2    has the bank produced all of its privileged documents, which

3    it would have to do if it's going to rely on advice of

4    counsel.

5          THE COURT:  They're not going to rely on advice of

6    counsel.  That would open up the attorney-client privilege

7    to heaven knows what.

8          MS. OLDEMEYER:  Correct, Your Honor.

9          THE COURT:  I can't even conceive she would want to

10   do that.

11         MS. OLDEMEYER:  We are not -- that is not an

12   alleged defense in our answer.  The line of questioning was

13   merely to show that the bank was -- all these alleged

14   coconspirators.

15         THE COURT:  Okay.  Mr. Forbes, how is your tango

16   going?

17         MR. FORBES:  Your Honor, the -- the tango is in

18   stasis.

19         THE COURT:  Stasis.  For those of you who are music

20   lovers or dancers, the tango is a complex dance.  You can't

21   just learn the tango in a minute or two.  But once you

22   master it, it's a beautiful performance.  It seems to me

23   that for you parties that were smart enough and clever

24   enough to figure out this whole business with Lardyn and the

25   bank, that you'd be smart enough to learn to tango.  I say

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 2      04/13/2021      447

1    that advisedly.  9 o'clock in the morning, folks.  Have a

2    nice evening.

3           MR. FORBES:  Your Honor, might I make one comment

4    just so you know?  The parties have attempted to tango, but

5    at this point they are tangoing on different floors.

6           MR. PULKRABEK:  Your Honor, the dance invitation

7    has been sent and no response received as of late.

8           MR. FORBES:  Well, yes.

9           THE COURT:  I know it's hard, but it's not that

10   hard.  Do you folks want this to be over and behind you or

11   do you not?  You've probably put in 50 to 100 documents for

12   me already.  For me to go through all that, it's going to

13   take forever, and whether I get the answer right or not

14   you're going to go up on appeal.  Now, if you can figure out

15   a way for Ms. Wilson to get something and for you folks to

16   put this behind you, I would think you all would be happy.

17   Anyway, 9 o'clock in the morning.

18          MR. FORBES:  Thank you, Your Honor.

19          MR. PULKRABEK:  Thank you, Your Honor.

20          THE COURTROOM DEPUTY:  All rise.  Court is in

21   recess.

22       (The proceedings were concluded at 4:45 p.m.)

23

24

25

                    Sarah K. Mitchell, RPR, CRR

1                          REPORTER'S CERTIFICATE

2

3              I, SARAH K. MITCHELL, Official Court Reporter for the

4      United States District Court for the District of Colorado, a

5      Registered Professional Reporter and Certified Realtime

6      Reporter, do hereby certify that I reported by machine

7      shorthand the proceedings contained herein at the time and

8      place aforementioned and that the foregoing pages constitute a

9      full, true and correct transcript.

10             Dated this 13th day of May, 2021.

11

12

13

14                    /s/ Sarah K. Mitchell

15                      SARAH K. MITCHELL
                      Official Court Reporter
16              Registered Professional Reporter
                    Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                         Sarah K. Mitchell, RPR, CRR