1                     IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF COLORADO

3
     Civil Action No. 19-CV-01224-RBJ
4

5      AMANDA WILSON,
                                             (Pages 448 - 652)
6            Plaintiff,

7            vs.

8      JONATHAN PAULING, et al.,

9            Defendants.

10   ----------------------------------------------------------

11                       REPORTER'S TRANSCRIPT
                        Bench Trial - Day 3
12
     ----------------------------------------------------------
13
             Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Judge, United States District Court for the District of
     Colorado, commencing on the 14th day of April, 2021, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                           APPEARANCES

17   For the Plaintiff:
     ROSS W. PULKRABEK, Keating Wagner Polidori & Free, PC, 1290
18   Broadway, Ste. 600, Denver, CO 80203

19   For the Defendants:
     PETER C. FORBES, Carver Schwarz McNab Kamper & Forbes, LLC,
20   1888 Sherman St., Ste. 400, Denver, CO 80203

21   R. LIVINGSTON KEITHLEY, Antero Law LLC, 1700 Broadway, Ste.
     640, Denver, CO 80290
22
     TRACY A. OLDEMEYER, Cline Williams Wright Johnson & Oldfather,
23   215 Mathews St., Ste. 300, Fort Collins, CO 80524

24
         Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25                 Denver, CO 80294, 303-335-2108

             Proceedings reported by mechanical stenography;
                 transcription produced via computer.

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021   449

1                          I N D E X

2     PLAINTIFF'S WITNESSES                                    PAGE

3     RICHARD STULL
        Cross-Examination (Cont'd) By Ms. Oldemeyer       451
4       Cross-Examination By Mr. Keithley                 457
        Redirect Examination By Mr. Pulkrabek             461
5       Recross Examination By Ms. Oldemeyer              478
        Recross Examination By Mr. Forbes                 479
6     STEPHEN STULL
        Direct Examination By Mr. Pulkrabek               488
7       Cross-Examination By Ms. Oldemeyer                536
        Cross-Examination (Cont'd) By Ms. Oldemeyer       540
8       Voir Dire Examination By MR. PULKRABEK            598
        Cross-Examination (Cont'd) By Ms. Oldemeyer       600
9       Cross-Examination By Mr. Forbes                   622
        Cross-Examination By Mr. Keithley                 633
10      Redirect Examination By Mr. Pulkrabek             640

11

12                    PLAINTIFF'S
                      EXHIBITS                       RECEIVED

13                    6                                  606

14                    14                                 493

15                    20                                 543

16                    27                                 501

17                    28                                 641

18                    44                                 452

19                    49                                 454

20                    50                                 455

21                    59                                 611

22                    66                                 538

23                    68                                 519

24                    105                                525

25                    124                                612

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021   450

 1              162                                508

 2

 3              DEFENDANTS'
                EXHIBITS                      RECEIVED
 4
                1002                               570
 5
                1003                               578
 6
                1006                               609
 7
                1015                               569
 8
                1038                               583
 9
                1039                               584
10
                1040                               584
11
                1057                               452
12
                1058                               453
13
                1059                               453
14
                1060                               453
15
                1071                               617
16
                1072                               617
17
                1074                               618
18
                1075                               618
19

20

21

22

23

24

25

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      451

1                 *        *        *        *        *

2        (The proceedings commenced at 9:00 a.m.)

3              THE COURT:  Good morning.

4        (Plaintiff's witness, RICHARD STULL, resumes the

5        stand.)

6              THE COURT:  Ms. Oldemeyer.

7                       CROSS-EXAMINATION (Cont'd)

8    BY MS. OLDEMEYER:

9    Q.  Mr. Stull, can you see me if I stand up?

10   A.  Yes, I can.

11   Q.  Okay.  I'm going to ask you about a few more exhibits,

12   but I want to remind you you're still under oath.  You know

13   that, right?

14   A.  Yes, I do.

15   Q.  I'm going to display in front of you Exhibit 1057.

16   A.  Okay.

17   Q.  Is Exhibit 1057 a true and accurate copy of Farmers

18   State Bank loan committee minutes from March 2nd, 2017?

19   A.  It is.

20   Q.  And in there there's discussion of the Two Mile Ranch

21   bankruptcy, and if Lardyn is successful in acquiring a loan

22   that Lardyn has applied for at FirsTier Bank, and that

23   discussion.  Do you see that?

24   A.  I do.

25              MS. OLDEMEYER:  We would offer Exhibit 1057.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      452

1            MR. PULKRABEK:  No objection.

2            THE COURT:  Admitted.

3        (Defendants' Exhibit 1057 received.)

4    Q.  (By MS. OLDEMEYER) I'll show you Exhibit 44.  The first

5    page of Exhibit 44 I believe is a document that's within

6    Exhibit 45, and Exhibit 44 is a multiple-page document.  Is

7    Exhibit 44 a true and accurate copy of the bank record of

8    the loan presentation memo for the loan committee from

9    March 22nd, 2017?

10   A.  It is.

11           MS. OLDEMEYER:  I would offer Exhibit 44.

12           MR. PULKRABEK:  No objection.

13           THE COURT:  Admitted.

14       (Plaintiff's Exhibit 44 received.)

15   Q.  (By MS. OLDEMEYER) I've put in front of you, Mr. Stull,

16   Exhibit 1058.  It's a one-page e-mail that you sent on

17   April 3rd, 2017.  Do you see that?

18   A.  I do.

19   Q.  And the subject line is Chapter 11 dismissal, correct?

20   A.  Correct.

21   Q.  And that was sent to both Mark Pauling and Jon Pauling

22   and Steve Stull, Mike Stull, and Chris Gray?

23   A.  That is correct.

24           MS. OLDEMEYER:  We would offer Exhibit 1058.

25           MR. PULKRABEK:  No objection.

                    Sarah K. Mitchell, RPR, CRR

1              THE COURT:  Admitted.

2         (Defendants' Exhibit 1058 received.)

3    Q.  (By MS. OLDEMEYER) And Exhibit 1059 I've displayed on

4    the screen in front of you.  It's a one-page, again,

5    minutes, but is Exhibit 1059 a true and accurate copy of

6    Farmers State Bank's special loan meeting minutes of

7    April 7th, 2017?

8    A.  Yes, it is.

9              MS. OLDEMEYER:  We would offer Exhibit 1059.

10             MR. PULKRABEK:  One moment, please.

11             THE COURT:  Well, it's stipulated.

12             MR. PULKRABEK:  Okay.  No objection.

13             THE COURT:  It's admitted.

14        (Defendants' Exhibit 1059 received.)

15   Q.  (By MS. OLDEMEYER) Exhibit 1060 is a three-page exhibit.

16   Did you, Mr. Dick Stull, on April 7th, 2017, send this

17   e-mail about the Two Mile Ranch LPM?

18   A.  Yes, I did.

19             MS. OLDEMEYER:  We would offer Exhibit 1060.

20             MR. PULKRABEK:  No objection.

21             THE COURT:  Why not.  Admitted.

22        (Defendants' Exhibit 1060 received.)

23   Q.  (By MS. OLDEMEYER) I'm going to ask you about

24   Exhibit 49.  Did you, Mr. Dick Stull, on April 10th, 2017,

25   receive from Jon Pauling a commitment letter that he had

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021      454

1   signed?

2   A.  Yes.

3   Q.  And that commitment letter appears on pages 2 and 3 of

4   Exhibit 49?

5   A.  Yes, it is.

6   Q.  And the borrowers there indicated Lardyn Consulting,

7   LLC, a Nebraska LLC, Elyce York and Mark Pauling as members

8   and personally, correct?

9   A.  That is correct.

10          MS. OLDEMEYER:  We'd offer Exhibit 49.

11          MR. PULKRABEK:  It's stipulated.

12          THE COURT:  Yeah, it's admitted.

13      (Plaintiff's Exhibit 49 received.)

14          THE COURT:  I honestly don't understand the point of

15  what Ms. Oldemeyer is doing, but I guess she has a point.

16          MS. OLDEMEYER:  Hopefully, Your Honor, closing

17  argument, if we get there, will make it clear.

18          THE COURT:  By the time you get to closing argument

19  we'll be so awash in documents that they'll be essentially

20  meaningless, and I'll just pick out a handful that make some

21  sense to me.  That's all I can do.  I'm just a person.  I

22  can't keep up with all of this.  So you're doing it for the

23  appellate record, not for me, and that's just honest advice.

24  Q.  (By MS. OLDEMEYER) Exhibit 50 I have in front of you.

25  We'd offer Exhibit 50 .

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      455

1          MR. PULKRABEK:  It's stipulated, Your Honor.

2          THE COURT:  Admitted.

3      (Plaintiff's Exhibit 50 received.)

4   Q.  (By MS. OLDEMEYER) I'll ask you about page 2.  This is a

5   title commitment attachment.  For purposes of conveying

6   property from -- that a borrower is going to acquire, is it

7   important to the bank to have a title insurance policy?

8   A.  Yes.

9   Q.  Why?

10  A.  That shows that there is clear title to the property and

11  no encumbrances are outstanding.

12  Q.  And on this title commitment that's within Exhibit 50,

13  page 2, did the title company want in Subsection J the

14  borrower to provide a copy of any and all bankruptcy court

15  documents and/or orders pertaining to said property and

16  debts to title prior to closing?

17  A.  Yes, it does.

18  Q.  And on Subsection N, as in Nancy, did the title company

19  require for purposes of issuing a title insurance policy a

20  satisfaction and release of the judgment entered

21  October 24th, 2015, in the amount of $78,271.41 against Two

22  Mile Ranch, LLC, et al., with a note at the end of that long

23  paragraph?

24  A.  Yes.

25  Q.  And with respect to Subparagraph O, as in Oliver, did

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    456

1    the title company also require satisfaction and release of

2    the judgment entered October 23rd, 2015, in the amount of

3    $3,918,166 against Jonathan M. Pauling, et al., defendants,

4    and in favor of Amanda Wilson, plaintiff, with that same

5    note to verify that the parties included in et al. as listed

6    on the judgment to verify if it is necessary to pay at

7    closing?

8    A.  Yes, it does.

9    Q.  And was it necessary to pay at closing that $3,918,166?

10   A.  No, it was not.

11   Q.  Did you personally meet with Elyce York after the

12   closing of the sale of assets -- some of Two Mile Ranch

13   assets to Lardyn?

14   A.  Yes.

15   Q.  How often?

16   A.  Oh, as need be.  There was no set schedule.  But anything

17   to do with the operation that we needed to discuss we were

18   meeting with her on a regular basis.

19   Q.  Is that unusual for you to do, meet on a regular basis

20   with a borrower?

21   A.  Absolutely not.

22   Q.  And where would you meet with her?

23   A.  We would meet at the bank.  We would meet at the feedyard.

24   I have met at her residence in Sidney, Nebraska.

25   Q.  Mr. Stull, did you agree as a bank to allow the sale of

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3     04/14/2021    457

1   some of Two Mile Ranch's assets to Lardyn Consulting in

2   April of 2017, in order to hinder, delay, or defraud Amanda

3   Wilson's ability to collect any portion of her judgment

4   against Jon Pauling, including her right to collect from any

5   distribution that Jon Pauling might get from Two Mile Ranch?

6   A.  No, we did not.

7           MS. OLDEMEYER:  No further questions.

8           THE COURT:  Let's see, who else wants to have a shot

9   at Mr. Stull?  Mr. Keithley, you do, so go ahead.

10          MR. KEITHLEY:  Just a few short questions.  Thank

11  you, Your Honor.

12                        CROSS-EXAMINATION

13  BY MR. KEITHLEY:

14  Q.  Good morning, Mr. Stull.  Can you hear me okay?

15  A.  Good morning.  Yes, I can.

16  Q.  Okay.  My name is Livingston Keithley.  I represent Mark

17  Pauling and Two Mile Ranch.  I just want to ask a few short

18  follow-up questions to your testimony yesterday and today,

19  please.  First of all, you've met Mark Pauling before,

20  correct?

21  A.  Oh, yes.

22  Q.  Several times?

23  A.  Numerous times.

24  Q.  And you worked with Mark with regard to the transaction

25  for Two Mile Ranch to sell its assets, some of its assets to

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      458

1   Lardyn, correct?

2   A.   Absolutely.

3   Q.   And you had several discussions with him during that

4   entire process?

5   A.   Numerous discussions.

6   Q.   Did he ever say to you in any of those discussions that

7   Two Mile Ranch needed to transfer its assets so that

8   Ms. Wilson would not obtain money from them?

9   A.   Absolutely not.

10  Q.   Did he ever even mention Ms. Wilson?

11  A.   Not to my recollection.

12  Q.   Since that transaction has occurred, up until the time

13  that this lawsuit was filed, did Mark Pauling ever mention

14  Ms. Wilson to you?

15  A.   I can't recall that he did, and I've got to be -- I don't

16  think so, but I can't be absolutely positive.  I don't --

17  nothing sticks out in my mind to that reference.

18  Q.   And that's fair.  It was a couple -- couple-year period

19  from a couple years ago, right?

20  A.   Yes.

21  Q.   When you did have these discussions with Mark Pauling,

22  what did he express to you that the reason for entering into

23  this transaction was?

24  A.   Well, Two Mile Ranch General Partnership was in default on

25  the loan, and in order to satisfy not going through deed in

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021    459

1   lieu and just turning everything over to the bank to sell the

2   assets to another entity, that somebody else would have a

3   chance of being profitable.  In that plan not all the assets

4   of Two Mile Ranch were sold to Lardyn Consulting, LLC, and so

5   there wasn't as much debt to service, and it just -- it just

6   had a better possibility of making money and being a

7   successful business, whereas Two Mile Ranch, it just had

8   incurred way too much debt, and there was no way it was cash

9   flowing without sale of assets.

10  Q.  He always expressed -- Mark Pauling always expressed to

11  you that he wanted to make it right with the bank and get

12  the bank repaid?

13  A.  Absolutely.  He's been more than upfront on that.

14  Q.  Now, you mentioned and we've talked about that most of

15  Two Mile Ranch's remaining assets in 2017 were transferred

16  to Lardyn, but not all of them.  The exception there is the

17  house on Turkey Creek Road, correct?

18  A.  That was not transferred, right.

19  Q.  And were you involved in 2019 when the house ultimately

20  was transferred to the bank with a deed in lieu?

21  A.  I was involved, as well as other members of our loan

22  committee as it was a proposal that just had to happen because

23  it was so far behind in payments, and it needed to -- needed

24  to be sold.  It was not getting sold.

25  Q.  Did that transfer of the Turkey Creek house to Farmers

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      460

1   State Bank satisfy the remainder of Two Mile Ranch's debt?

2   A.   Absolutely not.

3   Q.   There's a balance still owed as we sit here today for

4   Two Mile Ranch?

5   A.   That is correct.

6   Q.   So even as we sit here today, Two Mile Ranch is still a

7   debtor of Farmers State Bank?

8   A.   Absolutely.

9   Q.   The last thing I want to ask you about, if we can pull

10  up Exhibit 132 from my computer, please -- okay.  So we

11  pulled back up Exhibit 132 that Mr. Pulkrabek asked you

12  about and Ms. Oldemeyer asked you about.  I want to look

13  here at the e-mail from Kevin Kudera in the e-mail chain,

14  and the comment, Kind of amazing.  Do you see that?

15  A.   I do.

16  Q.   And he says, Down from approximately 4.75 million to

17  382,940 in five years.  Do you see that?

18  A.   I do.

19  Q.   Do you have any idea where he got those numbers from?

20  A.   I don't without looking at other information that would be

21  attached to an LPM.

22  Q.   Now, this e-mail, November 30th, 2017, this predates the

23  transfer of the Turkey Creek property, doesn't it?

24  A.   Yes, it does.

25  Q.   And at that time Two Mile Ranch owed much more than

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021     461

1   $382,000, didn't it?

2   A.   Absolutely.

3   Q.   So do these numbers even look correct?

4   A.   No, not if we were looking at Two Mile Ranch General

5   Partnership.

6          MR. KEITHLEY:   I have no further questions, Your

7   Honor.   Thank you.

8          THE COURT:   How about you, Mr. Forbes?   Do you want

9   to ask him some questions?

10          MR. FORBES:   I do not, Your Honor.   Thank you.

11          THE COURT:   Does plaintiff wish to redirect?

12          MR. PULKRABEK:   Yes, Your Honor.

13                      REDIRECT EXAMINATION

14   BY MR. PULKRABEK:

15   Q.   Mr. Stull, I'd like to start out with the first question

16   that you were asked by Ms. Oldemeyer which I wrote down as

17   do you intend to minimize in any way what Ms. Wilson has

18   experienced.   Do you remember that question?

19   A.   Yes.   And I do not.

20   Q.   And you answered no?

21   A.   Yes.

22   Q.   So here we have your testimony, do you intend to

23   minimize in any way what Ms. Wilson experienced, that's what

24   you said yesterday.   But back in 2016, in the e-mail that

25   you sent you said, Working with Mark and Jon on Chapter 11

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 3     04/14/2021     462

1    to get rid of Jon's judgment so the assets can be sold

2    without concern for legal recourse to buyers --

3              THE COURT:  Where are you getting this testimony?

4              MR. PULKRABEK:  The testimony Mr. Stull just

5    confirmed, that was the question Ms. Oldemeyer asked and his

6    answer from yesterday, the first very question.

7              THE COURT:  You don't have a transcript.  You're

8    doing that from your notes?

9              MR. PULKRABEK:  I'm doing that from my notes, but I

10   did ask him is this the question he was asked and that was his

11   answer.

12             THE COURT:  Okay.

13   Q.  (By MR. PULKRABEK) So you understand that part of

14   Ms. Wilson's experience was going to trial against Jon

15   Pauling and getting that verdict and judgment?

16   A.  Yes, I understand that.

17   Q.  And the bank is trying to minimize Ms. Wilson's

18   collection of that judgment?

19   A.  Well, I don't believe so, because what we were doing is

20   the assets of Jon Pauling, whatever his assets were in Two

21   Mile Ranch and other assets, whatever is left over would be

22   subject to Mark and Jon's distribution.

23   Q.  You did -- you did write earlier that you were working

24   with Mark Pauling and the person who assaulted Amanda Wilson

25   to try to get rid of that judgment?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    463

1    A.   Absolutely.  And the Two Mile Ranch Chapter 11 bankruptcy

2    that was filed, yes, and working with them to get rid of any

3    judgment that Two Mile Ranch General Partnership may have had.

4    I would agree.  And this does say Jon's judgment.

5    Q.   All right.  Ms. Oldemeyer --

6    A.   And I think there were other judgments out there against

7    Jon, but I can't swear to that.

8    Q.   Ms. Oldemeyer had some questions for you about the

9    relationship between you and Jon Pauling.  Do you remember

10   that line of questioning?

11   A.   I do.

12   Q.   And it was my understanding that you affirmed that there

13   was no relationship outside of banking?

14   A.   That's correct.

15   Q.   But that's not strictly speaking true, is it?

16   A.   Why is that?

17   Q.   Well, the first way that you came to know Jon Pauling

18   was by doing business with him?

19   A.   Yes.  But that was not other than -- yes, it was business

20   prior to me being involved with a bank that had a banking

21   relationship.  Yes.  I bought bulls personally from Two Mile

22   Ranch General Partnership, and I worked with Jon Pauling when

23   I would buy bulls.  I would also -- so that was personal, but

24   that was a business relationship.

25   Q.   Now, even though Farmers State Bank has only had its

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      464

1   banking relationship with Two Mile Ranch since December of

2   2011 approximately, you have known Jon Pauling for more than

3   20 years?

4   A.  I would say yes.  Known of him and know him, yes.

5   Q.  And possibly even as long as 30 years?

6   A.  Okay.  That goes back to 1991.  There's a possibility it

7   could go back that far, but I'm not sure.

8   Q.  Okay.  Now, Farmers State Bank Shares acquired Farmers

9   State Bank in November of 2011?

10  A.  That is correct.

11  Q.  And then the very next month we can see that a banking

12  relationship is forming with Two Mile Ranch?

13  A.  Yes, Two Mile Ranch Market, LLC.

14  Q.  So Two Mile Ranch was one of Farmers State Bank's very

15  first customers?

16  A.  Two Mile Ranch Market, LLC.  Whole different company than

17  Two Mile Ranch General Partnership.

18  Q.  And you dealt with Jon Pauling in that relationship?

19  A.  Yes.

20  Q.  There was some questions about Exhibit 38 and this

21  e-mail that was sent by you to Joe Henry and Mark Pauling.

22  Do you see that?

23  A.  Yes, I do.

24  Q.  This is February 1st, 2017.  I want to go through this

25  e-mail just a little bit here.  The start of this e-mail is

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    465

1    an e-mail from Briana Lamphier to you on January 31st, 2017,

2    subject, PSA for oil and gas appraisal, Two Mile Ranch.  Do

3    you see that?

4    A.  I do.

5    Q.  So Ms. Lamphier had sent you an engagement letter for

6    the appraisal?

7    A.  Yes.

8    Q.  Then you sent the engagement letter for the appraisal to

9    Jon Pauling, correct?

10   A.  I did.

11   Q.  Jon Pauling says, Dick, I would like to have Two Mile

12   Ranch also on the appraisal so we can have access to the

13   process and report.

14   A.  I see that.

15   Q.  Then you say, Mark was in this morning, and I asked him

16   if the agreement was going to be part of the plan for

17   bankruptcy, and he wasn't clear on that question.  Do you

18   want this as part of the plan?  If so, we need to put it in

19   a format for the court.  Do you see that?

20   A.  I absolutely do.

21   Q.  Jon Pauling's response -- or Joe Henry -- we don't want

22   it to be part of the bankruptcy, our use only, correct?

23   A.  Yes.

24   Q.  And as far as you know, the appraisal was never

25   disclosed in the bankruptcy?

                              Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      466

1    A.  Not that -- no, because it needed to be in a different

2    format to -- for Briana to prepare if it was going to go --

3    and that is the gist of the whole conversation here.  We had

4    no problem sending that particular appraisal to the bankruptcy

5    court, but it was not going to be part of the bankruptcy, so

6    it was not in the format that needed to be because it does

7    take a --

8    Q.  Just a --

9    A.  -- Chapter 11 does take other information.

10   Q.  Just a couple more details on this.  At the point in

11   time you wrote this, you did not have the appraisal yet, so

12   you did not know how the appraisal would come in?

13   A.  Oh, no, absolutely.

14   Q.  And you and Jon Pauling discussed how it was not going

15   to be part of the bankruptcy?

16   A.  Yes.  Because if you go back to the very first of it, this

17   is what Briana was asking, because if it was going to be part

18   of a bankruptcy, I needed to get that determined so I can tell

19   her we need it in a different format, and that needed to come

20   from I believe the court to get that.  But it's a different

21   legal process, and we were just clarifying that, but we had no

22   problem -- we had no problem providing that particular

23   appraisal for the bankruptcy court.

24   Q.  But it wasn't provided in the bankruptcy?

25   A.  No.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021    467

1   Q.  Okay.

2   A.  No.

3   Q.  Now --

4   A.  It's not.

5   Q.  -- next set of questions you were asked about had to do

6   with Exhibit 50, I believe.  Let me pull that up.  This is

7   my -- really my last question for you, last series of

8   questions.  So this was the title commitment.  Do you

9   remember being asked about the title commitment?

10  A.  Yes.  Yes, I do.

11  Q.  All right.  So let's go through in just a little bit

12  more detail, you sent the title commitment to Joe Henry and

13  Mark Pauling.  Do you see that?

14  A.  That's correct.

15  Q.  You did not send the title commitment to Elyce York?

16  A.  Not on this, no.

17  Q.  And your testimony was, as I heard it, that it was

18  important to a borrower to have a title commitment?

19  A.  Yes.  And I'm sure this was provided to the borrower --

20  Q.  Now --

21  A.  -- at some point, but that wasn't your question.

22  Q.  You said it was enough to give this to Mark Pauling and

23  Jon Pauling because they were Lardyn?

24          MS. OLDEMEYER:  Objection to form of the question.

25          THE COURT:  Overruled.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3       04/14/2021    468

1    A.  They're the sellers.  The sellers need to know what they

2    have to have in closing and what the requirements are, and I

3    think any transaction that has to do with real estate, both

4    the buyer and the seller are privy to the title commitment, as

5    well as the lender.

6    Q.  (By MR. PULKRABEK) And, in fact, Mr. Stull, you had no

7    explanation for why you didn't give this to Elyce York when

8    I asked you about this in your prior deposition?

9    A.  Why didn't I give it to her?  Is that your question?

10   Q.  You had no --

11   A.  I'm sorry.  I want to make sure I'm answering the

12   question.

13   Q.  You had no explanation for why you didn't give it to

14   Elyce York.

15   A.  No, and I still don't.  Not according to this e-mail here.

16   Q.  Just to look at your prior deposition, we're talking

17   about what was marked in the deposition as Deposition

18   Exhibit 44, and I asked you about this Deposition Exhibit 44

19   in your deposition.  And I asked you, This is so Lardyn

20   Consulting could rest assured that it's acquiring the assets

21   with insured title, and you agreed, correct?

22   A.  Yes.

23   Q.  I said it would be of paramount importance to Lardyn

24   Consulting to make sure that they were going to have good

25   insured title, right?  And you said, Yes, also to the bank,

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    469

1   correct?

2   A.  Correct.

3   Q.  And then I said, All right.  I'll rephrase the question.

4   Don't you think that Elyce York, if she's the 85 percent

5   owner of Lardyn, she's going to care the most about what

6   happens with Lardyn?  Answer, I'm assuming so.  Who's your

7   customer here?  Is it Elyce York or is it Jon Pauling?  Our

8   customer here is Two Mile Ranch.  They're transferring the

9   title for a legitimate sale to Lardyn Consulting.  Lardyn

10  Consulting is Mark Pauling and Jon Pauling.  I'm assuming

11  that the title company will also have sent this to Elyce and

12  Mark.  You see that?

13  A.  I do see that.

14  Q.  And then --

15  A.  I did not --

16  Q.  And then finally, Mr. Stull, I said why aren't you

17  including Elyce York on this e-mail with the requirements if

18  you think that Elyce York is the person behind Lardyn?

19  Answer, I have no explanation for that.

20        MS. OLDEMEYER:  I think the answer continues on

21  line 16.

22        THE COURT:  I'm sorry.  What did you say?

23        MS. OLDEMEYER:  Mr. Pulkrabek mentioned portions of

24  the answer on his questioning there, but the answer continues

25  on line 16 through the rest of the page, so --

                    Sarah K. Mitchell, RPR, CRR

1              MR. PULKRABEK:  That's fine.  I don't mean to

2     truncate it.  We can look at what the rest of it is.

3     Q.   (By MR. PULKRABEK) You did continue after I started my

4     next question.  You said, It references both Two Mile Ranch

5     partnership.  They are the sellers.  Lardyn Consulting is

6     the buyer.  The title company, I'm sure, has notified

7     Lardyn.  And my question to them, These are the requirements

8     to the title commitments.  You may have already gotten a

9     copy of the commitment from your company.  So I don't know

10    why to answer your question.  That was your -- the rest of

11    your answer?

12    A.   That's correct.

13    Q.   Okay.  Last question.  Mr. Stull, you're aware, aren't

14    you, that title commitment policies do not insure for

15    fraudulent transfers?

16    A.   Yes.

17    Q.   No further questions.

18    A.   Any title policy that is issued, yes, covers the title.

19              MR. PULKRABEK:  No further questions.

20              THE COURT:  Actually, Mr. Stull, I would like to ask

21    you a few questions.

22              THE WITNESS:  Sure.

23              THE COURT:  And I want to confess at the beginning

24    that I'm not a banker.  I'm not an expert in these financial

25    transactions.  I'm just trying to understand what really was

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    471

1    going on here.

2              THE WITNESS:  Okay.

3              THE COURT:  I'm doing the best I can to get to the

4    bottom of it.  So my questions might seem a little naive, but

5    in the timeframe of 2015, '16, and '17, from the testimony

6    I've heard, Two Mile Ranch, a significant customer of your

7    bank, was struggling; is that correct?

8              THE WITNESS:  That is correct.

9              THE COURT:  And the bank was concerned about its

10   ability to recover on the loans they've made.

11             THE WITNESS:  That is correct.

12             THE COURT:  Of course, the bank had collateral, as

13   banks typically do.

14             THE WITNESS:  That's true.

15             THE COURT:  And so there were various options that

16   the bank potentially had to try to realize on its loans.

17             THE WITNESS:  Yes.

18             THE COURT:  One option would be to foreclose on the

19   collateral, yes?

20             THE WITNESS:  That's correct.

21             THE COURT:  But the bank did not do that with the

22   exception of the house that the mother was living in and a

23   minor asset or two.  But the bank didn't choose that option,

24   correct?

25             THE WITNESS:  Correct.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    472

1           THE COURT:  Another would be to take a deed in lieu

2      and sell off the assets.

3           THE WITNESS:  That's correct.

4           THE COURT:  But you testified about that, and the

5      auctioneer said you're not going to get as much that way as

6      you hope to get.

7           THE WITNESS:  That's correct.

8           THE COURT:  Now, another option would be to enter

9      into the picture a new investor.

10          THE WITNESS:  That's correct.

11          THE COURT:  And if, to pick a hypothetical company,

12     Amazon had wanted to acquire -- pay off the debt and acquire

13     the assets, that would have been delightful for the bank.

14          THE WITNESS:  Oh, absolutely.

15          THE COURT:  But Amazon and General Motors and other

16     companies like that weren't available, right?

17          THE WITNESS:  That's correct.

18          THE COURT:  So what happened was the decision was

19     made for this newly formed entity Lardyn to be the investor.

20          THE WITNESS:  That's correct.

21          THE COURT:  Now, another option the bank I suppose

22     could have had would be simply to extend the notes and roll

23     over the debt and keep the Paulings in place, right?

24          THE WITNESS:  That would have been correct.

25          THE COURT:  But, again, you didn't choose that

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      473

1   option.  You chose Lardyn.  Now, as you said in your

2   testimony, Mr. Stull, you knew very little about Lardyn or

3   Ms. York.

4          THE WITNESS:  That's correct.

5          THE COURT:  You didn't know anything about her, or

6   almost anything about her history, her work experience or

7   educational background, her business experience, any of that.

