1                  IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLORADO

3
     Civil Action No. 19-CV-01224-RBJ
4

5     AMANDA WILSON,
                                         (Pages 653 - 889)
6            Plaintiff,

7            vs.

8     JONATHAN PAULING, et al.,

9            Defendants.

10   ----------------------------------------------------------------

11                       REPORTER'S TRANSCRIPT
                         Bench Trial - Day 4
12
     ----------------------------------------------------------------

13
             Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Judge, United States District Court for the District of
     Colorado, commencing on the 15th day of April, 2021, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                            APPEARANCES

17   For the Plaintiff:
     ROSS W. PULKRABEK, Keating Wagner Polidori & Free, PC, 1290
18   Broadway, Ste. 600, Denver, CO 80203

19   For the Defendants:
     PETER C. FORBES, Carver Schwarz McNab Kamper & Forbes, LLC,
20   1888 Sherman St., Ste. 400, Denver, CO 80203

21   R. LIVINGSTON KEITHLEY, Antero Law LLC, 1700 Broadway, Ste.
     640, Denver, CO 80290
22
     TRACY A. OLDEMEYER, Cline Williams Wright Johnson & Oldfather,
23   215 Mathews St., Ste. 300, Fort Collins, CO 80524

24
         Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25                  Denver, CO 80294, 303-335-2108

            Proceedings reported by mechanical stenography;
                 transcription produced via computer.

I N D E X

PLAINTIFF'S WITNESSES                                        PAGE

KELLY ROACH
    Direct Examination By Mr. Pulkrabek                      655
    Cross-Examination By Ms. Oldemeyer                       683
    Cross-Examination By Mr. Forbes                          700
    Cross-Examination By Mr. Keithley                        712
SHARI LUTZ
    Direct Examination By Mr. Pulkrabek                      717
    Voir Dire Examination By MR. FORBES                      725
    Direct Examination (Cont'd) By Mr. Pulkrabek             734
    Direct Examination (Cont'd) By Mr. Pulkrabek             755
    Cross-Examination By Mr. Forbes                          793
    Cross-Examination By Ms. Oldemeyer                       850
    Cross-Examination By Mr. Keithley                        880
    Redirect Examination By Mr. Pulkrabek                    883

| PLAINTIFF'S EXHIBITS | RECEIVED |
| --- | --- |
| 23 | 659 |
| 29 | 737 |
| 61 | 664 |
| 111 | 678 |
| 147 | 866 |
| 156 | 760 |
| 157 | 719 |

| DEFENDANTS' EXHIBITS | RECEIVED |
| --- | --- |
| 1046 | 817 |
| 1063 | 859 |
| 2063 | 673 |

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      655

1              *        *        *        *        *

2       (The proceedings commenced at 9:03 a.m.)

3              THE COURT:  Have a seat, everybody.  Good morning.

4  I can see that you've got a witness on the monitor.  So go

5  ahead and call your witness, and I'll swear her in.

6              MR. PULKRABEK:  Thank you, Your Honor.  Plaintiff

7  calls Kelly Roach.

8              THE WITNESS:  Good morning.

9              THE COURT:  Ms. Roach, if you'd raise your hand,

10  please, ma'am.

11                          KELLY ROACH

12  was called as a witness and, having been duly sworn, was

13  examined and testified as follows:

14              THE COURT:  Go ahead.

15                      DIRECT EXAMINATION

16  BY MR. PULKRABEK:

17  Q.  Good morning, Ms. Roach.  I am Ross Pulkrabek.  I'm the

18  lawyer for the plaintiff Amanda Wilson in this case.  If at

19  any point in time you can't hear me or your connection becomes

20  unstable, let me know, and I'll re-ask the question.

21  A.  Yes, I can do that.

22  Q.  Thank you.  Ms. Roach, you're a loan officer with Farmers

23  State Bank?

24  A.  Yes, I am.

25  Q.  And am I correct that you formerly worked at Wells Fargo

                    Sarah K. Mitchell, RPR, CRR

1   bank?

2   A.  I did.

3   Q.  Can you tell us when -- when did you leave Wells Fargo

4   bank?

5   A.  In January of 2012.

6   Q.  And did you go directly from Wells Fargo bank to Farmers

7   State Bank?

8   A.  Yes, I did.

9   Q.  And what was your previous position at Wells Fargo?

10  A.  I was a teller.

11  Q.  Now, at Farmers State Bank have you been a loan officer

12  the entire time you've worked there?

13  A.  No, I was not.  I started as a teller.

14  Q.  Walk us through your employment, if you would, at Farmers

15  State Bank, just so we have that chronology.

16  A.  Sure.  I was hired as a teller in 2012.  At that time I

17  ran deposits, cashed checks, main teller duties.  Then my job

18  duties transitioned more to loan administration as far as

19  building loan documents, scanning files, reviewing, making

20  sure everything was scanned and dated.  And then I believe I

21  was a licensed lender in mid-2013, and at that point I started

22  doing the consumer loans, vehicle loans, personal -- personal

23  loans, the smaller loans.

24  Q.  Okay.  And then at some point in time you began working on

25  Two Mile Ranch's loans?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4     04/15/2021    657

1   A.  Yes.

2   Q.  When did that start?

3   A.  2012, late 2012, early 2013.

4   Q.  And were you the primary loan officer working on Two Mile

5   Ranch loans?

6   A.  No.

7   Q.  And who else worked with you on this?

8   A.  I was the loan administration, but Dick Stull was the loan

9   officer.

10  Q.  And so he was the decision-maker on those loans?

11  A.  He was the loan officer, and everything would have gone

12  through loan committee, but he would present the loan

13  presentations.

14  Q.  Okay.  You're also familiar with a business called Lardyn

15  Consulting?

16  A.  Yes, I am.

17  Q.  And have you worked on loans pertaining to Lardyn

18  Consulting?

19  A.  Yes, I did.

20  Q.  And --

21  A.  In the same aspect.

22  Q.  I'm sorry.  Can you repeat what you just said?

23  A.  In the same aspect as far as helping build the documents.

24  Q.  And who was the primary officer on the Lardyn loans?

25  A.  Dick Stull.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    658

1   Q.  Okay.  And then there's a company called Redtail

2   Resources.  Are you familiar with that company?

3   A.  Yes, I am.

4   Q.  Have you worked on those loans?

5   A.  Yes, I have.

6   Q.  And who is the primary officer on those loans?

7   A.  I'm not sure if it's Dick or Steve Stull.

8   Q.  You've also --

9           THE COURT:  Would you pause just for a second.

10      (Pause in the proceedings.)

11          THE COURT:  All right.  Go ahead.

12  Q.  (By MR. PULKRABEK) Ms. Roach, my next question was you've

13  participated in meetings at Farmers State Bank's loan

14  committee?

15  A.  Yes.

16  Q.  Now, I want to take you back to May of 2016 and ask you

17  some questions about that time.

18  A.  Okay.

19  Q.  And if I can, if I am able to project a document to the

20  witness, I'll attempt to do that.

21          THE COURTROOM DEPUTY:  One moment.  I have to

22  change my source.  You should be hooked up, but I could be

23  wrong.

24          MR. PULKRABEK:  It's my fault.  I didn't plug in.

25          THE COURTROOM DEPUTY:  She will not see you or the

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    659

1   courtroom.  She'll only see the video.  Would you like the

2   judge to see it as well?

3           MR. PULKRABEK:  The document, yes.

4           THE COURTROOM DEPUTY:  The document.

5           MR. PULKRABEK:  Thank you.

6   Q.  (By MR. PULKRABEK) Ms. Roach, you should have displayed on

7   your monitor at this point an e-mail exchange between you and

8   Chris Gray on May 10th, 2016.  Do you have that in front of

9   you?

10  A.  Yes, I do.

11  Q.  Thank you.

12          MS. OLDEMEYER:  What exhibit, Counsel?

13          MR. PULKRABEK:  This is Exhibit 23.

14          THE COURT:  All right.  Exhibit 23 is admitted.

15      (Plaintiff's Exhibit 23 received.)

16  Q.  (By MS. OLDEMEYER) Ms. Roach, I'm going to just walk you

17  through this document and ask you a few questions about it.

18  Let me start by scrolling down to -- let me start by scrolling

19  down to the bottom of this.  So on May 10th, 2016, you sent an

20  e-mail to Chris Gray with a subject Two Mile.  Do you see

21  that?

22  A.  Yes.

23  Q.  Chris Gray is a vice president at Farmers State Bank?

24  A.  Yes, he is.

25  Q.  And what you wrote to Mr. Gray is, Explain to me how TMR

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4     04/15/2021    660

1    filing for bankruptcy is a good thing for FSB, correct?

2    A.  Yes.

3    Q.  So obviously you had heard that there was a thought of Two

4    Mile Ranch filing for bankruptcy.  Can you tell us who you

5    heard that news from?

6    A.  I don't remember.

7    Q.  Okay.  In any event, Mr. Gray does respond and he says,

8    Not exactly good news, but we expected would happen months

9    ago, and they just delayed.  He says, Bankruptcy doesn't

10   really hurt us.  We had the assets tied up.  The debt is

11   valid, and this should force them to come up with a plan ASAP

12   for paying us back.  Then he says, The only plan they have,

13   though, is for this unicorn-like investor group to buy them

14   out of bankruptcy.  Do you see that?

15   A.  Yes.

16   Q.  Now, I take it that talking about unicorn-like investment

17   groups is not a common occurrence in your industry?

18   A.  No, it's not.

19   Q.  Had you ever even heard that phrase before in connection

20   with a loan?

21   A.  No, I haven't.

22   Q.  Mr. Gray goes on and says, That's our real risk, that they

23   back out or don't step up to the plate for the amount that we

24   want.  Then Mr. Gray says, My understanding is that our

25   attorney and their bankruptcy attorney will have this agreed

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      661

1    upon before going to the BK court -- you understand that BK

2    here means bankruptcy?

3    A.   Yes, I do.

4    Q.   To the bankruptcy court and get it stamped approved at

5    that time, and then the transaction can take place.  Do you

6    see that?

7    A.   Yes.

8    Q.   And then finally Mr. Gray writes in this paragraph, The

9    bankruptcy really just protects the partnership from the

10   plaintiff for the long run.  Do you see that?

11   A.   Yes.

12   Q.   Now, I want to focus on this last sentence.  At that time,

13   you had an understanding that the plaintiff was a reference to

14   a woman who had obtained a judgment against Jon Pauling?

15   A.   Can you remind me what date this was?

16   Q.   This is May 10th, 2016.

17   A.   Yes.

18   Q.   And do you understand that the -- that plaintiff is my

19   client Amanda Wilson?

20   A.   I do.

21   Q.   Okay.  Now, what Mr. Gray says here is the bankruptcy just

22   protects the partnership.  Did you understand that the

23   partnership was the partnership between Jon Pauling and Mark

24   Pauling?

25   A.   Yes, Two Mile Ranch General Partnership.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    662

1   Q.   Okay.  So Mr. Gray says, The bankruptcy just protects the

2   partnership which is Two Mile Ranch from the plaintiff for the

3   long run, correct?

4   A.   Yes.

5   Q.   All right.  Now, I want to break that down just a little

6   bit further, because up above what Mr. Gray had talked about

7   was having a unicorn-like investor group buy them out of

8   bankruptcy, but then in this sentence he says that process

9   will protect Two Mile Ranch for the long run.  Do you see

10  that?

11  A.   Yes.

12  Q.   So what Mr. Gray was communicating to you was a concept

13  that in bankruptcy there would be simultaneously a buyout of

14  Two Mile Ranch that would allow the partnership to continue

15  and be protected from the plaintiff into the future?

16          MS. OLDEMEYER:  Objection, foundation.

17          THE COURT:  Overruled.

18          MS. OLDEMEYER:  She did not draft this.

19  Q.   (By MR. PULKRABEK) Go ahead, Ms. Roach.

20  A.   Can you repeat the question, please?

21  Q.   Yes.  The concept that was being described here was that

22  there would be simultaneously a buyout of Two Mile Ranch in

23  bankruptcy that would protect Two Mile Ranch from the

24  plaintiff going forward.  Do you see that?

25  A.   Yes.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    663

1    Q.  And can you recall how those two things would be

2    reconciled, that simultaneously Two Mile Ranch would be bought

3    out in the bankruptcy and yet would be able to continue for

4    the long run?

5    A.  Yes.

6    Q.  How was that going to work?

7    A.  I don't remember.

8    Q.  Now, you did reply to Mr. Gray, correct?

9    A.  Yes.

10   Q.  And you wrote, That makes sense.  I just feel like every

11   time you turn around it's a new, quote, plan and nothing ever

12   gets accomplished.  I hope it all works out, and in the 60 to

13   90 days that Dick is telling me, but like you said, this

14   unicorn investor group just really has me nervous.  Do you see

15   that?

16   A.  Yes.

17   Q.  So you refer to discussions with Dick.  Is that Dick

18   Stull?

19   A.  Yes, it is.

20   Q.  And so Dick Stull, does that refresh your memory as to

21   where you might have heard about the idea of Two Mile Ranch

22   filing bankruptcy?

23   A.  I don't recall if it was just conversation with Dick or

24   not.

25   Q.  Okay.  The way you end that particular sentence is saying,

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    664

1   This unicorn investor group just really has me nervous.  Do

2   you see that?

3   A.  Yes.

4   Q.  Fair to say the whole situation that was being described

5   surrounding the bankruptcy struck you as unusual?

6   A.  No.  I believe my -- I believe my quote there meaning it

7   had me nervous was is it going to happen, when is it going to

8   happen, not that it was an unusual circumstance.

9   Q.  Well, the unicorn investor group, you never heard of that

10  before, so you would agree at least that aspect of this was

11  unusual?

12  A.  Yes.  Unicorn meaning we weren't sure who was going to be

13  a part of it.

14  Q.  Now, I'd like to move on to some other statements between

15  -- or e-mails between you and Mr. Gray that took place, and

16  I'm going to refer your attention to what's been marked as

17  Exhibit 60.  I'm sorry.  This is not the exhibit I want.  61.

18          THE COURT:  Exhibit 61 is stipulated.

19          MS. OLDEMEYER:  Yes.

20          THE COURT:  Exhibit 61 is admitted.

21          MR. PULKRABEK:  Thank you, Your Honor.

22      (Plaintiff's Exhibit 61 received.)

23  Q.  (By MR. PULKRABEK) Ms. Roach, Exhibit 61 is another e-mail

24  exchange between you and Mr. Gray.  Do you see that in front

25  of you?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021      665

1   A.  Yes, I do.

2   Q.  And this e-mail exchange, if we go down to the start of

3   it, it's an e-mail that you sent to Mr. Gray on July 26th,

4   2017.  Do you see that?

5   A.  Yes.

6   Q.  Now, this is a couple months after assets of Two Mile

7   Ranch are transferred to Lardyn Consulting, correct?

8   A.  Yes.

9   Q.  And the subject of the e-mail is seriously, right?

10  A.  Yes.

11  Q.  Then you write, How many times am I going to rewrite loans

12  pledging vehicles from Jon Pauling, TMR, Lardyn, and Pauling

13  Hauling.  They say this is to get to the ultimate goal of them

14  out of the bank.  I hope they're right.  Sorry, venting a

15  little.  Do you see that?

16  A.  I do.

17  Q.  So this series of transactions involving the Paulings was

18  frustrating to you?

19  A.  Yes.

20  Q.  Then we have a response from Mr. Gray to your e-mail,

21  correct?

22  A.  Yes.

23  Q.  Mr. Gray responds, First, how many Paulings are there?

24  Correct?

25  A.  Yes.

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      666

1   Q.  And further down in this e-mail Mr. Gray writes, I hope we

2   are upgrading, but it just seems like we are rewriting all the

3   same loans into different names all still controlled by Jon,

4   correct?

5   A.  Yes.

6   Q.  Jon being Jon Pauling?

7   A.  Yes.

8   Q.  And this is an observation being made by a vice president

9   of the bank?

10  A.  Yes.

11  Q.  Further down Mr. Gray says, Are we charging a high rate to

12  get them out of the bank, question mark?  Did this go to loan

13  committee or is it being stacked?  Do you see that?

14  A.  I do.

15  Q.  Maybe you can help me understand what would it mean to be

16  stacked?

17  A.  Lenders can combine their lending authority to approve it.

18  Everyone has their own lending limit.  They can call upon

19  another lender to review it and approve or deny it.  If they

20  approve it, they're basically using their lending authority

21  along with the loan officer to get it approved, which is not

22  unusual.

23  Q.  Finally, Mr. Gray writes, Hang in there.  Gotta trust

24  Stephen on this one.  Do you see that?

25  A.  I do.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    667

1    Q.  Do you have an understanding of Stephen being Stephen

2    Stull?

3    A.  Yes.

4    Q.  And then your response to Mr. Gray was, IDK, I don't know?

5    A.  Yes.

6    Q.  And you say, I have yet to meet any of them but Jon and

7    Mark.  Do you see that?

8    A.  Yes.

9    Q.  So just to clarify, what you were expressing there is even

10   though there are these other Pauling affiliates, the only two

11   that you had personal interaction with was Jon Pauling and

12   Mark Pauling?

13   A.  Yes.

14   Q.  And further down in this e-mail you write, We never get

15   rid of customers.  They just go from one to another.  Do you

16   see that?

17   A.  I do.

18   Q.  Okay.  There's a redaction that I understand may relate to

19   a different customer entirely, so I don't mean to ask you

20   about that at all.

21        MS. OLDEMEYER:  Your Honor, that's a stipulation

22   that we filed that that does relate to a different customer.

23   Q.  (By MR. PULKRABEK) So, Ms. Roach, don't tell me about the

24   redacted portion there, please.  But then what you write is,

25   TMR to Lardyn, Lardyn to Pauling Hauling.  Do you see that?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021      668

1    A.  I do.

2    Q.  And that is in relation to Mr. Gray's prior comment, it

3    just seems like we are rewriting all the same loans into

4    different names all controlled by Jon, correct?

5    A.  Pauling Hauling was not related to Jon.

6    Q.  Okay.  Then you write, I'm trusting as much as I can, but

7    this is getting real old on my end, right?

8    A.  I did.

9    Q.  Again, this is -- this process of transferring assets from

10   Two Mile Ranch to Lardyn is frustrating to you?

11   A.  It was.

12   Q.  You also talk about making the tension high.  Do you see

13   that?

14   A.  I did.

15   Q.  That's tension within the bank among the employees?

16   A.  It was.  It was frustrating.

17   Q.  Then finally Mr. Gray replies, TMR to York.  Do you see

18   that?

19   A.  I do.

20   Q.  And, again, that is riffing off of what you had said

21   earlier about TMR to Lardyn, Lardyn to Pauling Hauling,

22   correct?

23   A.  I'm not sure what he's referring to there, but yes, that's

24   what it says.

25   Q.  And you regarded Lardyn as being controlled by Jon

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 4      04/15/2021      669

1    Pauling?

2    A.   No.

3    Q.   You regarded Elyce York as being controlled by Jon

4    Pauling?

5    A.   Yes, he was a mentor.

6    Q.   Beyond being a mentor, he was a puppet master?

7    A.   I did say that.

8    Q.   Let's go ahead and look at Exhibit 115.

9          MR. PULKRABEK:  Your Honor, Exhibit 115 is a

10   stipulated exhibit.

11         THE COURT:  It was previously admitted.

12   Q.   (By MR. PULKRABEK) Okay.  So, Ms. Roach, you have in front

13   of you Exhibit 115 which was previously admitted into

14   evidence.  This is an e-mail exchange between you and Jarrod

15   Hamik, correct?

16   A.   Yes.

17   Q.   Jarrod Hamik is another vice president inside Farmers

18   State Bank?

19   A.   Yes, he is.

20   Q.   And if we scroll down to see the communication you had

21   with Mr. Hamik, it originates over an effort by you to obtain

22   some vehicle titles; is that accurate?

23   A.   Yes, it is.

24   Q.   What was going on at this point in time was that you were

25   attempting to obtain vehicle titles in anticipation of closing

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021     670

1    on the SBA guaranty?

2    A.   Okay.

3    Q.   And that was going to be an SBA guaranty of loans to

4    Lardyn Consulting, correct?

5    A.   Yes.

6    Q.   And what you discovered was there were a number of

7    vehicles that the titles had never been obtained by the bank,

8    correct?

9    A.   Correct.

10   Q.   And part of collateralizing a title vehicle involves

11   obtaining the title so that the bank's collateral interests

12   can be endorsed on the title.  Is that accurate?

13   A.   Yes, it is.

14   Q.   And so previously that process had not occurred with

15   respect to Lardyn?

16   A.   Yes.

17   Q.   Okay.  So in the process of trying to get these duplicate

18   titles, or getting the titles, you write to Elyce York, and

19   you ask her to get a duplicate title for one of the vehicles

20   that nobody could find the title for, correct?

21   A.   Yes.

22   Q.   And Elyce York responds, What do you mean get a duplicate

23   title?  I don't understand what you mean.  Correct?

24   A.   Yes.

25   Q.   At that point you forward the e-mail to Vice President

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    671

1   Jarrod Hamik writing, This is the kind of crap I deal with.

2   See below.   Correct?

3   A.   Yes.

4   Q.   And Mr. Hamik's response is -- I don't even know how to

5   read that.   How would you read that?

6   A.   Good lord.

7   Q.   Okay.   So you and Mr. Hamik are in disbelief that Ms. York

8   doesn't seem to understand what is meant by getting a

9   duplicate title for these vehicles?

10  A.   I think she knew what it meant to get a duplicate title.

11  She wasn't aware of how to get the duplicate title.

12  Q.   So at that point in response to Mr. Hamik, you write, Yep,

13  seriously she is Jon's puppet.   Correct?

14  A.   I did.

15  Q.   And why did you describe her as Jon's puppet?

16  A.   Basically that these titles to these vehicles were

17  supposed to be transferred already to Lardyn.   Either she

18  hadn't gotten them or couldn't find them so she would have to

19  go back to Jon to discuss looking for it or maybe have him

20  explain the process to get a duplicate title in Colorado.

21  Q.   And in response to your comment that Elyce York was Jon

22  Pauling's puppet, Vice President Jarrod Hamik responds,

23  110 percent, correct?

24  A.   Yes.

25  Q.   Now, I just want to focus for a moment here on the timing

19-CV-01224-RBJ        Bench Trial - Day 4     04/15/2021    672

1   of this exchange.  The timing is June of 2019.  Do you see

2   that?

3   A.  I do.

4   Q.  First, you understand that the transfer of assets from

5   Lardyn -- from Two Mile Ranch to Lardyn Consulting occurred in

6   April of 2017, correct?

7   A.  I do.

8   Q.  So more than two years after that transfer you and Jarrod

9   Hamik are talking about how Elyce York is Jon Pauling's puppet

10  in relation to Lardyn?

11  A.  Yes.

12  Q.  You also understand that June 4th, 2019, was even after

13  this lawsuit was filed?

14  A.  Yes.

15  Q.  Then finally, Ms. Roach, you make this comment, what am I

16  saying?  Sometimes I am the damn puppet.  Do you see that?

17  A.  Yes, I do.

18  Q.  Would it be reasonable to say that you were frustrated

19  still about this whole process of transferring assets from Two

20  Mile Ranch into Lardyn Consulting?

21  A.  Yes.

22  Q.  And you were frustrated by your role in that process?

23  A.  Yes.

24  Q.  Now, I want to switch topics a little bit here and ask you

25  about an appraisal validation that you worked on, and I'm

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021       673

1    going to pull up what's been marked Exhibit 2063.

2          MR. PULKRABEK:  This is stipulated, Your Honor.

3          THE COURT:  Okay.  Just a second.  Yes, 2063 is

4    stipulated, and it's admitted.

5       (Defendants' Exhibit 2063 received.)

6    Q.  (By MR. PULKRABEK) So, Ms. Roach, one of the things that

7    you occasionally participate in as a loan officer at Farmers

8    State Bank will be to review an appraisal and determine

9    whether that appraisal is still valid or whether adjustments

10   need to be made to it; is that accurate?

11   A.  Yeah.

12   Q.  And that's --

13   A.  Yes, it is.

14   Q.  And that's just part of keeping up with the values

15   periodically on collateral that the bank has for loans?

16   A.  Yes.

17   Q.  In this instance, this is -- this Exhibit 2063 is titled

18   validation for using an earlier appraisal or a valuation.  The

19   customer for this document is Lardyn Consulting, correct?

20   A.  Yes.

21   Q.  And if we go to the very bottom, we can see that the loan

22   officer who certified this document was yourself?

23   A.  Yes.

24   Q.  And then you did that together with Vice President Chris

25   Gray?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      674

1   A.  He reviewed it, yes.

2   Q.  Okay.  So if we go back up in the document, what we can

3   see is being reviewed was the appraisal of property that was

4   done by an appraiser named Blake Moreland, correct?

5   A.  Yes.

6   Q.  And the original appraisal date was August 23rd of 2016,

7   correct?

8   A.  Sorry.  It's a little fuzzy on my end.

9   Q.  Let me magnify that for you.  August 23rd, 2016 --

10  A.  Thank you.

11  Q.  -- is the date.

12  A.  Yes.

13  Q.  And that was some months before April 2017 when the assets

14  were transferred, correct?

15  A.  Yes.

16  Q.  So as part of this you looked into whether there were

17  changed conditions that might affect the valuation of that was

18  done by Mr. Moreland on the farm property either upward or

19  downward?

20  A.  Yes.

21  Q.  And on the second page here one of the things that you

22  noted was that there had been a sale and a paydown in

23  connection with the sale of 25 acres of waste and 140 acres of

24  grassland for a total of 165 acres, correct?

25  A.  Yes.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    675

1    Q.  Because of that appraisal -- or I'm sorry -- because of

2    that sale, in your opinion that warranted a downward

3    adjustment to the appraised value of $112,000, correct?

4    A.  Yes.

5    Q.  Then in the next paragraph you discuss how there was a

6    lease agreement entered with BNN Energy to lease up to

7    6,800 acre feet of water with the North Sterling Irrigation

8    District, correct?

9    A.  Yes.  Can you please zoom in a little bit?

10   Q.  Certainly.  Let me know if you need to go in any further,

11   okay?  Is that okay?

12   A.  That's fine.  That's better, thank you.

13   Q.  You're welcome.  So what you -- what you evaluated was in

14   connection with Two Mile Ranch's water rights, there was an

15   upward adjustment to be made to Mr. Moreland's appraisal based

16   on that lease.

17   A.  Can you give me a minute to read this?

18   Q.  Yes, of course.

19   A.  Okay.  Now can you repeat the question, please?

20   Q.  Yes.  What you determined was based on the lease agreement

21   that had been reached between North Sterling Irrigation

22   District and BNN Energy with respect to the water rights,

23   Mr. Moreland's appraisal of Two Mile Ranch's farm property

24   should be adjusted upward?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4     04/15/2021     676

1   Q.  Okay.  And finally, there was additional discussion of

2   sales of pivot irrigated ground that had occurred in the area

3   of Two Mile Ranch's farm; is that right?

4   A.  Let me read this.  Yes, that's correct.

5   Q.  And the particular sale that you were talking about in

6   that paragraph occurred prior to the transfer of assets from

7   Two Mile Ranch to Lardyn?

8   A.  Yes.

9   Q.  All right.  So finally to bring it all together, there's a

10  reconciliation of value on the third page of this exhibit,

11  correct?

12  A.  Yes.

13  Q.  And what we see here is that the initial appraised value

14  by Mr. Moreland of the farm had been $4,270,000, correct?

15  A.  Yes.

16  Q.  You subtract the $112,000 because of the sale of some

17  portion of that property, right?

18  A.  Yes.

19  Q.  Then you say add new income stream from water rights

20  lease, 401,530, correct?

21  A.  Yes.

22  Q.  And you come to a validation amount of $4,559,530,

23  correct?

24  A.  Yes.

25  Q.  And then you signed off on that?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021     677

1   A.  Yes, I did.

2   Q.  And so did Mr. Gray?

3   A.  Yes, he did.

4   Q.  Now, in this -- in this case we have -- we've seen some

5   evidence of valuations that have been based on the farm

6   property that are greater than the initial appraised value

7   figure here of 4.27 million, and my question for you is this.

8   There was additional due diligence and additional analysis and

9   review done by the bank with respect to values of the farm,

10  correct?

11        MR. FORBES:  Your Honor, I'm going to object on two

12  grounds.  Number one, the preliminary comment is not part of

13  the question, and so to the extent the preliminary comment

14  was intended to be part of the question, I object to that.

15  Number two, he said the bank did due diligence, validation,

16  et cetera, and did not give a time -- a period of time for

17  that question.

18        THE COURT:  Okay.  You can fix those problems by

19  rephrasing your question.

20  Q.  (By MR. PULKRABEK) Certainly.  Ms. Roach, the $4,559,000

21  valuation that we see that you performed here is

22  representative of additional analysis performed by the bank?

23        MR. FORBES:  Object to the form.  There's been no

24  testimony this is a valuation.

25        THE COURT:  Overruled.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4    04/15/2021   678

1    Q.  (By MR. PULKRABEK) Ms. Roach, would you like me to repeat

2    the question?  Are you still there?

3    A.  I'm still here.  Yes.  Please repeat it, please.

4    Q.  Just to kind of close this topic out, what you did here

5    was additional analysis into the value of the farm property?

6    A.  Yes, it is.

7    Q.  Okay.  And you signed off on that February 7th, 2018?

8    A.  Yes.

9    Q.  Finally, Ms. Roach, I have just one more set of questions

10   for you concerning what's been marked Exhibit 111.  Let me

11   pull that up.

12          THE COURT:  111 has been stipulated and is now

13   admitted.

14       (Plaintiff's Exhibit 111 received.)

15   Q.  (By MR. PULKRABEK) Ms. Roach, Exhibit 111 is a series of

16   e-mails between you and LeAnn Placek?

17   A.  Placek.

18   Q.  And who is Ms. Placek at the bank?

19   A.  She is another loan officer, loan administrative type

20   person at another branch.

21   Q.  And your e-mail exchange between Ms. Placek occurs

22   March 19th, 2019.  Do you see that?

23   A.  I do.

24   Q.  So this e-mail exchange between you and her starts off

25   with just some ordinary chitchat about what's going on at

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    679

1   work; is that fair?

2   A.  Yes, it is.

3   Q.  And then at some point in this string you write to

4   Ms. Placek, Did you look at the Lardyn request for tomorrow's

5   loan committee?

6   A.  Yes, I did.

7   Q.  And Ms. Placek responds, I haven't had a chance to.

8   Correct?

9   A.  Yes.

10  Q.  You say, That will be a fun one.  Correct?

11  A.  I did.

12  Q.  Then Ms. Placek writes, Bet I know my vote without looking

13  at it.  Do you see that?

14  A.  I do.

15  Q.  Now, a loan committee is a committee of several people

16  whose job it is to provide an evaluation and their opinions or

17  insights about a proposed loan; is that fair?

18  A.  Yes, it is.

19  Q.  The idea behind the loan committee would be to have

20  several people who may have diverse opinions, diverse

21  backgrounds, diverse experience, but who collectively can come

22  together and make an informed decision about whether to accept

23  or approve a loan?

24  A.  Absolutely.

25  Q.  But here Ms. Placek is saying, I bet I know my vote

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      680

1   without looking at it, correct?

2   A.  Yes.

3   Q.  Then your response to Ms. Placek is this, I feel like we

4   have no choice.  Do you see that?

5   A.  I do.

6   Q.  You go on to say, They have to operate to cash flow and

7   make payments, and if we vote no, we're on the shit list.

8   That's what you wrote?

9   A.  I did.

10  Q.  You felt like you had to vote yes on this loan or you

11  would be in the doghouse?

12          THE COURT:  Which loan?

13          MR. PULKRABEK:  Let me repeat the question.

14  Q.  (By MR. PULKRABEK) You felt like you would have to vote

15  yes on the Lardyn request being discussed at the loan

16  committee?

17          MS. OLDEMEYER:  Objection, Your Honor.  I think

18  that is important to note this is an exchange in 2019.

19  Counsel needs to clarify which Lardyn requests he's

20  discussing.  This is not 2017.

21          THE COURT:  Well, I actually asked that same

22  question.  Which loan are we talking about?

23  Q.  (By MR. PULKRABEK) Ms. Roach, let me back up just a moment

24  here.  There was a -- in March of 2019, there was a loan

25  committee proposal concerning Lardyn?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021    681

1    A.   Yes.

2    Q.   There were many loans, loans extensions, modifications,

3    things of that nature with respect to Lardyn?

4    A.   Yes.

5    Q.   The same thing with Two Mile Ranch.  There were many

6    periodic loan extensions, modifications, and so forth,

7    correct?

8    A.   Yes.

9    Q.   So this is one of -- one of those many loan proposals.

10   Whether it was a modification, an extension, a new loan, it

11   was one of those that pertained to Lardyn Consulting in March

12   of 2019, correct?

13   A.   Correct.

14   Q.   And the general statement that you are making here is I

15   feel like we have no choice.  They have to operate to cash

16   flow and make payments, and if we vote no, we're on the shit

17   list.  Let me ask you this.  Was that -- did you feel that way

18   in connection with every customer at the bank?

19   A.   No.

20   Q.   This was a statement that you were making particular to

21   the Lardyn Consulting loan?

22   A.   Yes.

23            MR. FORBES:  Again, Your Honor, excuse me.  Which

24   loan are we talking about when he says that?

25            THE COURT:  Well, I think he's clarified it now to

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021    682

1    mean Lardyn loans in general.

2    Q.  (By MR. PULKRABEK) And --

3    A.  May I elaborate?

4         THE COURT:  Sure.

5    A.  I think the "I feel like we have no choice" was in regards

6    to are we extending, making a modification?  My next comment

7    goes on to say we have to operate to cash flow and make

8    payment.  We both know obviously that means they are not able

9    to operate to cash flow and make payments to this particular

10   request we were looking at.  Not all Lardyn loans.

11   Q.  (By MR. PULKRABEK) You felt -- you felt pressured to vote

12   yes?

13   A.  Pressure from who?

14   Q.  That's my next question.  So the first question is you

15   felt pressured to vote yes?

16   A.  Yes.

17   Q.  Would it be fair to say that there was pressure being put

18   on you within the bank to vote yes?

19   A.  In regards to the customer operating to cash flow, yes.

20        MR. PULKRABEK:  No further questions for this

21   witness.

22        MS. OLDEMEYER:  Can we leave that up?  I'll start

23   there.

24

25

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      683

1                                CROSS-EXAMINATION

2    BY MS. OLDEMEYER:

3    Q.  Good morning, Ms. Roach.  We --

4    A.  Good morning.

5    Q.  I'm sorry?

6    A.  Sorry.  I said good morning.

7            THE COURT:  Maybe you should identify whom you are

8    before you start cross-examining.  At least let her know who

9    you are.

