1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3
   Civil Action No. 19-CV-01224-RBJ
4

5    AMANDA WILSON,
                                    (Pages 890 - 990)
6         Plaintiff,

7         vs.

8    JONATHAN PAULING, et al.,

9         Defendants.

10   ---------------------------------------------------------

11                   REPORTER'S TRANSCRIPT
                     Bench Trial - Day 5
12
     ---------------------------------------------------------

13
            Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Judge, United States District Court for the District of
     Colorado, commencing on the 16th day of April, 2021, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                        APPEARANCES

17   For the Plaintiff:
     ROSS W. PULKRABEK, Keating Wagner Polidori & Free, PC, 1290
18   Broadway, Ste. 600, Denver, CO 80203

19   For the Defendants:
     PETER C. FORBES, Carver Schwarz McNab Kamper & Forbes, LLC,
20   1888 Sherman St., Ste. 400, Denver, CO 80203

21   R. LIVINGSTON KEITHLEY, Antero Law LLC, 1700 Broadway, Ste.
     640, Denver, CO 80290
22
     TRACY A. OLDEMEYER, Cline Williams Wright Johnson & Oldfather,
23   215 Mathews St., Ste. 300, Fort Collins, CO 80524

24
        Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25               Denver, CO 80294, 303-335-2108

            Proceedings reported by mechanical stenography;
                 transcription produced via computer.

19-CV-01224-RBJ       Bench Trial - Day 5                    891

1                        I N D E X

2

PLAINTIFF'S WITNESS                                          PAGE

3

AMANDA WILSON
4       Direct Examination By Mr. Pulkrabek              892
        Cross-Examination By Mr. Keithley                900
5


6
DEFENDANTS' WITNESS                                          PAGE
7
CHRISTOPHER GRAY
8       Direct Examination By Ms. Oldemeyer              928
        Cross-Examination By Mr. Forbes                  959
9       Cross-Examination By Mr. Keithley                962
        Cross-Examination By Mr. Pulkrabek               966
10      Redirect Examination By Ms. Oldemeyer            978

11

12              PLAINTIFF'S
                EXHIBITS                  RECEIVED
13
                21                             972
14
                24C                            940
15
                136                            956
16

17

                DEFENDANTS'
18              EXHIBITS                  RECEIVED

19              1025                           941

20              1050                           942

21              1064                           943

22              1067                           949

23              1068                           949

24                                             940

25

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      892

1                 *         *         *         *         *

2              (The proceedings commenced at 9:03 a.m.)

3              THE COURT:  Good morning.  Let's see, where are we

4  this morning?

5              MR. PULKRABEK:  Your Honor, the plaintiff calls

6  Amanda Wilson.

7              THE COURT:  All right.

8              Good morning.

9                          AMANDA WILSON

10  was called as a witness and, having been duly sworn, was

11  examined and testified as follows:

12              THE COURT:  Have a seat, please.

13              MS. OLDEMEYER:  Your Honor, I apologize.  I thought

14  Mr. Gray was up first, and there is a sequestration order.

15              Mr. Gray, could you sit outside.

16                        DIRECT EXAMINATION

17  BY MR. PULKRABEK:

18  Q.  Ms. Wilson, could you start by telling the Court a little

19  bit about who you are as a person.

20  A.  Who I am as a person is fairly simple.  I love books.

21  That's always been my most beloved hobby, so collect those,

22  old and new books.  And I have a 17-year-old son who is trying

23  to make it through his teenage years.  And I also just have a

24  little orange cat, who is basically my best friend.  It's a

25  fairly simple life, I guess.

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    893

1   Q.  Tell us what do you do in your free time?

2   A.  My free time, well, I belong to a Native American healing

3   church, which is a very healing spiritual community that has

4   given me the peace and the community that I need in my healing

5   journey to make it through all of this.  So it's been a really

6   important part of my healing journey.  I'm not Native

7   American, but the community has been very receptive to me and

8   what I'm going through and dealing with.

9   Q.  All right.  I'd like to start with the judgments that you

10  obtained in your trial against Jon Pauling and a little bit

11  about the process that was involved there, okay?  Just in a

12  couple of sentences can you describe what -- what was it like

13  for you to go to trial and obtain the judgments that you

14  obtained?

15          MR. FORBES:  Your Honor, I'm going to object.  This

16  is not relevant.  The issues here relate to asset values and

17  conspiracy at the time.  There's no claim under CUFTA for

18  noneconomic damages.  I object to the relevance.

19          THE COURT:  I trust this will be relatively short?

20          MR. PULKRABEK:  Yes.

21          THE COURT:  Overruled.  Just to give the witness a

22  chance to personalize herself a little bit.

23  A.  It was completely devastating.

24  Q.  (By MR. PULKRABEK) All right.  But the culmination of that

25  process was that you obtained some judgments, correct?

```
19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    894
```

1   A.  Yes.

2   Q.  And those are judgments against Jon Pauling?

3   A.  Yes.

4   Q.  Who is a defendant in this case?

5   A.  Yes.

6   Q.  I'd like to take just a brief look at the judgments.  We

7   don't have to go through them in detail, but I want to confirm

8   those are the judgments you obtained.

9        MR. FORBES:  Your Honor, the judgments are

10  stipulated fact, 403.

11       MS. OLDEMEYER:  Join.

12       THE COURT:  I think it is part of the stipulation,

13  isn't it?

14       MR. PULKRABEK:  Well, Your Honor, it is part of the

15  stipulation, but the judgments are against Jon Pauling.  Jon

16  Pauling is a defendant in this case.  They put Jon Pauling

17  on notice, and I think they also put the other defendants on

18  notice of their contents.  And this is a punitive damages

19  case, and one of the people we're asking for punitive

20  damages against is Jon Pauling, so certainly I think the

21  judgments are relevant.

22       MS. OLDEMEYER:  Your Honor, if I could briefly --

23       THE COURT:  Just a second.  Let me look at the

24  stipulation.  Stipulated Fact Number 6 states as follows:

25  In Denver District Court Case Number 2013-CV-53298, the

                    Sarah K. Mitchell, RPR, CRR

1    state case, Amanda Wilson obtained a jury verdict in her

2    favor against Jonathan Pauling, and on October 23, 2015,

3    judgment was entered on the jury verdict in the amount of

4    $3,918,166 representing economic damages in the amount of

5    732,136, noneconomic damages in the amount of 936,000, and

6    punitive damages in the amount of 2,250,000.  The trial

7    court awarded plaintiff costs and prejudgment interest.

8    However, the Court did not reduce the prejudgment interest

9    to a sum certain.

10        Going to paragraph 15, on July 25, 2018, an

11   additional award of $40,292.98 for costs in the state case

12   was entered in plaintiff's favor against Jonathan Pauling.

13   Paragraph 16, on December 19, 2018, the state case judgment

14   was amended to include certain prejudgment interest, which

15   added $430,971.24 to the judgment.  Paragraph 17, on

16   December 19, 2018, the state case judgment was further

17   increased when the Denver District Court granted plaintiff's

18   motion and increased the punitive damage award by an

19   additional $1,948,274.48 and entered judgment.

20   Paragraph 19, the judgment in the state case in favor of

21   Amanda Wilson and against Jon Pauling remains unpaid in any

22   amount.  The objection is sustained.

23        MR. PULKRABEK:  Okay, Your Honor.  And does that go

24   for the supplemental judgment as well as the judgment for

25   costs?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021   896

1           THE COURT:  You can put in evidence of any part of

2      the judgment that I didn't just go through, but there's no

3      point in having a stipulation and then proving the facts.

4           MR. PULKRABEK:  Okay.

5      Q.  (By MR. PULKRABEK) Ms. Wilson, can we talk a little bit

6      about the content of some of these judgments?

7      A.  Yes.

8      Q.  Did you obtain a judgment for assault by Jon Pauling?

9      A.  Yes.

10          MR. FORBES:  Your Honor, I'm going to again make a

11     403 objection.  It's not relevant under CUFTA what the

12     nature of the judgment was.  It's just relevant that there

13     was a judgment.

14          THE COURT:  That objection is overruled.

15     Q.  (By MR. PULKRABEK) Okay.  You can go ahead and answer.

16     A.  Yes.

17     Q.  Did you get a judgment for battery by Jon Pauling?

18     A.  Yes.

19     Q.  Did the -- did the judge in his entry of judgment find by

20     clear and convincing evidence that you had suffered serious

21     emotional harm?

22     A.  Yes.

23     Q.  Did the -- did the judge in his judgment find beyond a

24     reasonable doubt that the evidence warranted punitive damages,

25     and not only punitive damages, but enhanced punitive damages

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021       897

1    for the conduct of Jon Pauling?

2    A.   Yes.

3    Q.   All right.  I want to now talk to you a little bit about

4    your -- your situation after the judgment.  Have you collected

5    a penny of any of this?

6    A.   No.

7    Q.   And I want to talk first about how has that impacted you

8    financially that you've not been able to collect on this

9    judgment?

10           MR. FORBES:  Your Honor, it's, again, not relevant

11   under the issues raised by CUFTA, and, for the record, I

12   object on relevance grounds.

13           MS. OLDEMEYER:  Join.

14           THE COURT:  Overruled.

15   A.   It's been financially very difficult for me to survive

16   with the weight of all of this on me.  All the time, I feel it

17   every day.  With post-traumatic stress you have to work ten

18   times harder to make your life work.  You know, I was working

19   50 hours a week waiting tables, and for all the years of the

20   interim of this, and then I lost my job due to the pandemic.

21   So it's just -- it's been difficult.

22   Q.   (By MR. PULKRABEK) Okay.  Setting aside the financial

23   impact that it has had on you, how has this -- how has your

24   inability to collect a penny of this judgment affected your

25   ability just to obtain closure for the entire underlying

                        Sarah K. Mitchell, RPR, CRR

```
19-CV-01224-RBJ       Bench Trial - Day 5      04/16/2021    898
```

 1    episode that resulted in these judgments?

 2              MR. KEITHLEY:  Objection, relevance.

 3              MR. FORBES:  I apologize for interrupting, but I

 4    join in Mr. Keithley's relevance objection.

 5              MS. OLDEMEYER:  I join.

 6              THE COURT:  Which he hasn't yet made.

 7              MR. KEITHLEY:  I'm sorry.  We were talking at the

 8    same time, Your Honor.  I objected on the grounds of

 9    relevance.  This is a case about collection.  There was no

10    pleading about her emotional state.  There's been no

11    discovery or disclosure about her emotional state.  I don't

12    know why it's coming in at trial.

13              THE COURT:  The objection is sustained.

14    Q.  (By MR. PULKRABEK) Let's talk about then this case, and

15    what you have learned about Farmers State Bank and the other

16    defendants' actions that resulted in transferring Two Mile

17    Ranch to Lardyn Consulting, okay?

18    A.  It has --

19    Q.  My question for you is how has that aggravated the harm

20    that you have experienced financially from not being able to

21    collect these judgments?

22              MR. FORBES:  Again, Your Honor, relevance.

23              MR. PULKRABEK:  Your Honor, it's a punitive damages

24    case.

25              THE COURT:  It's an alleged punitive damages case.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      899

1   The objection is overruled.

2   A.  Can you repeat the question?

3   Q.  (By MR. PULKRABEK) Yes.  Can you tell me how has the

4   transfer of assets from Two Mile Ranch to Lardyn aggravated

5   the damages that you have -- you've been experiencing as a

6   result of not being able to collect these judgments, if at

7   all?

8   A.  Having to go through this whole process has me reliving a

9   lot of the pain that I went through.  It just never ends.

10  Having to deal with this makes all of the challenges in my

11  life much more challenging.

12  Q.  You've heard testimony in this case by Mark Pauling that

13  he'd never met you before today or before this trial.  Is that

14  true?

15  A.  I have met him before.

16  Q.  Tell us about that.

17  A.  Jon took me to a family football game.  His son was

18  playing, and I met his whole family.

19  Q.  You've heard some of the defendants say they don't believe

20  you were assaulted.  Can you confirm for us you were

21  assaulted?

22  A.  Yes.

23          THE COURT:  Some of the defendants?

24  Q.  (By MR. PULKRABEK) Well, let me be more particular.

25  You've heard Mark Pauling question whether you were assaulted

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      900

1    and whether you just made all of this up.  Did you make it up?

2    A.  No.

3    Q.  Okay.  You heard -- you heard Dick Stull in an e-mail talk

4    about Jon Pauling being accused of having a loose zipper.

5    What's the reality?

6    A.  The reality is that he brutally raped me.  To hear people

7    talk about what happened to me in that way and rob me of the

8    only justice that I will ever get from this is extremely

9    painful.

10          MR. PULKRABEK:  I have no further questions.

11          THE COURT:  Does anybody wish to cross-examine?

12          MS. OLDEMEYER:  No, Your Honor.

13          MR. KEITHLEY:  I have some short questions, Your

14   Honor.  Very quickly.

15                    CROSS-EXAMINATION

16   BY MR. KEITHLEY:

17   Q.  Ms. Wilson, good morning.  My name is Livingston Keithley.

18   I represent Mark Pauling and Two Mile Ranch, and I just want

19   to ask you about your testimony about having previously met

20   Mark Pauling.  You said you went to a family football game; is

21   that right?

22   A.  Yes.

23   Q.  And that the entire family was there?

24   A.  It was Mark and his wife, and I think his daughter was

25   there too.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    901

1  Q.  Was -- were any of the other brothers of Jon Pauling there

2  as well?

3  A.  No.

4  Q.  Have you ever met Timothy Pauling?

5  A.  No.

6  Q.  Have you ever met Paul Pauling?

7  A.  Yes.

8  Q.  Was it -- the son who was playing in the football game,

9  was that Jon's son who was playing?

10  A.  It was Mark's son.

11  Q.  It was Mark's son who was playing in the football game?

12  A.  Uh-huh.

13  Q.  Okay.  Thank you.

14          MR. KEITHLEY:  I have no further questions, Your

15  Honor.

16          THE COURT:  Mr. Forbes?

17          MR. FORBES:  I don't have any questions, Your

18  Honor.

19          THE COURT:  Redirect?

20          MR. PULKRABEK:  No, Your Honor.

21          THE COURT:  All right.  Thank you for your

22  testimony.  You may return to your seat.

23          Next witness, please.

24          MR. PULKRABEK:  Your Honor, the plaintiff rests.

25          THE COURT:  All right.  Any of the defendants wish

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021     902

1    to make a motion?

2             MR. FORBES:  Your Honor, the Lardyn defendants do.

3             THE COURT:  Pardon me?

4             MR. FORBES:  The Lardyn defendants do wish to make

5    a motion, Your Honor.

6             THE COURT:  Go ahead.

7             MR. FORBES:  Thank you, Your Honor.  I was going to

8    the lectern, Your Honor.  I apologize.  Your Honor, the

9    Lardyn defendants move for judgment under Federal Rule of

10   Civil Procedure 52(c), and they do on the following basis:

11   The claims against them are under the Colorado Uniform

12   Fraudulent Transfer Act, and one claim involving transfer of

13   the farm and the other assets in question here, and the

14   other claim involving alleged conspiracy to engage in a

15   violation of the Colorado Uniform Fraudulent Transfer Act,

16   which I will call CUFTA.