8          THE WITNESS:  That's correct.

9          THE COURT:  And as far as you knew, Ms. York had no

10  money.

11         THE WITNESS:  And that's -- that is correct.

12         THE COURT:  Which seems like an odd investor to stake

13  your bank's future on, doesn't it?

14         THE WITNESS:  Yes, it does.  But --

15         THE COURT:  Yes, it does.

16         THE WITNESS:  But with Mark Pauling continuing in the

17  operation, and he had knowledge of the operation, how it

18  worked and everything, that was a plus for us, and we felt

19  that that would be an option --

20         THE COURT:  Right.

21         THE WITNESS:  It was better than the option that we

22  had.

23         THE COURT:  It was the best among bad choices.

24         THE WITNESS:  Yes.  Because we could not continue

25  with Jon Pauling being part of this because he was toxic to

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      474

1    the operation.

2           THE COURT:  So what happened is to bring Lardyn into

3    the picture because it had no money, the bank provided the

4    money.

5           THE WITNESS:  The what?

6           THE COURT:  The bank provided the money.

7           THE WITNESS:  Yes.  Just as we did --

8           THE COURT:  In other words, your bank paid itself

9    off.

10          THE WITNESS:  Yes.

11          THE COURT:  Yes, it did.

12          THE WITNESS:  We had another --

13          THE COURT:  It paid the -- it paid the debts of Two

14   Mile Ranch by lending the money to Lardyn to do that.  Yes?

15          THE WITNESS:  Would you restate that, because I --

16          THE COURT:  Lardyn didn't have any money.  They

17   weren't Amazon.  Lardyn was just a name.

18          THE WITNESS:  That's correct.

19          THE COURT:  Lardyn was this nice young lady sitting

20   over here, Ms. York, but it had no ability to acquire Two Mile

21   Ranch.  It couldn't pay off the Two Mile Ranch debts.  It

22   didn't even have the ability to run the ranch operation.  But

23   you made it possible for Lardyn to enter the picture as the

24   investor by providing the money to Lardyn to do that, did you

25   not?

Sarah K. Mitchell, RPR, CRR

1      THE WITNESS:  Yes, we did.  We made a loan to Lardyn,

2  and Lardyn had four shareholders which were investors in the

3  company, a larger investor that would put a million dollars

4  into it, which they did not.

5      THE COURT:  You explained in your testimony in the

6  deposition that Mr. Pulkrabek just reminded you of as to why

7  you were willing to do that, because you testified, and I

8  quote, Lardyn Consulting is Mark Pauling and Jon Pauling,

9  closed quote.  That's why you did it.  Not because Ms. York

10  can run the business, but because the Paulings would be

11  running the business.

12      THE WITNESS:  Yes.  And that testimony -- I will not

13  disagree that that statement said Mark Pauling and Jon Pauling

14  are Lardyn.  And when I read that deposition, I evidently

15  missed that, or if there was a correction, it didn't get

16  corrected.  But at no time -- and that's my fault because I

17  should have looked at the deposition closer, but that was

18  entered into court.  So, no, Jon and Mark were not Lardyn.

19      THE COURT:  And, Mr. Stull, I have great respect for

20  you, sir.  You came up by the sweat on your back, and you

21  became a very successful man, businessman, and I respect that.

22  But the fact is that you in your own words, and your other

23  colleagues were saying things like we're working with Mark and

24  Jon to protect the proposed asset sale from the judgment of

25  Jon Pauling.  That was the purpose, wasn't it, of getting this

1  so-called unicorn investor into the picture?  It was to

2  protect against the judgment of Jon Pauling, and you also said

3  to get rid of Jon's judgment so the assets can be sold without

4  concern for legal recourse to the buyers.

5          THE WITNESS:  I did say that.

6          THE COURT:  Well, that's what happened, isn't it?

7          THE WITNESS:  Yes.  And that's -- that's exactly what

8  happened, and Two Mile Ranch was never part of the judgment.

9  Jon Pauling was part of -- he was the judgment, and --

10         THE COURT:  Yes, sir.  I understand that.

11         THE WITNESS:  This is where we were going, because

12  Jon Pauling had very little in any value left in Two Mile

13  Ranch General Partnership.  It lost money.  It was

14  unsuccessful in Two Mile Ranch Market, LLC.  JMP and the

15  ranching operation and everything else was deteriorating to

16  the point where the -- any -- anything left, and a lot of that

17  had to do from outside sources.  Real estate values were going

18  down.  Livestock prices were going down.  Commodity prices

19  were going down.  This had nothing to do with the lawsuit.

20  This had to do with Jon Pauling, so that affected not only Two

21  Mile Ranch General Partnership, but it affected a lot of other

22  customers too.

23         THE COURT:  So it seems to me that if Ms. York,

24  despite her intimate connection to Mr. Pauling, had stayed out

25  of this, that Lardyn had stayed out of this, that your bank

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      477

1   had stayed out of it, and Mr. Jon Pauling had been left to

2   sink or swim on his own, I suspect Ms. Wilson would have had a

3   heck of a time trying to collect five cents.

4           THE WITNESS:  Oh, I agree.

5           THE COURT:  But that isn't what happened.  What

6   happened is Lardyn did get involved, and your bank did make

7   that happen, and the Paulings have rose like Lazarus from the

8   dead.  Isn't that what happened behind the scenes?

9           THE WITNESS:  I wouldn't agree with that, but --

10          THE COURT:  Well --

11          THE WITNESS:  -- that's where we are.

12          THE COURT:  That's what it's looking like to me.  I'm

13  just being honest with you now.

14          THE WITNESS:  Yes.  Lardyn Consulting, they are a

15  customer of ours.  And so anyway...

16          THE COURT:  Those are my questions.  Now, would

17  anyone like to follow up on my questions?  Mr. Pulkrabek?

18          MR. PULKRABEK:  No, Your Honor.

19          THE COURT:  Ms. Oldemeyer?

20          MS. OLDEMEYER:  Your Honor, if I could have one

21  minute.  I'm looking at -- Mr. Pulkrabek, can you tell me the

22  page and line that you showed?

23          MR. PULKRABEK:  We were on pages 178 to 181.

24          MS. OLDEMEYER:  Thank you.

25          THE COURT:  You put it up in a different format in

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    478

1    front of the witness.  Can you put it back up in that same

2    format so Ms. Oldemeyer can see it?

3              MR. PULKRABEK:  It's still up.  The computer is not

4    connected -- or the screen is not connected to my computer.

5              THE COURTROOM DEPUTY:  I was connected to

6    Ms. Oldemeyer's.

7              THE COURT:  There you go.

8              MR. PULKRABEK:  Starting at 178, line 25.

9              MS. OLDEMEYER:  I'm just looking for the reference to

10   Jon and Mark.  Where is that?

11             THE COURT:  Lines 13 and 14.

12             THE WITNESS:  Yeah, 13 and 14.

13             MS. OLDEMEYER:  There's an errata sheet, Your Honor,

14   to the amendments to the deposition affecting page 180,

15   line 13.  So I don't know who has the original errata sheet.

16   I assume it went to Mr. Pulkrabek.  I don't have a copy of it.

17   I have it on the screen.  Maybe if -- Your Honor, may I

18   display it?

19             THE COURT:  Sure, you may display it.

20                        RECROSS EXAMINATION

21   BY MS. OLDEMEYER:

22   Q.  Mr. Stull, in the errata sheet to your deposition

23   transcripts that you signed, when you reviewed it, did you

24   make a change to page 108, line 13?

25   A.  I did.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      479

1   Q.  And it should read Lardyn Consulting isn't and the

2   reason not is?

3   A.  Correct.

4   Q.  And that's Lardyn Consulting isn't Jon and Mark?

5   A.  That is correct.

6           MS. OLDEMEYER:  No further questions.

7           THE COURT:  Mr. Keithley?

8           MR. KEITHLEY:  I have no further question with the

9   introduction of the errata sheet.  Thank you, Your Honor.

10          MR. FORBES:  Your Honor, I do have a few follow-up

11  questions.

12          THE COURT:  To my questions?

13          MR. FORBES:  Yes, to your questions.

14                    RECROSS EXAMINATION

15  BY MR. FORBES:

16  Q.  So, Mr. Stull, the judge, as part of the series of

17  questions he was posing to you, posed as one alternative

18  that General Motors or Amazon or somebody like that could

19  have appeared to buy assets, right?

20  A.  They could because it was open to anybody.

21  Q.  All right.  And he gave an example of those types of

22  well-funded companies?

23  A.  That's right.

24  Q.  And then he gave another example of somebody like -- not

25  somebody like -- of Lardyn, which didn't have anything,

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      480

 1    right?

 2    A.   That's correct.

 3    Q.   Now, in between Amazon and -- a company like Amazon that

 4    has billions of dollars of cash, or a well-established firm

 5    like GM that may not have as much as Amazon but certainly

 6    has a lot, and Lardyn that has nothing, I take it there are

 7    other potential groups of investors somewhere in that range

 8    between billions and zero?

 9    A.   Absolutely.

10    Q.   And were efforts made, to your knowledge, by Two Mile

11    Ranch to find one of those investors somewhere in that

12    middle range between billions and zero?

13    A.   I hope so.  And that was -- that was something that they

14    were looking for are investors and to get a group of investors

15    together.  It takes a lot of work, yes.

16    Q.   Is that something that Two Mile Ranch through Mark

17    Pauling and Jon Pauling told you they were trying to do?

18    A.   Absolutely.

19    Q.   All right.  And following up a little bit on this point,

20    I want to put up Exhibit 45.

21         THE COURTROOM DEPUTY:  We just tested it.

22         MR. FORBES:  Not to delay proceedings, might I ask

23    one of the defense counsel if they can display Exhibit 45?

24         MS. OLDEMEYER:  I've got it up.

25    Q.   (By MR. FORBES) Exhibit 45 we now have in front of us,

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021    481

1    and Exhibit 45 contains an e-mail that explains the

2    materials you were sending to possible participants in this

3    Lardyn Consulting group; is that correct?

4    A.  Yes, it is.

5    Q.  All right.  And we went through some of page 1 of the

6    e-mail earlier.  I'd like to go to page 2 of the e-mail.

7    And do you see at the top you state, This is not really the

8    way we want it to go, but Lardyn is at this point still

9    looking for permanent financing to take us all out, and

10   indications are that they do have a couple of lenders

11   interested, but we, Farmers State Bank, would have to carry

12   back some of the loan in a second position that would be

13   repaid by minerals, paren, oil, paren, income.  Are you with

14   me?

15   A.  Yes.

16   Q.  All right.  And what did you mean when you said this is

17   not really the way we want it to go?

18   A.  Well, let me -- would you roll it back to the first page?

19   Q.  Sure.

20   A.  I want to read it in its entirety before I answer.  Okay.

21   I think we were wishing for or hoping that there would be

22   somebody that would come in and buy the assets, and Two Mile

23   Ranch General Partnership would have been paid off in full at

24   Farmers State Bank, but this isn't the way it turned out.  So

25   not the best option, but ended up being the option that we

19-CV-01224-RBJ       Bench Trial - Day 3     04/14/2021    482

1    ended up doing.

2    Q.  And following up on another aspect of the judge's

3    questions, can you go back to page 1 of Exhibit Number 45?

4    And I want to direct your attention to the third paragraph

5    beginning at this point it looks like.

6    A.  Yes.

7    Q.  And if you could read that and familiarize yourself with

8    it.

9    A.  Okay.  At this point it looks --

10   Q.  You don't have to read it out loud.  I want to save the

11   reporter's fingers.

12          THE COURT:  It's too late for that.

13          MR. FORBES:  True, Your Honor.

14   A.  Okay.

15   Q.  (By MR. FORBES) Now, that paragraph refers to looking at

16   that point if there would be a deed in lieu of foreclosure

17   on the farm, the machinery, the mineral interests, and some

18   grassland in Weld County.  You see that?

19   A.  Correct.

20   Q.  Did that happen?

21   A.  Actually, I don't think the deed in lieu ever happened.

22   There was a sale directly to -- from Two Mile Ranch General

23   Partnership to Lardyn Consulting and --

24   Q.  And why did the bank not go the deed in lieu route as

25   opposed to financing the purchase from Lardyn?  Purchase by

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    483

1   Lardyn, excuse me.

2   A.  You know what, I don't remember the exact reason.

3   Q.  All right.

4   A.  The document -- it had to do with the title, I think,

5   saying it would be a clear title to go this way, a direct

6   loan, a direct purchase.

7   Q.  Speaking of clear title, do you know whether a creditor

8   of a partner in a partnership can have a lien against a

9   partnership's assets?

10  A.  I don't think so.

11          THE COURT:  How is that following up on my questions?

12          THE WITNESS:  That would be a technical question that

13  would have to be looked at close up.

14          MR. FORBES:  Your Honor, you were asking questions

15  about the resurrection of the Paulings and this being done to

16  wipe out liens on the property through the bankruptcy.

17          THE COURT:  Well, in any event, he said he couldn't

18  answer your question.

19  Q.  (By MR. FORBES) You said you didn't know whether that

20  was the case or not?

21  A.  Yes.

22  Q.  Okay.  All right.  This --

23          MR. FORBES:  Your Honor, you also referenced there

24  being minimal assets left in Two Mile Ranch as a premise for

25  one of your questions, and so my question is going to relate

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      484

1   to that.

2   Q.   (By MR. FORBES) Do you see again in that same paragraph

3   a reference to a $275,000 note from Mark Pauling to Two Mile

4   Ranch being assigned to the bank?

5   A.   I do see that.

6   Q.   Did that happen?

7   A.   I don't think so, because that was still part of the Two

8   Mile Ranch assets which didn't get sold, was Two Mile Ranch,

9   the Turkey Creek property, and so we have that as an asset,

10  and Mark's note didn't get sold to Lardyn, no.

11  Q.   Let me break that down, if I might.  So the $275,000

12  note from Mark Pauling, whatever it was worth or not worth,

13  that stayed in Two Mile Ranch?

14  A.   Yes, it did.

15  Q.   Okay.  Then there -- you said there was the Turkey Creek

16  property.  That stayed in Two Mile Ranch too?

17  A.   That's correct.

18  Q.   And that was the property in the Jefferson County

19  foothills?

20  A.   Yes.

21  Q.   All right.  And do you remember what the value of that

22  property was that stayed with Two Mile Ranch?

23  A.   Well, I think it was on the books.  We had an appraisal

24  and -- I'm guessing.

25  Q.   You shouldn't guess.  Okay.  I apologize for

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021    485

1    interrupting you.  If you're recalling what it was, you

2    should tell us, but if you're just guessing --

3    A.   Yes, I'm guessing.

4    Q.   Okay.

5    A.   Not true value.  But it was substantially less than what

6    the debt was.

7    Q.   Okay.  But whatever -- so you can't testify to the

8    value, but that property did stay in Two Mile Ranch; is that

9    correct?

10   A.   That is correct.

11   Q.   The judge also as part of the premise for one of his

12   questions I believe asked something to the effect of here

13   you have a situation where it would be impossible for Lardyn

14   to pay off the debt it was taking on from the bank -- or

15   excuse me -- the debt that it was incurring with the bank.

16   At the time of the transaction, did the bank believe it was

17   impossible for Lardyn to pay off that debt through

18   operations, or what was its view about that?

19   A.   Well, with the proposed cash flow, it looked like Lardyn

20   had a real good chance of making this operation successful by

21   not servicing as much debt, chained in an operation, and so

22   the Lardyn Consulting operation was different than the Two

23   Mile Ranch General Partnership.

24   Q.   And can you explain the difference?

25   A.   Well, the Logan County farm had a feedyard on it that was

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    486

1   used for the livestock Two Mile Ranch used to own with their

2   registered cattle, and this property was -- it looked as

3   though it would be better if it could be converted to a

4   commercial feedyard, and it would be more profitable.  And so

5   that was a change in the operation.  The crops that were being

6   grown on it, that was going to change from hay to corn which

7   would be utilized as dry corn or corn silage.  And if it could

8   be marketed through, that would be -- there's more value to

9   that.

10  Q.  And another thing the judge quite correctly pointed out

11  is that on her own Ms. York would not have been able to run

12  a feedyard back in April of 2017.  Did the bank share that

13  view?  That on her own she couldn't have run --

14  A.  On her own -- I don't think she would have been able to do

15  that on her own.  Mark Pauling was part of Lardyn, and with

16  his knowledge and with the two of them working together, we

17  thought it was a -- they had a very good chance of making the

18  operation successful.

19  Q.  All right.

20         MR. FORBES:  Those are all the follow-up questions I

21  have, Your Honor.  Thank you.

22         THE COURT:  All right then.  Thank you, sir.

23         THE WITNESS:  Thank you.

24         THE COURT:  Good luck to you.  Stay healthy, stay

25  safe.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021    487

1                THE WITNESS:  You too.  You too.

2                THE COURT:  I would like a copy of that excerpt from

3    Exhibit 50 that we've been talking about.

4                MR. PULKRABEK:  Exhibit 50 being the --

5                THE COURT:  What you put up on the screen that had

6    the comment that was corrected with the errata sheet.  I want

7    to see the context in which that testimony was given so I can

8    evaluate the errata sheet change.

9                MR. PULKRABEK:  You would like to see the deposition

10   transcript from page 179 through 181, I believe.

11               THE COURT:  Yes, sir, I would.

12               MR. PULKRABEK:  And, Your Honor, I do -- I apologize

13   I didn't notice the errata sheet in my electronic files before

14   I put that up.

15               THE COURT:  Well, errata sheets are not usually used

16   to change the subjects of testimony.  That's improper.

17               All right.  Next witness.

18               MR. PULKRABEK:  Plaintiff calls Steve Stull, Your

19   Honor.

20               THE COURT:  Okay.

21               MS. OLDEMEYER:  Your Honor, Mr. Dick Stull is here,

22   and I apologize.  I have a request that -- I do not intend to

23   call him as a witness again.  I don't know if Mr. Pulkrabek

24   does.  He's here from Bridgeport.  Does he need to remain?

25   And if he needs to remain --

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 3     04/14/2021     488

1            THE COURT:  No, he's excused and free to go.

2            MS. OLDEMEYER:  May he listen in to the trial?

3            THE COURT:  Under our protocol he is not supposed to

4    be able to listen sitting there, but I'll make an exception

5    for Mr. Stull.

6            MS. OLDEMEYER:  Thank you.

7            THE COURT:  The other Mr. Stull.

8                          STEPHEN STULL

9    was called as a witness and, having been duly sworn, was

10   examined and testified as follows:

11           THE COURT:  Have a seat.

12           By the way, Mr. Stull out in the back, have you had

13   your vaccination shots?

14           MR. STULL:  I have.

15           THE COURT:  All right.  Thank you, sir.  I'm glad you

16   have.

17           Go ahead.

18           MR. PULKRABEK:  Thank you, Your Honor.

19                        DIRECT EXAMINATION

20   BY MR. PULKRABEK:

21   Q.  Mr. Stull, I'm going to start with some background

22   questions.  We've heard that you're the president and CEO of

23   Farmers State Bank?

24   A.  Correct.

25   Q.  And you started at Farmers State Bank on November 11th,

                       Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ         Bench Trial - Day 3      04/14/2021    489

1    2011?

2    A.   Correct.

3    Q.   The same day that the holding company acquired Farmers

4    State Bank?

5    A.   True.

6    Q.   You're part of the shareholder group in Farmers State

7    Bank Shares that organized the acquisition of the bank?

8    A.   That is correct.

9    Q.   Your own business relationship with Jon Pauling started

10   shortly after January 1st, 2000?

11   A.   That is correct.

12   Q.   At that time you were working for First State Bank?

13   A.   Correct.  In Kimball, Nebraska.

14   Q.   Which later became FirsTier Bank?

15   A.   Compass, then FirsTier, but yes.

16   Q.   And Two Mile Ranch was an existing customer of First

17   State Bank?

18   A.   That's correct.

19   Q.   So shortly after Y2K, after the turn of the new year in

20   2000, you were assigned to Two Mile Ranch's account?

21   A.   That's correct.

22   Q.   And you were the bank officer essentially responsible

23   for that account?

24   A.   I was the one that dealt with them directly, but loan

25   committee made decisions.  I didn't have much decision-making

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    490

1   ability at that time.

2   Q.  Okay.  And that's -- that's how you got to know Jon

3   Pauling, correct?

4   A.  That's correct.

5   Q.  And then over the years at that bank you worked with Jon

6   Pauling as the representative, the primary representative of

7   Two Mile Ranch?

8   A.  For about six years, and then I got out of the lending at

9   FirsTier and became compliance and the CFO of the bank.

10  Q.  Now, Jon Pauling was your primary contact?

11  A.  Correct.

12  Q.  And so if you needed information, you would go to Jon

13  Pauling to get that?

14  A.  Correct.

15  Q.  Now, I want to move forward to Elyce York.  The first

16  time you heard of Elyce York was when Jon Pauling and Elyce

17  York had applied for a loan to purchase the North Turkey

18  Creek property?

19  A.  I believe so, yes.

20  Q.  And they were applying to buy that property under JMP

21  and Elyce York?

22  A.  I don't recall exactly how they did it, but I don't doubt

23  what you're saying.

24  Q.  And Mr. Pauling -- Jon Pauling contacted you about the

25  application for financing to purchase that property?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      491

1    A.  Correct.

2    Q.  And because you saw that Jon Pauling was applying to

3    purchase that property with Elyce York, you asked who Elyce

4    York was?

5    A.  Correct.

6    Q.  And then you later met Elyce York in person?

7    A.  At some point in time.  I don't remember when.

8    Q.  Now, the first time -- I want to focus in on this.  The

9    first time you met Elyce York she was with Jon Pauling and

10   Mark Pauling?

11   A.  I believe that's correct, yes.

12   Q.  And that meeting was sometime before the purchase of the

13   North Turkey Creek property?

14   A.  Yes.

15   Q.  So yesterday we heard from Mark Pauling that he did not

16   meet Elyce York until sometime after I took his deposition

17   in November of 2016.  You remember meeting with Elyce York,

18   Jon Pauling, and Mark Pauling before the Turkey Creek

19   property was purchased?

20   A.  I believe so.  But, again, this is a long time ago, and I

21   did testify to that, but if he remembers it differently, I

22   wouldn't say that he was wrong.

23   Q.  And so you -- what you remember was that at some point

24   before the acquisition of the North Turkey Creek property

25   there was a meeting with you, Mark Pauling, and Jon Pauling

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021     492

1    and Elyce York all in the same room?

2    A.   I don't know that we were all in the same room.  I think

3    what I recall was they came together at the same time, but,

4    again, that was a long time ago.  But that's probably what I

5    said.  That's what I recalled at the time.

6    Q.   And the subject of that meeting had to do with the

7    Turkey Creek property?

8    A.   Correct.

9    Q.   Okay.  And, of course, we know that the Turkey Creek

10   property was purchased in May of 2015?

11   A.   I'll take your word for it, yes.

12   Q.   All right.  In the April 2015, May 2015 timeframe Jon

13   Pauling made some representations to you about the equity in

14   Two Mile Ranch, correct?

15   A.   I don't understand your question.

16   Q.   Jon Pauling sent you information in which he made

17   representations about the amount of equity in Two Mile Ranch

18   in April 2015?

19   A.   True.

20   Q.   And I'd like to -- I'd like to go ahead and look at what

21   he represented to you was the equity in Two Mile Ranch at

22   that point in time.  I'm going to direct your attention to

23   Exhibit 14, which is stipulated, Your Honor.

24           THE COURT:  You want it admitted, I take it?

25           MR. PULKRABEK:  Yes, I do want that admitted.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    493

1              THE COURT:  All right.

2         (Plaintiff's Exhibit 14 received.)

3   Q.   (By MR. PULKRABEK) So here we have Mr. Jon Pauling

4   writing to you under Joe Henry.  He's also copied your

5   father, and the date is April 29th, 2015.  Do you see that?

6   A.   Yes.

7   Q.   And just -- that's about five to six months prior to

8   when we know Jon Pauling goes to trial against Amanda

9   Wilson?

10  A.   Well, I wouldn't have known that, but...

11  Q.   Now, what Mr. Pauling wrote to you at that time was,

12  Stephen and Dick, my personal cash flow and balance sheet

13  and cash flow schedules for both cash flows.  You see that?

14  A.   Yes.

15  Q.   Then he also offers, Cash remaining on both cash flows

16  will be used for payments and farm operation.  Thanks, Jon

17  Pauling.

18  A.   Correct.

19  Q.   All right.  I want to focus on the second page of this

20  exhibit for a moment.  Mr. Pauling provided you with the

21  cash flow schedule income -- or I'm sorry -- cash flow

22  schedule info.  Do you see that?

23  A.   Yes.

24  Q.   And one of the things that he put on here had to do with

25  the oil royalties.  Do you see that?

                              Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    494

1    A.  I do.

2    Q.  So Jon Pauling informed you oil royalties, my interest

3    in SEC 18T10N -- that's a legal description of a mineral

4    interest, correct?

5    A.  Right.

6    Q.  Then he says, Mark sold -- it says is half interest, but

7    I think meant to say his half interest.  Do you see that?

8    A.  Yes.

9    Q.  Okay.  So what Jon Pauling was telling you was he's --

10   he's going to provide you a summary of his remaining half

11   interest in the oil royalties.  Do you see that?

12   A.  I don't see that.

13   Q.  We'll look down the page a little further, but one thing

14   that Mr. Pauling was communicating to you at that time as

15   between Mark Pauling and Jon Pauling, at least in their

16   conception of things, Mark had sold his half interest in

17   these oil royalties?

18   A.  Correct.  That's what it says here.

19   Q.  All right.  So then if we go further down, Jon Pauling

20   has provided a spreadsheet.  Again, Jon Pauling was the

21   financial partner in Two Mile Ranch to the best of your

22   awareness?

23   A.  Correct.

24   Q.  And so Jon Pauling would provide you -- and he provided

25   you for many, many years with financial spreadsheets and

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      495

1    reports and documents on the ranch's operation?

2    A.   True.

3    Q.   He was experienced in doing that?

4    A.   True.

5    Q.   So here we have the Jon Pauling cash flow, 6/1/15 to

6    5/31/2016.  Do you see that?

7    A.   Yes.

8    Q.   Now, we've already seen that the date on this e-mail is

9    April 29th of 2015, so this is a pro forma spreadsheet?

10   A.   Correct.  At this point in time they didn't do any

11   feeding.

12   Q.   Now, at least what Jon Pauling was projecting in April

13   of 2015 forward looking into the following year was that he

14   would have profit.  Do you see that?  If we go over we can

15   see he's projecting $159,000 of profit over the following

16   year?

17   A.   Correct.

18   Q.   So there's been some testimony that Jon Pauling was

19   really doing nothing, but at least on this spreadsheet he is

20   projecting that he is going to have profits over the

21   forthcoming year?

22   A.   Correct.

23   Q.   One small point of note while we're on the spreadsheet

24   is he did list some oil royalties expected for this coming

25   year.  Do you see that?

                              Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021       496

1   A.   Yes.

2   Q.   And the amount of the oil royalties that he was

3   projecting was -- were on the order of about $1,500 per

4   month between June of '15 and June of '16, correct?

5   A.   Correct.

6   Q.   And that's before the 24 new oil wells were put in and

7   turned on, right?

8   A.   Yeah, I don't know -- I don't recall what date they did

9   that for sure, but...

10   Q.   Okay.  Let's go down a little further.  The next --

11   A.   That didn't happen until 2017, and you're talking way back

12   to '15.  There's no way for me to know that at that point in

13   time.

14   Q.   Jon Pauling provided the balance sheet titled Jon

15   Pauling, May 15th.  Do you see that?

16   A.   Yes.

17   Q.   And we can see that Jon Pauling is relatively cash poor,

18   correct?

19   A.   Correct.

20   Q.   But Jon Pauling's wealth as reported on here in Two Mile

21   Ranch is substantial?

22   A.   In 2015 that would probably be true.

23   Q.   All right.  So cash poor, but land rich?

24   A.   Asset rich in long-term assets.

25   Q.   That's not terribly uncommon of farmers and ranchers, is

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    497

1    it?

2    A.   No.

3    Q.   Their wealth is not in a bank account.  Their wealth is

4    tied up in the land and the agricultural operation and the

5    other assets?

6    A.   Correct.

7    Q.   And so if we go down to the next page, this is kind of a

8    strangely split-up page, but we can see he has a line for

9    total equity here.  Do you see that?

10   A.   Yes.

11   Q.   And so on the next page we can see total equity on his

12   balance sheet is reported at $3,522,313, correct?

13   A.   Correct.

14   Q.   That is Jon Pauling's statement to the bank of what his

15   wealth is as of May of 2015?

16   A.   That is correct.

17   Q.   There also is a balance sheet for Two Mile Ranch,

18   May 2015.  Do you see that?

19   A.   Yes.

20   Q.   And one of the representations that Jon Pauling makes on

21   this balance sheet has to do with the mineral value here

22   listed at 5,100,000?

23   A.   Okay.  What's the date again?

24   Q.   Two Mile Ranch, May 2015, correct?

25   A.   That's correct.  I just want to make sure the dates are

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021     498

1   right, because you tend to skip around on the dates, so I want

2   to make sure I'm staying within the same time period.

3   Q.  Jon Pauling also has a line item for the farm/feedlot.

4   Do you see that?

5   A.  Correct.

6   Q.  Now, there's been some discussion about how it wasn't

7   really a feedlot until Elyce York got ahold of it, but here

8   on this balance sheet in 2015 it is described as farm slash

9   feedlot.  Do you see that?

10   A.  Yes, I see that.

11   Q.  And the value of it is 4,500,000?

12   A.  Correct.

13   Q.  And then total equity provided by Jon Pauling on this

14   balance sheet for Two Mile Ranch is listed as $6,064,625?

15   A.  That's what it says.

16   Q.  All right.  We're done with that exhibit for the time

17   being.  Let me ask you some questions now about when you

18   learned about the judgment against Jon Pauling.