10   Q.  (By MS. OLDEMEYER) Ms. Roach, this is Tracy Oldemeyer.

11   We've met before, correct?

12   A.  Yes, we have.

13   Q.  And we practiced the technology connection to the

14   courtroom so you could testify here today, correct?

15   A.  Yes.  Would I be able to switch to see you on my screen?

16   Q.  You absolutely are.  You can take that down.

17           THE COURTROOM DEPUTY:  One moment.  I've got to

18   change the setting.

19   Q.  (By MS. OLDEMEYER) Can you see me, Ms. Roach?

20   A.  I can.  Thank you.

21   Q.  And we met before and practiced the technology for your

22   testimony, correct?

23   A.  Yes.

24   Q.  How old are you?

25   A.  I'm 34.

                          Sarah K. Mitchell, RPR, CRR

1   Q.  How long have you worked at Farmers State Bank?

2   A.  Nine years.

3   Q.  And which branch have you worked at?

4   A.  Bridgeport.

5   Q.  And Mr. Pulkrabek asked you about your time in banking at

6   Wells Fargo prior to Bridgeport, but could you briefly relate

7   for the Court your history in the banking industry.

8   A.  I've been in banking almost 15 years.

9   Q.  Is that just with Wells Fargo and Farmers State Bank?

10  A.  Yes, it is.

11  Q.  Is there a difference between the type of bank that Wells

12  Fargo is and Farmers State Bank is?

13  A.  I'm sorry.  Wells Fargo is a national bank.

14  Q.  And what's the difference then between a national bank and

15  what Farmers State Bank is?

16  A.  Different charter.

17  Q.  Does Farmers State Bank have locations outside the state

18  of Nebraska?

19  A.  No, we do not.

20  Q.  And what's the population of the Bridgeport community?

21  A.  About 1,800.

22  Q.  Do you like living in that community?

23  A.  I do.

24  Q.  When you're out on the street, do you run into customers

25  of the bank?

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021      685

1   A.  All the time.

2   Q.  When you're grocery shopping, do you wave to customers?

3   A.  I do.

4   Q.  You're kind of on duty 24/7?

5   A.  Yes, I am.

6   Q.  Ms. Roach, are you related to the Stull family in any way?

7   A.  No, I'm not.

8   Q.  Didn't marry in?

9   A.  No.

10  Q.  Not a child of somebody?

11  A.  I'm not.

12  Q.  Okay.  Of a Stull.  You're a child of somebody, but not a

13  child of a Stull, correct?

14  A.  No, I'm not.

15  Q.  The Court has in front of it several exhibits that

16  oftentimes mention you as a guest at a loan committee meeting.

17  Can you relate for the Court your positions on the loan

18  committee and why you might be a guest at a loan committee?

19  A.  If you are a guest on the loan committee you are allowed

20  -- everybody is allowed to sit in on our meeting.  It's a very

21  great learning tool for anyone looking to advance or learn

22  more about loan requests and how they work.

23  Q.  And why is it a good learning tool?

24  A.  To understand the language, the types of information that

25  you need to present, things that you would vocalize to the

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    686

1   loan committee, things like searches that you would need to be

2   doing.

3   Q.  And so as a guest would you listen to the discussion about

4   any particular loan under consideration?

5   A.  Yes.

6   Q.  And is that where you're absorbing that information?

7   A.  Yes.

8   Q.  But if you're a guest, do you get to vote?

9   A.  You do not.

10  Q.  Do you participate in the discussion?

11  A.  Not typically, no.

12  Q.  On the loan committee -- you ultimately did get on the

13  loan committee as a voting member, correct?

14  A.  I did.

15  Q.  When approximately was that?

16  A.  Sometime in 2013.

17  Q.  Was that for particular types of loans or are there

18  different types of loan committees?

19  A.  No.  We don't have different types of loan committees.

20  Q.  When you're a voting member on a loan committee, can you

21  generally describe the duties and responsibilities you have?

22  A.  As a member of the loan committee you are asked to review

23  the loan request prior to the meeting, write down or ask the

24  loan officer any questions that you may have, find any

25  clerical errors, talk about rate, terms.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4     04/15/2021     687

1   Q.  Do you consider whether a loan is potentially a loan that

2   might have repayment issues?

3   A.  Yes.

4   Q.  And why do you discuss that?

5   A.  Because they've got to be able to provide cash flow to

6   make the payments.

7   Q.  Is that unusual in banking?

8   A.  I'm sorry.  Is what unusual?

9   Q.  Is expecting a borrower to make cash flow to make the loan

10  payments, is that unusual?

11  A.  No.

12  Q.  Is it specific to Two Mile Ranch General Partnership that

13  any considerations like that took place?

14  A.  No.

15  Q.  Anything unusual if it was considered for Lardyn

16  Consulting, LLC?

17  A.  No.

18  Q.  Or Redtail Resources, LLC?

19  A.  No.

20  Q.  In loan committee if you vote no to a proposed loan

21  involving a then-existing borrower, what happens?

22  A.  If you vote no, you're asked if you have a better

23  alternative to the way it's presented.

24  Q.  What do you mean by that?

25  A.  Whether it needs to be structured differently, what your

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    688

1   concerns are with it.

2   Q.   Okay.  With respect to the SBA loan that was in

3   Exhibit 111, and I can put that up again -- well, first of

4   all, in March of 2019, what loan do you recall Lardyn

5   Consulting applying for?

6   A.   I don't know the timeline --

7   Q.   Did --

8   A.   -- exactly.

9   Q.   At any point in time did you help work on an SBA loan?

10  A.   No.

11  Q.   Who would work on SBA loans at Farmers State Bank?

12  A.   Jarrod Hamik.

13  Q.   Were you asked -- go ahead.  I didn't want to cut you off.

14  Were you saying something?

15  A.   Jarrod Hamik would be the primary contact.

16  Q.   And do you ever recall considering an SBA loan in loan

17  committee?

18  A.   Yes.

19  Q.   What do you recall about whether you voted yes or no for

20  that?

21  A.   I believe I voted yes.

22  Q.   And do you recall why you voted yes?

23  A.   They showed the way to make it cash flow, way to get the

24  SBA loan.

25  Q.   What is the business of Lardyn Consulting, LLC?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    689

1   A.  Cattle feeders.

2   Q.  Is that another term for a feedlot?

3   A.  Yes.  I'm sorry.

4   Q.  And do you recall if Lardyn Consulting, LLC was ever

5   expanding its feedlot?

6   A.  Yes.

7   Q.  Can you relate for the Court what you recall about Lardyn

8   Consulting and expansion of the feedlot.

9   A.  That was in regards to obtaining the SBA loan so they were

10  able to feed more cattle.

11  Q.  Why is it important to feed more cattle?

12  A.  So they can cash flow.

13  Q.  To your recollection had the expansion of the feedlot

14  begun prior to the SBA loan being approved?

15  A.  No.

16  Q.  Exhibit 111, which I have in front of you, why did you

17  feel like you have no choice?  Why -- those two sentences, can

18  you explain for the Court what you meant there?

19  A.  We have -- I feel we have no choice because this is an

20  alternative to them being able to produce more income for

21  themselves.

22  Q.  And if they couldn't produce more income, what happens?

23  A.  The payments don't get made.

24  Q.  And what happens when loan payments don't get made?

25  A.  They go into default.

Sarah K. Mitchell, RPR, CRR

1  Q.  And then what happens when a borrower goes into default?

2  A.  We try to collect obviously, and then charge-offs.

3  Q.  You pursue collateral liquidation potentially?

4  A.  Right.  Right.  Potential.

5  Q.  Is the loan committee just a rubber stamp for either Dick

6  or Steve Stull?

7  A.  No.

8  Q.  Does meaningful discussion occur in loan committee?

9  A.  Yes.

10 Q.  I'm going to take that down, or we can disconnect from

11 exhibits real quick so you can see.  Ms. Roach, do you know

12 Jon Pauling?

13 A.  I do.

14 Q.  Can you just briefly walk through your history of your

15 interactions with Jon Pauling as an employee of Farmers State

16 Bank briefly.

17 A.  Little to none.  I would be in loan closings for signing

18 documents.

19 Q.  Do you consider him a friend?

20 A.  No.

21 Q.  Do you know Mark Pauling?

22 A.  I do.

23 Q.  Do you consider him a friend?

24 A.  No.

25 Q.  Would you consider any member of the Pauling family a

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    691

1    friend?

2    A.   No.

3    Q.   Do you socialize with any of them?

4    A.   No.

5    Q.   Are you related to any of them?

6    A.   No.

7    Q.   With respect to your personal knowledge of when the loan

8    committee approved funding Lardyn Consulting's purchase of

9    some of Two Mile Ranch General Partnership assets in April of

10   2017, were you aware that there was a judgment, a multimillion

11   dollar judgment against Jon Pauling?

12   A.   Yes.

13   Q.   And were you aware of what the civil suit was about?

14   A.   Yes.

15   Q.   Were you aware that he had been charged criminally, Jon

16   Pauling had?

17   A.   No.

18   Q.   Were you aware that the person who held the civil judgment

19   against Jon Pauling had taken steps to collect on it?

20   A.   No.

21   Q.   Do you know what a transcript of judgment is?

22   A.   I don't.

23   Q.   Do you know what a charging order is?

24   A.   I don't.

25   Q.   Did you know at the time in April of 2017 when the loan

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      692

1    committee was considering funding a loan from -- for Lardyn

2    Consulting to purchase some of the assets of Two Mile Ranch

3    General Partnership, did you know whether the person holding

4    the judgment against Jon Pauling had served a charging order

5    on Two Mile Ranch General Partnership?

6    A.   No.

7    Q.   Was there -- do you know what -- strike that.  Did

8    discussion of a charging order ever come up at the loan

9    committee meeting in April of 2017?

10   A.   No.

11   Q.   I'm going to put up Exhibit 23.  This is one you did

12   review with Mr. Pulkrabek, and I'm going to start at page 3.

13   If you have questions about things going on with borrowers,

14   are you able to reach out to other representatives at Farmers

15   State Bank and ask questions?

16   A.   Absolutely.

17   Q.   Is it a good place to work?

18   A.   The best.

19   Q.   Lots of information sharing?

20   A.   Yes.

21   Q.   Are you being developed professionally?

22   A.   Absolutely.

23   Q.   Why did you put the words on page 3 -- excuse me -- I'm on

24   page 4, top of page 4 of Exhibit 23 -- why did you put the

25   words good thing in quotes?

1    A.  Basically because I had never dealt with a customer filing

2    for bankruptcy and wanted to know the pros and cons of it.

3    Q.  Because bankruptcy sounds bad, is that --

4    A.  Right.

5    Q.  Okay.  But somehow --

6    A.  Correct.

7    Q.  Somewhere you heard this is a good thing, correct?

8    A.  Yes.

9    Q.  And so you were just looking for an explanation of how

10   those two things can be reconciled; is that correct?

11   A.  Yes.

12   Q.  Going to then Mr. Gray's response, in response to his

13   communication to you on May 10th, 2016, you indicated to him

14   his response made sense, correct?

15   A.  Yes.

16   Q.  When you say his response makes sense, I want to make sure

17   I understand.  What was your understanding of what Mr. Gray

18   was telling you?

19   A.  Basically that the bankruptcy didn't affect us because we

20   do still have valid debt to the borrowers.

21   Q.  And if you had valid debt to the borrowers, did -- was

22   there a collateral pledge?

23   A.  Yes.

24   Q.  What did you mean by the rest of that sentence?  Not that

25   sentence, that paragraph, excuse me.

19-CV-01224-RBJ      Bench Trial - Day 4     04/15/2021    694

1    A.  Just that we were always trying to collect payment, and

2    waiting on this investor group had me nervous.  It was another

3    plan.

4    Q.  And why did you put the word plan in quotes?

5    A.  Because we hadn't seen it materialize.

6    Q.  And who -- who was working on the plan you had not seen

7    materialized?

8    A.  Who in regard to the bank?

9    Q.  Well, when you say you had not seen a plan materialize,

10   whose plan was it?

11   A.  Elyce and Mark.

12   Q.  And you mentioned, I hope it all works out, and then 60 to

13   90 days that Dick is telling me.  What's the 60 to 90 days

14   reference?

15   A.  In order for them to develop the investor group.

16   Q.  Who did you understand at this point in time in May of

17   2016 to be the investor group?

18   A.  We didn't know, or I didn't know.

19   Q.  And you end it with, I will continue not to hold my

20   breath.  Correct?

21   A.  Correct.

22   Q.  What did you mean by that?

23   A.  That I wasn't -- I wasn't set on it happening any time

24   soon.

25   Q.  What was your understanding that if a plan didn't

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    695

1  materialize, what would happen?

2  A.  They weren't going to be able to operate.

3  Q.  And then what happens?

4  A.  And then they default on payments, we collect on our

5  collateral.

6  Q.  Basically a foreclosure?

7  A.  Sure.

8  Q.  I've put in front of you Exhibit 66, and I just want to

9  ask you, this has been received into evidence, but I want to

10  ask you on this Trial Exhibit 66, there's a mention of a

11  company Two Six Too, LLC.  Do you see that?

12  A.  Yes.

13  Q.  Who do you understand -- what do you understand Two Six

14  Too, LLC to be?

15  A.  It's a local investment group.

16  Q.  And did you at this time in December of 2017 -- if we go

17  to the top -- who did you understand -- well, let me rephrase

18  it.  Did you understand any member of the Stull family to be a

19  member of Two Six Too, LLC?

20  A.  Yes.

21  Q.  Did you think there was anything wrong with that?

22  A.  No.

23  Q.  Why didn't you think there was anything wrong with that?

24  A.  It's an investment group that's looking to improve several

25  different things in and around Bridgeport.

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021      696

1   Q.  And do they do that by somehow helping out borrowers in

2   distress?

3   A.  Yes.

4   Q.  Exhibit 61 is a three-page exhibit that you reviewed with

5   Mr. Pulkrabek, and I just want to ask you about page 2.  You

6   sent this e-mail, Kelly, on July -- excuse me, Ms. Roach --

7   July 26th, 2017, to Mr. Gray, correct?

8   A.  Yes, I did.

9   Q.  And were you venting?

10  A.  Absolutely.

11  Q.  Why?

12  A.  Because I was tired of all of it.

13  Q.  What do you mean, because it's important the Court

14  understands.  Tired of all what?

15  A.  Tired of waiting on a plan.  Tired of -- I'm the one that

16  builds the loan docs out of Bridgeport -- I'm sorry -- the

17  loan documents out of Bridgeport, so it's very time consuming

18  and strenuous on my part.

19  Q.  It takes a lot of work?

20  A.  It does.

21  Q.  In page 1 of Exhibit 61, you were asked about the -- your

22  e-mail response to Mr. Gray, and in the first paragraph,

23  second sentence you say, I have yet to, quote, meet, end

24  quote, any of them but Jon and Mark.  Do you see that?

25  A.  Yes.

1   Q.  Why did you put meet in quotes?

2   A.  I'm not sure.  Because I was not part of the meeting.

3   Q.  Is that just something you sometimes do?

4   A.  Yeah, it is.

5   Q.  Does it --

6   A.  I'm very sarcastic.

7   Q.  Sarcastic, is that what you said?

8   A.  Yes.

9   Q.  If you put something in quotes, does it mean you're hiding

10  something?

11  A.  No.

12  Q.  Why -- why did you make the statement, If there are so

13  many of them with so much money, just let them buy you out,

14  please.  Why did you put that?

15  A.  Because we were looking for other routes to get out of

16  this relationship.

17  Q.  Did the bank want to get out of the relationship with Two

18  Mile Ranch General Partnership?

19  A.  Absolutely.

20  Q.  Why do you say absolutely?

21  A.  Because we have -- we have gone through so many different

22  plans and ways to try to make this work.

23  Q.  In the next paragraph you said you never, in all caps, get

24  rid of customers.  What do you mean by that?

25  A.  Well, sometimes when we have someone that has a loan here,

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    698

1   we might finance to the next borrower.  Even though they might

2   be borrowing from the current customer, we would lend to the

3   new buyer.

4   Q.  And do you -- why would the bank do that?

5   A.  Because they would show that they qualify for the loan.

6   Q.  Do you want your customers to succeed in business?

7   A.  Yes.

8   Q.  Does the bank want to foreclose?

9   A.  No.

10  Q.  You are aware of the allegations in this lawsuit against

11  Farmers State Bank that the bank conspired with Jon Pauling,

12  Mark Pauling, Two Mile Ranch General Partnership, Elyce York,

13  and Lardyn Consulting to prevent Ms. Wilson from collecting

14  money due her.  You are aware of those allegations, correct?

15  A.  I'm aware of the allegations, yes.

16  Q.  Is it true?

17  A.  No, it's not.

18  Q.  Do you personally have any motive to prevent Ms. Wilson

19  from collecting money due her?

20  A.  No.

21  Q.  Do you personally want to hurt her financially?

22  A.  No.

23  Q.  Have you ever even met her?

24  A.  May I interrupt?

25  Q.  Sure.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      699

1   A.  Can you go back so I can see you?  I can only see the

2   documents.  Thank you.  That's better.

3   Q.  Is that helpful?

4   A.  Yes.

5   Q.  Do you even know Ms. Wilson?

6   A.  No.

7   Q.  To your knowledge, does anyone else at Farmers State Bank

8   have any motive to prevent Amanda Wilson from collecting money

9   due her?

10  A.  No, I don't.

11  Q.  In your direct testimony you mentioned modifications,

12  extensions, things like that.  Why would a bank give a

13  borrower modifications and extensions?

14  A.  Modification or extension can be used interchangeably.  An

15  extension would be to extend the maturity date in order for

16  them to operate.

17  Q.  Is that a good thing or bad thing?

18  A.  Neither here nor there.

19  Q.  It's -- well, strike that.  Mr. Pulkrabek asked you

20  questions about an appraisal.  Who is Blake Moreland, do you

21  know?

22  A.  Just a certified appraiser is all I know.

23  Q.  Are you a certified appraiser?

24  A.  I'm not.

25  Q.  Don't have an appraisal license for land?

                              Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      700

1   A.  No.

2   Q.  With respect to the statement about the water rights, the

3   400,000 that you put on that exhibit you reviewed with him,

4   Exhibit 2063, do you recall that?

5   A.  Yes.

6   Q.  To your knowledge, did that income stream actually

7   materialize?

8   A.  No, it didn't.

9         MS. OLDEMEYER:  I don't have any further questions.

10         MR. FORBES:  Thank you, Your Honor.

11                     CROSS-EXAMINATION

12   BY MR. FORBES:

13   Q.  Good morning, Ms. Roach.  I think the camera is going to

14   switch to me, if it hasn't already.

15   A.  Not quite yet.

16   Q.  There it is.  Well, you still can't see me and know what I

17   look like, but my name is Peter Forbes, and I represent

18   Ms. York and Lardyn Consulting in this case, and I'm going to

19   ask some questions on their behalf.  The first thing is we've

20   never spoken before, correct?

21   A.  Correct.

22   Q.  Nor have we ever had e-mails, we've never communicated

23   before, right?

24   A.  No.

25   Q.  So given that, I may ask some questions that are silly or

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      701

1   wrong or just miss the point, and if I do that, tell me,

2   because we've never talked before, so this isn't a

3   pre-scripted examination.  I want to begin by talking about

4   Exhibit 115, and that was the one on June 4th, 2019, the

5   e-mail string where you said, Yep, seriously, she is Jon's

6   puppet, referring to Ms. York.  Do you remember that?

7   A.  Yes.

8   Q.  Okay.  Now, when did you first meet Ms. York in person?

9   A.  I don't remember.

10  Q.  Okay.  Was it before the loan closed to Lardyn, which was

11  April 27th, 2017?

12  A.  Yes.

13  Q.  Okay.  So you had met Ms. Lardyn -- excuse me -- Ms. York

14  before the loan closed, and tell me about your dealings with

15  Ms. York that you personally had between April 27th, '17, and

16  June 4th, 2019.  In other words, from the loan closing up

17  through June 4th, 2019, the date of Exhibit 115.

18  A.  Sure.  Other than introducing ourselves, I would contact

19  Elyce every time I needed to communicate with her about

20  Lardyn's business transactions, advances, anything like that.

21  Q.  Did you ever deal with her on issues relating to operating

22  a feedlot?

23  A.  No.

24  Q.  Did you ever go out to the feedlot itself and see what was

25  going on out there?

1    A.   No.

2    Q.   When you had matters that you needed to deal with that

3    were within your -- let me back up.   In terms of dealing with

4    Ms. York and Lardyn after the April 27th, 2017, closing, what

5    were your responsibilities?   In other words, what were you

6    responsible for doing in terms of dealing with Lardyn and

7    Ms. York?

8    A.   I would make advances, paydowns on the notes, as well as

9    prepare documents.

10   Q.   When you say you made advances and paydowns, is that to

11   say when she wanted an advance on a line of credit, she would

12   contact you?

13   A.   Yes.

14   Q.   And then did you have the authority to authorize that

15   yourself, or did you have to talk to somebody to do that?

16   A.   It doesn't really require an authority.

17   Q.   As long as she's in good -- excuse me -- as long as the

18   loan is in good standing, she can request an advance, and

19   you'll make it.   Is that basically it?

20   A.   Yes.

21   Q.   Okay.   And so that was one way you dealt with her, just

22   she'd call and request advances, right?

23   A.   Right.

24   Q.   All right.   And another way you dealt with her is when

25   Lardyn would make paydowns on its loans, those would be

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021     703

1   processed through you, and you would record them to reflect

2   that some outstanding amount had been paid; is that right?

3   A.   Yes, sir.

4   Q.   Okay.  So those were two ways you dealt with Ms. York.   In

5   doing those advances and paydowns did Jon Pauling make those

6   -- make requests like that on behalf of Lardyn?  Did you deal

7   with Jon Pauling on behalf of Lardyn?

8   A.   No.

9   Q.   Okay.  And when -- and when paydowns were made, did Jon

10  Pauling ever do those?  Did you ever deal with Jon Pauling?

11  A.   No, I didn't.

12  Q.   All right.  Anything -- and I'm setting aside now for your

13  participation in loan committee.  Anything else that you did

14  in dealing with Ms. York or Lardyn in terms of the financial

15  relationship that they had with Farmers State Bank?

16  A.   I don't believe so.

17  Q.   Just a suggestion, when there were issues about

18  documenting things like we looked at the documenting the

19  transfer of title, things like that, was that also something

20  you did besides paydowns and advances?

21  A.   Yes.

22  Q.   Okay.  So when there was a paperwork issue in terms of

23  security interests, that was also something that was your

24  responsibility to deal with Lardyn on?

25  A.   Yes.

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021      704

1    Q.  All right.  And when you did that, did you deal with

2    Ms. York or Jon Pauling or some combination of both?  And by

3    --

4    A.  Always --

5    Q.  I'm sorry.  I apologize.  I want to clarify, because

6    there's several Mr. Paulings.  Did you deal with Elyce York,

7    Jon Pauling, or some combination of both?  And, again, this is

8    on the paperwork issues.

9    A.  It was always with Ms. York.

10   Q.  And -- all right.  Any other aspect of the -- of your

11   duties that related to dealing with Lardyn and Ms. York's

12   financial relationship with the bank?

13   A.  I don't believe so.

14   Q.  And I think you said you didn't have anything to do with

15   Ms. Lardyn -- I'm going to rename my client Lardyn York, Your

16   Honor, just to keep myself straight.  I apologize.  Any -- I

17   think you said you didn't have any dealings with Ms. York on

18   operational issues relating to Lardyn, right?

19   A.  Right.

20   Q.  Okay.  Now, with respect to loan requests, that is

21   requests for modifications of existing loans or with respect

22   to asking for new loans, and this is after April 27th, 2017,

23   did you ever deal with Ms. York in terms of requests for

24   modifications or requests for new loans?

25   A.  If there was a request made, that would go to the loan

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 4     04/15/2021    705

1   officer, to loan committee.  I would prepare those documents

2   if it was approved and e-mail them.

3   Q.   Okay.  So the requests themselves for new loans or

4   modifications would be made to the loan officer, not to you,

5   right?

6   A.   Right.

7   Q.   All right.  And that loan officer, was that Dick Stull?

8   A.   Generally, yes.

9   Q.   And sometimes Steve Stull?

10  A.   Correct.

11  Q.   All right.  And then in loan committee -- well, let me,

12  before I get there, ask another question.  Did you ever deal

13  with Jon Pauling after April 27th -- excuse me -- did you ever

14  deal with Jon Pauling after April 27th, 2017, with respect to

15  requests by Lardyn for new loans or modifications of existing

16  loans or extensions of existing loans, anything having to do

17  with Lardyn's loan terms?

18  A.   No, sir.

19  Q.   Now, so my question is given that your dealings were with

20  Ms. Lardyn -- excuse me.  I'll ask again.  Given that your

21  dealings with Ms. York were limited to dealing with her on

22  advances, paydowns, and paperwork, on what basis could you

23  possibly say that she was Jon Pauling's puppet?

24  A.   I don't know.

25  Q.   You said that, but are you conceding here today you did

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      706

1   not have a factual basis for saying that?

2   A.  Correct.

3   Q.  All right.  Let's go to Exhibit 2063.

4          MR. FORBES:  Your Honor, might I have the entire

5   document screen shared with the witness?

6          THE COURTROOM DEPUTY:  It is.

7          MR. FORBES:  It is.  Okay.  Thank you.

8   Q.  (By MR. FORBES) All right.  So we talked about some

9   aspects of this with plaintiff's counsel, but I want to talk

10  about some other aspects of this Exhibit 2063.  What is the

11  title of this document?

12  A.  Validation for using an earlier appraisal or evaluation.

13  Q.  So is this document intended to come up with a new

14  valuation, or is it intended to see whether it's acceptable to

15  continue using an earlier appraisal or valuation?

16  A.  Whether it's acceptable to use it.

17  Q.  And why is this type of document prepared, to your

18  knowledge, inside Farmers State Bank?

19  A.  Just to make a comparison of the original appraisal.

20  Q.  Is there some regulatory requirement to verify that a

21  prior appraisal is still appropriate with respect to real

22  estate?

23  A.  I'm not sure.

24  Q.  Okay.  So is it fair to say you don't know why this is

25  done, but it's something that you do as part of your duties?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4    04/15/2021    707

1   A.  Yes.

2   Q.  And I want to go down to page 2 of this exhibit.  The

3   section should be in front of your other comments.  Do you see

4   that?

5   A.  I do.

6   Q.  I want to talk about the second of the other comments, one

7   concerning the North Sterling Irrigation District contract.

8   Are you with me?

9   A.  Okay.

10  Q.  Now, did you ever see that contract itself?

11  A.  No.

12  Q.  Did you ever talk to North Sterling Irrigation District

13  about that contract?

14  A.  No.

15  Q.  Is the sole knowledge you had about that contract from the

16  news article discussing it that you reference?

17  A.  I'm not sure.  Yes.  See attached copy news article.

18  Q.  What I'm getting at is when you said and came up with an

19  amount of an income stream for this, what was that based on?

20  A.  The news article.

21  Q.  So you didn't know if the article was correct or incorrect

22  in terms of describing that contract, but for purposes of this

23  that's what you relied on; is that right?

24  A.  Yes.

25  Q.  Then you refer to comparable sale.  Do you see that?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      708

1    A.  Yes.  Sorry.  I was reading.

2    Q.  Sorry.  Please.  Please, yeah, if you need to read, please

3    do, and tell me when you're done reading it.

4    A.  Okay.  One minute.

5    Q.  Sure.

6          THE COURT:  If you're going to be going for quite a

7    while, I think we better take a break here.

8          MR. FORBES:  I won't, Your Honor, but I think we

9    can take a break anyway.

10         THE COURT:  Let's do that.  Ten minutes or so.

11         THE COURTROOM DEPUTY:  All rise.  Court is in

12   recess.

13      (Break was taken from 10:35 a.m. to 10:51 a.m.)

14         THE COURT:  Ms. Roach, that's nice of you to stand

15   up, but you wouldn't have had to.

16         MR. FORBES:  Your Honor, I'll proceed.

17   Q.  (By MR. FORBES) Ms. Roach, we were talking when we took a

18   break about the second page of Exhibit Number 2063, and could

19   we screen share again?  And do you have that in front of you?

20   A.  Yes, I do.

21   Q.  Okay.  All right.  And so the last point you had was

22   looking at a comparable sale within ten miles of the subject

23   price that took place on 3/23/17?

24   A.  Yes.

25   Q.  And then it says what you did is you found information

19-CV-01224-RBJ       Bench Trial - Day 4     04/15/2021    709

1   concerning that sale on a real estate company website, right?

2   A.  Yes.

3   Q.  And then you compared the values on that sale that took

4   place as of a month before the transaction with the values in

5   the appraisal that was done by Mr. Moreland back in September

6   of 2016, right?

7   A.  Yes.

8   Q.  Okay.  And then the table there, we don't need to go

9   through it, but it shows basically where you thought the

10  appraisal supported -- excuse me -- why that recent sale

11  supported the values in the appraisal; is that right?

12  A.  Yes.

13  Q.  Okay.  And then let's go to the next page.  There's a

14  heading there, reconciliation of value.  Are you with me?

15  A.  Yes.

16  Q.  And then so you began with the value, and that's from

17  Mr. Moreland's appraisal, right?

18  A.  Right.

19  Q.  All right.  And just to be sure, I'm going to switch

20  briefly to another document that was admitted not for the

21  truth, but as something that Ms. York saw and relied on, and

22  this is the appraisal by Mr. Moreland with an effective date

23  of August 23rd, 2016.  Do you see that?

24  A.  Yes.

25  Q.  Okay.  And that's the appraisal you were seeing whether it

19-CV-01224-RBJ       Bench Trial - Day 4     04/15/2021    710

1    could still be considered a valid appraisal as of

2    February 2018 when you were doing your work, right?

3    A.  Yes.

4    Q.  Okay.  Let's go back to Exhibit 2063.  And so your

5    reconciliation of value was you took Mr. Moreland's appraised

6    value, then you reduced it by some land that Lardyn sold after

7    the sale from Two Mile Ranch closed; is that right?

8    A.  Yes.

9    Q.  Okay.  And then you added the valuation you did of this

10   income stream from the water rights lease based on the

11   information you had from the newspaper article, right?

12   A.  Yes, sir.

13   Q.  All right.  And then you just -- you deducted the amount

14   from the land sold, and you added the value you came up with

15   from that water rights lease, and that gave you a total value

16   based on validation review, right?

17   A.  Yes.

18   Q.  Now, I want to -- when you came up with that total value

19   based on validation review, you were not reaching the opinion

20   that was the fair market value of the ranch -- excuse me --

21   the farm that you were looking at here as of February 7th,

22   2018?

23   A.  No.

24   Q.  No, I'm not right or no, you were not reaching that

25   opinion?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    711

1   A.   No --

2   Q.   Let me ask it again.  That's confusing.  I apologize.

3   Were you reaching an opinion in the line item total value

4   based upon validation review as to the fair market value of

5   the Logan County farm as of February 7th, 2018?

6   A.   Yes.

7   Q.   Okay.  Now, what qualifications do you have as an

8   appraiser to reach a fair market value opinion?

9   A.   None.

10  Q.   What training have you had in order to reach fair market

11  value opinions concerning farms and feedlots?

12  A.   None.

13  Q.   What experience have you had in conducting actual fair

14  market value appraisals of farms and feedlots?

15  A.   None.

16  Q.   What education have you had, if any, in coming up with

17  fair market values for real estate like the feedlot in

18  question?

19  A.   None.

20  Q.   So this opinion that you reached as to the 4,559,530, that

21  was not based on any training, expertise, education, or

22  experience in appraising similar properties, correct?

23  A.   Correct.

24  Q.   And, in fact, the only opinion you expressed in your

25  validation review is the highlighted section there, right?

19-CV-01224-RBJ        Bench Trial - Day 4     04/15/2021    712

1   A.  Yes.

2   Q.  And can you read -- strike that.  If you could read that

3   to yourself, let me know when you've read it, I want to ask

4   you some questions about it.

5   A.  Okay.

6   Q.  All right.  And is it correct that in doing this appraisal

7   validation your final opinion was that the appraisal on

8   8/23/16 was still a reasonable and true reflection of the

9   market value of the Logan County farm?

10  A.  Yes.

11  Q.  So is that to say as of February 2018, some nine months or

12  so after the sale to Lardyn closed, you reached the opinion

13  that the $4,270,000 valuation in Mr. Moreland's September 2016

14  appraisal still reflected the reasonable and true value of the

15  subject property?

16  A.  Yes.

17          MR. FORBES:  Your Honor, those are all the

18  questions I have.

19          THE COURT:  Mr. Keithley, do you have any?

20          MR. KEITHLEY:  A few short questions.  Thank you,

21  Your Honor.

22                      CROSS-EXAMINATION

23  BY MR. KEITHLEY:

24  Q.  I'm going to wait for the camera to scroll over to me so

25  Ms. Roach can see who she's speaking with.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    713

1   A.   Thank you.

2   Q.   Good morning, Ms. Roach.  My name is Livingston Keithley.

3   I represent Mark Pauling and Two Mile Ranch.  We've never met,

4   have we?

5   A.   No.

6   Q.   And we've never spoken on the phone?

7   A.   No, we have not.

8   Q.   I just want to ask a couple of follow-up questions based

9   on what you testified this morning just to clarify a few short

10  points.  First, I think you testified before that you had met

11  Mark Pauling before; is that right?

12  A.   Yes.

13  Q.   And you've been in meetings with him regarding Two Mile

14  Ranch's loans?

15  A.   Yes.

16  Q.   You also testified you don't consider Mark Pauling to be a

17  friend of yours, though; isn't that right?

18  A.   Right.

19  Q.   In the meetings that you had with him, did he ever express

20  to you that he wanted to prevent the plaintiff in this case,

21  Ms. Wilson, from being able to collect her judgment?

22  A.   No, sir.

23  Q.   Did he ever even mention Ms. Wilson's name to you?

24  A.   No.

25  Q.   Did he ever mention the judgment against Jon to you?

19-CV-01224-RBJ        Bench Trial - Day 4       04/15/2021     714

1   A.   No.

2   Q.   I'm going to put an exhibit on the screen very quickly.

3   If you can take a look at that, I just have a couple follow-up

4   questions.  I have on my screen Exhibit 23.  Can you see that

5   exhibit?

6   A.   Yes, sir.

7   Q.   Okay.  And this is the e-mail that we looked at with the

8   quotes about a, quote, unicorn investor group; isn't that

9   right?