17            Your Honor, our motion is based on the following:

18   We understand that under 52(c) you evaluate the evidence

19   just as you would at the close of trial.  Our motion is made

20   on the grounds that the evidence as a matter of law, under

21   the evidence that is, plaintiffs did not meet their burden

22   of establishing transfers under CUFTA.  Your Honor, we say

23   that for the following reasons:  First, Your Honor, and I

24   know you think I am misreading or misstating the holding in

25   the James River case, but I believe, as I read it, that one

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      903

1    of the grounds on which the Tenth Circuit excluded the

2    testimony of the witness at issue in that case who was the

3    owner of the business in question concerning the value of

4    property was that the Tenth Circuit found that under the

5    Federal Rules of Evidence, valuation or property valuing is

6    a matter for expert opinion, with the possible exception of

7    allowing a landowner or a businessowner to testify as to the

8    value of his or her own business.

9         I say that because the Court there looked at the

10   question of whether the admission of that testimony by the

11   businessowner was error and analyzed it both under the

12   Federal Rules of Evidence and under Colorado common law.

13   Your Honor, the first ground on which we believe judgment is

14   appropriate in our favor is that under CUFTA the plaintiff

15   has the burden of establishing the value of the assets

16   transferred.  Our view is that they were required to do that

17   either by disclosed expert testimony or potentially through

18   cross-examination of the property owner, and they did not

19   present any disclosed expert testimony concerning value by

20   somebody who was qualified to testify concerning value.

21        Ms. Lutz testified that she did not believe she was

22   qualified to make independent valuations of the transferred

23   assets.  She also confirmed she did not make independent

24   valuations of the transferred assets.  She did confirm in

25   the business that she's in, which is valuing businesses, she

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      904

1    does and can rely on other valuation professionals' work.

2    Your Honor, I don't take exception with that, but I think

3    the question here is different.  The question is whether

4    they presented any independent admissible evidence on value,

5    and I contend they did not.

6            Your Honor, moving to the next ground on which we

7    seek judgment under CUFTA, in order to have an asset that is

8    subject to a claim, the value of the liens against the asset

9    must not exceed the value of the asset.  And, Your Honor,

10   there are two -- two components to this aspect of the case

11   -- aspect of our motion, excuse me.  The first is the

12   question the Court raised yesterday about the date on which

13   the value of the assets transferred is to be determined.

14           Your Honor, consistently with your pretrial order

15   in our trial brief we do not make a string cite of cases

16   relating to the question of when the date of value is

17   proper.  We did cite a case called *ASARCO, LLC vs. Americas*

18   *Mining Corporation*.  It was from the Southern District of

19   Texas.  396 B.R. 278, a 2008 case.  Your Honor, we cited

20   that because we thought it was a good summary of what we

21   believe to be the developed law on this point that the

22   transfer is to be -- excuse me -- the value of the property

23   is and must be measured on the date of the transfer.

24           And, Your Honor, I, in particular, cite in that

25   decision to pages 336 and 337.  At that point the Court is

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      905

1   discussing the Delaware Uniform Transfer Act, which is the

2   genesis of the Colorado Uniform -- I'm sorry -- they're both

3   based on the Uniform Transfer Act, and therefore I believe

4   it's relevant authority.  Specifically the Court was

5   discussing there the question of how one determines whether

6   a transfer was made for reasonably equivalent value, and I

7   want to quote what the Court said on page 336 carrying over

8   to page 337.

9          And I do quote, All jurisdictions agree that Courts

10   should measure the value of the property transferred and the

11   consideration received at the time of the transfer.  The

12   Court should not consider subsequent events such as the

13   exponential improvement in copper prices, which was one of

14   the questions in that case.  Here obviously it doesn't

15   involve copper prices.  It involves mineral rights really

16   and the feedlot property.  I don't think there's been any

17   contention that the other assets that were transferred were

18   subject to appreciation.

19          So I think that the comment there is consistent

20   with our position that you shouldn't consider subsequent

21   improvements for depreciation in the value of the assets

22   transferred.  The Court -- and I'm still quoting on page 337

23   of that decision -- went on to explain, and again I quote,

24   quote, The Court -- excuse me -- quote, By analyzing whether

25   ASARCO received reasonably equivalent value at time of the

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5        04/16/2021        906

1    transfer, comma, Courts avoid valuing an asset through the

2    20/20 vision of hindsight, and it cites another decision for

3    that proposition.

4          And it goes on to say, and I quote, This also means

5    that Courts should use the industry standards in place at

6    the time of the transaction to determine the fair market

7    value of the -- in this case SBCC stock -- because these

8    standards determined what a hypothetical sale of such

9    property would yield for the company.  So, Your Honor, our

10   position is in the first instance the question of value must

11   be determined at the time of the transfer, and as I said,

12   our position is they did not introduce admissible evidence

13   on the value of assets transferred at the time of the

14   transfer.

15         Your Honor, that being said, our position is that

16   even if one finds that the evidence provided by -- testified

17   to by Ms. Lutz or that the evidence -- the evidence of value

18   taken from the first -- excuse me -- Farmers State Bank loan

19   presentation that Ms. Lutz relied on to come up with her --

20   what she felt were the appropriate values as of the date of

21   the transfer, the next question becomes, even using those

22   values, was the value of -- were the value of the liens --

23   you know, I just -- was the value of the liens against the

24   transferred properties greater than the value of the

25   property used -- excuse me -- transferred or sold to Lardyn.

1          And, Your Honor, the plaintiff -- and this is why I

2    did go through that somewhat painful exercise, and I

3    apologize to everybody -- asking Ms. Lutz as to whether she

4    had looked at what the total liens were under the

5    encumbrances against the property transferred at the time of

6    the transfer, and she testified that she did not look at

7    that.  So, Your Honor, the plaintiff failed to meet its

8    burden of showing that the liens against the property at the

9    time of the transfer were less than the values that they

10   ascribe to the transfer.

11          Your Honor, on that point, if one disregards that

12   concession as relevant or controlling, the evidence showed

13   that, in fact, the liens against the property at the time of

14   the transfer even using the values ascribed by Ms. Lutz that

15   plaintiff used in their damage analysis, there was no equity

16   in the property.  In other words, the liens exceeded the

17   value of the property, and accordingly there were no assets

18   transferred.

19          Your Honor, to help illustrate this point, I have

20   prepared some demonstrative exhibits, if I might use the

21   Elmo.

22          THE COURT:  This is a motion.

23          MR. FORBES:  Yes, Your Honor.

24          THE COURT:  It's not a filibuster.

25          MR. FORBES:  I understand, Your Honor.  But if I

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      908

1   don't make a complete motion at this point, then our right

2   to -- if there is an appeal, our right to assert that the

3   case should have been --

4           THE COURT:  You've made your point.  Now, if you

5   have to make your record, make your record.  I understand

6   now why you couldn't or didn't stay within my page limits on

7   your trial brief.

8           MR. FORBES:  Your Honor, I thought you had said it

9   was okay to go over a little bit when I had said something

10  to the response of I don't know if I can do it in five.

11          THE COURT:  Would you then finish your argument --

12          MR. FORBES:  I will try --

13          THE COURT:  -- as quickly as you can?

14          MR. FORBES:  I will certainly try, Your Honor.  I

15  hold no illusion that -- well, I'll just proceed.

16          THE COURT:  Yesterday your co-counsel was

17  expressing extreme concern about whether they would have

18  time to present their case.  Bear that in mind, please.

19          MR. FORBES:  I will, Your Honor.  I don't know how

20  -- if I've been five minutes, I won't be another five.  If

21  I've been ten, I won't be another five.  I apologize, Your

22  Honor, but I believe it's important to make a record on this

23  point.  Your Honor, I placed before you a summary -- it's

24  not an exhibit.  I marked it as 2092 for identification

25  purposes only, but it's just a summary of the evidence.

1        Your Honor, this is taken from the proof of claim,

2   Exhibit 1046.  These were taken from the pages that Ms. Lutz

3   relied on to come up with the values of the loans that she

4   had -- she had used in her calculation of the -- what she

5   contended to be the appropriate debt for Farmers -- Two Mile

6   Ranch, excuse me -- Two Mile Ranch as of 4/27/17.  From this

7   we see that there was a principal outstanding of

8   approximately 8.2 million and accrued interest of

9   approximately $540,000.

10        Your Honor, going to another summary of the

11   testimony, Exhibit 2093, again, taking the values used by

12   Ms. Lutz --

13        THE COURT:  I don't see that 2092 or 2093 have been

14   admitted.

15        MR. FORBES:  It was just -- it is just for

16   identification for the record, Your Honor.  I'm not offering

17   these as exhibits.  I'm just using them to summarize the

18   testimony to be efficient rather than going through it

19   verbally.

20        THE COURT:  So you're making your motion using

21   exhibits that are marked with numbers but have not been

22   offered or admitted, but you've put them in front of me and

23   want me to look at them.

24        MR. FORBES:  Your Honor, I could write it on the

25   board, but I thought this would be more efficient.  I

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    910

1    apologize.  If you prefer me not to use it, I won't, and

2    I'll just orally put it into the record.

3              THE COURT:  It's going to be orally anyway because

4    that exhibit is not admitted.

5              MR. FORBES:  Right, Your Honor.

6              THE COURT:  If you tell me that you're using that

7    as your notes to make your argument, you can do that.

8              MR. FORBES:  I do not need to use that if that is

9    an issue.  I will return to my seat and proceed from there.

10   Your Honor, the evidence showed that under the proof of

11   claim relied on by Ms. Lutz there was a total asset -- total

12   principal balance owing by TMR as of 4/27/17 of

13   8,290,692.62, and there was total outstanding interest on

14   that date of $537,202.86.  Your Honor, under the security

15   instruments that were introduced into evidence as part of

16   plaintiff -- excuse me -- as part of Exhibit 1015, the deed

17   of trust on the Logan County property was for up to

18   5.5 million in principal, plus interest.

19             Given that there was $8.2 million in --

20   $8.29 million in principal outstanding, the amount of that

21   deed of trust in terms of principal is limited to

22   $5.5 million.  If you add the $537,202.86 as interest as

23   provided by that deed of trust, the total encumbrance of

24   that deed of trust on the Logan County farm as of April 27,

25   '17 was $6,037,202.86.  The Logan County farm was valued by

1    Ms. Lutz at $4,270,000.  Therefore, the over $6 million in

2    encumbrances against it exceeded the claimed value of the

3    property, meaning that property was not an asset under CUFTA

4    and could not be the subject of the fraudulent transfer.

5         Your Honor, with respect to the deed of trust in

6    Weld County that secured mineral rights, the value asserted

7    by plaintiffs through Ms. Lutz was $3.4 million.  Again,

8    that deed of trust was limited to $5.5 million plus

9    interest.  That $3.4 million value was exceeded by the

10   $6,037,202.86 value of the deed of trust, and therefore that

11   was not an asset within CUFTA.  And for the record, I want

12   to make sure that the record is clear the principal balances

13   and interest I'm using does not include any amounts for --

14   under the guaranty by TMR of Mark Pauling's loan.

15        The contract for the North Weld Irrigation District

16   that Ms. Lutz valued at $280,745 is a contract right and

17   intangible under the UCC.  Therefore, subject to the bank's

18   security interests.  The bank's security interests is

19   unlimited in amount, and therefore would be subject -- that

20   property would be encumbered by the full amount of the debt

21   that Ms. Lutz testified to.  The full amount of that debt

22   was $8,827,920.  Accordingly, there was no equity in that

23   property.  The liens exceeded the value and could not be the

24   subject of a transfer under CUFTA.

25        Your Honor, the equipment Ms. Lutz valued at 565.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    912

1   Again, equipment is subject to a security interest.  Under

2   the security interest the total debt exceeded $8 million.

3   Therefore, that is not an asset under CUFTA.  The alfalfa,

4   grain, and feed was $135,000 per Ms. Lutz.  The alfalfa,

5   grain, and feed is also going to be personal property

6   subject to the Uniform Commercial Code Article 9 security

7   interest.  $8 million -- over $8 million of debt against

8   that means that is not an asset either.  And, Your Honor,

9   again, even if we take -- therefore, even if we took the

10  total amount -- okay.  I'm sorry.  I completed that part of

11  my discussion.

12          Your Honor, the other point I'd like to make is

13  that we have looked for cases talking about transfer of

14  equity as being a basis for a claim under CUFTA.  We have

15  found none.  That is not to say they exist, and your clerks

16  may well find them, but I could not find any.  I did find

17  one case that rejected the proposition that -- that value

18  for purposes of CUFTA could be based on the transfer -- the

19  transfer -- value of an operating business on the basis that

20  the -- on the basis that there's no note, there's no way to

21  know that the customers of an operating business would have

22  gone to the -- gone with the purchaser if the business had

23  been foreclosed on by a judgment creditor.  That was *In Re*

24  *Atlas Computers*.  It was a 2012 Westlaw 3018256.

25          Your Honor, the final point I would make is that

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021     913

1    under CUFTA damages are to be based on the value of the

2    property transferred, not based on the use made by the

3    transferee, if there is no transfer, not made by the value

4    that the transferee may have contributed to the property,

5    and so --

6              THE COURT:  Isn't this the same as the first point

7    you made?

8              MR. FORBES:  Slightly different, Your Honor.  I'm

9    just saying that values based on what the equity or --

10   equity value of Lardyn are not relevant to CUFTA, and

11   therefore those values do not establish damages.  And with

12   that, Your Honor, I close my motion and thank you for your

13   indulgence.

14             THE COURT:  So, Mr. Forbes, you argued that if the

15   debt exceeds the value of the asset, then there's no

16   transfer of an asset.

17             MR. FORBES:  Yes, Your Honor.

18             THE COURT:  Doesn't that follow logically that if

19   the value of the asset exceeds the debt, there is a transfer

20   of an asset?

21             MR. FORBES:  That is what CUFTA says, Your Honor.

22             THE COURT:  And how is that different from equity?

23             MR. FORBES:  Equity I believe in this context --

24   oh, equity in terms of partnership equity?  I'm sorry, Your

25   Honor.

                          Sarah K. Mitchell, RPR, CRR

1         THE COURT:  The equity, as you call it, that the

2    expert talked about was simply the amount by which she

3    testified that the value of the asset exceeded the debt.

4         MR. FORBES:  Your Honor --

5         THE COURT:  You say there's never been a case that

6    has recognized transfer of equity under CUFTA.  I'm asking

7    why isn't every case where the asset exceeds the debt a

8    transfer of what you call equity?

9         MR. FORBES:  Your Honor, because -- there are two

10   things.  One, CUFTA requires you to look at only the assets

11   transferred.  Her calculation of partnership, quote, equity,

12   closed quote, was a -- included items that were not

13   transferred to Lardyn, so that would be one point why that

14   calculation wouldn't be appropriate.

15        THE COURT:  That doesn't respond to my point at

16   all.

17        MR. FORBES:  Well, I think -- okay.  That's why her

18   equity -- second, Your Honor, and this is the point I made

19   earlier, equity is a balance sheet item.  Equity cannot be

20   levied upon.  Equity cannot be sold.  The only thing that

21   can be levied upon and sold are actual tangible or

22   intangible assets, things that can be the subject of

23   property.  In this case, a judgment -- a judgment creditor

24   cannot levy directly upon the assets of a partnership, but I

25   agree that under her charging order she could have

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021   915

1    foreclosed on Mr. Pauling's interest, and could have then

2    had the assets sold, and could have then forced sales of

3    assets to the extent to satisfy her judgment.