19   A.  Okay.

20   Q.  So you figured out the -- you learned of the judgment,

21   and you figured out the amount of the judgment against Jon

22   Pauling sometime in early 2016.  Do I have that right?

23   A.  It was after the public announcement, sometime in that

24   timeframe.  I'm not sure the exact date, but sometime in that

25   timeframe.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    499

1   Q.  And you were concerned about how the judgment would

2   affect the bank?

3   A.  Correct.

4   Q.  You talked to Jon Pauling about it?

5   A.  Yeah.

6   Q.  And Jon Pauling told you he did not agree with the

7   judgment?

8   A.  Well, of course he didn't.

9   Q.  He was not happy with the jury's decision?

10  A.  That would be true.

11  Q.  He was angry about it?

12  A.  I don't know that he was angry, but I wouldn't doubt it.

13  He didn't show me any anger because we were probably by phone.

14  Q.  He didn't show you any anger?

15  A.  Well, we would have been on the phone.

16  Q.  Let me -- let me just refer you -- small point -- to the

17  testimony that you gave in your deposition.  I asked you, He

18  was angry about it, and you said, Sure.

19  A.  Okay.

20  Q.  Now, in March of 2016, Jon Pauling asked you to write a

21  letter for him, right?

22  A.  Say that again.

23  Q.  Jon Pauling asked you to write a letter in March of

24  2016?

25  A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    500

1   Q.  He asked you to write a letter to Judge Buchanan?

2   A.  Yes.

3   Q.  And he wanted you to inform Judge Buchanan that Farmers

4   State Bank had security interests and UCC filings on Jon

5   Pauling, Two Mile Ranch, and JMP Enterprises?

6   A.  I recall that.

7   Q.  So by at least March of 2016, you are in communication

8   with Jon Pauling about how the bank's UCC filings and liens

9   may be used to block collection of the judgment?

10  A.  Well, that was not the purpose -- my understanding of the

11  purpose, but he was asking us to provide it so he can show

12  whoever he wanted to show.  That's all he is doing is asking

13  for copies.  I mean, wanting us to forward them to him, but I

14  don't know what his purpose for them was.

15  Q.  I want to jump forward now to the loan that was made to

16  Elyce York in July of 2017.

17  A.  Okay.

18  Q.  Loan to Lardyn and Elyce York.

19  A.  Okay.

20  Q.  Now, previously we saw the chronology.  Jon Pauling on

21  July 20th sends an e-mail to your father in which he lays

22  out specific terms for a loan, and he says this could be

23  made to the borrower Elyce York, or if you prefer, Lardyn

24  Consulting.  Do you recall that?

25  A.  No.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        501

1   Q.  We will not spend much time on it, but we can go ahead

2   and take a quick look at it if it will help facilitate your

3   testimony.  So this is the e-mail that is sent under the Joe

4   Henry e-mail address, July 20th, 2016, to Richard Stull in

5   which the loan is -- the loan terms are presented.  Do you

6   see that?

7   A.  I see that.

8   Q.  Then do you recall that Elyce York the following day,

9   July 21st, submits a personal balance sheet in support of

10  the loan application?

11  A.  Correct.

12  Q.  So July 20th, July 21st.  All right.  And then you on

13  July 26th communicate with Elyce York about this loan

14  request, correct?

15  A.  I don't recall doing it, but I don't doubt you.

16  Q.  All right.  Let's take a look, and we can focus on it.

17  Exhibit 27, which is stipulated, Your Honor.

18          THE COURT:  Okay.  Admitted.

19      (Plaintiff's Exhibit 27 received.)

20  A.  Okay.

21  Q.  (By MR. PULKRABEK) Exhibit 27 is an e-mail that you sent

22  to Elyce York, and you sent it on July 26th, 2016.  You

23  copied your father.  Subject, 2015 bank statements.  Do you

24  see that?

25  A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    502

1    Q.  And so it starts off with an e-mail from Elyce York on a

2    different e-mail account.  It's actually Lardyn.com.  You

3    see that?

4    A.  Yes.

5    Q.  Okay.  She sends bank statements to you, and she says,

6    When do you anticipate a decision on my application?

7    Correct?

8    A.  Yeah.

9    Q.  All right.  And then your response is, Elyce, we will

10   figure out a way to get the loan approved, but as part of a

11   normal loan request we have certain requirements that need

12   to be fulfilled.  Do you see that?

13   A.  Yes.

14   Q.  You -- one of the requirements is, one, we need a

15   borrower or a borrower with a guarantor who has a credit

16   score of 650 or above without any derogatory accounts.  We

17   are still trying to fulfill that requirement.  Do you see

18   that?

19   A.  Correct.

20   Q.  So Ms. York did not meet the normal requirements for

21   being a borrower?

22   A.  Correct.

23   Q.  And one of the reasons why she didn't meet the normal

24   requirements was her credit score wasn't 650 or above

25   without derogatory accounts?

                              Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021     503

1    A.  That would be correct.  I assume.  I don't recall what it

2    was at the time.  But if we're writing this, that would be the

3    assumption.

4    Q.  All right.  The other requirement is that you needed to

5    see income that would service the debt?

6    A.  Correct.

7    Q.  And she wasn't able to demonstrate that?

8    A.  Okay.

9    Q.  Is that true, she was not able to demonstrate?

10   A.  I don't recall if she could or not.  From this piece of

11   paper, I can't remember.

12   Q.  Now, I want to go to this next paragraph here that says,

13   Just like Jon, we have -- just like Jon, we have to make

14   sure we cross our Ts and dot our I's and do everything just

15   like we normally would, especially with this request.  Do

16   you see that?

17   A.  Yeah.

18   Q.  So let's focus in on this a little bit.  First of all,

19   just like Jon.  What did you mean by that?  Did you mean

20   just like Jon because Jon had a judgment against him and he

21   had to be careful about crossing his Ts and dotting his I's?

22   Is that what you meant?

23   A.  I don't recall what I meant at the time, but we have to

24   make sure, and it probably had to do with knowing about the

25   judgment at the time and that, you know, we as the bank needed

                         Sarah K. Mitchell, RPR, CRR

1   to do our part to make sure we did things correctly.

2   Q.   Okay.  But you're drawing this analogy between the bank

3   and just like Jon.  So what was in -- can you remember what

4   was in your mind when you said just like -- we need to be

5   just like Jon?  What did you mean by that?

6   A.   We need to follow rules just like we would follow with

7   Jon.  I mean, it's not a big -- not a big deal.

8   Q.   Okay.  And then you go on and say like we normally

9   would, especially with this request.

10  A.   Yeah.

11  Q.   Why did you add especially with this request?  What was

12  it about that request that was special?

13  A.   Because he didn't meet the requirements of a normal

14  borrower, so we needed to make sure that we documented it

15  well.

16  Q.   Well, so, Mr. Stull, I think what you're saying covers

17  the and do everything like we normally would.  You have

18  certain loan requirements that you must formally follow and

19  you do everything that you normally would, but I'm focused

20  on especially with this request.  Can you explain that?

21  A.   It was general knowledge that Jon had a judgment.  Our

22  concern was that somebody would come out of the blue and try

23  to attach a judgment to our collateral at the time.  That was

24  our concern.

25  Q.   Wait, come out of the what?

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      505

1   A.  Our concern was that somebody was going to try to get in

2   front of our lien position at the time.  We didn't want to be

3   -- our legal position we didn't want changed.  You know, we

4   didn't want somebody to be in front of our -- our legal

5   position.

6   Q.  Okay.  I thought I heard you say you were concerned that

7   someone could come out of the loo.  Is that what you said?

8   A.  I don't think so.

9   Q.  I might have misheard.

10          THE COURT:  He said the blue.

11          MR. PULKRABEK:  The loop?

12          THE COURT:  Blue.

13          MR. PULKRABEK:  I misheard.  Got it.  I got it now.

14  I misheard.

15  Q.  (By MR. PULKRABEK) Then further on down here you say,

16  Again, we will figure out how to get this accomplished.

17  You're going to figure out how to get it done, right?

18  A.  That's standard for a community bank.  We try to figure

19  out how to get things accomplished.

20  Q.  But since your request is not fitting our normal

21  underwriting standards, we need to jump through some hoops

22  by satisfying the six items above, and you had listed the

23  number of items?

24  A.  Right.  I already talked about how it didn't fit a normal

25  underwriting.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      506

1   Q.  Then you say, I know this is way more difficult than it

2   should be.  If it's just your normal underwriting standards,

3   why is this way more difficult than it should be?

4   A.  I'm just telling her the process is more difficult than if

5   she would have qualified.

6   Q.  All right.  And then lastly -- this last sentence you

7   say, Let me know if any of these items are not attainable so

8   we can find a different avenue to satisfy our underwriting

9   requirements.  Do you see that?

10  A.  Correct.  And then we do that with every customer at the

11  bank.  We're going to try to find a way to get this

12  accomplished.  That's the way we do business.

13  Q.  One way or the other you were going to figure out a way

14  to --

15  A.  If possible.  If possible.

16  Q.  Now, the bank did proceed to make the loan in July of

17  2017?

18          THE COURT:  Just a minute.  If you're finished with

19  that document, Sarah, would this be a good time for a break?

20          THE COURT REPORTER:  Yes.

21          MR. PULKRABEK:  Certainly.

22          THE COURT:  Let's take a recess here.  10,

23  15 minutes.

24          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

25      (Break was taken from 10:38 a.m. to 10:57 a.m.)

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      507

1          THE COURT:  All right.

2          MR. PULKRABEK:  Thank you, Your Honor.

3   Q.  (By MR. PULKRABEK) So, Mr. Stull, we were talking about

4   the loan to Elyce York slash Lardyn in July 2016, and we

5   looked at the language that you used in communicating with

6   Ms. York, including finding different avenues, apologizing

7   for how difficult it was, figuring out how to get it

8   accomplished.  You were being very solicitous to Elyce York

9   because the bank and Jon Pauling had a problem that needed

10  to be solved, and she was part of the solution.  Isn't that

11  what it was?

12  A.  Not at all.

13  Q.  The loan did get made in July of 2016?

14  A.  Correct.

15  Q.  You personally signed the loan documents for the bank?

16  A.  I don't know if I did with that loan.  I do at times.  I

17  don't know if I did with that one.

18  Q.  Do you recall back at that point in time if you did or

19  didn't?

20  A.  I don't recall.  I don't doubt that I did, but I don't

21  recall.

22  Q.  Would it help you to see the loan documents to refresh

23  your memory on that?

24  A.  Sure, if that's necessary.

25  Q.  Let's just look at this purely to refresh your memory.

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    508

 1   I'll give you a moment to look this over.

 2   A.  Yes.

 3   Q.  That helps your memory on that point?  Why don't you

 4   just take a moment to look at some of this other information

 5   here.

 6             MS. OLDEMEYER:  Your Honor, we have no objection to

 7   Exhibit 162.

 8             MR. PULKRABEK:  I'm just trying to reduce the

 9   paperwork.  If he can testify from memory, I'm fine not

10   offering it.

11             THE COURT:  As I said to Mr. Forbes, it's too late

12   for that.  Ms. Oldemeyer took care of that, if you didn't.

13             MR. PULKRABEK:  All right.  I don't have an objection

14   to it coming in.

15             THE COURT:  Well, she wants it, so I'll admit it.

16       (Plaintiff's Exhibit 162 received.)

17   Q.  (By MR. PULKRABEK) So we'll just walk through this

18   exhibit.  You can confirm for us that's your signature, you

19   signed the loan paperwork, correct?

20   A.  Correct.

21   Q.  And in terms of the date on the loan, it's July 28,

22   2016, correct?

23   A.  That's what it says, yes.

24   Q.  That's two days after your e-mail that we saw just a

25   moment ago with Ms. York?

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        509

1   A.   Okay.

2   Q.   And the loan amount is $45,000, which is the same amount

3   that Jon Pauling had requested back on July 20th?

4   A.   I don't remember the July 20th, but, yeah, I'll accept

5   your statement.

6   Q.   All right.  And the loan was made to borrowers Elyce

7   Marie York and Lardyn Consulting, LLC?

8   A.   Correct.

9   Q.   Lardyn Consulting, LLC did not exist as a legal entity

10  yet at that point in time?

11  A.   Yeah, I believe they were filing.

12  Q.   And the bank -- previously we looked at Elyce York's

13  loan application.  Let me just refer back to that here as

14  Exhibit 26.  We saw that Elyce York had listed the address

15  for her personally as 206 North 117th Avenue, Omaha.  Do you

16  see that?

17  A.   Yes.

18  Q.   Similarly, for the Lardyn Consulting address, same

19  address.  Do you see that?

20  A.   Yes.

21  Q.   But by the time the bank made the loan, it knew that the

22  real address was the North Turkey Creek address?

23  A.   No.

24  Q.   Well, the bank put on the promissory note Elyce Marie

25  York and Lardyn Consulting, LLC, 22434 North Turkey Creek

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    510

1   Road, Morrison, Colorado, correct?

2   A.   That looks to be true.

3   Q.   And you signed the promissory note for the bank, and

4   Elyce York signed it for Lardyn and herself individually?

5   A.   Okay.

6   Q.   Thereafter, when the bank did a debt modification --

7   debt modification agreement, it used that same Turkey Creek

8   address for Ms. York?

9   A.   Yes.  I believe the 22434 North Turkey Creek was assigned

10  to the Lardyn Consulting portion of it, and so we were using

11  that address.

12  Q.   Now, this is, of course, the same property that you knew

13  Jon Pauling had bought through Two Mile Ranch?

14  A.   Again, what time frame is this?  This is in '16.  Yes,

15  that's true.

16  Q.   The same real property where your father testified

17  yesterday he understood Jon Pauling to be residing?

18  A.   I don't recall that being testified to, but -- I don't

19  doubt you, but I don't recall that.

20  Q.   Okay.

21           MR. PULKRABEK:   I believe Exhibit 44 already has been

22  admitted, if I'm recalling correctly.

23           MS. OLDEMEYER:   I apologize, what number?

24           MR. PULKRABEK:   44.

25           MS. OLDEMEYER:   Yes, that has been.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 3      04/14/2021     511

1   Q.   (By MR. PULKRABEK) So I'm going to ask you some

2   questions about Exhibit 44.

3   A.   Okay.

4   Q.   Exhibit 44, that first page is the old form of the

5   bank's loan presentation memo, correct?

6   A.   That's correct.

7   Q.   And the date on this is March 22nd, 2017.  Officers are

8   you and your father, right?

9   A.   That's what it says.

10  Q.   Borrower is Lardyn Consulting?

11  A.   That's what it says, yes.

12  Q.   This is for the loan of $7.1 million?

13  A.   Correct.

14  Q.   And under collateral analysis we have the values that

15  are plugged in here for grain and feed, machinery and

16  equipment, North Sterling Irrigation District, minerals, and

17  ag real estate.  Do you see those?

18  A.   Yes.

19  Q.   I want to focus on just a couple of these.  For the

20  North Sterling Irrigation District, that's the water rights?

21  A.   This was the -- if you recall Mark's testimony yesterday,

22  these would have been the special or extra rights that were

23  done, not the ones that go with the farm that are for the

24  farm, meaning this was the special contract that they

25  supposedly had.

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    512

 1   Q.  And the valuation on the bank's memo was $280,745?

 2   A.  Correct.  And that was under the understanding that they

 3   were going to get $40,000 a year over a certain amount of

 4   time.  Then we did a net present value of that contract, and

 5   later prior to doing the loan found out that it's not a

 6   guaranteed contract, and North Sterling Irrigation would not

 7   allow us to perfect the collateral.

 8   Q.  Okay.  And let me just separate out that final point

 9   that you made.  The North Sterling Irrigation District would

10   not permit the bank to collateralize that asset?

11   A.  Correct.

12   Q.  But it doesn't mean that the asset had no value?

13   A.  Well, when the guaranty that we thought was there -- it

14   was supposed to happen every year, and when we found out

15   that's not the case, only if Whiting chooses to use it that

16   year, I don't know what value to put on it because, you know,

17   are they going to use it every year or not, and what happened

18   was they did not.

19   Q.  My only point, Mr. Stull, you would agree that an asset

20   that can't be collateralized by the bank for whatever reason

21   doesn't mean that the asset itself doesn't have value.

22   That's the question I'm asking.

23   A.  That's true.

24   Q.  Okay.

25   A.  It just doesn't mean anything to the bank.

                           Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    513

1   Q.  The minerals listed here on this form are $3.4 million?

2   A.  Correct.

3   Q.  The net margin on this form is $1,635,745?

4   A.  That's correct.

5   Q.  And if we go down in this document, here we have the

6   newer form of the Farmers State Bank of Dodge credit review,

7   correct?

8   A.  Correct.  And I would say that these things didn't work

9   right, but -- and that's why we went back to --

10       THE COURT:  Mr. Stull, I've been noticing that every

11  time he asks a question you answer the question, and then you

12  make a speech as if you're trying to explain, you're trying to

13  correct, you're trying to communicate something.

14       THE WITNESS:  Okay.

15       THE COURT:  You would be much better off, sir, if you

16  would just answer his questions and do so truthfully and

17  completely.  If you do that, you'll be fine.

18       THE WITNESS:  Okay.

19       THE COURT:  But you're coming across as dodging,

20  feinting, and embellishing.

21       THE WITNESS:  Thank you.

22  Q.  (By MR. PULKRABEK) Also on this form we see the net

23  margin.  The amount on this is $1,635,989.  Do you see that?

24  A.  Yes.

25  Q.  That's an immaterial difference from the page that we

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 3       04/14/2021     514

1   saw earlier?

2   A.  Correct.

3   Q.  And then here we see a handwritten note approved

4   April 7th, 2017, special meeting 8-0, correct?

5   A.  Correct.

6   Q.  What that refers to is that the loan proposal that is

7   reflected here to Lardyn for $7.1 million was taken to the

8   loan committee on April 7th, 2017, and a special meeting of

9   the loan committee where it was approved unanimously?

10  A.  Correct.

11  Q.  We don't need to go into this in any great detail, but

12  we saw yesterday a form that was provided to Henderson Bank

13  and First Central Bank that had a discussion.  Do you recall

14  that?

15  A.  Yes.

16  Q.  You're the author of this discussion or a substantial

17  portion of this?

18  A.  Part of it, yes.

19  Q.  And I highlighted here the portions that talk about how

20  the valuation of the land at $4.27 million was before the

21  new water lease was negotiated by North Sterling Irrigation

22  District?

23  A.  Correct.

24  Q.  So there had been some additional developments since the

25  appraisal?

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3     04/14/2021     515

1   A.  Correct.

2   Q.  Also, there is discussion here of the mineral interests

3   in Weld County with the two wells under production and the

4   other 24 that have been drilled with a production valuation

5   of $2,301,120.  Do you see that?

6   A.  I do.

7   Q.  Again, that derives from Steve Brown's appraisal that we

8   looked at yesterday?

9   A.  Correct.

10  Q.  Plus 1,100 acres of additional mineral interest valued

11  at $1,000 per acre at 1.1 million.  Do you see that?

12  A.  Yes.

13  Q.  Now, it goes on to note higher valuations for some prior

14  sales that took place in 2015 and 2013 and the same

15  locations.  Do you see that?

16  A.  Yes.

17  Q.  So if, for instance, the 1,000 mineral -- or I'm sorry

18  -- the 1,100 mineral acres had been valued at 2,000 per,

19  that would be a $2.2 million valuation for the minerals?

20  A.  If they were, yes.

21  Q.  If they had been valued at $5,000 per acre, that would

22  have been $5.5 million?

23  A.  Yes.

24  Q.  There were prior sales that would have supported a

25  valuation in that range?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021    516

 1    A.  Not at that time.

 2    Q.  But you used $1,000 per acre, and that was conservative?

 3    A.  That was based off of a purchase agreement that was made

 4    by Wolf Resources, and they made the offer to sell, and then

 5    they went to their bank and was rejected I believe is what

 6    that was based off of.

 7    Q.  So when we talked about the valuation of the mineral

 8    interests that appear on these forms, these aren't numbers

 9    that have been pulled purely out of thin air.  There's a

10    reason for these numbers being used?

11    A.  Yes.

12    Q.  And the bank did its due diligence before going ahead

13    and accepting all of this and loaning $7.1 million to Lardyn

14    Consulting?

15    A.  It took information we were provided, yes.

16    Q.  And it was analyzed by the entire loan committee at a

17    dedicated special meeting for that purpose?

18    A.  Yes.

19    Q.  And it was approved?

20    A.  Yes.

21    Q.  And so these are the figures that were used for an

22    actual business transaction?

23    A.  Can you go down to the other document?

24    Q.  Which other document?  This one?

25    A.  Keep going.  Keep going.  That one.

                              Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        517

1   Q.  Okay.  So for collateralization purpose, you do have a

2   document in here that has a discounted negative valuation,

3   correct?

4   A.  Yes.

5   Q.  Okay.  But the one that's actually stamped approved,

6   that's this one, right?

7   A.  I believe it's all one big package.

8   Q.  Okay.  Now, the question that I just asked you really

9   was you went ahead and did a business transaction based on

10  this?

11  A.  Correct.

12  Q.  And you got participating lenders?

13  A.  Correct.

14  Q.  So it wasn't even just you.  It was other banks too?

15  A.  We were already in the -- they were already in the loans.

16  Q.  And they got into the Lardyn loan as well?

17  A.  Yes.

18  Q.  All right.  Elyce York -- I'll talk real quick about

19  your knowledge of Elyce York.  You knew that Lardyn

20  Consulting was going to be in the business of farming,

21  ranching, feedlot operation?

22  A.  Yes.

23  Q.  But you knew nothing about Ms. York's history with

24  cattle?

25  A.  That's correct.

Sarah K. Mitchell, RPR, CRR

1   Q.  As far as you knew, her history was none?

2   A.  That's correct.

3   Q.  You didn't know anything about her educational

4   background?

5   A.  Very little.

6   Q.  You didn't know anything about her work history?

7   A.  Very little.

8   Q.  Didn't know anything about her experience in ranching?

9   A.  No.

10  Q.  Or operating feedlots?

11  A.  No.

12  Q.  Or farming?

13  A.  No.

14  Q.  Or agriculture generally?

15  A.  Correct.

16  Q.  All right.  Further to the value of the mineral

17  interest, I want to talk a little bit about the subject of

18  minerals being moved to Redtail Resources.

19  A.  Sure.

20  Q.  And in connection with that transfer, you told others at

21  the bank that the value of the mineral resources at that

22  time were approximately 7 million -- $3,723,000; is that

23  right?

24        MR. FORBES:  Your Honor, I'm going to object unless

25  there's a foundation that this is proximate in time to the

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021   519

 1   transfer at issue.

 2        THE COURT:  Let's get the timing then of the

 3   statement you're attributing to him.

 4        MR. PULKRABEK:  Okay.

 5   Q.  (By MR. PULKRABEK) Let's go ahead and look at the

 6   documents.  I'm going to show you Exhibit 68.

 7   A.  Okay.  In December of --

 8   Q.  Well, hold on a second.

 9        MR. PULKRABEK:  Your Honor, this is a stipulated

10   exhibit.

11        THE COURT:  All right.  68 is now admitted.

12        (Plaintiff's Exhibit 68 received.)

13   Q.  (By MR. PULKRABEK) Okay.  So Exhibit 68 is an e-mail

14   from you to many people at Farmers State Bank, correct?

15   A.  Correct.

16   Q.  And it was sent on December 12th of 2017.  Do you see

17   that?

18   A.  I do.

19   Q.  This is at or about the time when the -- you and Jon

20   Pauling start discussing the idea of moving the mineral

21   interest into Redtail Resources?

22   A.  Well, it wasn't just me and Jon, but Jon was part of the

23   conversation, yes.

24   Q.  My question is more this isn't like at the front end of

25   the discussion; is that fair?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 3       04/14/2021      520

1    A.  Yes.

2    Q.  The actual transfer to Redtail occurs about three months

3    later?

4    A.  Okay.

5    Q.  And in this e-mail with the subject Lardyn and Redtail

6    that you sent to many people at the bank, one of the things

7    that you say is this down here.  You say the Redtail

8    Resources, LLC loan is to purchase the mineral interest from

9    Lardyn.  The value of those assets are approximately

10   $3,723,000, correct?

11   A.  Correct.

12   Q.  Now, is it true that also in connection with breaking

13   out the minerals into -- into Redtail Resources and sort of

14   restructuring the financing surrounding Lardyn and Redtail,

15   you, your brother Mike Stull, and some other gentleman that

16   you know formed -- or participated in an investment group?

17   A.  Yes.

18   Q.  To underwrite some of these loans?

19   A.  Not at that time, I don't believe.

20   Q.  Okay.  There's an investor group named Two Six Too, LLC?

21   A.  Yes.

22   Q.  You're a member?

23   A.  Correct.

24   Q.  Mike Stull is a member?

25   A.  Correct.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    521

1  Q.  Then there are seven or eight other members; is that

2  accurate?

3  A.  Eight.

4  Q.  Okay.  And you gentlemen pooled some of your own

5  personal money, and you participated -- much like we've seen

6  Henderson Bank, First Central Bank, you participated for a

7  period of time in underwriting these loans?

8  A.  That is correct.

9  Q.  And are you still participating today?

10  A.  No.

11  Q.  When we talk about do you have a financial interest in

12  any of this, one of the ways in which you have a financial

13  interest or had was through Two Six Too, LLC?

14  A.  Two Six Too, LLC was asked to take out the loan because

15  Henderson was having credit issues and they needed the loan

16  off of their books, and so they sold it to Two Six Too.

17  Q.  Okay.  My question is not why.  My question is you had a

18  financial interest through Two Six Too?

19  A.  In Two Six Too, yes.

20  Q.  And as a -- you're a shareholder of Farmers State Bank

21  Shares?

22  A.  Yes.

23  Q.  As a shareholder you have a financial interest in the

24  outcome of this litigation as well?

25  A.  Only to the point of our loans.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    522

1    Q.  All right.

2    A.  That's the case with every loan we have on the books.

3    Q.  All right.  Now, on the next page of this document here

4    I want to ask you a couple more questions.  This is the loan

5    presentation memorandum for Lardyn Consulting, correct?  As

6    of December 2017?

7    A.  That's what it looks like, yes.

8    Q.  All right.  And I'm going to go down several pages to

9    look at one for Redtail here.  Okay.  So this is a loan

10   presentation for Redtail, correct?

11   A.  Correct.

12   Q.  And, again, for the minerals on this loan presentation

13   memo it's listed at 3,723,140, correct?

14   A.  Correct.

15   Q.  Same figure that we saw from the first page just

16   repeated here.  And this -- what this shows is after moving

17   minerals over to Lardyn, even with a discount factor of

18   30 percent, the bank is going to have this margin, right?

19   A.  Yes.

20   Q.  366,630?

21   A.  Yes.

22   Q.  The bank -- the bank debt itself would be which of these

23   figures here?  What's the bank debt that's --

24   A.  3 million, 3.

25   Q.  3 million, 3.  Okay.  So the actual margin would be

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        523

1    closer to 423,000, correct?

2    A.  Say that again.

3    Q.  The actual difference between the value of the minerals

4    and the loan that you were anticipating putting on it at

5    this point in time was going to be closer to $423,000?

6    A.  I guess I'm not understanding your math.

7    Q.  Well, it's simply value of 3,723,000 minus the loan

8    amount stated here of 3.3 million.  That would be $423,000.

9    A.  The 366,630 includes other forms of collateral, so if

10   you're just comparing minerals to the loan, I would guess your

11   math is right, but I can't do it in my head.

12   Q.  Let's look at a comment here.  There's a background

13   information comment that says Redtail Resources, LLC is

14   being formed to buy the mineral interest from Lardyn

15   Consulting.  The principals are Elyce York, Mark Pauling,

16   and Pauling Hauling.  They are selling an interest to Brian

17   Bates.  Do you see that?

18   A.  Yes.

19   Q.  So that was -- that was the understanding at the point

20   in time this was written was that Brian Bates would be

21   coming in?

22   A.  And also Mark, but that didn't happen.

23   Q.  Okay.

24   A.  But Brian was coming in.

25   Q.  And then under favorable factors for this you said

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      524

1    producing minerals are just starting and ramping up.  Oil

2    prices are up from the time the minerals were valued.  Do

3    you see that?

4    A.  Yes.

5    Q.  So this is -- this is about the point in time when the

6    minerals really started producing income?

7    A.  True.

8    Q.  Now, Jon Pauling continued to be the one that

9    communicated with the bank about Lardyn Consulting's

10   business, including even Lardyn Consulting's tax returns?

11   A.  I believe that to be true.

12   Q.  And so when -- we've talked about things like bank

13   confidentiality and how sacrosanct that is, and why you need

14   to redact information that you can't even show in this

15   courtroom because it's pertaining to other customers, right?

16   A.  Correct.

17   Q.  But when it came to Lardyn Consulting's confidential

18   information including even things of the nature of a tax

19   return, you dealt with Jon Pauling, not with Elyce York

20   exclusively?

21   A.  And that's common when the owner assigns that duty to that

22   person.  We talk to all sorts of accountants.

23   Q.  I want to look at Lardyn Consulting's 2005 -- or I'm

24   sorry -- 2008 tax returns.  So let's look at Exhibit 105,

25   and I believe this is stipulated.  Let me check that.  It

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021      525

1    is.

2              THE COURT:  All right.  105 is admitted.

3        (Plaintiff's Exhibit 105 received.)

4    Q.  (By MR. PULKRABEK) So in this exhibit, Mr. Stull, we

5    have Lardyn Consulting, the business, through

6    LardynConsulting@gmail.com communicating with you, your

7    father, and Jarrod Hamik at the bank, correct?

8    A.  Yes.

9    Q.  And the subject is the Lardyn tax return?

10   A.  Yes.

11   Q.  This is being sent February 28th, 2019?

12   A.  Yes.

13   Q.  So nearly two years after assets were transferred from

14   Two Mile Ranch to Lardyn Consulting?

15   A.  Yes.

16   Q.  And it says, Steve, Dick, and Jarrod, attached is the

17   breakdown of the Lardyn tax return.  And then at the bottom

18   it says transaction, Jon.  Correct?