10  A.   Yes.

11  Q.   With regard to the plan, this e-mail was -- the e-mail

12  exchange was on May 10th of 2017, correct?

13          THE COURTROOM DEPUTY:  I just lost it.

14          THE WITNESS:  Correct.  I lost the screen.

15          THE COURTROOM DEPUTY:  Will you toggle again or did

16  you already?

17          MR. KEITHLEY:  I will unplug it and plug it back

18  in.

19          MR. FORBES:  The solution to all problems

20  electronic.

21          THE COURT:  I think she knows the sentence you're

22  talking about.  You can probably ask her the question.

23  Q.   (By MR. KEITHLEY) I'll continue.

24  A.   I can see it.

25  Q.   Thank you.  Ms. Roach, with regard to the plan, I want to

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      715

1   ask you first about this plan.  You put the word plan in

2   quotes.  Do you see that?

3   A.  Yes.

4   Q.  Now, by this point in time, May of 2016, Two Mile Ranch

5   had not yet declared for bankruptcy protection; isn't that

6   right?

7   A.  Correct.

8   Q.  And that's the reason you're having this discussion with

9   Mr. Gray, right?

10  A.  Yes.

11  Q.  Now, at this point in time, would you agree with me that

12  Mark Pauling, as well as Jon Pauling, were reaching out and

13  trying to come up with some possible way to pay off Two Mile

14  Ranch's debts to the bank?

15  A.  Yes.

16  Q.  And what you're expressing in this e-mail is that there

17  were multiple ideas they were talking with the bank about, but

18  none had yet come to fruition?

19  A.  Yes.

20  Q.  Would you agree with me that there was never just one

21  single plan that they were pursuing?

22  A.  I agree.

23  Q.  I think in your testimony you had said that the plan as

24  you understood it ultimately was a plan between -- brought to

25  the bank by Elyce and Mark.  Did I hear that correctly?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      716

1    A.  Yes.

2    Q.  That was well after the point in time of this e-mail,

3    though; isn't that right?

4    A.  Yes, sir.

5    Q.  What you were referring to in that testimony was that

6    ultimately it was a transfer of assets from Two Mile Ranch to

7    Lardyn which was owned by Mark and Elyce York, correct?

8    A.  Yes.

9         MR. KEITHLEY:  Your Honor, I do not have any

10   further questions for Ms. Roach.

11        Ms. Roach, thank you.

12        THE WITNESS:  Thank you.

13        THE COURT:  Do you have redirect?

14        MR. PULKRABEK:  I have no further questions for

15   Ms. Roach.

16        THE COURT:  All right.  Then, thank you, ma'am.

17   You're excused and free to go.  You can hang up now.

18        THE WITNESS:  Thank you.

19        THE COURT:  Next.

20        MR. PULKRABEK:  Your Honor, our next witness is

21   Shari Lutz.  She's out in the hall.  May I go get her?

22        THE COURT:  Of course.

23        Good morning.

24        THE WITNESS:  Good morning.

25                        SHARI LUTZ

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021     717

1  was called as a witness and, having been duly sworn, was

2  examined and testified as follows:

3          THE COURT:  Thank you.

4                    DIRECT EXAMINATION

5  BY MR. PULKRABEK:

6  Q.  Good morning, Ms. Lutz.  Can you tell us who you are,

7  what's your occupation, and what do you do for a living.

8  A.  So I'm a certified public accountant, and I have a couple

9  credentials in valuation, and since 1988 I have spent my

10 career doing something I call forensic accounting and

11 valuation.

12 Q.  And you were engaged by us in this case, correct?

13 A.  Correct.

14 Q.  Can you tell the Court what were you engaged or asked to

15 do in this case?

16 A.  So I was asked to assess whether there were any damages

17 associated with alleged transfers of assets from one entity to

18 another entity, in its simplest form.

19 Q.  Are you being compensated for your testimony today?

20 A.  I get compensated for my time, yes.

21 Q.  And what is the basis and rate of your compensation?

22 A.  $350 an hour.

23 Q.  Okay.  And we'll get into the work in more detail, but

24 have you formed opinions about the damage to Ms. Wilson?

25 A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      718

1   Q.  And have you formed opinions about the equity or

2   differential between the debt and asset value of assets

3   transferred in this case?

4   A.  Yes.

5   Q.  I'd like to ask you some questions then about your

6   background and qualifications.  And you had prepared a CV for

7   this case, correct?

8   A.  Correct.

9   Q.  A CV has been marked as an exhibit, and if that would

10  facilitate you going through your background and

11  qualifications, I'd like to bring that up.

12  A.  Okay.

13          THE COURT:  What's the exhibit number?

14          MR. PULKRABEK:  It's 157, Your Honor.

15          THE COURT:  And it's not stipulated.  Why?

16          MR. FORBES:  Why, Your Honor?  Because, quite

17  frankly, I'd like to hear the witness testify as to her

18  credentials, but if it would be helpful to you, we can just

19  have -- I'll agree to it now.

20          THE COURT:  Well, don't worry about what's helpful

21  to me.  That hasn't bothered anybody so far.

22          MR. FORBES:  Well --

23          THE COURT:  Just worry about what's helpful to your

24  client.

25          MR. FORBES:  Well, it sounds like what would be

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021    719

1    helpful to my client is to agree to 157, Your Honor, so I'll

2    agree to it being admitted.

3           THE COURT:  How about the others?

4           MS. OLDEMEYER:  No objection.

5           MR. KEITHLEY:  No objection, Your Honor.

6           THE COURT:  157 is admitted.

7       (Plaintiff's Exhibit 157 received.)

8           MR. PULKRABEK:  Thank you, Your Honor.

9    Q.  (By MR. PULKRABEK) Okay.  So, Ms. Lutz, can you identify

10   the exhibit before us?

11   A.  Yes.  This is my CV.

12   Q.  And you prepared this?

13   A.  Yes.

14   Q.  Okay.  And we won't go through every line by line, but

15   starting with your education, could you tell us about that?

16   What's your education?

17   A.  Not that I probably need it, but can I move this or do you

18   have control?

19   Q.  I'm driving.

20   A.  Okay.

21   Q.  So do you want me to go down?  Here we go.  Okay.  Tell us

22   about your educational background, please.

23   A.  You'd think I'd get the dates right, but it was a long

24   time ago.  So I have a BS from the University of Colorado at

25   Denver with honors.  My emphasis was in finance and

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    720

 1   international business.  I have a master's in business
 2   administration from the University of Michigan, also with an
 3   emphasis in finance and international business.
 4   Q.  All right.  After -- after your education, can you tell us
 5   what did you do?
 6   A.  I went to work for -- I think it had a different name at
 7   the time, but it's now known as KPMG Peat Marwick, which at
 8   the time was one of the big six or eight accounting firms.
 9   Q.  And what did you do for KPMG?
10   A.  I basically did a form of what I'm doing now.  At the time
11   we also did -- we were involved in something called leveraged
12   buyouts and some large transactions.
13   Q.  And then at what point in time did you become a licensed
14   certified public accountant?
15   A.  Yeah, I believe that was in 1992, but I would actually
16   have to look.
17   Q.  And is that date on your resume here?
18   A.  I think so.
19   Q.  Okay.  Does that help?
20   A.  Yes.  1992.
21   Q.  Okay.  And where are you -- where are you licensed or
22   certified as a certified public accountant?
23   A.  In Colorado.
24   Q.  Now, walk us forward, if you would, just hitting the main
25   points of your work history from KPMG to present.

                        Sarah K. Mitchell, RPR, CRR

1  A.  So I worked for KPMG in their consulting division doing

2  what I described for a couple years.  Then I moved back to

3  Denver, and I went to work for a firm called Senkin Kurtz

4  Baker.  That firm no longer exists, but I worked in their --

5  what they called at the time their litigation support area and

6  did what I essentially do now, forensic accounting and

7  valuation.  And then I jumped around to a few different firms

8  finally forming -- help forming another forensic accounting,

9  evaluation, and tax firm, Harper Lutz Zuber Potenza.  Left

10  that firm and started another firm, Lutz Zuber & Associates,

11  and now I have my own firm, which has been a legal entity for

12  a long time, but that's the entity that I do my work under.

13  Q.  Now, in the context of your background you mentioned

14  something called litigation support.  That's testifying as an

15  expert witness?

16  A.  Yeah.  I basically define it as working in the legal field

17  at the juncture of accounting or evaluation or economic

18  issues.

19  Q.  And is all of your practice, is it 100 percent litigation

20  support, or do you do other things as well?

21  A.  No, I do other things.  I value privately held businesses.

22  Sometimes there's a need for that in litigation and sometimes

23  there's not.  There's a need for it in other areas such as

24  regulatory matters, which I don't do a ton of anymore, but

25  also income tax, estate tax, that sort of thing.

19-CV-01224-RBJ          Bench Trial - Day 4      04/15/2021    722

1    Q.  And can you give us a sense of how your work breaks down

2    between litigation support and non-litigation support?

3    A.  Not really.  It varies quite a bit year to year, so I

4    would say in the last year it's been predominantly more

5    forensic accounting and litigation support.  It's just not

6    always like that.

7    Q.  All right.  Do you approach your engagement differently

8    depending on whether it's litigation support or not?

9    A.  Developmentally, no, but I think the context is different,

10   yes.

11   Q.  Do you apply the same methodologies?

12   A.  Yes.

13   Q.  Okay.  In this -- well, let me ask you.  You mentioned

14   that you have some particular credentials under the broader

15   rubric of being a certified public accountant, so can you tell

16   us what those credentials are?

17   A.  So I'm also an accredited senior appraiser, which is a

18   valuation credential.  I'm certified in financial forensics,

19   which is a credential that's granted by the American Institute

20   of Certified Public Accountants, and I was accredited in

21   business valuation also by the American Institute of Certified

22   Public Accountants, but I let that credential lapse.

23   Q.  All right.  And without going into too much depth, can you

24   give us a sense of what is required to obtain these various

25   credentials?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021       723

1    A.  Generally, they're -- well, first of all, I should say it

2    differs from organizations by organization.  But generally

3    there's an experience requirement.  You might have to have

4    reports approved by the organization, and usually there's an

5    exam.  And then there's continuing education required as well.

6    Q.  All right.  Now, as a certified public accountant, are you

7    subject to any ethical constraints or rules or obligations?

8    A.  Yes.

9    Q.  And can you just briefly describe what is the framework

10   that exists to hold certified public accountants responsible

11   for their work?

12   A.  Well, because certified public accountants represent

13   accounting information to the public, there's a very high

14   ethical and moral creed, if you will, that's laid out in the

15   professional standards.

16   Q.  And is there a body of rules that you follow?

17   A.  Yes.

18   Q.  Is your work in this case contingent in any way, shape, or

19   form on the outcome?

20   A.  No.

21   Q.  All right.  So let me ask you some questions about how you

22   approached this particular assignment, and let me take you

23   back to when you were first engaged.  Can you tell us about

24   when you were first engaged to work in this case?

25   A.  I think it was the summer of 2020.  It might have been

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      724

1   late summer of 2020.  And like a typical case, you know, the

2   attorney -- you in this case -- gave me some background on

3   what the issue was and provided a series of documents, which,

4   you know, were continued to be provided throughout the course

5   of the case, and I just sort of dove in and tried to make

6   sense of what was provided.

7   Q.  And can you tell me in general categorization what types

8   of information you were considering?

9   A.  Yes.  So there was a variety of financial information.

10  There were personal financial statements.  There was a fair

11  amount of internal documents generated by Farmers State Bank.

12  Some income tax returns.  There were various spreadsheets of

13  cash flow, that kind of thing.  There was some appraisals.

14  Documents of -- well, promissory notes and warranty deeds,

15  some indications of some sales of property.  And a variety of

16  e-mails, although I think some of those came later after the

17  initial report was issued.

18  Q.  And as part of your work did you synthesize the

19  information that you were provided?

20       MR. FORBES:  Objection.  The form of the question

21  is leading.

22       THE COURT:  Overruled.

23  A.  To the best of my ability, yes.

24  Q.  (By MR. PULKRABEK) And based on that, did you form

25  opinions to a probability or more likely than not as to

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      725

1    matters that you described earlier, damages and equity and

2    assets?

3    A.  Yes.

4            MR. PULKRABEK:  Your Honor, at this point I'd like

5    to move to qualify Ms. Lutz to testify as an expert in

6    forensic accounting, valuation, and damages analysis.

7            MR. FORBES:  Your Honor, may I voir dire?

8            THE COURT:  Yes, of course, you can.

9                        VOIR DIRE EXAMINATION

10   BY MR. FORBES:

11   Q.  Ms. Lutz, hello again.  We met at your deposition.  Peter

12   Forbes again.  Good to see you.

13   A.  You too.

14   Q.  With our masks on.  Ms. Lutz, you referenced you formed

15   some opinions concerning equity and assets, right?

16   A.  Yes.

17   Q.  All right.  Now, you, when you're doing your work,

18   identified what you believed to be the assets of Two Mile

19   Ranch as of April 27th, 2017, immediately before the transfer,

20   right?

21   A.  Correct.

22   Q.  All right.  And to try to facilitate things I have written

23   them down on this board.  If you can see it, great.  If not,

24   let me know.  Can you see that?

25   A.  Sort of.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      726

1   Q.  Okay.  Well, I'll repeat them, so if there's --

2   A.  But this individual needs to --

3          THE COURT:  This is voir dire now, not

4   cross-examination.

5          MR. FORBES:  I know, Your Honor.  I'm going to her

6   credentials to express opinions about the assets in

7   question.  So it's not going to be cross-examination.  It's

8   going to go to her qualifications to express value opinions,

9   Your Honor.

10         THE COURT:  Well, I hope so.

11         MR. FORBES:  It will, Your Honor.  And if it

12  doesn't, I know you'll tell me.

13  Q.  (By MR. FORBES) So, Ms. Lutz, I've listed here a series of

14  assets that you identified as belonging to TMR, that's Two

15  Mile Ranch, on April 27th, 2017, and do you recall that one of

16  the assets you concluded that belonged to TMR on 4/27/17 was

17  alfalfa and grain, right?

18  A.  Yes.

19  Q.  And you did not make an independent valuation and reach an

20  independent value concerning the alfalfa and grain -- the

21  value of the alfalfa and grain held by TMR on 4/27/17,

22  correct?

23  A.  Well, so my credentials are, because I'm sure we're going

24  to get here -- so I'm not an equipment appraiser.  I'm not an

25  alfalfa and grain appraiser, and in assignments where I might

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021      727

1  be appraising the entity as opposed to the specific assets, I

2  am allowed to -- it's part of the standards -- rely on the

3  reasonable assessments of value by other appraisers or other

4  documents or other individuals who would be qualified to know,

5  so that's what I did.

6  Q.  Right.  I apologize for interrupting, but these are very

7  specific questions, and it's important at least for me that

8  the answers be clear in the record.  So I think what you said

9  is you do not believe you are qualified to come up with an

10 independent valuation of alfalfa and grain, correct?

11 A.  No.  So what I said was I rely on other people with

12 qualifications.  That's standard procedure in my business.  I

13 do that in valuations all the time.  And what I did say was

14 would I go out to the silo and tell you how much that alfalfa

15 and grain would be independently, no, I would not.  I would

16 rely on the bank's representation, which is what I did.

17 Q.  I thought I asked a much more direct and smaller question.

18 I'll try it again.

19       THE COURT:  I think she answered your question.

20 Next question.

21 Q.  (By MR. FORBES) Are you qualified in your view to evaluate

22 and value equipment like of the type that was purchased by

23 Lardyn from Two Mile Ranch?

24 A.  So the value of -- as I said, I'm not an equipment

25 appraiser.  There are appraisers who are credentialed in

                   Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      728

1   something called M&E, machinery and equipment appraisal.

2   However, as a regular part of valuing entities, I rely on

3   equipment appraisers and equipment appraisals, which is what I

4   did in this case.

5   Q.  Did you independently value the equipment that TMR owned

6   that it sold to Lardyn, or did you just rely on someone else's

7   valuation?

8   A.  I'll answer again.  I am not an M&E appraiser.  I relied

9   on the M&E appraisal for the equipment value.

10  Q.  So I just am asking you, did you independently value it,

11  or did you rely on somebody else's valuation, yes or no?

12  A.  I relied on the appraisal prepared by the equipment

13  appraiser.

14  Q.  So you did not independently evaluate the equipment.  You

15  relied on somebody else's appraisal.

16  A.  Right.  I would never value equipment because I'm not

17  qualified to do that.

18  Q.  Okay.  Great.  And would you agree -- you listed as

19  another asset water rights.  Those were the contract rights

20  relating to the North Sterling Irrigation District contract,

21  right?

22  A.  Yes, I believe so.

23  Q.  And you did not independently value those contract rights,

24  correct?

25  A.  Those -- right.  That was a representation by Farmers

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      729

1   State Bank.

2   Q.  Right.  And you -- and would you be qualified in your view

3   to have done an independent valuation of those contract

4   rights?

5   A.  I haven't done that kind of assignment before, no.

6   Q.  Okay.  So would you agree with me that your -- based on

7   your experience, you're not qualified to value water rights of

8   the type at issue in this case?

9   A.  Correct.

10  Q.  All right.  And you did come up with an independent

11  valuation of the water rights that were an asset?

12          THE COURT:  That was asked and answered.  You're

13  wasting time.

14          MR. FORBES:  Well, Your Honor --

15          THE COURT:  She said she relied on others, not

16  herself independently.

17  Q.  (By MR. FORBES) Well, okay.  That's fine.  Let me just get

18  for the record, Ms. Lutz, is it correct that you did not value

19  independently any of the assets that you believe that TMR, Two

20  Mile Ranch, owned as of 4/27/17?

21  A.  As I testified, so I am -- as part of the standards that I

22  follow, I can rely on other types of appraisals and

23  appraisers, so, no, I didn't independently value them.  I

24  wouldn't independently value them in this case or any other

25  case.  I would rely on representations of financial

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    730

1    institutions and other appraisers who are qualified to

2    appraise those assets, which is what I did.

3    Q.  Do you agree that you are not qualified by education,

4    training, or experience to express an opinion concerning the

5    value of the assets of TMR as you identified them as of

6    April 27, '17?

7    A.  Not quite.  So I am not -- I would not produce an

8    equipment appraisal.  I would not produce an agricultural

9    appraisal.  But routinely in my work I rely on those

10   appraisals.  I look at them.  I evaluate them.  It's not a

11   blind adoption of what's there, but I would not conduct that

12   analysis myself.

13   Q.  And you would not conduct that analysis because you could

14   look at something, but you agree you are not qualified by

15   education, training, or experience to value the type of assets

16   you identified that TMR owned as of 4/27/17, correct?

17   A.  I don't -- I think I've testified to that, yes.  No, I

18   don't --

19          THE COURT:  She's answered that, and she said she

20   is qualified, and she's explained how she does it.

21          MR. FORBES:  Your Honor, and I'm sorry, but I

22   believe under the James River case I am entitled to

23   establish that this witness did not reach an independent

24   valuation opinion on any of the assets in question and is

25   not qualified to express an independent valuation opinion.

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021     731

1           THE COURT:  I don't know what the James case says,

2    but I know what she said.

3           MR. FORBES:  Your Honor, the James River case, we

4    discussed it in our brief.

5           THE COURT:  Mr. Forbes, would you continue and

6    complete your voir dire so we can move on?

7           MR. FORBES:  Okay.  Your Honor.

8    Q.  (By MR. FORBES) Do you believe you have the equipment --

9    excuse me -- strike that.  Do you believe you have the

10   experience, training, or education to independently value the

11   mineral rights that TMR owned as of April 27, '17?

12   A.  No.

13   Q.  Okay.  Do you believe you have the education, training, or

14   experience to independently value the Logan County farm that

15   TMR owned as of 4/27/17?

16   A.  I'm not an agricultural appraiser.  I am not a mineral

17   rights appraiser.  I routinely rely on other appraisers in

18   assignments I've done for 33 years for those types of values.

19   I would not independently value them because there are people

20   who are licensed to appraise real estate, and I'm not.  So I

21   don't know -- I don't know how to answer your questions any

22   more clearly.

23   Q.  You could answer it yes or no.

24   A.  I would not independently value them in any assignment,

25   but I would rely on people who are qualified to do so.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    732

1    Q.  Is the reason you would not independently value a farm

2    like the Logan County farm because you do not have the

3    education, training, or experience to independently value

4    agricultural real estate like that farm?

5    A.  And I'm not licensed to do so.

6    Q.  For both reasons.  Don't have the training, education,

7    experience.  Not licensed to do so, right?

8    A.  I don't have the -- well, I have a lot of valuation

9    training, and that's why I can rely on somebody else's

10   appraisal and look at it and understand it.  But, no, I would

11   not independently do it.

12   Q.  Okay.  And -- all right.  How about the North Turkey Creek

13   property?  That's a parcel of real estate in Jefferson County.

14   Understand that, right?

15   A.  That's the same answer.

16   Q.  That you don't have the education, training, or experience

17   to independently value that property, right?

18   A.  I have the education, training, and experience to

19   reasonably rely on somebody else's appraisal, but not to

20   prepare it, not to prepare a real estate appraisal, nor am I

21   licensed to do so.

22   Q.  Okay.  And how about the Mark Pauling note?  That was

23   another asset.  Do you believe you have the education,

24   training, and experience to independently value that asset?

25   A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4     04/15/2021    733

1    Q.  So that's the only asset here that you agree that you have

2    the education, training, and experience to independently

3    value, correct?

4    A.  I think you're changing my answer a little bit.  I have

5    33 years of education and training in valuation.  I do not

6    have -- I would not value those assets independently.  I would

7    rely on qualified appraisers to do so.  They would become part

8    of my report that I issue to the IRS or transaction or any

9    other matter.  It's standard procedure.

10   Q.  Okay.  You have the education and training and experience

11   to rely on others to value the alfalfa, the equipment, the

12   water rights, the farm, the Turkey Creek property, and the

13   mineral rights, right?

14   A.  Correct.

15   Q.  But you don't have the education, training, and experience

16   to independently value those properties, correct?

17   A.  Correct.

18          THE COURT:  Would you object?

19          MR. PULKRABEK:  Yes, Your Honor.

20          THE COURT:  Sustained.  You've asked and asked and

21   asked the same question.  She has answered and answered and

22   answered that question, Mr. Forbes.  Now, do you object to

23   her as an expert or not?

24          MR. FORBES:  I object to her expressing any

25   opinions -- independent opinions about the value of the

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      734

1   assets that TMR owned or transferred because she has

2   conceded she lacks the education, training, and experience

3   to reach an independent value -- independent opinion of

4   value concerning any of those assets other than the Mark

5   Pauling note, yes, Your Honor.

6            MS. OLDEMEYER:  I join that objection.

7            THE COURT:  Overruled.  Absolutely overruled, and

8   I'm glad you toned down your tone in the middle of your

9   speech.  How about you, Mr. Keithley, do you want to object

10  too?

11           MR. KEITHLEY:  Your Honor, I take no position.

12           THE COURT:  Onward.

13           MR. PULKRABEK:  Thank you, Your Honor.

14                 DIRECT EXAMINATION (Cont'd)

15  BY MR. PULKRABEK:

16  Q.  Ms. Lutz, I'd like to start with valuation or any opinions

17  of valuation you reached, not necessarily based on the asset

18  list that Mr. Forbes was just pointing to, but sales of

19  membership interest in Lardyn Consulting.  Do you have that

20  frame of reference?

21  A.  Yes.

22           THE COURT:  Sorry.  Just a minute.  I want to read

23  your question there.  Okay.  Thank you.

24  Q.  (By MR. PULKRABEK) In the course of your study, did you

25  evaluate sales of interest in Lardyn?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    735

1   A.   Yes.

2   Q.   And what sales of interest in Lardyn did you evaluate?

3   A.   There were two sales that I believe occurred in about the

4   eight months after the transfer of assets that's -- we're

5   talking about in this case, which was in April -- late April

6   of 2017.  There was a 2 percent interest purchase for 40,000,

7   and I believe a 3 percent interest purchase for 60,000.

8   Simplistically, because there are other valuation aspects to

9   it, but I don't think they matter for purposes of my testimony

10  today, if you simply divide the amount paid by the percentage,

11  then you arrive at a value for the entire entity.

12  Q.   And what is the valuation for the entire entity of Lardyn

13  Consulting based on the 2 percent and the 3 percent --

14           MR. FORBES:  Your Honor, I'm sorry, and I apologize

15  for objecting.  But I object on the basis that these are

16  more than six months post-transaction, and therefore not

17  relevant under the case law cited in our trial brief.  I

18  apologize for objecting, but I need to make that objection

19  for the record.

20           MS. OLDEMEYER:  I join that objection.

21           MR. KEITHLEY:  As do I.

22           THE COURT:  You don't have to apologize for

23  objecting.  That's what lawyers do.  Overruled.

24           Now, when did these -- this is a valuation of

25  Lardyn Consulting as of what date?

                        Sarah K. Mitchell, RPR, CRR

1              MR. PULKRABEK:   Let me ask the question and see if

2    we can get to it.

3    Q.  (By MR. PULKRABEK) Ms. Lutz, can you give a valuation of

4    Lardyn Consulting as of a date based on those sales or a

5    reasonable date within that range?

6    A.  Right.  So I don't -- I don't remember -- I don't recall

7    the exact date of those sales.  So it is true that valuation

8    is date specific.  However, it depends on whether anything

9    remarkable has changed within the entity's operations between

10   one point of time and another, and I guess I would argue in

11   this case nothing did.  Those percentages translate to a value

12   of $2 million -- I should say for the capital of Lardyn

13   Consulting, or you can use the term equity, but it's not

14   equity, it's capital in this case, but they're the same thing

15   basically.

16   Q.  Okay.  So just to break it down a little bit further,

17   you're aware that the transfer to Lardyn occurred on

18   April 27th, 2017?

19   A.  Yes.

20   Q.  And is it your -- is it your opinion that nothing material

21   changed between the date of that transfer and the date of the

22   sale of the 2 percent and 3 percent interest?

23   A.  That's my belief, yes.

24   Q.  Okay.  So based on those sales, do you have -- what is

25   your opinion then of the value of Lardyn at time of the

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      737

1    transfer?

2           MR. FORBES:  Your Honor, I object.  We still

3    haven't established the date of these transfers, which was

4    the question the Court asked.

5           THE COURT:  Right.  I think she was about to say

6    her opinion is of the value of Lardyn capital as of 4/27/17,

7    but you're right.  What was the date of those two sales that

8    she's relying on, please?

9    Q.  (By MR. PULKRABEK) Ms. Lutz, might it help you to look at

10   some of the documents to refresh your memory as to the date?

11   A.  Yeah, you would have to, because I believe that came from

12   testimony of one of the parties.  So I don't know if it's in

13   document or in testimony, and I don't know if -- I know it was

14   close to -- it was in near proximity, but it was definitely

15   later than April 27th.

16   Q.  Okay.  Let me bring up and see if this can just refresh

17   your memory on some of the dates, and then we can go from

18   there.  I'm displaying for you what has previously been marked

19   Exhibit 29.  It has not been admitted in this case, but I

20   believe, Your Honor, it is a stipulated exhibit.

21          THE COURT:  Exhibit 29 is a stipulated exhibit.

22   It's admitted.

23       (Plaintiff's Exhibit 29 received.)

24   Q.  (By MR. PULKRABEK) So, Ms. Lutz, allow me to take you

25   through this.  You can see that these are documents pertaining

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021      738

 1   to the organization of Lardyn Consulting, correct?

 2   A.   Correct.

 3   Q.   And if we scroll through it, we see there's an operating

 4   agreement.  Get through all this, and then you will find an

 5   amendment that added Mark Pauling, and then we will see an

 6   amendment dated July 17th, 2017.  Do you see that?

 7   A.   July 17th of 2017, yes.

 8   Q.   Yes.  So this is -- how long after the sale approximately

 9   is this?

10   A.   Well, this is -- this is before the transfer.

11   Q.   The transfer -- I'm sorry -- the transfer.

12   A.   I'm sorry.  Yeah, it's three months after.

13   Q.   Okay.

14   A.   Sorry, sir.

15   Q.   So you mentioned the 3 percent sale of the membership

16   interest, correct?

17   A.   Correct.

18   Q.   And in this document we see Elyce York's interest reduced

19   to 82 percent and Mark Pauling's interest of -- or Pauling

20   Hauling's interest of 3 percent.  Do you see that?

21   A.   Yes.

22   Q.   And you see it's signed by Pauling Hauling down here?

23   A.   Yes.  Well, yes.

24   Q.   Okay.  Does that -- does that help you to pinpoint when

25   Pauling Hauling became a member?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4     04/15/2021    739

1   A.  Right.  Assuming the dates are within a reasonable range

2   of when the transaction occurred, which there isn't a reason

3   they wouldn't be, so, yes, it was several months afterwards.

4   Q.  All right.  So let's just focus on the 3 percent sale.

5   What's the valuation of Lardyn based on the 3 percent sale

6   that occurred on or about July 17 or 18, 2017?

7           MR. FORBES:  Your Honor, again --

8           THE COURT:  I agree with you, Mr. Forbes.  This

9   document doesn't tell me anything, I don't think, about when

10  that sale to Pauling Hauling occurred.  It just tells me

11  that on July 17th of '17 Pauling Hauling owned 3 percent.

12          MR. PULKRABEK:  Allow me to ask further questions.

13  Q.  (By MR. PULKRABEK) You see on paragraph 13 new members, it

14  says Pauling Hauling is admitted as a new member of the

15  company?

16  A.  Correct.

17  Q.  Okay.  So this is the document or resolution that appears

18  to admit Pauling Hauling as a member of the company, correct?

19  A.  Correct.

20  Q.  That's dated July 17, 2017?

21  A.  Yes.

22  Q.  And it's been signed as of July 18, 2017?

23  A.  Yes.

24  Q.  So with that clarification that Pauling Hauling is

25  admitted as a member on those dates, can you express your

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      740

1  opinion about the valuation in connection with the admission

2  of the Pauling Hauling as a 3 percent member at $60,000?

3          MR. FORBES:  Your Honor, again, my apologies.  A

4  different objection.  I object to opinions concerning the

5  value of Lardyn Consulting, because the question in this

6  case relates to the value of the assets transferred by TMR

7  versus the liens against them, so that's my objection.

8          MS. OLDEMEYER:  Join.

9          MR. KEITHLEY:  And I join.

10         THE COURT:  I need to ask you a question.  When you

11  said the value of Lardyn Consulting as of April 27, '17, you

12  explained your opinion was $2 million capital which you said

13  was the same as equity.  Am I right so far?

14         THE WITNESS:  Yes.

15         THE COURT:  And my interpretation, but perhaps not

16  counsel's, is that this would be the amount by which the

17  value of the assets exceeded the debts?

18         THE WITNESS:  That's correct.

19         THE COURT:  Then I don't understand the objections,

20  but they're overruled.

21         MR. FORBES:  Might I explain the objection, Your

22  Honor?

23         THE COURT:  If you need to explain it for the

24  record.

25         MR. FORBES:  I do, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

1        THE COURT:  I understand what she's telling me.

2        MR. FORBES:  Yes, Your Honor.  And I understood

3   that she's -- she's talking about in her view an excess of

4   assets over liabilities, but it is of Lardyn, Your Honor.

5   It is not of the value of the assets versus liabilities,

6   i.e., the property versus the liens against it inside TMR.

7   This is a fraudulent conveyance case and --

8        THE COURT:  All she said was the value of Lardyn.

9   That's all she said.

10       MR. FORBES:  I understand, Your Honor.  And my

11  objection was it was not relevant to the question in this

12  case, which is the value of the assets and the liens against

13  them inside TMR.

14       THE COURT:  It's absolutely relevant.  Overruled.

15  But she wasn't trying to say anything other than Lardyn at

16  this point.

17  Q.  (By MR. PULKRABEK) Now, Ms. Lutz, can you draw for us the

18  connection between the value of the equity in Lardyn and the

19  differential between the value of the assets minus the debts?

20  How does that all tie together?

21  A.  Yeah, so we call that difference between assets and

22  liabilities different things in different legal forums, but

23  essentially we're always talking about the same thing.  What

24  are the assets worth, what are the debts valued at, and the

25  difference is equity or capital.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    742

1    Q.  All right.  So just to break it down a little bit more,

2    based on a transaction that occurred with Pauling Hauling

3    purchasing 3 percent at $60,000, are you able to reach an

4    opinion as to the value of those assets minus the debts that

5    form Lardyn?

6    A.  Yes.  That value would translate to $2 million.

7    Q.  All right.  And then was that valuation confirmed by a

8    subsequent sale of 2 percent?

9    A.  Yes.  Yes.  So there was an additional -- an additional

10   sale and purchase of a 2 percent interest for $40,000, so --

11   Q.  Let me refer you to the next page of Exhibit 29, which is

12   titled membership interest transfer and adoption agreement.

13   Do you see that?

14   A.  Yes.

15   Q.  And on this document, can you see that one of the parties

16   to this document is called Cherry Creek Cattle Company?

17   A.  Yes.

18   Q.  And what is that entity as it relates to what we're

19   talking about?

20   A.  I believe that's the entity that purchased the 2 percent

21   interest.

22   Q.  All right.  And what's the effective date of this

23   agreement?

24   A.  So this is in November 2017.

25   Q.  And if we scroll down, there's paragraph 1.1, which says

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4     04/15/2021     743

1   transfer and assignment to CCCC.  Do you see that?

2   A.   Yes.

3   Q.   And what does that read?  Just go ahead and read it to us.

4   A.   Subject to the terms, conditions, and provisions of this

5   agreement, for and in consideration of CCC's total

6   consideration to Ms. York of 40,000 and 0/100th dollars, the

7   purchase price, the receipt and sufficiency of which is hereby

8   acknowledged, CCCC shall have transferred to him in total a 2

9   percent membership interest in Lardyn.

10  Q.   Okay.  And is that 2 percent of 40,000 consistent with the

11  opinion you expressed a moment ago about the equity in Lardyn?

12  A.   Yes.

13  Q.   Why?

14  A.   Because it computes to the same value.

15  Q.   Okay.  Was there a later sale of membership interest in

16  Lardyn that you also considered?

17  A.   There was.  I believe Mark Pauling sold a 15 percent

18  interest for half a million dollars.  That was later.  I

19  believe it was in 2019.

20  Q.   Okay.  I would like -- I would like you to assume for the

21  purpose of your opinion that the transaction date on that

22  particular sale was June 20th of 2019.  Can you give us your

23  opinion of the equity in Lardyn as of that date based on the

24  15 percent sale?

25           MR. FORBES:  Your Honor, my apologies.  New

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    744

1   transaction, so I want to object on the basis that it is not

2   proximate in time and doesn't relate to issues of the case

3   which are value of TMR assets sold to Lardyn and the liens

4   against them as of April 27th, 2017.