4            That was not a remedy that was pursued here.  The

5    remedy instead related to the transfer of specific assets.

6    So that is why I don't believe that the, quote, equity value

7    that's shown by Ms. Lutz as of 4/27/17 in TMR can be the

8    subject of a fraudulent transfer and was not the subject of

9    the fraudulent transfer in this case.  Your Honor, this also

10   goes back to the point that -- this goes back -- well, Your

11   Honor, that is the point.

12           THE COURT:  Okay.  You've answered my question,

13   sir.

14           MR. FORBES:  Thank you.

15           THE COURT:  Do the defendants wish to simply join

16   or do they wish to add to the motion?

17           MS. OLDEMEYER:  I join.

18           MR. KEITHLEY:  We would join this motion, Your

19   Honor.

20           THE COURT:  Does the plaintiff wish to respond?

21           MR. PULKRABEK:  I'll keep my response as succinct

22   as possible, Your Honor.  First, we note that transfer under

23   CUFTA is every mode of a transfer of asset, direct or

24   indirect.  Obviously Mr. Jon Pauling's ownership interest in

25   Two Mile Ranch was his only asset of record, and he -- he

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      916

1    transferred that to the mother of his child by virtue of

2    having TMR assign all of its income producing assets to

3    Lardyn.  So that I think -- there is a transfer here.

4           With respect to the damages argument being made,

5    there's two points.  First of all, damages under the

6    fraudulent transfer act are different from damages for civil

7    conspiracy, and that is established by the Double Oak

8    Construction case that has already been discussed in the

9    briefing.  That case makes it quite clear that the measure

10   of damages for civil conspiracy and CUFTA are different.

11          THE COURT:  Which case?

12          MR. PULKRABEK:  The Double Oak Construction case.

13   Allow me to pull that up, and I can give you a citation to

14   it.  It is *Double Oak Construction vs. Cornerstone*

15   *Development*, 97 P.3d 140, and that is a Colorado Court of

16   Appeals decision from 2003.  And it's really the, I would

17   say -- I would call it seminal case for civil conspiracy to

18   violate the fraudulent transfer act, but it also cites a

19   number of other authorities.

20          THE COURT:  What is the difference in the damages

21   between CUFTA and conspiracy to violate CUFTA?

22          MR. PULKRABEK:  Yes .  So, Your Honor, under the

23   Colorado Uniform Fraudulent Transfer Act under Section 109

24   and 108(c) there are two different measures of damages.  The

25   measure of damages under Section 109 is the value of the

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021   917

1    asset transferred, and I would say the net value, net of

2    debt against it, but what is the value of the asset

3    transferred or collection of assets transferred subject to

4    adjustment as the equities may require.

5            And, Your Honor, yesterday you asked, or invited I

6    would say, some supplemental authorities on that point.  I

7    have my associate working on a brief.  But for now, let me

8    just tell you there's a case on this that I think is fairly

9    instructive by the First Circuit Court of Appeals.  It's

10   called *United States vs. Verduchi*, 434 F.3d 17, First

11   Circuit, 2006.  And that case was addressing the measure of

12   damages under the Uniform Fraudulent Transfer Act as it is

13   implemented in the state of Rhode Island.

14           And in that case the argument was made by the

15   defense that the trial court had improperly considered an

16   increased value of real property in measuring damages based

17   on the increased value.  The First Circuit rejected that

18   argument that it was improper citing the language that I

19   have already referred to, which is the value of the asset

20   subject to adjustment as the equities may require .  And to

21   just quote briefly from that case, the First Circuit said,

22   The statutory authorization in the Uniform Fraudulent

23   Transfer Act for equitable adjustment does not say it is a

24   one-way ratchet.  In discussing the general provision for

25   equitable adjustment, the commentary explicitly provides

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    918

1   protection for the creditor against a diminution of assets

2   by the transferee.  The equitable discretion can surely be

3   used to avoid an unfair windfall to a not-so-innocent

4   transferee at the expense of an undersecured creditor.

5           So that I think is -- that's the nub of the case

6   here.  What we have is -- at least my theory of the case,

7   our theory of the case is Jon Pauling took assets out of his

8   left pocket, and he moved them over to his right pocket.

9   And he did that using Ms. York, who he was in a long-term

10  romantic relationship with, and they had a child together,

11  and it was all done to keep his assets within his family to

12  deny Ms. Wilson the actual or true value of these assets, as

13  is demonstrated by the evidence, would be to give a windfall

14  to Mr. Pauling and his family at her expense.  And so I

15  won't belabor the point.

16          That's one measure of damages under CUFTA.  The

17  other measure of damages, of course, is the value of the

18  asset multiplied by 150 percent if the evidence establishes

19  that the defendants acted with actual intent to hinder,

20  delay, or defraud the plaintiff.

21          THE COURT:  And if I agree with that and add on the

22  50 percent, what does that do to your punitive damages

23  claim?

24          MR. PULKRABEK:  Your Honor, I would want them -- I

25  would ask that you consider running them parallel and not

                     Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ     Bench Trial - Day 5     04/16/2021     919

1   stacking them, because I do think that it could be -- it

2   could be viewed as improper if you awarded the 50 percent

3   penalty and then added punitive damages on that.  So I would

4   fashion an order -- or ask you to fashion an order that

5   considered the damages to run parallel to each other, but

6   that did not result in a duplication of the damages and the

7   total amount.  I hope I was clear enough in what I was

8   trying to describe there, but if you have questions, I can

9   elaborate on that.

10          So then you also asked what about civil conspiracy?

11  Well, civil conspiracy damages are actual damages.  What are

12  the actual damages, and the evidence established through

13  Ms. Lutz yesterday was that the actual damage to Ms. Wilson

14  is, in her opinion, this excess of $3 million figure, $3.5

15  million figure.  She testified that she believed the -- or

16  in her opinion that's what Ms. Wilson's damages are as a

17  result of the transfer.  So you have civil conspiracy

18  damages that are not the same as the CUFTA damages.

19          THE COURT:  Do you agree with Forbes that if you

20  don't prove CUFTA, you can't have a conspiracy?

21          MR. PULKRABEK:  Yes.  Yeah, I would have to concede

22  that.  If there was no violation of CUFTA, then the civil

23  conspiracy --

24          THE COURT:  So the point of the conspiracy then is

25  really to increase the damages.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5        04/16/2021   920

1          MR. PULKRABEK:  Yes.  I think that civil conspiracy

2     allows different damages, and it allows punitive damages

3     under the Double Oak Construction case that I provided to

4     you.  So they are two different measures of damages, and

5     from a policy perspective, it's worse when people conspire,

6     and so the measure of damages should be different.

7          I want to just briefly point out the evidence.  I

8     think there's ample evidence that there was equity in the

9     assets that were transferred.  Ms. Lutz established that, so

10    I won't belabor that point.  With respect to the fair market

11    value argument that I understand Mr. Forbes to be making,

12    it's really an affirmative defense under Section 1091 of

13    CUFTA, and that requires not only payment of fair market

14    value, it also requires good faith, and I don't think the

15    evidence establishes good faith in this case.  So Ms. Lardyn

16    -- Ms. York and Lardyn are not good-faith purchasers in this

17    context, whether or not they can argue they paid fair value.

18    I would submit that the evidence shows on balance they

19    didn't pay fair market.

20          Mr. Forbes -- one of Mr. Forbes's arguments, as I

21    understand it, is he would like to look at the existence of

22    a lien on an asset-by-asset basis, and say, Well, there's

23    $5 million of a lien on this asset, there's 5 million on

24    this one, there's 5 million on this one.  To take that to

25    its logical conclusion, you could break out each trailer and

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021   921

1    each vehicle, and say on this $10,000 trailer, there's

2    $5 million of debt.  That's, we submit, not the way it works

3    at all.

4         You would look at the totality of the assets and

5    the totality of the debt, not on an asset-by-asset basis so

6    that you can exclude each asset from being transferred.

7    That doesn't make sense if it would work that way, and it

8    would facilitate fraud where you might have ten assets each

9    worth $100,000, a single lien of $100,000 that may

10   cross-collateralize each asset, and you could transfer each

11   one of those and say there was never any equity in every

12   single one of them, and you could transfer $900,000 of

13   equity that way.  That would facilitate fraud, so I dispute

14   the reasonableness of Mr. Forbes's argument.

15        And also to the extent that Mr. Forbes is

16   suggesting that there was equity left in Two Mile Ranch that

17   Ms. Wilson should have gone after, there wasn't really any

18   equity in the transfers transferred to Lardyn, but equity

19   was left in Two Mile Ranch.  You heard Ms. Lutz describe it

20   yesterday as a zero-sum game, and it was.  These defendants

21   transferred the income producing assets to Lardyn that were

22   worth $8.8 million or more, and they only got a payment of

23   $7.1 million minus some closing costs for those assets paid

24   to Two Mile Ranch.  So there was a delta there of

25   approximately $1.6 million, and you've seen that in the

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    922

1    evidence.

2            THE COURT:  Approximately what?

3            MR. PULKRABEK:  Well, the differential between the

4    value of assets transferred to Lardyn and the new debt that

5    was used to pay down old debt of TMR, the difference there

6    is $1.6 million, right?  So they took -- that's when they

7    moved the value or the equity to Lardyn, and they kept or

8    held back debt on Two Mile Ranch against the remaining

9    assets, which you then heard they foreclosed upon and sold.

10           If under Mr. Forbes's theory -- if Mr. Forbes'

11   theory is right, what they should have done was paid the

12   additional $1.6 million in addition when they transferred

13   assets to Lardyn, and they leave assets free and clear

14   within Two Mile Ranch.  But they didn't do that, and so

15   that's why it's a zero-sum game.  They decided to hold debt

16   on the assets that they retained in Two Mile Ranch

17   precisely, I would submit, so that Amanda Wilson could not

18   reasonably go after those.  So in conclusion, Your Honor, we

19   oppose the motion.

20           THE COURT:  All right.  Thank you for your

21   arguments.  The lawyers know, possibly the clients do not

22   know, that at this stage of the case the Court is required

23   to assume the truth of the evidence presented by the

24   plaintiff.  Indeed, the Court must also draw all inferences

25   that rationally could be drawn from that evidence in favor

                    Sarah K. Mitchell, RPR, CRR

1    of the plaintiff.  In other words, the Court must construe

2    both the direct and circumstantial evidence in favor of the

3    plaintiff, and then grant the motion to dismiss only if no

4    rational finder of fact could find in favor of the plaintiff

5    despite viewing the evidence that way.

6           I note that in the motion to dismiss, which the

7    other two defendants joined, there was no argument about

8    whether the plaintiff has presented sufficient evidence of

9    the involvement of Jon Pauling, Mark Pauling, the bank, and

10   Lardyn in a scheme to avoid the impact of the judgment

11   against Jon Pauling.  Indeed, there is substantial, and I

12   would say virtually overwhelming evidence in support of that

13   part of the plaintiff's case.  Much of it comes from the

14   documents, and, indeed, from the testimony of bank

15   witnesses.  And I think I said way back toward the beginning

16   of the case that the documents, and now the testimony from

17   the bank personnel, tell the story, and the efforts of the

18   defendants during the case to explain, retract, in one case

19   involving deposition testimony literally to change the

20   record, won't work with this Court.

21          Now to the point that was argued in the motion.

22   The first argument is that there's no evidence that

23   transfers were made under CUFTA because you need expert

24   opinion regarding the value of property.  Setting aside

25   whether the James case stands for that proposition, because

1   the James case was litigated under evidence Rule 701, not

2   702, and was on completely different facts, the record

3   construed in favor of the plaintiff undoubtedly contains

4   evidence from a competent, qualified, and

5   accepted-by-the-Court expert regarding the value of the

6   property on the date that the assets were transferred.

7            The notion argued vigorously by Defendant Lardyn

8   that Ms. Lutz was not qualified to make independent

9   valuations of individual assets has no more force now than

10  it did when it was made, and I think I made that fairly

11  clear.  I want to say that if this were a jury trial, I

12  would stay completely silent.  I virtually never ask

13  questions or intervene in any way in a jury trial setting.

14  But it's not.  It's a bench trial, and therefore, my style

15  has always been to ask questions, to make comments.  Largely

16  I do that because I want the parties to have a sense of what

17  I'm thinking so that they can correct my mistakes and

18  misimpressions.

19           I haven't decided this case, and I won't decide

20  this case until all the evidence is concluded, but when I

21  said to Mr. Forbes I'm not impressed by the argument that

22  just because she isn't qualified to independently evaluate

23  farm equipment that should mean that she can't express an

24  expert opinion in this case, I was, in effect, inviting

25  Mr. Forbes to show me why that wasn't correct.  He has not

19-CV-01224-RBJ        Bench Trial - Day 5        04/16/2021        925

1   done so.

2          Moving on, the second point that was made is that

3   the liens can't exceed the value of the asset.  I think

4   that's probably almost a matter of common sense.  If the

5   asset that was transferred exceeded -- was exceeded by the

6   debt against the asset, it wouldn't be much of an asset.

7   And, of course, if that were the case, in this set of facts

8   one would have to wonder why then would these three parties

9   go to the lengths that they have to create Lardyn, to

10  transfer assets to Lardyn, and so forth, if, in fact,

11  nothing of value was being transferred.

12         I have commented that I think the mistake that was

13  made on the defense side occurred way before this lawsuit

14  started.  Had they just kept out of it, Ms. Wilson would be

15  in a position of having to try somehow to collect the

16  judgment against Jon Pauling, and people like Jon Pauling

17  are not easy to collect against.  Anyone who would do what

18  he did to Ms. Wilson and then not pay any of the judgment

19  and take any responsibility whatsoever for it, and then not

20  even show his face at this trial is not somebody that would

21  be easy to pin down and collect against.  But perhaps, to

22  Ms. Wilson's good fortune, the rest of the defendants

23  couldn't keep their hands off this situation, and that is

24  why they are in the predicament they are in.

25         In any event, to the point, there is expert

                        Sarah K. Mitchell, RPR, CRR

1    testimony unquestionably in my view that the value of the

2    assets transferred exceeded the liabilities on the date of

3    transfer.  Now, the defense can present contrary evidence,

4    of course.  But there is evidence construed in favor of the

5    plaintiff that that, indeed, has been shown.  And then if

6    the Court were to go along with what plaintiff counsel says

7    is the view of the First Circuit and construe that language

8    in CUFTA to adjust according to the equities, then perhaps

9    on that basis the Court could go beyond the value of the

10   asset, or if the Court were to accept the alternative

11   argument that the conspiracy theory has to be evaluated on a

12   completely different basis, the Court could possibly go

13   beyond that as well, but just to the point, there is

14   evidence that the value on the date of the transfer of the

15   assets transferred exceeded the debt, which also I think

16   addresses the curious point about transfer of equity.

17         So the Court finds that there is evidence in the

18   record on which a rational jury could find that CUFTA has

19   been violated, could find that it has been established that

20   the value of the assets on the date of transfer exceeds the

21   value of the debt, and then award an appropriate amount of

22   damages.  Of course, the Court is not making any damages

23   award.  That's not my role at this stage.  Just to say that

24   the plaintiff has the right to have the case decided after

25   all the evidence is in.  Therefore the motion is denied.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021     927

1           MR. FORBES:  Thank you, Your Honor, and I

2     appreciate your indulging me and my argument.