19   A.  Correct.

20   Q.  Now, Jon Pauling is describing some details of Lardyn

21   Consulting's tax return, some very specific details,

22   correct?

23   A.  Yes.

24   Q.  Then if we go to the next page he provides some

25   financial information.  On the third page is the U.S. return

                       Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    526

1  partnership income for 2018 for Lardyn Consulting, LLC,

2  correct?

3  A.  Correct.

4  Q.  And if we scroll down we can see that this has been

5  prepared by Ken Skipworth, correct?

6  A.  That's what it says, yes.

7  Q.  The historical accountant, tax accountant who did Two

8  Mile Ranch's tax returns?

9  A.  I believe so.

10  Q.  On the next page of the Lardyn tax return for 2018 there

11  is a rental real estate income and expenses of partnership

12  form, correct?

13  A.  Yes.

14  Q.  What this shows is from oil revenue to Lardyn in 2018

15  there was $482,752 in gross rents, correct?

16  A.  In gross rents, yes.

17  Q.  Previously we looked at the Redtail tax return for the

18  same year because that's the year that the minerals were

19  part of the year in Lardyn and part of the year in Redtail.

20  Do you recall that?

21  A.  Yes.

22  Q.  And do you recall the mineral revenue to Redtail being

23  in excess of $600,000 for 2018?

24  A.  I don't remember, but I'll accept your point.

25  Q.  And are you aware that the mineral income just for 2018

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    527

1    from these wells was in excess of a million dollars?

2    A.  If you add the two together, that is over a million

3    dollars, yes.

4    Q.  Now, I want to ask you some questions about the tax

5    document that we previously looked at with your father.  And

6    I take it you went through the same process that we heard

7    your father describe, which was you gave your -- you got

8    your cell phone provider to somehow scrape for whatever

9    messages were available, and you produced them?

10   A.  Correct.

11   Q.  But this isn't necessarily a comprehensive set of all

12   text messages that you had with Jon Pauling going back to

13   2013, is it?

14   A.  It would have been the comprehensive set back to whatever

15   date they could go to, the company when they went back to get

16   them.  I don't know what date that was.

17   Q.  Okay.  We're going to go to Bates page 10202.  This is

18   the page --

19            THE COURT:  Which exhibit?

20            MR. PULKRABEK:  Exhibit 131, page 10202.

21   Q.  (By MR. PULKRABEK) So this is the page where your text

22   messages start with Jon Pauling, correct?

23   A.  That is my number to his number, but I don't know whether

24   that's when they all started.

25   Q.  Well, at least in this document.  We can go up to the

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    528

1    next page --

2    A.  Well, your question is is this when they started.

3    Q.  Fair enough.  With respect to the record we have this

4    would be the first text message dated 12/14/2017.

5    A.  Correct.

6    Q.  And there's nothing terribly significant about this, I

7    don't believe, other than to just show it's the starting

8    one.  So I want to go down and look at just a few of these

9    text messages.  On February 7th, 2018, Jon Pauling writes to

10   you, Quick update.  Redtail documents will be done by end of

11   day tomorrow -- I'm sorry -- done by end of day for review.

12   Talked with Scott Prusia.  Group wants tax return.  Then

13   will take it to committee.  Very optimistic.  Said it looks

14   really good.  Lardyn hopes to have tax return done by the

15   end of next week.  Do you see that?

16   A.  Yes.

17   Q.  That's in reference to the tax return we just took a

18   look at three minutes ago?

19   A.  Yes.

20   Q.  But the other point here is that it's Jon Pauling who is

21   communicating with you about Redtail?

22   A.  Yes.

23   Q.  And this was a multimillion-dollar asset.  The minerals

24   were a multimillion-dollar asset of Lardyn, and it's Jon

25   Pauling talking to you about how it's going to be moved into

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        529

 1   Redtail?

 2   A.   Yes.

 3   Q.   And then let's go down -- let's see here -- here's

 4   another example of a text message about Redtail.   Jon

 5   Pauling writes to you on March 22nd, 2018, Can we close

 6   Redtail Friday?   Right?

 7   A.   Yes.   Didn't hear the question.   Sorry.

 8   Q.   Then further down here there's a text message that's

 9   written by you to Jon Pauling dated February 27th -- I'm

10   sorry -- March 27th, 2018.   Do you see this?

11   A.   Yes.

12   Q.   I want to read this.   You wrote to Jon Pauling, You are

13   cash flowing with your operation to allow real estate

14   payments.   You have equity in the property.   You still have

15   additional assets that are helping prop up another entity

16   with.   That's what you sent to Jon Pauling?

17        MS. OLDEMEYER:   Your Honor, that's -- there's more.

18   Q.   (By MR. PULKRABEK) Well, we can go on to read it, but so

19   far, did I read that accurately?

20   A.   Yes.   Because Jon is handling the financials for Redtail

21   and Lardyn.

22   Q.   And then you write, Lardyn's assets are excessive for

23   that operation, and the assets for Two Mile and Redtail are

24   not and need propped up.   Correct?

25   A.   Correct.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    530

1    Q.  So you as the banker are working with Jon Pauling to

2    reallocate assets in a way that you believe to be making

3    sense for lending decisions; is that accurate?

4    A.  Yes.

5    Q.  Okay.  Just to go forward in time some, if we jump

6    forward to January 2019, so still in 2019, you're text

7    messaging Jon Pauling, correct?

8    A.  Yes.

9    Q.  And what you sent him is, Can we get updated Lardyn,

10   Redtail, and Elyce York personal financials so I can put

11   together a presentation?  Do you see that?

12   A.  I do.

13   Q.  Okay.  So let's just break this down.  You are treating

14   Jon Pauling as the contact point of contact for Lardyn with

15   respect to its confidential and sensitive financial

16   information?

17   A.  We are not the ones choosing to deal with Jon.  That's

18   coming from their side.

19   Q.  Well, if I call up your bank tomorrow and I say I'd like

20   you to send me all Elyce York's confidential loan

21   documentation, you're going to say you're not Elyce York.

22   Go away.  Right?

23   A.  Give me authorization from Elyce York, and I will get you

24   the information.

25   Q.  Okay.  But here we see that you're perfectly comfortable

                    Sarah K. Mitchell, RPR, CRR

1    sending and asking Jon Pauling for this information for

2    Lardyn?

3    A.  Right.  I just explained that Lardyn is asking Jon Pauling

4    to handle this on their behalf.  That's all that's going on

5    here.

6    Q.  And I'm sorry, but is there a -- is there like a form

7    that somebody fills out like Jon Pauling and Elyce York to

8    say Jon Pauling is the authorized representative of Lardyn

9    Consulting?  Is there a form?

10   A.  Typically the owner of the account calls the bank and

11   says, Hey, accountant is going to be wanting information.

12   When he calls, give it to him.

13   Q.  Okay.  So what you're telling me is necessarily there

14   has been some authorization on the part of Ms. York that Jon

15   Pauling is going to be the point person that the bank can

16   communicate with with respect to all matters Lardyn?

17   A.  With the financials.

18   Q.  And with respect to Redtail?

19   A.  Correct.

20   Q.  And with respect to her own personal financial

21   information?

22   A.  Correct.

23   Q.  And going forward to May of 2019, May 28th, 2019, so

24   we're now after the date that this lawsuit has even been

25   filed you're continuing to communicate with Jon Pauling

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    532

1   about Lardyn matters, correct?

2   A.  It appears so, yes.

3   Q.  You write here, We really -- we need to be ready to

4   close on the trust deal as soon as the SBA loan closes.  Why

5   was that so important?

6   A.  This is the trust that was buying out Mark's ownership in

7   Lardyn, and Mark was in need of the funds that he injected

8   back into Two Mile to pay down on the debt that was severely

9   past due.

10  Q.  Then you go on to write, We are missing the stock

11  certificates for Lardyn and updated trust papers removing

12  Mark as the trustee per SBA.  Do you see that?

13  A.  Yes.

14  Q.  So earlier we saw that certificate that got printed off

15  the Internet, filled in, that -- you didn't have that at the

16  point in time that you wrote this particular text?

17  A.  Say that again.  Sorry.

18  Q.  You didn't have the Internet certificate when --

19  A.  No.  What was going on here is the SBA asked that Mark not

20  be the trustee, that Elyce be the trustee, and they wanted

21  that changed.  It's a request from the SBA to make that change

22  to the ownership.  That's what that's about.

23  Q.  And then in terms of your last text message to Jon

24  Pauling is here, June 12th, 2019.  See that?

25  A.  Say that date again.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021   533

1    Q.  I'm sorry.  Maybe this is -- I think it's the right

2    date.  June 12th or 13th, it's one of those two, June 12th

3    or 13th, 2019.

4    A.  Okay.

5    Q.  That's the last text message that you had with Jon

6    Pauling?

7    A.  Correct.

8    Q.  So this lawsuit gets filed, and in June the text message

9    chain which has been going on for nearly two years ceases?

10   A.  Correct.

11   Q.  Now, you'd agree with me as between Jon Pauling, Mark

12   Pauling, and Elyce York, the vast majority of your text

13   messaging was with Jon Pauling?

14   A.  Mine was, yes.

15   Q.  All right.  Finally, Mr. Stull, I need to ask you about

16   this text message that you sent to Mark Pauling on

17   June 20th, 2019.  You wrote, Looks like we just got served

18   by the bitch as well.

19   A.  Yes.  And I apologize to Ms. Wilson for that.  My -- it

20   was immature on my part, because I was frustrated, and I was

21   directing it at the victim instead of the person that should

22   have been, which was Jon, so -- and I do apologize for that.

23   Q.  Now, let me ask you some more questions about it

24   notwithstanding that.  Your empathy and allegiances when you

25   made this statement were with Jon Pauling?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        534

1    A.   Actually it was with Mark.

2    Q.   Well, you didn't think -- even then you didn't think,

3    even get your mind around that Jon Pauling had committed

4    this crime?

5    A.   I said I accepted in my deposition that it was -- there's

6    a court case that says it happened.

7    Q.   And you drew a -- you drew a correlation between your

8    own inability to believe that Jon Pauling had committed a

9    sexual assault and Amanda Wilson being a bitch; isn't that

10   right?

11   A.   At the moment that's not what I was tying together.  What

12   I was frustrated about was feeling like we were being pulled

13   into a lawsuit that we'd been trying to work out a terrible

14   situation.  So regardless of her deal, ag prices had dropped

15   tremendously, and we'll probably go through that later.  So it

16   was a problem whether any of this happened or not, and then

17   when Jon got his judgment, that put another layer of issues

18   that we were going to have to deal with to make it even

19   harder, so an impossible situation became super impossible,

20   and then with the lawsuit, now it's extremely hard to get out

21   of this deal.

22   Q.   Let me show you what you said on this topic when I took

23   your deposition last year.

24        (Video deposition played.)

25        MR. FORBES:  I'm sorry, Your Honor.

Sarah K. Mitchell, RPR, CRR

1           (Video deposition played.)

2     Q.   (By MR. PULKRABEK) Mr. Stull, everything was done the

3     way it was done because of the Amanda Wilson lawsuit; isn't

4     that true?

5     A.   Exactly wrong.

6     Q.   Did you -- having sat through the testimony that's been

7     given in this case, do you even acknowledge that Farmers

8     State Bank worked with Jon Pauling to try to get rid of

9     Amanda Wilson's judgment against him?

10    A.   How do we get rid of his judgment?  His judgment is

11    against his distributions.

12    Q.   Having sat through all the evidence that's been

13    presented, are you willing to acknowledge that Farmers State

14    Bank worked with Jon Pauling and Mark Pauling to protect the

15    partnership from Amanda Wilson's judgment?

16    A.   What I would say is the bank was looking out for the

17    bank's best interests and trying to get out of a loan that was

18    terrible to start with, got worse with Jon's judgment, and got

19    even worse when we got pulled into it.

20    Q.   And final question, Mr. Stull.  Sitting here today do

21    you take one iota of responsibility for working with Jon

22    Pauling and Mark Pauling to prevent Amanda Wilson from

23    collecting her judgment?

24    A.   I don't believe I helped do that.

25           MR. PULKRABEK:  No further questions.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      536

1          THE COURT:  Ms. Oldemeyer, you may get started.

2                    CROSS-EXAMINATION

3    BY MS. OLDEMEYER:

4    Q.  Mr. Stull, I want to start with the texts that counsel

5    asked you about.  It's Exhibit 131, and I'm very confused.

6    Give me just a minute.  Okay.  And I believe Mr. Pulkrabek

7    was on page 16.  These are really small.  Bear with me.

8    What's your cell phone number, Mr. Stull?

9    A.  308-235-5783.

10   Q.  And have you had that phone number since -- how long

11   have you had that phone number?

12   A.  Since I lived in Kimball, so probably mid 2000s.

13   Q.  And Mr. Pulkrabek asked you about the bottom of page

14   10211, and I think you confirmed the last e-mail you had

15   with Jon Pauling was about June 12th or 13th, 2019; is that

16   correct?

17   A.  E-mail or text?

18   Q.  I'm sorry.  Text.

19   A.  Yes.

20   Q.  And so his phone number, as you knew it, was

21   970-380-0542?

22   A.  Yes.

23   Q.  And then the other text exchange that Mr. Pulkrabek

24   asked you about was a different person, Mark Pauling; is

25   that correct?  I'm on PDF page 27 of Exhibit 31.  Looks like

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3     04/14/2021    537

1  we just got served by the bitch as well?

2  A.  Correct.  That's to Mark.

3  Q.  And that phone number of his is 970-580-7180?

4  A.  Correct.

5  Q.  Okay.

6          THE COURT:  Are we talking about two texts that say

7  the same thing?

8          THE WITNESS:  No.

9  Q.  (By MS. OLDEMEYER) When the texts were produced,

10 Mr. Stull, was there sometimes duplication of the same text

11 as it was provided by Verizon?

12 A.  Yeah.  It didn't go out twice.  It's one text.  I don't

13 know why it's there twice.  It looks like several of them are

14 that way.

15         THE COURT:  And so this is a text that you sent to --

16         THE WITNESS:  Mark Pauling.

17         THE COURT:  To Mark.

18 Q.  (By MS. OLDEMEYER) And when you sent this text to Mark

19 Pauling on June 20th, 2019, did you know Amanda Wilson had

20 sued Farmers State Bank?

21 A.  Well, that's the day we found out.

22 Q.  Prior to June 20th, 2019, you did not know Amanda Wilson

23 had sued Farmers State Bank?

24 A.  No.

25 Q.  Nobody had told Farmers State Bank, Mark Pauling, or Jon

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    538

1   Pauling?

2   A.  No.

3   Q.  That's correct?

4   A.  That's correct.  We did not know.

5   Q.  With respect to Mr. Pulkrabek's questions about the

6   numbers in the tax returns, did Farmers State Bank prepare

7   any tax returns?

8   A.  No.

9   Q.  Does it normally do that for borrowers?

10  A.  Never.

11  Q.  Does Farmers State Bank, however, need borrowers' tax

12  returns for purposes of compliance with state or federal

13  regulations?

14  A.  I wouldn't say that there's a federal regulation that says

15  we have to have a tax return.  We have to have a way of

16  analyzing their income.

17          THE COURT:  It's almost noon.  Would you like to

18  break here to find whatever you're looking for?

19          MS. OLDEMEYER:  Your Honor, I just found it.  It's

20  Exhibit 66.  I'll offer Exhibit 66.  Let me pull it up.

21          THE COURT:  Okay.  66 is admitted.

22      (Plaintiff's Exhibit 66 received.)

23  Q.  (By MS. OLDEMEYER) Mr. Stull, can you identify for the

24  Court what is Exhibit 66?

25  A.  Special loan meeting dated 12/12 of 2017.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        539

1   Q.   What's the date?  12/12 --

2   A.   12/12/2017.

3   Q.   This is a special loan meeting, correct?

4   A.   Correct.

5   Q.   At the bottom of the first page it says Lardyn

6   Consulting, the new request is for 3.25 million to be

7   100 percent participated to Two Six Too, LLC, Investment

8   Group, with -- and then it has the terms, correct?

9   A.   Yes.

10  Q.   And so this Two Six Too, LLC that Mr. Pulkrabek asked

11  you about, it wasn't concealed, was it?

12  A.   No.

13  Q.   Everybody on the loan committee knew about it, correct?

14  A.   Correct.

15  Q.   And in banking is it unusual to have a private group as

16  a participating lender?

17  A.   No.  Very normal.

18  Q.   Was Two Six Too, LLC formed solely for the purpose of

19  participating in the loan involving Lardyn Consulting?

20  A.   No.  We had multiple investments prior to this.

21        MS. OLDEMEYER:  Your Honor, I can go as long as the

22  Court wants, or we can take a lunch break whenever you prefer.

23  But if we take a lunch break, I'll be more organized with the

24  electronic exhibits.

25        THE COURT:  Well, organization is always a good

            Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    540

1   thing.  Let's break until 1 o'clock.

2          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

3      (Break was taken from 11:59 a.m. to 1:03 p.m.)

4          THE COURT:  Onward.

5                     CROSS-EXAMINATION (Cont'd)

6   BY MS. OLDEMEYER:

7   Q.  Mr. Stull, you realize you're still under oath, correct?

8   A.  Correct.  Yes, I understand.

9   Q.  I'm going to show you Trial Exhibit 14, page 6.  And

10  that's up on the screen, Mr. Stull.  Are you able to see

11  that?

12  A.  Yes.

13  Q.  And Mr. Pulkrabek asked you about this document -- I'll

14  go to the first page just to refresh your memory, but it's

15  an e-mail from Joe Henry at PaulingJM1963@gmail.com.  Did

16  you understand that to be Jon Pauling?

17  A.  Yes.

18  Q.  And he had several attachments.  On the last page is one

19  of the attachments, and it's titled TMR May 2015, correct?

20  A.  Correct.

21  Q.  And under long-term assets there's a line for minerals,

22  correct?

23  A.  Correct.

24  Q.  And entry of $5.1 million, correct?

25  A.  Correct.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    541

1    Q.  And whose number is that?

2    A.  I believe it's Two Mile Ranch's number.

3    Q.  I'll show you Exhibit 1080, a 12-page document from

4    February of 2016 to multiple people at Farmers State Bank.

5    Do you see that?

6    A.  Yes.

7    Q.  And it's from you, correct?

8    A.  Correct.

9    Q.  And it's attaching a Two Mile LPM of 5/7/15, correct?

10   A.  Correct.

11   Q.  If I go to page 3, that's a document entitled Loan

12   Presentation Memorandum Review, correct?

13   A.  Correct.

14   Q.  We've seen documents that have loan officers listed.

15   Who were the loan officers for Two Mile Ranch General

16   Partnership?

17   A.  Well, Dick and I are.  Richard Stull and myself.

18   Q.  And on this loan presentation memo, if you scroll down

19   to the middle under collateral analysis description, there's

20   a line item for mineral rights, correct?

21   A.  Correct.

22   Q.  And we also see the value there of $5.1 million,

23   correct?

24   A.  Correct.

25   Q.  So with respect to information that's put in loan

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    542

1    presentation memorandum reviews, is some of the -- well,

2    where does the information like this $5.1 million for

3    minerals come from?

4    A.   It comes from the borrower's information that they

5    provide.  Typically a financial statement.

6    Q.   And on this particular document then the next column is

7    DISC factor of 30 percent.  Do you see that?

8    A.   Yes.

9    Q.   Can you explain to the Court what that is?

10   A.   That is discounting the customer's number because the

11   customer's number assumes that they have time to market it,

12   that they have time and no debt to service on it, and we are

13   discounting it because if the bank is to take it over, we're

14   likely not going to get what a customer that doesn't have a

15   limitation on time to do.

16   Q.   So are you adopting then the customer's $5.1 million

17   valuation for Two Mile Ranch's mineral rights as of

18   May 2015?

19   A.   Well, we're allowing them to do it, but it's not -- we

20   don't agree with that's the value of the asset.

21   Q.   I'm going to move to Exhibit 20.  I'd like to offer

22   Exhibit 20.

23           MR. PULKRABEK:  Your Honor, it's stipulated.

24           THE COURT:  What number now?

25           MS. OLDEMEYER:  2-0.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    543

1            THE COURT:  Okay.  It's admitted.

2       (Plaintiff's Exhibit 20 received.)

3   Q.  (By MS. OLDEMEYER) Have you seen Exhibit 20 before,

4   Mr. Stull?

5   A.  Have I seen this before?  Yes.

6   Q.  In your direct examination with Mr. Pulkrabek he asked

7   you questions about a letter to Judge Buchanan.  Do you

8   recall that?

9   A.  Yes.

10  Q.  Does Exhibit 20 reflect the actual exchange you had with

11  Jon Pauling where he requested information be sent to Judge

12  Buchanan?

13  A.  Yes.

14  Q.  And in particular you -- in response to his inquiry you

15  replied, Just to clarify, letter to judge asking him to be

16  aware of our lien positions on all those, correct?  Is that

17  what you responded to him?

18  A.  Yes.

19  Q.  Did the bank ever send a letter to Judge Ross Buchanan?

20  A.  Not that I'm aware of.

21  Q.  Exhibit 162 you looked at with Mr. Pulkrabek.  This is

22  the August -- excuse me -- it might be July -- July of 2016

23  loan number 2479 to Elyce York and Lardyn Consulting, LLC in

24  the amount of $45,000.  Do you recall when you were asked

25  questions about that?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    544

1    A.  Yes.

2              THE COURT:  Just a second.  Sarah, how come I'm not

3    getting the realtime?

4         (Pause in the proceedings.)

5              THE COURT:  Sorry to interrupt you.  Go ahead.

6    Q.  (By MS. OLDEMEYER) Mr. Stull, on Exhibit 162 on the

7    first page, there's this stated purpose of startup business

8    expenses, correct?

9    A.  Correct.

10   Q.  Was that the bank's understanding of what the purpose of

11   this loan was?

12   A.  Yes.

13   Q.  And over on the security section side of this promissory

14   note it references a security agreement dated 7/28/2016.  Do

15   you see that?

16   A.  Yes.

17   Q.  A security agreement dated 7/28/2016, correct?

18   A.  Yes.

19   Q.  And then personal guaranty dated 7/28/2016.  Do you see

20   that?

21   A.  Yes.

22   Q.  Who was the personal guarantor on this loan to Elyce

23   York and Lardyn Consulting, LLC?

24   A.  I believe it was Paul Pauling.

25   Q.  In your testimony earlier with Mr. Pulkrabek you talked

                         Sarah K. Mitchell, RPR, CRR

 1  about North Sterling and whether that -- you were allowed to

 2  perfect your security interest in that.  Do you recall that

 3  testimony?

 4  A.  Yes.

 5  Q.  In one of your answers you mentioned only if Whiting

 6  chooses to use that year, and I wanted to know who is

 7  Whiting and what role did they have?

 8  A.  It's my understanding that Whiting is the oil company that

 9  is producing the oil on lots of mineral rights down in that

10  area, and so they're wanting the water for fracking.

11  Q.  Thank you.  Also in your testimony you mentioned a

12  contract for sale in minerals with Wolf Resources.  I think

13  your word was rejected.  Do you recall that?

14  A.  Yes.  I remember -- I remember talking about Wolf

15  Resources.

16  Q.  And they had applied for a loan, correct?

17  A.  Somebody else, not our bank.  With another bank.

18  Q.  But the contract was between Two Mile Ranch and Wolf

19  Resources where Wolf intended to purchase some of those

20  mineral interests, correct?

21  A.  That's correct.

22  Q.  And just for clarity, what's the timeframe of when that

23  contract process was taking place?

24  A.  Boy, I don't -- I can't remember without -- but it would

25  have been in the time of that 2015-ish time period.  Maybe

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      546

1   early 2016.  But that's a guess.  I shouldn't guess, I guess.

2   Q.  Okay.  I want to back up just a little bit.  How old are

    you, sir?

4   A.  I am 52.

5   Q.  Where do you live?

6   A.  Bridgeport, Nebraska.

7   Q.  Where do you work?

8   A.  Farmers State Bank in Bridgeport, Nebraska.

9   Q.  The town of Bridgeport, Nebraska, what's the population?

10  A.  1,400 people.

11  Q.  Do you travel a lot for your job?

12  A.  I do.

13  Q.  Where do you go?

14  A.  I go to Dodge across the state.  I go to Hickman, which is

15  across the state.  I go to Atkinson, which is north central

16  part of Nebraska.  I go to Spencer, which is further north

17  central.  Mainly those are the areas I go.

18  Q.  Are those all branches of Farmers State Bank?

19  A.  Those are all branches, correct.

20  Q.  Do you personally perform any inspections of borrower's

21  collateral?

22  A.  Very rarely, but I have on limited occasions.

23  Q.  Do other representatives of Farmers State Bank perform

24  inspections?

25  A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

1   Q.  With respect to inspections of borrower's collateral, is

2   there anything unique or unusual about that process as it

3   relates to Two Mile Ranch or Lardyn Consulting?

4   A.  No.

5   Q.  And the distance from the Lardyn feedlot in Logan County

6   to Farmers State Bank in Bridgeport?

7   A.  It's about an 80-minute drive.

8   Q.  Can you briefly relate for the Court your educational

9   history?

10  A.  I graduated high school from Bridgeport High School.  I

11  went for a year of college at Kearney State College.  I then

12  transferred to the University of Nebraska where I got a

13  bachelor's of finance degree at University of Nebraska,

14  Lincoln.

15  Q.  Can you briefly relate your history in the banking

16  industry?

17  A.  Well, I began working in banks when I was in high school

18  tellering at the banks that my dad worked for.  In college I

19  worked at a correspondent MBC bank in Lincoln.  My first job

20  out of college was in South Sioux City at Dakota County State

21  Bank.  I then went to the Bank of Bennington.  Bennington is a

22  suburb of Omaha.  From there I went to Dalton, Nebraska, for

23  First National Bank.  I then moved within the company to

24  Sidney.  From there I took a job at FirsTier Bank.  At the

25  time it was First State Bank, changed to Compass, then to

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      548

1   FirsTier.  And then after that I took four or five months to

2   help my younger brother who was in the construction business

3   to try to -- during the real estate crisis of 2007, 2008, we

4   were trying to save his company, and so I went to work for him

5   temporarily.  Then I went to work for Banner County Bank in

6   Harrisburg, and from there is when we acquired Farmers State

7   Bank.

8   Q.  That was toward the end of 2011?

9   A.  Yes.

10  Q.  Harrisburg, Sidney, Dalton, are those all towns in

11  Nebraska?

12  A.  They are.

13  Q.  And what year did you graduate from the University of

14  Nebraska, Lincoln?

15  A.  1991.

16  Q.  Are you married, sir?

17  A.  I am.

18  Q.  And how long have you been married?

19  A.  Since 1991.

20  Q.  Do you have children?

21         MR. PULKRABEK:  Objection, Your Honor.  Relevance.

22         THE COURT:  Well, she's entitled to personalize her

23  client.  I'm not too concerned about it.  It's more

24  interesting than just putting in documents.

25         MR. PULKRABEK:  I'll concede that point, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

1  A.  I have two children, Hannah and Colton.  Hannah is a

2  chiropractor in Hastings, and Colton works for our location in

3  Hickman.

4  Q.  (By MS. OLDEMEYER) I'm going to stand up so we have a

5  better line of sight there.  Mr. Stull, do you have any

6  professional licenses?  Are they needed as a banker?

7  A.  No.  I did go to the Graduate School of Banking in

8  Colorado, which is Boulder.  It's one of several bank schools

9  that bankers go to get more education about the full scope of

10  banking.  So I did go there for -- it's a three-year program.

11  I opted into the second year and did it for two years.  And

12  it's a two-week in the summer program where you run a

13  simulated bank and see how it works.

14  Q.  Do you hold any leadership positions in the banking

15  industry?

16  A.  I do.

17  Q.  What are those?

18  A.  I've been on the Nebraska Bankers Association's board of

19  directors for the last four years.  I was last month elected

20  the chairman-elect for -- to be the chairman in 2022.  So I'm

21  the chairman-elect for 2021.

22  Q.  Farmers State Bank is a bank generally.  Your dad

23  mentioned the term safety and soundness.  Does Farmers State

24  Bank have a good safety and soundness status?

25  A.  Yes.  I can't give you the rating.  That's prohibited by

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    550

1    the regulators, but I can tell you that we've not had any

2    issues as far as memorandums of understanding or anything like

3    that.

4    Q.   And who would issue a memorandum of understanding?

5    A.   Either the FDIC or the Department of -- Nebraska

6    Department of Banking.

7    Q.   Just in case it comes up at some point during the trial,

8    what's a bank charter?

9    A.   A bank charter is the actual certificate to the federal

10   agencies that says you've gone through the process of becoming

11   a bank.  And so it used to be all banks have to have a

12   separate charter, and then branch banking started, so then a

13   single bank charter could branch off of that.  So all your

14   Wells Fargos, all of your Banks of America are all branches

15   except for their headquarters where they're headquartered.

16   Q.   Okay.  In the timeframe that we've focused on in this

17   case, 2012 to 2017, were there any changes with respect to

18   Farmers State Bank's charter?

19   A.   We acquired another -- actually two other charters as we

20   were growing, Spencer, Nebraska.  So we had two charters

21   running at the same time for a couple years until we merged

22   them.  We also acquired another Farmers State Bank that was in

23   a little town, but we didn't run that one as a separate

24   charter.  We immediately branched it into our Dodge charter.

25   Q.   With respect to charters, we've heard talk about loan

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    551

1    participants.  Is there a difference and can you explain if

2    there is?

3    A.  Can you state that question again, please?

4    Q.  Yeah.  Are charters in any way related to loan

5    participants?  Are the concepts different or the same?

6    A.  Yeah, I don't see them being the same thing.

7    Q.  A loan participant is not necessarily a branch bank?

8    A.  Well, every bank that you deal with, whether it's a branch

9    or a charter, if you're dealing with another branch, you're

10   doing it with that bank's charter participation.  So whatever

11   you do with a branch you're actually doing under -- under the

12   umbrella of the charter.