5       MR. PULKRABEK:  Your Honor, under Section 38-8-108

6   of the Uniform Fraudulent Transfer Act the Court is asked to

7   look at the value of the asset that was transferred, and

8   then it goes on to say, and make such adjustments as the

9   equities may require.  In this case we believe the equities

10  require adjustments, and we'd like you to have the evidence

11  so that you can consider that.

12      THE COURT:  At this point, what I'm interested in,

13  Mr. Pulkrabek, is what this lady's -- this expert's opinion

14  is on value, and if she's going to express an opinion that

15  the June 2019 sale of 15 percent to Mark Pauling for

16  $500,000 is relevant, then I'd like to have her explain why.

17      MR. PULKRABEK:  Thank you.

18      THE COURT:  And the explanation doesn't lie in the

19  fraudulent transfer act.  The explanation lies with the

20  expert.

21      MR. PULKRABEK:  Thank you, Your Honor.  Let me ask

22  some questions about that.

23  Q.  (By MR. PULKRABEK) Ms. Lutz, to just back up a moment,

24  what was your observation of the equity in Lardyn following

25  the sale?  What did you see?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021      745

1    A.   The equity in Lardyn increased over time.

2    Q.   And can you put a characterization to that?  Did it

3    increase slowly over time, rapidly?

4    A.   It increased pretty rapidly.  It increased pretty rapidly

5    in a short period of time.  I'm sure -- I mean, there are

6    factors underlying that, but that is the answer, yes.

7    Q.   Okay.  And so to answer -- or try to answer the Court's

8    question, why is the -- why is the value of Lardyn in 2019 of

9    significance to this case?  Why is it important?

10   A.   Well, this is me as an expert, a layperson, and not as a

11   lawyer expressing my opinion.  But, you know, the allegation

12   is that -- in this case is that assets were moved from one

13   entity to another entity ostensibly to avoid having to pay any

14   monies on a charging order in a past judgment, and at what

15   point those assets should be valued is unknown in my opinion,

16   honestly.  I don't know if it's at the transfer.  I don't know

17   if it's most recently.  As a practical matter, if the Court

18   finds that that transfer shouldn't have been made and what

19   happened here shouldn't have happened, then I don't know

20   honestly at what point is the relevant point, because if the

21   assets did appreciate from the initial transfer to now, is it

22   relevant what they were transferred at or is it relevant that

23   there were considerably more now and that's the amount of

24   damages.

25   Q.   Okay.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021       746

1   A.   I actually don't have an opinion on what that correct date

2   is.

3   Q.   Well, let me ask you a follow-up question to that.   Let's

4   suppose hypothetically that the assets had not been

5   transferred to Lardyn, but what happened was the assets stayed

6   within Two Mile Ranch, but otherwise the financial

7   arrangements were essentially the same in terms of providing

8   Two Mile Ranch with time to realize the value of the mineral

9   interest and so forth.   Have you formed an opinion, if that

10  had happened, do you have an opinion here as to how Amanda

11  Wilson could have collected on the charging order?

12            MR. FORBES:   Your Honor, I'm going to object.

13            THE COURT:   Sustained.

14  Q.   (By MR. PULKRABEK) All right.   Let me ask you just

15  bluntly, have you formed an opinion about the feasibility of

16  Amanda Wilson collecting on the charging order from the income

17  that was generated from these assets?

18            MR. FORBES:   Objection, Your Honor.   Beyond the

19  qualification, beyond the scope.

20            THE COURT:   Sustained.   Sustained.

21  Q.   (By MR. PULKRABEK) Okay.   Have you -- have you evaluated

22  -- let me go ahead now and ask some questions.   So can you

23  give me the percentage -- or your opinion of what the value

24  was based on that percentage transfer of 15 percent to Mark

25  Pauling in June of 2019?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    747

1    A.  Yes.  It was 3.3 million.

2           THE COURT:  2 point?

3           THE WITNESS:  3.3.

4           THE COURT:  3.3 million.

5    Q.  (By MR. PULKRABEK) All right.  So now let me shift gears a

6    little bit and ask you this.  Did you also approach your

7    analysis from a different direction of looking at what the

8    financial records showed as to the value of the assets,

9    liabilities, and then the equity at different stages in time?

10   A.  Yes, I did.

11   Q.  And would it help you to explain your testimony if we were

12   to look at one of the schedules that you prepared to your

13   report?

14   A.  Sure.

15          THE COURT:  So just so I understand what you're

16   about to do, up to now you've expressed opinions based on

17   these sales.

18          THE WITNESS:  Yes.

19          THE COURT:  And now you're going to express opinion

20   on the same subject, but derived from a different method.

21          THE WITNESS:  Correct.  Yes.

22          THE COURT:  Okay.

23   Q.  (By MR. PULKRABEK) Okay.  So let me bring up what is

24   marked as Exhibit 156, and before we get into the details of

25   it, Ms. Lutz, can you explain, what is Exhibit 156?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    748

1   A.   This was -- I believe this is Schedule 1 to my initial

2   report, and I also issued a supplement.

3   Q.   Okay.  And if we go through and look at this page, is this

4   the supplement that you're talking about?

5   A.   Yes.

6   Q.   Okay.  And you can kind of explain to us your methodology

7   and what you did to analyze this, but walk us through, what is

8   being shown here on this left-hand column first?  What have

9   you charted out here?

10  A.   Right.  So this is a comparison over time of balance

11  sheets of TMR, Two Mile Ranch.  There's a -- in balance sheet

12  form there's an analysis of the collateral analysis that

13  Farmers State Bank did internally.  There is an adjusted

14  balance sheet that I prepared.  There are some other

15  representations of Lardyn and then subsequently Redtail

16  Resources balance sheets that were prepared.  I believe they

17  come from either personal financial statements that were

18  submitted by parties to the bank, and in one case I believe

19  there's income tax return information presented.  So the left

20  -- the left-hand column is just a list of the assets and

21  liabilities on the balance sheet and if -- and any remaining

22  capital or equity.

23  Q.   So you mentioned pulling together different pieces of

24  financial information from different sources.  Is that -- is

25  that what you routinely do in your profession?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    749

1   A.  Well, it depends.  Sometimes the balance sheets are more

2   complete and reliable than in other times, so generally, yes,

3   I do that.  It can be a more simple exercise or more complex

4   exercise depending on the case.

5   Q.  All right.  Now, one of the items that I want to ask you

6   about early on here so that we can talk about it is

7   adjustments.  You kind of mentioned what you did is you looked

8   and then made adjustments.  I want to talk about adjustments

9   to the debt and particularly with respect to a guaranty by --

10  of Mark Pauling's debt.  Are you familiar with that?

11  A.  Yes.

12  Q.  Okay.  So let's talk about Mark Pauling's debt to Farmers

13  State Bank and then the guaranty that was associated with

14  that.  Did you form opinions about whether it was appropriate

15  from an accounting standpoint to include the guaranty as a

16  debt of Two Mile Ranch?

17          MR. FORBES:  Your Honor, I'm going to object.  It's

18  irrelevant what -- whether that's a debt from an accounting

19  standpoint under CUFTA.  CUFTA, the question is whether it's

20  a part of a valid lien.

21          THE COURT:  Overruled .  We're talking about a

22  guaranty of what debt now?

23  Q.  (By MR. PULKRABEK) Ms. Lutz, can you explain the debt that

24  we're talking about?

25  A.  Right.  So there's a guaranty by Two Mile Ranch of a note

                      Sarah K. Mitchell, RPR, CRR

1   that Mark Pauling entered into with Farmers State Bank.

2   Q.  And do you recall the transaction that gave rise to that

3   note?

4   A.  Yes.  Part of -- part of the acreage or ranch, part of Two

5   Mile Ranch was purchased by Mark Pauling for a million

6   dollars.

7   Q.  Okay.  Now, in your review of the materials, did you see

8   indications that Farmers State Bank was at any point in time

9   trying to include the guaranty within the total debt that Two

10  Mile Ranch owed?

11  A.  Yes, it did do that.

12  Q.  Okay.  Were there times when it didn't do that?

13  A.  Yes.

14  Q.  All right.  In its bankruptcy schedules, for instance, did

15  it -- did it include the debt?  Did it include the guaranty?

16          MR. FORBES:  Your Honor, I'm going to object to the

17  question.  The bankruptcy schedules were offered.  I'm

18  sorry.  The schedules as opposed to the proof of claim.  I'm

19  sorry.  I take it back.

20  Q.  (By MR. PULKRABEK) Okay.  Let me ask the question again.

21  A.  Okay.

22  Q.  Did you -- when you were looking at bankruptcy schedules,

23  was the amount of the Mark Pauling guaranty listed as part of

24  a debt of Two Mile Ranch?

25  A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 4      04/15/2021    751

1   Q.  So what is your opinion as to whether from an accounting

2   point of view it is appropriate to include that guaranty

3   amount as a debt that Two Mile Ranch owed to Farmers State

4   Bank?

5   A.  From both an accounting and a valuation standpoint, the

6   guaranty should be reflected at its fair value, and since the

7   note was fully secured, then that fair value would be zero.

8   Q.  Okay.  So let's break this down in more detail.  First of

9   all, from a -- is there a GAAP or an accounting approach to

10  this question?

11  A.  There is -- there is some GAAP literature about this

12  issue.  Within that are interpretations of the issue and how

13  the value of a guaranty should be represented, if it's

14  represented at all, on the balance sheet.

15  Q.  Okay.  So let's just start there.  What is the -- what is

16  your opinion of how it works from a GAAP standpoint whether

17  that guaranty should be included?

18  A.  So there are different ways to book the -- if there is a

19  liability.  If there's a guaranty fee paid by the guarantor,

20  that might be booked as the liability.  I've also seen

21  literature that says if there's no guaranty fee, then you can

22  book the fair value, which is -- I mean, that's a defined

23  term, the fair value of the liability.  But, again, in this

24  case, there is no liability because it's fully secured.

25  Q.  Okay.  So just to close out the first point that you were

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    752

1   making about the guaranty fee, was there any guaranty fee paid

2   by Mark Pauling to Two Mile Ranch in exchange for Two Mile

3   Ranch's guaranty?

4   A.   No.

5   Q.   So hypothetically speaking, if Mark Pauling had paid a

6   guaranty fee of $50,000 to Two Mile Ranch, that would be the

7   appropriate way to book it?

8   A.   Yeah, it could be.  And I should say, I said did he pay

9   one, and the answer is no.  I haven't seen any indication that

10  he paid one.

11  Q.   Okay.  And you looked for that?

12  A.   Sorry?

13  Q.   You looked for any indication that he --

14  A.   Yeah, sure.

15  Q.   Okay.  All right.  The second point you made I think had

16  to do with collateralization.  So what did you see with

17  respect to collateralization of Mark Pauling's note?

18  A.   Well, so the note was collateralized by the purchase.  It

19  was a million-dollar purchase, and there's internal bank

20  documents that indicate that the debt is fully secured.

21  Q.   And why does that then matter for your opinion that it

22  shouldn't be listed as a debt that Two Mile Ranch owed to the

23  bank?

24  A.   Because liabilities in accounting are booked if they're

25  likely to be paid and you can estimate their value reasonably.

19-CV-01224-RBJ          Bench Trial - Day 4       04/15/2021      753

1   There wasn't any indication that there was going to be any

2   liability -- any liability for -- that TMR wasn't going to pay

3   that guaranty, wasn't going to have to come up with the money

4   to pay the guaranty.  The property could have been liquidated

5   to satisfy the debts to the bank.

6   Q.  Okay.  Did you also look at what the net effect would be

7   if it's Two Mile Ranch that has to pay that amount that Mark

8   Pauling owed rather than Mark Pauling paying the amount?

9   A.  Did I look at that?

10  Q.  Did you consider that?

11  A.  Well, my opinion is that it -- he could have paid it

12  because there was some capital in the company at the point of

13  transfer.

14  Q.  Okay.  Now, I may have asked the question wrong.

15  A.  Okay.

16  Q.  What is the -- did you consider and did you evaluate

17  what's the effect if Mark Pauling doesn't pay personally, but

18  Two Mile Ranch does pay that amount?

19  A.  Well, the impact is that there's just a transfer then to

20  Mark Pauling of the -- from Two Mile Ranch to Mark Pauling.

21  It's like a distribution, I guess I would say.  If Two Mile

22  Ranch paid the debt instead of Mark Pauling, then there's a --

23  there's basically a transfer of -- it's not a direct transfer,

24  but it's an indirect transfer of value.  Right now Mark

25  Pauling doesn't have to pay it, but Two Mile Ranch pays it.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      754

1    Q.  Okay.

2    A.  On its behalf.

3    Q.  And you just mentioned a moment ago the word distribution.

4    So if Two Mile Ranch pays Mark Pauling's debt, that gets

5    treated as a distribution?

6    A.  I actually don't know how it would get treated on the

7    books and records of Two Mile Ranch.  It has the same effect

8    as a distribution.

9    Q.  Okay.

10   A.  Or they could have distributed the money directly to him

11   to pay it.  They could have done it that way.

12          THE COURT:  Who did pay it?

13          MS. OLDEMEYER:  Nobody.

14          MR. KEITHLEY:  Your Honor, on behalf of Mark

15   Pauling, I have to object to relevance.  This is a complete

16   hypothetical line of questioning.

17          THE COURT:  Seemed like it to me.  I didn't

18   understand the point of what you were doing.  In any event,

19   it's time to take the lunch break, so we'll break until

20   1 o'clock.

21          THE COURTROOM DEPUTY:  All rise.  Court is in

22   recess.

23      (Break was taken from 12:02 p.m. to 1:02 p.m.)

24          THE COURT:  Okay.  Go ahead.

25

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 4     04/15/2021     755

1           DIRECT EXAMINATION (Cont'd)

2   BY MR. PULKRABEK:

3   Q.  Ms. Lutz, we just concluded talking about the debt

4   adjustment related to the Mark Pauling promissory note.  Do

5   you recall that?

6   A.  Yes.

7   Q.  So now I want to come back to the analysis that you were

8   doing of the assets and the debts as reflected on the schedule

9   that you prepared.  Okay?

10  A.  Okay.

11  Q.  I don't know if we can put that back up on the screen.

12  Maybe I need to re-plug in.  Okay.  So you looked at this over

13  a period or a course of time to give us an overview.  Can you

14  explain in terms of reliability of looking at one slice versus

15  multiple slices, how does that factor into your analysis?

16  A.  Well, I suppose if nothing dramatic happened with the

17  assets, you would expect some consistency over time.

18  Q.  Okay.  And --

19          THE COURT:  I don't understand your question.

20  Slices.  What are you talking about?

21  Q.  (By MR. PULKRABEK) You looked at multiple points in time

22  and what the assets did or did not do.  For example, the

23  minerals.  Let me talk about the minerals.

24  A.  Right.

25  Q.  The -- did you see the mineral values change over time?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    756

1    A.  Yes.

2    Q.  Okay.  And when you look at the way that the defendants

3    value the minerals or other assets over time, does that give

4    you a more complete picture?

5            MR. FORBES:  Your Honor, I'm going to object to the

6    form of the question.  It's overbroad.  Which defendants?

7            MR. KEITHLEY:  Same objection.

8            MS. OLDEMEYER:  Same objection.

9            THE COURT:  Is there an echo in here?

10           MR. KEITHLEY:  Your Honor, there are three echoes

11   in here.

12           MR. FORBES:  Two.

13           THE COURT:  All right.  Is it important for you to

14   explain which defendants you're talking about?

15           MR. PULKRABEK:  I can ask her the question.

16   Q.  (By MR. PULKRABEK) Ms. Lutz, did you look at financial

17   data from Farmers State Bank's records?

18   A.  Yes.

19   Q.  Did you look at financial data from Lardyn's records?

20   A.  Yes.

21   Q.  Did you look at financial data from Two Mile Ranch's

22   records?

23   A.  Yes.

24   Q.  Did you look at financial records from Redtail records?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021     757

1   Q.   Okay.  So taking the complete body of financial data that

2   you looked at, does looking at that not just in one slice of a

3   particular date but rather over a course of time, does that

4   give you a more complete picture?

5   A.   Well, I don't -- actually, I don't know that it

6   necessarily does in every case, but --

7           THE COURT:  You're talking about minerals now,

8   right?

9           MR. PULKRABEK:   Okay.

10  A.   Yeah.

11  Q.   (By MR. PULKRABEK) Let's talk about minerals.

12  A.   Okay.

13  Q.   What does looking at the mineral figures that were

14  represented by the defendants on different financial

15  statements over time tell you?

16  A.   Well, so over time the minerals, at least in the period

17  that I looked at, increased in value as represented on the

18  bank's financial information and on the financial -- the

19  personal financial statements of the parties and the income

20  tax return.  I mean, I think it's -- everybody knows that

21  mineral prices go up and down.

22  Q.   And do you also have an understanding of whether the

23  minerals started producing during the period of time of your

24  analysis?

25  A.   I think the answer to that is yes, because the income for

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    758

1    both Redtail and Lardyn was pretty substantial after the

2    transfer of assets, yes.

3    Q.  So let's kind of walk through some of your opinions that

4    you reached as reflected on Schedule 1.  First of all, the

5    first column here in blue is labeled TMR 1-July-16.  What does

6    that indicate?

7    A.  So that's a balance sheet of Two Mile Ranch, some of the

8    values I adopted from their own representation, and I think

9    some of them are based on other representations of value from

10   other documents.

11            THE COURT:  Before we go any further, you haven't

12   offered 156.

13            MR. PULKRABEK:  Your Honor, I offer 156.

14            MR. FORBES:  I do have one objection that I think

15   is important.  In the adjusted TMR balance column where she

16   shows at the very bottom --

17            THE COURT:  I don't know which column it is.  I

18   can't see the column heads.

19            MR. FORBES:  I guess the third column and the first

20   blue column, at the very top it says adjusted TMR

21   27-April-17.

22            THE COURT:  It might.  Oh, I see.

23            MR. FORBES:  All right.  And if we go down -- I'm

24   sorry -- I can't scroll it -- but if we go down, Your Honor,

25   there's the amount of debt that is reported there.  Do you

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      759

1    see it's 8,827,920 from Schedule 2?

2    A.  I see the figure there.

3            MR. FORBES:  Okay.  If you go -- I can make an

4    offer of proof, or I can voir dire on the exhibit -- that

5    number is taken from the proof of claim, the proof of claim

6    that the plaintiff objected to as being hearsay and was

7    excluded.  Under 703 she can certainly rely on that even if

8    it's hearsay, but 703 does not allow evidence from the proof

9    of claim to be introduced into evidence just because she

10   relied on it.  It has to be separately admissible.  So that

11   is -- if they offer --

12           THE COURT:  That's not true.

13           MR. FORBES:  Well, Your Honor, I believe -- that's

14   my interpretation.  Obviously you have to make your ruling.

15   But I believe 703 does state that you can rely on

16   inadmissible evidence, but you can't testify about it unless

17   the evidence is separately admissible.  You can rely on that

18   hearsay, but that doesn't mean you can testify as to the

19   contents of the hearsay as an expert.  So, Your Honor, I

20   object to this.  The objection will be cured if we allow the

21   proof of claim in.  I have no objection to that coming in.

22   And I believe you can also -- even if it's hearsay, you can

23   allow it under 703, that its probative value outweighs any

24   prejudice.

25           THE COURT:  Well, what else can I do, since you're

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 4     04/15/2021     760

1    telling me what I can do.

2          MR. FORBES:  Or you could exclude the exhibit

3    because it contains hearsay.

4          THE COURT:  The objection is overruled.  So then

5    156 is admitted.

6          (Plaintiff's Exhibit 156 received.)

7    Q.  (By MR. PULKRABEK) Ms. Lutz, starting with the TMR

8    1-July-16 column, what did you -- what opinion did you reach

9    as to the -- as you put it here, partner's capital or equity

10   in TMR ranch?

11         THE COURT:  This -- it's frustrating when I can't

12   see the caption of the column.

13         MR. PULKRABEK:  Okay.

14         THE COURT:  And I can't roll it up and down.  This

15   is TMR 1-July-16.

16         MR. PULKRABEK:  Let me -- very good.  Let me --

17   I'll go through it more slowly, Your Honor.  I'm sorry I

18   didn't do that.  Okay.  So we have TMR 1-July-16.

19         THE COURT:  Why don't we start by telling me what

20   is that?

21   Q.  (By MR. PULKRABEK) Ms. Lutz, can you explain that?

22   A.  Yeah, this is a balance sheet of TMR.  The values are all

23   footnoted.  So some of them come from representations made by

24   Two Mile Ranch.  Some of them come from other places.

25         THE COURT:  So this first column you say is a

                Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4    04/15/2021    761

1    balance sheet of Two Mile Ranch?

2              THE WITNESS:  Yes.

3              THE COURT:  As of that date?

4              THE WITNESS:  As of July 1st, 2016, yes.

5    Q.  (By MR. PULKRABEK) That's the date Two Mile Ranch filed

6    bankruptcy?

7    A.  Yes.

8    Q.  Now, if we scroll downward we can see total assets.  This

9    is your analysis of the total assets that would be on the

10   balance sheet?

11   A.  Yes.

12   Q.  And what was your analysis of the total balance -- the

13   total assets of Two Mile Ranch?

14   A.  $10,822,270.

15   Q.  Now, if we go down further, and can you tell us what was

16   your analysis of the total liabilities of Two Mile Ranch as of

17   that date?

18   A.  $9,013,185.

19   Q.  Okay.  Based on that, did you find equity or partner

20   capital in Two Mile Ranch as of that date?

21   A.  Yes.

22   Q.  And what did you find?

23   A.  That there was partner's capital of $1,809,085.

24   Q.  Moving forward --

25              THE COURT:  Before you move off of that, I want to

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      762

1    understand these, and if you won't ask the questions, I'm

2    going to ask them.

3              MR. PULKRABEK:  Okay.

4              THE COURT:  Because I'm the one that you're asking

5    to decide this.  The $1.8 million figure that we see there

6    in orange, is that -- does that correspond to the $2 million

7    figure that you calculated using the sales approach, but

8    this is the same idea, what the capital was, but using the

9    balance sheet approach?

10             THE WITNESS:  So I would say that both -- well, I'm

11   not sure how to answer the question.  So the -- in both

12   cases we're trying to ascertain value.  One is based on, you

13   know, balance sheets over time, and another is based on

14   transactions.  We're trying to get to the same place.  Those

15   assessments of value are at different points in time.  Those

16   assessments are at different points in time, but in point of

17   fact the assets pretty much remain constant over a long

18   period of time.  They didn't change.  So you would expect

19   some confluence of those values.

20             THE COURT:  Well, yes.  This one is July 16th of --

21   July 1st of 2016.

22             THE WITNESS:  Yes.

23             THE COURT:  And the other one was as of April 27th,

24   2017.

25             THE WITNESS:  Yes.  And then July of 2017, November

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    763

1    of 2017, and --

2            THE COURT:  Right, right, right.

3            THE WITNESS:  One indication in 2019 that was

4    higher.

5            THE COURT:  Setting aside the dates, though, am I

6    right, are we comparing apples to apples in terms of what

7    you're trying to calculate?

8            THE WITNESS:  Yes.

9            THE COURT:  And so the sales method produces a

10   slightly different number than the balance sheet method,

11   but, again, they are on different dates?

12           THE WITNESS:  Well, they're on different dates, and

13   it would only be by chance that different methods would give

14   you exactly the same answer.  They don't.  In this case

15   they're reasonably similar, which isn't surprising.  But

16   it's not -- it's not -- it doesn't always happen that one

17   method gives you a value that's the same as another method.

18           THE COURT:  Right.  But if one of them gave you 2

19   million and one of them gave you 15 million, then --

20           THE WITNESS:  Then it's up to --

21           THE COURT:  -- there's something wrong.

22           THE WITNESS:  Then it's up to an appraiser to

23   figure out why there's that difference and reconcile it.

24           MR. FORBES:  Judge, might I ask counsel what page

25   we are on?  I was looking at page 1 of Exhibit 156, which

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      764

1    has different pages on it.

2            MR. PULKRABEK:  This is page 7, which is the

3    supplemented Schedule 1.

4            MR. FORBES:  It's what's called Exhibit 2 in your

5    exhibit in the right-hand corner?

6            MR. PULKRABEK:  Yes, it does.

7            MR. FORBES:  Thank you.

8            THE COURT:  That's what we see in the first column.

9    Now you're moving to another column.

10           MR. PULKRABEK:  Yes.

11   Q.  (By MR. PULKRABEK) So moving forward in your analysis,

12   Ms. Lutz, then you have a collateral analysis that was

13   conducted by Farmers State Bank, 22-March-17 in the second

14   column.  Do you see that?

15   A.  Yes.

16   Q.  And what is that?

17   A.  That is -- again, it's in a balance sheet form relying on

18   values that were set forth in the collateral analysis prepared

19   by Farmers State Bank, which in turn relies on some appraisals

20   and some representations I believe from -- well, I'm not

21   actually sure on the crop value where the bank got that

22   135,000, but the values all come from the bank's records.

23   Some are substantiated by appraisals.

24   Q.  Okay.  And so according to that collateral analysis, what

25   was the equity that you were looking at -- or I'm sorry --

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4     04/15/2021    765

1   total asset value that you were looking at?

2   A.   $8,650,745.

3   Q.   Okay.  And just to be clear, this does not include -- does

4   this include the Turkey Creek property in this column?

5   A.   It does not.

6   Q.   Okay.  So this would be the assets that are being

7   transferred from Two Mile Ranch over to Lardyn?

8   A.   Yes, they are.

9   Q.   All right.  So the analysis of the total assets being

10  transferred to Lardyn is that $8.65 million figure?

11  A.   Yes.

12  Q.   All right.  And then going down we see $7 million as the

13  debt, so what is -- what is that representing?

14  A.   That was new debt that -- new debt of Lardyn, which is the

15  purpose of the collateral analysis.

16  Q.   Okay.  And then what did you calculate to be the equity in

17  Lardyn based on that balance sheet?

18  A.   $1,550,745.

19  Q.   All right.  And then moving forward, you have an adjusted

20  TMR, 27-April-17.  Do you see that?

21  A.   Yes.

22  Q.   What is that?

23  A.   So that is -- it's really the collateral analysis, which

24  doesn't include all the assets of TMR, and adds those assets

25  to -- and also adds, I believe -- I believe there's debt at

Sarah K. Mitchell, RPR, CRR

1  the bottom too that's different to show what TMR's equity was

2  with all of its assets and debt as of April 27, 2017.

3  Q.  Okay.  And --

4          THE COURT:  How does that differ from the other

5  two?

6  Q.  (By MR. PULKRABEK) What is that -- in terms of just other

7  than timing, what's the value that you came to?

8  A.  $1,772,825.  The differences are probably some amount of

9  the debt, and the -- I think the crops -- pretty sure the

10  crops changed value.  The current liabilities of 109,570 are

11  not on this balance sheet.  I don't know if they got paid or

12  not, but they aren't there.  They weren't transferred.

13  Q.  Okay.  And then moving -- moving forward in time from

14  there, we can see that your analysis goes into December of

15  '17, and then it goes into '19.  Is that just based on the

16  available data that you were able to use?

17  A.  Yeah, I believe so.  Yes, I believe so.

18  Q.  Okay.  So let's go ahead and move to just the year end '17

19  column for Lardyn.  What is represented there?

20  A.  If you could just scroll down to footnote five, I believe

21  this is from the Lardyn tax return.

22  Q.  So footnote five?

23  A.  Yeah.  So this information comes from a schedule in the

24  Lardyn tax return, but for some reason it doesn't show any

25  debt.  I'm not sure why.

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    767

1    Q.   Okay.

2    A.   I know there was -- I know Lardyn did have debt, so...

3    Q.   So you're able to pull some asset values from the tax

4    returns, and then you import available data from other

5    sources.  Is that the gist of it?

6    A.   In this particular column it's all from the income tax

7    return.

8    Q.   Okay.  Now, did you -- this $3.9 million figure that we

9    see in the equity in that column, did you discard that as

10   aberrant?

11   A.   Yes.  Because I think the data in the income tax return

12   for Lardyn, as it was for the entities over time, doesn't look

13   to be reliable.

14   Q.   Okay.  So then --

15          THE COURT:  If it doesn't have debt, it can't be

16   reliable, right?

17          THE WITNESS:  Yes.  And for other reasons too, but

18   yes, agreed.

19   Q.   (By MR. PULKRABEK) So then let's go forward and pick up

20   some of the ones that do reflect debt again.  Can we talk

21   about the next column over, 25 January of '19.  What is

22   represented there?

23   A.   So, again, these are -- I think when we get to these later

24   dates, these are representations from personal financial

25   statements provided to the bank over time at various points in

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      768

 1   time.

 2   Q.   Okay.  And so for January 25th, 2019, what did you find to

 3   be Lardyn's total assets?

 4   A.   So, well, let me just answer your question.  So the total

 5   assets are $5,151,335, and I think at this point -- well,

 6   before this the mineral interests went into another entity,

 7   and that's why they're no longer in Lardyn.

 8   Q.   Okay.  And so we'll -- just to kind of cut ahead to where

 9   this is going, there will be a -- what you then did at some

10   point was you combined -- you recombined Lardyn and Redtail to

11   look at the total value?

12   A.   Yes.

13   Q.   Okay.  So let's go back and look at what's going on with

14   some of these columns.  We talked about Lardyn, 26-January-19,

15   and we looked at the total assets.  What's the -- what's the

16   debt and what's the equity in Lardyn as of that time?

17   A.   I'm having the same problem as the judge.  Are you third

18   column from the left there?

19   Q.   So we're in this column.

20   A.   Okay.  Got it, where the cursor is.  So the capital at

21   that point is $1,688,186 .

22   Q.   Okay.  And that's for Lardyn.  And then if we go back up,

23   I'm going to skip over this next column for a moment and look

24   at this column here called Redtail, 25 of January '19.  So

25   that's the same -- that's the same date as this column right

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021       769

1   here, correct?

2   A.   Correct.

3   Q.   Okay.  And so walk us through what the assets were of

4   Redtail as of that time.

5   A.   So the assets of Redtail, which as I mentioned a minute

6   ago, Redtail now has the mineral interests, and the assets of

7   Redtail are 4,983,226.

8   Q.   And then what is the debt and the resulting equity of

9   partner's capital?

10  A.   So the debt I believe is the sum of the $2,968,043, and

11  I'm not sure what that $326,000 is because I can't see the

12  line item.  That may be debt too.

13  Q.   Okay.

14  A.   And then the equity is 1,674,364.

15  Q.   Okay.  Then --

16          THE COURT:  What was that number?

17          THE WITNESS:  $1,674,364.

18  Q.   (By MR. PULKRABEK) So now let me -- your schedule carries

19  over to following page; is that right?

20  A.   Yes.

21  Q.   So let's go over to the next page here, and you have a

22  column here that's labeled total Lardyn and Redtail, 2019?

23  A.   Yes.

24  Q.   All right.  And explain to us -- there's not much to it,

25  but explain to us what you did to consolidate the Lardyn and

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 4      04/15/2021    770

1   Redtail for 2019.

2   A.   I believe it's the sum of the prior columns for Lardyn and

3   Redtail separately.  I didn't always have financial statements

4   on the same date, so this is a combination based on the best

5   data I had.

6   Q.   All right.  And so looking at the consolidated amounts,

7   what is the total asset value as between Redtail and Lardyn

8   for 2019?

9   A.   The consolidated value is $10,134,561.

10  Q.   All right.  And then if we look at the consolidated debt

11  and then the resulting consolidated equity, what are those

12  figures?

13  A.   Again, the debt is likely a summation.  I can't tell -- I

14  can't tell exactly what's debt without having the line items

15  on the left, but the $6,137,381 is debt, and I would guess the

16  two numbers directly above that are also long-term debt.

17  Q.   And, Ms. Lutz, if it would help you to look at your own

18  printout of the report rather than trying to follow along on

19  the screen, that would be fine too, if that would help you

20  explain some of these columns.

21  A.   I can tell you what the total debt is without looking at

22  the specific elements.  So the total debt -- the total

23  long-term debt is 6,574,881, and then the total liabilities

24  are $6,772,011.

25  Q.   Okay.  So in terms of equity, it's this figure here?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    771

1    A.   Yeah.   The difference between the assets and the

2    liabilities is $3,362,550.

3    Q.   Okay.   And then did you also have some data that went into

4    either late 2019 or early 2020?

5    A.   Yes.

6    Q.   Did you look at that?

7    A.   Yes.

8    Q.   All right.   And so what is -- what is in this second

9    column on the second page of your amended Schedule 1?

10   A.   So the second column from the right is a Lardyn balance

11   sheet as of March 15th, 2020.

12   Q.   Okay.   And what did that tell you about the assets?

13   A.   They're showing assets --

14           THE COURT:   What's the name of that column, please?

15           MR. PULKRABEK:   We're in Lardyn, and then parens

16   12, 15-March-20.   So it's this column right here, Your

17   Honor.

18           THE COURT:   It's half of the column.

19   Q.   (By MR. PULKRABEK) Well, maybe -- Ms. Lutz, maybe you can

20   explain.   What's the significance of the blue columns?

21   A.   The blue is combined, is the combined balance sheets of

22   Redtail and Lardyn.

23           THE COURT:   So the very last one to the right is

24   basically the same as this white one.

25           THE WITNESS:   The very last column would be the sum

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021     772

 1   of the two immediately preceding columns.

 2   Q.   (By MR. PULKRABEK) I think, Ms. Lutz, if it would help,

 3   you can circle things with your finger on that screen, I

 4   believe.  I don't know.  Maybe that will help as we kind of go

 5   through.  So focusing just on the Lardyn 12, 15-March-20

 6   column, can you give us what the total assets were that you

 7   found?

 8   A.   So the total assets are 7,196,161.

 9   Q.   And then the total liabilities?

10   A.   The total liabilities -- sorry -- are $5,445,966.

11   Q.   And so then the equity in Lardyn for that date is what?

12   A.   Yeah, the partner's capital in Lardyn at that time was

13   $1,750,195.

14   Q.   Okay.  And then similarly, you analyzed Redtail Resources?

15   A.   Yes.  Well, again, this information I believe is from a

16   personal financial statement provided to the bank.

17   Q.   Okay.  And what were you able to pull from that?

18   A.   So I just looked at the balance sheets, again, on the

19   personal financial statement.