3           THE COURT:  So we'll proceed with the defendants'

4     witnesses after a short break.

5           THE COURTROOM DEPUTY:  All rise.  Court is in

6     recess.

7        (Break was taken from 10:06 a.m. to 10:18 a.m.)

8           THE COURT:  Have a seat.  In terms of timing, I

9     don't know what you all have planned for today, but I know

10    that you set the case for seven days, and so don't you worry

11    that you have to finish today.

12          MS. OLDEMEYER:  There's two attorneys missing, Your

13    Honor.  May I go grab them?

14          THE COURT:  So I was just saying that if you don't

15    finish today, that's okay, because you asked for seven days.

16    We haven't given that to you.  And I have some possible

17    dates, although we've got some real docket issues, but I do

18    want you to know so that nobody thinks they're getting

19    cheated out of time that I added up the time so far.  As of

20    the end of the day yesterday, the plaintiff as of the end of

21    the day yesterday had used 623 minutes.  The defendants

22    collectively have used 772 minutes.  Those were broken down

23    230 to Lardyn, 118 to Mark, and 424 to the bank.  So at the

24    end of the day yesterday, the defendants collectively had

25    used two and a half hours more time than the plaintiff.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5      04/16/2021    928

1   That does not mean that the defendant won't be allowed the

2   additional time they need, but it just means that they've

3   taken good advantage of the time we've had so far to make

4   their points.

5           All right.  Let's go ahead.  Who's going to call a

6   witness for the defense?

7           MS. OLDEMEYER:  I am, Your Honor, and I call

8   Mr. Christopher Gray.

9           THE COURT:  You were in here for a few minutes, and

10  you were out again.

11          THE WITNESS:  I finally made it.

12          THE COURT:  I'm sorry that we had to make you sit

13  outside.  It's just the way we conduct trials.

14                          CHRISTOPHER GRAY

15  was called as a witness and, having been duly sworn, was

16  examined and testified as follows:

17                         DIRECT EXAMINATION

18  BY MS. OLDEMEYER:

19  Q.  State your name, sir.

20  A.  Chris Gray.

21  Q.  And your age?

22  A.  54.

23  Q.  And do you work at Farmers State Bank?

24  A.  I do.

25  Q.  How long have you worked at Farmers State Bank?

                        Sarah K. Mitchell, RPR, CRR

```
19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    929
```

1   A.   About eight years.

2   Q.   And which branch do you work at?

3   A.   I'm in the Dodge, Nebraska, location.

4   Q.   For those who are not familiar with Nebraska, where is

5   Dodge, Nebraska?

6   A.   It's in northeast Nebraska nearest Fremont.

7   Q.   What's the population of Dodge, Nebraska?

8   A.   It's a couple hundred people.

9          THE COURT:  So when you left Dodge to come here, is

10   that what they mean when they say let's get out of Dodge?

11          THE WITNESS:  Exactly.

12          THE COURT:  Or are they talking about a different

13   Dodge?

14          THE WITNESS:  Well, I think they're talking about

15   Dodge, Kansas, but I'm not -- I'm under oath.  I don't want

16   to pretend that's true.

17   Q.   (By MS. OLDEMEYER) And Fremont is another town in

18   Nebraska.  What's the biggest metropolitan classification

19   town?

20   A.   Omaha would be the -- Omaha and Lincoln would be the two

21   you're familiar with.

22   Q.   Can you relate for the Court briefly the positions you've

23   had at Farmers State Bank in the eight years you've been

24   there?

25   A.   Yeah.  I was market president of the bank in Dodge, and

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    930

1    I've been a loan officer, and I started there as a senior vice

2    president, and I'm currently an executive vice president.

3    Q.  And the eight years after Farmers State Bank, is that all

4    the time you had in the banking industry?

5    A.  No.  I've been in banking for about 20 years, and I've

6    been in lending for about 30 years.

7    Q.  Are you related to the Stull family in any way?

8    A.  I'm not.

9    Q.  Do you serve on the board of Farmers State Bank?

10   A.  Yes.

11   Q.  How long have you served on the board?

12   A.  Just shortly after I started, so just about shy of eight

13   years.

14   Q.  Do you also serve on a loan committee?

15   A.  Yes.

16   Q.  How long have you served on the loan committee at Farmers

17   State Bank?

18   A.  The entire time.

19   Q.  Does the loan committee always meet in person, or do you

20   phone in?  How does it work?

21   A.  No.  We rarely meet every -- never meet all in person with

22   our eight locations, so it's always a call-in, but at each

23   location we're -- everybody's there physically.

24   Q.  What's a loan presentation memo?

25   A.  It's our way of analyzing potential credit for approval of

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    931

1    the loan.

2    Q.  And for whose use are loan presentation memos prepared?

3    A.  It's for our internal use.

4    Q.  For Farmers State Bank?

5    A.  Exactly.

6    Q.  I'm going to show you Exhibit 44.  Can you identify for

7    the Court, is Exhibit 44 a loan presentation memorandum dated

8    March 22nd, 2017?

9    A.  Yes.

10   Q.  With the borrower Lardyn Consulting?

11   A.  Yes.

12   Q.  Going through with respect to page 3 of Exhibit 44, do you

13   know who prepares a document like this corn planting 2017

14   summary?

15   A.  I know that it's not the bank.  I can assume it was the

16   customer/borrower.

17   Q.  And page 4 as well?

18   A.  Yes.

19   Q.  We've had testimony about page 6 of Exhibit 44 and the net

20   margin number of 1.635989.  I want to ask you about page 12 of

21   Exhibit 44.  Can you tell me what the net margin there is?

22   A.  It's a negative 1,054,195.

23   Q.  What's a net margin?

24   A.  Well, a positive net margin would indicate that we have

25   equity in our collateral on a discounted basis for what the

Sarah K. Mitchell, RPR, CRR

1   bank uses.

2   Q.  And what's a negative margin mean?

3   A.  The opposite, that we are under water.

4   Q.  And if you go to page 15, does it kind of show the

5   calculation and then any discount applied for assets --

6   actually, it's on the bottom of page 14.

7   A.  Exactly.  The number is the same, negative 1,054,000, and

8   then discounts are coming off -- this is new software that we

9   didn't use for long, but you'll see them coming up here.

10  Q.  Where's the discount -- if the Court were to look at this

11  later, where is the discount that's applied by the bank?

12  Which column?

13  A.  It's the far right.

14  Q.  The header percent colat?

15  A.  Yes.

16        THE COURT:  So when it says available market value,

17  that's the amount of the loan that's outstanding?

18        THE WITNESS:  That would be the value from the

19  borrower's financial statement.

20        THE COURT:  Oh.

21        THE WITNESS:  So we're transferring over financial

22  statement values onto this report, and then indicating that

23  it's a pledged asset or not, and then indicating our

24  discount factor.

25  Q.  (By MS. OLDEMEYER) You talked about software, use of

                    Sarah K. Mitchell, RPR, CRR

1    software.  I'm showing you Exhibit 47, and on the first page

2    -- this is an exhibit from March 28th of 2017 between Dick

3    Stull and JB Suddarth and others, but it mentions attaching

4    the front sheet of our old LPM form showing the collateral at

5    discounted value, and a second sheet showing no discounted

6    value, and then also our new form showing no discounted

7    collateral value.  Do you see that?

8    A.  Yes.

9    Q.  Can you explain what that -- your understanding of that

10   is?

11   A.  Part of it I believe is, although I'm unfamiliar with our

12   new software and our participant banks, and the other is

13   indicating discount values per bank can be different.  It's

14   really an internal policy, and so providing them with the fair

15   market -- the borrower values on the financial statement.

16   Q.  Is JB Suddarth with Henderson State Bank?

17   A.  Yes.

18   Q.  And is that a bank participant?

19   A.  Yes.

20   Q.  In the Two Mile Ranch loans?

21   A.  Yes.

22   Q.  And also the Lardyn loans?

23   A.  Exactly.

24   Q.  And if I go to the next page, is that the next page of the

25   loan presentation memo we reviewed in Exhibit 44?

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    934

1   A.  Yes.

2   Q.  And is it also then the other pages, the credit review

3   pages similar to the previous that we looked at in Exhibit 44?

4   A.  Yes.

5   Q.  Does Farmers State Bank dictate to other bank participants

6   any discount on collateral?

7   A.  No.

8   Q.  In your role at loan committee, do you speak up?

9   A.  Yes.

10  Q.  Is the loan committee just a rubber stamp for Dick or

11  Steve Stull?

12  A.  By no means.

13  Q.  If you vote no in a loan committee to a proposed loan

14  involving a then-existing borrower, what happens?

15  A.  Well, nothing really happens.  Everybody is free to vote

16  at any time for any reason, and we encourage no votes to have

17  an alternative plan or action items or reasons why they voted

18  no.

19  Q.  And with respect to an existing borrower, you're trying to

20  determine what to do with potentially a problematic existing

21  loan?

22  A.  Yeah.  For workout credits such as this, you know, I think

23  we would all -- if no votes made the problem with credit

24  disappear, that would be great.  But we all know what we're

25  dealing with on a workout credit, and so, yes, those are a

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021     935

1    norm because we know we have to work through this and get it

2    resolved.

3    Q.   Where -- where is the charter for Farmers State Bank --

4    where is it headquartered, I guess?

5    A.   It's in Dodge.

6    Q.   So is that the place where service of process is made?

7    A.   It is.

8    Q.   Were you served with this lawsuit in Dodge, Nebraska?

9    A.   Yes.

10   Q.   Do you remember the date?

11   A.   It was June 20th, 2019.

12   Q.   And prior to receiving service of process -- well, what

13   time of day?

14   A.   It was afternoon is the best I can --

15   Q.   Prior to receiving that service of process on June 20th,

16   2019, in the afternoon, did you know Farmers State Bank had

17   been sued by Amanda Wilson?

18   A.   No idea.

19   Q.   And what did you do when you learned the bank had been

20   sued?

21   A.   Called my boss, the CEO, Stephen.

22   Q.   That's Stephen Stull?

23   A.   Yes.

24   Q.   Can you -- in Dodge, Nebraska -- did Dodge, Nebraska, ever

25   get served with a copy of Exhibit 1 -- something like

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5      04/16/2021    936

1   Exhibit 1D, charging order on Two Mile Ranch Colorado General

2   Partnership, D/B/A Two Mile Ranch?

3   A.  No.

4   Q.  Do you know what a charging order is?

5   A.  At the time, no.  I have learned just a little since.

6   Q.  Pulling up --

7           THE COURT:  If it will help you feel better, I've

8   never heard of it.

9           THE WITNESS:  Makes me feel a little better.

10          THE COURT:  It was new to me.

11  Q.  (By MS. OLDEMEYER) I am putting up Exhibit 23, page 3, and

12  actually I'll start at the bottom.  This is an e-mail from

13  Kelly Roach to you on May 10th, 2016, correct?

14  A.  Correct.

15  Q.  And did you respond in the middle of page 2 of Exhibit 23?

16  A.  That's my response.

17  Q.  There's a phrase in the second paragraph, unicorn-like

18  investor group to buy them out of BK.  Does BK stand for

19  bankruptcy?

20  A.  Yes.

21  Q.  And the phrase unicorn-like investor group is in quotes,

22  correct?

23  A.  Correct.

24  Q.  Those are your words on May 10th, 2016, correct?

25  A.  Correct.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5        04/16/2021    937

1   Q.   What did you mean?

2   A.   That's a small-town banker trying to use a big-banker

3   term.   I think that a unicorn investor group is a group of

4   investors wanting a million type of odds of coming together to

5   make a purchase.

6   Q.   Have you ever heard of the expression white knight?

7        THE COURT:   Sorry.   I didn't really hear your

8   answer, and I'm not sure the reporter did either.   Could you

9   repeat that?

10       THE WITNESS:   Sure.   I think --

11       THE COURT:   You don't have to repeat exactly, but

12  what did you mean by unicorn-like investor group?

13       THE WITNESS:   It's -- it's a group of investors

14  that I think you can -- on Google or Wikipedia will show you

15  it's a group of private investors that comes around not so

16  very often to purchase assets or start up a business.   And I

17  have it in quotes because we've been hearing at this time

18  about an investor group for quite a while, and no details

19  had ever been offered and nothing had ever come to fruition,

20  so we were dubious at best about this investor group.

21  Q.   (By MS. OLDEMEYER) Have you heard the expression white

22  knight?

23  A.   Yes, I have.   And to me it means about the same thing.

24  Q.   I want to look at the third paragraph, the last sentence.

25  You say the BK -- does that stand for bankruptcy?

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    938

1   A.  Yeah.

2   Q.  I apologize.  I'm not good with this.  You say the BK

3   really just protects the partnership from the plaintiff for

4   the long run.  Do you see that?

5   A.  Yes.

6   Q.  Who's the plaintiff you're referring to there?

7   A.  Ms. Wilson.

8   Q.  So at this time on May 10th, 2016, you knew Ms. Wilson had

9   a judgment?

10  A.  Yes.

11  Q.  Do you know -- did you know who she had the judgment

12  against?

13  A.  I had the facts at the time, yes.

14  Q.  I'm going to point your attention to 24C.  Exhibit 24C has

15  been received.  It's an e-mail from June 3rd, 2016, and I want

16  to ask you about the bottom portion.  Did you, Chris Gray,

17  receive by forwarding this e-mail Steve Stull sent on

18  June 3rd, 2016, to JB and Don?

19  A.  Yes.

20  Q.  And is JB the JB Suddarth that we -- at Henderson State

21  Bank?

22  A.  The same.

23  Q.  Who's Don?

24  A.  Don is the president and CEO of a bank in McCook, First

25  Central.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5       04/16/2021     939

1  Q.  Was First Central also a participant on the Two Mile Ranch

2  loans?

3  A.  I believe so.

4  Q.  Explain for the Court what you took away from this

5  communication when you received it, if you recall?

6  A.  Just that we're disclosing the facts of the situation as

7  we see them unfolding, and we're asking for their -- giving

8  this information to them to continue to participate in loans

9  with us.

10  Q.  Have you heard testimony about -- the Court has heard

11  testimony about a company called Two Mile Ranch Market

12  Company, LLC.  Are you familiar with that company?

13  A.  Yes.

14  Q.  And what happened to Two Mile Ranch Market Company, LLC?

15  A.  It failed and filed for bankruptcy.

16  Q.  Did it own some equipment to the bank's knowledge?

17  A.  Yes.

18  Q.  And where did the equipment go?

19  A.  We don't know for sure.  It went into storage or -- it

20  never came into our possession.

21  Q.  Was there any recovery for the bank?

22  A.  No.

23  Q.  You mentioned storage.  Who paid the storage expenses for

24  the equipment?

25  A.  You know, I really don't know.  I don't know.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021   940

1          THE COURTROOM DEPUTY:  I apologize to interrupt,

2    but you said 24C was previously admitted.  I didn't have

3    that.  I could be wrong.

4          THE COURT:  Let me look too.  I don't have it as

5    admitted, but it's stipulated.  So if you want to admit it,

6    I'll do that.

7          MS. OLDEMEYER:  I do.  I apologize, Your Honor.  I

8    should check my notes.

9        (Plaintiff's Exhibit 24C received.)