13   Q.  Yeah, I'm not articulating my question here.  Henderson

14   -- we've heard about Henderson Bank, correct?

15   A.  Yes.

16   Q.  And the bank in McCook, Nebraska?

17   A.  Yes.

18   Q.  Are those branches of Farmers State Bank?

19   A.  No.

20   Q.  They're --

21   A.  They're separate charters and run their own banks.  We

22   have nothing to do with their decision-making.

23   Q.  Okay.  Is there much oil and gas out in the panhandle of

24   Nebraska?

25   A.  Very little.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    552

1   Q.  Does Farmers State Bank have a lot of borrowers with

2   mineral interests in Weld County, Colorado?

3   A.  Not many, no.

4   Q.  Are you an expert in valuation of mineral interests?

5   A.  No.

6   Q.  Are you a licensed appraiser?

7   A.  No.

8   Q.  We're going to go just through some terms that have been

9   thrown here and there during trial.  What's a commodity?

10  A.  A commodity is any product that's traded typically on some

11  type of board.  It can be oil, it can be corn, it can be

12  wheat, it can be other substantive assets.

13  Q.  And for purposes of your job as the president and CEO of

14  Farmers State Bank, do you watch the prices of commodities?

15  A.  Yes.

16  Q.  And why would you do that?

17  A.  To stay up on the values that are going on at the time.

18  Q.  And why is that important?

19  A.  Because it affects the value of our collateral and what

20  it's worth compared to our loans.

21  Q.  You heard Mr. Pulkrabek mention that Two Mile Ranch

22  received millions of dollars in royalty checks.  Is that

23  true?

24  A.  I think they may have earned a million dollars, but I

25  wouldn't say millions.  And those -- I'll stop there.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021       553

1   Q.  And with respect to any royalty checks from oil, where

2   would those go?

3   A.  They would go on the debt of whoever the check is made out

4   to.

5   Q.  And Two Mile Ranch had been receiving checks before it

6   sold mineral interests to Lardyn?

7   A.  Yes.

8   Q.  And that arrangement -- well, same with Lardyn.  If

9   mineral checks were due Lardyn, where would they go?

10  A.  They would go directly into their account and then

11  directly onto the loan.  So when I say their account, I mean

12  their deposit account.

13  Q.  What about Redtail?

14  A.  Same thing.

15  Q.  And have the bank checking account records for those

16  three entities been provided in this case to show the

17  deposits of all checks?

18  A.  I believe so.  I don't know that for a fact, but I believe

19  they have.

20  Q.  If one did not believe any testimony that all checks

21  issued to any of those entities, Two Mile Ranch, Lardyn, or

22  Redtail, went to the bank and were deposited to pay down

23  debt, where could they go other than the bank to verify what

24  checks were issued?

25  A.  The oil and gas commission keeps track of all of that

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    554

1    stuff.

2    Q.   In Colorado when we hear the word water, that kind of

3    gets your attention, so I want you to, if you could, explain

4    to the Court what your understanding as a bank was with

5    respect to any income -- strike that.  I think we covered

6    that already.  With respect to any checks due to Two Mile

7    Ranch or Lardyn or Redtail for water leases, where would

8    those go, to your knowledge?

9    A.   On the debt.

10   Q.   Is Jon Pauling a member of your family?

11   A.   No.

12   Q.   Is Mark Pauling a member of your family?

13   A.   No.

14   Q.   Are you related to any Pauling by marriage?

15   A.   No.

16   Q.   By blood?

17   A.   No.

18   Q.   Are you friends?

19   A.   Not social friends.

20   Q.   What does that mean?

21   A.   Friends, I know who they are.  I talk to them on the

22   phone, but I would never go out or invite them to come do

23   anything with me outside of the bank.

24   Q.   But you have a good interaction?

25   A.   Yes.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      555

1    Q.  So just to clarify, do you socialize with any member of

2    the Pauling family?

3    A.  No.

4    Q.  Do you socialize with Elyce York?

5    A.  No.

6    Q.  Your dad mentioned buying bulls from Jon Pauling, and

7    just to clear that up, do you know when your dad bought

8    bulls?  Not specific dates, but was there a timeframe in

9    your dad's life when he was buying bulls?

10   A.  There was, but I didn't even know about him buying them

11   from Jon.  I didn't know that he was buying bulls from Jon.  I

12   knew he would buy bulls, but I had no clue where they were

13   coming from.

14   Q.  To your knowledge, what's the time period your dad was

15   buying bulls, if you remember?

16   A.  It would have had to be -- well, are you asking about from

17   Jon Pauling?

18   Q.  Yes.

19   A.  And Two Mile Ranch?

20   Q.  When was the last time your dad bought bulls, to your

21   knowledge?

22        MR. PULKRABEK:  Objection, foundation.

23        THE COURT:  Sustained.

24   Q.  (By MS. OLDEMEYER) To your best recollection when is the

25   last time your dad bought bulls?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    556

1              MR. PULKRABEK:  Objection, foundation.

2              THE COURT:  Sustained.

3   Q.  (By MS. OLDEMEYER) Do you know the last time your dad

4   bought bulls?

5   A.  Yes.  It was in the mid 2000s.

6   Q.  You are aware the allegations in this case are that the

7   bank conspired with Jon Pauling, Mark Pauling, Two Mile

8   Ranch, Elyce York, and Lardyn Consulting to prevent Wilson

9   from collecting on her judgment against Jon Pauling through

10  a charging order on Two Mile Ranch General Partnership,

11  correct?

12  A.  I understand that, yes.

13  Q.  Is that allegation true?

14  A.  No.

15  Q.  Do you personally have any motive to do that?

16  A.  No.

17  Q.  Do you personally want to hurt Amanda Wilson

18  financially?

19  A.  No.

20  Q.  Or in any other way?

21  A.  No.

22  Q.  Do you know her?

23  A.  No.

24  Q.  Prior to this trial had you ever met her?

25  A.  No.  Not that I'm aware of.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        557

1   Q.  To your knowledge, does anybody else employed at Farmers

2   State Bank now or in the past have any motive to conspire

3   with Jon Pauling, Mark Pauling, Two Mile Ranch General

4   Partnership, Elyce York, or Lardyn Consulting to prevent

5   Amanda Wilson from collecting on her judgment against Jon

6   Pauling through her charging order on Two Mile Ranch?

7   A.  No.

8   Q.  At the bank are you accountable to anybody?  You're the

9   president and CEO.

10  A.  I'm accountable to the board of directors.

11  Q.  And how many are on the board?

12  A.  Including myself, 14.

13  Q.  And do you as the president and CEO have to report to

14  the board about stuff affecting the bank?

15  A.  Yes.

16  Q.  Do you have to report good things?

17  A.  Yes.

18  Q.  Bad things?

19  A.  Yes.

20  Q.  Ugly things?

21  A.  Yes.

22  Q.  Stuff about bad loans?

23  A.  Yes.

24  Q.  What's a charge-off?

25  A.  Charge-off is a loan that we declare worthless, and we're

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      558

1    required to take it off our books, which comes out of income.

2    Q.  You have to report charge-offs to the board?

3    A.  Yes.

4    Q.  Would you have to report lawsuits against the bank to

5    the board?

6    A.  Yes.

7    Q.  Have you reported to the board about Amanda Wilson's

8    allegations in this lawsuit here today?

9    A.  Yes.

10   Q.  And that includes her claim for exemplary damages

11   against Farmers State Bank?

12   A.  Yes.

13   Q.  Has there been any publicity to your knowledge about

14   this case?

15   A.  There was some negative --

16          MR. PULKRABEK:  Objection, relevance.

17          THE COURT:  What's the relevance of that?

18          MS. OLDEMEYER:  Your Honor, the allegations here are

19   that the bank is hiding things and that these witnesses aren't

20   telling the truth, and this is background information to talk

21   about the knowledge -- the breadth of knowledge of the

22   allegations.

23          THE COURT:  You asked him about adverse publicity.

24          MS. OLDEMEYER:  Correct.  Bank customers read the

25   publicity.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      559

1            THE COURT:  Yes, I imagine they do.

2            MS. OLDEMEYER:  Right.

3            THE COURT:  So what's your point?

4            MS. OLDEMEYER:  I would like to ask Mr. Stull if

5    there has been any publicity about Amanda Wilson's lawsuit

6    against the bank.

7            THE COURT:  Well, I know that's what you want to do.

8    I'm asking you what's your point?

9            MS. OLDEMEYER:  To argue --

10           THE COURT:  What's your point that you're trying to

11   accomplish with his answer?  That yes, there's been a lot of

12   bad publicity.  No, not yet, but there will be.  What's your

13   point?

14           MS. OLDEMEYER:  That there has been in the past, and

15   the bank is not hiding things, and they're here defending

16   themselves in this court.

17           THE COURT:  Okay.  Objection is overruled, but just

18   to keep things going.

19   A.  So yes, there has been.

20   Q.  (By MS. OLDEMEYER) Is that publicity something that had

21   to be discussed at the board level?

22   A.  Yes.

23   Q.  The Court will hear from a witness Chris Gray.  Is he a

24   member of the Stull family?

25   A.  No.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      560

1   Q.   Is he related, married, anything to a member of the

2   Stull family?

3   A.   No.

4   Q.   What is the board of director's role in bank loans?

5   A.   The board of directors oversee the -- we have a loan

6   committee that approves the loans, and then those loans get

7   reported to the board at each monthly board meeting where they

8   are able to review what's being made and denied.

9   Q.   And so are they getting into the weeds with respect to

10  what is pledged as collateral, or are they just looking at

11  what the loan committee did?

12  A.   So our board is made up of internal directors and external

13  directors.   The external directors are not part of the loan

14  committee, and they do not get down into the weeds and see the

15  financial details of the customers.   And the internal

16  directors, the people that work at the bank obviously see it

17  at the loan committee.

18  Q.   In banking terms, is there a term called cross

19  collateralized?

20  A.   Yes.

21  Q.   What does that mean?

22  A.   That means that you have a piece of collateral, and then

23  you do multiple loans and refer to the same piece of

24  collateral.

25  Q.   And so it reflects -- it's pledged for multiple

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021     561

1   borrowers?

2   A.  For multiple loans by a borrower.

3   Q.  Thank you.  What's a bridge loan?

4   A.  A bridge loan is a temporary loan that you would do

5   knowing that there's a permanent solution or permanent

6   financing sometime in the future.

7   Q.  And we've heard the expression OREO.  Your dad described

8   it as other real estate owned.  Did you hear that?

9   A.  Yes.

10  Q.  Is that a good thing?

11          MR. PULKRABEK:  Objection, Your Honor.  This is

12  cumulative.

13          THE COURT:  Sustained.

14  Q.  (By MS. OLDEMEYER) Are there costs associated to a bank

15  who takes on OREO property?

16          MR. PULKRABEK:  Objection, cumulative.

17          THE COURT:  Sustained.

18          MS. OLDEMEYER:  I purposefully didn't cover this with

19  Mr. Dick Stull so we could avoid repetition.

20          THE COURT:  I don't remember honestly.  Okay.  If you

21  say you didn't, go ahead.

22          MS. OLDEMEYER:  That's my memory, Your Honor, and I'm

23  tired.  I am trying to move quickly.

24  Q.  (By MS. OLDEMEYER) Briefly, Mr. Stull, could you explain

25  to the Court if there are costs associated with OREO

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021      562

1   property?

2   A.   Yes, there are.

3   Q.   What are they?

4   A.   We have to pay insurance on real estate.  We have to pay

5   the taxes that are due.  We have to do upkeep on the ground.

6   If it's a vehicle, we have to make sure it's insured.  Just

7   everything that an owner would have to do if it wasn't taken

8   back by the bank.

9   Q.   And when a bank goes to sell an OREO property on the

10  open market are additional costs incurred?

11  A.   Yes.  You would have to pay a broker or an auctioneer or a

12  dealer of some sort to dispose of the asset.

13  Q.   In direct examination Mr. Pulkrabek used a word pro

14  forma.  Do you know what that word means?

15  A.   Yes.

16  Q.   What is it?

17  A.   Pro forma is a projection after some assumptions are made.

18  Q.   It's forward thinking?

19  A.   Correct.

20  Q.   All the agreements with bank borrowers, if a borrower

21  has a loan and it's a business loan, can the bank then

22  dictate to the borrower who's going to be their president?

23  A.   No.  That's lender liability.

24  Q.   What do you mean by that?

25  A.   Banks are to make decisions whether to do a loan or not do

19-CV-01224-RBJ       Bench Trial - Day 3     04/14/2021    563

 1   a loan.  It's not the bank's decision to help run the business
 2   that they're loaning money to.
 3   Q.  But what about the subset of bank borrowers who might be
 4   having trouble running their business, they're running it
 5   poorly.  Can't the bank step in then?
 6   A.  No.  We can have constant communication and tell them our
 7   feelings and thoughts and give them recommendations, but we
 8   cannot coax them into doing anything.
 9   Q.  You heard Mark Pauling testify about the history of the
10   Two Mile Ranch Market Company, LLC, correct?
11   A.  Yes.
12   Q.  And the Two Mile Ranch General Partnership up to --
13   let's say up to 2014, did you agree with his recitation of
14   that history?
15           MR. PULKRABEK:  Objection, Your Honor.
16           THE COURT:  Sustained.
17   Q.  (By MS. OLDEMEYER) Did you hear Mark Pauling's testimony
18   about the history of Two Mile Ranch Market Company, LLC and
19   Two Mile Ranch General Partnership?
20   A.  Yes.
21   Q.  Does that comport with your understanding?
22           MR. PULKRABEK:  Your Honor, same objection.
23           THE COURT:  I don't want him commenting on someone
24   else's testimony.
25   Q.  (By MS. OLDEMEYER) Could you please describe for the

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021     564

1    Court the bank's understanding of Two Mile Ranch Market

2    Company, LLC?

3    A.   So the Two Mile Market Ranch, LLC was a -- it was supposed

4    to be a meat market over here in Denver that would sell the

5    Pauling Two Mile Ranch meat directly to consumers as opposed

6    to going through the typical packing plant to a wholesaler,

7    and my understanding is it became more than the meat market.

8    It became more like a Whole Foods grocery store, which we were

9    not aware of.  The business was not doing well, and we asked

10   Two Mile Ranch to step up to the plate and help cover the

11   debts that were going backwards.

12   Q.   And when you say Two Mile Ranch, that's Two Mile Ranch

13   General Partnership?

14   A.   The general partnership.

15   Q.   From the bank's perspective in the years 2014 and 2015,

16   was Jon Pauling in a strong financial position?

17   A.   2014, 2015 were good financial times for agriculture, yes.

18   Q.   What about Mark Pauling during that timeframe?

19   A.   Same.  Same answer.

20   Q.   Did the ag economy change at some point?

21   A.   Yes.

22   Q.   About when did that change begin?

23   A.   2014.

24   Q.   What were the changes?

25   A.   So at the end of 2014 oil prices -- well, in 2014, oil

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    565

1   peaked out at 108, $108 a barrel, and it bottomed out in 2017

2   at $29.  That's a 76 percent drop, 79 percent drop maybe.

3   Q.  Was there anything else going on in the ag economy?

4   A.  The corn prices dropped from all-time highs of $7.14 down

5   to $3.30, a 15 percent drop.

6   Q.  What about ag land values?

7   A.  Ag land values, they don't do statistics on Colorado and

8   Nebraska.  They do it on Iowa, if you use Iowa.

9        MR. PULKRABEK:  Objection, Your Honor.  Relevance and

10  foundation.

11       THE COURT:  Sustained.

12  A.  That --

13       THE COURT:  Sustained.

14  Q.  (By MS. OLDEMEYER) Mr. Stull, I'm going to ask you a few

15  questions.  You mentioned in your direct examination with

16  Mr. Pulkrabek that Farmers State Bank is a community bank,

17  correct?

18  A.  Correct.

19  Q.  Did you treat Jon Pauling, Mark Pauling, or their

20  entities any differently than any other Farmers State Bank

21  borrower?

22  A.  Only the fact that we had to meet with them a lot more, I

23  would say no.  There's no difference other than the amount of

24  time that was spent.

25  Q.  When you were interacting with Mark Pauling, Jon

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    566

1   Pauling, Elyce York, and any of the entities that we've

2   talked about, what was the bank's number one concern?

3   A.  Keeping the bank whole with the loans that we were working

4   on.  We're looking out for our shareholders is the -- is what

5   we do.

6   Q.  I'm going to ask you about texting.  Is it unusual for

7   you, sir, to text with a bank borrower?

8   A.  No.

9   Q.  Is it a form of communication unique to the codefendants

10  in this case?

11  A.  No.

12  Q.  Is it somehow an attempt to go offline?

13  A.  No.

14  Q.  Is it unusual for you to communicate with bank borrowers

15  by e-mail also?

16  A.  Not unusual to do that, no.

17  Q.  Is it -- do you communicate in person with borrowers

18  also?

19  A.  On occasion.  Not as often as the others.

20  Q.  And by phone?

21  A.  Yes.

22  Q.  So it's possible on any particular day you might have

23  had one or more forms of communication, e-mail, text, phone

24  or in person?

25  A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 3     04/14/2021     567

1   Q.  I want to show you exhibit -- by closing the sale of Two

2   Mile Ranch's assets to Lardyn Consulting in April of 2017,

3   after the Chapter 11 reorganization bankruptcy case was

4   dismissed, was that an attempt to hide those transactions?

5   A.  No.  They're public record.

6   Q.  When you say they're public record, what do you mean?

7   A.  They record it into county public records.

8   Q.  The deeds and the deeds of trust?

9   A.  Yes.

10  Q.  Can you explain to the Court, do you know why the

11  Chapter 11 bankruptcy case was dismissed?

12  A.  Well, I think there was multiple reasons.  The biggest

13  reason was they'd run out of money and couldn't afford to

14  continue to pay attorneys fees to keep it going, and the bank

15  didn't want to be putting more money out to accomplish that

16  when we'd given ample time to get a plan put together.

17  Q.  So with respect to the initial expenses, I think we saw

18  a $25,000 retainer for Two Mile Ranch's attorney.  Were

19  those funds that the bank was advancing to the borrower?

20  A.  Yes.

21  Q.  So adding more debt onto a bad debt?

22  A.  Yes.

23  Q.  Why would you do that?

24  A.  Well, we were trying to get to a solution of how to get

25  out of a bad situation, a bad loan.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021     568

1    Q.  Let me put up Exhibit 1015.  Is Exhibit 1015 -- it's a

2    40-page document, but is it one example of a loan with Two

3    Mile Ranch General Partnership, this one being loan 2094 on

4    January 1st, 2019, and the documents associated with that

5    particular loan?

6    A.  It appears, yes.

7    Q.  So there are multiple things with the loan.  A note,

8    correct?

9    A.  Yes.

10   Q.  And then the documents perfecting the security interest

11   in the collateral?

12   A.  Correct.

13   Q.  And any guaranties and all that?

14   A.  Guaranties and security agreements, yes.

15   Q.  I'm sorry.  I didn't hear what you said, sir.

16   A.  Guaranties and security agreements as well.

17          MS. OLDEMEYER:  We'd offer Exhibit 1015.

18          MR. PULKRABEK:  No objection.

19          THE COURT:  What purpose do you have for offering

20   this 48-page document?

21          MS. OLDEMEYER:  Your Honor, I have prepared a

22   summary, and this is an example of one item of support for the

23   summary that I'm going to try to get in that hadn't been

24   stipulated to.  And so it's helpful I think to explain to the

25   Court what we tried to do in summarizing voluminous evidence

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      569

1    for purposes of Rule 1006 under Federal Rules of Evidence.  So

2    I'm offering one example.

3              THE COURT:  Is this example one of the loans in

4    question here?

5              MS. OLDEMEYER:  It is.

6              THE COURT:  Okay.  Admitted.

7       (Defendants' Exhibit 1015 received.)

8    Q.  (By MS. OLDEMEYER) Why don't we go to then Exhibit 1001.

9    Have you seen this document before?

10   A.  Yes.

11   Q.  And you reviewed it and worked with me to prepare this

12   summary for purposes of this trial, correct?

13   A.  That's correct.

14   Q.  And then with respect to Exhibit 1002, that's entitled

15   cross-references for summary of loans through about

16   June 2019.  Does this correlate to the prior exhibit?

17   A.  Yes, it does.

18   Q.  So, for example, if anybody wanted to look at any

19   particular loan number of any of the loans with any of the

20   borrowers that are at issue in this case, there's a

21   cross-reference for the underlying documents and then the

22   Bates number for it, correct?

23   A.  That's my understanding, yes.

24             MS. OLDEMEYER:  We would offer Exhibits 1001 and

25   1002.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      570

1           MR. PULKRABEK:  Your Honor, I have no objection to

2    1002.  I think that's fine.  I do object to 1001 because I

3    don't think that it is admissible under Rule 1006.

4           THE COURT:  Why?

5           MR. PULKRABEK:  Because much of the underlying

6    information on here would be hearsay, for one thing.  In

7    addition, there's no explanation of this joint credit column

8    or what that means or how that works.  And then finally,

9    there's an inaccuracy here insofar as this purports to be

10   loans from the bank to Two Mile Ranch because it includes a

11   $275,000 loan that is actually from Mark Pauling to Two Mile

12   Ranch, and I'm not sure why that shows up on here.

13          THE COURT:  Well, 1002 is admitted, I guess.

14      (Defendants' Exhibit 1002 received.)

15          THE COURT:  1001 is just Ms. Oldemeyer's document.

16   She can't take the stand and testify, so she's got this guy

17   saying yeah, yeah, yeah.  But you're saying it's inaccurate

18   because of this $275,000 purported loan.

19          MR. PULKRABEK:  Yes, Your Honor.  It includes a

20   $275,000 TMR loan under Mark Pauling.  And in addition, I have

21   tried to ascertain what the rhyme or reason for joint credit,

22   why it would be, and I believe I asked Ms. Oldemeyer about

23   that and didn't get an explanation.  So I just don't

24   understand what that purports to be.  Maybe the witness can

25   explain that.

                        Sarah K. Mitchell, RPR, CRR

1    THE COURT:  At this point the Court does not admit

2  1001.

3  Q.  (By MS. OLDEMEYER) Mr. Stull, what's a joint credit?

4  A.  Joint credit is when one or more -- well, when more than

5  one person or entity is on the same loan.

6  Q.  So, for example, if one wanted to look at loan number

7  2094, let's look at who signed this note -- well, that's not

8  a good example.  Let's look at -- earlier in the exhibits we

9  looked at notes where all of the Two Mile Ranch Colorado,

10 LLC entities were listed, and Mark Pauling and Jon Pauling

11 signed on behalf of all those entities.  Do you remember

12 that?

13 A.  Yes.

14 Q.  And would that -- what is that an example of?

15 A.  That would be an example of joint credit.

16 Q.  So you go back, and you look at the note and see who

17 signed it, and if there was more than one person, then it's

18 joint?

19 A.  Correct.

20 Q.  With respect to this Exhibit 1001, under Mark Pauling

21 there's an entry that I've highlighted in blue, TMR,

22 5/15/2015, $275,000, and the purpose is carryback on ranch

23 sale.  Do you see that line?

24 A.  I do.

25 Q.  Is that the testimony that we've heard about when Mr. --

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      572

1  well, explain to the Court what that relates to.

2  A.  So Mark Pauling referred to it earlier in his testimony

3  that it was a debt owed to Two Mile Ranch, and he paid that

4  back when he sold his interest in Lardyn is my understanding.

5  Q.  And so if somebody wanted to look at the information

6  related to that, they could go to 1002, go to loan number

7  2346, and under that there's the TMR note with the Bates

8  number if they wanted to look at that document if they had

9  any questions about the accuracy of the entries, correct?

10 A.  Correct.

11       MS. OLDEMEYER:  We'd again offer Exhibit 1001 as a

12 summary under Rule 1006 of the Federal Rules of Evidence.

13       THE COURT:  Summary of what?

14       MS. OLDEMEYER:  The entire loan history between the

15 bank and the borrowers listed on Exhibit 1001 in the blue

16 headings where their names appear.

17       THE COURT:  Well, that's what I thought it was, but

18 you stuck that TMR loan in there, that purported loan.  That

19 doesn't fit.  I don't know why you stuck it in there.

20       MS. OLDEMEYER:  Because there's an allegation that

21 somehow that's inappropriate, so I didn't want to leave it out

22 and be accused of not including it.

23       THE COURT:  Ms. Oldemeyer, you will never be accused

24 of leaving something out.

25       MS. OLDEMEYER:  Well, I appreciate that, Your Honor,

Sarah K. Mitchell, RPR, CRR

1    I think.

2            THE COURT:  All right.  The objection is sustained

3    even though it's kind of a handy place to go over this loan

4    history.  But you're right.  There's an inaccuracy to it.

5    Q.   (By MS. OLDEMEYER) For any of the loans that were at

6    issue where there was a debt modification, would somebody be

7    able to go to the summary that has been admitted,

8    Exhibit 1002, and look at any listing of debt modification

9    and then track it back to an underlying document?

10   A.   It appears that that is the case, yes.

11   Q.   Did the bank give Two Mile Ranch, Lardyn, and Redtail

12   debt modification agreements?

13   A.   I'm sure we did, yes.

14   Q.   Why would you do that if they're having trouble?

15   A.   Well, a troubled loan doesn't just stop if you don't

16   continue it on.  I mean, it doesn't go away.

17   Q.   Does it mean you must immediately foreclose?

18   A.   Does a modification agreement?

19   Q.   No.  Does a need to consider a debt modification, does

20   that mean you must exercise the alternative -- an

21   alternative?

22   A.   Possibly, but not definitely.

23   Q.   Going back to one of the issues in this case about the

24   amendment to the partnership agreement, do you recall that

25   allegation that the bank conspired to -- with respect to

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      574

1    that amendment to the partnership agreement?

2    A.  Yes.

3    Q.  Can you explain to the Court the bank's response to the

4    allegation by Amanda Wilson that the bank conspired to

5    change from a 50/50 to a 90/10?

6    A.  It's the bank's position that we have 100 percent of Two

7    Mile Ranch.  What the owners do cannot affect the 100 percent

8    unless they were to give it to somebody outside of the current

9    ownership, at which time we would definitely want to take a

10   look at that.  But it's the bank's position we have 100

11   percent.

12   Q.  So would the bank care if somebody is a 50/50, 70/30?

13   A.  No.  As far as we're concerned, we're looking at the Two

14   Mile Ranch, not the individual ownership.  We're looking at

15   the entity as a whole, or the partnership as a whole.

16   Q.  Another banking term I'd like you to explain to the

17   Court, workout.

18   A.  A workout.  A workout loan is any loan that is not

19   performing as expected, and it's a process whereby the bank's

20   trying to work with the customer to get to an acceptable

21   resolution for both parties.

22   Q.  The May of 2015 transactions that have been talked about

23   in this courtroom where Mark Pauling bought the North Ranch,

24   Cervi Enterprises bought the South Ranch, do you recall

25   that?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021      575

1   A.   Yes.

2   Q.   At that point in time was Farmers State Bank aware

3   Amanda Wilson had sued Jon Pauling?

4   A.   I don't believe so, no.

5   Q.   Was anybody else, to your knowledge, at the bank aware

6   that Amanda Wilson had sued Jon Pauling?

7   A.   No, they weren't.

8   Q.   With respect to those transactions for purposes of

9   explaining the transactions in this case, did you compile

10  the supporting documents for the loans that were paid as

11  part of that transaction and loans that were -- the money

12  flow?  Did you gather bank documents to show where the money

13  went with those transactions?

14  A.   Yes, a source of use.

15  Q.   Thank you.  Are those pages within Exhibit 1003?  And

16  I've got that up on the screen.  I can click through for

17  you.

18  A.   Yeah.  Can you go to the top page, page 1?  Yes.

19  Q.   With respect to that page 1, is that a bank document or

20  is that something that was created for this case?

21  A.   This was me doing a summary for the case.

22  Q.   And then the pages that follow, pages 2 through 20 --

23  I'm just clicking through quickly -- are those all

24  underlying bank documents?

25  A.   They are.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      576

1              MS. OLDEMEYER:  We would offer Exhibit 1003.

2              MR. PULKRABEK:  One moment, please.  Your Honor, we

3    object to this as a 1006 summary.  The objection we have here,

4    if you want to hear it, is that this summary tries to lump in

5    not just the loans but also separately guaranty amounts.  As

6    you've heard testimony, those are -- those are disputed.

7              THE COURT:  Guaranty amounts.  Show me.

8              MR. PULKRABEK:  So the guaranty amounts really are --

9    I think they're the ones in these boxes, like $730,000,

10   $46,000.

11             THE COURT:  I don't know.  I can't even see the

12   boxes.  So there's a box.  I guess that's a box, and it says

13   that original note balance on loan 2069.  Then it says balance

14   remaining as of May 15th.  What does that got to do with

15   guaranty?

16             MR. PULKRABEK:  Are you asking me, Your Honor?

17             THE COURT:  I am, because you're the one that's

18   making the objection.

19             MR. PULKRABEK:  Yes.  So the $730,000 can only be

20   Mark Pauling's note, and there was testimony in this case --

21             THE COURT:  I don't see 730 on what's up here now.

22             MR. PULKRABEK:  For instance --

23             THE COURT:  5/20/2015, there's a little box, and it

24   says 2346.  That's a loan number, and it says 730,000.  What

25   about it?

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    577

1          MR. PULKRABEK:  So that's -- that's Mark Pauling's

2    loan, not Two Mile Ranch's loan.

3          THE COURT:  I see.  You're saying -- you're making

4    the same objection as you did to 1001.

5          MR. PULKRABEK:  Yes.  There's extraneous information

6    that's been added into here.

7          THE COURT:  Sustained.

8    Q.  (By MS. OLDEMEYER) For purposes of clarifying the record

9    on Exhibit 1003, is note 2346 a note that was generated as a

10   result of the May 2015 transactions?

11   A.  Yes.  It is part of that transaction.

12   Q.  Note 2217, however, that's a Jon Pauling car loan --

13   well, what is note 2217?