20   Q.   Okay.  And we're kind of getting close to the end of the

21   analysis here.  Go ahead and give us the Redtail assets of

22   December 31, '19.

23   A.   4,759,722.

24   Q.   The Redtail liabilities as of that date?

25   A.   Total liabilities are 2,985,224.

                        Sarah K. Mitchell, RPR, CRR

1    Q.  And the partner's capital?

2    A.  $1,774,498.

3    Q.  All right.  And then so now let's finish it out with this

4    last column here to the right.  It's called total Redtail and

5    Lardyn, Q1 2020.  What is that?

6    A.  So that's the sum of the immediately two succeeding

7    columns to the left.

8    Q.  So if you're looking at the assets that were transferred

9    from Two Mile Ranch to Lardyn, and then the minerals over to

10   Redtail, and summing those asset values of the Q1 2020 and

11   looking at the total value, what do you come to?

12   A.  So the total assets are $11,955,883.

13   Q.  And then the total liabilities are what?

14   A.  8,425,920.

15   Q.  Okay.  Then if we want to look at what is the equity as of

16   Q1 2020, what is it?

17   A.  The capital would be $3,529,963.

18   Q.  Okay.  Switching topics here, did you look at how the

19   transactions between Two Mile Ranch and Lardyn and then Lardyn

20   to Redtail affected Elyce York's personal reported wealth?

21   A.  Yes, I did.

22   Q.  Did you prepare a schedule on that as well?

23   A.  I did.

24   Q.  And is that -- do you recall offhand which schedule that

25   one was?  Is that Schedule 3?

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021     774

1   A.  Yeah, you're there.

2   Q.  Okay.  So we've already looked at -- I'll show you another

3   exhibit.  It's been admitted into evidence.

4         MR. FORBES:  Your Honor, while he's finding that,

5   just for the record, we object to testimony concerning her

6   personal wealth as not being relevant to the questions

7   raised by the Colorado Uniform Transfer Act claims at issue,

8   which are the value of the assets transferred on the date of

9   the assets versus the valid liens against them.

10         THE COURT:  I don't know.  I don't know what the

11   relevance is.

12         MR. PULKRABEK:  Well, let me ask -- let me just ask

13   this question.

14   Q.  (By MR. PULKRABEK) Is there a correlation between the

15   transfer of the assets and Ms. York's reported personal

16   wealth?

17   A.  Well, yes, because she was the majority owner of Lardyn

18   and Redtail, or still is, I believe.

19   Q.  And when you looked at the personal balance sheets of

20   Ms. York, what were her primary assets?

21   A.  Her investments in Lardyn and Redtail.

22   Q.  Okay.  So is there a fairly direct correlation then

23   between Ms. York's personal wealth and the assets that were

24   transferred?

25         MR. FORBES:  Your Honor, renew the objection.  It's

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    775

1   still not relevant.  And, quite frankly, if all they're

2   going to do is say what 85 percent of Lardyn was worth, it's

3   cumulative.

4            THE COURT:  Okay.  Overruled.

5   Q.  (By MR. PULKRABEK) I think my question was simply was

6   there a reasonably direct correlation between the assets

7   transferred to Lardyn and Ms. York's personal?

8   A.  Yes.

9   Q.  So going back to your schedule, just what did you -- what

10  did you find in terms of the percentage increase in Ms. York's

11  wealth as a result of the transfer?

12           THE COURT:  Can you make it so that we can see the

13  top of the column?

14           MR. PULKRABEK:  Yes.

15           THE COURT:  You've got dates there, 7/21/16,

16  3/15/17, 5/1/17, 1/28/19.  So what you're going to show me

17  is how her personal balance sheet improved from date to

18  date?

19           THE WITNESS:  Yes.

20  Q.  (By MR. PULKRABEK) Do each of these columns represent a

21  balance sheet signed by Ms. York?

22  A.  Yes.

23  Q.  Okay.  And if we look at just the net worth column, is

24  that -- would that be the bottom line as to how her net worth

25  increased over those four dates at the top of the column?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021      776

1   A.  Yes, it would.

2   Q.  All right.  And the -- if we go back to the top of the

3   column, we have 3/15/2017, 5/1/2017.  Is it accurate that the

4   assets were transferred between those two dates?

5   A.  Yes.

6   Q.  Okay.  So then if we go back down to look at the bottom

7   line and how her net worth increased, how does that translate

8   into a percentage increase in net wealth for Ms. York over the

9   period of the roughly two and a half years represented by this

10  chart?

11  A.  Well, her beginning net wealth was 67,000, and her ending

12  net wealth was almost 3 million.  So as you might imagine,

13  that's a pretty large percentage increase over a short period

14  of time.  It's a 4,373 percent increase.

15  Q.  From an economic or accounting perspective, what was the

16  -- what was the net effect of the transfers that occurred from

17  Two Mile Ranch to Lardyn?

18          MR. FORBES:  Objection, relevance under CUFTA, Your

19  Honor.

20          MR. KEITHLEY:  Object to vague.  The economic --

21  the economic effect of the transfers.  I'm not sure what

22  that means.

23          THE COURT:  The objections are overruled.  She may

24  answer.

25  A.  Can you repeat the question for me?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    777

1    Q.   (By MR. PULKRABEK) Yes.  I'm looking at -- what's the net

2    effect of the transfers that occurred from Two Mile Ranch to

3    Lardyn Consulting?

4    A.   The net effect to --

5    Q.   Let me just rephrase it.

6    A.   Okay.

7    Q.   The assets -- the assets that were transferred to Lardyn,

8    were those income producing or non-income producing assets?

9    A.   They were income producing.

10   Q.   And what happened -- were there non-income producing

11   assets as well for TMR?

12   A.   Yes.  So the North Turkey Creek property and the note from

13   Mark Pauling were the assets -- the only assets I'm aware of

14   that were left in Two Mile Ranch, neither of which would have

15   been income producing.

16   Q.   Okay.  What's -- what's the effect of the transfer of the

17   income producing assets to Lardyn with respect to the charging

18   order in this case?

19            MR. FORBES:  Objection, Your Honor.

20            MS. OLDEMEYER:  Objection, foundation.

21            MR. FORBES:  Lack of expertise.

22            THE COURT:  Actually, I don't have a problem with

23   her expertise, but I don't understand the question.  What's

24   the effect?  I think I have to sustain Keithley.  It's

25   vague.  I don't get it.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      778

1    Q.   (By MR. PULKRABEK) Is there -- is there an effect on the

2    ability to charge partner income under the charging order when

3    income producing assets were transferred to Lardyn Consulting?

4    A.   Yeah.

5    Q.   What is that effect?

6    A.   Well, so Mr. Jon Pauling wasn't a legal owner of either

7    Lardyn or Redtail.  He was an owner in Two Mile Ranch.  The

8    effect of the transfer was to leave the non-income producing

9    assets, and I believe fully encumbered by debt, in Two Mile

10   Ranch.  The income producing assets got shifted to Lardyn and

11   then later Redtail generating income and the ability to make

12   distributions to the owners of those entities.

13   Q.   All right.  So we previously looked at your opinion that a

14   little bit more than $3.5 million of equity existed between

15   Redtail and Lardyn for Q1 2020 as reflected on the last column

16   of Schedule 1.  Do you recall that?

17   A.   Yes.

18   Q.   Is there a connection between equity valuation and

19   amortization of payments over time?  Can you explain that?

20          THE COURT:  I don't understand the question.  It's

21   probably just me.  Maybe everybody else in the room does,

22   but I don't.

23          MS. OLDEMEYER:  I object, but I try not to object.

24          THE COURT:  Well, that was weird.

25          MS. OLDEMEYER:  I think it's vague, Your Honor.  I

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      779

1   object on vagueness.

2   Q.   (By MR. PULKRABEK) Let me see if -- let me see if I can

3   rephrase that question.  If somebody wanted to pay for assets

4   over time, can that be done?  Is that something that can be

5   looked at?

6   A.   I mean, I know what you're asking.

7   Q.   Maybe I'm asking it a very bad way.  Maybe you can --

8            THE COURT:  Somebody wanted to pay for assets over

9   time.  You mean like make monthly payments?

10  Q.   (By MR. PULKRABEK) Right.  There you go.  If somebody

11  wanted to make monthly payments.

12           THE COURT:  Most people buy their house by making

13  monthly payments.

14           MR. PULKRABEK:  Thank you, Your Honor.

15           THE COURT:  Is that what you're talking about?

16           MR. PULKRABEK:  I think that would capture the

17  idea, so let me see if I can ask a question.

18  Q.   (By MR. PULKRABEK) You rendered an opinion that there's

19  $3.5 million of value between Lardyn and Redtail, correct?

20  A.   As of that point in time, yes.

21  Q.   Okay.  If someone wanted to create a payment stream over

22  time that was equivalent to that $3.5 million, is that

23  something you analyzed here?

24  A.   Yes.  So that's a schedule to my report.  So the judge is

25  correct.  It's just like a mortgage.  You can amortize -- it's

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      780

1   called amortization, and you can amortize any lump sum over

2   time depending on term and interest rate.

3          THE COURT:  Let me ask about a different analogy

4   that might be a better one.  You've been involved in cases,

5   I'm sure, where there was a personal injury and a settlement

6   or a judgment, and the settlement was for 3.5 million

7   hypothetically.  But then they go buy an annuity in part for

8   the protection of the injured victim so that he doesn't get

9   or she doesn't get taken by bad people who want to take

10  advantage of her having a big sum of money, and she's paid

11  out over 20 years, let's say, and the total payout is going

12  to be 7 million, but the net present value is 3.5.  Is that

13  what we're talking about now?

14         THE WITNESS:  That's what we're talking about.

15  Yes.

16         THE COURT:  Got it.

17  Q.  (By MR. PULKRABEK) Let's go ahead and look at the schedule

18  on which you analyzed that, and we can work through that.

19         MR. FORBES:  Your Honor, just for the record, I

20  object to any testimony about amortization of a value of

21  Lardyn in 2020, three years after the transfer, as

22  irrelevant under CUFTA.

23         THE COURT:  Well, I don't know if it's irrelevant

24  under CUFTA or not.  What we're trying to figure out, I

25  think, is what was the value of the asset of Jon Pauling

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021   781

1    that was transferred, and counsel is saying it depends on

2    how you look at it.  If you look at what was it worth that

3    day on a slice, as you called it, it's one value.  If you

4    look at it as an income producing property that increases

5    and generates income over time, it's got a different value.

6    I think that's what you're trying to get at.

7              MR. PULKRABEK:  Yes, Your Honor.  And to just

8    elaborate briefly on that, what I believe the evidence has

9    shown in this case is that there was an intent to transfer

10   assets that they knew and expected would generate income

11   over time.

12             THE COURT:  That's the liability side of the case.

13   I'm just thinking about the damages now.

14             MR. PULKRABEK:  Right.  But that -- but we've heard

15   from the defense that it's very important only to look at

16   the value of the assets.  I disagree with that, but they're

17   very focused on that.  I think that -- I think that given

18   the intent --

19             THE COURT:  I think you have to look at the value

20   of the assets minus the debts, don't you?

21             MR. PULKRABEK:  Yes.  Assets minus the debt, but

22   then I think subject to a equitable adjustment.

23             THE COURT:  Yes, I know your point on that.

24             MR. PULKRABEK:  Yes.

25             THE COURT:  But basically if we stopped after she

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021        782

1    gave her opinion on the sales transactions, and her opinion

2    was at the date of the transfer, the value was -- the equity

3    was 2 million.  Now, if that's the figure I'm looking for,

4    and if Pauling was 50 percent of the 2 million, your damage

5    is 1 million under that theory.

6            MR. PULKRABEK:  If all that's correct, yes, you're

7    right.

8            THE COURT:  And now you've moved it ahead because

9    you've said that asset that she had the charging order

10    against has grown.

11            MR. PULKRABEK:  Correct.

12            THE COURT:  And I guess the assumption is she

13    hasn't been able to execute on the charging order yet, so

14    the asset that she's got available to execute on, it was a

15    calf on one date, and now it's a cow.

16            MR. PULKRABEK:  Very good.

17            THE COURT:  And at some point it's going to be a

18    bull.  And so now the cow is worth three and a half, and you

19    divide that by two, and now you're looking at 1.7, and then

20    you're going to try to increase it even further.  That's

21    what you're trying to do.

22            MR. PULKRABEK:  Well, that's right.  I think that

23    it's important to look not at the -- not solely at the value

24    of the asset on the date of the transfer, because this was

25    -- I mean, the whole intention here, I believe the evidence

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    783

1   will show, was to capture future value.

2          THE COURT:  And Mr. Forbes is telling us that CUFTA

3   requires that it only be the value on the day of the

4   transfer, and any increase in value thereafter is

5   irrelevant.  That's what he's saying.

6          MR. PULKRABEK:  That's what he's saying.  And I'm

7   saying that it is relevant, because CUFTA allows you to make

8   the equitable adjustments.

9          THE COURT:  Is there case law that answers that

10  question, or am I going to answer that question?

11         MR. PULKRABEK:  Well, there is case law, and there

12  are comments to CUFTA, and there's the text of CUFTA itself,

13  all of which I think support my argument.

14         THE COURT:  Well, I mean, setting aside this

15  equitable adjustment business, is there case law that says

16  at what point is the improper -- fraudulently transferred

17  asset evaluated?

18         MR. PULKRABEK:  Actually, there's text in CUFTA,

19  and I can't recite it from memory, but the question is I

20  believe when the transfer is so far completed as between

21  bona fide purchasers perhaps, that it can't be unwound.

22  That's -- I'm paraphrasing.

23         THE COURT:  But that doesn't answer the question,

24  does it?

25         MR. PULKRABEK:  Well, it doesn't because we don't

Sarah K. Mitchell, RPR, CRR

1    have arm's length dealing here.

2         MR. FORBES:  Your Honor, if I might answer your

3    question, there is case law under CUFTA as to the date upon

4    which the amount of the fraudulent transfer is to be

5    calculated.  That case law says you look at the value of the

6    property on the date of the transfer.

7         THE COURT:  Well, let's assume that, Mr. Forbes.

8         MR. FORBES:  Okay.

9         THE COURT:  And I am only assuming that

10   hypothetically.  You cited the James case to me, and over

11   the lunch hour I looked at it, and it doesn't stand for what

12   you said, so I'm a little skeptical.

13        MR. FORBES:  I was citing that for a different

14   proposition, Your Honor.

15        THE COURT:  I know what you were citing it for, and

16   it doesn't support that proposition, and that concerns me

17   some.  But now the value on the date of the transfer, that

18   begs the question, does it not, of whether the ability of

19   that asset to generate future income is part of the value of

20   the asset.  Your bank people back there are shaking their

21   heads in answer, but that isn't where I'm getting my

22   answers, Mr. Steve Stull.

23        MR. FORBES:  Your Honor, two points.  Number one,

24   I'm sorry if you read James River differently than I do.

25   Your reading is obviously the controlling reading unless

1   there's an appeal, and then the Tenth Circuit will tell us

2   what it meant, so I'm sorry if you feel that I

3   misrepresented the holding in that case.  Your Honor, cases

4   are legion under CUFTA that you value it as of the date of

5   the transfer, and I cited several cases in our trial brief

6   where courts have said you don't take into account

7   subsequent events, because, to use your analogy, who knows

8   if that calf would have died the day after the transfer.

9           So in terms of, you know, future income, the

10  question is the nature of the asset, right?  The appraisal

11  here does value that property based on, as one of the

12  measures, the income measure of value; i.e., you look at the

13  future earning potential of that property and discount it

14  back, the classic discounted cash flow analysis I know

15  you've seen a lot.  So with respect to property that

16  generates cash, standard valuation methods do look as of the

17  date of the transfer to the projected cash flow -- net

18  present value of the projected cash flow.  The appraisal did

19  that of the land, did that as one of the values.

20          The same with the minerals, Your Honor.  All the

21  valuations of the minerals, whether it be the one that the

22  bank did on the production value, whether it be with the one

23  that Gustavson did, whether it be any of the ones you're

24  going to see -- Brown I think was the other guy -- they all

25  look at future cash flows, and they all look at assuming

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021       786

1   these wells went into production, what's the net present

2   value of the future cash flows from those properties.  So,

3   Your Honor, valuation as of the date of the transfer of

4   income producing assets does take into account the future

5   cash to be generated by those assets.

6           THE COURT:  That answers my question from your

7   perspective.  Does Ms. Lutz agree with you?

8           THE WITNESS:  Well, Mr. Forbes is correct, that

9   valuation -- at least one method is about future -- future

10  cash flow generation.  But what we're dealing with, of

11  course, is different points in time, so the -- and different

12  projections, so a projection in February of 2017 might look

13  very different when two more years have passed and

14  circumstances have changed, so the unknown factor being what

15  actually will happen.  So as time goes on, those values can

16  change, of course, because now we have more information

17  about what the cash flows were or what happened with the

18  prices of oil, et cetera, et cetera.  So I agree with him

19  that valuation methodology does look at future cash flows,

20  but, of course, because it's in the future, it's uncertain.

21          THE COURT:  Well, then let me ask you the bottom

22  line question.  Have you formed an opinion as to what the

23  equity that was transferred on April 27, '17 was worth?

24          THE WITNESS:  Yes.  That would be indicated in the

25  column that we looked at that was -- that had the April 27th

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      787

1   date on it.

2            THE COURT:  And what's -- what's your opinion?

3            THE WITNESS:  I have to bring up the number again,

4   if you could, Mr. Pulkrabek.  Well, it's a -- so what Lardyn

5   -- can I just see the top of the column?  So the equity or

6   the capital that Lardyn had, it's about 1,550 -- 1,550,000

7   to 1,571,000.  The numbers aren't exact because the crop

8   values are changing, and there's just some things that

9   changed.

10           THE COURT:  So you say 1 million, 550 to --

11           THE WITNESS:  $1,550,745.

12           THE COURT:  To 1,772,825, is that what you're

13  saying?

14           THE WITNESS:  No.  That's not that column.  The

15  next column, 1,571,565.

16           THE COURT:  If you go by the approach on this

17  chart.

18           THE WITNESS:  Yes.  As of the -- as of the dates

19  that are approximately as of the transfer.

20           THE COURT:  But if you go by the transaction

21  method, your opinion was 2 million.

22           THE WITNESS:  Yes.  And those dates are a little --

23  I know these are big numbers for people who aren't

24  appraisers.  It's not unusual to get differences in value

25  even in a short period of time for substantially the same

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      788

1   assets.

2          THE COURT:  So you're saying that if one ignores

3   all the things that have occurred after transfer, we're

4   looking at an asset that was transferred, the net asset that

5   was transferred in the range of one and a half to

6   $2 million?

7          THE WITNESS:  Yeah.  Yes, I think that's fair.  I

8   think the latter transactions are -- well, at least one of

9   the transactions was by what I would call an insider, so

10  maybe that person thought it was worth a little bit more for

11  whatever reason at that point in time.  But, yes, I think

12  that's a correct statement, between 1.5 and 2 million.

13         THE COURT:  And then if the future things that have

14  played out over the last six years are legally relevant,

15  then you're up to something in the range of three and a half

16  million?

17         THE WITNESS:  Yes.  Over the last three years, yes.

18         THE COURT:  But even there we're talking about a

19  range of one and a half to three and a half?

20         THE WITNESS:  Yes.

21         THE COURT:  Okay.  I understand.  Sorry,

22  Mr. Pulkrabek, but you're wanting me to decide this, and so

23  I've got to ask the questions in my way --

24         MR. PULKRABEK:  Your Honor --

25         THE COURT:  -- sometimes.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4     04/15/2021    789

1          MR. PULKRABEK:  Please.  I appreciate you asking

2     the questions, so you can understand where we're coming

3     from.

4     Q.  (By MR. PULKRABEK) All right.  So going back to the

5     schedule we were talking about, Schedule 5, we see the

6     $3.5 million figure here, and tell us is there any -- if it

7     was a lump sum damage award, is there any discount to present

8     value?

9     A.  Well, the present value is the 3.5 million.  There isn't

10    any -- what's missing maybe, there's no interest on that value

11    from 20 -- whatever the date was -- I think it was the end of

12    2019, beginning of 2020.  There's no -- there's no statutory

13    interest on that amount from that point in time until today.

14    So the present value would be -- would be -- the present value

15    today of the 3.5 million is different because of the time

16    value of money.  But assuming that it's 3.5 million, that is

17    the present value, and then the schedule just shows what the

18    amortization payment would be at different percentages of that

19    amount for 30 years at a risk-free interest rate.

20    Q.  And that scenario may not really be something that we need

21    to get into.  What if the -- what if the evidence were to show

22    that Jon Pauling's equity was not 50 percent, but it was

23    85 percent as between him and Mark Pauling.  Did you do that

24    calculation for the $3.5 million, if based on the 85 percent

25    interest that was given to Elyce York was the figure you used?

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021      790

1    A.  Yes.  So --

2              MR. KEITHLEY:  Objection, relevance.

3              THE COURT:  I don't get it.

4              MR. PULKRABEK:  Okay.  Let me -- let me back up a

5    little.

6              THE COURT:  I've never seen how his interest would

7    be more than 50/50, and, in fact, the defendants even are

8    trying to argue that it's 10 to 90.

9              MR. FORBES:  We're not arguing that, Your Honor.

10             THE COURT:  Well, somebody is.

11             MR. PULKRABEK:  Your Honor, I think there's

12   evidence in this case that Mark Pauling sold his half of the

13   minerals prior to this transaction, and that Mark Pauling

14   had gotten other equity out, and so that when the assets

15   were transferred to Lardyn Consulting, Mark Pauling only had

16   a 15 percent interest in that entity, whereas Elyce York

17   who, at least under our theory of the case, is Jon Pauling's

18   straw person and insider, got 85 percent.  And so our

19   argument would be that 85 percent amount is more

20   representative of what was actually being transferred in

21   terms of Jon Pauling's interest to Lardyn.  Not 50 percent,

22   because if 50 percent had been transferred, one would expect

23   to see a 50/50 percent ownership of Lardyn between Ms. York

24   and Mark Pauling.

25             THE COURT:  Okay.  I follow you .  I don't know if

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 4     04/15/2021     791

1    that's right or not, but I understand at least.  It's not

2    out of the blue.

3          MR. KEITHLEY:  Your Honor, I would reiterate my

4    objection on relevance and move to strike.  This is the

5    first time I'm hearing of this theory.  It wasn't contained

6    in the pleadings.  It wasn't contained in any disclosures.

7    Sitting here right now is the first time I hear this theory

8    of damages.

9          THE COURT:  How can I comment on that?  I don't

10   know.

11         MR. FORBES:  Your Honor, I'll also object on the

12   ground it's an undisclosed opinion.

13         THE COURT:  I don't know.  Is it?

14         MR. PULKRABEK:  No.  I think it's absolutely

15   disclosed, and you have a schedule right in front of you

16   that actually has that calculation, and in Ms. Lutz's report

17   she talks about doing those calculations.  So I don't think

18   it's undisclosed at all.

19         THE COURT:  Looks like it was disclosed.

20         MR. KEITHLEY:  Your Honor, I'm sorry.  I have to

21   reiterate my objection.  I'm supposed to know from one

22   schedule that calculates at 85 percent of equity that that's

23   a reference that the plaintiffs are going to come into this

24   trial and argue that Jon Pauling's real interest in Two Mile

25   Ranch was 85 percent and not 50 percent?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021   792

 1              THE COURT:  I don't know.  I haven't seen her

 2   report.  I don't know what she says about it in her report.

 3              MR. PULKRABEK:  Your Honor, I'm also -- I'm happy

 4   to dig through our Rule 26 disclosures on damages, and I'll

 5   pull that up.

 6              THE COURT:  Well, you might have to.

 7              MR. PULKRABEK:  Okay.

 8              THE COURT:  You might have to.

 9   Q.  (By MR. PULKRABEK) At 85 percent, what would be the lump

10   sum?

11   A.  So at 85 percent of the -- assuming the 3,500,000 is the

12   right number is 2,975,000.

13   Q.  And if the judge were to conclude that it was only

14   50 percent, what's that number?

15   A.  Then that lump sum is 1,750,000.

16   Q.  Okay.  And are those your opinions as to the damages that

17   Ms. Wilson has sustained as a result of our theory of a

18   fraudulent transfer and a conspiracy to do that?

19   A.  Yeah.  Based on the theory of the date of value being

20   later when the assets had appreciated, yes.

21              MR. PULKRABEK:  Okay.  Thank you, Ms. Lutz.  I have

22   no further questions.

23              THE COURT:  Now, which of you wants to be the

24   first?  Which of you feels the most wounded?

25              MR. FORBES:  Your Honor, that would be me, on all

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ    Bench Trial - Day 4    04/15/2021    793

1   counts.

2          THE COURT:  I don't think so actually.

3          MR. FORBES:  There is a smile under this, Your

4   Honor.

5                    CROSS-EXAMINATION

6   BY MR. FORBES:

7   Q.  So, Ms. Lutz, to begin, I want to talk about your

8   calculation of the debt that you used to calculate TMR's

9   adjusted balance sheet as of April 27, 2017, and to do that

10  I'm going to put up -- I've put up again what was introduced

11  as Exhibit 156, and I'm on the first page of that.  Do you see

12  the PDF there indicating that?

13  A.  Yes.

14  Q.  Good.  And just this was your original schedule showing

15  the various partnership values and equity, correct?

16  A.  Correct.

17          THE COURT:  What page -- is this part of 156 still?

18          MR. FORBES:  First page of 156, Your Honor.

19          THE COURT:  Thank you.

20  Q.  (By MR. FORBES) And this is difficult because we're using

21  electronic exhibits and we can't just flip back and forth

22  between pages, but your original calculation of Two Mile

23  Ranch's balance sheet, and I'm in the first column as of

24  June 30, '16, that was -- you actually showed that they had no

25  -- no positive partner's capital, right?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    794

1    A.  That's what that column shows, yes.

2    Q.  That was your calculation, right?  I mean, it wasn't

3    anybody else, right?

4    A.  Again, it's not my calculation.  It's -- you can -- if you

5    scroll up those numbers come from footnote -- I believe this

6    is footnote one, so if we go to footnote one, I believe this

7    is a balance sheet presented by TMR.

8    Q.  So you think this is actually taken from a TMR balance

9    sheet, and you're just reproducing what was shown on that

10   balance sheet?

11   A.  Yes.

12   Q.  Okay.  And that balance sheet showed that as of -- what is

13   it -- June 30, 2016, which is the day before TMR filed

14   bankruptcy, right?

15   A.  Yes.

16   Q.  Okay.  It showed that TMR's total long-term debt as of

17   that date was $9,674,749, right?

18   A.  $479.

19   Q.  I'm sorry.  479.  Then you changed that number in the

20   schedule you talked about with the judge originally that was

21   your revised schedule, right?  And I'm showing you what is

22   going to be page 7 of Exhibit 156.  The left-hand column now

23   shows TMR total long-term liabilities of 8 million-900-rough

24   thousand dollars, right?

25   A.  Yes.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4     04/15/2021    795

1   Q.  And the difference between the two is that you removed

2   TMR's liability under its guaranty, right, of Mark Pauling's

3   loan?

4   A.  I removed -- I'm sorry.  I removed the value of the

5   guaranty.

6   Q.  And you actually removed it as a liability, right?

7   A.  Yes.

8   Q.  Okay.  I mean, the guaranty is not an asset that has

9   value.  It's a liability, right?

10  A.  Yes.  It would be, yes.

11  Q.  All right.  And so that's why you were able to -- did you

12  change anything else in that column to come up with a positive

13  partner's capital for TMR before they filed bankruptcy of

14  $1,800,000?

15  A.  I don't know.

16  Q.  The reason I ask is that -- and, again, I apologize for

17  doing this, but it's the way the exhibit is set up -- the

18  reason I ask is that you originally had a negative 567,000 in

19  partner's capital -- and I'm rounding off -- as of June 30,

20  2016, for TMR, and that showed the liability under the

21  guaranty was 755,681, right?

22  A.  Yes.

23  Q.  So if we remove that as a liability, that should only have

24  a $200,000 effect on the partner's capital, right?

25  A.  Correct.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021      796

1    Q.   So, in fact, basically under your original schedule, if we

2    removed the guaranty, it would have gone from a negative 567

3    to a positive roughly $200,000, right?

4    A.   Yes.

5    Q.   But, in fact, you went to a positive 1 million, 8, right?

6    A.   Yes.

7    Q.   Okay.  So obviously you did something else to that

8    schedule besides just remove the guaranty as a liability,

9    right?

10   A.   Yes.

11   Q.   And as you sit here today, do you know what that something

12   was you did?

13   A.   Well, I suspect it has to do with the minerals in North

14   Turkey Creek.

15   Q.   Okay.  Let's take a look at that.  So we're now looking at

16   the revised June 30, 2016, TMR balance sheet, and we've got

17   3.4 million for the minerals and 1.685 million for Turkey

18   Creek, right?

19   A.   Yes.

20   Q.   Okay.  So that was what you changed.  We're now looking at

21   your original, and, in fact -- I'm on the wrong page, I'm

22   sorry.

23           THE COURT:  Can -- Julie, can we put those two

24   documents side by side?

25           THE COURTROOM DEPUTY:  I'm not in control of the

```
19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021      797
```

1  presentation.  I'm sorry.

2  Q.  (By MR. FORBES) It looks like you increased the value of

3  the mineral rights from 2.35 million to 3.4 million, right?

4  A.  Yes.

5  Q.  Okay.  So that would explain most of the change?

6  A.  Yeah, the note from Mark Pauling isn't in that column

7  either.

8  Q.  Okay.  All right.  So you made some changes to liabilities

9  and assets in your revised schedule, right?

10 A.  Yes.

11 Q.  By making those changes to liabilities and assets you were

12 able to make -- strike that.  By making those changes to

13 assets and liabilities you were able to show that there was a

14 positive capital in TMR as of 7/30/16, right?

15 A.  That's June 30th, so 6/30.

16 Q.  Sorry.  Right you are.  As of June 30, '16 by making

17 changes to assets and liabilities from your original schedule

18 you were able to show that TMR had a positive capital as of

19 June 30, '16, right?

20 A.  Yes.

21 Q.  Okay.  Now, I want to go to your adjusted TMR column as of

22 April 27, '17.  Are you with me?

23 A.  Yes.

24 Q.  Okay.  And this -- this column shows a total, asset total

25 that is, of 10,600,745, right?

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      798

1   A.  Yes.

2   Q.  But this column includes 1,950,000 of assets that were not

3   transferred to Lardyn, right?

4   A.  Yes.  That's correct.

5   Q.  Okay.  If we just want to look at the values for the

6   assets transferred to Lardyn, we would look at the Farmers

7   State Bank collateral analysis, right?

8   A.  Yes.

9   Q.  All right.  And so if we just look at the assets

10  transferred to Lardyn, the value is 8,650,745, right?

11  A.  The assets transferred to Lardyn are 8,650,745.

12  Q.  Okay.  Then we go down to your debt number, the 827 --

13          THE COURT:  Are you in the white column here?

14          MR. FORBES:  I'm in the blue column, Your Honor.

15  I'm sorry.  Let me go back up.  The adjusted TMR,

16  27-April-2017 column.

17          THE COURT:  If -- let me just ask a question here.

18          MR. FORBES:  Okay.  All right.

19          THE COURT:  This adjusted TMR column is all assets,

20  not just the ones transferred.

21          MR. FORBES:  Yes.

22          THE COURT:  What does this have to do with

23  anything?

24          MR. FORBES:  Well, Your Honor, again, our view is

25  under CUFTA you've got to look only at the assets

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      799

1    transferred to come up with the value less liens.

2          THE COURT:  Well, that seems right.  Because after

3    all, we're talking about fraudulent transfers.

4          MR. FORBES:  Yes, Your Honor.  And what I -- the

5    point I was making was that the capital that plaintiff is

6    claiming was transferred is based on including assets that

7    were not transferred.

8          THE COURT:  It depends on which column you're

9    talking about.

10   Q.  (By MR. FORBES) Well, let's just clarify that.  The

11   adjusted TMR column, 27-April-2017, Ms. Lutz, that includes

12   the values you ascribed to all of TMR's assets as of 27

13   April 2017, right?

14   A.  Yes.

15   Q.  And the numbers next to that column indicate the source of

16   the numbers that you used, right?

17   A.  Yes.

18   Q.  All right.  And so basically with respect -- with respect

19   to the alfalfa, grain and feed, that number, the number two

20   indicates that came from the internal collateral analysis that

21   was done by Farmers State Bank, right?

22   A.  Yes.

23   Q.  All right.  And so you just adopted that value.  You felt

24   that was the most appropriate value to use, right?

25   A.  Yes.

19-CV-01224-RBJ        Bench Trial - Day 4     04/15/2021    800

1    Q.  That wasn't an independent valuation you did.  You just

2    felt that was the most appropriate value to use, right?

3    A.  Yes.

4    Q.  Okay.  Then we go down -- and that -- that is an asset

5    that was transferred to Lardyn, right?

6    A.  That's my understanding, yes.

7    Q.  Okay.  And the -- just a moment -- that was the only asset

8    you included as a current asset that was transferred to

9    Lardyn, right?

10   A.  It's the only one that I'm aware of.

11   Q.  Right.  And this is your work we're talking about, so that

12   was the one you became aware of, the one you included as a

13   current asset transferred to Lardyn, right?

14   A.  Yes.

15   Q.  Then your next column was long-term assets, right?  The

16   next column --

17   A.  The next row.

18   Q.  Your next section was long-term assets?

19   A.  Yes.

20   Q.  And the first item that you included in your TMR balance

21   sheet as of 4/27/17 was 565,000 for equipment, right?

22   A.  Yes.

23   Q.  And that was based on an appraisal done by a company named

24   Kraupie's in part, right?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021    801

1   Q.   And then you actually adjusted that appraisal downward

2   based on Mr. Stephen Stull's testimony that it had double

3   counted for some hay, right?

4   A.   That's what he thought, yes.

5   Q.   And you felt that was the appropriate value to use, right?

6   A.   Yes.

7   Q.   You did not independently value the equipment.  You just

8   felt the value used by FSB was the appropriate one with the

9   adjustment Mr. Stull described, right?

10  A.   Yes.

11  Q.   Okay.  Then the next entry is water rights, and that again

12  was taken from the FSB collateral analysis, right?

13  A.   Correct.

14  Q.   All right.  And you read that analysis, and that 280,745

15  represented the discounted present value that FSB put on the

16  future cash flow from a contract with North Sterling Water

17  District, right?  If we need to look at it, we can.

18  A.   Yeah, we can.  I think -- I don't recall that it was a

19  present value, but I'd be happy to look at it.

20  Q.   So that might have -- what you're saying is that might

21  have been the gross value of anticipated future income, or you

22  don't remember at all?

23  A.   No, I do remember part of it .  I think it did not include

24  a new water lease that was of substantially more value, but

25  because that's the value they used in their collateral

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    802

1   analysis, that's what I adopted.  I didn't try to

2   independently value the cash flows on that one.