10         THE COURT:  There have been a lot of documents.  I

11   think we all get lost in it sometimes.

12   Q.  (By MS. OLDEMEYER) I'm going to show you another exhibit.

13   Let me check my list here.  This has not been received.  Well,

14   what happened, if you know, to Two Mile Ranch Company, LLC?

15   Market -- excuse me -- Two Mile Ranch Market Company, LLC?

16   A.  I mean, after liquidation and bankruptcy?

17         THE COURT:  I think he already told us the answer

18   to that, didn't he?

19   A.  Well, all I know is they failed and filed bankruptcy, but

20   I don't know after that what became of the company, or if it

21   continues.

22         MS. OLDEMEYER:  I'd offer Exhibit 1025, which are

23   the bankruptcy schedules for several entities including Two

24   Mile Ranch Market Company .

25         MR. PULKRABEK:  Relevance, Your Honor.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      941

1       THE COURT:  It's a stipulated exhibit.  Admitted.

2      (Defendants' Exhibit 1025 received.)

3   Q.  (By MS. OLDEMEYER) I'll show you Exhibit 1050.  Exhibit --

4       THE COURT:  So you put the other exhibit in, but

5   you're not going to use it?

6   Q.  (By MS. OLDEMEYER) With respect to Exhibit 1025, Mr. Gray,

7   were Farmers State Bank's loans to multiple entities in which

8   Jon Pauling had an ownership interest cross-collateralized

9   against each other?

10  A.  Yes.

11  Q.  So if one had assets and defaulted, its assets were

12  available to the bank in the foreclosure process, correct?

13  A.  Yes.

14  Q.  And if another related entity defaulted, the first

15  entity's assets were also subject to the bank's ability to

16  foreclose; is that correct?

17  A.  Yes, that's correct.

18  Q.  And these Two Mile Ranch, LLC, Two Mile Ranch Cattle

19  Feeders Company, LLC, Two Mile Ranch Land Company, LLC, Two

20  Mile Ranch Market Company, LLC, Two Mile Ranch Processing

21  Company, LLC, Pauling Management, LLC, were those borrowers of

22  the bank, to your knowledge?

23  A.  They were borrowers or guarantors, yes.

24  Q.  I've put in front of you Exhibit 1050.  Can you identify

25  for the Court what is Exhibit 1050?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      942

1    A.  This is an e-mail from Richard Stull to loan committee

2    talking about a sale of some real estate by Two Mile.

3    Q.  Are you a recipient of this e-mail?

4    A.  Yes.

5    Q.  And when you say the loan committee, by looking at the two

6    members there you can say those are folks on the loan

7    committee?

8    A.  Several members.  You said two members.

9    Q.  Are those the members?

10   A.  Yes.

11          MS. OLDEMEYER:  We would offer Exhibit 1050.

12          MR. PULKRABEK:  No objection.

13          THE COURT:  All right.  It's admitted.  I think it

14   was already admitted according to my notes.

15       (Defendants' Exhibit 1050 received.)

16          MS. OLDEMEYER:  You can't see me smiling behind my

17   mask, but thank you, Your Honor.

18   Q.  (By MS. OLDEMEYER) Exhibit 1050, what's going on, to your

19   memory, in November of 2016 with respect to Two Mile Ranch's

20   negotiating to sell a 237-acre parcel of land in Weld County,

21   Colorado?

22   A.  If my memory serves, they were trying to sell some

23   property that wasn't vital to their operation with which they

24   could pay down debt.

25   Q.  And the third paragraph says, This contract has to go

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021     943

1   through the bankruptcy court for approval.  Do you see that?

2   A.  Yes.

3   Q.  And then the next paragraph, Hopefully this will start the

4   process for getting contracts signed and before the court.  Do

5   you see that?

6   A.  Yes, I do.

7   Q.  At any point in time did Farmers State Bank desire to not

8   put things before the bankruptcy court, the Chapter 11 for Two

9   Mile Ranch General Partnership, to your knowledge?

10  A.  No.

11  Q.  I'll show you Exhibit 1064.  Exhibit 1064 -- can you

12  identify for the Court what is 1064, because I don't have this

13  one received either.

14  A.  Loan committee meetings -- loan committee minutes dated

15  April 20th, 2017.

16          MS. OLDEMEYER:  We would offer Exhibit 1064.

17          MR. PULKRABEK:  No objection.

18          THE COURT:  Admitted.

19      (Defendants' Exhibit 1064 received.)

20  Q.  (By MS. OLDEMEYER) In this loan committee meeting, it was

21  conveyed to the loan committee that the potential borrower --

22  this was a potential loan to Lardyn Consulting; is that

23  correct?

24  A.  Correct.

25  Q.  And it mentions subject to dismissal from bankruptcy and

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021       944

1   Lardyn is successful in acquiring a loan.  Do you see that?

2   A.  Yes.

3   Q.  Was Lardyn successful in acquiring a loan?

4   A.  No.

5   Q.  Did Farmers State Bank proceed to give Lardyn a

6   $7.1 million loan?

7   A.  Yes, we did.

8   Q.  Why in the world would Farmers State Bank give Lardyn

9   Consulting a $7.1 million loan?  Can you explain that?

10  A.  Yeah.  Simply put, I think that the reason we put

11  ourselves in this position is because, although not ideal by

12  any means, Lardyn and its ownership group was more -- was an

13  improvement for the bank compared to Jon Pauling with his

14  legal issues.

15  Q.  What is the Lardyn ownership group as you understood it?

16  A.  It's Elyce and Mark.

17  Q.  Is that Elyce York and Mark Pauling?

18  A.  Sorry, yes.

19  Q.  With respect to Two Mile Ranch then, I put in front of you

20  Exhibit 1059, which has been received, and I just want to ask

21  you about the last entry there.  Were you at this special loan

22  committee meeting April 7th, 2017?

23  A.  Yes.

24  Q.  And did you vote to approve to loan to Two Mile Ranch, Jon

25  Pauling, Mark Pauling for $2.2 million?

19-CV-01224-RBJ        Bench Trial - Day 5        04/16/2021      945

1   A.  Yes.

2   Q.  Why would you do that?

3   A.  This was the amount carved out of what we referred to as

4   the Turkey Creek property, and we saw this collateral at the

5   time as, again, some collateral that was more advantageous to

6   us, or more marketable.

7   Q.  Was it being marketed?

8   A.  Yes.  For a long time Two Mile Ranch had this property

9   listed.

10  Q.  Was it able to sell it for an amount that would satisfy

11  the $2.2 million obligation?

12  A.  No, unfortunately.

13  Q.  And ultimately the bank took it by way of a deed in lieu?

14  A.  Yes.

15  Q.  Did the bank do that to punish Amanda Wilson?

16  A.  No.

17  Q.  Did the bank charge off some after it took that on as OREO

18  property?

19  A.  Yes.  We charged off our lost half a million dollars.

20  Q.  I want to ask you about Exhibit 61, which has been

21  received into evidence, and I'll start at page 2.  This is a

22  communication from Kelly Roach to you, Chris Gray, on

23  July 26th, 2017.  First of all, July 26th, 2017, to your

24  recollection, had the sale of some of Two Mile Ranch's assets

25  to Lardyn been completed by this time?

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      946

1  A.  Yes.

2  Q.  And what was Kelly Roach reaching out to you about?

3  A.  Just like the last sentence of her e-mail there, she's

4  venting a bit.  You know, all these transactions that were

5  taking place were being primarily documented and prepared by

6  Kelly, and, you know, I think this was keeping her busy, and

7  it was frustrating.

8  Q.  Was the bank being asked to fund a loan at this time in

9  July of 2017?

10  A.  Yes.

11  Q.  What loan?

12  A.  A loan to Pauling Hauling, I believe.

13  Q.  The Court has heard evidence of a -- I believe a $40,000

14  loan to Pauling Hauling.  Is this that loan?

15  A.  Ms. Oldemeyer, I'm not -- you know, we -- I don't

16  recollect.  I think there was a couple loans.  One was for a

17  pickup and a semitrailer, and I don't recollect which we were

18  referring to here.  With the titles involved, I'm thinking it

19  was the vehicle purchase.

20  Q.  Okay.  Did you reply, Mr. Gray, starting at the bottom of

21  page 1 of Exhibit 61 to Kelly Roach?

22  A.  Yes.

23  Q.  And these are your words, correct?

24  A.  Correct.

25  Q.  I'm going to ask you about this sentence:  I hope we are

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    947

1    upgrading, but it seems like we are rewriting all the same

2    loans into different names all still controlled by Jon.  Is

3    that a reference to Jon Pauling?

4    A.  Yes.

5    Q.  Can you explain to the Court what you -- what that means?

6    A.  Yeah, I can try.  We were -- so through this whole

7    process, including with Lardyn and with Ms. York and Mark and

8    now Paul Pauling, again, a lot of activity and proposed sales,

9    and we're financing these vehicles that I believe are being

10   purchased from Lardyn or Two Mile Ranch, and so the bank's

11   strategy again is to improve our position in the best way we

12   can, and so by having this underwritten to Paul, we believed

13   we were achieving that.

14   Q.  And with respect to the next -- the top of this page 2,

15   Are we charging a higher rate of interest to get them out of

16   the bank, question mark, did you write that?

17   A.  Yes.

18   Q.  And by getting them out of the bank, what does that mean?

19   A.  We would prefer that this credit borrower relationship

20   exit the bank.

21   Q.  And Kelly responded, and then you responded to her, TMR to

22   York, correct?

23   A.  Yes.  That was my final response to Kelly.

24   Q.  And that's Two Mile Ranch to York, correct?

25   A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    948

1    Q.  That's Elyce York?

2    A.  Yes.

3    Q.  And she had mentioned in her list here we never get rid of

4    customers.  They just go from one to another, TMR, there's a

5    redaction, then TMR to Lardyn, Lardyn to Pauling Hauling.  Do

6    you see that?

7    A.  Yes.

8    Q.  And you responded, TMR to York, correct?

9    A.  Correct.

10   Q.  I'll show you Exhibit 45 at page 2.  Within Exhibit 45, we

11   looked at multiple pages, but I want to ask you about page 42,

12   that's PDF page 42, debt payment with oil revenue.  Do you see

13   that?

14   A.  Yes.

15   Q.  Is that a document that the bank prepared?

16   A.  No.

17   Q.  Does the bank have any relationship with Bank of Colorado?

18   A.  No.

19   Q.  If the bank didn't prepare it, why is it in the bank's

20   records?

21   A.  We will include useful borrower information when we're

22   analyzing a loan.

23   Q.  I'll show you 1067.  Once the sale to certain TMR assets

24   to Lardyn occurred, did the bank collateralize the loan to

25   Lardyn?

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021     949

1  A.  Yes.

2  Q.  Is Exhibit 1067 a deed of trust against the Logan County

3  property that became titled in the name of Lardyn Consulting?

4  A.  Yes.

5          MS. OLDEMEYER:  I would offer Exhibit 1067.

6          MR. PULKRABEK:  No objection.

7          THE COURT:  Okay.  1067 admitted.

8      (Defendants' Exhibit 1067 received.)

9  Q.  (By MS. OLDEMEYER) And then with respect to Exhibit 1068,

10 is that the deed of trust that the bank recorded against the

11 property in Logan County, Colorado, that Two Mile Ranch

12 General Partnership transferred to Lardyn Consulting?

13 A.  Yes.

14         MS. OLDEMEYER:  We'd offer Exhibit 1068.

15         THE COURT:  Okay.  1068, that's stipulated, I'll

16 admit it.

17     (Defendants' Exhibit 1068 received.)

18 Q.  (By MS. OLDEMEYER) What is Two Six Too, and those are

19 spelled out, T-w-o S-i-x T-o-o.  What is that?

20 A.  It's an investment club in Bridgeport, Nebraska.

21 Q.  And are Stull family members in that investment club?

22 A.  I believe Stephen Stull and Mike Stull.

23 Q.  Have you known that since you first heard of it?

24 A.  Yes.

25 Q.  Is there anything wrong with a banker being part of an

                    Sarah K. Mitchell, RPR, CRR

1  investment group?

2  A.   No.

3  Q.   Is there anything wrong with a bank participating with a

4  private investment group?

5  A.   No.

6  Q.   With respect to Exhibit 1046, which has been received into

7  evidence, did you review the proof of claim for Farmers State

8  Bank that would be filed in the Chapter 11 bankruptcy case?

9  A.   I would have looked at it, yes.

10  Q.   And with respect to the value of property, what was the

11  representation to the bankruptcy court of the value of the

12  property there?

13  A.   $8,963,500.

14  Q.   I'll show you Exhibit 1043, which has been admitted into

15  evidence.  Exhibit 1043 is a 30-page document, and I'll

16  represent to you that these are bankruptcy schedules filed by

17  Two Mile Ranch in its bankruptcy case.  Do you see the total

18  of all property on the first page of --

19  A.   Yes.

20  Q.   -- Exhibit 1043?  And what's that number?

21  A.   It's -- if you might move your cursor -- $8,870,800.

22  Q.   I'll leave that there just to make it difficult for you,

23  sir.  I'll ask you, and then I'll cover it up.  Is that higher

24  or lower than the eight -- the bank's proof of claim value on

25  the collateral?

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    951

1              THE COURT:  This is going to be a tough one for

2    you.  Think hard on it now.  Is 963 higher or lower than

3    830?

4    A.  That's higher.  I'm always looking for a trick question.

5              THE COURT:  It might have been.  You never know.

6    Q.  (By MS. OLDEMEYER) Go back --

7              THE COURT:  I'm just teasing Ms. Oldemeyer.  It's

8    one of my favorite activities.

9    Q.  (By MS. OLDEMEYER) I just want to make sure we have this

10   nailed down.  I'm going to go back to page 2 of Exhibit 1046,

11   and the value of property is 8.9 million, correct?

12   A.  Yes.

13   Q.  And then on the borrowers proof of claim they put a total

14   value of all property at 8.8, correct?

15   A.  Yes.

16   Q.  And so that's lower?

17   A.  Yes.

18   Q.  I'll turn your attention to page 5 in the schedules.  Is

19   there a listing there in Section 55 for the Logan County farm

20   and ranch?

21   A.  Yes.

22   Q.  And the Turkey Creek property in Morrison, Colorado?

23   A.  Yes.

24   Q.  And it has appraisal here, correct?

25   A.  Correct.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    952

1   Q.  I'll represent to you that page 18 are amended schedules

2   filed January 18th, 2017.  Do you see that?

3   A.  Yes.

4   Q.  And in these schedules it's representing in Section 13

5   prior transfers, correct?

6   A.  Correct.

7   Q.  And had Two Mile Ranch General Partnership sold some

8   property to Cervi Enterprises and some minerals to Cervi

9   Enterprises?

10  A.  Yes.

11  Q.  So this 917,000 and 205,000, those were numbers the bank

12  knew?

13  A.  Yes.

14  Q.  And then with respect to the Mark Pauling North Ranch,

15  that's listed there for a million dollars, correct?

16  A.  Correct.

17  Q.  And that's something the bank knew, correct?

18  A.  Yes.

19  Q.  And then on page 26, in the amended schedules on

20  January 18th, 2017, Section 55, the first two items are listed

21  there, Logan County and Morrison, and now there's in 55.3 the

22  240 acres of undeveloped land.  Do you see that?