14   A.  2217?

15   Q.  Yes.  I can go to Exhibit 1001, if that might be

16   beneficial to you.  And let's look at note 2217.  Do you see

17   it there?

18   A.  Yes.  So that was the pickup loan that was made to Jon

19   Pauling.

20   Q.  So, again, what you're trying to do is be helpful to

21   help people understand the May of 2015 transaction and who

22   got what; is that right?

23   A.  Correct.

24   Q.  That's the purpose of Exhibit 1003?

25   A.  Yes.  We're trying to show everybody where all the money

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    578

1    went.

2              MS. OLDEMEYER:  We'd offer Exhibit 1003.

3              MR. PULKRABEK:  And, Your Honor, sorry to be the bad

4    guy, but it just didn't fit within 1006.  It's not accurate as

5    to TMR transactions.  We just talked a loan for a pickup.

6              THE COURT:  Why doesn't it fit within 1006 now that

7    it's been clarified?  And why do you care, in any event?

8              MR. PULKRABEK:  Your Honor, I just want to make sure

9    there's not confusion in the record as to --

10             THE COURT:  Oh, there's lots of confusion in the

11   record.  This document isn't going to remove the confusion or

12   add to it.  It's just a summary.

13             MR. PULKRABEK:  Understood, Your Honor.

14             THE COURT:  But what's the 1006 problem now that

15   she's had it explained more?

16             MR. PULKRABEK:  Your Honor, I think now that the

17   foundation has been laid and clarified these are not all TMR

18   transactions, that there are some other things going on here,

19   I'll withdraw the objection.

20             THE COURT:  1003 is admitted.

21        (Defendants' Exhibit 1003 received.)

22             THE COURT:  How much longer are you going to go,

23   Ms. Oldemeyer?

24             MS. OLDEMEYER:  Well, I apologize, Your Honor.  I did

25   mention that Mr. Stull would be our longest witness, and I

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      579

1   probably have at least another hour of direct.

2           THE COURT:  Okay.  We'll take a break now.  I need

3   some relief from this.

4           THE COURTROOM DEPUTY:  All rise.  Court is in recess.

5       (Break was taken from 2:07 p.m. to 2:31 p.m.)

6   Q.  (By MS. OLDEMEYER) Mr. Stull, I'd like to remind you

7   you're still under oath.

8   A.  I understand.

9   Q.  Early in your testimony we talked about commodities and

10  mentioned oil and gas, corn.  What about cattle in that

11  timeframe?  What was cattle doing?

12          MR. PULKRABEK:  Objection, foundation.

13          THE COURT:  Well, the question was what about cattle.

14  I suppose the answer could be it's a form of cows, steers and

15  bulls.  Rephrase your question.

16  Q.  (By MS. OLDEMEYER) Do you recall earlier in your

17  testimony where you talked about as part of your job you

18  look at commodity prices?

19  A.  Yes.

20  Q.  And do you recall your testimony where you talked about

21  your knowledge of oil and gas and corn prices?

22  A.  Yes.

23  Q.  Could you explain to the Court your knowledge of cattle

24  prices during that timeframe?

25  A.  Yes.  In 2014 calf prices were in the $3.08 per pound

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 3     04/14/2021     580

1   price range.  In 2017, they dropped to a dollar-30-something,

2   and so that's a 56 percent drop in value.

3   Q.  Mr. Stull, I've got in front of you up on the screen

4   Exhibit 16, page 3, and I think you reviewed this with

5   Mr. Pulkrabek.  This relates to Two Mile Ranch loan 2288, in

6   May of 2015.  Are you familiar with that loan?

7   A.  Yes.

8   Q.  What type of loan is this?

9   A.  This is a bridge loan.

10  Q.  Did Farmers State Bank keep a spurious lien against

11  Turkey Creek in Jefferson County, Colorado, after May of

12  2015?

13  A.  Yes.

14  Q.  A spurious lien?

15       MR. PULKRABEK:  Objection, leading.

16  A.  Okay.  Let me ask, what did you say?

17       THE COURT:  You've got to be careful, Mr. Stull.

18  Listen to the question because sometimes she throws a Mickey

19  in there.  She asked if you had a spurious lien.  I don't

20  suppose you want to say yes to that.

21  A.  I don't even know what spurious is, so that tells you what

22  I know.  Sorry.  I thought I heard something else.

23  Q.  (By MS. OLDEMEYER) Mr. Stull, after May of 2015 the

24  transactions closed, the sale of the North Ranch, the sale

25  of the South Ranch, the acquisition of Turkey Creek in a

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3       04/14/2021    581

1    1031 exchange.  Did the bank have Turkey Creek pledged as

2    collateral?

3    A.  We had a deed of trust on the Turkey Creek property that

4    we filed, yes.

5    Q.  And was that deed of trust that was filed proper?

6    A.  Yes.

7            MR. PULKRABEK:  Object to foundation.

8            THE COURT:  Okay.  The form of the question.  Re-ask

9    your question.  What do you mean was it proper?

10   Q.  (By MS. OLDEMEYER) Did the bank --

11           THE COURT:  To the best of your knowledge, did the

12   bank have a valid lien on the property?

13   A.  We had a valid lien on the property.

14           MS. OLDEMEYER:  Thank you.

15   Q.  (By MS. OLDEMEYER) The May 2015 transactions, were those

16   sped up or slowed down due to any timing of an examination

17   by bank regulators?

18   A.  I'm sorry.  I am having a hard time hearing you.

19   Q.  I'll stand up.  With respect to the May of 2015

20   transactions that occurred, did Farmers State Bank either

21   speed up or slow down the timing of those transactions due

22   to the timing of any exam by bank regulators?

23   A.  No.

24   Q.  You talked a lot about the civil case, Amanda Wilson's

25   civil case.  At the time the May of 2015 transactions

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021    582

 1   closed, did you know of any criminal charges against Jon

 2   Pauling stemming from a sexual assault that occurred in

 3   2013?

 4   A.   No.

 5   Q.   Did anyone at Farmers State Bank, to your knowledge,

 6   other than you, know of criminal charges against Jon Pauling

 7   stemming from a sexual assault in 2013?

 8          MR. PULKRABEK:  Foundation.

 9          THE COURT:  Sustained.

10   A.   Am I to answer the question?

11   Q.   (By MS. OLDEMEYER) No.  I have to rephrase it.

12          THE COURT:  If I say sustained, then just bide your

13   tongue.

14   Q.   (By MS. OLDEMEYER) As you sit here today, Mr. Stull, do

15   you have personal knowledge that any other member of Farmers

16   State Bank knew Jon Pauling had been charged criminally for

17   sexual assault in 2013 in the May 2015 timeframe?

18   A.   I am not aware of anyone in the bank that was aware of any

19   lawsuit or any charges.

20   Q.   Let me show you Exhibit 1038.  Exhibit 1038 is a

21   two-page exhibit.  I'll just shrink it down and ask you to

22   take a look at that.  Are you familiar with Exhibit 1038?

23   A.   Yes, I am.

24   Q.   Is that something that the bank asked its legal counsel

25   to do for the bank?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021     583

1   A.  Yes.

2   Q.  We would offer Exhibit 1038.

3            MR. PULKRABEK:  It's hearsay.

4            THE COURT:  Ms. Oldemeyer.

5            MS. OLDEMEYER:  It's not hearsay, Your Honor.  This

6   is a bank record, a demand calling the notes that are at issue

7   in this case, the very debt that underlies the valid liens and

8   the definition of an asset under CUFTA.

9            THE COURT:  I agree with Ms. Oldemeyer.  The

10  objection is overruled.  The document is admitted.

11       (Defendants' Exhibit 1038 received.)

12  Q.  (By MS. OLDEMEYER) Are all the parties listed on

13  Exhibit 1038 borrowers on the notes that are listed in that

14  document in the text?

15  A.  Well, I have a hard time answering that question because

16  some of those didn't owe us money, but we had security

17  interest in them, so the assets wouldn't get transferred to

18  them, but they didn't have loan balances.

19  Q.  Thank you.  Exhibit 1040.  Is Exhibit 1040 a demand that

20  the bank asked legal counsel to prepare and send to Mark

21  Pauling about his note 2346 in the amount of $730,000?

22  A.  Yes.

23            MS. OLDEMEYER:  We'd offer Exhibit 1040.

24            MR. PULKRABEK:  Same objection.

25            THE COURT:  The objection is overruled.  The document

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021      584

1    is admitted.

2        (Defendants' Exhibit 1040 received.)

3    Q.  (By MS. OLDEMEYER) I'll go to Exhibit 1039.  1039 is a

4    10-page exhibit, and I believe we looked at the certificate

5    of mailing earlier.  Is exhibit -- the first page of

6    Exhibit 1039 a document that Farmers State Bank directed its

7    attorneys to prepare and send to Jon Pauling in April of

8    2016?

9    A.  Yes.

10   Q.  And is the second page a document that Farmers State

11   Bank's attorney sent to Mr. Pauling pursuant to Colorado law

12   for foreclosure purposes?

13   A.  Yes, I believe so.

14   Q.  Did Farmers State Bank direct legal counsel to initiate

15   foreclosure against Mr. Jon Pauling's residence at 717 7th

16   Avenue in Sterling, Colorado?

17   A.  Yes.

18   Q.  And to your knowledge, did that foreclosure end up with

19   the bank taking on that home as OREO?

20   A.  It did.

21           MS. OLDEMEYER:  We'd offer Exhibit 1039.

22           MR. PULKRABEK:  Same objection, hearsay.

23           THE COURT:  Overruled.  It's admitted.

24       (Defendants' Exhibit 1039 received.)

25   Q.  (By MS. OLDEMEYER) The letters, the first page of the

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3     04/14/2021    585

1   exhibit, the cover letters, were those accurate statements

2   of the amount of the balances of the loans referenced in

3   those demands for payment to the bank's knowledge?

4           THE COURT:  What cover letter?  The cover letter on

5   the screen doesn't say anything about --

6           MS. OLDEMEYER:  I'm looking at Exhibit 1038, the

7   letter on page two.

8   Q.  (By MS. OLDEMEYER) Were those accurate statements of the

9   balance on the debts on those loan numbers referenced

10  therein?

11  A.  I believe those to be true.

12  Q.  And on Exhibit 1040 with respect to note 2346, was that

13  an accurate statement of the balance due on that note?

14  A.  I believe those numbers to be accurate.

15  Q.  And Exhibit 1039, on the first page, is that an accurate

16  statement of the balance of the debt due under note 2217 as

17  of April 15th, 2016?

18  A.  Yes.

19  Q.  During the time period from that demand for payment in

20  April of 2016 as represented in those three documents and

21  the sale of assets to Lardyn in April of 2017 a year later,

22  was the bank in communications with Jon and Mark Pauling?

23  A.  Constant.

24  Q.  Did the bank know Two Mile Ranch General Partnership was

25  going to file for bankruptcy protection before it filed for

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        586

1   bankruptcy protection?

2   A.  I believe so, yes.

3   Q.  Exhibit 24C.  Exhibit 24C is a one-page exhibit.  Did

4   you, Mr. Steve Stull, draft that bottom e-mail on June 3rd,

5   2016, to individuals whose first names are JB and Don?

6   A.  I believe so, yes.

7   Q.  And what was your purpose in -- well, first of all, who

8   are those two people?

9   A.  JB Suddarth is the executive vice president of Henderson

10  State Bank, and Don Moore is the president of First Central

11  Bank in McCook.

12  Q.  For what purpose did you send them this?

13  A.  To just to keep them informed as to the process we were

14  going through at the time.

15  Q.  Mr. Stull, have you heard the word unicorn?

16  A.  Yes.

17  Q.  What's a unicorn?

18  A.  It's a mythical animal with a horn on it.  It looks like a

19  horse.

20  Q.  During the nine months from when Two Mile Ranch General

21  Partnership filed for Chapter 11 on July 1st, 2016, and the

22  bankruptcy being dismissed nine months later, was it

23  predetermined from the outset that ownership of Lardyn

24  Consulting would be Elyce York and Mark Pauling?

25  A.  No.  Not from the beginning, no.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021      587

1    Q.  Can you explain to the Court -- because there's

2    confusion.  The allegation is that was absolutely the plan

3    from day one.  Can you explain to the Court why that's not

4    true?

5    A.  Well, my understanding is that they were going to go out

6    and try to get investors, people with money, equity to come in

7    and buy into Lardyn as a vehicle, you know, capitalized brand

8    new entity and acquire the assets.

9    Q.  Exhibit 31, did you, Mr. Steve Stull, send this e-mail

10   on November 8th, 2016, with the two-page attachment to Jon

11   Pauling?

12   A.  Yes.

13   Q.  And with respect to -- well, first of all, what's a

14   commitment letter?

15   A.  A commitment letter is a letter that spells out what

16   conditions are necessary for you to provide financing to an

17   individual.  It's not a guarantee that you're going to do the

18   loan.  It's a commitment that if you follow everything that

19   you put in there, we will do a loan.

20   Q.  And on that particular loan commitment sent to

21   Mr. Pauling in November of 2019, the letter is addressed to

22   Lardyn Consulting, LLC and Elyce York; is that correct?

23   A.  Correct.

24        THE COURT:  Well, the cover letter went to Pauling,

25   not to Lardyn, right?  The e-mail went to Pauling.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      588

1        MS. OLDEMEYER:  That's correct.  I'm not arguing it

2   didn't.  Did I say something wrong?

3        THE COURT:  No.

4   Q.  (By MS. OLDEMEYER) My question to you, Mr. Stull, is on

5   this paragraph of borrowers, what did you tell -- for

6   purposes of this loan commitment in that paragraph, what did

7   you tell whoever received it?

8   A.  Well, this is a commitment letter that was made out to

9   Elyce letting her know that we would provide credit up to

10  $3.2 million if they could find -- and then under the

11  borrowers, it talks about if she can find a qualified investor

12  or entities as the members, and then it goes on to define what

13  a qualified investor is.

14  Q.  So in that borrowers section, second line, there's an

15  asterisk and qualified in parenthesis.  Do you see that?

16  A.  Correct.

17  Q.  And then does that asterisk relate to a different

18  asterisk in the paragraph below the borrowers section

19  heading?

20  A.  Right.  That's what it is intended to point to is that

21  paragraph.

22  Q.  Did the bank make up Exhibit 31 in anticipation of being

23  -- well, that's argumentative.  Was this the bank's intent

24  on November 4th, 2016, when the bank communicated this

25  entire communication?

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021    589

1   A.  Yes.  It was our understanding that they were working with

2   an investor group to get equity put into Lardyn Consulting,

3   LLC to purchase the farm ground at $4.2 million, thus the

4   $3.2 million loan.  They were looking for a million-dollar

5   investor.

6   Q.  And I'm going to ask you about Exhibit 35.  Did, in

7   Exhibit 35, Elyce York send the top portion of the first

8   page of Exhibit 35 to you, Steve Stull, on December 19th,

9   2016?

10  A.  It appears so, yes.

11  Q.  When she told you Lardyn will not be a part of the

12  entity buying the farm and Turkey Creek, they decided they

13  wanted more separation, what did you as the president and

14  CEO of Farmers State Bank take that to mean?

15  A.  They I took to be these investors that they'd been talking

16  about that they would not identify to us until things got

17  closer to being a done deal.

18  Q.  I'll ask you about Exhibit 1046.  And we went through

19  some of the pages of this, the security agreements and deeds

20  of trust, et cetera, with Mr. Mark Pauling.  But are you

21  familiar with the proof of claim that Farmers State Bank

22  prepared and filed in the federal court Chapter 11

23  bankruptcy case pending for Two Mile Ranch General

24  Partnership?

25  A.  I'm aware of it, yes.

                        Sarah K. Mitchell, RPR, CRR

 1   Q.  And in that proof of claim, did the bank state the total

 2   amount of debt that the bank believed was owed?

 3   A.  Was the 9,582,213.61.

 4   Q.  And that's on page 2 of 1046?

 5   A.  Yeah, under number seven.

 6   Q.  And as support for that did the bank provide bank

 7   documents -- I'm on page 4 of Exhibit 1046.  Did the bank

 8   provide bank documents by loan showing the -- excuse me --

 9   the balance due under each particular note that it was

10   filing including in that total $9.5 million number with the

11   proof of claim?

12   A.  Yes.

13   Q.  Those are as of the date that Two Mile Ranch General

14   Partnership filed for bankruptcy on; is that correct?

15   A.  I'm looking at this.  It says that it was run on 6/20/16

16   with a payment date of 7/1 of '16.

17   Q.  What is 7/1 of '16?

18   A.  Well, that's supposed to be the payoff date, but it also

19   is the day they must have filed the proof of claim.

20   Q.  Is that the date Two Mile Ranch General Partnership

21   filed for Chapter 11, to your knowledge?

22   A.  Yeah, I'm not exactly sure what date, but it's the right

23   timeframe.

24         MS. OLDEMEYER:  Your Honor, we would offer

25   Exhibit 1046.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021   591

1              MR. PULKRABEK:  It's hearsay offered for the truth.

2              THE COURT:  What is it offered to prove?

3              MS. OLDEMEYER:  Your Honor, this is a document

4    offered to prove the amount of debt that Two Mile Ranch

5    General Partnership owed Farmers State Bank as of the date of

6    the filing of the bankruptcy.

7              THE COURT:  Objection sustained.

8              MS. OLDEMEYER:  I don't think it's hearsay if it

9    falls under the public records exception as a court filing.

10   I'm going to pull up my hearsay rules.

11             THE COURT:  You can do that, but the objection is

12   sustained.

13   Q.  (By MS. OLDEMEYER) Did Farmers State Bank commit

14   bankruptcy fraud when it filed its proof of claim?

15   A.  Not -- no.

16   Q.  Was it trying to accurately state the amount of debt

17   that Two Mile Ranch owed?

18   A.  Yes.

19   Q.  The bank --

20   A.  Yes.

21   Q.  -- right?  And it provided 72 pages of support for the

22   cover page showing how it arrived at the amount of debt owed

23   the bank, correct?

24   A.  Correct.

25   Q.  And the underlying documents that showed the liens to

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021      592

1    secure that debt, correct?

2    A.   Correct.

3    Q.   And then calculated a value of what it felt it was

4    undersecured, correct?

5    A.   Correct.

6    Q.   With respect to the timing between July 1st of 2016,

7    when Two Mile Ranch filed for bankruptcy protection and

8    April of 2017, when the assets were sold to Lardyn

9    Consulting, did Two Mile Ranch General's debt obligation

10   change?

11   A.   Well, the accrued interest would have continued to grow,

12   but the principal balance should have stayed the same.

13   Q.   But the amount owed would increase by the amount of

14   interest that was accruing during that interim period?

15   A.   Correct.

16   Q.   And any advances like the attorney retainer we talked

17   about, would that increase the amount of debt owed the bank?

18   A.   Yes.

19   Q.   To determine -- well, what's equity?

20   A.   Equity is the same as capital.  So normally we'd count

21   equity as assets less liabilities equals your capital or

22   equity.

23        MS. OLDEMEYER:  Your Honor, I think Exhibit 1046

24   falls under the hearsay exception of Federal Rule 801(d)(1), a

25   declarant witness's prior statement.  It's consistent with the

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      593

1    declarant's testimony and is offered to rebut an express or

2    implied charge that the declarant recently fabricated it or

3    acted from a recent improper influence or motive in so

4    testifying.

5           THE COURT:  I didn't hear anyone attack his

6    credibility on these numbers.

7           MS. OLDEMEYER:  Your Honor, that's the CUFTA claim

8    where they're saying the bank lied about whether it was fully

9    secured, and therefore they get $7 million, and the bank

10   should be punished with exemplary damages.

11          MR. PULKRABEK:  Your Honor, I believe that exception,

12   number one, requires that the statement be made before any

13   motive to falsify has arisen, and here we've already heard

14   evidence these people were talking about filing the bankruptcy

15   to get rid of Amanda Wilson's judgment.  Also to protect the

16   partnership.

17          THE COURT:  The objection is still sustained.

18   Q.   (By MS. OLDEMEYER) Let's go to Exhibit 45.

19          THE COURT:  45.

20   Q.   (By MS. OLDEMEYER) In your direct examination

21   Mr. Pulkrabek asked you in Exhibit 45 -- and this is a

22   46-page exhibit -- he asked you about PDF page 27 which

23   bears the Bates number 15729.  Do you recall discussing that

24   with him?

25   A.   Yes.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        594

1    Q.   Who is Steve Brown, to your knowledge?

2    A.   Steve Brown is I believe -- I don't know if you'd call it

3    a geologist, or anyway, he's the person who goes out and

4    studies the oil fields for Antelope Energy.  And Antelope

5    Energy is a company out of Kimball, Nebraska.  I think they

6    have a head office in Midland, Texas.

7    Q.   Did Farmers State Bank ask Mr. Brown to do anything for

8    Farmers State Bank?

9    A.   No.

10   Q.   This document is an e-mail between Mr. Brown and Mr. Joe

11   Henry who he begins with, Jon, J-o-n.  Do you see that?

12   A.   Yes.

13   Q.   With respect to this appraisal, and Mr. Pulkrabek

14   pointed out the figure here, the 2,301,000 -- sorry --

15   2,301,000 number there.  Do you see that?

16   A.   Yes.

17   Q.   That paragraph continues.  Can you please read the rest

18   of that paragraph?

19   A.   Then uncertainty rears its head.  Since we are uncertain

20   on how many of the wells will actually be completed, Whiting

21   corporate decision, and how many will produce like our typical

22   well, banks typically discount proven nonproducing properties

23   by 75 percent giving your potential production the loan value

24   of $575,280.

25   Q.   To your knowledge -- well, let me ask a different

                        Sarah K. Mitchell, RPR, CRR

1    question.  The next page is a list of Two Mile Ranch

2    interests.  Do you see that?

3    A.  Yes.

4    Q.  To your knowledge, was Mr. Brown communicating with Jon

5    Pauling about the same producing mineral acres that the bank

6    asked Briana Lamphier at Gustavson to appraise?

7    A.  Yes.  Well, I don't know because I don't know what legal

8    descriptions we had Briana do, so I can't say from that

9    document.

10   Q.  Okay.  Other -- well, that's fine.  I'm going to go to

11   another page in this document.  I'm on page -- PDF page 38,

12   which bears the Bates stamp 15740, and it goes with the next

13   two pages through PDF 40 and Bates number 15742.  Do you see

14   the typewritten two pages in there?

15   A.  Yes.

16   Q.  Who prepared those?

17         MR. PULKRABEK:  Foundation.  Objection, foundation.

18         THE COURT:  Right.  That's -- that's what he's trying

19   to figure out, if he even knows.  Do you know who prepared

20   this stuff?

21   A.  I'm trying to refresh my memory by reading it.

22   Q.  (By MS. OLDEMEYER) Feel free -- I can shrink it down and

23   move around within those.

24   A.  That would be good, if I could see.

25   Q.  Let me know when you want me to flip to the other page.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      596

1   A.  Well, it would have been either me or Dick, I believe.

2   It's not ringing a bell as to which one of us did it, but one

3   of the two.  I can't tell who did that.

4   Q.  I want to point out at the bottom of PDF page 38.

5   A.  Lardyn will furnish the FirsTier by the 10th.  So that

6   would have been somebody from Lardyn prepared that.

7   Q.  So you looked at the line that said we are seeking a

8   20-year loan with annual amortized payments beginning

9   January 1st, 2018, on the Bates page FSB 15740, correct?

10  A.  Correct.

11  Q.  And so my question to you is did any member of Farmers

12  State Bank prepare those two typewritten pages?

13  A.  It does not appear as though they did, no.

14  Q.  Was Lardyn trying to get a loan from a bank other than

15  Farmers State Bank for a period of time?

16  A.  Yes.  FirsTier Bank in Kimball.

17  Q.  Did FirsTier Bank in Kimball grant the request for a

18  loan?

19  A.  They denied it.

20  Q.  With respect to the amount of debt that Two Mile Ranch

21  General Partnership owed, the $9.5 million figure that we

22  looked at in Exhibit 1046, the proof of claim, did you

23  include in that number any additional fees and costs that

24  the bank was entitled to recover under its agreements with

25  the borrower?

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    597

1  A.  I don't remember putting those fees in there.

2  Q.  So with respect to Exhibit 1007, it's a 24-page

3  document.  A summary is on the first page, and then there

4  are support behind of multiple expense invoices -- expenses

5  --

6  A.  Correct.

7  Q.  -- and invoices.  Do you see that?

8  A.  Yes.

9  Q.  Going to the summary, who is Deer Creek Appraisals?

10  A.  I believe Deer Creek Appraisals is the appraisal for

11  Turkey Creek.

12  Q.  What is Redtail Research?

13  A.  They did research for mineral interests.

14  Q.  Is that associated with the same Redtail that became a

15  borrower of the bank?

16  A.  No.  This is a separate company that existed.

17  Q.  And U.S. Appraisal Service of Colorado, what's that?

18  A.  Appraisals for the Logan County real estate and the Weld

19  County real estate.

20  Q.  And Moreland Realty?

21  A.  Also an appraisal for the Logan County real estate.

22  Q.  And Gustavson Associates?

23  A.  That would be that Briana Lamphier who did a -- I guess

24  you'd call it a mineral appraisal.

25  Q.  And then Cline Williams is what?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    598

1    A.  That's our law firm that we use.

2    Q.  The one that completed the foreclosure on the Sterling

3    residence?

4    A.  Yes.

5    Q.  And did other work.  So with respect to expenses

6    incurred for purposes of the problem borrower Two Mile Ranch

7    General Partnership, by May 11th, 2017, can you estimate the

8    total of expenses the bank had incurred?

9          MR. PULKRABEK:  Your Honor, I'm going to object to

10   this.  This is basically asking the witness substantive

11   questions about an exhibit that hasn't been admitted and is

12   leading him to a conclusion.

13         THE COURT:  The objection is overruled.

14   A.  The total would be $103,140.87 is the balance listed on

15   that page.

16   Q.  (By MS. OLDEMEYER) And if somebody wanted to question

17   the accuracy of any entry, there's attached support for

18   those calculations, correct?

19   A.  Correct.

20         MS. OLDEMEYER:  We would offer Exhibit 1007.

21         MR. PULKRABEK:  May I voir dire?

22         THE COURT:  Certainly.

23                    VOIR DIRE EXAMINATION

24   BY MR. PULKRABEK:

25   Q.  So in terms of this exhibit, the question -- or the

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    599

1    statement was there's adequate -- there's adequate support.

2    I want to go through that.  We have these summaries of Cline

3    Williams' invoices there.  Do you see that?

4    A.  Yes.

5    Q.  But there is no description whatsoever of what work was

6    being done.  Do you see that?

7    A.  Yes.

8    Q.  And what the evidence has shown already is that the

9    bank's attorneys were working with Two Mile Ranch's attorney

10   Mr. Lindquist-Kleissler even before going to bankruptcy with

11   the protection of the partnership.  Do you recall that?

12   A.  I recall them working together.

13   Q.  And so there's just -- with respect particularly to the

14   Cline Williams law firm, there's no way in this document to

15   ascertain what charges actually pertain to Two Mile Ranch

16   versus other matters because we don't have any of that

17   detail, but beyond that, there's no way that we can see

18   within that to whether it would be an appropriate charge

19   under any of your lending documents because that support is

20   not provided here, is it?

21   A.  Well, I don't know if it -- what it requires, but the

22   detail is not there, I will agree.

23             MR. PULKRABEK:  Thank you, Your Honor.

24             MS. OLDEMEYER:  May I ask a question or two, Your

25   Honor?  If I could have the screen back?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      600

1      THE COURT:  Will you promise that it's only a

2   question or two?

3      MS. OLDEMEYER:  Sure.

4      CROSS-EXAMINATION (Cont'd)

5   BY MS. OLDEMEYER:

6   Q.  I'm on page 4 of Exhibit 1007, Mr. Stull, and is there a

7   name for the client listed on that matter ledger report?

8   A.  Farmers State Bank Dodge.

9   Q.  And is there a matter description there?

10  A.  Two Mile Ranch; Two Mile Ranch Market Company, LLC; Two

11  Mile Ranch Cattle Feeders Company, LLC; Two Mile Ranch Land

12  Company, LLC.

13  Q.  And on the previous page, that matter ledger report, is

14  there also a description of the matter?

15  A.  Pauling subpoena.

16  Q.  And then on the other page previous, what's the matter

17  description there?

18  A.  General.

19  Q.  And there are a bunch of redactions, correct?

20  A.  Correct.

21      MS. OLDEMEYER:  I would offer Exhibit 1007.

22      MR. PULKRABEK:  I maintain my objection.  This would

23  never pass muster if somebody was trying to seek legal fees.

24      THE COURT:  Sustained.

25  Q.  (By MS. OLDEMEYER) Did the bank have a lot of legal

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    601

1   issues going on between January 1st, 2016 and April of 2017,

2   other than -- for which it used Cline Williams law firm

3   other than issues related to these borrowers?

4   A.  No.

5   Q.  I'm going to go to Exhibit 34, and I'm on page 2, and

6   I'm under present status.

7   A.  What's the date again?  Sorry.

8   Q.  I'll make it smaller.  Mr. Pulkrabek asked you about in

9   particular this document on the present status paragraph and

10  the content of that section.  Do you recall that?

11  A.  Yes.

12  Q.  Does the words charging order appear in that paragraph?

13  A.  I don't see anything in that paragraph, no.

14  Q.  Does the word equity appear in that paragraph -- those

15  two paragraphs?

16  A.  Equity?

17       THE COURT:  Why are you having him do this?  I mean,

18  we're wasting time.  Poor guy, if it's there, point it out to

19  him.  If it's not there, then it's not there.

20       MS. OLDEMEYER:  I fear objections, Your Honor, and

21  the Court has indicated it does not like to read voluminous

22  information, so this is an important point.

23  Q.  (By MS. OLDEMEYER) Mr. Stull, if I represent to you that

24  the word equity does not appear in the present status

25  paragraph, would you disagree with me?

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021    602

1    A.  I would believe you.

2    Q.  And earlier in your testimony you explained the

3    difference between assets and equity, correct?