3   Q.  Let's take a look at that, because I want to make sure

4   we've got a clear record on that.  That is going to be

5   Exhibit, I believe, 44.  Just, Ms. Lutz, by way of

6   edification, you have a table at the bottom of page 1 of

7   Exhibit 156 that shows the source of the footnoted numbers,

8   right?

9   A.  Yes.

10  Q.  And so what we're looking at here in terms of these water

11  rights was what you footnoted as FSB 2105.  That's the Bates

12  number for that page, right?

13  A.  I believe so.  I can't see the --

14  Q.  I'm sorry.  Do you want me to --

15  A.  I trust you to read the footnote correctly.

16  Q.  I'm trying to.

17        THE COURT:  May I ask, Mr. Pulkrabek, are you

18  claiming that the assets not transferred should be

19  considered in the numbers?

20        MR. PULKRABEK:  The answer is this, Your Honor.

21  It's a zero-sum game as between all the debt and the assets

22  that were transferred.  And so what I believe the real

23  argument here is is that the assets transferred to Lardyn

24  were undervalued for the amount that Lardyn paid, the

25  $7.1 million, and it's the delta between the value that

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021   803

1   represents the transfer.  Two Mile Ranch retained these

2   non-income producing assets, the promissory note and the

3   property, and subsequently foreclosed on them to wipe out

4   the rest of the debt, but Two Mile Ranch wants to come in

5   now and say there was equity there but there was no equity

6   over here, we should have gotten paid when the house sold,

7   but I think that the better argument is the transfer was

8   what happened with Lardyn, not trying to pull a fast one

9   with the house.

10         THE COURT:  In other words, this column that he's

11   working on at the moment is a bit of a straw man.  He can

12   knock it down, but you're not relying on that column.

13         MR. PULKRABEK:  Yeah, I think that's true, right.

14         MR. FORBES:  Your Honor, that's manifestly not the

15   case.  Ms. Lutz said the damages were based on this column

16   I'm talking about right now.

17         THE COURT:  I don't think she said that.

18         MR. FORBES:  Well, Your Honor, she said if you go

19   to the -- go to the bottom of that column -- if you go to

20   the bottom of that column, Your Honor, you see the

21   $1,772,825 partner's capital figure?

22         THE COURT:  Yes, I see that.

23         MR. FORBES:  When you asked her what the damages

24   were or what the value of the capital transferred was as of

25   4/27/17, she pointed to that column and said it was between

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      804

1   1,772,825, and the next column over, 1,571,565.

2          THE COURT:  I don't think that's what she said, but

3   if she did, I've got it wrong in my notes.

4   Q.  (By MR. FORBES) Let me ask you this, Ms. Lutz, so if I'm

5   going down the wrong path we can correct it.  Is it your

6   testimony that the value of the equity that was transferred in

7   your opinion on 4/27/17 was between 1,571,565 as shown in the

8   Lardyn 21-April-17 column, the fourth column to the right, and

9   1,772,825 as shown in the adjusted TMR 27-April-2017 column?

10  A.  I believe my testimony was as between the two numbers, I

11  show capital as 1 million, 550 and 1 million, 571.

12          THE COURT:  That's what I got down.

13  Q.  (By MR. FORBES) So you are not saying -- maybe we can save

14  a lot of effort -- you are not saying then that the 1,772,825

15  figure is relevant to determining the value of the capital

16  transferred to Lardyn?

17          THE COURT:  Actually, what I wrote down is she said

18  between 1,550,745 and 1,571,565.

19          MR. FORBES:  Then I got it wrong, Your Honor, and

20  so --

21          THE COURT:  Well, I might have gotten it wrong.

22          MR. FORBES:  Well, that's what I'm trying to

23  clarify.

24  Q.  (By MR. FORBES) Is the value of the capital you're saying

25  that was transferred to Lardyn by TMR on 4/27/17 between

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021     805

1    $1,550,745 and $1,571,565?

2    A.  Yes.

3    Q.  Okay.

4         THE COURT:  On this method.

5    Q.  (By MR. FORBES) Yes, on this method.  Not on -- in other

6    words, not looking at subsequent events, but just based on

7    this date using this method, that's the range, you say, of

8    capital transferred, right?

9    A.  Correct.

10        THE COURT:  Not including the sales transaction

11   method.

12        MR. FORBES:  The subsequent -- okay.

13        THE COURT:  You're just going by the method that

14   she's been talking about ever since we got into Exhibit 156.

15   Her opinion is what she just said.

16   Q.  (By MR. FORBES) Okay.  And Mr. Jon Pauling's 50 -- share

17   of that capital would have been 50 percent, right?

18   A.  Well, assuming that that is his share, yes, it would be.

19   Q.  Right.  So about $750,000, right?

20   A.  Give or take, yes.

21   Q.  Okay.  Let me just go back to finish this asset column for

22   another purpose here.  So we were just going to look at

23   Exhibit 44 to see if we can figure out the source of the

24   280,745.

25        THE COURT:  Sarah, do you need a break yet?

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4     04/15/2021    806

1           THE COURT REPORTER:  Yes.

2           THE COURT:  Let's take about a 10- or 15-minute

3    break here.

4           THE COURTROOM DEPUTY:  All rise.  Court is in

5    recess.

6       (Break was taken from 2:25 p.m. to 2:38 p.m.)

7           THE COURT:  Okay.

8           MR. FORBES:  Thank you, Your Honor.

9    Q.  (By MR. FORBES) Ms. Lutz, to pick up where we were, we

10   were looking at the value you ascribed to the -- what you

11   refer to in your page 1 of your schedule of Exhibit 156 as

12   water rights, and we're going to look at the source, the

13   280,745, where that came from.

14          THE COURT:  Okay, hold on a second.  Sarah, once

15   again, I'm not getting my realtime here.  I'm sorry, but I'm

16   dependent on that on some of this to make sure I've got it

17   right.

18      (Pause in the proceedings.)

19   Q.  (By MR. FORBES) So to go back to where we were, we are

20   going to take a look at the collateral analysis, and in your

21   table two -- excuse me -- I went too far -- on page 1 -- I

22   think we had established this, but I just want to make sure --

23   you had cited in support of the values you chose to use and

24   found appropriate FSB 002105, and I'm going to pull up what

25   has been admitted already as Exhibit 44, and the reason I'm

Sarah K. Mitchell, RPR, CRR

1   doing that is to show you down in the corner here, this is FSB

2   002105, so this would appear to be the collateral presentation

3   you used as a source of that value?

4   A.  Yes.

5   Q.  Okay.  And I'm on page 1 of Exhibit 44, and we see the

6   280,745 figure there?

7   A.  Yes.

8   Q.  Okay.  And it's under North Sterling Irrigation District?

9   A.  Yes.

10  Q.  And then if we go -- I apologize for scrolling so quickly,

11  but I did actually highlight this so I could find it.  If we

12  go to page 2111, there's a discussion, I believe it's by

13  Mr. Richard Stull and Mr. Stephen Stull, of a credit review

14  here and the assets.  Do you remember reading that?

15  A.  Yes.

16  Q.  Okay.  I don't want to read it out loud.  Can you read the

17  first highlighted section beginning the property has two water

18  leases?

19  A.  The property has --

20  Q.  I'm sorry.  Did I say out loud?  I meant to say could you

21  please read that to yourself so we don't have to type it.

22  Then I could ask you some questions about it.

23  A.  Sure.  I read it.

24  Q.  In looking at that, is that where you got the 265 figure

25  from?

19-CV-01224-RBJ       Bench Trial - Day 4     04/15/2021   808

1   A.  Is that what you asked me about before?

2   Q.  Right.

3   A.  Before we broke.  So yes.

4   Q.  Okay.  And so I guess 265 is actually the gross number,

5   isn't it?

6   A.  Looks like it.

7   Q.  Right.  All right.  So that would be a number reflecting

8   anticipated future revenues from that lease adding a discount?

9   A.  That's what it looks like.

10  Q.  If we need to go back to the schedule, we can, but do you

11  remember you also referenced this collateral analysis as to

12  the source of the value you chose to adopt for the mineral

13  rights?

14  A.  Yes.

15  Q.  Then again to yourself, if you could read that sentence

16  and tell me when you've had a chance to do that, the one

17  beginning included also in the purchase.

18  A.  I've read it before, so I'm fine.

19  Q.  Okay.  And when you read that, was it your understanding

20  that the $2,301,120 value reflected the future revenues from

21  the future wells to be drilled that would be received under

22  that lease, that royalty interest?

23  A.  Yes.

24  Q.  And the other component of it was a value of unproducing

25  -- excuse me -- of nonproducing mineral interests, right?

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    809

1    A.  Yes.

2    Q.  Okay.  So to the extent there were anticipated revenues

3    from the mineral interests that Lardyn was acquiring from TMR,

4    they were accounted for in the $3.4 million value, right?

5    A.  Based on these values, yes.

6    Q.  Right.  And these are the values you felt were appropriate

7    to use, right?

8    A.  Yes.  At that point in time, yes.

9    Q.  All right.  And then another value that you felt was

10   appropriate to use was 4,270,000, and that was for the ranch

11   in Logan County, right?

12   A.  Yes.

13   Q.  And that was based on the 2016 appraisal done by

14   Mr. Moreland.  Do you recall that?

15   A.  I do.

16   Q.  Did you actually review the appraisal?

17   A.  Yes, I would have looked at it.

18   Q.  And do you recall that Mr. Moreland used three methods in

19   coming up with his appraised value; income, replacement, and

20   comparable sales?

21   A.  That would be standard, yes.

22   Q.  Okay.  And do you recall he came up with the same value

23   using all three methods?

24   A.  They were very close, yes.

25   Q.  All right.  And so do you agree that the 4,270,000 for the

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    810

1   ranch -- excuse me -- for the feedlot, the farm, the Logan

2   County farm is based on a valuation looking at the anticipated

3   future revenues from the operation of that property?

4   A.  Yes.

5   Q.  All right.  And then the next item, the 1,675,000, still

6   in the TMR 42717 adjusted value column, the 1,675,000, that

7   was the Turkey Creek property, right?

8   A.  Yes.

9   Q.  And that was based on an appraisal that the bank had

10  obtained of that property, correct?

11  A.  Yes.

12  Q.  All right.  And then there was the -- we talked about the

13  mineral rights.  That's 3,400,000, right?

14  A.  Yes.

15  Q.  All right.  And then there is the 275,000, and that was

16  for a receivable that TMR held from Mark Pauling, right?

17  A.  Yes.

18  Q.  And you determined that the appropriate value for that

19  receivable is $275,000, right?

20  A.  Yes.

21  Q.  Okay.  When you added the long-term assets and the

22  short-term assets together for TMR, you got $10,600,745,

23  right?

24  A.  Yes.

25  Q.  And when you look at the value of the assets actually

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    811

1    transferred to Lardyn, it was $8,650,745?

2    A.  Yes.  Based on the -- I can't see the tops of the columns.

3    Q.  I'm sorry.  Let's go up there.

4    A.  So I think -- yes.

5    Q.  Essentially what you concluded was that the values that we

6    just went through were the appropriate values to use as of

7    4/27/17 to value both the assets of TMR and the assets

8    transferred to Lardyn?

9    A.  Yes.  Correct.  And just to be more clear, and then I

10   testified that it's really that small range between the

11   balance sheet dated March 22nd and April 21st, but they're

12   very close.

13   Q.  Okay.  Sure enough.  But -- okay.  Fair enough.  So what

14   you're saying -- but you know the 21-April-17 has $350,000 in

15   it for cash, right?

16   A.  Yes.

17   Q.  And there was no cash transferred from TMR to Lardyn,

18   right?  That you're aware of?

19   A.  Yeah.  I don't know where that cash came from, honestly.

20   Q.  Right.  So really shouldn't we deduct that $350,000 in

21   looking at the value of the equity transferred to Lardyn

22   because that $350,000 was not transferred to Lardyn?

23   A.  Well, I don't think so, because there's -- that's not the

24   only change in those two balance sheets.

25   Q.  Right.  But that's a whole brand-new asset, $350,000

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021      812

1   worth, right?

2   A.  Well, there's $445,000, to use your words, brand-new

3   liability, so...

4   Q.  Right.  No, I know that.  But I'm just saying in terms of

5   coming up with the value of the capital transferred, you would

6   have to deduct -- I see what you're saying -- you should

7   deduct the 350 and the 445 to come up with the value of the

8   capital transferred on an apples-to-apples basis, right?

9   A.  I'm just saying that there are some -- there are other

10  differences between those two dates, and I haven't tried to

11  assess why are there differences or where they come from.

12  Net/net, the values of the capital are quite close as of two

13  dates that are quite close.

14  Q.  Okay.

15  A.  But, yes, that is what I'm saying is there's $350,000 of

16  cash that I've never been able to ascertain where it came

17  from, but then there's also $445,000 in new liabilities.

18  Q.  Let me ask you a question.  The 21-April-17 column doesn't

19  actually reflect the transfer of assets to Lardyn, correct?

20  A.  Well, I think it's intended to, yes.

21  Q.  Wasn't that based on a projected balance sheet?

22  A.  Well, I think that is their opening balance sheet.  I

23  mean, at that point in time, six days before the transfer,

24  they knew there was going to be a transfer.  They knew what

25  the approximate value of the assets were.  Do assets change in

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021   813

1   value a little bit in a few days?  Yeah, maybe things like

2   crops and cash, but nothing else essentially would change.

3   Q.  But you said you didn't know where it came from.  My point

4   is do you know whether Lardyn actually had $350,000 of cash on

5   April 27, '17?

6   A.  It was one of the stipulations of the loan that's written

7   in the document.

8   Q.  I know that.  I just asked whether you knew it.

9   A.  Whether I knew where it came from?

10  Q.  Where they had it, not where it came from.  That assumes

11  they had it.  Do you know if they even had that $350,000 in

12  cash?

13  A.  Well, since it was part of the transfer, I assumed they

14  had to have had it by the date of the transfer, or six days

15  before.  I don't know exactly when.

16  Q.  So my question was a much simpler one.  Based on all the

17  materials you looked at, did you look at Lardyn's bank

18  statements as part of the materials?

19  A.  I don't think they were produced, but I could be wrong.

20  Q.  Oh, your lawyer didn't provide you with those?

21  A.  I actually don't recall if there were bank statements

22  provided.  There very well may have been.  There's a lot of

23  documents.

24  Q.  But that would answer the question -- never mind.  I guess

25  what I'm saying is you didn't look at any bank statements.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021   814

1   You assume the $350,000 was there, but you don't know for

2   sure?

3   A.  Yes.  I assume that it's there because it's on their

4   balance sheet, yes, and it was a stipulation of the loan.

5   Q.  Right.  But you don't know for sure?

6   A.  Well, for sure -- yes, I'm basing this on their

7   representations.  Did I look at a bank statement?  No.

8   Q.  Great.  All right.  Let's go down to the debt numbers you

9   used.  The debt -- again, I'm going to be talking about the

10  three columns, the collateral analysis column as of March 22,

11  '17, the adjusted TMR as of April 27, '17, and the Lardyn as

12  of April 21, '17, okay?  So I may call those by some acronym

13  using the dates just to make it easy.

14          THE COURT:  So you're still attacking the column

15  that we all seem to agree doesn't apply to the case.

16          MR. FORBES:  No, Your Honor.  I believe I can show

17  why it's relevant.

18          THE COURT:  Oh, you want that column to be

19  relevant?

20          MR. FORBES:  No, I want one number in that column

21  to be relevant.

22          THE COURT:  Okay.  Your favorite number --

23          MR. FORBES:  Yes.

24          THE COURT:  -- plucked from an irrelevant column to

25  save the day.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021   815

1            MR. FORBES:  Your Honor, I believe that one of the

2    requirements under CUFTA is to look at the amount of valid

3    liens against the property transferred on the date of the

4    transfer.  And the -- the calculations that have been done

5    here are based on using a $7,100,000 number, right?  That is

6    not the amount of the liens against the property on the date

7    they were transferred, and so I want to explore with

8    Ms. Lutz her calculation --

9            THE COURT:  Okay.

10           MR. FORBES:  -- of the amount due on the date of

11   the transfer.

12           THE COURT:  Have at her.

13           MR. FORBES:  Thank you, Your Honor.

14   Q.  (By MR. FORBES) Ms. Lutz, and that colloquy is not

15   evidence, so to come up with the capital using the March

16   collateral analysis column -- or the April 21st Lardyn

17   projected balance sheet column, you subtracted from your asset

18   value a loan value of $7,100,000, right?

19   A.  Correct.

20   Q.  But that did not reflect TMR's debt as of 4/27/17 prior to

21   the transfer, right?

22   A.  That is not the amount of TMR's debt, correct.

23   Q.  And you have in column three -- excuse me -- two, the

24   4-17-2017 column, you have an amount of debt as $8,827,920,

25   right?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4     04/15/2021    816

1   A.  Yes.

2   Q.  And that is the amount of TMR's debt that you used for

3   purposes of your calculation as of that date, right?

4   A.  Yes.

5   Q.  But, in fact, that number came from a proof of claim that

6   was filed by Farmers State Bank in the TMR bankruptcy, right?

7   A.  Yes.

8   Q.  And the numbers on that proof of claim only went through

9   July 1, 2016, right?

10  A.  Yes.

11  Q.  And interest continued to accrue on the TMR loans after

12  July 1, 2016, correct?

13  A.  I believe so, yes.

14  Q.  Okay.  If we go to your Schedule 2, which is page 3, this

15  shows how you calculated TMR's debt from that proof of claim,

16  right?

17  A.  Yes.

18  Q.  All right.  And so basically you concluded that the total

19  before the guaranty was 8,827,920, right?

20  A.  Yes.

21  Q.  And then if you added the guaranty of 754,343, you came

22  out to the total shown on the proof of claim of $9,582,264,

23  right?

24  A.  Yes.

25  Q.  And that was based on looking through the proof of claim

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 4     04/15/2021    817

1    at the information that was being provided to the bankruptcy

2    court by Farmers State Bank, right?

3    A.  Yes.

4    Q.  All right.  And I'm going to go to --

5            MR. FORBES:  Your Honor, at this point we offer

6    Exhibit 1046, which is the Farmers State Bank proof of

7    claim.

8            THE COURT:  So there's a Farmers State Bank

9    document that Ms. Oldemeyer didn't already offer, you're

10   saying.

11           MR. FORBES:  She did offer it, Your Honor, and

12   there was an objection on hearsay, and it was sustained.

13           MS. OLDEMEYER:  And I wanted to add additional

14   hearsay argument.

15           MR. FORBES:  Let's see if there's still an

16   objection.

17           MR. PULKRABEK:  Your Honor, I do object based on

18   hearsay.  It's -- to the extent the document itself is being

19   offered to prove the truth of the matter asserted, it's

20   still hearsay.  It doesn't mean Ms. Lutz can't take

21   information from that and rely on it and form her opinions.

22           THE COURT:  Okay.  If your expert has taken

23   information from that, then it's good enough for my

24   admitting the document.  1046 is now admitted.

25        (Defendants' Exhibit 1046 received.)

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 4      04/15/2021     818

1          MR. FORBES:   Thank you, Your Honor.

2     Q.   (By MR. FORBES) Ms. Lutz, I have up on the screen now

3     1046, and I apologize for going so quickly.  And we just

4     looked at your Schedule 2 from your Exhibit 156 -- not your

5     Exhibit 156 -- from Exhibit 156.  And on line 7 do you

6     remember in your schedule you said it foots to the proof of

7     claim?  Is line 7 the number you were saying your calculation

8     foots to?

9     A.   Yeah, I think it's off a couple dollars, but yes.

10    Q.   Okay.  And that number doesn't break down the amounts due

11    by loan, right?

12    A.   I think they were attached to my --

13    Q.   Right.  Right.

14    A.   It did.

15    Q.   I apologize for interrupting.  Go ahead.

16    A.   Well, that number doesn't, but the attachments do.

17    Q.   Right.  So what I was getting at is that you actually

18    looked through and looked at the attachments to come up with

19    the numbers that you used in your -- in the Schedule 2 we just

20    looked at, right?

21    A.   Right.  I just wanted to see if they summed to that

22    number, and they did.

23    Q.   Right.  And if we go a little further in this -- and I'm

24    going to switch back a little bit between the schedules so

25    that we can put ourselves in context -- you found there were

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    819

1   three outstanding loans that you used in your analysis.  They

2   were 2097, 2351, and 2352, right?

3   A.  Those were the loans that were attached in the bank's

4   proof of claim, yes.

5   Q.  Let's go back to that proof of claim now, and so we're

6   looking now at Bates page FSB 00048, and is that where you got

7   the total number for loan number 2097?

8   A.  Well, it's from that document, yeah.

9   Q.  And this document actually breaks it down by principal and

10  interest, but in your schedule you just added them both

11  together, right?

12  A.  Yes.

13  Q.  Okay.  Not to belabor this point, but we'll go on to the

14  next page, which is 49, FSB 00049.  That's loan 2351.  That's

15  where you got the balance, and, again, you used the total

16  balance on your schedule and didn't break it down between

17  principal and interest, right?

18  A.  Right.

19  Q.  And then the final one is loan 2352, and, again, you took

20  the total from their rounding it, and your schedule at least

21  didn't break it down between principal and interest, right?

22  A.  Right.

23  Q.  And then at the time you did your schedule that we've been

24  looking at, which is -- let me pull that back up -- I

25  apologize -- at the time you did your schedule you had been

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4     04/15/2021   820

1   provided with an update by First State Bank of the balances

2   that are due on these loans as of 4/27/17, right?

3   A.   I think that's correct, yes.

4   Q.   Do you remember telling me in your deposition you did have

5   that schedule at the time you did your report?

6   A.   Yeah, I do remember telling you that.

7   Q.   And that was accurate when you told me that, wasn't it?

8   A.   I hope so.

9   Q.   So you did have the updated schedule when you did your --

10  came up with the debt number you used, right?

11  A.   Yes.

12  Q.   And you agreed with me that you could have used that to

13  update the numbers from 7/1/16 up to 4/27/17, right?

14  A.   Yes.

15  Q.   And you also agreed with me that it would have been a more

16  accurate debt number for TMR as of 4/27/17 to have updated

17  your debt numbers using the most current information provided

18  by TMR, right?

19  A.   Yes.  So all else being equal, the most accurate way to

20  represent the debt would be to accrue the interest up to the

21  point of the date of the balance sheet, yes.

22  Q.   Okay.  Right.  I'm going to show you Exhibit 1006, and do

23  you recognize this as the updated schedule of TMR debt

24  provided by Farmers State Bank as of -- the debt as of

25  4/28/2017?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ          Bench Trial - Day 4      04/15/2021    821

1   A.  Yes.  This was the exhibit you presented at the deposition

2   that has -- well, it has numbers in addition to what I would

3   call debt.

4   Q.  Correct.  I'm just -- I'm sorry.  The top box is the

5   update on the TMR debt as of 4/28/2017, right?

6   A.  Well, I'm going to caveat.  I'm going to say based on the

7   bank's calculations that obviously included guaranties that I

8   did not include, and if you look at the underlying notes they

9   also include about $60,000 of protective advances that were

10  made immediately preceding the bankruptcy filing.

11  Q.  Sure.  Sure.  But you could have -- you had three notes in

12  your schedule, right?  You had 2097, 2351, and 2352, right?

13  A.  Yes.

14  Q.  And you could have updated those, right?

15  A.  Well, yes.  I could have accrued the interest on those

16  amounts.

17  Q.  And that would have given a more accurate number of TMR's

18  debt as of 4/27/17, right?

19  A.  Well, yeah.  Again, assuming that -- assuming in normal --

20  a normal situation where somebody wants to be as accurate as

21  possible about the amount of debt as of a date certain, that

22  would be the way to do it, yes.

23  Q.  And certainly here we are in court.  We want to be as

24  accurate as possible, right?

25  A.  Well, in court always, yes.

                              Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    822

1   Q.  Okay.  So certainly in court it would have been more

2   accurate to have updated the number that you used for TMR's

3   debt to reflect accruing interest through 4/27/17, right?

4   A.  Yes.  So I could have accrued the interest and presented

5   those numbers in the context of what was happening with the

6   bankruptcy and in the case, yes.

7   Q.  Okay.  And we talked about that back on November 23rd,

8   2020, which is some, what, four months ago roughly?

9   A.  Is that a question?

10  Q.  Yeah.

11  A.  I don't remember the date.

12  Q.  Okay.  Let's assume that was about four months you've had

13  to update your numbers to reflect the 4/27/17 balances, right?

14  A.  Yes.  That time period is correct.

15  Q.  Okay.  But you didn't do that, right?

16  A.  I did not.

17  Q.  Okay.

18          MR. FORBES:  Your Honor, may I use the Elmo

19  briefly?  I want to ask questions, and I know I should be

20  asking from the table, not the podium, but that's why I was

21  asking.

22          THE COURT:  Of course you can use the Elmo.

23  Q.  (By MR. FORBES) Ms. Lutz, you don't have your exhibit in

24  front of you.  I'm going to put it up for you.  What I wanted

25  to do was just put ourselves in context.  I'm looking now at

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    823

1   Exhibit 156, page 1, the collateral analysis as of March 22,

2   '17.  And that's what you said reflected the values of the

3   assets transferred to Lardyn somewhere between that 8,650,745

4   and the 9,116,605 in the Lardyn 21 April column, right?

5   A.  Yes.

6   Q.  All right.  So those are asset values, the asset values

7   that you derived for Lardyn at the time of the transfer, right

8   between -- it's correct that the value of the assets you found

9   appropriate to use for property transferred to Lardyn was

10  between $8,650,745 and $9,116,605, right?

11  A.  Yes.

12  Q.  Okay.  And in terms of -- in terms of the entire pool of

13  TMR assets including the assets not transferred to Lardyn, the

14  value, do you recall, was $10,600,745?

15  A.  I don't, but I'll trust you to read the number.

16  Q.  Okay.  All right.  That is -- thank you for trusting me on

17  that.  All right.  So then we looked at the -- if you need to

18  look at it again, we can -- the calculation of the total debt

19  TMR owed as of 4/28 /2017 was 10,141,626.08, right?

20  A.  No, that's not correct.

21  Q.  What do you think the number should be based on 1006?

22  A.  Well, I think it should be the 10,141,626 less potentially

23  loan 2353, which wasn't in the proof of claim, and I'm not

24  sure why, less the three guaranties of 5,725, 730,000,

25  $11,223.93, less the $103,140.87, less the protective

19-CV-01224-RBJ        Bench Trial - Day 4       04/15/2021    824

1    advances, which you can't see on here, 60,000 of which were

2    advanced ostensibly in protection of collateral immediately

3    before the bankruptcy.  Then I think you'd get to a reasonable

4    number assuming you should include the interest from April to

5    -- I'm sorry -- July to April.

6    Q.  You agree, do you not, Ms. Lutz, that the mere fact that

7    you for accounting purposes don't want to treat a guaranty as

8    a liability doesn't change the fact that a guaranty is a legal

9    liability, right?

10   A.  I have no opinion on whether it's a legal liability, but

11   what we're talking about is the fair market value of assets

12   and liabilities, and the fair market value of those guaranties

13   is -- at least the 730,000 and the 11,000 is zero.  I actually

14   don't know what the $5,000 guaranty is.

15   Q.  You're talking about the fair market value of the

16   guaranty.  I'm talking about the legal enforceability of a

17   guaranty.  And you agree with me, do you not, that you do not

18   have an opinion that simply because you don't think a guaranty

19   should be put on a balance sheet, that doesn't affect the

20   legal implication of the guaranty, right?

21   A.  Yeah.  I don't have an opinion on legally what that

22   guaranty means.

23   Q.  Right.  Okay.  So that would be something somebody else

24   would have to look at whether the fact that you don't think it

25   should be treated as a liability for accounting purposes

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    825

1   affects its enforceability, right?  That's something somebody

2   else would have to look at, right?

3   A.  Yes.

4   Q.  Well, let's assume for purposes of argument that your view

5   that it shouldn't be treated as a liability for accounting

6   purposes is not what the law says, okay?  Will you assume that

7   with me?

8              THE COURT:  This is going to be a hypothetical now?

9              MR. FORBES:  It is.

10             THE COURT:  I agree with her.

11             MR. FORBES:  I'm sorry, Your Honor?

12             THE COURT:  I said it's hypothetical now because I

13   agree with her.  I don't think it should be counted for the

14   very reason that she gave.  That doesn't mean that it's not

15   enforceable.  If the bank were to want to enforce the

16   guaranty because that didn't have security and the note

17   wasn't paid and they had to turn to the guaranty, yes, it

18   would be enforceable.  But in terms of my calculation of

19   damages, if there are any damages, I agree entirely with the

20   expert.  So you can make your record, but it won't help.

21             MR. FORBES:  Fair enough, Your Honor.  I

22   understand.  Our position is that CUFTA refers to all valid

23   liens, and the liens in question here did include all

24   liabilities of TMR, so included the guaranty, but I

25   understand your --

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    826

1              THE COURT:  I understand your position.

2              MR. FORBES:  Thank you, Your Honor.

3              THE COURT:  Before I forget to ask, because I need

4    to ask a question, and I'll forget if I don't ask it,

5    several times now he has gotten you to say and I think

6    you've agreed that the calculation of the debt numbers could

7    be more accurate if they were updated to the actual date.

8              THE WITNESS:  Yes, I did say that.

9              THE COURT:  Would the same be true on the asset

10   side?

11             THE WITNESS:  Well, the assets as represented --

12   could the asset values change?  Yes.  But they're

13   represented as of that date.  So there's probably no reason

14   to update them unless there is some prevailing argument that

15   they were undervalued as of that date.

16             THE COURT:  Do you have any idea as to how much the

17   debt numbers would change if you updated them in those few

18   months?

19             THE WITNESS:  Well, so I did what I just testified

20   to.  I subtracted all those amounts that I don't think are

21   debt, and the balance was 373,000.  I didn't independently

22   try to calculate if that was the interest.  After -- well,

23   there's a theory in the case, and I saw e-mails subsequent

24   to my deposition, that the bankruptcy was essentially a sham

25   to protect Mr. Pauling, and so what I said in my report is

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 4     04/15/2021     827

1     it's really up to the trier of fact to ascertain what is

2     legitimate debt after that point in time, which I guess

3     would be May of 2016, and should interest have been accrued

4     or not.

5          THE COURT:  Okay.

6          THE WITNESS:  But in a normal situation, which I

7     don't think this is, yes, you would want to accrue the

8     interest to the date of the balance sheet.

9          THE COURT:  But given this situation, you're still

10    happy with the numbers you used?

11         THE WITNESS:  Well, I testified I don't think it's

12    up to me.  I don't think it's my decision.  The $373,000

13    number is the number that fell out after I eliminated

14    everything that I didn't think was interest.  So depending

15    on what Your Honor decides, that could be added to the debt.

16    As a practical matter, I don't know if it matters, there's

17    still positive capital.  There's still positive capital in

18    TMR, Lardyn, and subsequently Redtail.

19         THE COURT:  Right.  But where's this 372 that

20    you're talking about?

21         THE WITNESS:  You have to do -- you have to -- it's

22    nowhere on this page.  Do you want me to repeat how you get

23    there?

24         THE COURT:  I don't know.  I'm just -- he's had you

25    testify -- you have testified that these numbers that you

1   used for debt could have been updated by adding more

2   interest for the months in between when these numbers were

3   issued and the date of the transfer.

4           THE WITNESS:  Yes.

5           THE COURT:  And I'm trying to understand if the

6   fact that you didn't do that changes your opinion as to what

7   the net equity is.

8           THE WITNESS:  It doesn't change my opinion of the

9   net equity of Lardyn as of 4/27, no, it doesn't.

10          THE COURT:  Then the reason it doesn't is what?

11          THE WITNESS:  Because the debt on Lardyn was 7

12  million, 1, and the assets were 1,500,000 greater than that,

13  and that's what was -- that's the net amount that was taken

14  out of TMR and transferred to another entity.  Mr. Pulkrabek

15  earlier used the term zero-sum game.  It is a zero-sum game.

16  They just took the assets from here and moved them to there.

17  They left the assets in TMR fully encumbered by the rest of

18  the debt including the accrued interest, and then they

19  issued new debt for Lardyn.  So we just move -- things just

20  got moved around.  I said we.  Not me.  But assets got

21  moved.  New debt got issued.  The remaining debt, as

22  Mr. Forbes is describing it, as far as I know and from the

23  bank's record, remained in TMR fully -- and the assets were

24  fully encumbered, the note from Mark Pauling and North

25  Turkey Creek.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    829

1        THE COURT:  Thank you.

2   Q.  (By MR. FORBES) 370,000 -- was it 372,000?

3   A.  It's about 373,000 was my calculation.

4   Q.  And what you were saying is if you were to update your

5   debt calculation, the one you did as of 7/1/16 --

6   A.  Yes.

7   Q.  -- to 4/27/17, you would add $373,000 to it?

8   A.  If -- if -- yes, to accrue interest.  I didn't check the

9   bank's calculations, but I assume that that's the number,

10  because when I subtract everything else that I don't think is

11  debt, then what's left over has to be interest.

12  Q.  You did not disclose that calculation, so we can't check

13  it, but that's -- for purposes of this, I just want to get you

14  -- your decision, your conclusion was that there would be an

15  additional 373,000 if you just updated the loans that you

16  included in coming up with your TMR debt number?

17  A.  Right.  If it's appropriate to include interest after the

18  point of bankruptcy, then the accrued interest is about

19  $373,000.

20  Q.  So in that case I believe you said that the debt number

21  you used, and we can look at it -- the debt in TMR you used

22  was $8,827,920.  We're back looking at Exhibit 156, Schedule

23  2.

24  A.  I'm not.

25  Q.  You're not.  Okay.  Sorry.  We're still on the Elmo.  I'm

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    830

1   sorry.  It's just not working.  Now we're back in action.

2   We've got 156, Schedule 2.  The 8,827,920, that was your

3   initial calculation using just the three loans you thought

4   were appropriate to include as TMR debt, right?

5   A.  Right.  Based on the bank's filing of the debt that was

6   owed as of July 1st in the bankruptcy --

7   Q.  Right.

8   A.  -- proof of claim.

9   Q.  Those were the only three -- I'm sorry.  You didn't

10  include the guaranty in coming up with that number.  Those are

11  the three loans, 2096, 2351, and 2352, you felt it was

12  appropriate to use in performing your capital analysis, right?

13  A.  Yes.

14  Q.  Okay.  And we've just been talking about updating that and

15  in terms of accruing interest through 4/27/17, and I think

16  what you said is to that $8,827,920 you would add $373,000?

17  A.  I'm saying that that would be the representation of the

18  accrued interest between July and April, yes.