23  A.  Yes.

24  Q.  And there's a value listed for 96,000.  Do you see that?

25  A.  Yes.

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    953

1   Q.  Did that -- is that -- we looked at an e-mail earlier

2   about a sale to the Stanleys.  Do you recall that?

3   A.  Yes.

4   Q.  Is this the same property that was sold to the Stanleys?

5   A.  Yes.

6   Q.  Do you recall what the sale price was?

7   A.  Sorry.  I don't.

8   Q.  Okay.  Are you familiar with Exhibit 134, which has not

9   been received into evidence.  It's Farmers State Bank's

10  objections and answers to plaintiff's interrogatories.

11  A.  Yes.

12  Q.  And were you aware at some point in time the bank was

13  asked to produce internal e-mails?

14  A.  Yes.

15  Q.  And did the bank do so?

16  A.  Yes.

17  Q.  And did the bank do so through its attorneys representing

18  -- who were agents of Farmers State Bank?

19  A.  Yes.

20          MS. OLDEMEYER:  I'd offer Exhibit 134.

21          THE COURT:  Why?

22          MS. OLDEMEYER:  I think, Your Honor, for purposes

23  of the allegation that the bank is hiding things, I wanted

24  to --

25          THE COURT:  I don't know if anybody is alleging

19-CV-01224-RBJ     Bench Trial - Day 5     04/16/2021    954

1   that they're hiding internal e-mails.  On the contrary,

2   their internal e-mails have been very hurtful to them, and

3   they produced them anyway, and I'm proud of them for that.

4           MS. OLDEMEYER:  Your Honor, thank you.  I

5   appreciate that.  But I wanted to put the question in front

6   of the Court, and I don't think I have the right exhibit

7   number up.

8           THE COURT:  Well, the Court takes judicial notice

9   of the files of its own case, so you don't technically have

10  to put that in evidence, but I'm just wondering what the

11  point is.  Is somebody accusing the bank of playing fast and

12  loose with the discovery rules?

13          MS. OLDEMEYER:  Yes, Your Honor.

14          THE COURT:  I haven't heard that.

15          MS. OLDEMEYER:  I believe it will be the basis of

16  argument, and so in anticipation of arguments, I would like

17  to shut them down in advance.

18          THE COURT:  I don't know.  Are you going to argue

19  that?

20          MR. PULKRABEK:  Your Honor, you presided over the

21  discovery hearings in this case.  You're already familiar

22  with what happened.

23          THE COURT:  Well, I don't remember anything that

24  happened before yesterday.

25          MR. PULKRABEK:  Your Honor, there were discovery

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    955

1   disputes to get the bank's internal e-mails, which then were

2   produced, which then have become the subject of the case,

3   and that was -- that was a discovery hearing that happened

4   in November of 2020.  You ordered the bank to produce the

5   documents on or before November 30th.  They did.  We got the

6   documents that we're looking at, and that happened.

7         MS. OLDEMEYER:  Exhibit 136 is the exhibit that I

8   would like to offer that plaintiff has included in their

9   exhibits, so I would offer Exhibit 136.

10        THE COURT:  136.  What's that?

11        MS. OLDEMEYER:  Those are Farmers State Bank's

12  objections and second supplemental responses to plaintiff's

13  third set of requests for production of documents.

14        MR. PULKRABEK:  Well, and, Your Honor, I will note

15  that I put them on the exhibit list anticipating I might

16  need to use them for impeachment or some other purpose.  I

17  did not anticipate Farmers State Bank wanting to offer them

18  for its own purposes, and I would object to that because

19  it's hearsay to the extent that they're offering it to prove

20  the truth of the matter that they are asserting.

21        THE COURT:  I don't know that it's hearsay.  It's a

22  document in the case.  But what's the point?

23        MS. OLDEMEYER:  Again, Your Honor, many, many

24  arguments have been made in this case.  I don't know when

25  certain ones stop, so really for the appellate record

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5        04/16/2021      956

1    probably.

2          THE COURT:  Well, for the appellate record, I'm

3    satisfied that the bank has been very forthright in

4    producing its internal documents.

5          MS. OLDEMEYER:  Thank you, Your Honor.  We would

6    still offer Exhibit 136 for the scope of the request because

7    I think there might be argument about delay that prejudiced

8    their expert's ability to respond, and Exhibit 136 has the

9    actual specific request as it came in, my objection, how the

10   discovery dispute was resolved by Court order, and --

11         THE COURT:  Has this document been filed in the

12   Court's file?

13         MS. OLDEMEYER:  It has not since it's discovery.

14         THE COURT:  Okay.  I'll admit it, but it seems like

15   you're -- I mean, until you raised the point, I hadn't even

16   thought that the bank was not producing documents.  You've

17   --

18         (Plaintiff's Exhibit 136 received.)

19         MS. OLDEMEYER:  That's very reassuring.

20         THE COURT:  You've raised it.

21         MS. OLDEMEYER:  It's always a concern, and I

22   appreciate that.

23         THE COURT:  I haven't made any secret of the fact

24   that I think the bank in some of those documents has cooked

25   its own goose.  But my point is they produced them.  They

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5        04/16/2021   957

 1   didn't hide them.  They didn't deep-six them.  They didn't

 2   trash them.  They didn't shred them.  They did the honorable

 3   thing and produced them.

 4           MS. OLDEMEYER:  Thank you, Your Honor.

 5           THE COURT:  In my view.

 6   Q.  (By MS. OLDEMEYER) Mr. Gray, I just have a few more

 7   questions for you.  We're done with the paper.  You are aware

 8   that the allegations in this case are that Farmers State Bank

 9   representatives conspired with Jon Pauling, Mark Pauling, Two

10   Mile Ranch General Partnership, Elyce York, and Lardyn

11   Consulting, or any one of them to prevent Ms. Wilson from

12   collecting her multimillion-dollar judgment.  You are aware of

13   that, aren't you?

14   A.  Yes.

15   Q.  Is that allegation true?

16   A.  Absolutely not.

17   Q.  Do you personally have any motive to hurt Ms. Wilson?

18   A.  I do not.

19   Q.  Do you even know her?

20   A.  No.

21   Q.  To your knowledge, does anyone else at Farmers State Bank

22   have any motive to prevent Ms. Wilson from collecting her

23   judgment?

24   A.  We have none whatsoever.

25   Q.  In the decision-making process that the bank had with

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5      04/16/2021    958

1    which you are personally familiar, from January 1st, 2016,

2    until this day in this room, who is the bank's number one

3    concern?

4    A.  It's managing our own risk.

5    Q.  Does Farmers State Bank want to do business with convicted

6    felons?

7    A.  No.

8          MS. OLDEMEYER:  No further questions, Your Honor.

9          THE COURT:  Okay.  Since all these bank people are

10   here, I will say to them I don't see any evidence that they

11   had a motive to hurt Ms. Wilson.  They had a motive to help

12   the bank, but in the process it appears to me they hurt

13   Ms. Wilson.

14         Okay.  Who wants to cross-examine Mr. Gray?

15   Plaintiff would have the first shot.

16         MR. PULKRABEK:  Well, Your Honor, I suppose I would

17   like to reserve my cross until after the defense has asked

18   all their questions.

19         THE COURT:  That's okay.  You can do that.  I don't

20   know if the other defendant lawyers want to ask any

21   questions or not.  I didn't think they would, but they --

22   maybe they do.

23         MR. FORBES:  I had a couple questions, Your Honor.

24         THE COURT:  Sure.  Fine.

25

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    959

1                              CROSS-EXAMINATION

2    BY MR. FORBES:

3    Q.  Mr. Gray, you may not remember this, but you referred to

4    the Turkey Creek property as better collateral or words to

5    that effect.  Do you remember that?

6    A.  Yes.

7    Q.  Well, why was that better collateral and better collateral

8    than what?

9    A.  So a mountain -- so what was presented to us as a

10   desirable mountain retreat would have been a piece of property

11   that we think would have been very marketable.

12   Q.  Okay.  As opposed to what?  You said it was better, so

13   usually that's a comparative.

14   A.  Well, as opposed to the ranch, the farm/ranch collateral.

15   Q.  And so why is a marketable property a better collateral

16   than the farm and ranch property that they previously had?

17   A.  More marketable in our view.  More desirable to a larger

18   population.

19   Q.  And do you know whether that transaction involved what's

20   known as a 1031 exchange?

21   A.  Yes.

22   Q.  And what was your understanding of how the fact that that

23   was a 1031 exchange was significant, if at all, to that

24   transaction?

25   A.  It introduced some timelines.

                          Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      960

1   Q.  Can you explain?

2   A.  There's -- there's a certain amount of time that a person

3   with a 1031 exchange has to make a purchase.  As far as what

4   those dates are, I'm not the right person to tell you.

5   Q.  Okay.  All right.  Fair enough.  You know the concept of

6   what a 1031 is.  You just don't know the details?

7   A.  Yes.

8   Q.  And was whether Ms. York lived at the Turkey Creek

9   property or didn't live there, did that play any -- in your

10  participation, did that play any role in the bank's decision

11  to agree to the Turkey Creek transaction?

12  A.  Never came into any decisions or conversations that I had.

13  I'm not sure that place is habitable, to be honest with you,

14  from what I saw out there.

15  Q.  So I think that's to say that the bank -- I'll ask this

16  question.  Did, therefore, the bank's decision to make the

17  loans associated with Turkey Creek have anything to do with

18  creating a place for Ms. York to live?

19  A.  No.

20  Q.  It might have been Jon Pauling's idea, or part of it, but

21  that wasn't the bank's idea?

22  A.  No.

23  Q.  Okay.  You also said something, and this is -- I wrote it

24  down, and I might have the words wrong, but something to the

25  effect of that the financing -- the Lardyn acquisition of some

19-CV-01224-RBJ     Bench Trial - Day 5     04/16/2021    961

1    of Two Mile Ranch's assets was a better option for the bank

2    than leaving them in Two Mile Ranch?

3    A.  Well, yeah.  We were simply eliminating Jon from the

4    equation, and that was an improvement.

5    Q.  Okay.  Now, Jon was an experienced rancher and experienced

6    farmer, right?

7    A.  Correct.

8    Q.  And we've seen a lot of documents showing that he was the

9    partner of Two Mile Ranch that had financial acumen in terms

10   of dealing with the bank and things like that, right?

11   A.  That's correct.

12   Q.  All right.  And Ms. York didn't have any financial acumen

13   at the time, no operating experience at the time?

14   A.  No.

15   Q.  Nothing at the time that would make her a feedlot owner.

16   Were you aware of that?

17   A.  Am I aware of that?

18   Q.  Were you aware of that at the time?

19   A.  Yes.

20   Q.  So why is making a $7.1 million loan to a partnership

21   consisting of Ms. York -- excuse me -- a limited liability

22   company consisting of Ms. York and Mark Pauling a better

23   option than just foreclosing on the -- foreclosing on the

24   assets, auctioning them off at bankruptcy?  I mean, I guess

25   that's really one of the questions in the case is why did the

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021    962

1  bank do this rather than just do that, foreclose or go through

2  an auction or some other thing?

3  A.   That's a great question, and one we struggled with, but

4  our belief, and some of it comes towards our bias as a

5  community bank, that working these -- that a workout or an

6  ongoing operation can provide better risk management for us

7  and more income in the future as opposed to what the bigger

8  bank approach might be of just foreclosing and liquidating,

9  which we certainly ran up the flagpole and almost got there,

10 but this seemed a viable plan to us, and we knew during this

11 critical transaction phase that Mark also had a good amount of

12 expertise, and we had a faith that Elyce -- Ms. York would be

13 able to learn, and she knew that she would seek and ask for

14 help where she needed it, and this would include with Jon.

15         MR. FORBES:  All right.  Those are all the

16 questions I have, Your Honor.  Thank you.

17         Thank you, Mr. Gray.

18         MR. KEITHLEY:  Your Honor, I do have a few

19 questions.

20         THE COURT:  Just a second, please.

21         Okay.  Mr. Keithley, your turn.

22         MR. KEITHLEY:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24 BY MR. KEITHLEY:

25 Q.  Good morning, Mr. Gray.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    963

1   A.  Good morning.

2   Q.  My name is Livingston Keithley.  I represent Mark Pauling

3   and Two Mile Ranch.  We've never met, have we?

4   A.  No.

5   Q.  And we've never corresponded?

6   A.  No.

7   Q.  I'm going to ask you a couple questions just to follow up

8   on your testimony this morning.  I understand you've been here

9   since Wednesday, so thank you for sticking around.  I want to

10  follow up on your answer a moment ago to Mr. Forbes' question

11  about running -- if I understood it right, did you testify

12  that you ran potential foreclosure of TMR's assets up the

13  flagpole and almost got there?  That's what you were referring

14  to?

15  A.  Correct.  During -- I believe the timeframe was during

16  their bankruptcy filing, we had sent demand notices and were

17  working out plans for liquidation.

18  Q.  Can you briefly describe for the Court, please, what some

19  of the considerations you recall were in trying to evaluate

20  whether you wanted to foreclose on these assets or not?

21  A.  Right.  So after considerable time trying to collect these

22  loans, foreclosure and liquidation does become a real

23  opportunity -- or a real option for us.  And so as we started

24  that process and learned fairly quickly I think that we

25  weren't -- that the liquidation was not going to go well, and

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021    964

1    I think it largely had to do with the reputation for Jon and

2    his lawsuit, that we -- that asset sales were not going to go

3    well, and so that's when we looked for different plans.

4    Q.  Based on the -- well, let me ask a foundational question,

5    please.  Did you yourself do any particular financial analyses

6    to determine whether or not foreclosure of the assets would

7    satisfy Two Mile Ranch's debt?

8    A.  I did not, no.

9    Q.  Did you see any financial analyses of whether foreclosure

10   of the assets would satisfy that debt?

11   A.  Yes.

12   Q.  And based on those analyses that you saw, was there any

13   conclusion at any point in time that foreclosure would have

14   satisfied all the debt?

15   A.  Foreclosure would not have satisfied the debt, and that's

16   an ongoing thing throughout this loan relationship.  We've

17   always known that the bank was under water, and so working out

18   despite that was our goal.

19   Q.  Based on the condition of Two Mile Ranch during this

20   bankruptcy time period, it's fair to say the -- as one would

21   say, the vultures were circling?

22   A.  Correct.

23   Q.  Have you ever met Mark Pauling?

24   A.  No.

25   Q.  At least not before the trial here.  Do you see him

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021      965

1    silting at my left today?

2    A.   We have never been truly introduced here either.

3    Q.   Mr. Gray, let me introduce you to Mark Pauling.

4    A.   Hey, Mark.

5    Q.   Okay.  If I call something taking a flier, do you know

6    what that possibly means?

7    A.   I don't think I'm familiar with that term.

8    Q.   You never heard that term?  Let me ask the question this

9    way then, Mr. Gray.  Is it fair to say that when the bank

10   agreed to the transfer of these assets from Two Mile Ranch to

11   Lardyn, they prospectively believed there was a possibility

12   that there could be a turnaround and improvement in asset

13   value, but it was not yet guaranteed?

14   A.   That's most definitely true, and we were very hopeful.  I

15   would clarify that we think this was a sale, not a transfer,

16   that Two Mile Ranch sold the assets to Lardyn.