4    A.  Correct.

5              MS. OLDEMEYER:  Your Honor, I'd like the Court to

6    take judicial notice of an admission in the court filings.

7    It's docket exhibit 82, page 6, and it's at paragraph 8 where

8    they're talking about the first sentence.

9              THE COURT:  You're talking about some filing in this

10   case?

11             MS. OLDEMEYER:  Yep, by plaintiff.

12             THE COURT:  By the plaintiff?

13             MS. OLDEMEYER:  Yep.

14             THE COURT:  You say it's Number 82?

15             MS. OLDEMEYER:  Docket 82, page 6, paragraph 8, and I

16   can pull it up.

17             THE COURT:  What is the document?

18             MS. OLDEMEYER:  It is their motion for exemplary

19   damages.  And in that document --

20             THE COURT:  Well, the Court certainly takes judicial

21   notice of the filings in this case.

22             MS. OLDEMEYER:  And in particular the admission that

23   although FSB's terminology was imprecise hyphen, defendants

24   could not, quote, get rid of Jon's judgment sic, end quote, by

25   running Two Mile Ranch through a Chapter 11 proceeding, these

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 3     04/14/2021   603

1    statements leave no doubt that defendants' intent was to block

2    plaintiff from collecting her judgment and avoid the charging

3    order entered by Judge Buchanan.

4            THE COURT:  You want me to take judicial notice of

5    that?

6            MS. OLDEMEYER:  I want you to take judicial notice of

7    the admission that the legal consequence of Jon's judgment,

8    Wilson admits that Farmers State Bank's terminology was

9    imprecise.  I understand the Court's going to argue intent,

10   and the Court has -- doesn't --

11           THE COURT:  The Court's going to argue intent?

12           MS. OLDEMEYER:  No.  The plaintiff is going to argue

13   intent, and the Court's going to have to make a determination

14   on what was Farmers State Bank's intent, which is debated in

15   this case.  It's a disputed fact.  But the legal issue has

16   been admitted by Wilson in that court filing.

17           THE COURT:  All right.  I don't know what you want to

18   say they're admitting.  If they're admitting that you

19   defendants can't get rid of the judgment in a Chapter 11

20   proceeding, I'm not going to take judicial notice of that as

21   an admission.  I don't even know what it means.

22           MS. OLDEMEYER:  We'll have legal expert Ryan Thorson

23   come talk about those.  He's an expert that will be called on

24   Friday.

25           THE COURT:  I guarantee you there isn't going to be

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      604

1    any legal expert in this courtroom telling me what documents

2    say.  That isn't going to happen.

3          MS. OLDEMEYER:  He's not going to tell you what this

4    document says.  He's going to explain Colorado law.

5          THE COURT:  Not to me, he's not.  So you can save

6    your client a little money if that's what you think the expert

7    is going to come in and do.

8          MS. OLDEMEYER:  Absolutely.  And can I make an offer

9    of proof now then?

10         THE COURT:  What, that some legal expert is going to

11   come in later in the week and tell me what the law is?  No,

12   you can't make an offer of proof on that.  That's just

13   absolutely improper, and you know it.

14         MS. OLDEMEYER:  Actually, I don't know it, Your

15   Honor, and he's rebutting the opinions of plaintiff's experts

16   Ms. Patterson and Ms. Lutz.

17         THE COURT:  I don't have any idea what the

18   plaintiff's experts are going to say.  They're not going to

19   tell me what the law is either.

20         MS. OLDEMEYER:  Well, I'll wait to -- I'll wait until

21   after they testify.

22         THE COURT:  One reason I'm sitting here is to

23   determine what the law is.  I'm not going to have either

24   side's experts come in and tell me what the law is.  This

25   young lady sitting over there in the jury box is going to tell

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3     04/14/2021    605

1    me what the law is because that's her job.

2    Q.   (By MS. OLDEMEYER) On Exhibit 36, Mr. Stull --

3    A.   Yes.

4    Q.   -- in the middle, did you, Mr. Steve Stull, on

5    January 23rd, 2017, e-mail Mark Allan Pauling at

6    dirtmagnet1961@gmail.com and make the statement, We would

7    love it if you would get your deal put together without us

8    doing a deed in lieu so you have the chance to make

9    something from the oil rights, but we don't and can't keep

10   hoping for it to happen either.  Did you send that?

11   A.   Yes.

12   Q.   What did you mean by that when you sent that e-mail to

13   Mr. Mark Pauling?

14   A.   Well, this was a time when we were about ready to do the

15   deeds in lieu, and they came to us with this alternative plan

16   which had always been before them getting some type of

17   investor in to put equity in and go forward.  I believe what

18   they were talking about at this time, January 23rd, it was

19   talking about doing it outside of the bankruptcy and letting

20   us do the foreclosure or letting them put together some kind

21   of deal that they were working on.

22            MS. OLDEMEYER:  We'd offer Exhibit 36.

23            MR. PULKRABEK:  No objection.

24            THE COURT:  Just a minute, please.  The document's

25   admitted.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      606

1          (Plaintiff's Exhibit 6 received.)

2             MS. OLDEMEYER:  I apologize.

3             THE COURT:  I don't understand why you're putting it

4    in, Ms. Oldemeyer.  I understand why he doesn't object to it.

5    It's admitted.

6             MS. OLDEMEYER:  Sure.  Would you like me to explain?

7             THE COURT:  No.

8             MS. OLDEMEYER:  Well, I don't get a chance to ask

9    questions after Mr. Pulkrabek goes, and if he brings up new

10   information, that deprives me of my opportunity, so I'm trying

11   to be proactive.

12            THE COURT:  What he testified to was they, meaning

13   the Paulings, came to us about this new deal; i.e., the Lardyn

14   deal, to avoid a deed in lieu, right, sir?

15            THE WITNESS:  No, not quite right.  It's not the

16   Paulings.  It's Mark and Elyce, I believe.

17            THE COURT:  So when you said they, you meant Elyce

18   and Mark?

19            THE WITNESS:  Yes.

20   Q.  (By MS. OLDEMEYER) Mr. Stull, if Farmers State Bank had

21   thought at any time in 2015 or 2016 or before the sale to

22   Lardyn in April of 2017 that the bank could foreclose on all

23   of the assets pledged as collateral for Two Mile Ranch debts

24   and guaranties, that the bank could recoup all the debt it

25   was owed, would the bank have done that?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    607

1   A.   Absolutely.

2   Q.   Why didn't the bank foreclose?

3   A.   Because we were getting information from experts that we

4   were going to fall way short of that amount, and that we would

5   rather see a plan put together where somebody would pay market

6   price for the assets.

7   Q.   Did the dismissal of the bankruptcy Chapter 11 have

8   anything to do with the plan to pull the wool over

9   Ms. Wilson's or her attorney's eyes?

10  A.   No.

11  Q.   Did the bank want to do business with Jon Pauling in --

12  after April of 2017?

13  A.   No.

14  Q.   Would the bank have allowed the sale of the Two Mile

15  Ranch in Logan County, Colorado, to Lardyn Consulting if

16  there was no title insurance policy?

17  A.   Well, we always get a title insurance policy to make sure

18  what liens are out there, so, no, we would not.

19  Q.   I'm going to show you Exhibit 1006.  Exhibit 1006 is a

20  12-page document, the first page being a summary.  Did you

21  prepare the first page of Exhibit 1006?

22  A.   I prepared this page.

23  Q.   And what are the pages that follow?

24  A.   The supporting information.

25  Q.   And when you say --

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021      608

1   A.  For the first page.

2   Q.  Are these supporting -- the supporting information, are

3   those Farmers State Bank records?

4   A.  Those are bank records.

5   Q.  And was all -- what were you trying to show in the first

6   page of Exhibit 1006?

7   A.  Well, I'm trying to show the source and use of funds.

8   Q.  And that's related to the sale of assets to Lardyn on

9   April 27th, 2018?

10  A.  Correct.

11          MS. OLDEMEYER:  We would offer Exhibit 1006.

12          MR. PULKRABEK:  Objection, Your Honor.  Doesn't meet

13  the criteria for Rule 1006, and among other things, I'll just

14  point directly to the fees and expenses that the Court has

15  ruled could not be admitted through the other document because

16  of inadequate foundational support.

17          MR. FORBES:  Your Honor, I believe you did allow him

18  to testify as to the amount of fees and expenses.  You just

19  did not receive the backup document because there wasn't

20  supporting, but the testimony about the amount did come in.

21          THE COURT:  Right.  The concern was that it wasn't

22  clear whether it all related to this matter.  That

23  notwithstanding, the objection is overruled, and it's admitted

24  because the rest of the exhibit, I presume, or at least

25  there's evidence, that it's accurate.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3     04/14/2021     609

1       (Defendants' Exhibit 1006 received.)

2   Q.  (By MS. OLDEMEYER) Exhibits 58 and 59.  Is Exhibit 58 a

3   three-page exhibit of the Lardyn Consulting, LLC and Elyce

4   M. York bank account at Farmers State Bank for the month of

5   April 2017?

6   A.  It appears to be, yes.

7   Q.  And does it show a deposit of loan proceeds in the

8   amount of $7,100,000?

9   A.  Yes, it does.

10  Q.  And then does it show that miscellaneous debit of

11  counter check for $6.49 million?

12  A.  Yes.

13  Q.  And a check, 1004, for $610,000?

14  A.  Yes.

15  Q.  And then if one goes to page 3 of Exhibit 58, you can

16  find the supporting documents for those, correct?

17  A.  Correct.

18  Q.  And it actually has a copy of the check written to Two

19  Mile Ranch, Colorado General Partnership in the amount of

20  $610,000, correct?

21  A.  Correct.

22  Q.  I have that exhibit as received.  I'm going to show you

23  Exhibit 59.  Exhibit 59 is a four-page exhibit.  Is it a

24  true and accurate copy of the Two Mile Ranch General

25  Partnership Mark Allan Pauling bank account at Farmers State

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    610

1   Bank for the month of April 6, 2017, ending April 30, 2017?

2   A.   Yes.

3   Q.   And on 4/28/2017, does it show a regular deposit of

4   $610,000?

5   A.   Yes.

6   Q.   And a regular deposit of $6.49 million?

7   A.   Yes.

8   Q.   And then does it have a series of loan payments there as

9   well?

10  A.   Yes.

11  Q.   And a miscellaneous counter check in the amount of

12  $49,847.68, correct?

13  A.   Correct.

14  Q.   And if one goes to the later pages in Exhibit 59, one

15  can see that reference to the $49,847.68 counter check with

16  a description by Kelly of loan closing fees, correct?

17  A.   Correct.

18  Q.   What loan is that?

19  A.   Well, it's the 7 million, 1 loan.

20  Q.   That's the date where the transactions where Lardyn

21  acquired Two Mile Ranch General Partnership assets, some of

22  them, correct?

23  A.   Correct.

24  Q.   And there was a loan associated with that, correct?

25  A.   Correct.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      611

1          MS. OLDEMEYER:  We would offer Exhibit 59.

2          MR. PULKRABEK:  No objection.

3          THE COURT:  Admitted.

4      (Plaintiff's Exhibit 59 received.)

5   Q.  (By MS. OLDEMEYER) With respect to one asset that wasn't

6   sold, a big one, can you tell me what big asset wasn't sold

7   to Lardyn Consulting?

8   A.  The Turkey Creek property in Morrison County -- or in

9   Morrison.  I don't know what county that's in.

10  Q.  To your knowledge, what was happening with that property

11  from April of 2017 until the bank took a deed in lieu of

12  foreclosure in December of 2019?

13  A.  It was being marketed by a real estate broker.

14  Q.  And were you getting updates as to whether there was any

15  interest?

16  A.  There was very little interest in it.

17          MR. PULKRABEK:  Hold on, objection, Your Honor.

18  Hearsay.

19          THE COURT:  Sustained.

20  Q.  (By MS. OLDEMEYER) For purposes of the bank's

21  decision-making on whether to foreclose on that property

22  prior to December of 2019, why didn't the bank foreclose on

23  that property prior to December of 2019?

24  A.  Because we were allowing them to try to market it for as

25  much as they could.  We would prefer that the customers sell

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    612

1    it.

2    Q.  I've put on the screen Exhibit 124.  That's a 15-page

3    exhibit.  Is that the deed in lieu of foreclosure between

4    the bank and Two Mile Ranch and Jon and Mark Pauling?

5    A.  It appears to be, yes.

6           MS. OLDEMEYER:  We'd offer Exhibit 124.

7           MR. PULKRABEK:  No objection.

8           THE COURT:  Did you say no objection?

9           MR. PULKRABEK:  Yeah.  No objection, Your Honor.

10          THE COURT:  It's admitted.  I think it was stipulated

11   anyway.

12       (Plaintiff's Exhibit 124 received.)

13   Q.  (By MS. OLDEMEYER) What happened after the bank took

14   this deed in lieu of foreclosure?

15   A.  My brother Mike Stull, Chris Gray, and myself went up to

16   the property to assess the condition of the property.  It

17   needed some cleanup and repairs, and so we hired multiple

18   contractors to come in and do repairs.  We then hired a

19   realtor in the area to put it on the market.

20   Q.  And did you put it on the market?

21   A.  We did.

22   Q.  Were you able to sell it?

23   A.  We did sell it, yes.

24   Q.  How long did it take?

25   A.  I don't remember the exact date.  I think we sold it in

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      613

1   June-ish.  I don't remember.  It was a while.

2   Q.  Okay.

3   A.  Several months.

4   Q.  With respect to then what the bank collected when it

5   sold it, do you recall how much the bank collected?

6   A.  Well, the sales price was a million-625 or a million-650.

7   I can't remember.  There was negotiations going on.  The

8   realtor's fee was just right at $100,000.  That's what I

9   remember about it.

10  Q.  After the bank took title to the Turkey Creek property,

11  was there any charge-off?

12  A.  We did a $500,000 principal charge-off, and then we had to

13  reverse accrued interest for another 89,000, I believe.

14  Q.  The Court has heard testimony about Lardyn transferring

15  mineral interests into Redtail.  Did the bank object to

16  that?

17  A.  No.

18  Q.  Why not?

19  A.  Because we were -- it was a dollar-for-dollar transaction,

20  and we kept the same collateral, and they guaranteed each

21  other.  The reason that I understood that they did it --

22      MR. PULKRABEK:  Objection, foundation, hearsay.

23      THE COURT:  Sustained.

24  Q.  (By MS. OLDEMEYER) Why did the bank not object?

25  A.  Well, there was multiple reasons why we didn't object.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3     04/14/2021   614

1   One, it separated the assets, so if they could market

2   either/or separately as opposed to together, we could keep

3   track of their income and expenses.  And then the other reason

4   that we liked it is it allowed us to have two separate

5   borrowers, meaning that we have two different repayment

6   sources, and we can lend money to two borrowers instead of one

7   and allow us to not have to deal with one participant.

8   Q.  Was there, to your recollection, any change in the

9   existing deed of trust?

10  A.  Was there a change in the existing deed of trust?

11  Q.  Yeah.

12  A.  The original Lardyn deed of trust?

13  Q.  Right.

14  A.  I don't remember the details on that.  I would think that

15  we would file a new one under Redtail.

16  Q.  With respect to -- you just don't know one way or the

17  other?

18  A.  Not for certain without documents to help refresh my

19  memory.

20  Q.  Let's move to June of 2019.  Can you explain to the

21  Court what an SBA loan is?

22  A.  Small Business Administration loan is a government

23  guaranteed loan.  Typically the type that we went for was a

24  75 percent guaranty on the principal amount.  It allows for

25  the bank to loan money long term and put it on a structured

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      615

1   payment as opposed to having it come due every year.  So that

2   was the purpose of the SBA loan was to get some type of

3   structure to the repayment source.

4   Q.  And on behalf of the bank, who was principally involved

5   in the work leading up to that SBA loan?

6   A.  Jarrod Hamik does most of our SBA loans.

7   Q.  The bank made a loan to the Elyce York Trust Number 1;

8   is that correct?

9   A.  Yes.

10   Q.  And why did the bank make that loan?

11   A.  We were pushing Mark to get us paid down on the Two Mile

12   Turkey Creek loan, and they, being Mark, actually thought that

13   selling that and converting it to cash and then paying down

14   the debt on the Two Mile Ranch side would be beneficial to him

15   because he was also taking out his loan to Two Mile Ranch that

16   he had.

17   Q.  Thank you.  I'm looking for a document.  I'm pulling up

18   Exhibit 1076.  Why don't you take a minute and look at that

19   document and see if it refreshes your memory as to when the

20   bank sold Turkey Creek.

21   A.  September of -- September 1st of 2020.  It looks like it

22   was recorded on September 2nd, 2020.

23   Q.  Let me show you Exhibit 134.  We'll skip that.

24   Exhibit 1078 is a four-page exhibit.  Are these board

25   meeting minutes?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    616

1   A.   Yes.

2   Q.   And these board meeting minutes are from when?

3   A.   December 17th of 2019.

4   Q.   Are the board meeting minutes prepared at or about the

5   time of the meeting shortly thereafter?

6   A.   Yes.

7   Q.   And are they reviewed and approved by the participants

8   in the meeting?

9   A.   At the next meeting.

10  Q.   And on page 2 of Exhibit 1078, does this refer to a

11  discussion at the board level of a 500,000 charge-off of Two

12  Mile Ranch once the bank attorney gives the approval to do

13  so?

14  A.   Yes.

15  Q.   And the board voted 14 to 0 to approve that, correct?

16  A.   Correct.

17  Q.   Was there anything left over after paying the remaining

18  debts that Two Mile Ranch owed the bank to give back to Two

19  Mile Ranch after that foreclosure?

20  A.   Back to Two Mile Ranch after we charged off $500,000, no.

21  Q.   And with respect to the Sterling home at the end of the

22  2016 time period that was foreclosed on, was there any money

23  left over to give back to Jon Pauling or Two Mile Ranch?

24  A.   No.  It all got applied to debts.

25  Q.   The transactions between Lardyn and Redtail in 2017,

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021   617

1   were those reviewed at the loan committee?

2   A.  I'm sorry.  Can you say that again?

3   Q.  The transactions relating to Redtail and Lardyn, were

4   those reviewed at the loan committee?

5   A.  Yes.  It appears so, yes.

6           MS. OLDEMEYER:  We'd offer Exhibit 1071.

7           MR. PULKRABEK:  No objection.  I'm not sure what the

8   relevance is, but...

9           THE COURT:  It's admitted.

10      (Defendants' Exhibit 1071 received.)

11  Q.  (By MS. OLDEMEYER) With respect to your earlier

12  testimony about a deed of trust for Redtail, what is

13  Exhibit 1072?

14  A.  1072 is a deed of trust, Redtail Resources, Nebraska

15  limited liability company, trustee is Weld County public

16  trustee, and the lender is Farmers State Bank Bridgeport.

17          MS. OLDEMEYER:  We'd offer Exhibit 1072.

18          MR. PULKRABEK:  No objection.

19          THE COURT:  It's admitted.

20      (Defendants' Exhibit 1072 received.)

21  Q.  (By MS. OLDEMEYER) What is Exhibit 1074?

22  A.  Special loan meeting, February 1st, 2019.

23  Q.  And does this relate to Lardyn Consulting, Elyce York,

24  Mark Pauling, Pauling Hauling, Cherry Creek Cattle Company

25  loan requests?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    618

1   A.  Yes.

2   Q.  And it was discussed and that loan request was approved

3   at loan committee, correct?

4   A.  That's correct.

5   Q.  Does this relate to the SBA loan?

6   A.  It does.

7            MS. OLDEMEYER:  We'd offer Exhibit 1074.

8            MR. PULKRABEK:  Business record.  No objection.

9            THE COURT:  Right, and it was also stipulated.  It's

10  admitted.

11           (Defendants' Exhibit 1074 received.)

12  Q.  (By MS. OLDEMEYER) And what is Exhibit 1075?

13  A.  Loan meeting minutes from 7/24/2019.

14  Q.  We would -- does it relate to Elyce York?

15  A.  It does.

16  Q.  And Lardyn Consulting?

17  A.  Yes.

18           MS. OLDEMEYER:  We'd offer Exhibit 1075.

19           THE COURT:  Admitted.  Stipulated.

20       (Defendants' Exhibit 1075 received.)

21  Q.  (By MS. OLDEMEYER) Mr. Stull, at any point in time in

22  your business dealings with Two Mile Ranch General

23  Partnership did you, Steve Stull, stop being a banker and

24  become an accomplice?

25  A.  No.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    619

1    Q.  At any point in time in your business dealings with Jon

2    Pauling did you stop being a banker and become a

3    coconspirator to commit a fraudulent transfer of Jon

4    Pauling's assets?

5    A.  No.

6    Q.  Did you stop being a banker and become a coconspirator

7    to defeat Amanda Wilson's charging order against Jon

8    Pauling's interest in Two Mile Ranch?

9    A.  No.

10   Q.  With respect to any of the transactions involving Elyce

11   York, Lardyn Consulting, Redtail, same thing, did you stop

12   being a banker and become a coconspirator to fraudulent

13   transfer of assets to defeat Amanda Wilson's charging order

14   against Jon Pauling's interest in Two Mile Ranch?

15   A.  No.

16   Q.  The Court heard testimony yesterday about Ms. York

17   purchasing a home in Sidney, Nebraska, and I want to -- for

18   those who aren't familiar with Sidney, Nebraska, what was a

19   major business in Sidney, Nebraska?

20   A.  Sidney, Nebraska, was the home of Cabela's, which is the

21   large sporting goods store that merged with Bass Pro.

22   Q.  When that merger occurred, what happened to the

23   community?

24   A.  Well, the headquarters moved out.

25          MR. PULKRABEK:  Objection, relevance, foundation.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    620

1              THE COURT:  Sustained.

2    Q.   (By MS. OLDEMEYER) What are the home prices like in

3    Sidney, Nebraska?

4    A.   Today?

5    Q.   After Cabela's merged with Bass Pro.

6              MR. PULKRABEK:  Foundation.

7              THE COURT:  Sustained.

8    Q.   (By MS. OLDEMEYER) Do you as a banker know the home

9    prices in Sidney, Nebraska, and what happened in that

10   community?

11             MR. PULKRABEK:  Same objection, Your Honor.

12             THE COURT:  Yeah.  How do you know?  Do you know?

13   How do you know?

14             MS. OLDEMEYER:  I'll ask those two questions.

15   Q.   (By MS. OLDEMEYER) Do you know?

16   A.   I do know.

17   Q.   How do you know?

18   A.   Because it was plastered all over the newspapers, and it

19   was plastered that home prices were crashing.

20   Q.   Were people moving out of the community?

21   A.   Yes.

22   Q.   And so the impression was she lives in a

23   5,000-square-foot house on a golf course.  Is that -- did

24   the bank loan her the purchase price?

25   A.   No.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 3     04/14/2021    621

1   Q.  Ms. Wilson was sexually assaulted by Jon Pauling and got

2   a judgment to compensate her for that harm.  You are aware

3   of that aren't you, sir?

4   A.  Yes, I am.

5   Q.  And the bank had a lending relationship with Jon Pauling

6   and his entities, didn't the bank?

7   A.  Yes, we did.

8   Q.  Why doesn't the bank just give her some money?

9        MR. PULKRABEK:  Objection, Your Honor.  This is

10  argumentative.

11        THE COURT:  Sustained.

12        MS. OLDEMEYER:  I'm sorry.  Did the Court rule on the

13  objection and you're waiting for me?

14        THE COURT:  I sustained the objection.

15        MS. OLDEMEYER:  I didn't hear.  I apologize.  There

16  was a pregnant silence, and I didn't know you were waiting on

17  me.

18  Q.  (By MS. OLDEMEYER) Is the bank a for-profit entity?

19  A.  Yes.

20        MS. OLDEMEYER:  No further questions.

21        THE COURT:  Which of you two wishes to cross-examine?

22        MR. FORBES:  Your Honor, Peter Forbes.  I'll go.

23        THE COURT:  Mr. Forbes.

24

25

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    622

1                              CROSS-EXAMINATION

2    BY MR. FORBES:

3    Q.  Mr. Stull, we looked at, and if you need to see these

4    I'll pull them up, but we looked at Exhibit 31.  That was a

5    November 4, 2016, commitment letter where you referred to

6    the need for this new entity that would include Lardyn to

7    get a qualified investor.  Do you remember that?

8    A.  Yes.

9    Q.  Okay.  And then we then looked at a follow-up exhibit, I

10   think it was 34, but it was Elyce's e-mail back to you

11   saying they want more separation so we're not going forward?

12   A.  Yes.

13   Q.  Okay.  Going forward a little bit -- so that was in the

14   November 2016 time period, right?

15   A.  Yes.

16   Q.  Okay.  I want to jump forward then to another exhibit

17   that you were asked questions about.  It was Exhibit

18   Number 45.  It was a March 27th, 2017, e-mail with

19   attachments from your father -- I'm sorry -- from Richard

20   Stull to various bankers sending out a participation packet.

21   Do you remember that?

22   A.  Yes.

23   Q.  Okay.  I'm going to pull that up a little bit because I

24   want to ask a couple questions about that.  Let me go to

25   this Exhibit 45, and this was -- Exhibit 45, as I said, this

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021      623

1   is March 2017.  And this is a month before the transaction

2   with Lardyn closes, right?

3   A.  I believe that's correct.

4   Q.  All right.  And just directing your attention to this

5   paragraph that begins at this point, it looks as if there

6   will be a deed in lieu, et cetera?

7   A.  Yes, I see it.

8   Q.  And that didn't happen, the deed in lieu transaction,

9   right?

10  A.  Correct.

11  Q.  All right.  And before we looked at the other

12  transaction, it said basically you're only going to lend to

13  Elyce if she could bring in an investor that would put in a

14  million dollars when it was just buying the farm, right?

15  A.  Right.

16  Q.  And at this point the bankruptcy is still pending,

17  right?

18  A.  I can't tell you when it was dismissed.

19  Q.  Yeah, and I apologize.  In the previous paragraph you

20  see there's a reference to at that point Two Mile Ranch had

21  a motion before the bankruptcy court to have the Chapter 11

22  dismissed?

23  A.  Right.

24  Q.  Okay.  So the first question is why didn't the bank just

25  go through the Chapter 11 and have these assets sold through

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        624

1   the bankruptcy court?

2   A.  Several reasons.  One, again, had to do with them being

3   out of money and us having to pay all the legal fees is one of

4   the reasons I remember.  The other was the distressed property

5   because of the reputation around it was being indicated that

6   it was not going to come back favorable.

7   Q.  When you say what wasn't going to come back favorable?

8   A.  The sale of the real estate was going to come back poorly.

9   Q.  Let me back up.  So when I was talking about selling it

10  through bankruptcy, are you talking about basically

11  conducting an auction through the bankruptcy court?

12  A.  Yes.

13  Q.  Okay.  So just to break it down then, the reason you

14  didn't proceed to just go through an auction in the

15  bankruptcy court was because of what you just said, because

16  it had come back that the property wouldn't be received

17  favorably in terms of pricing?

18  A.  Correct.

19  Q.  Mine is a slightly different question then.  Why didn't

20  you just go to the bankruptcy court and seek to have the

21  sale to Lardyn approved by the bankruptcy court?

22  A.  Again, it had to do with us paying for all the legal fees

23  at the time, and that wasn't sitting well with all the other

24  fees that we had paid.

25  Q.  And is that the reason or are there other reasons?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        625

1   A.  I don't recall any other reasons, but, I mean, there's a
2   whole lot of reasons not to, but...
3   Q.  And what are those?
4   A.  Just the time that it was going to take.  We were leading
5   into another planting season.  We missed out on one full
6   operating season prior.  And if we would have gone through
7   that, the crops would have got planted, the operation would
8   have been going, that would have been another huge burden to
9   the bank, and so that was taken into consideration.
10  Q.  Any other factors that you can recall now?  And, again,
11  I don't want --
12  A.  No.  Those are the ones that I recall.
13  Q.  I was going to say to the extent you talked to counsel,
14  I don't want you to tell us what your conversations with
15  your bankruptcy counsel might have been.  So I'm just
16  getting at practical business reasons.  Those are the ones
17  you can recall?
18  A.  Right.
19  Q.  Okay.  Then so the bankruptcy was pending.  You
20  discussed and answered my questions about why you didn't go
21  through the bankruptcy.  Why didn't you go through the deed
22  in lieu process which is the next process -- potential
23  that's described?
24  A.  Same reason.  It would have been an auction, and, again,
25  we were getting indication from Kraupie real estate that was

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    626

1   going to do the auction there was a lot of people interested

2   at really low prices, and we didn't feel like -- we felt like

3   if we can have an ongoing entity in there, even if it was

4   somebody with no experience, we were no further off.  At least

5   they were operating it and giving them the chance to make a go

6   of it and not lose out on operating season.  We were quite

7   confident that they could get the feedlot filled up because we

8   were getting feeders saying they were needing that service.

9   So we took all of those things into consideration when we did

10  this.

11  Q.  Okay.  I wanted to turn now -- I apologize -- we'll just

12  be skimming through some of these pages until I get to where

13  I need to be.  So this document we're looking at here,

14  Exhibit 45, was sent on March 27th of 2017, and at that

15  point you'd received the appraisal from Gustavson, right?

16  A.  So I'm not seeing the date.

17  Q.  Right.  I'm sorry.  I had thought maybe -- I hoped maybe

18  you'd remember that.

19  A.  Well, I remember this document.  It's the document from

20  Steve Brown that talked about production values and discounts.

21  Q.  Right.  And really what I want to get at is let's assume

22  you received the document -- and the record will show the

23  document from Gustavson is dated in February of 2017, so it

24  had, in fact, been received, so let's assume that for

25  purposes of this question.  Why did you send these potential

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    627

1    participants this Steve Brown -- what is it -- a one-page

2    e-mail as opposed to sending Ms. Lamphier's report which is,

3    as we'll see, multiple pages with multiple schedules and

4    price forecasts and done by a certified mineral appraiser?