19  Q.  Okay.  And you calculated that yourself?

20  A.  No.  I calculated it based on the schedules that you

21  provided me.

22  Q.  1005, that schedule?

23  A.  The one we were just looking at.  Sorry.

24  Q.  Yeah, I'm sorry.  You're right.  It was 1006.  In other

25  words, this schedule?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    831

1    A.  Yes.  And the attachments.

2    Q.  Okay.  All right.  So you concluded, and I'm going to

3    round up a little bit, that there was about, in your view,

4    $9,200,000 of debt that was appropriately recognized against

5    TMR's assets as of 4/27/17, if you accrue interest after the

6    bankruptcy was filed?

7    A.  If it's -- I would change the words a little.  If it's

8    appropriate to accrue interest after the bankruptcy was filed,

9    then, yes, that's the correct number.

10   Q.  All right.  And that number, the 9,200,000, was greater

11   than the value of the assets transferred to Lardyn, right?

12   A.  Well, it's greater than the value of the assets

13   transferred to Lardyn, but it's not greater than the assets of

14   TMR.

15   Q.  No, I know, but I was just asking you a more narrow

16   question.  That updated debt number that you just gave us with

17   the conditions you just gave us is greater than the value of

18   the assets transferred to Lardyn, right?

19   A.  Yes.

20   Q.  And if that updated debt number is the correct number, the

21   9.2 million, there would be over a million dollars of assets

22   left in -- a million dollars in net equity left in TMR after

23   the transfer, right?

24   A.  I guess I'm not sure what you're --

25   Q.  Sure.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4     04/15/2021     832

1    A.  -- asking me.

2           THE COURT:  Wouldn't you take the 1.5 and subtract

3    the 372?

4           THE WITNESS:  Yes.  No.  You would take the column

5    that's TMR and subtract the 373.  So that number was I think

6    a million, 8.  You subtract -- I'm going from memory, but

7    it's about a million, 8.  You would subtract it from that

8    column.

9           THE COURT:  So you get right back to the 1.5.

10          THE WITNESS:  Close, yes.

11          MR. FORBES:  I'm talking about a different concept,

12   Your Honor, and obviously not very well.

13   Q.  (By MR. FORBES) What I'm saying is you had 10,600,745,

14   that was what you came up with as the value of all TMR assets,

15   right?

16   A.  Yeah, again, I'm not looking at the schedule, but let's go

17   with it.

18   Q.  If you want to look at the schedule --

19   A.  No, that's okay.  Go ahead.  I'm sure Mr. Pulkrabek will

20   object if that's not right.

21   Q.  And from that, from those assets, there was $8,650,749 of

22   assets transferred to Lardyn, right?  745, excuse me.  If you

23   need to see the schedule, I'll pull it up.

24   A.  No.  Go ahead.

25   Q.  Does that comport with your memory?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021        833

1    A.  Yes.

2    Q.  Okay.  So this is total assets, and this is to Lardyn,

3    right?  And that would leave assets worth -- am I doing this

4    right?  No, I'm not.  That would leave assets worth $1,950,000

5    worth in TMR, right?

6    A.  Correct.

7    Q.  Now, let's talk about the debt using the debt numbers you

8    think are appropriate.  Okay.

9            THE COURT:  Why is what's left in TMR your goal to

10   prove?

11           MR. FORBES:  Well, Your Honor, there's been this

12   allegation that everything was stripped out of TMR that had

13   value, and she was totally denuded of her ability to collect

14   on anything, and using their numbers I want to --

15           THE COURT:  You have insisted that what I need to

16   focus on is what was transferred.

17           MR. FORBES:  Well, I agree, Your Honor.  I agree

18   that that is the question, what was transferred and what

19   were the liens against it.  I agree.  So if this would not

20   be helpful --

21           THE COURT:  Well, I don't know if it's helpful or

22   not.  I'm just saying I don't know what you're doing.

23           MR. FORBES:  I'm just trying to show, Your Honor,

24   that using Ms. Lutz's debt numbers, there would have been

25   substantial equity left in TMR for Ms. Wilson to reach

19-CV-01224-RBJ      Bench Trial - Day 4     04/15/2021    834

1    somehow through her charging order.

2           THE COURT:  Yeah, well, if that's what the numbers

3    show, then the numbers have got to be wrong because it's

4    baloney.

5           MR. FORBES:  Your Honor, these are their numbers,

6    the numbers they want you to use.

7           THE COURT:  I don't hear them wanting me to use

8    that number.

9           MR. FORBES:  They don't want you to use that

10   number.  That's exactly right, Your Honor.

11          THE COURT:  All right.

12          MR. FORBES:  My point is if you add $9,200,000 in

13   debt, and 8 million of that debt is a lien -- is applied to

14   the transferred assets, in other words, the lien applies --

15   a part of the lien applies to those assets --

16          THE COURT:  By the time you finish, Mr. Forbes,

17   you're going to tell me that I should order Ms. Wilson to

18   pay Jon Paulson -- Pauling some money.

19          MR. FORBES:  Not at all.  I don't know Jon Pauling.

20   I don't represent him.  I'm not speaking on his behalf.

21          THE COURT:  Your numbers aren't doing much for me.

22          MR. FORBES:  They're not doing much for me now

23   either, Your Honor.

24   Q.  (By MR. FORBES) Did you look at the question of whether

25   there were liens against the assets transferred to Lardyn?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021   835

1    A.  I'm sure there was liens against the assets, and I assume

2    those liens were released when the assets were transferred,

3    and there was new debt put on them.

4    Q.  So my question was just did you look at the question of

5    whether there's liens transferred to Lardyn?

6    A.  I think I answered.

7    Q.  You did, right?  You did?

8    A.  Well, I'm sure that the bank's debt has a lien on the

9    assets.  Why wouldn't it?

10   Q.  I'm just asking you what you looked at.

11   A.  I looked at the notes.  I probably skimmed through the

12   security.  But, yes, I'm sure there were liens against the

13   assets.

14   Q.  And you looked at the deeds.  Did you look at the deeds of

15   trust?

16   A.  I would have skimmed them, yes.

17   Q.  And do you recall that the deeds of trust each provided

18   for a deed of trust in the amount of 5.5 million plus

19   interest?

20   A.  No, I don't recall that.

21   Q.  Okay.  Let's look at Exhibit 1015.  1015 is an admitted

22   exhibit containing notes and security agreements and deeds of

23   trust, and I'm on page 7 of the PDF viewer.  And do you

24   remember if you looked at this deed of trust that was recorded

25   in Logan County?

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021      836

1   A.  Again, I didn't -- I didn't -- I have the deeds of trust.

2   I'm sure I didn't pay a lot of attention to them.

3   Q.  You do remember, though, that the deeds of trust

4   cross-collateralized FSB, correct?

5   A.  You told me that in the deposition, I believe.

6   Q.  And you didn't go back to see whether that was the case or

7   not?

8   A.  No.

9   Q.  Okay.  Well, let's look then at the relevant clause of

10  this deed of trust.  By the way, in your work do you look at

11  deeds of trust?  Are you familiar with them?

12  A.  Yes, sometimes.

13  Q.  Okay.  Could you read the highlighted section, which is --

14  well, I'm sorry.  First, do you see Section 3, deed of trust

15  refers to maximum obligation limit not to exceed $5 million?

16  A.  Yeah, I see that.

17  Q.  And that limitation doesn't include interest and other

18  fees and charges validly made, right?  Do you see that?

19  A.  Yes.

20  Q.  Okay.  And then you go down, and read that -- that next

21  section, 4A through D to yourself, if you would.

22        MR. PULKRABEK:  Your Honor, I'm just going to

23  object to this.  I think it's 403, waste of time, and also I

24  can't see how the follow-up question is going to be

25  relevant.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    837

 1            THE COURT:  Well, I'm not following what he's doing

 2    either.  I'm sure he has something in mind.

 3            MR. FORBES:  I'm trying, Your Honor.

 4            THE COURT:  What is it?  What is the point you're

 5    making?

 6            MR. FORBES:  The point I'm making, Your Honor, just

 7    to make an offer of proof, is that under CUFTA, it refers to

 8    -- you define an asset as the fair market value of the

 9    property, in our view on the day of the transfer, minus all

10    valid liens against it.  My point is that the deeds of

11    trust, the valid lien included all indebtedness, and I was

12    going to ask the witness if she had ever looked at the

13    question of whether applying the deeds of trust in

14    accordance with their terms, the amounts under the deeds of

15    trust were greater than the value of the assets as she

16    reported them in her report.

17            THE COURT:  You're saying that the deeds of trust

18    are different than the debt?

19            MR. FORBES:  Your Honor, each asset is secured by

20    either a deed of trust or a security agreement.  The deeds

21    of trust --

22            THE COURT:  Well, the assets aren't secured by

23    deeds of trust.  Assets secure deeds of trust.

24            MR. FORBES:  I'm sorry?

25            THE COURT:  The deeds of trust secure notes, loans.

                    Sarah K. Mitchell, RPR, CRR

1           MR. FORBES:  Each asset -- each asset was

2    encumbered by a deed of trust, each asset subject to a deed

3    of trust, and there were security agreements for assets not

4    subject to deeds of trust.  So each asset at issue was

5    subject to some type of perfected lien.

6           THE COURT:  Okay.

7           MR. FORBES:  All right.  And --

8           THE COURT:  And that's what she attempted to do.

9    She attempted to determine the value of the assets

10   transferred and the amount of the debt transferred that had

11   to be taken off that value to show what the net was that was

12   transferred from TMR to Lardyn.  That's what she's done.

13          MR. FORBES:  Well, Your Honor, I respectfully

14   disagree.

15          THE COURT:  Okay.  Well, fine.  You disagree with

16   me.  You disagree with her.  That's your right.  You're the

17   lawyer.

18          MR. FORBES:  Well, okay.

19   Q.  (By MR. FORBES) Have you read this?

20   A.  I have.  But it doesn't mean all that much to -- it's

21   probably why I don't spend a lot of time reading them,

22   frankly.

23   Q.  Fair enough.

24          MS. OLDEMEYER:  Your Honor, I hate to interrupt,

25   but is there any way we can have a five-minute bathroom

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021        839

1    break?  I apologize.  I don't know when we had our last

2    break.

3            THE COURT:  That's okay.  Let's take a break.

4    Sure.

5            MS. OLDEMEYER:  Thank you.

6            THE COURT:  It's 3:38.  How about until 3:50?

7            MR. FORBES:  Thank you, Your Honor.

8            THE COURTROOM DEPUTY:  All rise.  Court is in

9    recess.

10        (Break was taken from 3:38 p.m. to 3:49 p.m.)

11            MR. FORBES:  May I proceed, Your Honor?

12            THE COURT:  Sure.

13   Q.  (By MR. FORBES) Let me simplify what I'm trying to do.

14   Maybe I'll make a point.  Maybe I won't.  Let's take the farm

15   on 4/27/17, the farm, for example, the Logan County farm.  Are

16   you with me?

17   A.  Yes.

18   Q.  And you came up with what you thought based on what you

19   viewed was an appropriate value for the farm of 4.270 million,

20   right?

21   A.  Yes.

22   Q.  All right.  And you're aware, are you not, that the farm

23   was subject to a deed of trust, right?

24   A.  Yes.

25   Q.  Okay.  And we just looked at that deed of trust, and it

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    840

 1   was for up to 5.5 million, plus interest and expenses, right?
 2   A.   Okay, yes.
 3   Q.   Did you ever figure out what the total lien was of the
 4   deed of trust against the farm?
 5   A.   I don't know how to answer that.
 6   Q.   Well, what's wrong with the question?
 7   A.   I guess the answer is no.
 8   Q.   Okay.  All right.  So as you sit here today, you did not
 9   reach an opinion on whether the total due under the deed of
10   trust that was burdening the farm was greater than or less
11   than the value you gave to the farm, right?
12   A.   Right.
13   Q.   All right.  And I guess we can go through every asset, but
14   to shortcut it, isn't it correct that for none of the assets
15   transferred to Lardyn did you ever determine whether the liens
16   against those assets exceeded the value you ascribed those
17   assets?  I'll break that down.  I see raised eyebrows.
18   A.   I don't understand what you're trying to --
19   Q.   Sure thing.
20   A.   -- say.
21   Q.   We talked about the farm.  You said you never made an
22   effort to figure out whether the amount due under the deed of
23   trust that was encumbering the farm was greater than the value
24   you gave to the farm, right?
25   A.   Right.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    841

1   Q.  Let's talk about the mineral rights.  You ascribed the

2   value of 3.4 million based on your review of the documents,

3   and that's the value you felt was appropriate, right?

4   A.  Yes.

5   Q.  All right.  And are you aware that the mineral rights were

6   also subject to a deed of trust?

7   A.  I'm sure they were, yes.

8   Q.  Okay.  Did you ever make an attempt to determine whether

9   on the date of the transfer the mineral asset was burdened by

10  a deed of trust whose value exceeded -- strike that.  I'll

11  start again.  Did you ever determine whether the amount due

12  under the deed of trust that was encumbering the minerals

13  exceeded the $3.4 million value you ascribed to the minerals?

14  A.  So what I did is looked at the total value of the assets

15  and the total value of the liabilities.  That's what I did.

16  The deed of trust -- if you want to ask for every asset, I'll

17  answer, but I didn't do what you're showing me.

18  Q.  But I do need to go through every asset for my record.

19  A.  Okay.

20  Q.  So did you ever determine in rendering your opinions

21  whether the amount of the deed of trust encumbering the

22  minerals was greater than the $3.4 million value you ascribed

23  to the minerals?

24  A.  No.

25  Q.  All right.  There was the water rights, the contract

Sarah K. Mitchell, RPR, CRR

1    rights.  Did you ever determine whether the amount of the

2    security interest encumbering those contract rights was

3    greater than the value you found appropriate to ascribe to

4    those water rights?

5    A.   No.

6    Q.   Only two more.  The equipment.  Did you ever do an

7    analysis to determine whether the amount of the security

8    interest encumbering the equipment was greater than the value

9    you ascribed to the equipment?

10   A.   No, I didn't do that exercise.

11   Q.   Did you ever do -- final one -- did you ever do an

12   analysis of whether the amount of the security interest

13   encumbering the alfalfa and grain was greater than the value

14   you ascribed to the alfalfa and grain?

15   A.   No, I did not.

16   Q.   Okay.  Thank you.  You talked a little bit about what the

17   judge referred to, and I now know what he's referring to, as

18   the sales method for valuing Lardyn, right?

19   A.   Yeah.  He's referring to a market method, market approach,

20   yes.

21   Q.   And the market approach you were looking at was valuing an

22   interest in Lardyn, right?

23   A.   Well, there was an interest purchased from which a value

24   was ascertained for all the capital.

25   Q.   Right.  But what you're looking at was the value of Lardyn

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021     843

1   based on this market approach, right?

2   A.  Yes.

3   Q.  You were not looking at the value of the assets

4   transferred to Lardyn when you were doing your market

5   approach, right?

6   A.  It's just another -- it's just another way of getting to

7   the value.  It's just a different approach.  They're just

8   different approaches.

9   Q.  Let me ask it this way.  How -- so when I do -- when I buy

10  an interest in a company, I'm not just buying assets, right?

11  A.  You can just buy assets.

12  Q.  Sure.  Or you could buy a wing and a prayer in a company,

13  right?

14  A.  I'm sorry?

15  Q.  You could buy a wing and a prayer, like a startup company,

16  right?

17  A.  Right.  I'm not trying to be flip.  Sometimes people buy

18  assets.  Sometimes they buy assets and assume part of the

19  debt.  Sometimes they buy capital.  There's different ways of

20  purchasing an interest in a company is all I'm trying to say.

21  Q.  What you're talking about here is purchasing a membership

22  interest, right?

23  A.  Yes.  So there was -- right.  So that was an interest in

24  the LLC.  Yes, correct.

25  Q.  So I didn't know why you got into the asset thing, because

19-CV-01224-RBJ        Bench Trial - Day 4       04/15/2021    844

1   we're talking about buying an interest in a company, right?

2   Isn't that what we're talking about, buying an interest in

3   Lardyn?

4   A.  I thought you -- anyway, go ahead.

5   Q.  Are we talking about buying an interest in Lardyn or not?

6   That's all I'm trying to figure out.

7   A.  Yes.

8   Q.  So when somebody buys an interest in a company, they may

9   look at many factors, right?

10  A.  Yes.

11  Q.  They may look at whether there are assets in a company

12  that exceed its liabilities, right?

13  A.  Yes.

14  Q.  Or they may not look at that, right?

15  A.  I think most of the time they would look at that, but I

16  guess it's possible that they wouldn't.

17  Q.  Have you ever dealt with anybody buying interest in a

18  startup company?

19  A.  Yes.

20  Q.  And startup companies frequently have liabilities greater

21  than their assets, don't they?

22  A.  Yes, they do.

23  Q.  All right.  So in that case, somebody wouldn't be really

24  looking primarily at whether the assets are greater than the

25  liabilities.  They'd be looking at future potential, right?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4    04/15/2021    845

1    A.  Yes.

2    Q.  And that even happens sometimes with a company that has no

3    positive track record of earnings, right?

4    A.  Yes.

5    Q.  And then you may have I think you called them insider

6    transactions where somebody may be making an investment for

7    reasons unrelated to the value of the company, right?

8    A.  That can happen, yes.

9    Q.  They might be making it because they want to help out a

10   family member, right?

11   A.  Sure.

12   Q.  They might be making -- sometimes people make investments

13   because they think by doing so their business will be able to

14   supply services to that company?

15   A.  Sure.

16   Q.  And speaking of the two transactions you had, you do not

17   know whether in the Pauling -- the first one with Paul Pauling

18   -- you do not know whether Mr. Pauling made that investment

19   based on valuing the assets in the company and comparing it to

20   the liabilities, correct?

21   A.  Yeah, I don't know what his assessment was based on.

22   Q.  All right.  And the second one involving Cherry Creek

23   Cattle Company by Mr. Bates, you don't know what his

24   assessment was based on either, right?

25   A.  Correct.

Sarah K. Mitchell, RPR, CRR

1    Q.  All you know is that both of those people felt for

2    whatever individual reasons that they had that it was worth

3    paying $20,000 a point -- or $20,000 a percentage interest to

4    invest in Lardyn, right?

5    A.  Yes.

6    Q.  And by doing so, that doesn't say whether Lardyn had

7    capital of $2 million, $10 million, or $100, right?

8    A.  Well, I think it is an indication -- it's an indication by

9    -- both transactions have some indication about what those --

10   what a buyer and seller thought it was worth.

11   Q.  Sure.  But you said it related to the capital in Lardyn,

12   and my point is -- because you said it meant that capital in

13   Lardyn was worth $2 million.  I thought that's what you said.

14   A.  Well, that is what the transaction indicates.  Yes, it

15   doesn't indicate that.

16   Q.  But you don't know whether it was because of the capital

17   in Lardyn, whether they thought Ms. York was going to do a

18   bang-up job, or anything else about why they did it, right?

19   A.  Well, I mean, I didn't talk to them individually and ask

20   what their individual motivations were to pay that money, no.

21   Q.  And you also talked about the fact that over time the

22   value of Lardyn has increased, right?

23   A.  Yes.

24   Q.  All right.  And this just assumes that those post-transfer

25   events are found to be relevant, which we do not think is the

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    847

1   case, but isn't it the goal of somebody that owns a company to

2   increase the value of the company?

3   A.   Generally.

4   Q.   And people do that by various ways, increase the value of

5   a company, right?

6   A.   Yes.

7   Q.   One way is putting in sweat equity, right?

8   A.   Yes.

9   Q.   Sweat equity means you spend your time working to make the

10  company a success, right?

11  A.   Yes.

12  Q.   Another way is the values of the company's assets may

13  increase over time due to forces completely outside the

14  company's control, right?

15  A.   Yes.

16  Q.   An example I think you gave is mineral interests, right?

17  A.   Yes.

18  Q.   You could hold some mineral interests, for example, last

19  year when oil went negative.  Mineral interests weren't worth

20  much, were they?

21  A.   I don't know what happened to oil prices last year, but if

22  they -- I think you just said oil prices went negative.  I'm

23  not sure what that means, but if they declined, then yes, all

24  else being equal, the mineral -- the revenue from the mineral

25  interests would have also declined.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021    848

1   Q.  By that I meant there was a brief period of time when the

2   West Texas Intermediate Crude Index actually was negative when

3   it was valuing oil in the spot market, so I apologize if I

4   confused you because I assumed you knew that, but I was wrong,

5   and I apologize.  So -- okay, so assets can increase in value.

6   A company can make improvements to its operation that can

7   increase its value, right?

8   A.  Yes.

9   Q.  A company can get new investors and buy new equipment, and

10  that can increase its value, right?

11  A.  Yes, it can.

12  Q.  It can get new customers, and that can increase its value,

13  right?

14  A.  It can.

15  Q.  Did you evaluate why the value in Lardyn increased from

16  the time it was acquired in April 2017 up through Q1 of 2020?

17  A.  It looks primarily like its mineral interests increased in

18  value, but I know they also -- I believe they also did an

19  expansion of the feedlot.  But, again, I was only focused on

20  assets, so...

21  Q.  All right.  And you agree, right, that the analysis done

22  for the $3.4 million value you used was based on looking

23  forward at the time of the transaction projecting cash flows

24  and coming up with a number, right?

25  A.  Are you talking -- I'm not sure -- are you talking about

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    849

1    the mineral interests?

2    Q.   I'm sorry.  I thought that's what we were talking about.

3    The mask muffles and --

4    A.   I know it does.  Yeah, in part it was based on future cash

5    flow, and part was based on nonproductive acreage.

6    Q.   And nonproductive --

7    A.   Nonproducing acreage, sorry.  Not nonproductive.

8    Q.   Right.  And nonproducing acreage can, in your experience,

9    if you have it, can that fluctuate significantly based on

10   market factors?

11   A.   Well, the value of real property can fluctuate, sure.

12   Q.   No.  No.  Nonproductive mineral interests themselves?

13   A.   I'm sure that can fluctuate too.  The value of all things

14   fluctuate.

15   Q.   And did you look at whether there was a fluctuation in the

16   market for nonproducing mineral acres in the area where Lardyn

17   held its nonproducing mineral acres --

18   A.   No.

19   Q.   -- after 4/27/17?

20   A.   No, I didn't.

21   Q.   Okay.  All right.  And you didn't study whether there were

22   price increases that would -- oil price increases, that is,

23   that would explain any of the increase in value of the oil

24   assets now owned by Redtail, right?

25   A.   Correct.

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    850

1   Q.  All right.  And did you look at whether there had been

2   more wells drilled or the wells that were drilled became more

3   efficient or anything else to see if there might be another

4   source of value for that increase that didn't exist at the

5   time of the transaction?

6   A.  No, I didn't.

7          MR. FORBES:  Your Honor, I will spare everyone, and

8   that is all I have for questions on cross-examination.

9          THE COURT:  How about the lady and gentleman in the

10  back, do you want to ask questions?

11         MS. OLDEMEYER:  I do.  Your Honor, may I use the

12  podium just because of the line of sight?  And I will use

13  the Elmo in the presentation as well.

14         THE COURT:  Your line of sight will be better if

15  you'll take his board down.

16         MS. OLDEMEYER:  I was going to use the Elmo as

17  well.

18         THE COURT:  If you need to use the Elmo, then, yes,

19  you can move up.

20                     CROSS-EXAMINATION

21  BY MS. OLDEMEYER:

22  Q.  Good afternoon, Ms. Lutz.  Exhibit 156, we spent a lot of

23  time looking at that document, and I want to ask you about a

24  few entries on it.  I'm trying to narrow down the issues in

25  this case and whether we need to call lots of people to

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    851

1   confirm the content of the appraisals you reviewed.  So I want

2   to look at this document, which is the second-to-last page --

3   or it's Schedule Exhibit 2 as updated.  And with respect to

4   the value that you placed for the Logan County farm of

5   4.27 million, was that the purchase price that Lardyn paid to

6   Two Mile Ranch General Partnership for the Logan County farm

7   and ranch?

8   A.  I believe it was.

9   Q.  If we look at Exhibit 56, which has been received, do you

10  see a contract sales price for 4.27 million?

11  A.  Yes.

12  Q.  So with respect to the transfer of that asset, that

13  isolated asset, do you, Ms. Lutz, have any reason -- well,

14  first of all, there was an appraisal of the Logan County farm

15  and ranch, correct?

16  A.  Yes.

17  Q.  And it was from August of 2016, you reviewed it with

18  Mr. Forbes, correct?

19  A.  Yes.

20  Q.  Do you have any reason to dispute the accuracy of the

21  appraisal done by that appraiser in August of 2016 appraising

22  the Logan County property owned by Two Mile Ranch at

23  4.27 million?

24  A.  No.

25  Q.  Do you have or know of any evidence that Two Mile Ranch

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    852

1   General Partnership sold the Logan County real estate to

2   Lardyn Consulting, LLC in April of 2017 for less than

3   reasonably equivalent value?

4   A.   No.

5   Q.   And that's based on the appraisal, correct?

6   A.   Yes.

7   Q.   An appraisal that you don't question.  In fact, in your

8   experience as a business valuator, you rely on them, correct?

9   A.   Correct.

10  Q.   And you have the whole appraisal with that person's

11  credentials.  You could have said I suspect this appraisal is

12  wrong, it's overvalued, undervalued.  You could have done

13  that, correct?

14          MR. PULKRABEK:  Objection.  This is cumulative.

15  She said she relied on it.

16          THE COURT:  She did.

17          MS. OLDEMEYER:  My question is -- again, it's not a

18  stipulated fact, and we have six appraisers potentially

19  lined up to testify as to their work, and so I want to nail

20  down specifically that this particular witness, Ms. Wilson's

21  expert witness, does not question the credentials or the

22  results of the appraisal underlying that transfer of the

23  asset.

24          THE COURT:  Do you think if you asked her that

25  several times you might get a different answer?

                        Sarah K. Mitchell, RPR, CRR

1        MS. OLDEMEYER:  I guess I didn't know that she had

2   already testified she reviewed all the credentials of the

3   appraiser that performed the appraisal.

4        THE COURT:  She relied on that number.  I thought

5   that's what you wanted her to say.

6   Q.  (By MS. OLDEMEYER) And you don't question that number?

7   A.  No, I don't.

8   Q.  With respect to the machinery and equipment that was

9   transferred, do you know the contract sale price for the

10  machinery that was transferred from Two Mile Ranch to Lardyn

11  Consulting, LLC?

12  A.  I believe it's a different number than the appraisal.  I

13  believe it's lower.

14        MS. OLDEMEYER:  Your Honor, I would offer Exhibit

15  --

16  Q.  (By MS. OLDEMEYER) Well, have you seen the equipment bill

17  of sale and contract for the transfer of the equipment and

18  vehicles and other items listed on the attached schedule?

19  A.  I thought I had.  I thought it was $610,000 if I'm

20  thinking of the right contract.

21  Q.  Okay.  So $610,000.  So for this line here, total

22  equipment $565,000, you said they sold it for more or less?

23  A.  Well, no.  What I said was the appraisal was for more.

24  The contract has a different number on it.

25  Q.  What -- when you say the appraisal was for more, what are

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    854

1    you referring to?

2    A.  I believe the Kraupie's appraisal was for more than

3    $610,000.

4    Q.  The version you saw, was equipment sold at auction and

5    items moved, do you know?

6    A.  I guess I don't know.

7    Q.  Okay.  As you sit here today -- well, first of all, you

8    indicated you are aware the machinery and equipment was

9    transferred for $610,000, correct?

10   A.  I believe that's what the contract said, yes.

11   Q.  And you didn't go line by item and review each piece of

12   equipment that was transferred and compare it to this

13   equipment appraisal that you've referred to, correct?

14   A.  I don't recall that the contract had a list of equipment.

15   Maybe it did.  But I didn't do that.

16   Q.  Well, I'm going to put in front of you Exhibit 1063.  Have

17   you seen this equipment bill of sale and contract?

18   A.  I believe so, yes.

19   Q.  And that's the 610,000 purchase price referenced there,

20   correct?

21   A.  Correct.

22   Q.  And there's an attached list, correct?

23   A.  Correct.

24   Q.  And the list is attached getting to the total of $610,000?

25   A.  I honestly don't remember seeing that attachment.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 4     04/15/2021     855

1    Q.  Okay.  Do you have any reason to believe it wasn't

2    provided to you by your counsel who retained you?

3    A.  No.  I just don't remember it.

4    Q.  And so you never went back to determine if the assets

5    transferred matched this appraisal you're referring to?

6    A.  I did not.

7    Q.  As you sit here today --

8            THE COURT:  You've got me confused now.  The

9    appraisal was higher.  You want her to use the higher

10   number?

11           MS. OLDEMEYER:  No, sir.  It's not the same list of

12   equipment.  The appraiser itemized -- he'll be here.  We'll

13   call him remotely.

14           THE COURT:  You might.  You've got one day left.

15           MS. OLDEMEYER:  Your Honor, you indicated that you

16   have a trial starting next week, so we'd continue so that

17   the defense had sufficient time.

18           THE COURT:  Yes, we will.  But I've got a trial

19   next week.  I've got a trial practically every week until

20   the end of my life, and the end of my life might come during

21   this trial.

22           MS. OLDEMEYER:  Well, and I apologize for that,

23   Your Honor.  It would have been nice if we could have

24   stipulated to certain basic facts like this, but we didn't,

25   and therefore for the defense, it's important to have their

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    856

1    defense put on.

2          THE COURT:  Hey, you can drag this case out for the

3    next year, and then two more years in the Court of Appeals,

4    or you can come to your senses and hear, not just listen,

5    but hear what's being said and resolve the case.  That's a

6    choice you've got or you can drag it on, on and on and on.

7    So which number do you want her to use then, the 610 or the

8    higher number?

9          MS. OLDEMEYER:  I want to ask her a question.

10   Q.  (By MS. OLDEMEYER) Ms. Lutz, do you hold an opinion that

11   the equipment Two Mile Ranch General Partnership sold to

12   Lardyn Consulting, LLC was sold for less than reasonably

13   equivalent value?

14   A.  I guess it could have been since I didn't do that

15   comparison.

16   Q.  Do you recall your deposition when I took it?

17   A.  Do -- I recall the deposition, yes.

18   Q.  Okay.  And I'm going to point you to page 46 to page 47 to

19   refresh your memory.  Why don't you -- at line 24 I asked you,

20   Do you hold an opinion that the equipment -- can you see that?

21   It's probably too small -- that the equipment that Two Mile

22   Ranch General Partnership sold to Lardyn Consulting, LLC was

23   sold for less than reasonably equivalent value?  What was your

24   answer?

25   A.  No.  But I relied on --

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      857

1   Q.  Your attorney will be able to ask clarifying questions.

2          THE COURT:  I can ask her then.  If you won't let

3   her, I'll ask her.  But I want you to tell me,

4   Ms. Oldemeyer, what you're doing because I'm totally

5   confused.

6          MS. OLDEMEYER:  Your Honor --

7          THE COURT:  You're saying that she should have used

8   a higher number than this 610, which increases the asset

9   value, which increases the net equity.  That doesn't make

10  sense if you're doing that.

11         MS. OLDEMEYER:  And apparently I am

12  misunderstanding the Court's question.

13         THE COURT:  Maybe I'm misunderstanding.  It seems

14  like she took the more conservative value when she

15  calculated the assets.

16         MS. OLDEMEYER:  And I'm asking her a question

17  directly to item by item on assets transferred versus the

18  balance sheet approach that she took in total.  I'm looking

19  at the assets individually that were transferred.  So was

20  the machinery and equipment that was transferred for

21  $610,000 transferred for less than reasonably equivalent

22  value?  That's the CUFTA standard.  Her answer is no.

23         THE COURT:  So it actually transferred then -- it

24  had more value when it was transferred.  Okay.

25         MS. OLDEMEYER:  I -- it's the opposite, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      858

1   If it was transferred for less than reasonably equivalent

2   value, no, it wasn't, meaning it was transferred for

3   reasonably equivalent value.

4         THE COURT:  Whatever.  Maybe I'm just too dense to

5   understand what you're doing.  There's probably a good

6   chance of that.

7         MS. OLDEMEYER:  I don't think that, Your Honor, and

8   that is what concerns me.  I know the Court is listening and

9   wants to understand, and that is my effort to try to help

10  understand going asset by asset, and I -- I will ask the

11  witness another clarifying question.

12  Q.  (By MS. OLDEMEYER) Ms. Lutz, I'm going to go back to the

13  Logan County farm and ranch sold for $4.27 million.  Should,

14  based on the appraised price, Lardyn have paid more than the

15  appraised price in your valuation?

16  A.  No.

17  Q.  And if it was a sale to a third party, would there be

18  closing costs?

19  A.  I presume so.

20  Q.  Commissions?

21  A.  I presume so.

22  Q.  If there were back property taxes owed they would have had

23  to be paid, right?

24  A.  Right.  There's always a settlement statement.

25  Q.  Right.  And if a title commitment showed that a judgment

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4        04/15/2021        859

1    against the owner of the property needed to be satisfied, that

2    would need to be satisfied, correct?

3    A.   I assume so.

4    Q.   Because you want to transfer clear title?

5    A.   Yes.

6    Q.   With respect to the machinery and equipment, it sold for

7    $610,000.  Do you agree?

8    A.   I need to draw a distinction between what I relied on for

9    the balance sheet and the sales contracts that I didn't rely

10   on that you are referring to between the parties.  I think

11   that's where some of the confusion is.  Sorry, Your Honor.  So

12   the sales contract said 610,000.  The appraisal said 650,000.

13   There was an adjustment for some possible double counting, and

14   that's how I get to 565.  I didn't -- I would say that I did

15   not rely on those sales contracts.

16              MS. OLDEMEYER:  Okay.  I'd offer Exhibit 1063, the

17   sales contract that she did not rely upon, for purposes of

18   the -- our expert who will talk about that.

19              THE COURT:  1063.  But she just told us that she

20   came up with a number that's quite a bit lower even than the

21   sales price, which means her number is even more

22   conservative.  1063?

23              MS. OLDEMEYER:  Exhibit 1063, Your Honor.

24              THE COURT:  Just a minute.  1063 is now admitted.

25              (Defendants' Exhibit 1063 received.)

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    860

1    Q.   (By MS. OLDEMEYER) Going back to your schedules, with

2    respect to the equipment and machinery, if it had been sold,

3    do you know if it would have obtained the price that you

4    assigned to it on your schedules at auction?

5    A.   I don't know if that's the relevant measurement, but no.

6    Q.   I'm going to show you Exhibit 44.  I've put in front of

7    you Exhibit 44.  And you talked about using numbers from the

8    bank's records for purposes of the -- inserting the numbers on

9    your schedules.  Do you recall that?