17   Q.   And based upon that as only a possibility, is it also fair

18   to conclude that the bank believed -- the bank believed that

19   if that possibility didn't come to fruition, that these assets

20   didn't ultimately improve in value, it still had the option to

21   foreclose upon them from Lardyn?

22   A.   Yeah, of course, yes.

23   Q.   And it was in no worse position than it was trying to deal

24   with Two Mile Ranch?

25   A.   That's true.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    966

 1          MR. KEITHLEY:  Thank you, Mr. Gray.  I don't have

 2   any further questions.

 3          THE COURT:  All right.  Cross-examination by the

 4   plaintiff?

 5          MR. PULKRABEK:  Yes, Your Honor.

 6                    CROSS-EXAMINATION

 7   BY MR. PULKRABEK:

 8   Q.  Good morning, Mr. Gray.  I represent Amanda Wilson in this

 9   lawsuit.

10   A.  Morning.

11   Q.  I want to start by following up on some questions that

12   Ms. Oldemeyer asked you about the day that you were served

13   process in this case, and it's my understanding that you

14   called Steve Stull?

15   A.  Yes.

16   Q.  Now, did Mr. Stull indicate to you that he was already

17   aware of the lawsuit?

18   A.  No.

19   Q.  And was it -- did I understand your testimony to be that

20   you did not know of the lawsuit?

21   A.  The lawsuit against the bank we did not know about, no.

22   Q.  And did you testify that to your knowledge nobody else

23   knew about the lawsuit either?

24   A.  I testified -- I can't testify to what anybody else knew.

25   I know nobody at the bank -- I believe nobody at the bank knew

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    967

1    about the lawsuit.  This service was a surprise to us.

2    Q.  I'd like to ask you about a statement that Steve Stull

3    made after you informed him, I presume, of the service.  And I

4    want to focus on this question, see if it helps jog your

5    memory as to anything.  So the statement that -- there was a

6    text message that Mr. Stull sent here.  Do you see -- do you

7    see the text message?  I'm sorry.  I'm not plugged in.  So I'm

8    going to show you a part of Exhibit 131.

9            MR. FORBES:  Your Honor, might I just raise

10   something here?  We've heard some testimony about

11   retraumatization, and it appears that if we go through this

12   counsel may be retraumatizing his client with her presence.

13   Obviously she's entitled to be here, but I just raise that

14   as a consideration that we might want to consider.

15           THE COURT:  Well, I think that plaintiff counsel

16   and the plaintiff are going to have to make a decision on

17   that, but I don't think it's for me or even for you,

18   Mr. Forbes --

19           MR. FORBES:  It's not for me.

20           THE COURT:  -- to shut him off.

21           MR. FORBES:  No.  No, Your Honor.

22           THE COURT:  I'm not exactly sure why you're doing

23   this.  The document is already in evidence.

24           MR. PULKRABEK:  Your Honor, I'm not doing it for a

25   gratuitous purpose.  I have an actual question about this.

                         Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021     968

 1              THE COURT:  Okay.
 2   Q.  (By MR. PULKRABEK) So you see the statement in front of
 3   you --
 4              THE COURT:  How can he see the statement?  Oh, this
 5   is the text here now.
 6              MR. PULKRABEK:  Yes.  This is the text message.
 7              THE COURT:  And it's exhibit which?
 8              MR. PULKRABEK:  It's Exhibit 131.
 9              THE COURT:  Thank you.
10   Q.  (By MR. PULKRABEK) So Mr. Stull's statement at 6/20/2019,
11   12:58, is in front of you, and that would be consistent with
12   about the time when you told Mr. Stull about the service of
13   process?
14   A.  Yes.
15   Q.  Okay.  So the question I have for you is this.  Mr. Stull
16   says, Looks like we just got served by the bitch as well.  Do
17   you see the as well on there?
18   A.  I do.
19   Q.  Okay.  So do you recall Mr. Stull expressing that he was
20   aware that other parties to the lawsuit had also been served
21   with process?  Did he mention that to you?
22   A.  No.
23   Q.  Okay.  Next -- next question.  With respect to
24   Exhibit 1064, the loan meeting minutes, I want to make sure I
25   understand this.  This is a set of meeting minutes from

                    Sarah K. Mitchell, RPR, CRR

```
19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    969
```

1  April 20th, 2017?

2  A.  Yes.

3  Q.  Okay.  And was it your testimony based on these minutes

4  that Lardyn was still looking for a loan?

5  A.  Yes.

6  Q.  And you sit on the loan committee?

7  A.  Yes.

8  Q.  Isn't it a fact that the loan committee had already had a

9  special meeting prior to April 20th to approve the Lardyn

10 loan?

11 A.  Show me those minutes, and I'll look at them.

12 Q.  All right.  Let's look at Exhibit 44.

13 A.  This was a long time ago.

14 Q.  And Exhibit 44, if we scroll through this, on the sixth

15 page of this document there's a note here with respect to the

16 Farmers State Bank of Dodge credit review committee.  Do you

17 see that?

18 A.  This is a presentation to the loan committee, yes.

19 Q.  Right.  And we can see that the commitment amount was

20 7.1 million, correct?

21 A.  Correct.

22 Q.  And that was for Lardyn, correct?

23 A.  Correct.

24 Q.  And then the note down in the lower corner is approved,

25 4/7/17, special meeting, 8-0.

19-CV-01224-RBJ        Bench Trial - Day 5        04/16/2021        970

1    A.  Yes, that's correct.

2    Q.  So that's inconsistent with what we saw in the minutes for

3    4/20/2017 saying that Lardyn is still looking for a loan?

4    A.  If -- will you take me back to those?  I can't explain the

5    dates there.  I don't know what to -- how to explain that

6    part, to be honest.

7    Q.  All right.  Next set of questions.  I heard you say that

8    Lardyn was preferable to Jon Pauling because of Jon Pauling's

9    legal issues.  Did I understand that correctly?

10   A.  Yes.

11   Q.  And you also testified that you are aware that Jon

12   Pauling's legal issues included Amanda Wilson's judgment?

13   A.  Yes.

14   Q.  The final set of questions I have for you, Mr. Gray,

15   concern the proof of claim that you were asked about.  Let me

16   see if I can pull that document up.

17              THE COURT:  1046.

18              MR. PULKRABEK:  Yes.

19   Q.  (By MR. PULKRABEK) So here we have the proof of claim

20   document.  Do you see that, Mr. Gray?

21   A.  Yes.

22   Q.  And the proof of claim here is -- has the amount of the

23   value of the property.  You talked some about that.  Do you

24   see that?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    971

1    Q.  All right.  Do you see just the date of the filing here is

2    2/27/17?

3    A.  Yes.

4    Q.  Okay.  I want to see if we can -- I want to look at some

5    various figures here with respect to this proof of claim.  So

6    I'm going to put a column for proof of claim, and then I'm

7    going to have a column for bank documents, okay?  And so the

8    date on the proof of claim we established was February 2nd of

9    2017.  Was that accurate -- or February 27, 2017, correct?

10   A.  Correct.

11   Q.  So I'll just put that here, 2/27/17.  And can you read for

12   me the value of the property that is listed there?

13   A.  8,963,500.

14   Q.  Okay.  So that's what the bank was representing in its

15   bankruptcy filing was the value of the property as of that

16   time?

17   A.  Yes.

18   Q.  Okay.

19   A.  If that was a question.

20   Q.  Now, let's look at some other exhibits.  Let's look at

21   Exhibit 21.

22        MR. PULKRABEK:  I'm not sure that Exhibit 21 was

23   previously admitted, Your Honor.

24        THE COURT:  No, I don't have it as previously

25   admitted or stipulated.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    972

1   Q.  (By MR. PULKRABEK) Let me ask you about this document,

2   Mr. Gray.  Is this an e-mail that you received from Steve

3   Stull on February 5th, 2016?

4   A.  Yes.

5   Q.  And is the subject Two Mile Ranch?

6   A.  Yes.

7           MR. PULKRABEK:  I move to admit the exhibit.

8           MS. OLDEMEYER:  No objection, Your Honor.  Your

9   Honor, I guess for clarification, Exhibit 21 is consumed

10  within Exhibit 1080, which has been received.  1080 just has

11  a few more pages.

12          THE COURT:  Okay.  Any objection to 21?

13          MR. FORBES:  No, Your Honor.

14          MR. KEITHLEY:  No, Your Honor.

15          THE COURT:  Okay.  It's admitted.

16      (Plaintiff's Exhibit 21 received.)

17  Q.  (By MR. PULKRABEK) So, Mr. Gray, we see that on

18  February 5th, 2016, this e-mail is sent to you, and there are

19  some different pages to it.  So I want to start with this

20  second page.  It's the TMR May 2015 balance sheet, and it is

21  signed by Jon Pauling 5/1/15, okay?  Do you see that?

22  A.  Yes.

23  Q.  So understanding that that's Jon Pauling, not the bank's

24  document, per se, I'd like to just add that in this column,

25  5/1/15, and what is the total equity that Jon Pauling has

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    973

1    listed for TMR there?

2    A.   This is not a bank document just so we make sure.

3    Q.   We all understand.

4    A.   Okay.  14,865,000.

5    Q.   Okay.  Now, going down a little bit further in this

6    particular document, there's a loan presentation memo slash

7    review.  Do you see that?

8    A.   Yes.

9    Q.   And this was by Dick Stull?

10   A.   Correct.

11   Q.   Okay.  There is a collateral analysis on this particular

12   document, correct?

13   A.   Yes.

14   Q.   And if we wanted to look at the date of it, what's the

15   date?

16   A.   May 7th, 2015.

17   Q.   Okay.  So if we want to use that date, let's put May 7th,

18   5/7 slash 15, and what does the bank on its own collateral

19   analysis say to be the value of the total collateral?

20   A.   This would be $14,420,000.

21   Q.   14,420,000?

22   A.   Correct.

23   Q.   Okay.  You see that if we go further down here, there's

24   kind of a dangling page here that appears to be after some

25   discounting by the bank with the bank's discounted value.  Do

19-CV-01224-RBJ       Bench Trial - Day 5      04/16/2021    974

1   you see that?

2   A.  Yes.

3   Q.  So even the bank's discounted value is what?

4   A.  Would you scroll up a little bit, Mr. Pulkrabek, because

5   that same information should be up above.  I just want to make

6   sure it's part of the very first page.

7   Q.  Okay.  If you see it here --

8   A.  Right there.  10,105,500.  There you go.

9   Q.  Very good.  So let's just go ahead and put a slash here.

10  And what was that figure?

11  A.  10,105,500.

12  Q.  Now, let's look at another document that is already in

13  evidence.  It's Exhibit 34.  So in Exhibit 34 we have an

14  e-mail from Richard Stull to a number of people in the bank,

15  including yourself, correct?

16  A.  Correct.

17  Q.  And this is the watch list report e-mail.  Do you see

18  that?

19  A.  Yes.

20  Q.  Okay.  And if we go down to just the first page here, we

21  can see that the borrower listed on this page is TMR, et al.

22  Do you see that?

23  A.  Yes.

24  Q.  All right.  And on this page there is a collateral

25  analysis.  Do you see that?

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      975

1   A.  Yes.

2   Q.  If we go up -- well, what is the collateral analysis?  Do

3   you see it?  Total collateral?

4   A.  Yes.

5   Q.  What is the amount?

6   A.  $11,724,652.

7   Q.  So I'm going to write that down.  Can you give me the

8   figure again, please?

9   A.  $11,724,652.

10  Q.  Okay.  And then if we go up, there's a date on these

11  things, correct?

12  A.  Correct.

13  Q.  Okay.  And what's the date on this one?

14  A.  November 30th, 2016.

15  Q.  Okay.  Let's look at another document.  Exhibit 44, this

16  was the special meeting document.  If we go up to the first

17  page, there's a loan presentation memo for Lardyn Consulting.

18  Do you see that?

19  A.  Yes.

20  Q.  What's the date on that?

21  A.  March 27th, 2017.

22  Q.  Now, there's a list of collateral, collateral analysis

23  here that includes several assets that were still then owned

24  by Two Mile Ranch, correct?

25  A.  Correct.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5        04/16/2021      976

1   Q.  But this list of collateral, this is the list of

2   collateral that's going to Lardyn, correct?

3   A.  Yes, in the sale.

4   Q.  So it does not include the North Turkey Creek property; is

5   that right?

6   A.  Yes.

7   Q.  All right.  And so if -- and the North Turkey Creek

8   property was how much?  Do you recall?

9   A.  I can tell you that it was 2.4, 2.2 million.

10  Q.  That's your recollection.  All right.  Let me -- let me go

11  ahead and write this down, and we'll make a note that it does

12  not include the property.  So 3/22/2017, I'm going to have you

13  read the value to me.  What's the value?

14  A.  8,735,745.

15  Q.  And I'll say without Turkey Creek, right?  And then let me

16  show you one last exhibit, and we'll be done looking at the

17  exhibits.  Exhibit 45 was an e-mail that Richard Stull sent to

18  JB Suddarth at Henderson, Don Moore at First Central, and you

19  were copied on that as well?

20  A.  Yes.

21  Q.  Okay.  And so when the bank -- well, I should look at the

22  date.  The date is March 27th, 2017, correct?

23  A.  Correct.

24  Q.  All right.  And that's just shortly after the prior date

25  that we talked about, March 22nd?

19-CV-01224-RBJ       Bench Trial - Day 5      04/16/2021     977

1   A.  Yes.

2   Q.  And when the bank was telling Henderson and First Central

3   Bank about its value information, it did provide a -- its own

4   collateral balances, correct?

5   A.  If you get it in front of me, I will agree with that.

6   Q.  Sure.

7   A.  Yes.

8   Q.  On this collateral analysis that was provided, this was,

9   again, for the Lardyn loan, correct?

10  A.  Correct.

11  Q.  So that doesn't include the North Turkey Creek property?

12  A.  Correct.

13  Q.  Right.  But what the discussion section says is the

14  approximate value of the assets is 8,786,000.  Do you see

15  that?

16  A.  Yes.

17  Q.  So it's close to that last value that we just took a look

18  at, right?

19  A.  It's close.

20  Q.  I'm not going to add that one to the board, but that value

21  wouldn't also include the North Turkey Creek property,

22  correct?

23  A.  Correct.

24  Q.  So getting back to what we've written down here, when it

25  came to the bank filing a proof of claim in bankruptcy, it

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5      04/16/2021     978

1    identified the value of the property as being $8,963,500.  Do

2    you see that?

3    A.  Yes.

4    Q.  When it came to the bank doing its own internal analysis,

5    including communicating with other banks that it wished to

6    participate in loans, it listed values as high as $14 million?

7    A.  Yes.

8    Q.  And the values that we saw going to Henderson State Bank

9    of 8.7 million, about $200,000 less than the $8.9 million on

10   the bankruptcy schedules, those did not include the Turkey

11   Creek property?

12   A.  Correct.

13   Q.  But if you added the Turkey Creek property, this 8.7

14   figure, that would go up to greater than $10 million.  Would

15   you agree with that?

16   A.  Yes.

17   Q.  Thank you.

18        MR. PULKRABEK:  No further questions of Mr. Gray.

19        THE COURT:  Okay.  I guess it's back to redirect.

20                     REDIRECT EXAMINATION

21   BY MS. OLDEMEYER:

22   Q.  Is Dodge, Nebraska, on the same time zone as Bridgeport,

23   Nebraska?

24   A.  No.  We're an hour different.

25   Q.  Which is Central?

                      Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    979

1    A.  We are.  Dodge is Central.  Bridgeport is Mountain.

2    Q.  With respect to Exhibit 44, do you recall looking at a

3    handwritten notation of approved at a special meeting?

4    A.  Yes.

5    Q.  Is Exhibit 1059 a special meeting?

6    A.  Yes.

7    Q.  So in Exhibit 1064, by 4/2017, had the Two Mile Ranch

8    bankruptcy been dismissed already?

9    A.  I don't recall the dates.

10   Q.  I'm going to -- Exhibit 1057, these are meeting minutes

11   from May 2nd, 2017.  Do you see those?

12   A.  March 2nd.

13   Q.  I'm sorry.  What did I -- March 2nd, 2017, correct.

14          MR. PULKRABEK:  Your Honor, I object.  I think this

15   is beyond the scope of my cross.

16          THE COURT:  Okay.  Overruled.

17   Q.  (By MS. OLDEMEYER) And in the -- are these loan meeting

18   minutes from March 2nd, 2017?

19   A.  Yes.

20   Q.  In there does it indicate that Lardyn Consulting has

21   applied for a loan at FirsTier Bank and indications are that

22   they will let them know by Tuesday or Wednesday of next week?

23   A.  Yes.

24   Q.  Did Lardyn Consulting, LLC get a loan from FirsTier Bank?

25   A.  No.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    980

1    Q.  And despite being denied for a loan at FirsTier Bank,

2    Farmers State Bank chose to proceed with a loan to Lardyn in

3    the total amount of $7.1 million, correct?

4    A.  Yes.

5    Q.  I'm looking for a specific entry.  I'm on page 8 of

6    Exhibit 143.  Do you know if Farmers State Bank, for purposes

7    of its proof of claim, adopted line 89 on Two Mile Ranch

8    General Partnership's schedules for intangibles and

9    intellectual property of $2.35 million?

10   A.  Yes.

11   Q.  By the time Farmers State Bank filed its proof of claim in

12   -- and we can look at that -- in February of 2017, did Farmers

13   State Bank have an appraisal from Gustavson & Associates for

14   the producing mineral interests?

15   A.  I believe so, yes.

16   Q.  And do you recall what the appraisal by Gustavson of the

17   producing mineral interests was?

18   A.  2.1.

19   Q.  Let's look at Exhibit --

20   A.  I don't remember.  That's from memory.

21   Q.  Yeah, there's a difference between producing and

22   nonproducing, correct?

23   A.  Yes.

24   Q.  So do you know what the appraisal said for the producing?

25   A.  I do not.

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    981

1   Q.  Exhibit 34, I'm on page 2.  First of all, this is a

2   document called a classified watch list, correct?

3   A.  Yes.

4   Q.  What is the significance of a borrower being on a

5   classified watch list loan report?

6   A.  This is a -- like, we know this is a workout loan where we

7   expect losses and are trying to identify those losses,

8   potential losses.

9   Q.  On page 2, Mr. Pulkrabek asked you about the total

10  collateral, or a similar page.  What's the margin for the net

11  collateral the bank determined on page 2?

12  A.  115,596.

13  Q.  And that's still a positive number, isn't it?

14  A.  It is.

15  Q.  So for sure you were going to be made whole, weren't you?

16  A.  No.  That would be nice if it worked that way.

17          MS. OLDEMEYER:  No further questions.

18          THE COURT:  Okay.  Thank you, Mr. Gray.  You're

19  excused and free to go.

20          Now, do you want to start another witness or take

21  your break here?

22          MS. OLDEMEYER:  Your Honor, I'm looking for my

23  notes, and this is just for purposes of the plan.  We have

24  up next Briana Lamphier, who's the appraiser for the

25  Gustavson appraisal.  She will testify remotely at

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    982

1    1 o'clock.  We have Darrell Kraupie.  He will not be more

2    than an hour total, I don't think.

3              THE COURT:  Okay.

4              MS. OLDEMEYER:  And then we'll potentially call two

5    more witnesses.  I'm still trying to decide whether to call

6    them.  The first is our defense expert who's serving as a

7    rebuttal expert to Ms. Patterson, and she was not called in

8    plaintiff's case in chief, so I will address that in a

9    minute.  And then potentially Mr. Hamik, if he's available

10   this afternoon.  So we want to address that one issue about

11   Ms. Patterson.

12             THE COURT:  Is there a dispute about it or not?

13             MS. OLDEMEYER:  Well, I would like to call her in

14   our case in chief.  And in anticipation of an objection,

15   what I did was try to streamline, because I know the Court

16   would like efficiency.  So I did file a designation of her

17   deposition transcript and would like to offer as Exhibit 181

18   that deposition transcript.  Again, if -- my understanding

19   of the law is it's within the Court's discretion whether to

20   allow the adverse party to call a retained expert who's been

21   deposed and who's been listed as a witness on the trial

22   list.

23             THE COURT:  Well, if that's your understanding of

24   the law, you will let me know what the law is if there is a

25   dispute.  I haven't heard yet whether he's even disputing

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021    983

1   this.

2          MR. PULKRABEK:  Yes, Your Honor.  I object to the

3   calling of both Ms. Patterson as well as a rebuttal to

4   Ms. Patterson.  This is going to be cumulative and a waste

5   of time to have multiple experts saying -- by the bank.

6          THE COURT:  Well, it's your expert.  Doesn't she

7   have good things to say for you?

8          MR. PULKRABEK:  She absolutely does, Your Honor.

9   You know, if you allow it, I will examine her.

10          THE COURT:  Well, okay.  Then there's a dispute as

11   to whether she's entitled to this.  What's your law that

12   says she is not?

13          MR. PULKRABEK:  I agree with Ms. Oldemeyer that

14   it's discretionary with the Court.

15          THE COURT:  Well, if you agree with that, then as

16   much as I hate to say this, I'll allow it.  I hate to say it

17   because you're just stringing it out, it seems to me.  But

18   whatever.

19          MS. OLDEMEYER:  Maybe I can work with --

20          THE COURT:  Your plan to get all this done in the

21   afternoon is unlikely to be successful.

22          MS. OLDEMEYER:  And I believe Mr. Forbes has

23   witnesses as well, Your Honor.

24          THE COURT:  Well, he might.  So like I said

25   yesterday, on you go.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5        04/16/2021    984

1              MS. OLDEMEYER:  Well --

2              THE COURT:  I think there are people in the

3    courtroom that would like to have this done and like to have

4    this behind them and like to go on with their lives.

5              MS. OLDEMEYER:  So for efficiency purposes we would

6    offer the designations of plaintiff's transcript

7    Exhibit 1081 as our party's designations of an opposing

8    party.  It's not hearsay under the hearsay rules according

9    to the research that I did.

10             THE COURT:  I'm not going to -- if you're going to

11   call this woman, then call her.

12             MS. OLDEMEYER:  Okay.

13             THE COURT:  Don't be giving me depositions to read.

14   You've already given me well over 100 exhibits to supposedly

15   read.  You want to call your next witness at 1 o'clock, so

16   we'll see you at 1 o'clock.

17             MR. FORBES:  Thank you, Your Honor.

18             MR. PULKRABEK:  Thank you, Your Honor.

19             THE COURT:  All rise.  Court is in recess.

20             MR. FORBES:  Just about the comment about going

21   today, I had anticipated based on what everybody said about

22   how much time they're going to take that we would not get to

23   my witnesses today.  They're all very short witnesses.

24   They're all just professionals that deal with Ms. York, and

25   I think it would be difficult to get them today.

                        Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5       04/16/2021    985

1          THE COURT:  I don't think she's going to finish

2     today.

3          MR. FORBES:  Thanks, Your Honor.  If she does,

4     though, that's -- I wanted to -- hopefully if we could -- if

5     we can't get them lined up for late afternoon, whether we

6     could bring them back on another day.  Just planting the

7     seed, Your Honor.

8          THE COURT:  So here's what Mary gave me.  Mary is

9     my judicial assistant.  She's not here today.  But I asked

10    her to see what we can do, because you folks weren't going

11    to finish today, about giving you two or three more days,

12    and here's what she said.  If McWhinney or Smoky Hill can't

13    or don't go, three days starting May 3rd, May 10th, or

14    May 17th.  Now, what that means is that we've got cases that

15    are set to go, McWhinney and Smoky Hill, both approved as

16    pilot cases, both jury trials, and in both cases they claim

17    they're going.  But we all know that you say you're going to

18    go, and then you sometimes don't.  But if those cases don't

19    go, that will open up potentially one of those dates

20    depending on which one doesn't go, but I can't tell you

21    today whether that's going to happen.

22          Then she says, three days on June 28th over the

23    current settings that week.  And then she says, the week of

24    June 28th we have the Doe case -- that's a case where the

25    plaintiff is known as Doe to be not identified publicly --

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      986

1   the Kazi case, the Vinnedge case, the Harless case, the

2   Vencel case; and the Fryer case.  Five cases set already on

3   that date.  But she says, and I agree, I think it's unlikely

4   any of the criminal cases will go.  Well, criminal would be

5   Harless, Vencel, and Fryer, but that leaves Doe, Kazi, and

6   Vinnedge.

7         And she says Doe has an interlocutory appeal.

8   That's true.  They filed an interlocutory appeal on a

9   qualified immunity issue, and that probably means Doe won't

10  go unless the Court of Appeals decides right away.  So that

11  leaves Kazi, which is a dispute between Kentucky Fried

12  Chicken and one of its franchisees, and Vinnedge, which is

13  an underinsured motorist case.  Those are two cases that

14  were moved to federal court under diversity of citizenship

15  jurisdiction.  Who knows if those cases are going to go or

16  not.  But we'd have to clear out five other cases to get you

17  in on June 28th.

18        And then she says our next time is three days on

19  August 30th.  Now, we already set the Lucky Shot case that

20  week, but we think it's going to settle.  I had reserved

21  that week because it's the week of the judicial conference.

22  But if I skip the judicial conference, then that opens up

23  August 30th.  I'm just telling you what we're dealing with

24  here.  Our situation is usually fairly booked, but since

25  March we've mostly been shut down on trials, and they've all

Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021      987

1    gotten set over and set over and set over like yours has

2    too.

3            So I'm just warning you that I can't necessarily

4    just say, hey, let's go.  I can't say let's continue next

5    Monday.  I've got a case starting Monday, a jury trial that

6    they say they need six or seven days for.  And I've told

7    them I won't even be around starting on Tuesday the 27th, so

8    they've got to finish in six days.  I can't tell them, okay,

9    we'll give you two days, and then we'll start them on

10   Wednesday, because then there's no way they can be finished

11   by the following Monday, and it's a jury trial.

12           And so that the non-lawyers understand, we can't

13   try a jury case jury trial for a while and then stop and

14   then come back in several weeks and finish it.  We can do

15   that on a bench trial.  It's not ideal, but we can do it.

16   We can't send jurors away, and then have them come back in a

17   few weeks.  Who knows what they're going to learn or do

18   during those weeks.

19           So we're kind of stuck, guys.  We'll do the best we

20   can for you.  If the Harris case set for next Monday were to

21   settle this afternoon, I would tell you that, and tell you

22   we can go next week.  But, you know, they insist they're

23   going.  It's a case about a basketball coach and the

24   Colorado athletic association and a dispute they've got.  So

25   there you go.  Anyway, we'll see you at 1 o'clock.

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ       Bench Trial - Day 5      04/16/2021     988

1          MR. FORBES:  Thank you, Your Honor.

2          MR. KEITHLEY:  Thank you, Your Honor.

3          MR. PULKRABEK:  Thank you, Your Honor.

4       (Break was taken from 11:57 a.m. to 1:21 p.m.)

5          THE COURT:  So can I assume that part of your deal

6    is that Ms. Oldemeyer is going to buy me a new bottle of

7    Advil because my right hand, arthritic already, is about

8    ready to fall off keeping up with her?

9          MR. PULKRABEK:  That's in the agreement, Your

10   Honor.

11         THE COURT:  Good.  Have a seat.  Congratulations to

12   all of you on reaching a settlement.  I'm not surprised, but

13   I'm delighted.  I will give you, if you want it, the

14   opportunity to put your settlement on the record.  But, of

15   course, you don't have to do that.  It's going to be totally

16   confidential, and I have no right to know what it is.

17   Sometimes people want to put their settlement on the record

18   just to cement it in, so tell me what you prefer.

19         MR. PULKRABEK:  Your Honor, we've agreed to keep

20   the terms confidential.

21         THE COURT:  That's fine.  Is there anything else

22   that anybody wants to put on the record?

23         MR. PULKRABEK:  Well, Your Honor, aside from

24   thanking you for your time and attention during this trial,

25   which we do appreciate, I'm sure I speak for everybody on

19-CV-01224-RBJ      Bench Trial - Day 5      04/16/2021    989

1   that, the settlement involves a payment to be made on or

2   before April 30th, and so we'd ask that you keep the case

3   open at least until that time, and then within two days

4   after that payment has been made we will file a stipulation

5   to dismiss the case with prejudice.

6           THE COURT:  That's fine.  Anything else?

7           MR. FORBES:  Just one, to share Mr. Pulkrabek's

8   thanks to the Court and also to your courtroom staff and

9   your clerks.

10          MR. PULKRABEK:  Indeed.

11          THE COURT:  Mr. Forbes, I picked on you quite a

12  bit, but you've got a thick skin.

13          MR. FORBES:  Your Honor, I've been married for

14  30 years this year.  You did a good job, but not the hardest

15  I've ever had.

16          MS. OLDEMEYER:  And I echo those thanks as well.

17          THE COURT:  Ms. Oldemeyer, we were just talking.

18  You had another trial here not too long ago, right?

19          MS. OLDEMEYER:  And I'm supposed to see you in

20  September, but I'm not sure you will welcome me.

21          THE COURT:  September.  My hand might recover by

22  then.

23          MR. KEITHLEY:  Your Honor, on behalf of Mr. Mark

24  Pauling and Two Mile Ranch, thank you for your time, and

25  thank you to the staff for their time and attention in this

                    Sarah K. Mitchell, RPR, CRR

19-CV-01224-RBJ        Bench Trial - Day 5      04/16/2021    990

1    complex case.

2              THE COURT:  Well, it is a complex case, and I can

3    tell you that my law clerks over here found it fascinating,

4    not just the issues, but just watching you lawyers do your

5    work and learning from that.  It's a wonderful opportunity

6    for them to see you guys do what you do.

7              And, Mr. Stull, way out there in back, 79 years

8    young you told me.

9              MR. STULL:  That's correct.

10             THE COURT:  You stay healthy, sir.  That's an

11   order.

12             MR. STULL:  I plan to.

13             THE COURT:  All right.  Then we'll be in recess.

14   Thank you all.

15        (The proceedings were concluded at 1:25 p.m.)

16

17

18

19

20

21

22

23

24

25

                          Sarah K. Mitchell, RPR, CRR

1                         <u>REPORTER'S CERTIFICATE</u>

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10          Dated this 13th day of May, 2021.

11

12

13

14          _____/s/ Sarah K. Mitchell_____

15                  SARAH K. MITCHELL
                   Official Court Reporter
16           Registered Professional Reporter
                Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                   Sarah K. Mitchell, RPR, CRR