5    Why were you sending out this e-mail?

6    A.   I wasn't aware that we didn't send out both personally.

7    Q.   Okay.  Well, let's assume -- let's assume you did send

8    it.  Why did you send some other --

9              MR. PULKRABEK:  Objection, foundation.

10             THE COURT:  Overruled.

11   Q.   (By MR. FORBES) I mean, in other words, I don't want you

12   to worry about why you didn't send it.  My question now is

13   why did you send this one-page document to these loan

14   participants?

15   A.   It was information that was provided to us, and we wanted

16   all the information out there.  You know, it shows there in

17   the document that a typical bank would give that much loan

18   history.  We wanted them to know all of the information.

19   Q.   Okay.  And --

20   A.   The other thing I like about it is it has the individual

21   price and a formula that I can put a number into any day of

22   the year what gas prices are and figure a value.  That's one

23   other reason I like it.

24   Q.   All right.  When you sent it did you notice that --

25   A.   Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3        04/14/2021        628

1   Q.  -- Mr. Brown said he wasn't certified in any way to

2   publish these values?

3   A.  Right.

4   Q.  Okay.  But nonetheless, you felt it was information, so

5   you sent it out?

6   A.  Correct.

7   Q.  Okay.  Did you ever ask Mr. Brown to do an appraisal of

8   the mineral interests owned by -- owned by Two Mile Ranch?

9   A.  The bank did not, no.

10  Q.  I'm sorry.  The bank.  Did you ever ask Ms. Lamphier of

11  Gustavson to appraise the undeveloped acreage, that is the

12  acreage other than the 80 acres that Whiting was drilling

13  wells on?

14  A.  I was not responsible for that, so I don't know if it was

15  asked, but I don't remember seeing one, so I assume that one

16  didn't get ordered.  But that -- I wasn't the one responsible

17  for ordering that.

18  Q.  Okay.  So you wouldn't know why there was no appraisal

19  ordered of the undeveloped acreage?

20  A.  I think we were comfortable with the Wolf Resource offer

21  for the thousand dollars, which then they took to their bank,

22  and they got rejected for because of the -- you know, it was

23  high, if anything.  It was not conservative.  It was high.

24  Q.  All right.  And then I'm now on page 15740 of

25  Exhibit 45, and there's some references -- there's some

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021      629

1    references to maintaining business accounts at FirsTier and

2    furnishing financial statements to FirsTier, and I just want

3    to be clear, this was not something prepared by the bank,

4    this page, right?

5    A.  Yes.  We determined this was provided by Lardyn, I

6    believe.

7    Q.  Okay.  All right.  I'm going to try to grab the page

8    here so I don't have to scroll through it all.  Let's go --

9    there was some pretty extensive questioning about the

10   creditor -- and I wanted to focus a little bit on this --

11   this tall grass lease, these water rights.

12   A.  Right, I see.

13   Q.  So I just want to clarify, the value that you assigned

14   to this new lease in your loan presentation, was that in

15   addition to the value of the water rights that were included

16   in the sale of the farm?

17   A.  That would have been on top of the water rights.  Again,

18   we were being told that it was a guarantied 10-year $406,000

19   contract, and when we did our further research after this, we

20   found out that, number one, it's not guarantied.  It's only

21   guarantied if they need water that year.  And so if they pump

22   one gallon that year, then they owe it, but if they don't pump

23   it, they don't owe it is what we found out.  And then we also

24   found out that there's no way to perfect the asset.  So the

25   valuation that was in there at the time is what we thought it

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    630

1    was, but later became known to be not worth it.

2    Q.   But the additional 265,000 that was shown for water

3    rights was actually with respect to this contract, not to

4    the underlying water itself, right?

5    A.   Right.  It's to the 46,000-per-year contract.  We took

6    that at ten years and then did a net present value calculation

7    to come up with a this is what it should be worth today.

8    Q.   Okay.  Do you recall after you learned that whether you

9    removed that contract as an asset with value for purposes of

10   looking at your collateral position with Lardyn?

11   A.   We did take that out of our collateral analysis, yes.

12   Q.   Okay.  Just to go back to another exhibit that was

13   introduced, 68, I'm going to page 16995 in this Exhibit 68,

14   and this is loan presentation memorandum review, this

15   page 16995.  Do you see that?

16   A.   Yes.

17   Q.   Okay.  And it has a collateral analysis on it?

18   A.   Yes.

19   Q.   Okay.  The total collateral, the number that you came up

20   with, and I say you -- is this something you did or is this

21   something you and your father did or is this somebody else

22   in the bank did this?

23   A.   If you go to the top, it might -- it probably says both,

24   but it might tell who did it.  This one I did by myself.

25   Q.   If we go down and look at your collateral analysis, and

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    631

1   this is as of -- this is as of --

2   A.  12/11/2017.

3   Q.  Okay.  So that's roughly six months after the Lardyn

4   purchase, and the total collateral you show is 10,143,661,

5   right?

6   A.  That's not the collateral value, no.

7   Q.  I'm sorry.

8   A.  That's the statement value that the customer would have

9   provided us.

10  Q.  Okay.  I'm sorry.  The statement value you showed that

11  the customer provided was 10,143,661, right?

12  A.  Correct.

13  Q.  And that includes Mark's guaranty for $1,100,000?  Do

14  you know why that's included?

15  A.  I'm trying to remember here what's -- I don't remember the

16  details on that, no.

17  Q.  Okay.  But that wasn't -- go ahead.  Sorry.

18  A.  So the 1 million-1 was the value that was assigned to

19  Mark's ranch at the time.  We discounted it 20 percent.  We

20  had a value of 880,000, and then showed that there's prior

21  liens because he has a loan for 730, so we are taking --

22  because Mark has a guaranty, we're applying the equity in his

23  ground of $150,000 to -- so we're saying that his guaranty

24  adds value of 150,000.

25  Q.  But that property that was the basis for valuing that

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021   632

1   guaranty was not owned by Lardyn, correct?

2   A.  Correct.  We're trying to show that Mark's guaranty has

3   value.

4   Q.  Right.  But I'm just saying -- my only question was that

5   was not property owned by Lardyn, right?

6   A.  No.  No.

7   Q.  When you say no, you say no, I'm right?

8   A.  No, it's not -- it's not Lardyn's property.

9   Q.  Okay.  And then also in coming up with that statement

10  value, there's an entry for receivables and those

11  receivables reported by Lardyn?

12  A.  Receivables, 179,000, that would have been -- that would

13  have been them, yes.

14  Q.  And that would have been generated as a result of

15  operations, because it wouldn't have existed when the loan

16  began, right?

17  A.  Right.  So, again, what was the date on this?

18  Q.  The date was 12/1/17 -- or I'm sorry -- 12/11/17.

19  A.  So the feedlot had just started operating, and the people

20  put the cattle in prepaid feed, and they started feeding, and

21  then this would be the yardage would be my guess.  The yardage

22  would be the receivable from the customer.  They prepaid a

23  fee.  The fee goes in.  The feedlot will charge yardage.

24  Q.  Okay.  All right.  Those are all the questions I have

25  for you.  Thank you.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      633

1              THE COURT:  Mr. Keithley.

2              MR. KEITHLEY:  Yes, Your Honor.  Thank you.

3                          CROSS-EXAMINATION

4    BY MR. KEITHLEY:

5    Q.  Good afternoon, Mr. Stull.  I just have a few questions

6    regarding your testimony today.  I know it's been long, so

7    I'll be as short as I can.

8    A.  Thank you.

9    Q.  I want to direct you first to the time period we've

10   talked a lot about, the time period in 2016, early 2017 when

11   Two Mile Ranch is in bankruptcy, trying to find buyers,

12   ultimately sells its assets to Lardyn.  You had numerous

13   conversations with Mark Pauling during that time period,

14   correct?

15   A.  Yes.

16   Q.  More than once?

17   A.  Multiple times, yes.

18   Q.  During those discussions with Mark, did he ever indicate

19   to you that he wanted to prevent Ms. Wilson from being able

20   to collect on her judgment against Jon?

21   A.  No.

22   Q.  Did he ever even mention her name?

23   A.  No.

24   Q.  Did it ever even enter into the discussion?

25   A.  No.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    634

1   Q.  What did Mark indicate to you his focus was in trying to

2   get through that time period?

3   A.  Well, Mark was wanting to get the bank made whole, but he

4   also was wanting to retain his equity he had in his operation.

5   Q.  And with regard to that potential equity, was it actual

6   equity or a potential equity?

7   A.  Well, equity is not anything until you actually sell the

8   asset and convert it to cash.  I mean, it's -- on paper it's

9   value, but is it real?  I mean, until you sell something,

10  value is not realized.

11  Q.  Fair to say Mark was hopeful that there would be

12  something left at the end of the day after the bank was

13  fully repaid?

14  A.  Yes.  And that was our hope as well.

15  Q.  But to your point, there wasn't a pile of cash sitting

16  somewhere that everyone could point out and say that much is

17  going to be left when we're all said and done?

18  A.  No.  I wish there was.

19  Q.  You also testified -- I apologize in advance, sir.  It's

20  going to seem like I'm skipping around, but there are

21  particular points you testified to.

22  A.  That's fine.

23  Q.  New item.  You testified towards the end of your

24  testimony from Ms. Oldemeyer about the charge-off after the

25  sale of the Turkey Creek property.  Do you recall that?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    635

1    A.  Yes.

2    Q.  And I think you testified there was a charge-off of

3    $500,000 principal, plus a certain amount additional

4    expenses, correct?

5    A.  Well, the additional expenses was the non-accrued interest

6    that we had to back off the earnings, so yes.

7    Q.  Because --

8    A.  But there were also expenses.  Sorry.  Yes.

9    Q.  Okay.  My question to you is because the bank has

10   charged off those amounts, that does not mean that Two Mile

11   Ranch no longer owes you the money, right?

12   A.  They still owe us the money.  Yes.

13   Q.  It's just not an amount that the bank is permitted by

14   regulation to carry upon its books going forward?

15   A.  That's correct.  We have to account for the loss until we

16   can recoup it.

17   Q.  You testified to Mr. Pulkrabek earlier today about the

18   first time you remember meeting Elyce York.  Do you recall

19   that?

20   A.  Yes.

21   Q.  And I think you testified it was a meeting with Mark and

22   Jon and Elyce; is that right?

23   A.  That's the best of my recollection, yes.

24   Q.  And as I noted it, I think you testified you thought

25   that was with regard to the purchase of the Turkey Creek

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021       636

1   property?  Are you sure?

2   A.  Well, that probably -- I'm not sure of anything.  I mean,

3   that was such a long time ago.  I don't remember the first

4   time I met Elyce, to be honest.  I do know that she was there

5   when we talked about the Turkey Creek property.  I don't know.

6   It's such a long time ago.  We had so many things going on at

7   the time, it was crazy.

8   Q.  Is it at least possible that it is more likely around

9   the point in time of 2016, 2017 when you were discussing the

10  transfer of assets from TMR to Lardyn, and that included a

11  discussion about Turkey Creek?

12  A.  To be honest, I don't recall.  I just -- I don't -- I

13  don't remember the first time.  It's possible.

14  Q.  Okay.

15  A.  And I think I said that after I testified that I'm not 100

16  percent sure on that.

17  Q.  If I can plug in my computer here, I want to pull up an

18  exhibit we looked at a few moments ago.  This is Exhibit 36,

19  and it was an e-mail exchange you had only with Mark

20  Pauling, correct?

21  A.  Based upon that, that's correct.

22  Q.  Okay.  And you see the date on this is January 23rd,

23  2017, correct?

24  A.  Correct.

25  Q.  And you're e-mailing back and forth about -- with Mark

1   about potentially trying to get a deal together without

2   doing a deed in lieu, right?

3   A.  Correct.

4   Q.  Now, I know there's been a lot of testimony so far from

5   you and from Mr. Dick Stull about Two Mile Ranch trying to

6   find buyers that can come in, and I think your testimony has

7   been that those buyers were not disclosed to the bank; is

8   that right?

9   A.  Correct.  And I would call them potential investors

10  because they weren't going to be buying it by themselves.

11  They were going to be investing into a group is my

12  understanding.

13  Q.  Even though you didn't know the identity of these

14  prospective investors, to use your word, you did know about

15  some -- generally about some of the discussions that they

16  were trying to have, though, correct?

17  A.  Oh, yes.  Yes.

18  Q.  For instance, you knew they were trying to find someone

19  to invest a million dollars like you testified before?

20  A.  Exactly.

21  Q.  Did you know about how the operations would potentially

22  continue once those investors came into the picture?

23  A.  Well, the plan was for it to be Elyce through Mark running

24  the operation .  Them being equity investors and taking a

25  portion of the profits, if there are any, was my

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    638

 1    understanding.

 2    Q.  And that was how it ultimately ended up.  I'm asking

 3    even before then when there would be other potential

 4    investors as well trying to invest or purchase assets from

 5    Two Mile Ranch.

 6    A.  Well, that's what I'm saying, yes.  My understanding was

 7    is they would like to set up an operation -- investors, Mark,

 8    whoever they could get to make it work -- my understanding is

 9    they were just looking for investors.  In fact, it seemed like

10    every other week there's something different.  I mean, they

11    were working on something here going down this line, but they

12    were also working on things here, so they were working on

13    things this way.  They were working on lots of different

14    possible scenarios all at the same time.  It's not like they

15    did this one, oh, that one ran out.  Now we're going to a new

16    one.  They were doing lots and lots of trying to figure it

17    out.

18    Q.  Okay.  But I guess the point, though, is we can agree

19    there wasn't only one single path they were pursuing, right?

20    A.  Absolutely not.  No.  There was lots of opportunity -- I

21    mean, they were going lots of ways.

22    Q.  And based on the information that they described to you,

23    you thought some of those potential opportunities could

24    possibly be viable if they ultimately went to conclusion,

25    right?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    639

1   A.   Yes.

2   Q.   These weren't hypothetical situations that had no basis

3   in reality?

4   A.   Right.  So, for instance, the million-dollar person was

5   supposed to be a large cattle person from southern -- not

6   southern -- south of Denver area, but they would never give us

7   a specific name so that we could, you know -- those were the

8   typical things we would get.

9   Q.   And was that atypical in your experience when a borrower

10  is trying to create a workout situation like that, that

11  information gets staged?

12  A.   In a workout situation, there is no standard.  It's every

13  -- every possibility is on the table.

14  Q.   You didn't believe, though, did you, Mr. Stull, they

15  were describing to you a mythical beast in the forest with a

16  horn on its head, did you?

17  A.   No.  The unicorn investor comment is the fact that they

18  were always talking about an investor that we couldn't

19  identify, and so I think some of our employees get frustrated

20  with the constant bring the loan committee a request or an

21  idea, and you can't identify the tangible.  And so I think

22  that's where the unicorn investor comes from is the fact that

23  there's not somebody named.

24  Q.   Okay.  Thank you.

25       MR. KEITHLEY:  I have no further questions for you.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    640

1    Thank you.

2              THE COURT:  Redirect?

3              MR. PULKRABEK:  Yes, Your Honor.

4                        REDIRECT EXAMINATION

5    BY MR. PULKRABEK:

6    Q.  I'd like to go back to the beginning of Ms. Oldemeyer's

7    examination and talk about the purpose of the initial loan

8    to Lardyn and Elyce York.  You recall that question?

9    A.  No, not specific.  If you can repeat the question.

10   Q.  Well, the loan document itself referred to startup

11   expenses.  Does that jog your memory?

12   A.  You're talking about the $45,000 loan?

13   Q.  Correct.

14   A.  Yes.

15   Q.  But that wasn't what Elyce York actually told you on the

16   loan application was going to be the purpose of the loan?

17   A.  I don't recall.

18   Q.  What Elyce York told you was that she was going to spend

19   some of it on an accountant, comma, lawyer, part of it on a

20   convenience store, and part of it for personal.

21   A.  Well, accountants would be business startup, I guess.

22   Q.  And she said convenience store and personal.

23   A.  I don't know what convenience store is.  We never talked

24   about a convenience store.

25   Q.  Do you agree she told you she was going to use it for

```
19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021    641
```

1   convenience store and personal?

2   A.  I'm telling you I don't -- I don't remember anything about

3   a convenience store.

4   Q.  Let's look at Exhibit 28.

5         MR. PULKRABEK:  Your Honor, this is a stipulated

6   exhibit.

7         THE COURT:  Okay.  28 is admitted.

8       (Plaintiff's Exhibit 28 received.)

9   Q.  (By MR. PULKRABEK) This is from you to LeAnn Placek at

10  the bank, correct?

11  A.  Yes.

12  Q.  And you sent this on July 27th, 2016, correct?

13  A.  Okay.

14  Q.  And you told Ms. Placek to prepare the joint loan with

15  Elyce Marie York and Lardyn Consulting for July 28th, 2016,

16  correct?

17  A.  Uh-huh.

18  Q.  And then there were some documents that you attached.

19  There's Ms. York's driver's license, correct?

20  A.  Appears to be, yes.

21  Q.  And then here's the new consumer profile document,

22  correct?

23  A.  Okay, yes.

24  Q.  And then under the primary use of funds, do you see

25  this?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    642

1    A.  So what you're taking is a customer profile when we open a

2    new checking account.  This is not a loan application, sir.

3    This is when we open a new account, checking account or

4    deposit account, we have to find out their name, address, all

5    the pertinent information, and then we -- for our know your

6    customer, we have to fill out what are they using it for,

7    what's the source of funds.  So down at the bottom it says

8    which of the following is either a primary source or a primary

9    use of your funds?  And she's going to use it for accountants.

10   Q.  What else?

11   A.  And convenience store.  So that could mean that's the

12   source of the funds.

13   Q.  So you thought perhaps she was running a convenience

14   store?

15   A.  Well, if she's working at a convenience store and getting

16   paid, that would be the source of the funds.

17   Q.  Is that what you believe?  Is that what you understand?

18   A.  This is the way the form works.

19   Q.  Now, sir, here she told you that the source of the

20   deposit would be loan proceeds, correct?

21   A.  Yeah.  Is that the only source of proceeds for a deposit

22   account?

23   Q.  Did you think it was some loan other than the $45,000

24   loan?

25   A.  This is not for a loan.  I'm telling you this is not for a

19-CV-01224-RBJ       Bench Trial - Day 3      04/14/2021    643

1   loan.  This is for a deposit account.

2   Q.  And she filled it out, primary use of funds, accountant,

3   lawyer?

4   A.  Right.

5   Q.  Convenience store, personal?

6   A.  Primary source or primary use.

7           THE COURT:  Well, did she work at a convenience

8   store?

9           THE WITNESS:  I don't know if she worked at a

10  convenience store.  I didn't fill this out.

11          THE COURT:  Well, of course you didn't fill it out.

12  It was submitted to your bank.  What did you think she meant?

13          THE WITNESS:  What I thought she meant is she's

14  working at a convenience store, and that's one of her primary

15  sources of funds going into the checking account.

16          THE COURT:  Did you check that out to see if she

17  actually worked at a convenience store?

18          THE WITNESS:  I personally did not, no.

19          THE COURT:  Who did?

20          THE WITNESS:  I don't know.

21          THE COURT:  Okay.

22  Q.  (By MR. PULKRABEK) And then it was the bank that decided

23  to put startup expenses on the promissory note?

24  A.  On the what?

25  Q.  Start-up expenses.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3       04/14/2021     644

1   A.  On what though?

2   Q.  On the promissory note.

3   A.  I don't know who -- I mean, that's what we put, but it

4   would have been told to us.

5   Q.  Next set of questions.  So I want to understand this

6   correctly.  Are you telling us today that the bank did foot

7   the bill for Two Mile Ranch to go into a Chapter 11

8   proceeding?

9   A.  Say that again.

10  Q.  The bank sponsored the financial aspect of the

11  Chapter 11 bankruptcy by advancing the funds for that?

12  A.  I don't know.  We ended up paying for ours, our fees.  I

13  don't know about theirs.

14  Q.  Okay.  I just -- I'm trying to understand, did you

15  testify earlier today that the money that was used to pay

16  Mr. Arthur Lindquist-Kleissler was from the bank?

17  A.  I don't recall saying that.

18  Q.  Well --

19  A.  They may have been.  They may not have been.  Some of them

20  may have been.  Some of them might not have been.  What I do

21  know is if we continued forward, the bank would have been

22  footing the bill.

23  Q.  There was some -- there was some questions about the

24  amount of debt that you supported that was apparently owed

25  to the bank by Two Mile Ranch.  Do you recall that?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    645

1   A.  Say that again.

2   Q.  Sure.  You testified to an amount of debt that Two Mile

3   Ranch allegedly owed to the bank?

4   A.  At what time period?

5   Q.  As part of I believe the -- I believe it was July 1st of

6   2016, the date of the bankruptcy.

7   A.  Yes.  We filed a brief, or I don't know what you call it.

8   Q.  And that amount that you testified to, the $9.5 million

9   amount included $730,000 that was actually owed by Mark

10  Pauling to the bank, correct?

11  A.  I don't recall the specifics.  It's possible.

12  Q.  Do you recall the basis for your $9.5 million figure,

13  whether it included Mark Pauling's debt or not?

14  A.  The debts and the guaranties.

15  Q.  So it did include the guaranties?

16  A.  I did not prepare the documents.  We had our attorneys

17  prepare the documents, and we submitted them.

18  Q.  Let me back up a second.  You testified to an amount

19  that was owed to the bank by Two Mile Ranch as of July 1st,

20  2016.  Do you know the amount yourself or not?  Do you have

21  personal knowledge of it or not?

22  A.  There was detail supporting the numbers that were on there

23  .

24  Q.  That's not my question, sir.  My question is do you have

25  personal knowledge of the amount of the debt that was owed

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    646

1    to the bank on July 1st, 2016, or not?

2    A.  If I see it I do.  It was there.  I said yes to the amount

3    that was on that form.

4    Q.  Did you --

5    A.  I don't know what else you want me to say.

6    Q.  Well, I want to know did you calculate that amount or

7    not?

8    A.  Did I calculate it?  Yes.  I provided all the information.

9    Q.  That's not the same as calculating.  Did you calculate

10   the debt yourself?

11   A.  On the form itself.  I knew the debt that day, so I'll say

12   yes.

13   Q.  All right.  Did the debt include the $730,000 guaranty

14   amount that Mark Pauling actually owed to the bank?

15   A.  Can you show me the document so I can answer the question?

16   Q.  I'm not going to do that because I want to know if you

17   know, if you're able to actually tell us if that

18   $9.5 million figure included that amount or not?

19            MR. FORBES:  Your Honor, I think at this point it's

20   just harassment.  He's objected to the document.  There's been

21   testimony about it.  The number is in the record.  I don't

22   think it advances anything, so I object.  It's improper

23   questioning.

24            MS. OLDEMEYER:  I would join the objection.

25            THE COURT:  Do you want to make it three?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 3     04/14/2021     647

1          MR. KEITHLEY:  Yes, Your Honor.  I object that it's

2    harassing and cumulative.

3          THE COURT:  Overruled.  I think it's fair for the

4    attorney to see if the president of the bank actually knows

5    what the debts included.

6    Q.  (By MR. PULKRABEK) Go ahead, Mr. Stull.

7    A.  I don't know without seeing the document.

8    Q.  Okay.  So you're not able to testify sitting here

9    whether the $9.5 million figure that you testified was owed

10   by Two Mile Ranch to the bank as of July 1st, 2016, does or

11   does not include that Mark Pauling $730,000 loan?

12   A.  I remember seeing $730,000 on there, so I would assume

13   that it's part of the calculation.  But without seeing it, I

14   can't be certain.  You're wanting me to go off memory for

15   something that was done in 2016.

16   Q.  Next question, that $730,000 debt that Mark Pauling owed

17   to the bank was more than fully collateralized?

18   A.  That's true.

19   Q.  So the bank was never at risk of not being able to

20   collect that against Mark Pauling?

21   A.  The 730,000, they were not at risk at that time, no.

22   Q.  And yet the bank sought the $730,000 amount from Two

23   Mile Ranch as part of its allegation how much was owed;

24   isn't that right?

25   A.  I can't tell you for certain, no.  I know it was on there,

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021      648

1   so I will agree that the 730 was on there.  Whether it was

2   proper or not, I don't know.

3   Q.  And if Two Mile Ranch pays the 730,000 instead of Mark

4   paying it, two things happen.  First, Mark gets the benefit

5   of the $730,000 without having paid himself, correct?

6   A.  That would be true.

7   Q.  And second, it reduces the equity in Two Mile Ranch,

8   correct?

9   A.  Say that again.

10  Q.  If Two Mile Ranch has to pay for Mark Pauling's debt of

11  $730,000, that reduces the amount of money in Two Mile

12  Ranch?

13  A.  That would be true.

14  Q.  Okay.  Thereby leaving less or nothing for Amanda Wilson

15  to ever reach?

16            MR. FORBES:  Objection, Your Honor.

17            THE COURT:  Sustained.

18            MR. FORBES:  Thank you.

19            THE COURT:  That's argument.

20  Q.  (By MR. PULKRABEK) Small point on Exhibit 45.  I want to

21  look at that because there was some discussion.  This is

22  page 15740 of Exhibit 45.  Do you remember these notes?  Do

23  you recall seeing these earlier?

24  A.  Yes.

25  Q.  Okay.  And in these notes Lardyn is specifically

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 3     04/14/2021    649

1   described as, quote, a reorganization of a member of Two

2   Mile Ranch with the addition of a new member.  Do you see

3   that?

4   A.  Yes.

5   Q.  So it is -- it's described in terms of a reorganization

6   of Two Mile Ranch, would you agree?

7   A.  That's what it says.

8   Q.  Okay.  And that's how it was presented to these other

9   banks when you solicited participation?

10            MR. KEITHLEY:  Your Honor, I'm going to object as to

11   beyond the scope.

12            THE COURT:  Overruled.

13   A.  Yes.

14            MS. OLDEMEYER:  Lack of foundation.

15            THE COURT:  Also overruled.

16   A.  Yes.

17   Q.  (By MR. PULKRABEK) Let's go back to Exhibit 36, which

18   Ms. Oldemeyer offered and was admitted into evidence.  This

19   is the e-mail in which you tell Mark Allan Pauling, quote,

20   We would love it if you would get your deal put together

21   without us doing a deed in lieu so you have the chance to

22   make something from the oil rights.  Do you see that?

23   A.  Yeah.

24   Q.  That's what this all was about, trying to get money from

25   those oil rights?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 3      04/14/2021    650

1          MR. FORBES:  Object to the form.  This is vague.
2    What is this?
3          THE COURT:  Rephrase the question, sir,
4    Mr. Pulkrabek.
5    Q.   (By MR. PULKRABEK) The entire deal, the entire deal that
6    you, Jon Pauling, occasionally Mark Pauling, and Elyce York
7    were working on was all about making money from the oil
8    rights?
9    A.   So it's my understanding that when there was this charging
10   order, that Mark and Jon as Two Mile Ranch, anything that Jon
11   got distributed would go to Ms. Wilson.  It was also my
12   understanding that if the operation did not continue, that the
13   assets had to be sold, you go out and get a fair market value
14   for those assets at that time, right?  The charging order
15   doesn't get to go forward with the new entity.  The charging
16   order, you settle up when the entity is sold.
17   Q.   Thank you, Mr. Stull.  I have no further questions.
18         THE COURT:  Sometimes it's better just to answer the
19   question they ask.  Sometimes making a speech will bite you.
20   All right.  We're done with this witness, and it's a quarter
21   to five, and we're done for the day.  What do you have left?
22         MR. PULKRABEK:  Your Honor, I have to consider
23   whether I need to call any more liability witnesses at this
24   point.  I want to wrap it up as quick as possible, so I may
25   just move to my damages expert.

                          Sarah K. Mitchell, RPR, CRR

1         MS. OLDEMEYER:  Your Honor, Mr. Pulkrabek and I have

2    discussed the fact that Mr. Chris Gray traveled from Omaha

3    Tuesday night with the expectation he would testify today,

4    Wednesday.  We extended his flight.  He's staying until

5    tomorrow.  He will be called whether Mr. Pulkrabek calls him

6    or not, so I will confer with Mr. Pulkrabek so that Mr. Gray

7    can testify and get on a flight back to Omaha.

8         THE COURT:  Okay.  Fine.  Hope you might be

9    conferring with him about other things as well.

10        MS. OLDEMEYER:  He's going to be reminded he's going

11   to testify under the penalty of perjury.

12        THE COURT:  Anything else tonight, folks?

13        MR. PULKRABEK:  No, Your Honor.

14        MR. KEITHLEY:  No, Your Honor.  Thank you.

15        MR. FORBES:  No, Your Honor.

16        MS. OLDEMEYER:  Actually, Your Honor, I apologize.  I

17   do have one thing.  I work with an attorney, Mr. Beau Bump,

18   and when this case came in back in 2019, I anticipated that I

19   would need some assistance, but Mr. Bump has never worked on

20   the case at all.  So I conferred with counsel before the court

21   -- at the last break and asked that he be allowed to withdraw

22   from the case, and they do not have an objection, so I would

23   make an oral motion that Mr. Beau Bump be permitted to

24   withdraw as counsel.

25        THE COURT:  Gosh, I've never had a lawyer in a case

19-CV-01224-RBJ      Bench Trial - Day 3      04/14/2021      652

1    whose name was Beau Bump.

2          MS. OLDEMEYER:  I hope you get to meet him, and he'll

3    get to explain his name.

4          MR. PULKRABEK:  He's a banking barrister.

5          THE COURT:  Beau Bump, the banking barrister.  Oh,

6    well.  Yes, he can withdraw.

7          MS. OLDEMEYER:  You don't need a written motion?

8          THE COURT:  I do not.

9          MS. OLDEMEYER:  Thank you, Your Honor.

10          THE COURT:  Good night.

11          MR. PULKRABEK:  Good night.

12          MR. FORBES:  Thank you, Your Honor.

13          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

14       (The proceedings were concluded at 4:46 p.m.)

15

16

17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

1                         REPORTER'S CERTIFICATE

2

3              I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10             Dated this 13th day of May, 2021.

11

12

13

14             _____/s/ Sarah K. Mitchell_____

15                       SARAH K. MITCHELL
                         Official Court Reporter
16             Registered Professional Reporter
                    Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                      Sarah K. Mitchell, RPR, CRR