10   A.   Yes.

11   Q.   And so did you use the $3.4 million figure for minerals

12   from this first page of the loan memorandum dated March 22nd,

13   2017?

14   A.   Yes.

15   Q.   And with respect to that 3.4 figure, you testified earlier

16   that you used numbers that were in the bank records.  Do you

17   recall that testimony?

18   A.   In part I did, yes.

19   Q.   Okay.  So borrowers give information about what their

20   assets are to the bank, correct?

21   A.   They do, yes.

22   Q.   And then the bank takes that information and uses it for

23   its own purposes, correct?

24   A.   Correct.

25   Q.   Loan presentation memos, are those for the public?

Sarah K. Mitchell, RPR, CRR

1    A.  No, I don't think so.

2    Q.  You as a CPA prepare things for the general public.  I

3    think you made a distinction about that early in your

4    testimony, correct?

5    A.  Yes.

6    Q.  Why, Ms. Lutz, did you disregard the information in

7    Exhibit 44 about the bank's consideration of the collateral

8    with a net margin of a negative 1,500 -- or excuse me --

9    1,054,195 on FSB 2116?

10   A.  I don't know what that document is.

11   Q.  You didn't review it?

12   A.  Well, I may have, but I don't know what you're pointing

13   at.

14   Q.  Did you review the balance sheet collateral summary report

15   that contained the percentage pledged and the percent

16   collateral?

17   A.  I'm sure I looked at it.

18   Q.  And did you do -- make any attempt to determine how the

19   excess deficit total on page FSB 2119, the negative 1,054,195

20   was determined?

21   A.  No.  Because I don't think that number is relevant to my

22   analysis.

23   Q.  Well, it's relevant to whether the 3.4 number is the

24   bank's number, correct?

25   A.  I don't know, because I don't actually know -- I'm not

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    862

1    familiar with the document that you're showing me.  I very

2    well may have them.  I'm sure I do have them, but I don't know

3    -- I mean, in that collateral analysis there's -- there's a

4    lot of pages.  So the numbers I used comported with the Lardyn

5    balance sheet.  I didn't just rely on one thing.  There was an

6    indication of value, and then there was a balance sheet

7    presented that had the same values.  In some cases there was

8    an appraisal as well, so --

9    Q.  Let me ask you this.  Did you see a mineral appraisal?

10   A.  Yes, I did.

11   Q.  Did you see one from Gustavson Associates?

12   A.  Yes.

13   Q.  And was that for producing or nonproducing?

14   A.  Producing only.

15   Q.  Do you remember in your deposition you did not know

16   whether that appraisal was for producing or nonproducing?

17   A.  Before I issued -- well, after I issued my report and

18   during the deposition there was still confusion about where

19   the mineral values came from, the 3.4 versus the 1.4.  So,

20   yes, I may have said that.  That subsequently got resolved

21   with some more discovery.

22   Q.  What's 1.4?

23   A.  The appraisal from Gustavson for the producing minerals

24   was 1.46 million.

25   Q.  So for purposes of your work here on your exhibit, did you

 1   know of that $3 million figure that you input into your

 2   spreadsheet what -- whether they were both producing and

 3   nonproducing minerals?

 4   A.  Yes, they are producing and nonproducing.

 5   Q.  You know that now, but when you put that in there you

 6   didn't know, correct?

 7   A.  I wasn't clear -- I couldn't make the numbers add up, so

 8   I'm sure I was unclear.

 9   Q.  Okay.  I'm going to show you the seller's closing

10   statement again.  Do you recall in your deposition when I

11   showed you the contract to buy and sell minerals?

12   A.  Is that for the 2.2 million between the parties?

13   Q.  Let's look at Exhibit 41.  Exhibit 41 is a two-page

14   document.  This is a contract to buy and sell minerals dated

15   February 28th, 2017.  Do you see that?

16   A.  Yes.

17   Q.  And the purchase price is 1.945 million?

18   A.  Yes.

19   Q.  And then on the second page of the Exhibit 41 it's a

20   similar contract but dated in April 2017, correct?

21   A.  Yes.

22   Q.  Do you have any knowledge as to why the purchase price

23   went up to 2.22 million?

24   A.  No.

25   Q.  As you look at the itemization of mineral interests sold,

1    do you know which of those are producing and nonproducing?

2    A.   The producing acreage is in Section 18.

3    Q.   You know that now, but you didn't know previously when you

4    prepared your --

5    A.   No.  I always knew there was producing acreage.  I

6    couldn't figure out why the bank used a combined number of

7    2.3 million for producing acreage and 1.1 million for the

8    nonproducing acreage, where those numbers came from.

9    Q.   Okay.  As you sit here and you were preparing your report

10   and your assignment, you could have asked for an appraisal to

11   be performed for determining the value of the nonproducing

12   minerals as of April 27th, 2017, true?

13   A.   I could have, sure.  I could have, I guess.

14   Q.   You could have, because in your work that's what you do.

15   You need the information, you go get somebody you can rely

16   upon, correct?

17   A.   I don't direct the obtaining of appraisals ever.

18   Q.   Correct.  But if you wanted it, you could have requested

19   it, correct?

20   A.   It would be highly unusual.  I could do anything, so I

21   will answer your question, yes, I could have, but it's

22   completely outside of my realm of responsibility.

23   Q.   As you sit here today, do you know if the nonproducing

24   mineral interests were transferred for $1.1 million?

25   A.   Well, I guess I'm not sure what you're asking.

                              Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4     04/15/2021    865

1   Q.  Yes or no.

2   A.  I can't answer that question yes or no.

3   Q.  Do you know in any way how that $2.22 million purchase

4   price was arrived at?

5   A.  No, I don't.

6   Q.  If let's hypothetically assume -- well, first of all, what

7   was the appraisal by Gustavson of the producing minerals?

8   A.  1.4 million.

9   Q.  Was that actually 1.356?

10  A.  I guess it could have been.  I just am rounding.  It was

11  -- I saw it as 1.36.

12  Q.  Let me show you within Exhibit 147, market value appraisal

13  of certain mineral interests owned by Two Mile Ranch in Weld

14  County, Colorado, as of February 1st, 2017.

15  A.  Yes.

16  Q.  You've seen this document before?

17  A.  Yes.

18  Q.  And do you know Briana Lamphier?

19  A.  No.

20  Q.  Have you ever worked with her before?

21  A.  No.

22  Q.  And with respect to her opinions, did you go to the

23  summary of market value and see that she determined a total of

24  1.356 million?

25  A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    866

1    Q.   Okay.  So that's for the producing mineral interests.  Do

2    you have any reason to dispute Gustavson's value of the

3    producing mineral interests that were conveyed from Two Mile

4    Ranch General Partnership to Lardyn Consulting, LLC?

5    A.   Well, I think that there are certain different indications

6    of value with regard to the minerals more than the other

7    assets.

8    Q.   My question is do you have any reason to dispute the

9    appraisal?

10   A.   It appears that it's low based on what the bank and the

11   insiders thought it was worth.

12   Q.   Okay.  So you question a licensed appraiser's result

13   because you've seen numbers that the borrower -- the

14   borrower's own statements of opinion?

15   A.   Well, there's -- there --

16   Q.   Yes or no.  I mean --

17   A.   Yes.  There's other indications of value.

18   Q.   Okay.

19        MS. OLDEMEYER:  We'd offer Exhibit 147.

20        THE COURT:  You said 137?

21        MS. OLDEMEYER:  47.

22        THE COURT:  Okay.  It's admitted.

23        (Plaintiff's Exhibit 147 received.)

24   Q.   (By MS. OLDEMEYER) Let's assume hypothetically that part

25   of the purchase price -- well, let me go back.  You said

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    867

1   you've seen information that the nonproducing minerals were

2   worth $1.1 million, correct?

3   A.   Correct.

4   Q.   Do you have any reason to dispute that?

5   A.   It was in the bank's collateral analysis, and there were

6   some prior sales both higher and lower than that number.  It's

7   an estimate that the bank relied on for its loan.

8   Q.   Do you have any reason to dispute the nonproducing mineral

9   acres value at $1.1 million?

10  A.   You're asking me if I dispute it.  I adopted it based on

11  the information that was provided that the bank relied on.

12  Q.   Excellent.  So you adopted that, which was not appraised,

13  correct?

14  A.   Well, no, it was not appraised during the --

15  Q.   Correct.  There was no appraisal of the nonproducing

16  mineral interests, correct?

17  A.   That I've seen, yes.

18  Q.   But there is an appraisal of the producing.  So you've

19  adopted the $1.1 million for the nonproducing, correct?

20  A.   Yes.

21  Q.   But you reject the 1.356 million appraisal for the

22  producing, correct?

23  A.   Yes.

24  Q.   But if one were to add those two numbers together, you get

25  roughly $2.4 million?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    868

1    A.  You do.

2    Q.  Okay.  Ms. Lutz, if on February 1st, 2017, Farmers State

3    Bank had foreclosed on all of the collateral pledged as

4    security for Two Mile Ranch debts and liquidated the assets

5    and then turned them into cash, paid the debts, do you hold an

6    opinion there would have been anything left over for Two Mile

7    Ranch after liquidation?  Do you remember your answer?

8    A.  I don't.  But liquidation is -- assets and liquidation are

9    almost always worth different amounts than assets in a going

10   concern, so I probably said I don't know.

11   Q.  Okay.  So you -- you don't know if on February 1st, 2017,

12   Farmers State Bank had foreclosed on all of the collateral

13   pledged as security for Two Mile Ranch debts and liquidated

14   the assets, turned them into cash, paid the debts -- you don't

15   know whether there would have been anything left over,

16   correct?

17   A.  I don't because --

18   Q.  Thank you.

19   A.  For the reason that I stated.

20   Q.  Do you dispute that Two Mile Ranch General Partnership

21   owed Farmers State Bank at least $8.7 million as of July 1st,

22   2016?

23   A.  Yeah, I can't remember what that number is now, but is

24   that off the proof of claim or is that a different number?

25   Q.  Let's look at the proof of claim, Exhibit 1046.  Is

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    869

1    Exhibit 1046 the proof of claim that you relied upon for

2    purposes of some of the information you put in your report?

3    A.  Yes.

4    Q.  And on page 2 of the proof of claim, how much is the claim

5    $9,582,213.61.  You see that number?

6    A.  Yes.

7    Q.  And then the basis of the claim is money loaned and loans

8    guarantied, correct?

9    A.  Correct.

10   Q.  And it cites the security agreement securing that,

11   correct?

12   A.  Yes.

13   Q.  So in that is included the loan to Mark Pauling, correct?

14   A.  The -- yes, the guaranty is.  The amount of the -- yes,

15   the amount of the loan, yes.

16   Q.  The amount of the loan that Two Mile Ranch guarantied, a

17   loan that is Mark Pauling's, correct?

18   A.  Correct.

19   Q.  And that's the loan that you dispute whether it should be

20   properly included in your analysis, correct?

21   A.  I don't dispute whether it should be properly included in

22   my analysis.  I don't believe it should be included in my

23   analysis.

24   Q.  Thank you.  So if for purposes of one wanting to know what

25   the total debts were excluding the Mark Pauling note and the

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    870

1   balance due, one could take the total amount due, the

2   $754,343.13, and subtract it from the $9.5 million as the

3   total, correct?

4   A.  Yes, correct.

5   Q.  And that gives you a number roughly in the 8.8 million

6   range?

7   A.  Right.  That's Schedule 2, I believe, to my report.

8   Q.  And with respect to that, the proof of claim has by note

9   each note and the payoff balance as of the date of the

10  bankruptcy filing, correct?

11  A.  Yes.

12  Q.  Do you dispute -- I'm a little confused.  Do you dispute

13  the accuracy of the bank's records that show the amount of the

14  loan due as of that date?

15  A.  No.

16  Q.  And that information is in there for each loan, correct?

17  A.  For each loan that was attached to the proof of claim,

18  yes.

19  Q.  And you mentioned that you were unaware of why certain

20  notes weren't included when we looked at your chart.  On your

21  schedule, the first page of Plaintiff's Exhibit 61, you

22  actually identified them by note number, correct?

23  A.  Correct.

24  Q.  And you indicated you could have updated those numbers to

25  show the numbers as of the bankruptcy filing, but you

Sarah K. Mitchell, RPR, CRR

1   questioned some of the contents of the advances, correct?

2   A.   I don't know -- I don't know what's in the advances.  I

3   can just see a number.  So I don't know what it's -- what it

4   represents.

5   Q.   Okay.  But if one were to look at Exhibit 1006, which is

6   the outstanding debts as of the date April 27th, 2017, one

7   could go through the pages attached and look by loan number to

8   the amount in principal and interest and the history of

9   advances, if any, on this, correct?

10  A.   Correct.

11  Q.   So you could go through page by page and determine what

12  was paid and what was advanced if you wanted to, correct?

13  A.   Correct.

14  Q.   With respect to Two Mile Ranch General Partnership, do you

15  know if note 2352 was -- had a balance due of 2.24 million

16  after the sale to Lardyn?

17  A.   That's what it looks like.

18  Q.   Was that rolled over then -- not rolled over -- but that

19  continued as a liability of Two Mile Ranch General

20  Partnership, correct?

21  A.   That's my understanding, yes.

22  Q.   So when you talk about your sales approach, you know that

23  when Pauling Hauling and CCC, I think is the abbreviation you

24  used, purchased in for 2 percent and 3 percent, they were

25  purchasing into a company that had $2.2 million less in

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    872

1    liabilities attached to it, correct?

2    A.  I don't think that 2.2 million that was left in TMR has

3    anything to do with Lardyn.

4    Q.  It does, because my understanding of your analysis is that

5    Two Mile Ranch was a continuation after the sale.  Is that

6    what -- is that what your evaluation is in the capital

7    accounts?

8    A.  I think there's a better and more complete way to say

9    that.  The assets of TMR with the exceptions that we noted

10   went to Lardyn, and new debt was issued against those assets.

11   Essentially it was the same operation that TMR was.  It was

12   the same assets and the same location.  But the new debt,

13   7.1 million, was securing the assets that were transferred,

14   and debt was left in TMR along with some assets.  So I think

15   there's a distinction between the assets and the liabilities

16   of the entities.  The operations of TMR, in fact, got

17   transferred to Lardyn, yes.

18   Q.  So my question is with respect to your sales approach, and

19   those folks determining to buy 2 percent for I think it was

20   40,000, and then you did a multiplier, you have -- if they had

21   bought into Two Mile Ranch General Partnership before the

22   sale, they would have been buying into a completely different

23   company because it had $2.2 million more in liabilities,

24   correct?

25   A.  Well, I'm actually not sure what you're asking me.  I

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    873

1   mean, they didn't buy into Two Mile Ranch.  They bought into

2   Lardyn.

3   Q.  Right.

4   A.  So --

5   Q.  Did you see in your information --

6           MR. PULKRABEK:  Your Honor, I object.  She was not

7   finished with her answer.

8           THE COURT:  True.  Go ahead.

9   Q.  (By MS. OLDEMEYER) Go ahead.

10  A.  I'm sorry.  I lost track of where I was.  Sorry.

11  Q.  I apologize.  I don't know if the court reporter --

12  A.  I said that the two purchases were of Lardyn, not of Two

13  Mile Ranch, so I thought that's where I ended.

14  Q.  Exactly.  And that's my point.  Two Mile Ranch as a going

15  concern before the sale to Lardyn looked very different and

16  had a very different level of attractiveness or detractiveness

17  to potential investors, correct?

18  A.  Let me see if -- you were saying that Two Mile Ranch

19  looked different before the transfer of assets?

20  Q.  Correct.

21  A.  Yes.  I would agree with that.

22  Q.  It had Jon Pauling's name associated with it, right?

23  A.  Yes.

24  Q.  And he was publicly aired that he sexually assaulted a

25  woman and now has a multimillion-dollar judgment.  That's a

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    874

1  bad thing for a business, correct?

2  A.  Right.

3  Q.  Yes or no?

4  A.  Well, I can't testify --

5        MR. PULKRABEK:  Your Honor, I object to this yes or

6  no.

7        THE COURT:  You object to what?

8        MR. PULKRABEK:  I object to Ms. Oldemeyer cutting

9  off the witness and then telling her to answer yes or no

10  after she started to answer the question.

11        THE COURT:  She has been doing that.

12        MS. OLDEMEYER:  I apologize.  I'll try to be

13  better.

14  Q.  (By MS. OLDEMEYER) Two Mile Ranch General Partnership,

15  that entity had -- did it have any good will?

16  A.  I don't think so.

17  Q.  And it didn't have good will because it had Jon Pauling's

18  name associated with it, correct?

19  A.  I don't think that's why it didn't have good will, and I

20  -- honestly, I didn't do that evaluation, but --

21  Q.  Is that sometimes part of what you do in business

22  valuations?

23  A.  Sure.

24  Q.  Any reason you didn't do it in this particular case?

25  A.  There was no need to.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    875

1  Q.  When you did your analysis, you could have chosen to get

2  appraisals of the mineral interests for 2018, 2019, or 2020 as

3  well, but instead you chose to rely on information in the bank

4  files, correct?

5  A.  I relied on information in the bank files, yes.

6          THE COURT:  You're not suggesting that your

7  client's information was wrong, are you?

8          MS. OLDEMEYER:  No, Your Honor.

9  Q.  (By MS. OLDEMEYER) The information in the bank's files

10 originated with the borrowers, correct?  It didn't originate

11 with the bank.  They've got to get the numbers somewhere

12 first, correct?  Do you know?

13 A.  That's a good question.  I know that there's -- well,

14 that's -- I don't know.  I don't know if it went directly to

15 the bank first, or if it went to the client and then to the

16 bank.

17 Q.  In this case there's another expert witness, correct,

18 Sheri Patterson?

19 A.  Sheryl Patterson.

20 Q.  Thank you.  And you were officemates at some point in

21 time?

22 A.  Yes.

23 Q.  And she's also retained by plaintiff's counsel in this

24 case as a banking industry standards expert, correct?

25 A.  Correct.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021      876

1   Q.  So with respect to banking industry and what's normal and

2   whether you accept the borrower's information at face value,

3   she would be the better expert to explain that, correct?

4   A.  I believe so, yes.

5   Q.  So would you agree with me on April 27th, 2017, Two Mile

6   Ranch General Partnership's debt was $8.8 million?

7   A.  Yeah, I think that's in the vicinity, yes.

8   Q.  Okay.  Would you agree with me that on April 29th, 2017,

9   Lardyn's debt was $7.1 million?

10  A.  Yes.

11  Q.  And you -- Lardyn -- excuse me -- Two Mile Ranch General

12  Partnership did not operate a feedlot, did it?

13  A.  After the transfer?

14  Q.  Two Mile Ranch General Partnership did not operate a

15  feedlot?

16  A.  I don't know the answer to that, I don't think.

17  Q.  So are you aware that Two Mile Ranch General Partnership

18  did not operate a feedlot?

19         THE COURT:  She just said she didn't know.

20  Q.  (By MS. OLDEMEYER) Are you aware whether Lardyn Consulting

21  was a startup commercial custom feeding feedlot?

22  A.  I honestly thought it was a feedlot before and a feedlot

23  after, but maybe I -- there's a distinction in how cows are

24  fed.  I thought there was a feedlot before and a feedlot after

25  that was later expanded.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 4      04/15/2021    877

1    Q.  So as you sit here today, you still don't know whether the

2    business of Two Mile Ranch General Partnership was a cattle

3    breeding operation?

4    A.  I don't know.

5    Q.  In your request -- in your report you express no opinion

6    that there was distributions of cash from Two Mile Ranch

7    General Partnership to either Jon Pauling or Mark Pauling

8    prior to April 27th, 2017, true?

9    A.  I opined that there weren't any.

10   Q.  In your report you expressed no opinion that there was

11   distributions of cash from Two Mile Ranch General Partnership

12   to Jon Pauling or Mark Pauling post April 27th, 2017, true?

13   A.  Yeah.  I actually don't know if there were or there

14   weren't.  No, I don't have an opinion about that.

15   Q.  In your report you express no opinion there was a

16   distribution of cash from Lardyn Consulting to Elyce York

17   after April 27th, 2017, true?

18   A.  I didn't express an opinion on that issue, no.

19   Q.  In your report you express no opinion that there was a

20   distribution of cash from Lardyn Consulting to Mark Pauling

21   after April 27th, 2017, true?

22   A.  I have to just clarify, because I did in my report cover

23   the fact that various amounts were being paid to members of

24   the Pauling family.  I wouldn't call those distributions, but

25   I don't know how you're using the term.  But, I mean, that's

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      878

1   in the records.  You know, fee for service, whatever they were

2   doing.  So they were getting paid by the entities.

3   Distributions to me is a different thing, but I don't know how

4   you're using it.

5   Q.  With respect to Mark Pauling, he was compensated under an

6   employment agreement for wages, true?

7   A.  He was compensated.  I don't recall if I saw an employment

8   agreement.

9   Q.  Are you -- if the record reflects there was an employment

10  agreement, do you dispute that?

11  A.  I don't know what you're asking me.

12          MR. PULKRABEK:  Your Honor, I object.  This is 403.

13  This is just a waste of time.

14          THE COURT:  Sustained.

15  Q.  (By MS. OLDEMEYER) You talked in your report about

16  increases in wealth in Redtail, and that's based on what you

17  believed to be increases in the value of mineral interests,

18  correct?

19  A.  I think it is primarily from that, yes.

20  Q.  And you're ignoring the operation of Lardyn's commercial

21  feedlot, true?

22  A.  No, I'm not ignoring it.  I just didn't try to analyze

23  specifically what the increase was comprised of.

24  Q.  I'm going to get one more exhibit.

25          MR. PULKRABEK:  Your Honor, I know it's getting

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021      879

1   close to five.  If there's some way we can move this along

2   so that Ms. Lutz doesn't have to return tomorrow, I would

3   really like that.

4            THE COURT:  I don't know how I can move it along.

5   I've tried.

6   Q.  (By MS. OLDEMEYER) Ms. Lutz, I'm showing you Trial

7   Exhibit 50.

8            THE COURT:  Are you even close to being done?

9            MS. OLDEMEYER:  I am, Your Honor.

10           THE COURT:  You are?

11           MS. OLDEMEYER:  I will be.  I don't think -- well,

12   what time is it?  I don't see a clock.

13           THE WITNESS:  It's 10 to 5.

14           MS. OLDEMEYER:  I will do my best, Your Honor.

15           THE COURT:  Well, we've got Mr. Forbes.  He's got a

16   right to --

17           MR. KEITHLEY:  Mr. Keithley.

18           THE COURT:  Or Mr. Keithley, I mean, and then we

19   have redirect.

20           MS. OLDEMEYER:  I don't understand.  Do you want me

21   to stop or are you trying --

22           THE COURT:  No.  Just keep going until five.

23   Q.  (By MS. OLDEMEYER) In Exhibit 5, did you list as judgment

24   of $78,000 -- $78,271 against Two Mile Ranch in your

25   schedules?

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    880

1   A.  I don't think I know what that is.

2   Q.  So Two Mile Ranch General Partnership had some liabilities

3   that aren't even listed on your schedules, correct?

4   A.  Well, they could have, yes.

5           MS. OLDEMEYER:  May I have one minute, Your Honor?

6   No further questions.

7           THE COURT:  Mr. Keithley?

8           MR. KEITHLEY:  Thank you, Your Honor.

9                        CROSS-EXAMINATION

10  BY MR. KEITHLEY:

11  Q.  Ms. Lutz, good evening.  My name is Livingston Keithley.

12  I represent Mark Pauling and Two Mile Ranch.  I'm not going to

13  go back over a lot of numbers and the issues that have already

14  been raised by the other defense counsel, but I do have two

15  topics to quickly raise.  The first is this.  You did not do

16  an analysis of the actual ownership percentages in Two Mile

17  Ranch between Jon Pauling and Mark Pauling as part of your

18  analysis in this case, correct?

19  A.  I looked at the ownership percentages as represented on

20  various documents, and consistent with many of the documents

21  in this case, they do not agree.  So did I try to conclude or

22  have an opinion about the ownership interest, no, I did not.

23  Q.  And you're not expressing an opinion about those ownership

24  interests today?

25  A.  I am not.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    881

1    Q.   The other topic I want to ask you about is that in all of

2    the documents you've reviewed in performing your analysis, you

3    didn't see any documentation that was viewed by Mark Pauling

4    prior to April of 2017 showing that Two Mile Ranch had a

5    positive net value in the partner's capital account, did you?

6    A.   Are you asking me if I know what Mark Pauling reviewed

7    before April 27th?

8    Q.   I'm asking you if you saw any document in your review and

9    analysis that indicated Mark Pauling thought there was a

10   positive partner's capital account balance in Two Mile Ranch

11   as of April 2017?  Did you see any document to that effect?

12   A.   I did not.

13   Q.   And the schedules that we've looked at today, as far as

14   you know -- if we can put up Exhibit 156 quickly here.  Now,

15   this is the first page of Exhibit 156, and I believe your

16   testimony of this first column here, TMR 1 as of June 30th,

17   2016, you took that from the bankruptcy schedules, correct?

18   A.   No.  I don't think that is correct.  I think that was just

19   a balance sheet prepared --

20   Q.   You believe that was a balance sheet prepared by TMR?

21   A.   I believe so.

22   Q.   And it's -- the one actually indicates down here to a

23   document TMR 000147, correct?

24   A.   Correct?

25   Q.   And that's what you just copied the numbers from into this

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    882

1   model?

2   A.   Yes.

3   Q.   Fair?

4   A.   Yes.

5   Q.   And according to TMR's calculation as of that time, the

6   partner's capital was a negative $567,000, correct?

7   A.   Based on their balance sheet, yes.

8   Q.   Now, the balance sheet that Mr. Pulkrabek spent most of

9   his time reviewing with you is actually your supplemental on

10  page 7 of Exhibit 156; isn't that right?

11  A.   Yes.

12  Q.   And here that calculates about that time period a capital

13  account that is positive 1.8 million, right?

14  A.   Correct.

15  Q.   But that's after you've done various changes and

16  calculations to that column, correct?

17  A.   Correct.

18  Q.   And the changes you made were not based upon anything that

19  Mark Pauling might have seen, right?

20  A.   Well, I can't testify about what Mark Pauling might have

21  seen.  What I testified was that there wasn't anything that I

22  saw in the file that indicated what he knew or didn't know at

23  this point in time.

24  Q.   Based on what you reviewed in preparing your opinions and

25  your report in this case, you -- you saw nothing that would

19-CV-01224-RBJ          Bench Trial - Day 4       04/15/2021     883

1    cause you to dispute Mr. Mark Pauling's testimony that at the

2    time of the transfer to Lardyn he thought that TMR was

3    underwater, fair?

4    A.   Right.  I can't dispute that testimony.

5            MR. KEITHLEY:  Thank you.  I have no further

6    questions.

7            THE COURT:  Redirect?

8            MR. PULKRABEK:  Thank you, Your Honor.

9                        REDIRECT EXAMINATION

10   BY MR. PULKRABEK:

11   Q.  Ms. Lutz, you were asked some questions about good will in

12   Two Mile Ranch.  Let me ask you the same for Lardyn.  Was

13   there any good will in any of the balance sheets for Lardyn?

14   A.  Well, so good will is an intangible asset -- well, good

15   will specifically is never booked as an asset until it's

16   purchased, so there is no good will showing on the books, and

17   as I testified, I didn't do that analysis for TMR, and I

18   didn't do it for Lardyn either.

19   Q.  You were asked a number of questions about the market

20   value or the market approach based on the three sales.  When

21   doing the market approach, does a professional such as

22   yourself inquire into the subjective motivations or intentions

23   of the buyer or seller?

24   A.  No.

25   Q.  Okay.  With respect to the proof of claim that you were

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    884

1    shown, Document Number 1046, let me see if I can get through

2    this fairly quickly.  Farmers State Bank on its proof of claim

3    represented -- Farmers State Bank represented a total amount

4    of the debt being north of 9.5 million, correct?

5    A.  Correct.

6    Q.  Of course that includes the Mark Pauling debt that you

7    opine should not be included?

8    A.  It does.

9    Q.  Now, if we go down to how Farmers State Bank characterized

10   its security, do you see where Farmers State Bank represents

11   that it has actually undersecured by $618,000?

12   A.  Yes.

13   Q.  If you factor in the collateral that Farmers State Bank,

14   in fact, had for the Mark Pauling debt, does that

15   representation of being unsecured go away?

16   A.  I'm not sure what you're -- so you're saying if you

17   subtract the 754,000 from -- yeah, I'm sorry.  It does go

18   away.

19   Q.  Because --

20   A.  Because the number -- if you subtract the 754,000 from the

21   9.5 million, you get a number that's smaller than 8.9 million.

22   Q.  Well, and coming at it from a different direction too, did

23   Farmers State Bank have security for the Mark Pauling note?

24   A.  Yes, they were fully secured.

25   Q.  All right.  You were asked some questions about why didn't

19-CV-01224-RBJ       Bench Trial - Day 4       04/15/2021    885

1   you pay attention or why -- pay attention is not the right

2   word -- why didn't you rely upon this schedule that was

3   provided by Farmers State Bank itself as to the amount that it

4   said it was owed as of April 27th or 28th, 2017?  Do you

5   recall those questions?

6   A.   Right.  Yes.

7   Q.   So just to kind of go over it quickly, why did you reject

8   this $103,000 figure?  Why didn't you give that credibility?

9   A.   So the $103,000 figure is a summation of invoices -- I

10  haven't seen the invoices themselves, but they were invoices

11  from Cline Williams to Farmers State Bank.  There were also

12  charges for appraisals.  All those charges were to Farmers

13  State Bank.  So for the invoices I didn't have backup, and

14  it's not clear to me that those are debts of Two Mile Ranch.

15  Q.   All right.  And your analysis of the guaranty with respect

16  to Mark Pauling, does that apply to all these guaranties?

17  A.   They would apply to all of them.  I paid more attention to

18  the guaranty for Mark Pauling obviously because it's quite

19  material.  The other guaranty of 11,000 I'm 99.9 percent sure

20  was paid off, and I don't know what the $5,000 guaranty is,

21  but it's immaterial to the conclusion.

22  Q.   All right.  And last couple questions here.  Just backing

23  out from the minutia of each asset and each figure, is there

24  any question that equity was transferred to Lardyn?

25  A.   Not in my mind, no.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    886

1   Q.  And is there any question in your mind that Ms. Wilson

2   suffered damages because of that?

3   A.  Yes, I think she did.  There's no doubt that she did in my

4   mind, in my opinion.

5           MR. PULKRABEK:  Thank you.  No further questions.

6           THE COURT:  All right.  Well, you did a good job in

7   the last 15 minutes, all of you.  We'll pick it up at

8   9 o'clock in the morning.  And by 9 o'clock we might have

9   some idea of when you folks can resume your trial assuming

10  you don't finish it tomorrow.

11          MR. FORBES:  Your Honor, just one small point.  You

12  had raised a question about case law concerning the timing

13  of when one conducts the value for purposes of a fraudulent

14  transfer.  Would it be helpful if we were to submit a

15  supplemental finding referencing that case law so your

16  clerks can at least use that as a starting point?

17          THE COURT:  Sure.

18          MR. FORBES:  Thank you, Your Honor.

19          MS. OLDEMEYER:  And I have one point.  Prior to

20  trial there was an indication that plaintiff may not call

21  their banking industry expert, and when I got that

22  indication they might not, I did -- she's on my witness

23  list.  I intend to call her, and I subpoenaed her so that I

24  could make sure she was here to testify for the Court.  I

25  don't know if plaintiff has changed their mind and they do

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    887

1    intend to call her.

2          MR. PULKRABEK:  Your Honor, Steve Stull testified

3    at the conclusion of yesterday that he considered that there

4    was a charging order that would have captured income, and

5    they transferred the assets to Lardyn.

6          MR. STEPHEN STULL:  I didn't say that.

7          MR. PULKRABEK:  That's the upshot of --

8          THE COURT:  I heard his testimony.  It potentially

9    is extremely significant testimony.

10          MR. PULKRABEK:  Well, that would -- I'm

11    paraphrasing, of course, but the gist of my expert on

12    banking Sheryl Patterson's testimony was there would be no

13    reason to do any of these transactions but for an attempt to

14    --

15          THE COURT:  All she's asking is whether you're

16    going to call her at not.

17          MR. PULKRABEK:  No, I'm not going to call her.  But

18    where this is going is Ms. Oldemeyer would like to call her

19    in addition to she's already listed her own banking

20    standards expert.

21          THE COURT:  She was a hired expert you hired.

22          MR. PULKRABEK:  Yes.

23          THE COURT:  How can you possibly compel her to

24    testify?

25          MR. PULKRABEK:  I will concede that there's legal

19-CV-01224-RBJ       Bench Trial - Day 4      04/15/2021    888

1  authority that goes both ways on this point, Your Honor, but

2  my broader concern is that it would be cumulative, because

3  we've already heard the equivalent of bank expert testimony

4  from both of the Stulls, and we're going to have

5  Ms. Oldemeyer's bank expert, and I just think it is

6  cumulative to then call -- for Ms. Oldemeyer to call a bank

7  expert that I retained and have decided I don't believe is

8  necessary to this case.

9         THE COURT:  It might be cumulative.  But if you're

10  not objecting on the basis she has no right to call your

11  expert, then I'm not going to stand in her way.

12         MR. PULKRABEK:  Well, I am going to object to it.

13         THE COURT:  Well, then you better come with some

14  authority in the morning.  I can't imagine that an opposing

15  party could compel your expert to come in and testify.  I

16  think that was decided many, many, many years ago in a case

17  involving IBM.  I might be wrong about that.  Good night.

18         MR. PULKRABEK:  Thank you, Your Honor.

19         MR. FORBES:  Thank you, Your Honor.

20         THE COURTROOM DEPUTY:  All rise.  Court is in

21  recess.

22         THE COURT:  Of course, if she does call your

23  expert, at a minimum it's on your nickel.

24         MR. PULKRABEK:  Thank you, Your Honor.

25         MS. OLDEMEYER:  Well, and that was my concern with

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 4      04/15/2021    889

1    the subpoena.  I'll talk with Mr. Pulkrabek.  She's going to

2    testify remotely.

3            THE COURT:  Well, I don't know if she's going to

4    testify at all if he doesn't call her.  But if she does, her

5    charges are going to be on your bill, your client's bill,

6    not on his.

7        (The proceedings were concluded at 5:06 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sarah K. Mitchell, RPR, CRR

1                        REPORTER'S CERTIFICATE

2

3           I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10          Dated this 13th day of May, 2021.

11

12

13

14          _____/s/ Sarah K. Mitchell_____

15              SARAH K. MITCHELL
                Official Court Reporter
16          Registered Professional Reporter
               Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR